IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ANYWHERECOMMERCE, INC. and BBPOS LIMITED | CIVIL ACTION FILE NO. |
| Plaintiffs, | |
| vs. | |
| INGENICO, INC., INGENICO CORP., INGENICO GROUP, SA, and INGENICO VENTURES SAS | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT

Plaintiffs AnywhereCommerce, Inc. ("AnywhereCommerce") and BBPOS

Limited ("BBPOS," and together, "Plaintiffs"), by and through their attorneys,

hereby file this civil action complaint against the above-named defendants (each, a

"Defendant"; collectively, or in any combination thereof, "Defendants"), and show

the Court as follows:

## I.    INTRODUCTION

1.    This is a business tort action for tortious interference and breach of

contract and theft of trade secrets against French payments technology behemoth,

Defendant Ingenico Group, SA (individually, or generally, "Ingenico," as the

context requires); its primary United States subsidiaries, Defendants Ingenico Corp.

and Ingenico, Inc.; and its France-based acquisition vehicle, Defendant Ingenico Ventures SAS.

2. The Ingenico Defendants tortiously interfered with Plaintiffs' relationships with First Data Corporation ("FDC" or, generally, "First Data"), First Data Merchant Services Corporation ("FDMS") (First Data's merchant acquiring business arm), and their affiliates and partners, giving rise to common law claims for tortious interference with contracts). Additionally, Defendants have thieved Plaintiffs' trade secrets and business plans, continuing to profit from that theft, giving rise to claims for misappropriating trade secrets and other rights/privileges at common law, under Georgia's Trade Secrets Act (O.C.G.A. §§ 10-1-760, *et seq.*), Massachusetts Trade Secrets Act (Chapter 93 of General Laws, Section 19), the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836, *et seq.*), and the Lanham Act (15 U.S.C. § 1125(a)), as well as giving rise to claims for breach of contract and unjust enrichment. Defendants also violated Georgia Deceptive Trade Practices Act (O.C.G.A. § 10-1-372(a)) and Georgia Fair Business Practices Act (O.C.G.A. §§ 10-1-390, *et seq.*).

## II. THE PARTIES TO THIS COMPLAINT

### A. Plaintiffs

3. Plaintiff AnywhereCommerce is a foreign corporation that is incorporated under the laws of the Canada Business Corporations Act as of July 15,

4851-8098-9314.2

2011. Its principal place of business in the United States is located at 4585 North Maroa Avenue, Fresno, CA 93704.

4.     Plaintiff BBPOS is a Hong Kong corporation. Its principal place of business is located at Suite 1903 - 1904, Tower 2 Nina Tower, No. 8 Yeung UK Road, Tsuen Wan, N.T., Hong Kong.

**B.     Defendants**

5.     Defendant Ingenico Inc. ("Ingenico GA") is a wholly-owned subsidiary of Defendant Ingenico Corp. (a Delaware holding company) that is organized and existing under the laws of the State of Georgia. It purports to be the successor-in-interest by merger to ROAM Data, Inc. ("ROAM"), a Boston-based mobile point of sale device supplier, pursuant to an Agreement and Plan of Merger dated December 13, 2017. Its principal place of business is located at 3025 Windward Plaza, Suite 600, Alpharetta, Georgia 30005.

6.     Ingenico Corp. ("Ingenico DE") is a wholly-owned subsidiary of Defendant Ingenico Group, SA (the French parent company for the payments technology conglomerate) that is registered to do business in Georgia, but is organized and existing under the laws of the State of Delaware. Its principal place of business is located at 3025 Windward Plaza, Suite 600, Alpharetta, Georgia 30005.

7. Defendant Ingenico Group, SA ("Ingenico Group") is a société anonyme that is organized under the laws of France with a principal place of business located at 28-32 boulevard de Grenelle, 75015 Paris, France.

8. Defendant Ingenico Ventures SAS ("Ingenico Ventures") is a société par actions simplifiée that is organized under the laws of France with a principal place of business located at 28-32 boulevard de Grenelle, 75015 Paris, France. Ingenico Ventures was formed to, among other things, acquire and hold ownership interests in ROAM. By 2015, ROAM was a fully-owned subsidiary of Ingenico Ventures.

## III. JURISDICTION & VENUE

9. This is an action under both state law and federal law, including the Defend Trade Secrets Act of 2016 and the Lanham Act, seeking to recover, among other things, compensatory damages, statutory damages, double damages, costs of suit, and reasonable attorney's fees.

10. Jurisdiction is based upon 28 U.S.C. § 1331, federal question, insofar as this case concerns claims under 18 U.S.C. § 1836(b), Misappropriation of Trade Secrets, and 15 U.S.C. § 1125(a), the Lanham Act.

11. This Court also has diversity over the state law claims under 28 U.S.C. § 1332. Plaintiffs are a dual American and foreign citizen and foreign citizen,

4851-8098-9314.2

respectively, and Defendants are citizens of different States and foreign states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

12.     Jurisdiction for violations of state law and state statutory claims may also be based upon 28 U.S.C. §1367(a), insofar as those claims are based upon a common nucleus of operative facts with Plaintiffs' federal claims, and the entire action commenced by this complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.

13.     Venue is proper under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.     FACTUAL BACKGROUND

### A.     The Strategic Partnership Of AnywhereCommerce And BBPOS

14.     Plaintiff AnywhereCommerce is in the credit card processing business. It was the first technology company to develop and market a mobile payment "dongle" that connects to the audio port of a wireless device (smartphone, tablet, PDA) and has since cornered the market on controlling the rights to all relevant patents related to mobile payment transactions done on smartphones/tablets.

15.     Plaintiff BBPOS is an mPOS[1] solution provider headquartered in Hong Kong. It is a leading innovator, designer, and manufacturer of end-to-end mobile

---

[1] "mPOS" means "mobile point of sale."

4851-8098-9314.2

point of sale ("POS") solutions. Utilizing various patents, BBPOS manufactured mobile POS terminals for AnywhereCommerce and others globally.

16.     Notably, much of the patented mPOS technology utilized by Plaintiffs was invented, developed, and patented through the collaboration and joint efforts of a group of engineers and payments entrepreneurs, associated with both BBPOS and AnywhereCommerce, doing business as "HomeATM" at the time, that came together in or around 2006. This group included, among others, (i) Ben Lo ("Lo") and Jimmy Tang ("Tang") of BBPOS, on the one hand, and (ii) Mitchell Cobrin ("Cobrin"), Michael Kron ("Kron"), and Kenneth Mages ("Mages") of the HomeATM d/b/a, on the other.[2]

17.     Early in its inception, AnywhereCommerce focused on creating scalable mobile payments processes, nationally, and winning customers in the United States, where these emerging mPOS technologies were first fully embraced.

18.     In 2012, AnywhereCommerce went global, even as its domestic supplier efforts continued. It soon began servicing foreign markets and signed various distribution agreements in First Data's Asia Pacific and Latin America regions as it pursued finalization of the written agreement to cover First Data's domestic mPOS supplier business. AnywhereCommerce is now a recognized,

---

[2] Mages, one of the inventors of certain relevant patents, was the first Chairman/CEO of what is now AnywhereCommerce. Lo, at times, was or performed the function of a CTO for AnywhereCommerce.

4851-8098-9314.2

global payments technology provider. As AnywhereCommerce's primary manufacturer and technology developer, BBPOS was a critical component of AnywhereCommerce's overall business plan.

19.    The resilient alliance between AnywhereCommerce and BBPOS (then operating from Canada and Hong Kong, respectively) withstood the test of time, in part, because their operations are complementary and philosophically aligned.

20.    Beginning in 2010, BBPOS licensed and then moved to sublicense certain rights to use technology and/or techniques owned or controlled by AnywhereCommerce or its affiliates incident to its core operations in manufacturing, distributing, and selling mobile payments processing products, devices, and services in and throughout China with a world-wide reach.

21.    The scope and limitations of BBPOS's licensing rights are evidenced, in part, by two contracts, namely: (i) that certain License Agreement and Non Competition Agreement dated March 18, 2010 (the "Original License"), by and between the Licensor, "HomeATM EPayment Solution," who is now AnywhereCommerce, and the Licensee, BBPOS; and (ii) that certain License Agreement and Non-Competition Agreement dated July 1, 2013 (the "Second License"), by and between the Licensor, 4361423 Canada Inc. ("436 Canada"), AnywhereCommerce's parent, and the Licensee, BBPOS.

4851-8098-9314.2

22.     Under the Original License, the Licensor granted to the Licensee "a
non-exclusive license to use the Intellectual Property Rights in the Region in relation
to the Products." *See* Original License at §2.1. The scope of the licensed rights
granted reads as follows:

> (1)     "Intellectual Property Rights" is defined as "trademark, design,
> or patent and other intellectual property rights of **DTMF technology**
> titled the **Apparatus and Method for Commercial Transactions**
> **Using a Communication Device**".

*See* §1.1 (emphasis in original).

> (2)     "Products" is defined as "the communication device using the
> DTMF technology".

*Id.*

23.     Years later, 436 Canada and BBPOS entered into the Second License,
which terminated and superseded the Original License as of an effective date of July
1, 2013, whereby 436 Canada granted to BBPOS a "non-exclusive license with a
right to sub-license to Sublicensees . . . to use and/or practice the Licensed Patent
Rights for the purpose of manufacturing, distributing and selling Products in the
Region." *Id.* at §3.1.

24.     With reference to an attached schedule of patented and patent-pending
technology (by patent/application numbers and applicable jurisdictions listed
thereon), "Licensed Patent Rights" is defined as follows:

> [T]he patents and patent applications owned by the Licensor or
> its Affiliate and listed in Exhibit-B attached hereto in the

4851-8098-9314.2

jurisdictions listed thereunder, together with all patents issuing from any listed pending patent application, including any future divisionals, continuations, continuations-in-part, reissues, re-examinations and extensions thereof, and all foreign counterparts of such applications and patents[.]

*See* §1.4.

25.     The Second License also identifies the parameters of permitted uses for the manufacture, distribution, and sale of "Products," meaning:

[A]ny and all hardware, software, systems, devices and methods that incorporate or are designed, manufactured or produced by the Licensee or its Affiliate, directly or indirectly, using the technologies and/or techniques encompassed within the Licensed Patent Rights and/or invention claimed in the Licensed Patent Rights[.]

*Id.* at §1.7.

26.     At § 9.2 of the Second License, the Plaintiff parties acknowledge the existence of the BBPOS's and ROAM's Engineering Development and License Agreement dated May 4, 2010 as amended August 15, 2010 (the "ROAM Sublicense"), a copy of which is attached hereto as Exhibit A; the Licensor "consents to such agreement" as of July 1, 2013 and further agrees not to grant to ROAM or Ingenico S.A. or their respective affiliates any rights to use the Licensed Patent Rights.

27.     Today, AnywhereCommerce (via 436 Canada) controls a growing international patent portfolio covering mPOS solutions utilizing handheld devices. This includes existing and future-anticipated devices with broad application and

4851-8098-9314.2

features, such as audio jack, bluetooth, EMV, smart cards, optical scanners, barcode readers, *etc.*, and user interfaces such as touch screen, fingerprint, proximity detectors, cameras, *etc.* The patent portfolio includes at least eleven United States patents and several international patents.

28.     BBPOS similarly maintains a robust patent portfolio related to the manufacture of mPOS devices.

29.     As a result, Plaintiffs AnywhereCommerce and BBPOS each control or hold rights to various patents and other intellectual property that, together, effectively lock up the manufacture and supply of mobile point of sale devices world-wide without infringing upon their respective patents or otherwise licensing the necessary rights from it to use such patented technology.

**B.     ROAM Strikes Up Relationships With Plaintiffs**

30.     ROAM was a technology start-up based out of Boston, Massachusetts that was founded in 2005 and led by Will Wang Graylin ("Graylin"). It had a mobile commerce platform that was directly competitive with the AnywhereCommerce/BBPOS strategic partnership. However, it was nevertheless dependent upon use of Plaintiffs' patents and intellectual property, consisting of mobile card readers, software development kits ("SDK's"), application program interfaces ("API's"), a mobile payments engine, and other services. This relationship was set forth in the ROAM Sublicense agreement.

4851-8098-9314.2

31.     As of the effective date of the ROAM Sublicense, the Original License

was in effect by and between HomeATM/AnywhereCommerce, on the one hand,

and BBPOS, on the other, and the sole source of BBPOS's licensed rights to use the

Intellectual Property Rights.

32.     Section 1.1 of the ROAM Sublicense, as amended, states:

> The Partner hereby grants to the Company a worldwide,
> perpetual, fully-paid license to freely use the Partner Intellectual
> Property to make, have made, develop, have developed, use, sell,
> offer for sale, import and distribute the Products[3], any portion
> thereof, or any products similar to or based upon any Products.
> For purposes of this Agreement, "Partner Intellectual Property"
> shall mean: (a) any and all patents and patent applications
> relating to the Products, including without limitation US Patent
> Application Number 12/767,831[4] for secure audio coupled card
> swiper filed on April 27, 2010 with the United States Patent and
> Trademark Office (the "Patent Application") and any patents
> issuing on the Patent Application, including (i) any reissues,
> renewals, reexaminations, substitutions or extensions thereof and
> foreign equivalents of the foregoing; (ii) any claim of a
> continuation-in-part application or patent that is entitled to the
> priority date of, and is directed specifically to subject matter
> specifically described in, the Patent Application; (iii) any foreign
> counterpart thereof (including PCTS); and (iv) any
> supplementary protection certificates and any other patent term
> extensions, restorations and exclusivity periods and the like of

---

[3] Per Schedule I, "Products" refers to the "Encrypted Circle Swipe reader. .
.[connecting] from the audio jack of a mobile device or PC, this was developed by
the Partner, and including any variance of this design" and "EMV capable POS unit
with Bluetooth interface, sometimes referred to as the "BBPOS" currently
completing certification."

[4] This application refers to BBPOS's US Patent No. 8,336,771 (payment card
terminal dongle for communications devices), which is technology at issue in the
Original License.

4851-8098-9314.2

the Patent Application; and (b) any copyrights, trademarks, trade names, trade secrets, knowledge, data and information owned or controlled by the Partner relating to the Products.

33.     ROAM Sublicense § 6.1 provides:

Both parties agree to treat the other's Confidential Information (as defined below) as confidential, to take all reasonable measures to protect and prevent the disclosure of and/or unauthorized use by third parties of the other parties' Confidential Information, to exercise at least the same degree of care exercised for the protection of its own Confidential Information, and to not use Confidential Information other than for its intended purpose under this Agreement.

34.     Section 4.3 of the ROAM Sublicense provides:

The Company agrees to indemnify and hold [BBPOS] harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Company or arising out of or resulting from any claim brought by a third party against [BBPOS] as a result of or relating to any actual or alleged breach hereof by the Company.  In the event of any such claim, [BBPOS] agrees to notify the Company promptly of the claim and to permit the Company at the Company's expense, to assume control of the defence (sic) thereof with counsel of the Company's choosing, and cooperate with the Company in such defence (sic) at the Company's expense.

35.     Under §1.2 of the ROAM Sublicense, the sublicense granted therein explicitly states that it is not transferable or assignable "in event a sale of the Company to a competitor with its own POS products" – unless prior written consent is given by BBPOS.

36.     As the inventors, licensors, developers, applicants, and/or owners of the intellectual property and trade secrets handled as described herein, BBPOS invested substantial time and money into developing the information, data, and work product that it licensed to ROAM.

37.     Access to BBPOS's trade secret information is restricted by both physical and electronic means in accordance with prevailing industry standards, including locks, password protections, the installation of security software, and the use and enforcement of company security procedures and protocols.

38.     Moreover, BBPOS uses commercially reasonable efforts in maintaining and safeguarding the safety, security, and confidentiality of its own confidential intellectual property and trade secrets in accordance with prevailing industry standards, including requiring the execution of non-disclosure agreements and confidentiality agreements before disclosing the same to third-parties.

**C.     Ingenico Acquires A Controlling Interest In ROAM And Thieves and Continues to Thieve Trade Secrets And Processes Belonging To Plaintiffs**

39.     Founded in 1980, Ingenico is a significant manufacturer and seller of card-based, electronic POS payment terminals.   Within that space, Ingenico maintained a relatively steady focus on supplying, to both countertop retail and multilane large retail merchants, the necessary payments terminals to process *in-store* and later online electronic payments.  Prior to the theft detailed herein, Ingenico

largely ignoring the mobile payments space. Indeed, a significant element of the theft has only been consummated in and post 2017, with its final merger into ROAM.[5]

40.    As acknowledged in its 2017 Registration Document, up until 2014, Ingenico had little interest in, and clearly was not operating to capacity, if at all, in the smaller niche mobile commerce market, involving the supply of mobile card-readers and mPOS solutions to merchants and merchant acquirers that Plaintiffs AnywhereCommerce and BBPOS had led.

41.    Ingenico acquired a non-controlling 43.92% ownership interest in ROAM in November 2009. The investment was led by two Ingenico executives, Christophe Dolique and Vince Tallent ("Tallent"), who created and managed the newly formed Ingenico Ventures, as a mobile commerce acquisition vehicle for the company.

42.    In conjunction with the investment, Tallent joined ROAM's founder, Graylin, as the other member of ROAM's board of two. By 2011, ROAM had nearly

---

[5] *See* Ingenico 2017 Registration Document at 6:

> Ingenico embarked upon its technological transformation in 2006. Until 2014, the Group focused on the acquisition of technology linked to in-store and online transaction management.

4851-8098-9314.2

run out of cash and was on the verge of bankruptcy, according to Graylin and others.[6] Subsequently in 2011, Ingenico proposed investment of a total of $50 million in ROAM, including a proposed acquisition of Plaintiff BBPOS (unbeknownst to AnywhereCommerce at the time).[7]

43.    Indeed, while feigning some interest in acquiring AnywhereCommerce since first meeting AnywhereCommerce's Cobrin in early 2010, Graylin also targeted for acquisition BBPOS.  However, ultimately, rather than actually paying full value for the trade secrets belonging to Plaintiffs, Ingenico simply satisfied itself with the theft of those trade secrets.

44.    On February 6, 2012, Ingenico closed on an investment of about $48 million in ROAM, which secured Ingenico Ventures a controlling interest of 83.63% in ROAM.  With this controlling interest, ROAM now fell directly within the purview of Ingenico Group's newly-created "Central Operations division" and was moved thereto, internally, for Ingenico Group's direct oversight as a "business[] operated on an international basis and monitored at Group level."[8]  Ingenico's

---

[6] See Amended Derivative Complaint against Ingenico SA, et al. dated November 29, 2012 pending in the Massachusetts Superior Court in Suffolk at docket no. 12-4032 (the "ROAM Derivative Compl.") at ¶¶ 34-39.

[7] See ROAM Derivative Compl. at ¶¶ 39-42.

[8] See Ingenico 2011 Registration Document at 76.

Philippe Lazare ("Lazare") and Christopher Coonen were added to the now expanded board of three; Ingenico's Christopher Rotsaert ("Rotsaert"), was appointed as Vice President of Products.[9]

45.     Ingenico's Lazare, in particular, played an active role in overseeing Ingenico's U.S. operations, while simultaneously controlling Ingenico Group. According Ingenico's 2017 Registration Document at 105, Lazare was both a director of Ingenico GA until December 12, 2017 and a director of ROAM until June 8, 2015; in France and elsewhere, Lazare was a director of Ingenico Group from March 15, 2006 onward, was appointed Chief Executive Officer of Ingenico Group on July 17, 2007, and then also contemporaneously assumed the role of its Chairman on January 20, 2010, which role continued until near the time of this Complaint.

46.     Under the watchful eye and direction of Lazare and others in France, Ingenico installed Rotsaert as Vice President of Products for the illegal purpose of improperly accessing and stealing ROAM's technology and trade secrets, including BBPOS's designs and trade secrets related to the products it was making for ROAM.[10]

47.     According to court filings:

---

[9] *See* ROAM Derivative Compl. at ¶¶ 44-45.

[10] *See* ROAM Derivative Compl. at ¶¶ 48-51.

In the summer of 2012, Graylin learned that Rotsaert transferred key technology, knowhow and design information of ROAM products to Ingenico's research and development team in France, including designs and trade secrets from ROAM's exclusive vendor BBPOS Ltd, without any commercial agreement in place between ROAM and Ingenico. In July 2012, Rotsaert organized a multi day visit with Ingenico engineering personnel to interview BBPOS personnel on design and trade secrets of the products BBPOS was making for ROAM. The documents requested by Rotsaert included schematics, data output format files, design files, and even source code. All files except for source code were turned over to Rotsaert. Further detailed interviews were conducted by Rotsaert and Ingenico engineers to deduce the trade secrets used in the making of ROAM's products by BBPOS. When confronted by Graylin on August 29, 2012 to stop transferring IP to Ingenico, and to catalog the information Rotsaert obtained, Rotsaert forwarded the files he obtained and admitted that "the most interesting document is the schematics. . ." Rotsaert also admitted to the Q&A sessions between Ingenico and BBPOS to obtain undocumented trade secrets.[11]

48. Ingenico, through Rotsaert, under the direction of Lazare and Coonen, then misused the stolen technology and trade secrets, and converted the same to Ingenico's exclusive benefit without any reasonable value in return, to develop a directly competitive EMV[12] reader.[13] This misuse is ongoing.

---

[11] *See* ROAM Derivative Compl. at ¶ 48.

[12] EMV stands for Europay, MasterCard, Visa; it is the global standard for chip-based debit and credit card transactions.

[13] *See* ROAM Derivative Compl. at ¶¶ 49-51.

4851-8098-9314.2

49.    The foregoing constitutes an acknowledged and *continuing* theft of BBPOS's trade secrets by Ingenico Group and Ingenico Ventures with the assistance of ROAM's then-newly appointed executive, Rotsaert, undertaken with Graylin's knowledge (if not consent) as ROAM's lame-duck Chairman of the Board and CEO.

50.    The foregoing also constitutes a breach and *continuing* breach (acknowledged by no less than two ROAM executives) of the ROAM Sublicense at § 6.1.

51.    Said breach entitled and *continues* to entitle BBPOS to indemnification by Ingenico GA of all related losses, per § 4.3 of the ROAM Sublicense.

52.    Though the breach began in the summer of 2012, the breach is in fact ongoing and continues to this day, and Plaintiffs are presently damaged and continue to be damaged to this day.  The breach has damaged BBPOS insofar as Defendants' acts have caused a direct diversion of profits from BBPOS to ROAM/Ingenico Ventures/Ingenico Group or Ingenico GA and also a loss of royalties that both Plaintiffs charge to others to use the thing misappropriated.  This breach and this loss are continuing.

53.    Ingenico has since fully consummated its theft of Plaintiffs' trade secrets by fully acquiring ROAM.  Ingenico Ventures ultimately decided to close out the remaining ROAM minority interests, acquiring 100% of the company as its

4851-8098-9314.2

fully-owned subsidiary by early 2015.[14]  Defendants failed to secure permission at this time for their wholesale and continuing theft.  Pursuant to an Agreement and Plan of Merger dated December 13, 2017, ROAM merged with and into the surviving entity, Ingenico GA.  Defendants once again failed to secure permission at this time for their wholesale and continuing theft.

**D.    Ingenico Feigns False Interest In AnywhereCommerce To Illicit AnywhereCommerce's Sensitive Information And, Eventually, Destroy It**

54.    The foregoing presents the backdrop and buildup to the unjustified and malicious tortious interference by Defendants in Plaintiff AnywhereCommerce's contractual and prospective business opportunities with First Data and others.

55.    Through the intentional and malicious misuse of the confidential information of AnywhereCommerce, beginning as early as 2010, Defendants were able to complete their improper interference in 2015.

1.    <u>ROAM & Ingenico Usurp AnywhereCommerce's Mobile Licensing Plans</u>

56.    For, at least, two years, ROAM's Graylin kept up a steady stream of communication with Anywhere Commerce's Cobrin, a founding member of the company, with vague promises of a potential equity investment or merger by,

---

[14] *See* Ingenico SA's Consolidated Financial Statements dated December 31, 2014.

4851-8098-9314.2

through, or into ROAM and/or Ingenico in exchange for periodic access to AnywhereCommerce's confidential, proprietary, and sensitive business materials.

57.     These discussions were conducted through primarily Cobrin and Kron on behalf of AnywhereCommerce and Graylin and John Coloe ("Coloe") for ROAM. Discussions included a proposed acquisition of AnywhereCommerce by Ingenico, a merger with ROAM, and assorted cross-channel revenue opportunities.

58.     On February 23, 2010, Graylin advised Cobrin that "Ingenico showed interest in HomeATM, they have not explore (sic) the on-line ecommerce market for debit, but are open to new ideas," further stating that any "M&A or Investment activities" would need to involve the Ingenico appointees to ROAM's board, which could take time, but that he would follow up with the head of strategy.

59.     At some point thereafter, ROAM/Ingenico soured on AnywhereCommerce, but continued to hold discussions for the purposes of better understanding Anywhere Commerce's strategic mPOS plans – that is, so as to better adopt them and compete against them. One of those plans included the manufacture and sale of a mPOS card reader that interfaced with mobile devices through the audio jack – a plan that was disclosed to Graylin, and then stolen.

60.     After inviting ROAM to make a proposal for mobile device licensing through AnywhereCommerce, and putting Graylin in direct contact with Lo/BBPOS to discuss the technological details, Graylin decided to cut out the middle man, or

AnywhereCommerce, and manufacture its own device through BBPOS. Giving some false explanation for not licensing the AnywhereCommerce technology, he went about licensing the exact same technology indirectly, as it turned out, from BBPOS.

61.     All the while, however, ROAM was thieving AnywhereCommerce's idea for building an audio jack reader with BBPOS, unbeknownst to AnywhereCommerce, then debuting AnywhereCommerce's idea in the market within months.

> 2.     AnywhereCommerce's     Dead-End     Discussions     with
>         ROAM/Ingenico Continue

62.     Meanwhile, by May 2010, revenue-sharing opportunities were being explored in greater depth, including the feasibility of a hardware/software/gateway offering to market. The parties ultimately consummated a reseller agreement to more formally pursue these opportunities.

63.     As the two companies worked on several reseller initiatives, under the guise of advancing AnywhereCommerce's interests with Ingenico while in Paris, Graylin reached out to Cobrin to request AnywhereCommerce's sensitive information. Accordingly, on November 14, 2010, Cobrin advised Graylin:

> We will begin to accumulate the information discussed. I would like to execute an NDA with Ingenico, can you please arrange.

64.     Graylin thanked him by email later that day, adding:

Don't forget the projections, i (sic) understand it is hard to project anything longer than 6 -10 months. Also a detailed list of IP granted or filed, with specific patent numbers for each territory filed.

65.    On January 25, 2011, Graylin emailed Cobrin and Kron, noting the "good start to 2011 and lots of changes," and requesting a call to discuss how the companies could help each other grow. Cobrin immediately accepted Graylin's suggestion and a call was set up for January 27, 2011.

66.    That day on February 3, 2011, Graylin confirmed that he was seeking Series B financing and represented that he was willing to discuss opportunities with AnywhereCommerce. Per Graylin's request, Kron emailed Graylin on February 4, 2011 a copy of a patent abstract. In response later that same day, Graylin noted that the information supplied related to an original patent filed in 2004 by Harry Hargens for internet PIN debit, inquiring whether "there are any other patents granted or pending right now?"

67.    Unbeknownst to AnywhereCommerce, ROAM was growing concerned with Ingenico's insufficient capitalization of its operations, inaction, and general lack of interest, upon belief. Apparently, by 2011, the company had nearly run out of cash and was on the verge of bankruptcy, according to Graylin and others.[15]

---

[15] *See* ROAM Derivative Compl. at ¶¶ 34-39.

4851-8098-9314.2

68.     The repeated and specific patent information requests to AnywhereCommerce were being peppered by ROAM at or around this time.

69.     Apparently, ROAM's and Ingenico's on-going due diligence efforts relating to a BBPOS acquisition had come to reveal certain serious questions regarding the validity of the ROAM Sublicense and the quality of sublicensed rights granted thereunder by BBPOS derived from "HomeATM" in the production of ROAM's product lines.

70.     Thus, having uncovered the IP infirmity, as a condition to closing on a second round investment (first promised by Ingenico in August 2011), Ingenico extracted from Graylin an agreement to indemnify any losses associated with his failure to secure a perpetual license between BBPOS and HomeATM for certain intellectual property, thereby providing ROAM (and its soon-to-be majority investor, Ingenico) stability in the sublicense of this intellectual property from BBPOS within sixty days of closing.[16]

71.     In mid-November 2011, while Graylin was still in Paris with Ingenico, he reached out to Cobrin again seeking AnywhereCommerce's sensitive business information, including information specifically related to the BBPOS/ROAM

---

[16] *See* Graylin's Complaint against Ingenico SA, *et al.* dated September 13, 2013 pending in the Massachusetts Superior Court in Suffolk at docket no. 13-3271 (the "Graylin Enforcement Compl.") at ¶¶ 28-29.

4851-8098-9314.2

licensing problem. Telling Cobrin that he was closing $40M + and <u>wanted to "start pitching" AnywhereCommerce to Ingenico</u>, Graylin requested biographies for Cobrin and Kron, information regarding the corporate structure of the business, an overview of AnywhereCommerce's patents and pending patents with jurisdictions of coverage (*i.e.*, the real targeted material), revenue forecasts, and an executive summary.

72.    This was just a couple months in advance of completing the second round investment by Ingenico in ROAM on February 6, 2012.

73.    Pursuant thereto, Graylin agreed to indemnify any losses associated with his failure to secure a perpetual license between BBPOS and HomeATM for certain intellectual property within sixty days of closing.[17]

74.    By April 2012, ROAM was still actively pursuing an acquisition of BBPOS. Graylin was actively under pressure to avoid the personal indemnity exposure extracted by Ingenico should he fail to obtain a perpetual license solution from "HomeATM" for the IP infirmities uncovered with the BBPOS product line.

75.    At this time Graylin advised AnywhereCommerce of its acquisition intentions regarding BBPOS, noting, however, "after significant legal DD by our attorneys, we have discovered a few items related to the BBPOS IP that I want to discuss with you guys[.]"  These conversations did not resolve by way of any

---

[17] *See* Graylin Enforcement Compl. at ¶¶ 28-29.

extension of a perpetual license. The failure to obtain perpetual license forced Defendants to simply thieve what they needed; it also forced them in the coming years to maliciously and without justification undercut Plaintiffs' business relationships, as discussed below.

### E. Building The Valuable First Data Relationship

76. First Data is a financial services company presently headquartered in Atlanta, Georgia. It got its start as one of the nation's first processors of VISA and MasterCard bank-issued credit cards. During the 1980s, it was acquired by American Express. Then, in 1992, FDC spun off from American Express and went public.

77. In or around 2002, First Data operated in four business segments: payment services, merchant services, card issuing services, and emerging payments. FDC acquired TASQ Technology Inc. ("TASQ") in March 2001, ushering in a period of accelerated expansion for the company.[18]

78. In relevant part hereto, First Data's merchant services segment was comprised of FDMS, a provider of merchant credit and debit card transaction processing services in the United States, including, among other things, the supply and deployment of POS devices and other products and services used by merchants

---

[18] *See* "First Data Corporation 2002 Annual Report (Form 10-K)". <u>U.S. Securities and Exchange Commission</u>. March 18, 2003. Retrieved December 3, 2018.

to accept electronic payment transactions through FDC's wholly-owned subsidiary, TASQ.

79.     TASQ provides point of sale devices and other equipment necessary to capture credit, debit, ATM, check, Internet and smart card transactions for First Data's merchant business and other partners by entering into development and services agreements with suppliers, such as Ingenico and, formerly, Plaintiff AnywhereCommerce, for the products necessary to so operate.

80.     Beginning in 2008 and continuing through 2015, AnywhereCommerce actively negotiated or performed in accordance with the terms and conditions of a purchase and service agreement that it ultimately consummated with First Data in September 2012, under which it supplied FDC (via its developer-subsidiary, TASQ) with mobile "PEDs" (or PIN entry devices) and other mobile commerce solutions, manufactured by its strategic partner, BBPOS.

81.     Over this period, AnywhereCommerce, and in particular Cobrin, AnywhereCommerce's First Data account manager, devoted a significant amount of time and energy in developing this and other strategic partnership opportunities with First Data and its affiliates on behalf of AnywhereCommerce, all stemming from his earliest discussions in 2008 with FDMS about mPOS hardware production and service opportunities.

82.     In May 2010, AnywhereCommerce had continued to make steady progress towards consummating a distribution contract with First Data, FDC, and/or TASQ.

83.     By February 2012, AnywhereCommerce expected to soon ink a deal whereby AnywhereCommerce would function as First Data's exclusive (or nearly so) hardware supplier for all of its mPOS products (which would be handled by and funneled through FDC's subsidiary, TASQ) for the implementation of First Data's software and payment gateway provider at the time, Apriva.

**F.     AnywhereCommerce Inks A Deal With First Data**

84.     By July of 2012, AnywhereCommerce had developed three mPOS card readers, namely, the Rambler, Rover, and Nomad (with the latest Nomad device nearly ready for launch).  AnywhereCommerce was also working on a particular mPOS device for Bank of America, a "BAM Bento," in anticipation of consummating the domestic supplier deal with First Data.  The BAM Bento, in fact, garnered AnywhereCommerce a statue of recognition from Bank of America.

85.     On September 27, 2012, AnywhereCommerce and FDMS entered into a Purchase and Services Agreement for the supply of mPOS hardware within the United States.  The parties also agreed to a Statement of Work dated September 27, 2012 addressing the pricing structure that would govern the supplier arrangement.

4851-8098-9314.2

86.     Performance on the contract had long been underway.  Just days after consummating the deal, on November 1-8, 2012, AnywhereCommerce exchanged correspondence with First Data and others regarding its production of readers for Bank of America and gave a status update for the "BAMS Bento" shipment in light of Hurricane Sandy: 500 units were delivered to TASQ with 50 units being delivered to Bank of America.

87.     On February 20, 2013, First Data supplied AnywhereCommerce its request for proposal ("RFP") for Mobile PEDs for its EMEA region.  On August 8, 2013, AnywhereCommerce also received an invitation from First Data to participate in a live auction for its signature "POGO" devices with a magnetic stripe reader ("MSR").  AnywhereCommerce participated in both opportunities.

88.     First Data's RFP recognized AnywhereCommerce's rights to the patented audio-jack interface technology in its RFP.  It asked bidding parties to explain the basis of their rights to use this technology if the proposed interface would be by audio-jack.

89.     In mid-October 2013, AnywhereCommerce received another invitation from First Data to participate in a RFP via Ariba eSourcing to provide MSR devices globally.  AC participated in the RFP and submitted information for all available countries except for the UK (*i.e.*, Ireland, Poland, Greece, Germany, India, Australia,

Hong Kong, Singapore, Malaysia, Brazil, Mexico, and Canada), with an auction slotted to take place on December 11.

90.    In the midst of several pending RFPs, on or around January 16, 2014, First Data and AnywhereCommerce entered into "Amendment No One" dated January 16, 2014 to the Purchase and Services Agreement.  The parties also executed "Amendment No One to the Statement of Work Number One" on January 16, 2014, which provided new sweetheart pricing (to be retro-calculated from October 1, 2013) for AnywhereCommerce's entire product line for First Data, but especially deeply discounted the Rambler device, which was to remain in force for a period of eighteen months.

91.    The discounted pricing was as follows: (i) For POGO, Rambler2 and Ramble3 Prices $11.99/unit 0-250,000 and $10.99/unit 250,000+; (ii) BAMS Bento Reader Prices $16.75/unit 0-50,000, $16.20/unit 50,000 -100,000, and $14.73/unit 100,000+; (iii) Walker Prices $34.46/unit 0-250,000 and $27.75/unit 250,000+; and (iv) Nomad Prices $84.99/unit 0-250,000 and $73.90/unit 250,000+.

92.    Meanwhile, the RFP process was refreshed in April 2014 with updated submissions due to First Data on April 16, 2014.  On May 29, 2014, First Data informed AnywhereCommerce that it had been included in the final stages of the sourcing process and invited AnywhereCommerce to participate in an eAuction on June 11, 2014.

93.     On June 18, 2014, First Data requested pricing for a contactless reader for the Nomad 2.0 or Walker devices, which AnywhereCommerce had indicated would be ready "late Q3, early Q4." Upon Cobrin's follow up, First Data advised:

> We have halted temporarily the communication with selected suppliers due to particular business decisions regarding POGO.
>
> Specifically - in your case - we are pleased to continue business-as-usual collaboration with your company in the markets where you were already established as FD supplier.

94.     Meanwhile, on May 2, 2014, AnywhereCommerce received an invitation from First Data to submit pricing consistent with the newly negotiated sweetheart pricing structure for a POGO RFP for the U.S. market, which it did.

95.     Over the course of its dealings with First Data and its affiliates, AnywhereCommerce performed satisfactorily.

96.     As of April 2014, Ingenico had been identified to AnywhereCommerce as a vendor of First Data (regarding a 2014 client conference hosted by First Data). Nonetheless, AnywhereCommerce long knew Ingenico to be a large and influential supplier for First Data respecting its need for countertop retail and multilane large merchant retail payment solutions.

97.     Unaware of Ingenico's machinations behind the scenes designed to eventually freeze AnywhereCommerce out of its mPOS niche, as further discussed below, AnywhereCommerce relentlessly pursued – *over a period of years* – and ultimately <u>earned</u> its preferred mPOS supplier status with First Data.

4851-8098-9314.2

98.     This extraordinary expenditure of time and effort was already paying dividends by 2015. The relationship was lucrative for AnywhereCommerce and cost-effective for First Data's direct and indirect mPOS merchants, given the sweetheart pricing deal negotiated by First Data and the existing mPOS infrastructure keyed to AnywhereCommerce and its existing and future mPOS product lines.

99.     Indeed, due to the wide-ranging features and characteristics of even the most comparable mPOS product lines (attributable to manufacture, material, supply or the like), which, in turn, require individualized customization and integration solutions to properly interface with applicable API, best practices dictate using as few as possible hardware suppliers/manufacturers within any given function area. To do otherwise is logistically complex and an unnecessary waste of time and resources.

100.    AnywhereCommerce's historical sales during the duration of the First Data relationship achieved levels of roughly 10,000 to 15,000 units per month. Sales numbers were very strong in 2014 through 2015 with no apparent new risk factors or adverse indicators to depress sales forecasts beyond.

101.    In addition to a demonstrable increasing demand for these devices (as evidenced, in part, by its actual sales numbers), AnywhereCommerce expected its gross margins on the mPOS hardware sales to substantially increase in the immediate

4851-8098-9314.2

and near future. AnywhereCommerce anticipated this increase due to a number of factors, including the natural evolution of product price-point (with older, less expensive products giving way to newer and more expensive technology and growth of value-added services), an ever-increasing penetration into the market (both geographically and in terms of targeted merchant base to include a new micro-merchant segment), and increase in third party sales attributable to the reputational and credibility boost of performing in such an important role for First Data.

102. From mid-2014 through 2015, AnywhereCommerce aptly and ably adapted to rapidly changing market conditions affecting product rollout and innovation; indeed, this period was one of the most disruptive and transformative years in the payments industry in nearly 40 years.

103. As more U.S. merchants worked towards adoption of the EMV security standard as of October 1, 2015, they were forced to order new EMV-compliant terminals and devices. The forced infrastructure reboot coincided with emerging contactless payments technology enabled by near-field communication ("NFC") chips that are typically embedded in physical credit or debit cards, but increasingly also reside in wearable devices, smartphones, and other devices, as a clear preferred mobile acceptance technology.

104. Thus, as the rise in demand for EMV-compliant mPOS hardware, generally, peaked in advance of the October 1, 2015 deadline, suppliers intensified

efforts to rollout NFC-enabled devices to meet the artificially stimulated demand for new terminals and devices.

105.   Plaintiffs are informed and believe and thereon allege that AnywhereCommerce's development and eventual rollout of NFC-enabled devices was consistent with or better than that of similarly situated mPOS hardware suppliers at the time and, in relevant part, *substantially identical* to the capacity of Ingenico, who, upon acquiring ROAM, relied on its theft of Plaintiffs' trade secrets by way of ROAM/BBPOS.

106.   Meanwhile, AnywhereCommerce was still awaiting the official results of its second round bidding in First Data's online POGO RFP auction.   Plaintiff AnywhereCommerce is informed and believes and thereon alleges that its bidding in comparison to the other second round invitees was (i) the lowest (patently, given the steeply discounted Rambler and Walker lines, as well as latently, considering the comparable integration savings to be had under the existing mPOS infrastructure); (ii) the most qualified (having an established track record of success with First Data in supplying mPOS products over a period of years); and (iii) the most invulnerable to patent infringement claims in the manufacturing and production of mPOS readers.

## G.   The Shoe Drops

107.   By August 21, 2015, however, it was clear that First Data would not be acknowledging AnywhereCommerce as winning bidder for the POGO RFP

statement of work. Instead, AnywhereCommerce's coveted position would go to Ingenico.

108. Indeed, after having acquired a controlling interest in competitor ROAM and having begun integrating its mobile solutions into its U.S. operations, it is believed that Ingenico, in response to its knowledge of Plaintiffs' business plans and on the back of its theft of Plaintiffs' trade secrets, began bundling and discounting products and services to unfairly inflate its profits and shut out competition from AnywhereCommerce and similar others in the mPOS space, generally, and as a mPOS supplier for First Data, specifically.

109. Respecting the decision to cut out AnywhereCommerce, Dan Bobier of First Data told AnywhereCommerce's Cobrin that the decision was "above his level" but "was not a product issue."

110. Cobrin then reached out to his mentor, and AnywhereCommerce advisory board member, OB Rawls ("Rawls") who also worked at First Data at the time. Although not directly involved in the POGO RFP bidding or oversight of the AnywhereCommerce relationship, Rawls promised to look into it.

111. Over the course of several conversations and after some in-house digging by Rawls, Rawls advised Cobrin that AnywhereCommerce's preferred mPOS supplier status was awarded to Ingenico for "political reasons" internally and

confirmed that the decision was "not a product issue, delivery issue, or certification issue."

112. Thereafter, AnywhereCommerce's viable First Data opportunities had all dried up once Ingenico took hold of First Data's mPOS needs. It lost its lucrative mPOS supplier position, merchant referral opportunities, and preliminary investment interest expressed by FD Ventures after meeting with Ben Love and others in Atlanta to discuss a possible equity investment in AnywhereCommerce.

113. The acts and omissions of Defendants constitute a tortious interference with AnywhereCommerce's business relationship with, among others, FDC, FDMS, TASQ, First Data Cono Sur SRL ("FD Argentina"), First Data (China) Co., Ltd. ("FD China"), RapidConnect, TeleCheck Services, Inc. ("TeleCheck"), First Data Singapore (PTE) Ltd ("FD Singapore"), and FD Ventures, among others.

114. This interference was done without justification and with one or more improper, illegal, and unacceptable motives, including misappropriating Plaintiffs' trade secrets, misappropriating its confidential business strategies and know-how, and maximizing profits and market power at the expense of AnywhereCommerce and to the detriment of merchants and merchant acquirers in this mobile commerce space.

115. Defendants' tortious conduct has also interfered with AnywhereCommerce's prospective business relationships with others. For

example, AnywhereCommerce had opportunities to be the mPOS supplier of many other groups, opportunities which were usurped by ROAM/Ingenico, including with PayPal, Inc., YUM!, Wells Fargo, Bank of America, INVENSTAR, Banco Azteca, and TAXIPASS, among others.

116. Absent Defendants' interference, the foregoing relations were reasonably likely to develop. In fact, these include entities for which AnywhereCommerce had significant discussions with and, in fact, requested protected account status from ROAM for the supply of mPOS solutions that had been thieved and usurped by Defendants.

117. This interference was done with improper purpose of injuring AnywhereCommerce and was accomplished, in part, through the misuse of confidential and sensitive business information of AnywhereCommerce, maliciously elicited with Defendants' fake acquisition promises and other false claims. Indeed, Ingenico in contravention of confidentiality agreements with AnywhereCommerce instead appropriated AnywhereCommerce's business plans and strategies for its own use over a period of years, and with those strategies in hand, displaced AnywhereCommerce and interfered with its relationships.

118. The loss of the First Data preferred supplier position was a tremendous blow to AnywhereCommerce's business finances and operations and market presence at the time. As a direct result of the interference, AnywhereCommerce has

incurred damage including loss of profits, loss of business, loss of future profits, and costs, the extent of which is, to date, unknown.

## CLAIMS AND VIOLATIONS ALLEGED

### COUNT I – Tortious Interference With Existing and Prospective Contracts and Business Relationships (AnywhereCommerce v. Defendants)

119.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

120.    Beginning in or around 2012, after having acquired a controlling interest in competitor ROAM and having begun integrating its mobile solutions into its U.S. operations, it is believed that Ingenico began bundling and discounting products and services, possibly, to unfairly inflate its profits and shut out competition from AnywhereCommerce and similar others in the mPOS space, generally, and as a mPOS supplier for First Data, specifically.

121.    The acts and omissions of Defendants constitute a tortious interference with AnywhereCommerce's business relationships with, among others, FDC, FDMS, TASQ, FD Argentina, FD China, RapidConnect, TeleCheck, FD Singapore, and FD Ventures, among others.

122.    This interference was done without justification and with one or more improper, illegal, and unacceptable motives, including maximizing profits and

market power at the expense of AnywhereCommerce and to the detriment of merchants and merchant acquirers in this mobile commerce space.

123. Defendants' tortious conduct has also interfered with AnywhereCommerce's prospective business relationships with others. For example, AnywhereCommerce had opportunities to be the mPOS supplier of many other groups, opportunities which were usurped by ROAM/Ingenico, including with PayPal, Inc., YUM!, Wells Fargo, Bank of America, INVENSTAR, Banco Azteca, and TAXIPASS, among others, the foregoing appearing to be viable customer relationships, many of which for whom AnywhereCommerce requested protected account status from ROAM.

124. This interference was done with improper purpose of injuring AnywhereCommerce and was accomplished, in part, through the misuse of confidential and sensitive business information of AnywhereCommerce, maliciously elicited with Defendants' fake acquisition promises and other false claims.

125. The acts of Defendants were intentional, malicious, illegal, outrageous, and/or grossly reckless.

126. As a direct result of the interference, AnyhwereCommerce has incurred damage including loss of profits, loss of business, loss of future profits, and costs, the extent of which is, to date, unknown.

4851-8098-9314.2

127. To the extent that Defendants' conduct was done knowingly, intentionally, willfully, wantonly, maliciously, and recklessly, AnywhereCommerce is entitled to an award of punitive damages.

## COUNT II – Violation of The Georgia Trade Secrets Act
### (O.C.G.A. §§ 10-1-760, *et seq.*)
### (BBPOS v. Defendants)

128. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

129. The Georgia Trade Secrets Act is meant to prevent the misappropriation of trade secrets as described herein.

130. BBPOS maintains trade secret-protected information regarding the manufacture of mPOS devices, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public.

131. This information derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts by BBPOS that are reasonable under the circumstances to maintain its secrecy.

4851-8098-9314.2

132. Defendants acquired BBPOS's trade secrets by improper means as described herein, including theft, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

133. As a result of Defendants' misappropriation of trade secrets they experienced a material and unfair competitive advantage in the marketplace which allowed them to handsomely benefit from their improper conduct to the detriment of BBPOS and others.

134. This misappropriation was done with improper purpose of injuring BBPOS for a competitive advantage and was accomplished through the misuse of confidential and sensitive business information of maliciously elicited with Defendants' acquisition promises and other false claims.

135. BBPOS has incurred damages that include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation to be taken into account in computing actual loss, including loss of profits, market share, and royalties.

136. Defendants' misappropriation was willful and malicious entitling BBPOS to exemplary damages up to double the amount of any award made hereunder and attorney's fees.

## COUNT III – Violation of The Massachusetts Trade Secrets Act
## (Chapter 93 of the General Laws, Section 19)
## (BBPOS v. Defendants)

137. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

138. The recently passed Massachusetts Trade Secrets Act is meant to prevent the misappropriation of trade secrets as described herein.

139. BBPOS maintains trade secret-protected information regarding the manufacture of mPOS devices, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public.

140. This information derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts by BBPOS that are reasonable under the circumstances to maintain its secrecy.

141. Defendants acquired BBPOS's trade secrets by improper means as described herein, including theft, misrepresentation, breach or inducement of a

4851-8098-9314.2

breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

142. As a result of Defendants' misappropriation of trade secrets they experienced a material and unfair competitive advantage in the marketplace which allowed them to handsomely benefit from their improper conduct to the detriment of BBPOS and others.

143. This misappropriation was done with improper purpose of injuring BBPOS for a competitive advantage and was accomplished through the misuse of confidential and sensitive business information of maliciously elicited with Defendants' acquisition promises and other false claims.

144. BBPOS has incurred damages that include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation to be taken into account in computing actual loss, including loss of profits, market share, and royalties.

145. Defendants' misappropriation was willful and malicious entitling BBPOS to exemplary damages up to double the amount of any award made hereunder and attorney's fees.

4851-8098-9314.2

## COUNT IV – Violation of The Defend Trade Secrets Act of 2016
## (18 U.S.C. § 1836, *et seq.*)
## (BBPOS v. Defendants)

146.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

147.    The recently passed Defend Trade Secrets Act is meant to prevent the misappropriation of trade secrets as described herein.

148.    BBPOS maintains trade secret-protected information regarding the manufacture of mPOS devices, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public.

149.    This information derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts by BBPOS that are reasonable under the circumstances to maintain its secrecy.

150.    The misappropriated trade secrets at issue are related to a product or service used in, or intended for use in, interstate and foreign commerce.

151. Defendants acquired BBPOS's trade secrets by improper means as described herein, including theft, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

152. As a result of Defendants' misappropriation of trade secrets they experienced a material and unfair competitive advantage in the marketplace which allowed them to handsomely benefit from their improper conduct to the detriment of BBPOS and others.

153. This misappropriation was done with improper purpose of injuring BBPOS for a competitive advantage and was accomplished through the misuse of confidential and sensitive business information of maliciously elicited with Defendants' acquisition promises and other false claims.

154. BBPOS has incurred damages that include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation to be taken into account in computing actual loss, including loss of profits, market share, and royalties.

155. Defendants' misappropriation was willful and malicious entitling BBPOS to exemplary damages under the statute and attorney's fees.

## COUNT V – Breach Of Contract
## (BBPOS v. Ingenico GA)

156.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

157.  Defendants, through Rotsaert, under the direction of Lazare and Coonen, thieved BBPOS's trade secrets and gleaned an unfair competitive advantage in breach of Rotsaert's fiduciary duties to ROAM by then allegedly misusing the stolen technology and trade secrets, and converting the same to Ingenico's exclusive benefit without any reasonable value in return, to develop a directly competitive EMV reader.

158.  This amounts to an acknowledged theft of BBPOS's trade secrets on the part of Ingenico Group and Ingenico Ventures with the assistance of ROAM's then-newly appointed executive, Rotsaert, undertaken with Graylin's knowledge (if not consent) as ROAM's lame-duck Chairman of the Board and CEO.

159.  The foregoing also constitutes a breach (acknowledged by no less than two ROAM executives at the time) of the ROAM Sublicense at § 6.1, which provides:

> Both parties agree to treat the other's Confidential Information (as defined below) as confidential, to take all reasonable measures to protect and prevent the disclosure of and/or unauthorized use by third parties of the other parties' Confidential Information, to exercise at least the same degree of care exercised for the protection of its own Confidential

4851-8098-9314.2

Information, and to not use Confidential Information other than for its intended purpose under this Agreement.

160. Said breach entitles BBPOS to indemnification by Ingenico GA of all related losses incurred by BBPOS as a result of this improper disclosure of its confidential material to a direct competitor and the detrimental marketplace impact suffered by BBPOS. In particular, § 4.3 of the ROAM Sublicense provides:

> The Company agrees to indemnify and hold [BBPOS] harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Company or arising out of or resulting from any claim brought by a third party against [BBPOS] as a result of or relating to any actual or alleged breach hereof by the Company. In the event of any such claim, [BBPOS] agrees to notify the Company promptly of the claim and to permit the Company at the Company's expense, to assume control of the defence (sic) thereof with counsel of the Company's choosing, and cooperate with the Company in such defence (sic) at the Company's expense.

161. BBPOS has suffered losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach of Ingenico GA's confidentiality obligations under the ROAM Sublicense, entitling BBPOS to recovery of the same from Ingenico GA.

4851-8098-9314.2

## COUNT VI – Violation of Section 43(a) Of The Lanham Act
## (15 U.S.C. § 1125(a))
## (BBPOS v. Defendants)

162. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

163. BBPOS spent years and substantial monetary investments in creating the trade secrets misappropriated by Defendants, such that the ownership of the misappropriated trade secrets give rise to property rights.

164. Defendants have appropriated the misappropriated trade secrets at little or no cost, such that Defendants improperly and unfairly have reaped the benefits of that which they have not sown.

165. Defendants' acts have injured BBPOS, including by a direct diversion of profits from BBPOS to Defendants and a loss of royalties that BBPOS charges to others to use the trade secrets so misappropriated.

166. As a result of Defendants' unfair competition as described herein, BBPOS is entitled to recover: (1) Defendants' profits; (2) BBPOS's damages arising herefrom, including loss of profits, market share, and royalties; and (3) the cost of the action.

## COUNT VII – Unjust Enrichment
## (Plaintiffs v. Defendants)

167. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

4851-8098-9314.2

168.    In improperly procuring the trade secrets and business plans of Plaintiffs, Plaintiffs conferred a substantial benefit upon Defendants.

169.    Defendants accepted, retained, and enjoyed the benefit of Plaintiffs' trade secrets and business plans.

170.    The retention of the benefits of Plaintiffs' trade secrets and business plans without compensating Plaintiffs would be unjust.

171.    The reasonable value of the benefit conferred by Plaintiffs is in excess of $75,000.

## COUNT VIII – Violation Of The Georgia Deceptive Trade Practices Act
### (O.C.G.A. § 10-1-372(a))
### (Plaintiffs v. Defendants)

172.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

173.    Plaintiffs are manufacturer/vendor of goods it supplied to First Data and others.

174.    Defendants are commercial competitors. Their actions as described above constitute deceptive and unfair trade practices in violation of O.C.G.A. § 10-1-372(a).

175.    The Georgia Deceptive Trade Practices Act was enacted to protect the public and legitimate business enterprises from those who engage in unfair methods

4851-8098-9314.2

of competition and unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

176. Defendants' actions as alleged herein, constitute unconscionable commercial practices, deception, fraud, false pretense, false promise, and/or misrepresentation in violation of O.C.G.A. § 10-1-372(a).

177. Defendants engage in deceptive, unfair, and fraudulent misrepresentations as alleged herein, including their theft of Plaintiffs' trade secrets and business plans and elimination of mPOS competition through leveraging its historic POS terminal influence globally and through its relationship with First Data, locally.

178. Consumers, *i.e.*, merchants and merchant acquirers, are certain to be deceived with regard to Defendants' business practices in initially pretending to partner with Plaintiffs to then squeezing them out of the marketplace and rebranding Plaintiffs' trade secrets and business plans as Ingenico's own and rebranding those same products in a manner intended to deceive consumers.

179. As a direct and proximate result of Defendants' unlawful acts and omissions, Plaintiffs have suffered an ascertainable loss of money or property in the form of diverted or lost sales and royalties.

180. Plaintiffs are entitled to compensatory and punitive damages, equitable and injunctive relief, costs, and reasonable attorney's fees.

4851-8098-9314.2

## COUNT IX – Violation Of The Georgia Fair Business Practices Act
## (O.C.G.A. §§ 10-1-390, *et seq.*)
## (Plaintiffs v. Defendants)

181.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

182.   Plaintiffs are manufacturer/vendor of goods it supplied to First Data and others.

183.   Defendants are commercial competitors. Their actions as described above constitute unlawful acts and practices in violation of O.C.G.A. § 10-1-393.

184.   The Georgia Fair Business Practices Act was enacted to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state.

185.   Defendants' actions as alleged herein, constitute unconscionable commercial practices, deception, fraud, false pretense, false promise, and/or misrepresentation.

186. Defendants engage in deceptive, unfair, and fraudulent misrepresentations as alleged herein, including their theft of Plaintiffs' trade secrets and business plans and elimination of mPOS competition through leveraging its historic POS terminal influence globally and through its relationship with First Data, locally.

4851-8098-9314.2

187.   Consumers, *i.e.*, merchants and merchant acquirers, are certain to be deceived with regard to Defendants' business practices in initially pretending to partner with Plaintiffs to then squeezing them out of the marketplace and rebranding Plaintiffs' trade secrets and business plans as Ingenico's own and rebranding those same products in a manner intended to deceive consumers.

188.   As a direct and proximate result of Defendants' unlawful acts and omissions, Plaintiffs have suffered an ascertainable loss of money or property in the form of diverted or lost sales and royalties.

189.   Plaintiffs are entitled to compensatory and punitive damages, equitable and injunctive relief, costs, and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.   Judgment in Plaintiffs' favor on all claims asserted against Defendants;

B.   Judgment be entered in Plaintiffs' favor and against Defendants for statutory damages including but not limited to double damages, costs of this action (including reasonable attorney's fees), equitable relief, and for such other further relief as the Court deems just and proper.

C.   Monetary damages arising from Ingenico GA's breaches of the terms of the ROAM Sublicense in an amount to be proven at trial but in excess of $75,000, including without limitation compensatory and actual damages;

D. All damages and/or other monetary relief, as provided by federal and state laws;

E. Pre-and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint;

F. Plaintiffs' costs and disbursements of this suit, including reasonable attorney's fees as provided by law and/or contract; and

G. Such other further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial.

Respectfully submitted this 20th day of December, 2018.

KUTAK ROCK LLP

/s/ Gregory R. Crochet
Gregory R. Crochet
Georgia Bar No. 196650
303 Peachtree Street, N.E.
Suite 2750
Atlanta, GA 30308
(404) 222-4600 (Telephone)
(404) 222-4654 (Facsimile)
greg.crochet@kutakrock.com

and

4851-8098-9314.2

/s/ Oliver D. Griffin
Oliver D. Griffin
*Pro Hac Vice Forthcoming*
Pennsylvania Bar No. 88026
Oliver.griffin@kutakrock.com
Peter N. Kessler
*Pro Hac Vice Forthcoming*
Pennsylvania Bar No. 209033
Peter.kessler@kutakrock.com
Melissa A. Bozeman
*Pro Hac Vice Forthcoming*
Pennsylvania Bar No. 201116
Melissa.bozeman@kutakrock.com
1760 Market Street
Suite 1100
Philadelphia, PA 19103-4104
(215) 299-4384 (Telephone)
(215) 981-0719 (Facsimile)

Attorneys for Plaintiffs

4851-8098-9314.2