AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | |
|---|---|
| ANYWHERE COMMERCE, INC., ET AL. | ) |
| *Plaintiff* | ) |
| INGENICO INC., INGENICO CORP., and INGENICO GROUP SA | ) Civil Action No.   1:19-CV-11457-IT |
| *Defendant* | ) |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: FIRST DATA CORPORATION, 5565 GLENRIDGE CONNECTOR NE, SUITE 200, ATLANTA, GA 30342

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: SEE ATTACHED EXHIBIT A

| Place: KUTAK ROCK LLP, 1801 CALIFORNIA STREET, SUITE 3000, DENVER, CO 80202 | Date and Time: 03/16/2020 9:00 am |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   02/24/2020

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ Daniel Carmeli |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
ANYWHERE COMMERCE, INC. and BBPOS LIMITED                 , who issues or requests this subpoena, are:
DANIEL CARMELI, KUTAK ROCK LLP, 1801 CALIFORNIA STREET, SUITE 3000, DENVER, CO 80202
daniel.carmeli@kutakrock.com, 303-297-2400

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 1:19-CV-11457-IT

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*                    .

❑ I served the subpoena by delivering a copy to the named person as follows:

on *(date)*                    ; or

❑ I returned the subpoena unexecuted because:

                              .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$                    .

My fees are $                    for travel and $                    for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date:

*Server's signature*

*Printed name and title*

*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

#### (c) Place of Compliance.

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

#### (d) Protecting a Person Subject to a Subpoena; Enforcement.

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

#### (e) Duties in Responding to a Subpoena.

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

#### (g) Contempt.
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

### INSTRUCTIONS

1.      All answers and objections in response to these Requests for Production of Documents ("Requests") shall be made in accordance with applicable rules of court, including Fed. R. Civ. P. 45.

2.      These Requests include a request for all documents in your possession, custody or control, including all documents within the knowledge or possession, custody or control of your agents or representatives.

3.      These Requests shall be deemed to be continuing, and if, prior to any evidentiary hearing or trial of this case, you discover additional information, materials or evidence, you must supplement your responses to these Requests.

4.      If any document called for by these Requests was in your possession but is no longer in your possession, custody or control, your response hereto shall identify the document by providing, to the best of your ability, its general subject matter, date, author(s), addressee(s) and recipient(s) and what disposition was made of the document and shall identify the document's present custodian.

5.      To the extent that you believe any particular Request, or any subpart thereof, is objectionable, you are requested to produce all those documents called for in such Request not subject to the objection and portions of each document subject to the claimed objection which do not contain objectionable information.  With respect to each document withheld in whole or in part as objectionable, your response shall identify the document by providing, its general subject matter, date, author(s), addressee(s), and recipient(s) and shall state with specificity all grounds upon which you rely in so objecting with respect to each such document.

6.      To the extent that any particular Request, or any subpart thereof, calls for a document that you believe to be subject to a claim of privilege, you are requested to produce all those documents called for in such Request not subject to the claim of privilege and portions of each document subject to the claimed privilege which do not contain privileged information.  With respect to each document withheld in whole or in part because of a claim of privilege, your response shall identify the document by providing, its general subject matter (without disclosing privileged information), date, author(s), addressee(s), recipient(s), and the nature of the privilege that is being claimed with respect to each such document. If the privilege is being asserted in connection with a claim or defense governed by state law, your response further shall indicate the particular privilege rule that is being invoked.

7.      If any information called for by these Requests is unknown to you, so state and then state all remaining information that is known to you.

8.      Unless expressly specified otherwise, the relevant time period for each of the Requests is January 1, 2006 to the present.

## DEFINITIONS

1.      The terms "you" and "your" refer to First Data and/or FDMS.

2.      The term "action" refers to the civil litigation of *AnywhereCommerce Inc., et al. v. Ingenico Inc., et al.*, No. 19-11457-IT (D.Mass).   A true and correct copy of the Amended Complaint of this action is attached as Exhibit B.

3.      The term "AnywhereCommerce" refers to AnywhereCommerce, Inc. – a plaintiff in this action – (and any predecessors, parents, subsidiaries, and affiliates) and its officers, directors, employees, agents and representatives, including attorneys or any employee, agent or representative of its attorneys.

4.      The term "BBPOS" refers to BBPOS Limited – a plaintiff in this action – (and any predecessors, parents, subsidiaries, and affiliates) and its officers, directors, employees, agents and representatives, including attorneys or any employee, agent or representative of its attorneys.

5.      The term "Ingenico" refers to the defendants in this action, Ingenico Inc., Ingenico Corp., and Ingenico Group SA (and any predecessors,[1] parents, subsidiaries, and affiliates), and each party/entity's respective officers, directors, employees, agents and representatives, including attorneys or any employee, agent or representative of their attorneys.

6.      The term "ROAM" refers to ROAM Data, Inc. (and any predecessors, parents, subsidiaries, and affiliates) and its officers, directors, employees, agents and representatives, including attorneys or any employee, agent or representative of its attorneys.

7.      The term "First Data" refers to First Data Corporation (and any predecessors, successors, parents, subsidiaries, and affiliates, including without limitation FDMS and TASQ) and its officers, directors, employees, agents and representatives, including attorneys or any employee, agent or representative of its attorneys.

8.      The term "FDMS" refers to First Data Merchant Services Corporation (and any predecessors, successors, parents, subsidiaries, and affiliates) and its officers, directors, employees, agents and representatives, including attorneys or any employee, agent or representative of its attorneys.

9.      The terms "related to," "relating" and "relates" mean constitutes, refers to, contains, embodies, evidences, reflects, contradicts, refutes, identifies, states, deals with, bears upon or is in any way connected with the matter described.

---

[1] Expressly included in this term is Ingenico Ventures SAS.

4815-6238-2004.3

10.     The terms "documentation" or "documents" or "document" shall mean any kind of written, typewritten, printed, recorded, electronically-stored, computer stored, computer-produced, or graphic information or material, however produced or reproduced, including, without limitation, emails, text messages, instant messages, social media postings or messages, website pages, brochures, pamphlets, bulletins, prospectuses, drawings, graphs, photographs, microfilms, microfiches, notes, memoranda, letters, reports, plans, account statements, confirmations, forms, telegrams, facsimiles, applications, newspaper advertisements and articles, summaries and/or records of telephone conversations, summaries and/or records of personal conversations, summaries and/or records of meetings and conferences, summaries and/or records of negotiations or investigations, diaries, questionnaires, commentaries, notebooks, minutes, calendars, appointment books, analyses, computer printouts, computer disks, hard copy of software computer programs, projections, ledger sheets, accounts, tax returns, bills, invoices, purchase orders, journals, publications, agreements, deposit and withdrawal slips, cancelled checks, receipts, records, tapes, transcripts of records and recordings and business records relating to the subject matter to which the Request refers and including, without limitation, all original, copies, drafts and/or any other writings in the possession, custody or control of Defendants, their agents, employees, attorneys, accountants and/or any other person acting on their behalf.  This definition includes electronically stored information ("ESI") stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form including, without limitation, on a computer, thumb drive, portable external hard drive, mobile phone, smart phone, or any other electronic device, and all metadata connected to electronically store information, as well as information kept in hard copy format.

4815-6238-2004.3

This definition also includes all tangible things, including physical models, objects, prototypes, miniatures, examples, samples, copies, and representations.

11.     Any reference to the singular shall include the plural, and references to the plural shall include the singular.

12.     The conjunctions "and" and "or" shall be construed either disjunctively or conjunctively so as to bring within the scope of these Requests all information that otherwise might be construed to be outside their scope.

13.     The term "any" shall be read to mean each and every.

14.     The term "communications" shall mean any transfer or exchange between two or more persons of any information in-person, orally, and/or by written or electronic means including, but not limited to, written correspondence, electronic mail, text message, instant message, facsimile, and telegram.

15.     The term "mPOS" refers to mobile point of sale.

16.     The term "POS" refers to point of sale.

17.     The term "mPOS technology" means hardware, software, and other technical features related to mPOS card readers, including the devices themselves.

18.     The term "mobile commerce market" means the supply of mobile card-readers and mPOS solutions to merchants and merchant acquirers.

19.     Pursuant to L.R. 26.5(a), the full text of the definitions set forth in subsection (c) of L.R. 26.5 is deemed incorporated by reference into these Requests.   In the event of any inconsistencies between the definitions set out in these Requests and the definitions set out in L.R. 26.5(c), the definitions set out in these Requests shall control.

4815-6238-2004.3

20.     All terms not otherwise defined are to be defined as referenced in Plaintiffs' Amended Complaint.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      All statements (as that term is used in Fed. R. Civ. P. 26(b)(3)(C)) that were previously made by you and any of your present or former directors, officers, or employees, concerning this action or relating to its subject matter.

2.      All documents that relate to any communication between you and AnywhereCommerce, concerning this action or relating to its subject matter.

3.      All documents that relate to any communication between you and BBPOS, concerning this action or relating to its subject matter.

4.      All documents that relate to any communication between you and Ingenico, concerning this action or relating to its subject matter.

5.      All documents that relate to any communication that indicates or shows the existence of a contract or relationship between First Data and AnywhereCommerce.

6.      All documents that relate to an actual or potential merger, combination, acquisition, investment arrangement, or other similar transaction by First Data with Ingenico or ROAM, including but not limited to due diligence materials, valuations, financial models and sensitivity analyses, business plans, projections, marketing plans, and break even analyses.

7.      Copies of any investor presentations or materials or press releases issued by you, concerning Ingenico or ROAM, and mPOS technology and/or the mobile commerce market.

8.      All documents that relate to Ingenico or ROAM's efforts to secure from First Data preferred and/or exclusive vendor status, modified pricing arrangements, distributor agreements, and/or supply agreements for Ingenico or ROAM's mPOS technology, including but not limited to marketing, solicitations, RFPs, bids, proposals, offers, and negotiations.

4815-6238-2004.3

9.      All documents that relate to First Data's evaluation of Ingenico, ROAM, and/or AnywhereCommerce's bid for the POGO RFP statement of work.

10.      All documents that relate to First Data's decision to award the POGO RFP statement of work to Ingenico.

11.      All documents that relate to First Data's decision not to award the POGO RFP statement of work to AnywhereCommerce.

12.      All documents that relate to the auction process between First Data and Ingenico or ROAM related to Ingenico or ROAM's mPOS technology.

13.      All documents that relate to any arrangements, agreements, or transactions between First Data and Ingenico or ROAM with respect to Ingenico or ROAM's mPOS technology.

4815-6238-2004.3

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANYWHERECOMMERCE, INC. and BBPOS LIMITED,<br><br>    **Plaintiffs,**<br><br>v.<br><br>INGENICO INC., INGENICO CORP., and INGENICO GROUP SA,<br><br>    **Defendants.** | Leave to file granted on October 17, 2019<br><br><br><br>**Civil Docket No: 1:19-cv-11457-IT**<br><br><br>**Jury Trial Demanded** |

### FIRST AMENDED COMPLAINT

Plaintiffs AnywhereCommerce, Inc. ("AnywhereCommerce") and BBPOS Limited ("BBPOS," and together, "Plaintiffs"), by and through their attorneys, file this first amended complaint against the above-named defendants (each, a "Defendant"; collectively, or in any combination thereof, "Defendants"), and show the Court as follows:

### I.    INTRODUCTION

1.    This is a business tort action for tortious interference and breach of contract and theft of trade secrets against French payments technology behemoth, Defendant Ingenico Group SA, and its United States subsidiaries, Defendant Ingenico Corp. and Defendant Ingenico Inc.

2.    The Ingenico Defendants tortiously interfered with Plaintiffs' relationships with First Data Corporation ("FDC" or, generally, "First Data"), First Data Merchant Services Corporation ("FDMS") (First Data's merchant acquiring business arm), and their affiliates and partners, giving rise to common law claims for tortious interference with contracts. Additionally, Defendants have thieved Plaintiffs' trade secrets and business plans, continuing to profit from that theft, giving rise to claims for misappropriating trade secrets and other rights/privileges at common law, under Georgia's Trade Secrets Act (O.C.G.A. §§ 10-1-760, *et seq*.), Massachusetts Trade

Secrets Act (Chapter 93 of General Laws, §§ 42, *et seq.*), the Defend Trade Secrets Act of 2016 (18 U.S.C. §§ 1836, *et seq.*), and the Lanham Act (15 U.S.C. § 1125(a)), as well as giving rise to claims for breach of contract and unjust enrichment. Defendants also violated the Georgia Deceptive Trade Practices Act (O.C.G.A. § 10-1-372(a)) and the Georgia Fair Business Practices Act (O.C.G.A. §§ 10-1-390, *et seq.*).

3.     On December 20, 2018, Plaintiffs initiated this action in the United States District Court for the Northern District of Georgia (the "Transferor Court").

4.     On July 2, 2019, the Transferor Court entered an Order that, among other things, granted Defendants' Motion to Transfer Venue Under 28 U.S.C. § 1404, upon the consent of all appearing parties, whereby the case was transferred to this Court (the "Transferee Court"), subject to this Court's application of the Transferor Court's choice-of-law rules, as applicable.[1]

## II.     THE PARTIES TO THIS COMPLAINT

### A.     Plaintiffs

5.     Plaintiff AnywhereCommerce is a foreign corporation that is incorporated under the laws of the Canada Business Corporations Act as of July 15, 2011. Its principal place of business in the United States is located at 4585 North Maroa Avenue, Fresno, CA 93704.

6.     Plaintiff BBPOS is a Hong Kong corporation. Its principal place of business is located at Suite 1903 - 1904, Tower 2 Nina Tower, No. 8 Yeung UK Road, Tsuen Wan, N.T., Hong Kong.

---

[1] "[W]here a case is transferred pursuant to 28 U.S.C. § 1404(a), [a court] must apply the choice-of-law rules of the State from which the case was transferred." *In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 18 (1st Cir. 2012) (citations omitted). In Georgia, "[t]he application of another jurisdiction's laws is limited to statutes and decisions construing those statutes. When no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law." *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1311-12 (N.D. Ga. 2019) (citing *Coon v. The Med. Ctr., Inc.*, 300 Ga. 722, 729, 797 S.E.2d 828 (2017).

**B.    Defendants**

7.    Defendant Ingenico Inc. ("Ingenico GA") is a wholly-owned subsidiary of Defendant Ingenico Corp. (a Delaware holding company) that is organized and existing under the laws of the State of Georgia.  It purports to be the successor-in-interest by merger to ROAM Data, Inc. ("ROAM"), a Boston-based mobile point of sale device supplier, pursuant to an Agreement and Plan of Merger dated December 13, 2017.  Its principal place of business is located at 3025 Windward Plaza, Suite 600, Alpharetta, Georgia  30005.

8.    Ingenico Corp. ("Ingenico DE") is a wholly-owned subsidiary of Defendant Ingenico Group SA (the parent company for the French-based payments technology conglomerate) that is registered to do business in Georgia, but is organized and existing under the laws of the State of Delaware.  Its principal place of business is located at 3025 Windward Plaza, Suite 600, Alpharetta, Georgia  30005.

9.    Defendant Ingenico Group SA (formerly known as Ingenico SA) ("Ingenico") is a société anonyme that is organized under the laws of France with a principal place of business located at 28-32 boulevard de Grenelle, 75015 Paris, France.[2]

### III.    JURISDICTION & VENUE

10.    This is an action under both state law and federal law, including the Defend Trade Secrets Act of 2016 and the Lanham Act, seeking to recover, among other things, compensatory damages, statutory damages, double damages, costs of suit, and reasonable attorney's fees.

---

[2] By Joint Stipulation of Dismissal, entered on September 27, 2019, former Defendant Ingenico Ventures SAS ("Ingenico Ventures") was dismissed from this action.  Ingenico Ventures was a société par actions simplifiée organized under the laws of France with a principal place of business located at 28-32 boulevard de Grenelle, 75015 Paris, France.  Ingenico Ventures was formed to, among other things, acquire and hold ownership interests in ROAM. By 2015, ROAM was a fully-owned subsidiary of Ingenico Ventures.  As discussed below, Ingenico Ventures has dissolved and been deregistered.

11.     Jurisdiction is based upon 28 U.S.C. § 1331, federal question, insofar as this case concerns claims under 18 U.S.C. § 1836(b), Misappropriation of Trade Secrets, and 15 U.S.C. § 1125(a), the Lanham Act.

12.     This Court also has diversity over the state law claims under 28 U.S.C. § 1332. Plaintiffs are a dual American and foreign citizen and foreign citizen, respectively, and Defendants are citizens of different States and foreign states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13.     Jurisdiction for violations of state law and state statutory claims may also be based upon 28 U.S.C. §1367(a), insofar as those claims are based upon a common nucleus of operative facts with Plaintiffs' federal claims, and the entire action commenced by this complaint constitutes a single case that would ordinarily be tried in one judicial proceeding.

14.     Venue is proper under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## IV.     FACTUAL BACKGROUND

### A.     The Strategic Partnership Of AnywhereCommerce And BBPOS

15.     Plaintiff AnywhereCommerce is in the credit card processing business.  It was the first technology company to develop and market a mobile payment "dongle" that connects to the audio port of a wireless device (smartphone, tablet, PDA) and has since cornered the market on controlling the rights to all relevant patents related to mobile payment transactions done on smartphones/tablets.

16.     Plaintiff BBPOS is an mPOS[3] solution provider headquartered in Hong Kong. It is a leading innovator, designer, and manufacturer of end-to-end mobile point of sale ("POS")

---

[3] "mPOS" means "mobile point of sale."

solutions. Utilizing various patents, BBPOS manufactured mobile POS terminals for AnywhereCommerce and others globally.

17.    Notably, much of the patented mPOS technology utilized by Plaintiffs was invented, developed, and patented through the collaboration and joint efforts of a group of engineers and payments entrepreneurs, associated with both BBPOS and AnywhereCommerce, doing business as "HomeATM" at the time, who came together in or around 2006. This group included, among others, (i) Ben Lo ("Lo") and Jimmy Tang ("Tang") of BBPOS, on the one hand, and (ii) Mitchell Cobrin ("Cobrin"), Michael Kron ("Kron"), and Kenneth Mages ("Mages") of HomeATM, on the other.[4]

18.    Early in its inception, AnywhereCommerce focused on creating scalable mobile payments processes, nationally, and winning customers in the United States, where these emerging mPOS technologies were first fully embraced.

19.    In 2012, AnywhereCommerce went global, even as its domestic supplier efforts continued. It soon began servicing foreign markets and signed various distribution agreements in First Data's Asia Pacific and Latin America regions as it pursued finalization of the written agreement to cover First Data's domestic mPOS supplier business. AnywhereCommerce is now a recognized, global payments technology provider. As AnywhereCommerce's primary manufacturer and technology developer, BBPOS was a critical component of AnywhereCommerce's overall business plan.

20.    The resilient alliance between AnywhereCommerce and BBPOS (then operating from Canada and Hong Kong, respectively) withstood the test of time, in part, because their operations are complementary and philosophically aligned.

---

[4] Mages, one of the inventors of certain relevant patents, was the first Chairman/CEO of what is now AnywhereCommerce. Lo, at times, was or performed the function of a CTO for AnywhereCommerce.

21.     Beginning in 2010, BBPOS licensed certain rights to use technology and/or techniques owned or controlled by AnywhereCommerce or its affiliates incident to its core operations in manufacturing, distributing, and selling mobile payments processing products, devices, and services in and throughout China with a world-wide reach.

22.     The scope and limitations of BBPOS's licensing rights via AnywhereCommerce and its affiliates are evidenced, in part, by two contracts, namely: (i) that certain License Agreement and Non-Competition Agreement dated March 18, 2010 (the "Original License"), by and between the Licensor, "HomeATM EPayment Solution," which is now AnywhereCommerce, and the Licensee, BBPOS; and (ii) that certain License Agreement and Non-Competition Agreement dated July 1, 2013 (the "Second License"), by and between the Licensor, 4361423 Canada Inc. ("436 Canada"), AnywhereCommerce's parent, and the Licensee, BBPOS.

23.     Under the Original License, the Licensor granted to the Licensee "a non-exclusive license to use the Intellectual Property Rights in the Region in relation to the Products." *See* Original License at §2.1.  The scope of the licensed rights granted reads as follows:

> (1)     "Intellectual Property Rights" is defined as "trademark, design, or patent and other intellectual property rights of **DTMF technology** titled the **Apparatus and Method for Commercial Transactions Using a Communication Device**".

*See* §1.1 (emphasis in original).

> (2)     "Products" is defined as "the communication device using the DTMF technology".

*Id.*

24.     Years later, 436 Canada and BBPOS entered into the Second License, which terminated and superseded the Original License as of an effective date of July 1, 2013, whereby 436 Canada granted to BBPOS a "non-exclusive license with a right to sub-license to Sublicensees

. . . to use and/or practice the Licensed Patent Rights for the purpose of manufacturing, distributing and selling Products in the Region." *Id.* at §3.1.

25.     With reference to an attached schedule of patented and patent-pending technology (by patent/application numbers and applicable jurisdictions listed thereon), "Licensed Patent Rights" is defined as follows:

> [T]he patents and patent applications owned by the Licensor or its Affiliate and listed in Exhibit-B attached hereto in the jurisdictions listed thereunder, together with all patents issuing from any listed pending patent application, including any future divisionals, continuations, continuations-in-part, reissues, re-examinations and extensions thereof, and all foreign counterparts of such applications and patents[.]

*See* §1.4.

26.     The Second License also identifies the parameters of permitted uses for the manufacture, distribution, and sale of "Products," meaning:

> [A]ny and all hardware, software, systems, devices and methods that incorporate or are designed, manufactured or produced by the Licensee or its Affiliate, directly or indirectly, using the technologies and/or techniques encompassed within the Licensed Patent Rights and/or invention claimed in the Licensed Patent Rights[.]

*Id.* at §1.7.

27.     At § 9.2 of the Second License, the signatories thereto acknowledge the existence of BBPOS's and ROAM's Engineering Development and License Agreement dated May 4, 2010 as amended August 15, 2010 (the "ROAM License"), a copy of which is attached hereto as <u>Exhibit A</u>; the Licensor "consents to such agreement" as of July 1, 2013 and further agrees not to grant to ROAM or Ingenico or their respective affiliates any rights to use the Licensed Patent Rights.

28.     Today, AnywhereCommerce (via 436 Canada) controls a growing international patent portfolio covering mPOS solutions utilizing handheld devices. This includes existing and future-anticipated devices with broad application and features, such as audio jack, bluetooth,

EMV, smart cards, optical scanners, barcode readers, *etc.*, and user interfaces such as touch screen, fingerprint, proximity detectors, cameras, *etc.* The patent portfolio includes at least eleven United States patents and several international patents.

29.     BBPOS similarly maintains a robust patent portfolio related to the manufacture of mPOS devices.

30.     As a result, Plaintiffs AnywhereCommerce and BBPOS each controls or holds rights to various patents and other intellectual property that, together, effectively lock up the manufacture and supply of mobile point of sale devices world-wide without infringing upon their respective patents or otherwise licensing the necessary rights from them or their affiliates to use such patented technology.

### B.     ROAM Strikes Up Relationships With Plaintiffs

31.     ROAM was a technology start-up based out of Boston, Massachusetts that was founded in 2005 and led by Will Wang Graylin ("Graylin"). It had a mobile commerce platform that was directly competitive with the AnywhereCommerce/BBPOS strategic partnership. However, it was nevertheless dependent upon use of Plaintiffs' patents and intellectual property, consisting of mobile card readers, software development kits ("SDK's"), application program interfaces ("API's"), a mobile payments engine, and other services. This relationship was set forth in the ROAM License agreement.

32.     As of the effective date of the ROAM License, the Original License was in effect by and between HomeATM/AnywhereCommerce, on the one hand, and BBPOS, on the other.

33.     Section 1.1 of the ROAM License, as amended, states:

> The Partner hereby grants to the Company a worldwide, perpetual, fully-paid license to freely use the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and

distribute the Products,[5] any portion thereof, or any products similar to or based upon any Products. For purposes of this Agreement, "Partner Intellectual Property" shall mean: (a) any and all patents and patent applications relating to the Products, including without limitation US Patent Application Number 12/767,831[6] for secure audio coupled card swiper filed on April 27, 2010 with the United States Patent and Trademark Office (the "Patent Application") and any patents issuing on the Patent Application, including (i) any reissues, renewals, reexaminations, substitutions or extensions thereof and foreign equivalents of the foregoing; (ii) any claim of a continuation-in-part application or patent that is entitled to the priority date of, and is directed specifically to subject matter specifically described in, the Patent Application; (iii) any foreign counterpart thereof (including PCTS); and (iv) any supplementary protection certificates and any other patent term extensions, restorations and exclusivity periods and the like of the Patent Application; and (b) any copyrights, trademarks, trade names, trade secrets, knowledge, data and information owned or controlled by the Partner relating to the Products.

34. ROAM License § 6.1 provides:

> Both parties agree to treat the other's Confidential Information (as defined below) as confidential, to take all reasonable measures to protect and prevent the disclosure of and/or unauthorized use by third parties of the other parties' Confidential Information, to exercise at least the same degree of care exercised for the protection of its own Confidential Information, and to not use Confidential Information other than for its intended purpose under this Agreement.

35. Section 4.3 of the ROAM License provides:

> The Company agrees to indemnify and hold [BBPOS] harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Company or arising out of or resulting from any claim brought by a third party against [BBPOS] as a result of or relating to any actual or alleged breach hereof by the Company. In the event of any such claim, [BBPOS] agrees to notify the Company promptly of the claim and to permit the Company at the Company's expense, to assume control of the defence (sic) thereof with counsel of the Company's choosing, and

---

[5] Per Schedule I, "Products" refers to the "Encrypted Circle Swipe reader. . .[connecting] from the audio jack of a mobile device or PC, this was developed by the Partner, and including any variance of this design" and "EMV capable POS unit with Bluetooth interface, sometimes referred to as the "BBPOS" currently completing certification."

[6] This application refers to BBPOS's US Patent No. 8,336,771 (payment card terminal dongle for communications devices).

cooperate with the Company in such defence (sic) at the Company's expense.

36.     Under §1.2 of the ROAM License, the license granted therein explicitly states that it is not transferable or assignable "in event a sale of the Company to a competitor with its own POS products" – unless prior written consent is given by BBPOS.

37.     As the inventors, licensors, developers, applicants, and/or owners of the intellectual property and trade secrets handled as described herein, BBPOS invested substantial time and money into developing the information, data, and work product that it licensed to ROAM.

38.     Access to BBPOS's trade secret information is restricted by both physical and electronic means in accordance with prevailing industry standards, including locks, password protections, the installation of security software, and the use and enforcement of company security procedures and protocols.

39.     Moreover, BBPOS uses commercially reasonable efforts in maintaining and safeguarding the safety, security, and confidentiality of its own confidential intellectual property and trade secrets in accordance with prevailing industry standards, including requiring the execution of non-disclosure agreements and confidentiality agreements before disclosing the same to third-parties.

**C.     Ingenico Acquires A Controlling Interest In ROAM And Thieves And Continues To Thieve Trade Secrets And Processes Belonging To Plaintiffs**

40.     Founded in 1980, Ingenico is a significant manufacturer and seller of card-based, electronic POS payment terminals.  Within that space, Ingenico maintained a relatively steady focus on supplying, to both countertop retail and multilane large retail merchants, the necessary payment terminals to process *in-store* and later online electronic payments.  Prior to the theft

detailed herein, Ingenico largely ignored the mobile payments space. Indeed, a significant element of the theft has only been consummated in and post 2017, with its final merger into ROAM.[7]

41.     As acknowledged in its 2017 Registration Document, up until 2014, Ingenico had little interest in, and clearly was not operating to capacity, if at all, in the smaller niche mobile commerce market, involving the supply of mobile card-readers and mPOS solutions to merchants and merchant acquirers that Plaintiffs AnywhereCommerce and BBPOS had led.

42.     Ingenico acquired a non-controlling 43.92% ownership interest in ROAM in November 2009.  The investment was led by two Ingenico executives, Christophe Dolique and Vince Tallent ("Tallent"), who created and managed the newly formed Ingenico Ventures, as a mobile commerce acquisition vehicle for the company.

43.     In conjunction with the investment, Tallent joined ROAM's founder, Graylin, as the other member of ROAM's board of two.  By 2011, ROAM had nearly run out of cash and was on the verge of bankruptcy, according to Graylin and others.[8]  Subsequently in 2011, Ingenico proposed investment of a total of $50 million in ROAM, including a proposed acquisition of Plaintiff BBPOS (unbeknownst to AnywhereCommerce at the time).[9]

44.     Indeed, while feigning some interest in acquiring AnywhereCommerce since first meeting AnywhereCommerce's Cobrin in early 2010, Graylin also targeted for acquisition

---

[7] *See* Ingenico 2017 Registration Document at 6:

> Ingenico embarked upon its technological transformation in 2006. Until 2014, the Group focused on the acquisition of technology linked to in-store and online transaction management.

[8] *See* Amended Derivative Complaint against Ingenico SA, *et al.* dated November 29, 2012 pending in the Massachusetts Superior Court in Suffolk at docket no. 12-4032 (the "ROAM Derivative Compl.") at ¶¶ 34-39.

[9] *See* ROAM Derivative Compl. at ¶¶ 39-42.

BBPOS.  However, ultimately, rather than actually paying full value for the trade secrets belonging to Plaintiffs, Ingenico simply satisfied itself with the theft of those trade secrets.

45.      On February 6, 2012, Ingenico closed on an investment of about $48 million in ROAM, which secured Ingenico Ventures a controlling interest of 83.63% in ROAM.  With this controlling interest, ROAM now fell directly within the purview of Ingenico's newly-created "Central Operations division" and was moved thereto, internally, for Ingenico's direct oversight as a "business[] operated on an international basis and monitored at Group level."[10] Ingenico's Philippe Lazare ("Lazare") and Christopher Coonen were added to the now expanded board of three; Ingenico's Christopher Rotsaert ("Rotsaert") was appointed as Vice President of Products.[11]

46.      Ingenico's Lazare, in particular, played an active role in overseeing Ingenico's U.S. operations, while simultaneously controlling Ingenico.  According to Ingenico's 2017 Registration Document at 105, Lazare was both a director of Ingenico GA until December 12, 2017 and a director of ROAM until June 8, 2015; in France and elsewhere, Lazare was a director of Ingenico from March 15, 2006 onward, was appointed Chief Executive Officer of Ingenico on July 17, 2007, and then also contemporaneously assumed the role of its Chairman on January 20, 2010, which role continued until near the time Plaintiffs filed their initial complaint in this action.

47.      Under the watchful eye and direction of Lazare and others in France, Ingenico installed Rotsaert as Vice President of Products for the illegal purpose of improperly accessing and stealing ROAM's technology and trade secrets, including BBPOS's designs and trade secrets related to the products it was making for ROAM.[12]

---

[10] *See* Ingenico 2011 Registration Document at 76.

[11] *See* ROAM Derivative Compl. at ¶¶ 44-45.

[12] *See* ROAM Derivative Compl. at ¶¶ 48-51.

48.     According to court filings:

> In the summer of 2012, Graylin learned that Rotsaert transferred key technology, knowhow and design information of ROAM products to Ingenico's research and development team in France, including designs and trade secrets from ROAM's exclusive vendor BBPOS Ltd, without any commercial agreement in place between ROAM and Ingenico.  In July 2012, Rotsaert organized a multi day visit with Ingenico engineering personnel to interview BBPOS personnel on design and trade secrets of the products BBPOS was making for ROAM.  The documents requested by Rotsaert included schematics, data output format files, design files, and even source code.  All files except for source code were turned over to Rotsaert.  Further detailed interviews were conducted by Rotsaert and Ingenico engineers to deduce the trade secrets used in the making of ROAM's products by BBPOS.  When confronted by Graylin on August 29, 2012 to stop transferring IP to Ingenico, and to catalog the information Rotsaert obtained, Rotsaert forwarded the files he obtained and admitted that "the most interesting document is the schematics. . ."  Rotsaert also admitted to the Q&A sessions between Ingenico and BBPOS to obtain undocumented trade secrets.[13]

49.     Ingenico, through Rotsaert, under the direction of Lazare and Coonen, then misused the stolen technology and trade secrets, and converted the same to Ingenico's exclusive benefit without any reasonable value in return, to develop a directly competitive EMV[14] reader.[15]  This misuse is ongoing.

50.     The foregoing constitutes an acknowledged and *continuing* theft of BBPOS's trade secrets by Ingenico with the assistance of ROAM's then-newly appointed executive, Rotsaert, undertaken with Graylin's knowledge (if not consent) as ROAM's lame-duck Chairman of the Board and CEO.

---

[13] *See* ROAM Derivative Compl. at ¶ 48.

[14] EMV stands for Europay, MasterCard, Visa; it is the global standard for chip-based debit and credit card transactions.

[15] *See* ROAM Derivative Compl. at ¶¶ 49-51.

51.     The foregoing also constitutes a breach and *continuing* breach (acknowledged by no less than two ROAM executives) of the ROAM License at § 6.1.

52.     Said breach entitled and *continues* to entitle BBPOS to indemnification by Ingenico GA of all related losses, per § 4.3 of the ROAM License.

53.     Though the breach began in the summer of 2012, the breach is in fact ongoing and continues to this day, and Plaintiffs are presently damaged and continue to be damaged to this day. The breach has damaged BBPOS insofar as Defendants' acts have caused a direct diversion of profits from BBPOS to ROAM/Ingenico Ventures/Ingenico or Ingenico GA and also a loss of royalties that both Plaintiffs charge to others to use the thing misappropriated.  This breach and this loss are continuing.

54.     Ingenico has since fully consummated its theft of Plaintiffs' trade secrets by fully acquiring ROAM.   Ingenico Ventures ultimately decided to close out the remaining ROAM minority interests, acquiring 100% of the company as its fully-owned subsidiary by early 2015.[16] Defendants failed to secure permission at this time for their wholesale and continuing theft. Pursuant to an Agreement and Plan of Merger dated December 13, 2017, ROAM merged with and into the surviving entity, Ingenico GA.  Defendants once again failed to secure permission at this time for their wholesale and continuing theft.

**D.      Ingenico Feigns False Interest In AnywhereCommerce To Illicit AnywhereCommerce's Sensitive Information And, Eventually, Destroy It**

55.     The foregoing presents the backdrop and buildup to the unjustified and malicious tortious interference by Defendants in Plaintiff AnywhereCommerce's contractual and prospective business opportunities with First Data and others.

---

[16] *See* Ingenico's Consolidated Financial Statements dated December 31, 2014.

56.     Through the intentional and malicious misuse of the confidential information of
AnywhereCommerce, beginning as early as 2010, Defendants were able to complete their
improper interference in 2015.

1.      ROAM & Ingenico Usurp AnywhereCommerce's Mobile Licensing Plans

57.     For at least two years, ROAM's Graylin kept up a steady stream of communication
with AnywhereCommerce's Cobrin, a founding member of the company, with vague promises of
a potential equity investment or merger by, through, or into ROAM and/or Ingenico in exchange
for periodic access to AnywhereCommerce's confidential, proprietary, and sensitive business
materials.

58.     These discussions were conducted through primarily Cobrin and Kron on behalf of
AnywhereCommerce and Graylin and John Coloe ("Coloe") for ROAM.  Discussions included a
proposed acquisition of AnywhereCommerce by Ingenico, a merger with ROAM, and assorted
cross-channel revenue opportunities.

59.     On February 23, 2010, Graylin advised Cobrin that "Ingenico showed interest in
HomeATM, they have not explore (sic) the on-line ecommerce market for debit, but are open to
new ideas," further stating that any "M&A or Investment activities" would need to involve the
Ingenico appointees to ROAM's board, which could take time, but that he would follow up with
the head of strategy.

60.     At some point thereafter, ROAM/Ingenico soured on AnywhereCommerce, but
continued to hold discussions for the purposes of better understanding AnywhereCommerce's
strategic mPOS plans – that is, so as to better adopt them and compete against them.  One of those
plans included the manufacture and sale of an mPOS card reader that interfaced with mobile
devices through the audio jack – a plan that was disclosed to Graylin, and then stolen.

61.     After inviting ROAM to make a proposal for mobile device licensing through AnywhereCommerce, and putting Graylin in direct contact with Lo/BBPOS to discuss the technological details, Graylin decided to cut out the middle man, or AnywhereCommerce, and manufacture its own device through BBPOS.  Giving some false explanation for not licensing the AnywhereCommerce technology, he went about licensing the exact same technology indirectly, as it turned out, from BBPOS.

62.     All the while, however, ROAM was thieving AnywhereCommerce's idea for building an audio jack reader with BBPOS, unbeknownst to AnywhereCommerce, then debuting AnywhereCommerce's idea in the market within months.

> 2.     AnywhereCommerce's Dead-End Discussions With ROAM/Ingenico Continue

63.     Meanwhile, by May 2010, revenue-sharing opportunities were being explored in greater depth, including the feasibility of a hardware/software/gateway offering to market.   The parties ultimately consummated a reseller agreement to more formally pursue these opportunities.

64.     As the two companies worked on several reseller initiatives, under the guise of advancing AnywhereCommerce's interests with Ingenico while in Paris, Graylin reached out to Cobrin to request AnywhereCommerce's sensitive information.  Accordingly, on November 14, 2010, Cobrin advised Graylin:

> We will begin to accumulate the information discussed.  I would like to execute an NDA with Ingenico, can you please arrange.

65.     Graylin thanked him by email later that day, adding:

> Don't forget the projections, i (sic) understand it is hard to project anything longer than 6 -10 months.  Also a detailed list of IP granted or filed, with specific patent numbers for each territory filed.

66.     On January 25, 2011, Graylin emailed Cobrin and Kron, noting the "good start to 2011 and lots of changes," and requesting a call to discuss how the companies could help each other grow.  Cobrin immediately accepted Graylin's suggestion and a call was set up for January 27, 2011.

67.     That day on February 3, 2011, Graylin confirmed that he was seeking Series B financing and represented that he was willing to discuss opportunities with AnywhereCommerce. Per Graylin's request, Kron emailed Graylin on February 4, 2011 a copy of a patent abstract.  In response later that same day, Graylin noted that the information supplied related to an original patent filed in 2004 by Harry Hargens for internet PIN debit, inquiring whether "there are any other patents granted or pending right now?"

68.     Unbeknownst to AnywhereCommerce, ROAM was growing concerned with Ingenico's insufficient capitalization of its operations, inaction, and general lack of interest, upon belief.  Apparently, by 2011, the company had nearly run out of cash and was on the verge of bankruptcy, according to Graylin and others.[17]

69.     The repeated and specific patent information requests to AnywhereCommerce were being peppered by ROAM at or around this time.

70.     Apparently, ROAM's and Ingenico's on-going due diligence efforts relating to a BBPOS acquisition had come to reveal certain serious questions regarding the validity of the ROAM License and the quality of licensed rights granted thereunder by BBPOS derived from "HomeATM" in the production of ROAM's product lines.

71.     Thus, having uncovered the IP infirmity, as a condition to closing on a second round investment (first promised by Ingenico in August 2011), Ingenico extracted from Graylin an

---

[17] *See* ROAM Derivative Compl. at ¶¶ 34-39.

agreement to indemnify any losses associated with his failure to secure a perpetual license between BBPOS and HomeATM for certain intellectual property, thereby providing ROAM (and its soon-to-be majority investor, Ingenico) stability in the license of this intellectual property from BBPOS within sixty days of closing.[18]

72.     In mid-November 2011, while Graylin was still in Paris with Ingenico, he reached out to Cobrin again seeking AnywhereCommerce's sensitive business information, including information specifically related to the BBPOS/ROAM licensing problem.  Telling Cobrin that he was closing $40M + and wanted to "start pitching" AnywhereCommerce to Ingenico, Graylin requested biographies for Cobrin and Kron, information regarding the corporate structure of the business, an overview of AnywhereCommerce's patents and pending patents with jurisdictions of coverage (*i.e.*, the real targeted material), revenue forecasts, and an executive summary.

73.     This was just a couple months in advance of completing the second round investment by Ingenico in ROAM on February 6, 2012.

74.     Pursuant thereto, Graylin agreed to indemnify any losses associated with his failure to secure a perpetual license between BBPOS and HomeATM for certain intellectual property within sixty days of closing.[19]

75.     By April 2012, ROAM was still actively pursuing an acquisition of BBPOS. Graylin was actively under pressure to avoid the personal indemnity exposure extracted by Ingenico should he fail to obtain a perpetual license solution from "HomeATM" for the IP infirmities uncovered with the BBPOS product line.

---

[18] *See* Graylin's Complaint against Ingenico SA, *et al.* dated September 13, 2013 pending in the Massachusetts Superior Court in Suffolk at docket no. 13-3271 (the "Graylin Enforcement Compl.") at ¶¶ 28-29.

[19] *See* Graylin Enforcement Compl. at ¶¶ 28-29.

76.     At this time Graylin advised AnywhereCommerce of its acquisition intentions regarding BBPOS, noting, however, "after significant legal DD by our attorneys, we have discovered a few items related to the BBPOS IP that I want to discuss with you guys[.]"  These conversations did not resolve by way of any extension of a perpetual license.  The failure to obtain perpetual license forced Defendants to simply thieve what they needed; it also forced them in the coming years to maliciously and without justification undercut Plaintiffs' business relationships, as discussed below.

###     E.     Building The Valuable First Data Relationship

77.     First Data is a financial services company presently headquartered in Atlanta, Georgia.  It got its start as one of the nation's first processors of VISA and MasterCard bank-issued credit cards.  During the 1980s, it was acquired by American Express.  Then, in 1992, FDC spun off from American Express and went public.

78.     In or around 2002, First Data operated in four business segments: payment services, merchant services, card issuing services, and emerging payments.   FDC acquired TASQ Technology Inc. ("TASQ") in March 2001, ushering in a period of accelerated expansion for the company.[20]

79.     In relevant part hereto, First Data's merchant services segment was comprised of FDMS, a provider of merchant credit and debit card transaction processing services in the United States, including, among other things, the supply and deployment of POS devices and other products and services used by merchants to accept electronic payment transactions through FDC's wholly-owned subsidiary, TASQ.

---

[20] *See* "First Data Corporation 2002 Annual Report (Form 10-K)". U.S. Securities and Exchange Commission. March 18, 2003. Retrieved December 3, 2018.

80.     TASQ provides point of sale devices and other equipment necessary to capture credit, debit, ATM, check, Internet and smart card transactions for First Data's merchant business and other partners by entering into development and services agreements with suppliers, such as Ingenico and, formerly, Plaintiff AnywhereCommerce, for the products necessary to so operate.

81.     Beginning in 2008 and continuing through 2015, AnywhereCommerce actively negotiated or performed in accordance with the terms and conditions of a purchase and service agreement that it ultimately consummated with First Data in September 2012, under which it supplied FDC (via its developer-subsidiary, TASQ) with mobile "PEDs" (or PIN entry devices) and other mobile commerce solutions, manufactured by its strategic partner, BBPOS.

82.     Over this period, AnywhereCommerce, and in particular Cobrin, AnywhereCommerce's First Data account manager, devoted a significant amount of time and energy in developing this and other strategic partnership opportunities with First Data and its affiliates on behalf of AnywhereCommerce, all stemming from his earliest discussions in 2008 with FDMS about mPOS hardware production and service opportunities.

83.     In May 2010, AnywhereCommerce had continued to make steady progress towards consummating a distribution contract with First Data, FDC, and/or TASQ.

84.     By February 2012, AnywhereCommerce expected to soon ink a deal whereby AnywhereCommerce would function as First Data's exclusive (or nearly so) hardware supplier for all of its mPOS products (which would be handled by and funneled through FDC's subsidiary, TASQ) for the implementation of First Data's software and payment gateway provider at the time, Apriva.

### F.     AnywhereCommerce Inks A Deal With First Data

85.     By July of 2012, AnywhereCommerce had developed three mPOS card readers, namely, the Rambler, Rover, and Nomad (with the latest Nomad device nearly ready for launch). AnywhereCommerce was also working on a particular mPOS device for Bank of America, a "BAM Bento," in anticipation of consummating the domestic supplier deal with First Data.  The BAM Bento, in fact, garnered AnywhereCommerce a statue of recognition from Bank of America.

86.     On September 27, 2012, AnywhereCommerce and FDMS entered into a Purchase and Services Agreement for the supply of mPOS hardware within the United States.  The parties also agreed to a Statement of Work dated September 27, 2012 addressing the pricing structure that would govern the supplier arrangement.

87.     Performance on the contract had long been underway.  Just days after consummating the deal, on November 1-8, 2012, AnywhereCommerce exchanged correspondence with First Data and others regarding its production of readers for Bank of America and gave a status update for the "BAMS Bento" shipment in light of Hurricane Sandy: 500 units were delivered to TASQ with 50 units being delivered to Bank of America.

88.     On February 20, 2013, First Data supplied AnywhereCommerce its request for proposal ("RFP") for Mobile PEDs for its EMEA region.  On August 8, 2013, AnywhereCommerce also received an invitation from First Data to participate in a live auction for its signature "POGO" devices with a magnetic stripe reader ("MSR").  AnywhereCommerce participated in both opportunities.

89.     First Data's RFP recognized AnywhereCommerce's rights to the patented audio-jack interface technology in its RFP.  It asked bidding parties to explain the basis of their rights to use this technology if the proposed interface would be by audio-jack.

90.     In mid-October 2013, AnywhereCommerce received another invitation from First Data to participate in a RFP via Ariba eSourcing to provide MSR devices globally. AnywhereCommerce participated in the RFP and submitted information for all available countries except for the UK (*i.e.*, Ireland, Poland, Greece, Germany, India, Australia, Hong Kong, Singapore, Malaysia, Brazil, Mexico, and Canada), with an auction slotted to take place on December 11.

91.     In the midst of several pending RFPs, on or around January 16, 2014, First Data and AnywhereCommerce entered into "Amendment No One" dated January 16, 2014 to the Purchase and Services Agreement.  The parties also executed "Amendment No One to the Statement of Work Number One" on January 16, 2014, which provided new sweetheart pricing (to be retro-calculated from October 1, 2013) for AnywhereCommerce's entire product line for First Data, but especially deeply discounted the Rambler device, which was to remain in force for a period of eighteen months.

92.     The discounted pricing was as follows: (i) For POGO, Rambler2 and Rambler3 Prices $11.99/unit 0-250,000 and $10.99/unit 250,000+; (ii) BAMS Bento Reader Prices $16.75/unit 0-50,000, $16.20/unit 50,000 -100,000, and $14.73/unit 100,000+; (iii) Walker Prices $34.46/unit 0-250,000 and $27.75/unit 250,000+; and (iv) Nomad Prices $84.99/unit 0-250,000 and $73.90/unit 250,000+.

93.     Meanwhile, the RFP process was refreshed in April 2014 with updated submissions due to First Data on April 16, 2014.  On May 29, 2014, First Data informed AnywhereCommerce that it had been included in the final stages of the sourcing process and invited AnywhereCommerce to participate in an eAuction on June 11, 2014.

94.     On June 18, 2014, First Data requested pricing for a contactless reader for the Nomad 2.0 or Walker devices, which AnywhereCommerce had indicated would be ready "late Q3, early Q4."  Upon Cobrin's follow up, First Data advised:

> We have halted temporarily the communication with selected suppliers due to particular business decisions regarding POGO.
>
> Specifically - in your case - we are pleased to continue business-as-usual collaboration with your company in the markets where you were already established as FD supplier.

95.     Meanwhile, on May 2, 2014, AnywhereCommerce received an invitation from First Data to submit pricing consistent with the newly negotiated sweetheart pricing structure for a POGO RFP for the U.S. market, which it did.

96.     Over the course of its dealings with First Data and its affiliates, AnywhereCommerce performed satisfactorily.

97.     As of April 2014, Ingenico had been identified to AnywhereCommerce as a vendor of First Data (regarding a 2014 client conference hosted by First Data).  Nonetheless, AnywhereCommerce long knew Ingenico to be a large and influential supplier for First Data respecting its need for countertop retail and multilane large merchant retail payment solutions.

98.     Unaware of Ingenico's machinations behind the scenes designed to eventually freeze AnywhereCommerce out of its mPOS niche, as further discussed below, AnywhereCommerce relentlessly pursued – *over a period of years* – and ultimately <u>earned</u> its preferred mPOS supplier status with First Data.

99.     This extraordinary expenditure of time and effort was already paying dividends by 2015.  The relationship was lucrative for AnywhereCommerce and cost-effective for First Data's direct and indirect mPOS merchants, given the sweetheart pricing deal negotiated by First Data

and the existing mPOS infrastructure keyed to AnywhereCommerce and its existing and future mPOS product lines.

100.    Indeed, due to the wide-ranging features and characteristics of even the most comparable mPOS product lines (attributable to manufacture, material, supply or the like), which, in turn, require individualized customization and integration solutions to properly interface with applicable API, best practices dictate using as few as possible hardware suppliers/manufacturers within any given function area.  To do otherwise is logistically complex and an unnecessary waste of time and resources.

101.    AnywhereCommerce's historical sales during the duration of the First Data relationship achieved levels of roughly 10,000 to 15,000 units per month.  Sales numbers were very strong in 2014 through 2015 with no apparent new risk factors or adverse indicators to depress sales forecasts beyond.

102.    In addition to a demonstrable increasing demand for these devices (as evidenced, in part, by its actual sales numbers), AnywhereCommerce expected its gross margins on the mPOS hardware sales to substantially increase in the immediate and near future.  AnywhereCommerce anticipated this increase due to a number of factors, including the natural evolution of product price-point (with older, less expensive products giving way to newer and more expensive technology and growth of value-added services), an ever-increasing penetration into the market (both geographically and in terms of targeted merchant base to include a new micro-merchant segment), and increase in third party sales attributable to the reputational and credibility boost of performing in such an important role for First Data.

103.    From mid-2014 through 2015, AnywhereCommerce aptly and ably adapted to rapidly changing market conditions affecting product rollout and innovation; indeed, this period

was one of the most disruptive and transformative years in the payments industry in nearly 40 years.

104.    As more U.S. merchants worked towards adoption of the EMV security standard as of October 1, 2015, they were forced to order new EMV-compliant terminals and devices.  The forced infrastructure reboot coincided with emerging contactless payments technology enabled by near-field communication ("NFC") chips that are typically embedded in physical credit or debit cards, but increasingly also reside in wearable devices, smartphones, and other devices, as a clear preferred mobile acceptance technology.

105.    Thus, as the rise in demand for EMV-compliant mPOS hardware, generally, peaked in advance of the October 1, 2015 deadline, suppliers intensified efforts to rollout NFC-enabled devices to meet the artificially stimulated demand for new terminals and devices.

106.    Plaintiffs are informed and believe and thereon allege that AnywhereCommerce's development and eventual rollout of NFC-enabled devices was consistent with or better than that of similarly situated mPOS hardware suppliers at the time and, in relevant part, *substantially identical* to the capacity of Ingenico, who, upon acquiring ROAM, relied on its theft of Plaintiffs' trade secrets by way of ROAM/BBPOS.

107.    Meanwhile, AnywhereCommerce was still awaiting the official results of its second round bidding in First Data's online POGO RFP auction.  Plaintiff AnywhereCommerce is informed and believes and thereon alleges that its bidding in comparison to the other second round invitees was (i) the lowest (patently, given the steeply discounted Rambler and Walker lines, as well as latently, considering the comparable integration savings to be had under the existing mPOS infrastructure); (ii) the most qualified (having an established track record of success with First

Data in supplying mPOS products over a period of years); and (iii) the most invulnerable to patent infringement claims in the manufacturing and production of mPOS readers.

### G.      The Shoe Drops

108.    By August 21, 2015, however, it was clear that First Data would not be acknowledging AnywhereCommerce as winning bidder for the POGO RFP statement of work. Instead, AnywhereCommerce's coveted position would go to Ingenico.

109.    Indeed, after having acquired a controlling interest in competitor ROAM and having begun integrating its mobile solutions into its U.S. operations, it is believed that Ingenico, in response to its knowledge of Plaintiffs' business plans and on the back of its theft of Plaintiffs' trade secrets, began bundling and discounting products and services to unfairly inflate its profits and shut out competition from AnywhereCommerce and similar others in the mPOS space, generally, and as an mPOS supplier for First Data, specifically.

110.    Respecting the decision to cut out AnywhereCommerce, Dan Bobier of First Data told AnywhereCommerce's Cobrin that the decision was "above his level" but "was not a product issue."

111.    Cobrin then reached out to his mentor, and AnywhereCommerce advisory board member, OB Rawls ("Rawls") who also worked at First Data at the time.  Although not directly involved in the POGO RFP bidding or oversight of the AnywhereCommerce relationship, Rawls promised to look into it.

112.    Over the course of several conversations and after some in-house digging by Rawls, Rawls advised Cobrin that AnywhereCommerce's preferred mPOS supplier status was awarded to Ingenico for "political reasons" internally and confirmed that the decision was "not a product issue, delivery issue, or certification issue."

113.    Thereafter, AnywhereCommerce's viable First Data opportunities had all dried up once Ingenico took hold of First Data's mPOS needs.  It lost its lucrative mPOS supplier position, merchant referral opportunities, and preliminary investment interest expressed by FD Ventures after meeting with Ben Love and others in Atlanta to discuss a possible equity investment in AnywhereCommerce.

114.    The acts and omissions of Defendants constitute a tortious interference with AnywhereCommerce's business relationship with, among others, FDC, FDMS, TASQ, First Data Cono Sur SRL ("FD Argentina"), First Data (China) Co., Ltd. ("FD China"), RapidConnect, TeleCheck Services, Inc. ("TeleCheck"), First Data Singapore (PTE) Ltd ("FD Singapore"), and FD Ventures, among others.

115.    This interference was done without justification and with one or more improper, illegal, and unacceptable motives, including misappropriating Plaintiffs' trade secrets, misappropriating its confidential business strategies and know-how, and maximizing profits and market power at the expense of AnywhereCommerce and to the detriment of merchants and merchant acquirers in this mobile commerce space.

116.    Defendants' tortious conduct has also interfered with AnywhereCommerce's prospective business relationships with others.  For example, AnywhereCommerce had opportunities to be the mPOS supplier of many other groups, opportunities which were usurped by ROAM/Ingenico, including with PayPal, Inc., YUM!, Wells Fargo, Bank of America, INVENSTAR, Banco Azteca, and TAXIPASS, among others.

117.    Absent Defendants' interference, the foregoing relations were reasonably likely to develop.  In fact, these include entities for which AnywhereCommerce had significant discussions

with and, in fact, requested protected account status from ROAM for the supply of mPOS solutions that had been thieved and usurped by Defendants.

118.    This interference was done with improper purpose of injuring AnywhereCommerce and was accomplished, in part, through the misuse of confidential and sensitive business information of AnywhereCommerce, maliciously elicited with Defendants' fake acquisition promises and other false claims.  Indeed, Ingenico in contravention of confidentiality agreements with AnywhereCommerce instead appropriated AnywhereCommerce's business plans and strategies for its own use over a period of years, and with those strategies in hand, displaced AnywhereCommerce and interfered with its relationships.

119.    The loss of the First Data preferred supplier position was a tremendous blow to AnywhereCommerce's business finances and operations and market presence at the time.  As a direct result of the interference, AnywhereCommerce has incurred damage including loss of profits, loss of business, loss of future profits, and costs, the extent of which is, to date, unknown.

**H.    Successor Liability: Ingenico As Successor-In-Interest to Ingenico Ventures**

120.    According to a public record, dated July 3, 2018, from the Registry of the Commercial Court of Paris entitled "EXTRAIT D'IMMATRICULATION PRINCIPALE AU REGISTRE DU COMMERCE ET DES SOCIETES / EXTRACT FROM THE REGISTRY OF COMMERCE AND COMPANIES," Ingenico Ventures dissolved as of January 18, 2018 and deregistered on March 7, 2018 under Article 1844-5 of the French Civil Code[21] via an automatic

---

[21] Article 1844-5, as translated, states in pertinent part:

The reuniting of all the shares of the capital into a single hand does not involve the dissolution of the firm by operation of law. . .

The fact that the usufruct of all the shares of capital belongs to the same person has no consequence as to the existence of the firm.

transfer of all of its assets and liabilities to its then sole shareholder and Managing Director, Defendant Ingenico, known under French law as "*transmission universelle de patrimoine*" or "*TUP*." A true and correct copy of the public record is attached hereto as Exhibit B.

121.    Section 302 of the Second Restatement of Conflict of Laws provides that

The local law of the state of incorporation will be applied to determine [[i]]ssues involving the rights and liabilities of a corporation, other than those dealt with in § 301,[22] are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6], except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship to the occurrence and the parties, in which event the local law of the other state will be applied.

122.    Section 302 "is concerned with issues involving matters that are peculiar to corporations and other associations, whereas the rule of § 301 is concerned with issues arising from corporate acts of a sort that can also be done by individuals." *Id.*, cmt. a. Section 302 applies to issues relating to "mergers" and dissolution. *Id.*

123.    Accordingly, applying French law, Defendant Ingenico bears the liabilities of Ingenico Ventures.

---

"In case of dissolution, it involves the universal transfer of the patrimony of the firm to the sole member, without there being occasion for liquidation. The creditors may object to the dissolution within a period of thirty days after the recording of the latter. A judicial decision shall dismiss the objection or order either the payment of the claims, or the constitution of warranties where the firm offers any and where they are considered sufficient. The transfer of the patrimony is carried out and the juridical person vanishes only at the end of the period for objection or, if there is occasion, where the objection has been dismissed in first instance or where the payment of the claims has been made or the warranties constituted. . .

[French] Civil Code – art. 1844-5 (Amended by Law No. 2001-420 of May 15, 2001 - art. 103 JORF May 16, 2001) (translation by George Rouhette, et al. (Updated 2006), accessible at the following website: https://sopheaksrey.files.wordpress.com/2012/05/french-civil-code_en_2006.pdf (last visited October 8, 2019). The "transfer of patrimony" refers to the transfer of assets and liabilities.

22 Section 301 of the Second Restatement of Conflict of Laws provides that "[t]he rights and liabilities of a corporation with respect to a third person that arise from a corporate act of a sort that can likewise be done by an individual are determined by the same choice-of-law principles as are applicable to non-corporate parties."

124.     To the extent the law of any jurisdiction other than France is deemed applicable, successor liability still would attach to Ingenico because (1) Ingenico expressly or impliedly assumed liability of Ingenico Ventures, (2) the dissolution was a de facto merger or consolidation, (3) Ingenico is a mere continuation of Ingenico Ventures, and/or (4) the dissolution was a fraudulent effort to avoid liabilities of Ingenico Ventures.

## CLAIMS AND VIOLATIONS ALLEGED

### COUNT I – Tortious Interference With Existing and Prospective Contracts and Business Relationships (AnywhereCommerce v. Defendants)
### (Direct Liability, Successor Liability)

125.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

126.     Beginning in or around 2012, after having acquired a controlling interest in competitor ROAM and having begun integrating its mobile solutions into its U.S. operations, it is believed that Ingenico began bundling and discounting products and services, possibly, to unfairly inflate its profits and shut out competition from AnywhereCommerce and similar others in the mPOS space, generally, and as an mPOS supplier for First Data, specifically.

127.     The last event necessary to make Defendants liable for tortious interference involved Defendants' causing First Data and its affiliates to reject AnywhereCommerce's bid for the POGO RFP statement of work, which event occurred in Georgia where First Data is headquartered.[23]

---

[23] Also, Defendant Ingenico GA (wholly owned subsidiary of Ingenico DE) is incorporated and headquartered in Georgia and Ingenico DE (wholly owned subsidiary of Ingenico) is registered to do business and headquartered in Georgia.

128.    The acts and omissions of Defendants constitute a tortious interference with AnywhereCommerce's business relationships with FDC, FDMS, TASQ, FD Argentina, FD China, RapidConnect, TeleCheck, FD Singapore, and FD Ventures, among others.

129.    This interference was done without justification and with one or more improper, illegal, and unacceptable motives, including maximizing profits and market power at the expense of AnywhereCommerce and to the detriment of merchants and merchant acquirers in this mobile commerce space.

130.    Defendants' tortious conduct has also interfered with AnywhereCommerce's prospective business relationships with others.  For example, AnywhereCommerce had opportunities to be the mPOS supplier of many other groups, opportunities which were usurped by ROAM/Ingenico, including with PayPal, Inc., YUM!, Wells Fargo, Bank of America, INVENSTAR, Banco Azteca, and TAXIPASS, among others, the foregoing appearing to be viable customer relationships, many of which for whom AnywhereCommerce requested protected account status from ROAM.

131.    This interference was done with improper purpose of injuring AnywhereCommerce and was accomplished, in part, through the misuse of confidential and sensitive business information of AnywhereCommerce, maliciously elicited with Defendants' fake acquisition promises and other false claims.

132.    The acts of Defendants were intentional, malicious, illegal, outrageous, and/or grossly reckless.

133.    As a direct result of the interference, AnywhereCommerce has incurred damage including loss of profits, loss of business, loss of future profits, and costs, the extent of which is, to date, unknown.

134.    To the extent that Defendants' conduct was done knowingly, intentionally, willfully, wantonly, maliciously, and recklessly, AnywhereCommerce is entitled to an award of punitive damages.

**COUNT II – Violation of The Georgia Trade Secrets Act**
**(O.C.G.A. §§ 10-1-760,** *et seq.***)**
**(BBPOS v. Defendants)**
**(Direct Liability, Successor Liability)**

135.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

136.    The Georgia Trade Secrets Act is meant to prevent the misappropriation of trade secrets as described herein.

137.    BBPOS maintains trade secret-protected information regarding the manufacture of mPOS devices, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public.

138.    This information derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts by BBPOS that are reasonable under the circumstances to maintain its secrecy.

139.    Defendants acquired BBPOS's trade secrets by improper means as described herein, including theft, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

140.     As a result of Defendants' misappropriation of trade secrets they experienced a material and unfair competitive advantage in the marketplace which allowed them to handsomely benefit from their improper conduct to the detriment of BBPOS and others.

141.     This misappropriation was done with improper purpose of injuring BBPOS for a competitive advantage and was accomplished through the misuse of confidential and sensitive business information of maliciously elicited with Defendants' acquisition promises and other false claims.

142.     BBPOS has incurred damages that include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation to be taken into account in computing actual loss, including loss of profits, market share, and royalties.

143.     Defendants' misappropriation was willful and malicious entitling BBPOS to exemplary damages up to double the amount of any award made hereunder and attorney's fees.

### COUNT III – Violation of The Massachusetts Trade Secrets Act
### (Chapter 93 of the General Laws, §§ 42, *et seq.*)
### (BBPOS v. Defendants)
### (Direct Liability, Successor Liability)

144.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

145.     The Massachusetts Trade Secrets Act is meant to prevent the misappropriation of trade secrets as described herein.

146.     BBPOS maintains trade secret-protected information regarding the manufacture of mPOS devices, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public.

147.    This information derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts by BBPOS that are reasonable under the circumstances to maintain its secrecy.

148.    Defendants acquired BBPOS's trade secrets by improper means as described herein, including theft, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

149.    As a result of Defendants' misappropriation of trade secrets they experienced a material and unfair competitive advantage in the marketplace which allowed them to handsomely benefit from their improper conduct to the detriment of BBPOS and others.

150.    This misappropriation was done with improper purpose of injuring BBPOS for a competitive advantage and was accomplished through the misuse of confidential and sensitive business information of maliciously elicited with Defendants' acquisition promises and other false claims.

151.    BBPOS has incurred damages that include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation to be taken into account in computing actual loss, including loss of profits, market share, and royalties.

152.    Defendants' misappropriation was willful and malicious entitling BBPOS to exemplary damages up to double the amount of any award made hereunder and attorney's fees.

## COUNT IV – Violation of The Defend Trade Secrets Act of 2016
### (18 U.S.C. §§ 1836, *et seq.*)
### (BBPOS v. Defendants)
### (Direct Liability, Successor Liability)

153.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

154.     The Defend Trade Secrets Act is meant to prevent the misappropriation of trade secrets as described herein.

155.     BBPOS maintains trade secret-protected information regarding the manufacture of mPOS devices, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public.

156.     This information derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts by BBPOS that are reasonable under the circumstances to maintain its secrecy.

157.     The misappropriated trade secrets at issue are related to a product or service used in, or intended for use in, interstate and foreign commerce.

158.     Defendants acquired BBPOS's trade secrets by improper means as described herein, including theft, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

159.     As a result of Defendants' misappropriation of trade secrets they experienced a material and unfair competitive advantage in the marketplace which allowed them to handsomely benefit from their improper conduct to the detriment of BBPOS and others.

160.     This misappropriation was done with improper purpose of injuring BBPOS for a competitive advantage and was accomplished through the misuse of confidential and sensitive business information of maliciously elicited with Defendants' acquisition promises and other false claims.

161.     BBPOS has incurred damages that include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation to be taken into account in computing actual loss, including loss of profits, market share, and royalties.

162.     Defendants' misappropriation was willful and malicious entitling BBPOS to exemplary damages under the statute and attorney's fees.

## COUNT V – Breach Of Contract
### (BBPOS v. Ingenico GA)

163.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

164.     Defendants, through Rotsaert, under the direction of Lazare and Coonen, thieved BBPOS's trade secrets and gleaned an unfair competitive advantage in breach of Rotsaert's fiduciary duties to ROAM by then allegedly misusing the stolen technology and trade secrets, and converting the same to Ingenico's exclusive benefit without any reasonable value in return, to develop a directly competitive EMV reader.

165.     This amounts to an acknowledged theft of BBPOS's trade secrets by or through Ingenico GA and on the part of Ingenico and Ingenico Ventures with the assistance of ROAM's

then-newly appointed executive, Rotsaert, undertaken with Graylin's knowledge (if not consent) as ROAM's lame-duck Chairman of the Board and CEO.

166.    The foregoing also constitutes a breach (acknowledged by no less than two ROAM executives at the time) of the ROAM License at § 6.1, which provides:

> Both parties agree to treat the other's Confidential Information (as defined below) as confidential, to take all reasonable measures to protect and prevent the disclosure of and/or unauthorized use by third parties of the other parties' Confidential Information, to exercise at least the same degree of care exercised for the protection of its own Confidential Information, and to not use Confidential Information other than for its intended purpose under this Agreement.

167.    Said breach entitles BBPOS to indemnification by Ingenico GA of all related losses incurred by BBPOS as a result of this improper disclosure of its confidential material to a direct competitor and the detrimental marketplace impact suffered by BBPOS.  In particular, § 4.3 of the ROAM License provides:

> The Company agrees to indemnify and hold [BBPOS] harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Company or arising out of or resulting from any claim brought by a third party against [BBPOS] as a result of or relating to any actual or alleged breach hereof by the Company.  In the event of any such claim, [BBPOS] agrees to notify the Company promptly of the claim and to permit the Company at the Company's expense, to assume control of the defence (sic) thereof with counsel of the Company's choosing, and cooperate with the Company in such defence (sic) at the Company's expense.

168.    BBPOS has suffered losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach of Ingenico GA's confidentiality obligations under the ROAM License, entitling BBPOS to recovery of the same from Ingenico GA.

## COUNT VI – Violation of Section 43(a) Of The Lanham Act
### (15 U.S.C. § 1125(a))
### (BBPOS v. Defendants)
### (Direct Liability, Successor Liability)

169.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

170.    BBPOS spent years and substantial monetary investments in creating the trade secrets misappropriated by Defendants, such that the ownership of the misappropriated trade secrets give rise to property rights.

171.    Defendants have appropriated the misappropriated trade secrets at little or no cost, such that Defendants improperly and unfairly have reaped the benefits of that which they have not sown.

172.    Defendants' acts have injured BBPOS, including by a direct diversion of profits from BBPOS to Defendants and a loss of royalties that BBPOS charges to others to use the trade secrets so misappropriated.

173.    As a result of Defendants' unfair competition as described herein, BBPOS is entitled to recover: (1) Defendants' profits; (2) BBPOS's damages arising herefrom, including loss of profits, market share, and royalties; and (3) the cost of the action.

## COUNT VII – Unjust Enrichment
### (Plaintiffs v. Defendants)
### (Direct Liability, Successor Liability)

174.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

175.    In improperly procuring the trade secrets and business plans of Plaintiffs, Plaintiffs conferred a substantial benefit upon Defendants.

176.    Defendants accepted, retained, and enjoyed the benefit of Plaintiffs' trade secrets and business plans.

177.    Since at least December 13, 2017, Defendants accepted, retained, and enjoyed the benefit of Plaintiffs' trade secrets and business plans in connection with Ingenico's U.S.-based mPOS operations in the State of Georgia – the place where Defendant Ingenico GA (wholly owned subsidiary of Ingenico DE) is incorporated and headquartered and where Defendant Ingenico DE (wholly owned subsidiary of Ingenico) is registered to do business and headquartered.

178.    The retention of the benefits of Plaintiffs' trade secrets and business plans without compensating Plaintiffs would be unjust.

179.    The reasonable value of the benefit conferred by Plaintiffs is in excess of $75,000.

**COUNT VIII – Violation Of The Georgia Deceptive Trade Practices Act (O.C.G.A. § 10-1-372(a))**
**(Plaintiffs v. Defendants)**
**(Direct Liability, Successor Liability)**

180.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

181.    Plaintiffs are manufacturers/vendors of goods supplied to First Data and others.

182.    Defendants are commercial competitors. Their actions as described above constitute deceptive and unfair trade practices in violation of O.C.G.A. § 10-1-372(a).

183.    The Georgia Deceptive Trade Practices Act was enacted to protect the public and legitimate business enterprises from those who engage in unfair methods of competition and unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

184.    Defendants' actions as alleged herein, constitute unconscionable commercial practices, deception, fraud, false pretense, false promise, and/or misrepresentation in violation of O.C.G.A. § 10-1-372(a).

185.     Defendants engage in deceptive, unfair, and fraudulent misrepresentations as alleged herein, including their theft of Plaintiffs' trade secrets and business plans and elimination of mPOS competition through leveraging its historic POS terminal influence globally and through its relationship with First Data, locally.

186.     Consumers, *i.e.*, merchants and merchant acquirers, are certain to be deceived with regard to Defendants' business practices in initially pretending to partner with Plaintiffs to then squeezing them out of the marketplace and rebranding Plaintiffs' trade secrets and business plans as Ingenico's own and rebranding those same products in a manner intended to deceive consumers.

187.     As a direct and proximate result of Defendants' unlawful acts and omissions, Plaintiffs have suffered an ascertainable loss of money or property in the form of diverted or lost sales and royalties.

188.     Plaintiffs are entitled to compensatory and punitive damages, equitable and injunctive relief, costs, and reasonable attorney's fees.

**COUNT IX – Violation Of The Georgia Fair Business Practices Act**
**(O.C.G.A. §§ 10-1-390, *et seq*.)**
**(Plaintiffs v. Defendants)**
**(Direct Liability, Successor Liability)**

189.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

190.     Plaintiffs are manufacturers/vendors of goods supplied to First Data and others.

191.     Defendants are commercial competitors. Their actions as described above constitute unlawful acts and practices in violation of O.C.G.A. § 10-1-393.

192.     The Georgia Fair Business Practices Act was enacted to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the State.

193.    Defendants' actions as alleged herein, constitute unconscionable commercial practices, deception, fraud, false pretense, false promise, and/or misrepresentation.

194.    Defendants engage in deceptive, unfair, and fraudulent misrepresentations as alleged herein, including their theft of Plaintiffs' trade secrets and business plans and elimination of mPOS competition through leveraging its historic POS terminal influence globally and through its relationship with First Data, locally.

195.    Consumers, *i.e.*, merchants and merchant acquirers, are certain to be deceived with regard to Defendants' business practices in initially pretending to partner with Plaintiffs to then squeezing them out of the marketplace and rebranding Plaintiffs' trade secrets and business plans as Ingenico's own and rebranding those same products in a manner intended to deceive consumers.

196.    As a direct and proximate result of Defendants' unlawful acts and omissions, Plaintiffs have suffered an ascertainable loss of money or property in the form of diverted or lost sales and royalties.

197.    Plaintiffs are entitled to compensatory and punitive damages, equitable and injunctive relief, costs, and reasonable attorney's fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

A.      Judgment in Plaintiffs' favor on all claims asserted against Defendants;

B.      Judgment be entered in Plaintiffs' favor and against Defendants for statutory damages including but not limited to double damages, costs of this action (including reasonable attorney's fees), equitable relief, and for such other further relief as the Court deems just and proper.

C.      Monetary damages arising from Ingenico GA's breaches of the terms of the ROAM License in an amount to be proven at trial but in excess of $75,000, including without limitation compensatory and actual damages;

D.      All damages and/or other monetary relief, as provided by federal and state laws;

E.      Pre-and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the complaint;

F.      Plaintiffs' costs and disbursements of this suit, including reasonable attorney's fees as provided by law and/or contract; and

G.      Such other further and different relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Plaintiffs demand a jury trial.


Dated: October 17, 2019

Respectfully submitted,

Plaintiffs,
By their attorneys,

*/s/ Jonathon D. Friedmann*
Jonathon D. Friedmann, Esq. (BBO # 180130)
Robert P. Rudolph, Esq. (BBO # 684583)
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA 02109
Tel.: (617) 723-7700
Fax: (617) 227-0313
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

and

KUTAK ROCK LLP

*/s/ Melissa A. Bozeman*
Oliver D. Griffin (Pro Hac Vice)
Pennsylvania Bar No. 88026
Oliver.griffin@kutakrock.com
Peter N. Kessler (Pro Hac Vice)
Pennsylvania Bar No. 209033
Peter.kessler@kutakrock.com
Melissa A. Bozeman (Pro Hac Vice)
Pennsylvania Bar No.  201116
Melissa.bozeman@kutakrock.com
1760 Market Street
Suite 1100
Philadelphia, PA  19103-4104
(215) 299-4384 (Telephone)
(215) 981-0719 (Facsimile)

Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

I, Melissa A. Bozeman, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 17, 2019

*/s/ Melissa A. Bozeman*
Melissa. A. Bozeman

# EXHIBIT A

## ENGINEERING DEVELOPMENT AND LICENSE AGREEMENT

THIS AGREEMENT is made as of the 4th day of May 2010

Between

**ROAM Data, Inc.,** a Delaware corporation with its head office situated at 280 Summer Street, Lobby Level, Boston, MA 02210, fax no. +1 617 249 1661 (the "Company");

And

**BBPOS LIMITED,** a Hong Kong corporation with its address situated at Room 810, 8/F, Grand City Plaza, 1 Sai Lau Kok Road, Tsuen Wan, H.K., (the "Partner").

WHEREAS

A.    The Company wishes to engage the Partner to provide services (the "Services") identified on Schedule I, including design, manufacturing and production of the devices identified in Schedule I (the "Products" and "Devices"), and including software development, in each case according to the scope of work, processes, specifications, schedule and milestone described in Schedule I (the "Specifications").

B.    The Company wishes to obtain an exclusive license to use and sell the products identified in Schedule I (the "Products").

C.    The Partner agrees to license the rights to the Products and provide the Products, Devices, and Services in accordance with the terms of this Agreement.

NOW IT IS AGREED as follows:

1.    **LICENSE**

1.1    The Partner hereby grants to the Company a worldwide, perpetual, fully-paid license to freely use and sell the Products.

1.2    The license granted in Section 1.1 is not transferrable or assignable in the event a sale of the Company to a competitor with its own POS products without prior written consent of the Partner, not to be unreasonably withheld.

1.3    The license granted in Section 1.1 is exclusive on a worldwide basis (with the exception of China, Philippines, as set forth below and clause 1.5). Without limiting the generality of the foregoing, the Partner may not, directly or indirectly, anywhere in the world, use or sell any Products, or any portion thereof, or any products similar to or based upon any Products (other than as explicitly provided in this Agreement) or grant any other person the right to use or sell any Products, any portion thereof, or any products similar to or based upon any Products. Notwithstanding the foregoing provisions of this Section 1.3, the Partner shall retain non-exclusive, non-transferrable right to sell the Products in China for use in China and sell the Products in Philippines and use in Philippines.

1.4

During the term of this Agreement, the Partner will have the nonexclusive right to resell the BBPOS and ROAMpay POS solution described on Schedule I, and the Partner shall be

entitled to a commission equal to 25% of the Net Profit of for recurring service revenue or transaction revenue relating to any such resale. "Net Profit" as used in this section is defined as the Company's revenue minus cost of goods sold, cost of customer acquisition and service.    The terms of this resale arrangement shall be subject to and as set forth in a Reseller Agreement to be discussed by the parties following the date of this Agreement and where a simple means to account for 25% Net Profit or equivalent value will be agreed upon for disbursement of the commission to the Partner by the Company.

1.5     Notwithstanding the foregoing provisions of this Section 1.3, during the term of this Agreement, in the event that the Company is unable to provide the BBPOS and ROAMPay POS solution ("The Solution") in a region or country due to regional or national policies, or the Company's decision of not providing the solution to that region or country, the Partner shall have the option to jointly sell with the Company the BBPOS or ROAMpay POS in that region or country separately independent of the Solution. The ability to jointly sell preserves price integrity and brand integrity of the hardware, avoids channel conflict and can result in higher margin should there be no recurring revenue. To preserve price and branding integrity, the Partner shall sell the BBPOS and ROAMpay POS under ROAM branding. Under this circumstance where the Partner finds the customer and sells the BBPOS or ROAMpay POS jointly with the Company, and no backend services is required, the Partner would receive a commission of 50% of the Margin. Margin is defined as price of product minus cost manufacturing, packaging and Bill of Material.

## 2.    APPOINTMENT

2.1     The Company engages the Partner to provide the Services, and the Partner accepts such appointment. The terms of this engagement shall be as set forth herein or in any Statement of Work ("SOW") signed by the parties from time to time. Except as otherwise agreed by the parties, each SOW shall contain each of the following items: description of the services and place of performance; schedule for provision of the Services and performance; the Company's right to own the Devices or any associated work product; costs of the Services and agreed expenses; and invoicing schedule. Any SOW shall be deemed a part of this Agreement. Products, Devices, Deliverables, Services or Specifications referred to in any SOW shall be deemed Products, Devices, Deliverables, Services or Specifications, respectively, under this Agreement.

## 3.    PARTNER REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1     The Partner shall promptly provide and deliver to the Company the Products, Devices, Services or other work product ordered or requested by the Company as specified herein or in any SOW (collectively, the "Deliverables").

3.2     The Partner warrants and agrees that it will perform the Services in a professional manner, that it will at all times comply with applicable law in connection with this Agreement, that that it will exercise the highest level of skill and care in the provision of the Services, including without limitation in connection with the design and manufacture of the Devices. All Products, Devices, Deliverables and Services shall be provided in accordance with the applicable Specifications. In the event the Partner receives notice from the Company that any Product, Device, Deliverable or Service is not in compliance with the applicable Specifications or is otherwise not accepted by the Company pursuant to Section 4.1 below, the Partner, as a non-

2

exclusive remedy of the Company, shall use best efforts to promptly correct such noncompliance or other problem or defect.

3.3 Without prejudice to any rights or remedies of the Company, the Partner shall notify the Company immediately in writing if it encounters any delays or problems in connection with its provision of the Services or otherwise in connection with any Deliverable and shall take all reasonable steps to mitigate any such delay or problem.

3.4 The Partner shall be responsible for ensuring that all Deliverables are provided to the Company in compliance with all applicable import and export laws. The Partner shall be responsible for the payment of all tariffs, duties, customs fees and taxes, and the like in connection with the provision of the Deliverables to the Company in accordance with this Agreement.

3.5 The Partner agrees that the Company may, at any time and for any reason, cancel or suspend any requested Services or Deliverables and that the Company shall not be required to pay for any Services performed or Deliverables delivered in contravention of any such cancelation or suspension.

3.6 To the extent permitted by the Company in writing, it is hereby agreed that the Partner is entitled to sub-contract or otherwise engage any third party that is not competitive with the Company to manufacture the Products pursuant hereto, provided that any such sub-contractor or other third party shall comply with this Agreement and the Partner shall be responsible for any breach hereof, or any other actions or inactions relating to this Agreement, by such sub-contractor or other third party.

3.7 Upon delivery and acceptance of a Deliverable, the Company shall hold good, valid and marketable title to the Deliverable, free and clear of any liens, encumbrances, and restrictions on use, resale or transfer.

3.8 The Partner agrees that, during or after the term of this Agreement, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Devices, or products substantially similar to the Devices, for any third party. The Partner also agrees that, during or after the term of this Agreement, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Products, or products substantially similar to the Products, for any third party (other than in China to the extent permitted in Section 1.3 above).

3.9 The Partner represents and warrants that it has full power to enter into this Agreement and to carry out its obligations pursuant to this Agreement. The Partner represents and warrants that it has obtained all corporate, third party, and governmental approvals and intellectual property rights necessary to enter into this Agreement and carry out the transactions contemplated hereby.

3.10 The Partner represents and warrants that that none of the Products, Devices, Deliverables or Services does or will infringe, misappropriate or violate any intellectual property right of any person. The Partner represents and warrants that that none of the Products, Devices, or Deliverables does or will contain any third-party software or products, other than any third-party software or product that is included therein with the Company's written consent and that in no manner interferes with or limits the Company's right to use or sell such Product, Device or Deliverable. The Partner represents and warrants that it has used, and will use for the Company's benefit, its best efforts to perfect and protect all intellectual rights in the Products, Devices, Deliverables and Services. The Partner shall sign all documents, make all

3

filings and take all actions reasonably requested by the Company in order to perfect and protect the Company's intellectual property rights in the Products, Devices, Deliverables or Services. The Partner shall promptly notify the Company if it becomes aware of any actual or alleged infringement with respect to any Products, Devices, Deliverables or Services.

3.11    The Company may in its discretion, in connection with the performance by the Partner of its obligations under this Agreement, provide the Partner with the use of rights or property owned or used by the Company ("Company Property"). Company Property shall be used by the Partner only for its intended purpose during the term of this Agreement and shall be promptly returned to the Company upon termination of this Agreement or earlier at the request of the Company. Company Property and all rights therein shall at all times remain the sole property of the Company, subject only to the Partner's limited right to use Company Property as set forth in this Section 3.11. Without limiting the generality of the foregoing provisions of this Section 3.11, the Partner shall not use any Company Property in connection with the provision of products or services for any person other than the Company.

3.12    The Partner agrees that the Company is and shall be the sole and exclusive owner of all right, title and interest, including all intellectual property rights, in and to all Deliverables (other than Products), that all Deliverables (other than Products) are deemed "works for hire" for the Company, and that all rights in all Deliverables (other than Products) that are not otherwise vested in the Company are hereby irrevocably assigned and transferred to the Company. Without limiting the generality of the foregoing, the Partner agrees that the Company is the sole and exclusive owner of all rights in and to the Software (as defined below), that no proprietary rights, including but not limited to copyrights and patents in the Software, are being retained by or transferred to the Partner, and that the Company is the exclusive owner of all right, title and interest, including all intellectual property rights, in and to any and all source code developed solely by or for the Partner related to or in support of any object code of the Software. As used in this section, "Software" means the mobile applications developed by the Partner on behalf of the Company.

3.13    The Partner represents and warrants that each Deliverable will not contain any malicious code, programs or other components (e.g., computer "virus", computer "worm", computer time bomb, "Trojan horse", "back door", or similar component) or any other code, program or other component that would have the effect of damaging, destroying, disabling, or otherwise shutting down, or altering the functionality of or specifications for, or restricting the use of or access to, all or any portion of any Deliverable.

3.14    The Partner acknowledges that this Agreement contains no minimum purchase commitments and that the Company is not expressing or implying any commitment or guarantee as to the scope of work or orders from the Partner.

3.15    The Partner shall at its own cost maintain adequate and appropriate insurance policies as are necessary to cover its obligations and liabilities under this Agreement and shall furnish to the Company upon request proof of such insurance.

3.16    The Partner hereby warrants to the Company and its customers that for 12 months the Products, Devices and Deliverables will be free from defects and operate as intended and in accordance with all applicable Specifications and other documentation.

4

3.17   The Products and Devices will be packaged and shipped by the Partner.   The Company will pay for appropriate shipping costs from Hong Kong to Boston, MA.

3.18   The Partner agrees to indemnify and hold the Company harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Partner or arising out of or resulting from any claim brought by a third party against the Company as a result of or relating to any actual or alleged breach hereof.

## 4.   COMPANY REPRESENTATIONS, WARRANTIES AND COVENANTS

4.1   In consideration of and subject to the Partner complying with its obligations under this Agreement, the Company agrees to pay the Partner the consideration referred to in Schedule II. All cash payments are paid in U.S. dollars, it being understood that any prices quoted are for FOB Hong Kong (unless otherwise specified). The Company will have 10 days upon delivery to inspect the Products, Devices, or Deliverables and shall be required to remit payment to the Partner only upon the Company's acceptance thereof. Such acceptance by the Company of any Product, Device or Deliverable shall not be deemed a waiver of any rights or remedies of the Company with respect thereto. If the Company does not accept any Product, Device or Deliverable, it shall notify the Partner in writing of such non-acceptance and the reason therefor. The Company may withhold from any payments any amounts that the Company reasonably determines are appropriate under applicable law.

4.2   The Company represents and warrants that it has full power to enter into this Agreement and to carry out its obligations pursuant to this Agreement. The Company also represents and warrants that it has obtained all corporate, third party, and governmental approvals and intellectual property rights associated with the Products necessary to enter into this Agreement and carry out the transactions contemplated hereby.

4.3   The Company agrees to indemnify and hold the Partner harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Company or arising out of or resulting from any claim brought by a third party against the Partner as a result of or relating to any actual or alleged breach hereof by the Company. In the event of any such claim, the Partner agrees to notify the Company promptly of the claim and to permit the Company at the Company's expense, to assume control of the defence thereof with counsel of the Company's choosing, and cooperate with the Company in such defence at the Company's expense.

## 5.   TERM AND TERMINATION

5.1   This Agreement shall become effective upon execution and shall continue in full force unless or until terminated (a) by the written consent of the parties or (b) by either party pursuant to Section 5.3 below. Nothing in this clause shall prejudice the continued application of those terms and conditions intended to have effect after termination of this Agreement.

5.2   Upon termination of this Agreement, the Partner shall, at the Company's option, either (a) immediately deliver to the Company all finished and incomplete

Deliverables at costs payable by the Company or (b) the Partner may sell such finished Products in China until such Products are sold out.

5.3    Either party may immediately terminate this Agreement by notice to the other party in the event that:

(a)    the other party becomes insolvent, files for bankruptcy, discontinues all or a substantial portion of its business operations, and cannot perform its obligations; or

(b)    the other party breaches any provision of this Agreement and such breach is not remedied within 30 days after receipt of notice from the first party requiring it to remedy such breach.

5.4    The Company agrees that it and its affiliated companies shall distribute the minimum aggregated total of 10,000 Products from the Partner in each full calendar year for the duration of this Agreement. In the event the company fails to meet the Minimum order for a full calendar year starting 2011, the Partner may immediately terminate this agreement.

## 6.    CONFIDENTIALITY

6.1    Both parties agree to treat the other party's Confidential Information (as defined below) as confidential, to take all reasonable measures to protect and prevent the disclosure of and/or unauthorized use by third parties of the other parties' Confidential Information, to exercise at least the same degree of care exercised for the protection of its own Confidential Information, and to not use Confidential Information other than for its intended purpose under this Agreement.

6.2    "Confidential Information" shall mean information (whether written or oral) of a confidential or proprietary nature concerning this Agreement or the assets, products or business of any party hereto that either party shall have obtained as a result of discussions or communications related to this Agreement or the transactions contemplated undertaken by this Agreement, including (but not limited to) in the case of the Company, the technical and other information concerning the Products and Devices and related documentation. Without limiting the generality of the foregoing, the terms and conditions of this Agreement are hereby deemed Confidential Information. Also without limiting the generality of the foregoing, if either party hereto receives from the other party written information that is marked "Confidential" and/or "Proprietary", such information shall be deemed "Confidential Information." The obligation to keep Confidential Information confidential shall not apply to any information that has been disclosed in publicly available sources; is, through no fault of the party receiving the confidential information, hereafter disclosed in a publicly available source; or is in the rightful possession of the party receiving the confidential information without an obligation of confidentiality.

6.3    Notwithstanding any provision herein to the contrary, a party may disclose Confidential Information on a need-to-know basis to its contractors, lawyers, accountants and agents, provided that any such person is bound by a duty of confidentiality, and such party shall be responsible for any disclosure or use by any such third party in contravention hereof. In addition, a party may disclose Confidential Information if such party reasonably determines that such disclosure is required by law, provided that such party shall endeavour to minimize the extent of such disclosure and, if possible, provide the other party with prior notice of the disclosure

6

so as to allow such other party to seek a protective order to prevent or limit the disclosure.

6.4   Upon termination of this Agreement, each party shall promptly return to the other, or certify that it has destroyed, any documents or other materials containing Confidential Information of the other party. In addition, during the term of this Agreement, at the request of a party, the other party shall return any documents or other materials containing Confidential Information of the requesting party.

6.5   The obligation not to disclose shall continue for a period of five (5) years after the termination of this Agreement.

## 7.   NO PARTNERSHIP OR AGENCY

7.1   Nothing in this Agreement shall have the effect of constituting either the Company or the Partner as an agent of the other, and neither is authorized to make any representation nor incur any obligation of any kind on behalf of the other party, nor to bind the other party in any way. This Agreement shall not be construed as creating any joint venture, partnership or agency agreement between the Company and the Partner.

## 8.   AMENDMENT

8.1   Any amendment or waiver to this Agreement shall be in writing and signed by the parties.

## 9.   ASSIGNMENT, SUB-LICENSING

9.1   The Partner shall have no right to assign, sub-licence, divest or otherwise delegate or purport to transfer any of its rights and obligations under this Agreement without the prior written consent of the Company except as expressly set out in this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

9.2   The Company shall have rights to the design of the ROAMpay POS, and to all engineering and Gerber files, and tooling so that it can manufacture the Products with a vendor of its choice. If Partner is not able to perform the Services properly or cost effectively, as determined by the Company, the Company has the right to source the Services elsewhere, and the Partner will provide all required or requested materials and information to the Company. If the Products or Devices incorporate Partner-owned IP, the Company is hereby granted a worldwide, perpetual, fully paid, sublicensable license to use the Partner IP to continue developing, manufacturing and selling the Products and Devices. The Company shall have to right to request such designs, files, tooling from the Partner provided all payments to the Partner within this agreement has been paid for.

## 10.   SEVERABILITY

10.1   If, at any time, any one or more of the provisions in this Agreement is or are deemed to be invalid, illegal, unenforceable or incapable of performance in any respect, the validity, legality, enforceability or performance of the remaining provisions of this Agreement shall not be affected.

## 11.   WAIVER

7

11.1  No failure or delay by either party in exercising any right, power or privilege to which it is entitled shall operate as a waiver nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise.

11.2  For the avoidance of doubt, any waiver of any breach of the Agreement by either party shall not be construed as a waiver of any subsequent breaches of that same or any other provision.

**12.    ENTIRE AGREEMENT**

12.1  All agreements and obligations herein contained shall be in substitution for and shall supersede all and any previous agreements or understandings, oral or written, between the parties with respect to the subject matter hereof.

**13.    SCHEDULES**

13.1  All schedules to this Agreement constitute integral parts of this Agreement.

**14.    HEADINGS**

14.1  The headings inserted in this Agreement are for convenience only and shall not affect the construction of this Agreement.

**15.    NOTICES**

15.1  Any notice or other information required or authorised by this Agreement to be given by either party to the other may be given by hand or sent (by reputable international courier that guarantees delivery in 5 or fewer days, or by facsimile transmission) to the other party at its address referred to in preamble of this Agreement.

15.2  Any notice or other information served pursuant to 15.1 shall be deemed to have been served when delivered by hand at the time of delivery and, when sent by international courier as provided above, 5 days after the date of sending and, when sent by facsimile, on the date of transmission.

**16.    APPLICABLE LAW**

16.1  This Agreement shall be governed by and construed in all respects in accordance with the laws of Massachusetts, USA and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the courts of Massachusetts. Either party may require that any dispute concerning this Agreement that is not resolved by the parties within 30 days be resolved by binding arbitration in Boston, Massachusetts using one arbitrator and the Commercial Arbitration Rules of the American Arbitration Association.

IN WITNESS whereof the parties hereto have executed this Agreement the day and year first above written.

SIGNED by                                )
                                         )
for and on behalf of                     )
**ROAM Data, Inc.**                      )
                                         )

**Will Graylin, CEO,**

SIGNED by                                )
                                         )
for and on behalf of                     )
**BBPOS (Hong Kong) Limited**            )
                                         )

**Ben Lo, CEO**

9

### SCHEDULE I

## PRODUCTS, DEVICES, SERVICES AND SPECIFICATIONS

#### The Products

- Encrypted Circle Swipe reader, sometimes referred to as the "Crypto Swipe" or "ROAMpay Swipe" that has ability to generate capacitance for encryption from the audio jack of a mobile device or PC, this was developed by the Partner, and including any variance of this design.
- EMV capable POS unit with Bluetooth interface, sometimes referred to as the "BBPOS" currently completing certification.

#### The Solution

- Payment solution using the BBPOS or ROAMpay POS as the customer facing hardware terminal and transact via any ROAM Data payment gateway or equivalent software backend for recurring revenue and services.

#### The Devices

- The "ROAMpay POS" EMV terminal developed by the Contactor based on the foundation of BBPOS, is the "Device" that will be owned by ROAM. *ROAMpay POS*

#### The Services and Specifications

- The Services shall include appropriate design and manufacturing services to produce the Cyrpto Swipe devices, including without limitation key injection and support with respect to software to port to ROAMplayers on a variety of devices.

- The Services shall include Software development services.

- The Services and Devices shall include the design and development of the ROAMpay POS device which includes EMV L1, L2, and PCI certifications.  ROAMpay POS shall contain, enough memory to run applications including a ROAMplayer, it shall contain WIFI, has ability to interface with other mobile phones like the iPhone, and can adapt to a portable low cost printer. This printer shall be produced by the Partner. Future versions of the ROAMpay POS may contain NFC.

- The Partner shall provide at minimum one dedicated resource with iPhone, Android, Blackberry development skills to help with ROAMplayer and mobile application development, and at minimum two dedicated resource for server side development, with DB, C#, .Net skills.  Four development resources along with a project manager will be made full time available to Company.

- Other Devices, Services and Specifications may be set forth in any SOW.

10

## SCHEDULE II

### PAYMENTS for Engineering Development and Licensing

- $250,000 for development, certification and Licensing of ROAMpay POS, which can include additional cost for certification, to be paid as follows: $50,000 upon signing of this agreement, $50,000 upon working prototype of the ROAMpay POS product, $50,000 upon PCI PED certification, and $50,000 upon EMV L1 and L2 certification, $50,000 upon integrating EMV application with ROAMplayer application via Bluetooth. *Additional out of pocket cost of EMV and PCI PED certification of the ROAMpay POS will be paid by Company to Partner.*

- $50,000, to be paid at the time of signing as part of the exclusive license to the Products. Note that any funds from previous contracts on FSK reader and non-encrypted reader can be applied towards money due from the Company to the Partner for this agreement and future orders of product.

- ROAM will be the exclusive distributor of the Products and Devices, Cyrpto Swipe (branded ROAMpay Swipe) and ROAM will provide margin of $3 per Crypto Swipe unit and $7 per BBPOS or ROAMpay POS unit above cost of manufacturing, packaging and BOM (Bill of Material), paid to BBPOS for delivering the units to ROAM as part of the invoice for hardware. These margins will be built into the price per unit charged to ROAM which also include BOM and manufacturing costs. For the case of BBPOS or ROAMpay POS sales referred by the Partner and where only hardware is sold, both parties will split the margin with 50% of the Margin going to the Partner, in accordance with section 1.5 of this agreement.

- $25,000 per month for four (4) dedicated programmers or development resources include one (1) project manager to help the Company with ongoing software development for ROAMplayer, ROAM Server side work, internationalization, and other software work. ROAM may request to scale these development resources up or down based on its discretion, and what is happening in the market. To be clear, the Company is separately outsourcing the Partner in this clause to provide development resources for the Company, which can go up or down, this variable cost is purely for engineering development and is not consideration for licensing under this agreement.

- The Company will issue the Partner an option or warrant to purchase 100,000 shares of Company common stock option, with strike price of $0.12, subject to Company board approval and the parties entering into an option or warrant agreement (which shall provide, among other provisions, that upon termination of this Agreement the option or warrant shall terminate and the Company shall have the right to repurchase the shares), and subject to the Company being satisfied that it has obtained all required corporate or contractual consents for the issuance and that such issuance is in compliance with applicable law.

- In the event the Partner refers any services to the Company, the Company shall pay to Partner an amount equal to 25% of the Company's net profits from such services as described in section 1.4 of this agreement.

11

## AMENDMENT TO ENGINEERING DEVELOPMENT AND LICENSE AGREEMENT

Amendment to Engineering Development and License Agreement made as of May 4, 2010 (the "Agreement") by and between ROAM Data, Inc., a Delaware corporation with its head office situated at 280 Summer Street, Lobby Level, Boston, MA 02210, fax no. +1 617 249 1661 (the "Company"), and BBPOS LIMITED, a Hong Kong corporation with its address situated at Room 810, 8/F, Grand City Plaza, 1 Sai Lau Kok Road, Tsuen Wan, H.K., (the "Partner").

WHEREAS, the Agreement originally contemplated an exclusive product license; and

WHEREAS, Partner filed or caused to be filed US Patent Application Number 12/767,831 for secure audio coupled card swiper filed on April 27, 2010 with the United States Patent and Trademark Office (the "Patent Application"); and

WHEREAS, the Company and Partner wish to amend the Agreement to include the Patent Application within the scope of the exclusive license grant under the Agreement, to clarify that the scope of the license grant under the Agreement includes any other intellectual property rights of the Partner relating to the Products and to make certain further amendments to the Agreement;

NOW THEREFORE, for good and valuable consideration the receipt of which is hereby acknowledged, the Company and Partner hereby agree as follows:

1. Section 1.1 of the Agreement is hereby amended and restated to read in its entirety as follows:

"1.1 The Partner hereby grants to the Company a worldwide, perpetual, fully-paid license to freely use the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and distribute the Products, any portion thereof, or any products similar to or based upon any Products. For purposes of this Agreement, "Partner Intellectual Property" shall mean: (a) any and all patents and patent applications relating to the Products, including without limitation US Patent Application Number 12/767,831 for secure audio coupled card swiper filed on April 27, 2010 with the United States Patent and Trademark Office (the "Patent Application") and any patents issuing on the Patent Application, including (i) any reissues, renewals, reexaminations, substitutions or extensions thereof and foreign equivalents of the foregoing; (ii) any claim of a continuation-in-part application or patent that is entitled to the priority date of, and is directed specifically to subject matter specifically described in, the Patent Application; (iii) any foreign counterpart thereof (including PCTs); and (iv) any supplementary protection certificates and any other patent term extensions, restorations and exclusivity periods and the like of the Patent Application; and (b) any copyrights, trademarks, trade names, trade secrets, knowledge, data and information owned or controlled by the Partner relating to the Products."

2. Section 1.3 of the Agreement is hereby amended and restated to read in its entirety as follows:

"1.3 The license granted in Section 1.1 is exclusive on a worldwide basis (with the exception of China, Philippines, as set forth below and Section 1.5). Without limiting the generality of the foregoing, the Partner may not, directly or indirectly, anywhere in the world, use or sell any Products, or any portion thereof, or any products similar to or based upon any Products (other than as explicitly provided in this Agreement) or grant any other person rights to the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and distribute any Products, any portion thereof, or any products similar to or based upon any Products. Notwithstanding the foregoing provisions of this Section 1.3, the Partner shall retain the non-exclusive, non-transferrable right to sell the Products in China for use in China and sell the Products in Philippines for use in Philippines."

3. The following new Section 4.4 is hereby inserted immediately following Section 4.3 of the Agreement:

"4.3 In the event that any person is infringing or misappropriating the Partner Intellectual Property within the Company's exclusive geographic field, the Company shall have the first right, but not the obligation, to institute, prosecute and control legal proceedings and/or administrative proceedings to prevent or restrain such infringement or misappropriation, at its own expense. In the event that the Company elects to initiate legal proceedings and/or administrative proceedings in accordance with the preceding sentence, the Company shall be required to deliver notice of such election to the Partner. The Partner shall assist in the prosecution of such proceedings as reasonably requested by the Company at the Company's expense, and the Partner may participate in such proceedings with its own counsel, at its sole cost and expense. Any recoveries from such proceedings shall first be used to reimburse the Company for the costs and expenses associated with the proceedings (including amounts used to reimburse the Partner for expenses incurred by the Partner for assistance requested by the Company). If any recoveries still remain, the balance shall be paid to the Company."

4. That Schedule II to the Agreement is hereby deleted in its entirety and replaced by Schedule II attached hereto.

5. Any capitalized terms used herein without express definition shall have the respective meanings defined for them in the Agreement.

6. The parties hereby confirm and acknowledge the continuing validity and enforceability of the Agreement as amended hereby.

IN WITNESS whereof the parties hereto have executed this Amendment to Engineering
Development and License Agreement, effective as of August _15,_ 2011.

SIGNED by                              )
                                       )
for and on behalf of                   )
**ROAM Data, Inc.**                    )
in the presence of:-                   )

_____              **Will Graylin, CEO,**


SIGNED by                              )
                                       )
for and on behalf of                   )
**BBPOS (Hong Kong) Limited**          )
in the presence of:-                   )

_____              **Ben Lo, CEO**

## SCHEDULE II

### PAYMENTS for Engineering Development and Licensing

- $250,000 for development, certification and Licensing of ROAMpay POS, which can include additional cost for certification, to be paid as follows: $50,000 upon signing of this agreement, $50,000 upon working prototype of the ROAMpay POS product, $50,000 upon PCI PED certification, and $50,000 upon EMV L1 and L2 certification, $50,000 upon integrating EMV application with ROAMplayer application via Bluetooth. *Additional out of pocket cost of EMV and PCI PED certification of the ROAMpay POS will be paid by Company to Partner.*

- $50,000, to be paid at the time of signing as part of the exclusive license to the Products. Note that any funds from previous contracts on FSK reader and non-encrypted reader can be applied towards money due from the Company to the Partner for this agreement and future orders of product.

- ROAM will be the exclusive distributor of the Products and Devices, Cyrpto Swipe (branded ROAMpay Swipe) and ROAM will provide margin of $3 per Crypto Swipe unit (which shall be reduced to a margin of $2 per unit for sales above 150,000 cumulative units) and $7 per BBPOS or ROAMpay POS unit above cost of manufacturing, packaging and BOM (Bill of Material), paid to BBPOS for delivering the units to ROAM as part of the invoice for hardware. These margins will be built into the price per unit charged to ROAM which also include BOM and manufacturing costs. For the case of BBPOS or ROAMpay POS sales referred by the Partner and where only hardware is sold, both parties will split the margin with 50% of the Margin going to the Partner, in accordance with section 1.5 of this agreement.

- $25,000 per month for four (4) dedicated programmers or development resources include one (1) project manager to help the Company with ongoing software development for ROAMplayer, ROAM Server side work, Internationalization, and other software work. ROAM may request to scale these development resources up or down based on its discretion, and what is happening in the market. To be clear, the Company is separately outsourcing the Partner in this clause to provide development resources for the Company, which can go up or down, this variable cost is purely for engineering development and is not consideration for licensing under this agreement.

- The Company will issue the Partner an option or warrant to purchase 100,000 shares of Company common stock option, with strike price of $0.12, subject to Company board approval and the parties entering into an option or warrant agreement (which shall provide, among other provisions, that upon termination of this Agreement the option or warrant shall terminate and the Company shall have the right to repurchase the shares), and subject to the Company being satisfied that it has obtained all

required corporate or contractual consents for the issuance and that such issuance is in compliance with applicable law.

- In the event the Partner refers any services to the Company, the Company shall pay to Partner an amount equal to 25% of the Company's net profits from such services as described in section 1.4 of this agreement.

# EXHIBIT B

**Greffe du Tribunal de Commerce de Paris**
1 quai de la Corse
75198 Paris CEDEX 04

N° de gestion 2012B02877

*Extrait Khis*

**EXTRAIT D'IMMATRICULATION PRINCIPALE AU REGISTRE DU COMMERCE ET DES SOCIETES**

**à jour au 7 mars 2018**

## IDENTIFICATION DE LA PERSONNE MORALE

| | |
|---|---|
| *Immatriculation au RCS, numéro* | 512 427 550 R.C.S. Paris |
| *Date d'immatriculation* | 09/02/2012 |
| *Transfert du* | R.C.S. de Nanterre en date du 30/01/2012 |
| *Immatriculation radiée le* | 07/03/2018 |
| *Dénomination ou raison sociale* | **INGENICO VENTURES** |
| *Forme juridique* | Société par actions simplifiée (Société à associé unique) |
| *Capital social* | 42 942 027,00 EUROS |
| *Adresse du siège* | 28-32 boulevard de Grenelle 75015 Paris |
| *Activités principales* | La société a pour objet principal la souscription ou l'acquisition, la gestion et la cession, directement ou indirectement sous quelque forme que ce soit, d'un portefeuille d'instruments financiers, de droits sociaux, d'avances en compte courant ou autres droits financiers, représentatifs de titres ou droits de capital ou de créance ou donnant accès au capital ou droit à l'attribution de titres de créance, dans toutes sociétés, Opcvm ou autres entités juridiques quelconques. La société pourra avoir recours à tous moyens de financement, y compris sous forme d'emprunt bancaire, et consentir toutes garanties, nécessaires à la réalisation de son objet principal. A titre accessoire, la société pourra également exercer des prestations d'études et de conseils au profit d'entreprises en matière d'opérations financières, de stratégie industrielle et de questions connexes, telles que la levée de capitaux, la structuration de capital, l'évaluation, la création, le rachat ou le rapprochement d'entreprises, la recherche en investissements et l'analyse financière ou toute autre forme de recommandation générale concernant la réalisation de transactions sur instruments financiers. |
| *Durée de la personne morale* | Jusqu'au 12/05/2108 |
| *Date de clôture de l'exercice social* | 31 décembre |

## GESTION, DIRECTION, ADMINISTRATION, CONTROLE, ASSOCIES OU MEMBRES

*Président*

| | |
|---|---|
| *Dénomination* | INGENICO GROUP |
| *Forme juridique* | Société anonyme |
| *Adresse* | 28-32 boulevard de Grenelle 75015 Paris |
| *Immatriculation au RCS, numéro* | 317 218 758 Paris |

*Commissaire aux comptes titulaire*

| | |
|---|---|
| *Dénomination* | MAZARS |
| *Forme juridique* | Société anonyme |
| *Adresse* | 61 rue Henri Regnault - Tour Exaltis 92400 Courbevoie |
| *Immatriculation au RCS, numéro* | 784 824 153 Nanterre |

*Commissaire aux comptes suppléant*

| | |
|---|---|
| *Nom, prénoms* | Simon Jean-Louis |
| *Date et lieu de naissance* | Le 17/02/1949 à Sarreguemines (57) |
| *Nationalité* | Française |
| *Domicile personnel ou adresse professionnelle* | 61 rue Henri Regnault 92400 Courbevoie |

## RENSEIGNEMENTS RELATIFS A L'ACTIVITE ET A L'ETABLISSEMENT PRINCIPAL

| | |
|---|---|
| *Adresse de l'établissement* | 28-32 boulevard de Grenelle 75015 Paris |
| *Activité(s) exercée(s)* | La société a pour objet principal la souscription ou l'acquisition, la gestion et la cession, directement ou indirectement sous quelque forme que ce soit, d'un portefeuille d'instruments financiers, de droits sociaux, d'avances en compte courant ou autres droits financiers, représentatifs de titres ou droits de capital ou de créance ou donnant accès au capital ou droit a l'attribution de titres de créance, dans toutes sociétés, Opcvm ou autres entités juridiques quelconques. La société pourra avoir recours à tous moyens de financement, y compris sous forme d'emprunt bancaire, et consentir toutes garanties, nécessaires à la réalisation de son objet principal. A titre accessoire, la société pourra également exercer des prestations d'études et de conseils au profit d'entreprises en matière d'opérations financières, de stratégie industrielle et de questions connexes, telles que la levée de capitaux, la structuration de capital, l'évaluation, la création, le rachat ou le rapprochement d'entreprises, la recherche en investissements et l'analyse financière ou toute autre forme de recommandation générale concernant la réalisation de transactions sur instruments financiers. |
| *Date de commencement d'activité* | 06/05/2009 |
| *Origine du fonds ou de l'activité* | Création |
| *Mode d'exploitation* | Exploitation directe |

## DISSOLUTION OU DECISION PRONONCANT LA NULLITE

| | |
|---|---|
| *- Mention n° 10 du 12/02/2018* | DISSOLUTION - REUNION DE TOUTES LES PARTS SOCIALES OU ACTIONS ENTRE UNE SEULE MAIN EN VERTU DE L'ARTICLE 1844-5 DU CODE CIVIL A COMPTER DU 18-01-2018 |

## RADIATION

| | |
|---|---|
| *Motif de la radiation* | Réalisation de la transmission du patrimoine à l'associé unique |
| *Date de radiation* | 07/03/2018 |
| *- Mention n° 15 du 07/03/2018* | RADIATION PAR SUITE DE TRANSMISSION UNIVERSELLE DU PATRIMOINE |

## OBSERVATIONS ET RENSEIGNEMENTS COMPLEMENTAIRES

| | |
|---|---|
| *- Mention n° 1 du 09/02/2012* | LA SOCIETE NE CONSERVE AUCUNE ACTIVITE A SON ANCIEN SIEGE |
| *- Mention n° 12 du 12/02/2018* | Associé unique : INGENICO GROUP SA 512 427 550 Rcs Paris |

Le Greffier

FIN DE L'EXTRAIT

R.C.S. Paris - 07/03/2018 - 09:43:20

*Translated from the French for informational purposes only*

INGENICO VENTURES
Registry no 512 427 550

**Registry of the Commercial Court of Paris**
1 Quai de la Corse
75198 Paris Cedex 04

File no. 2012B02877

# EXTRACT FROM THE REGISTRY OF COMMERCE AND COMPANIES
## As of March 7, 2018

## IDENTIFICATION

| | |
|---|---|
| Company registration number: | 512 427 550 R.C.S. Paris (*Registration no. at Registry of Commerce and Companies of Paris*) |
| Date of registration: | February 9, 2012 |
| Transfer from: | RCS Nanterre on January 30, 2012 |
| Deregistration date: | March 7, 2018 |
| Corporate name: | **INGENICO VENTURES** |
| Legal form of company: | Simplified limited liability company (in French *"Société par actions simplifiée"* or *S.A.S.*) |
| Share capital: | 42,942,027.00 Euros |
| Registered office: | 28-32 boulevard de Grenelle – 75015 Paris [France] |
| Main objectives of the company: | The main purpose of the company is the subscription or acquisition, management and transfer, directly or indirectly in any form whatsoever, of a portfolio of financial instruments, employee rights, current account advances or other financial rights, representing securities or rights of capital or of debt or giving access to their capital or right to the allocation of debt securities, in any company , Opcvm or any other legal entity. The company may use any means of financing, including in the form of a bank loan, and grant any guarantees necessary for the accomplishment of its main purpose. On an ancillary basis, the company may also provide study and advisory services for companies in the field of financial operations, industrial strategy and related matters, such as capital raising, capital structuring, valuation, creation, buy-out or mergers, investment research and financial analysis or any other form of general recommendation concerning the realization of transactions on financial instruments. |
| Duration of the company: | Until May 12, 2108 |
| Financial year closing date: | December 31 |

## MANAGEMENT, DIRECTORS, AUDITORS, PARTNERS OR MEMBERS

### Managing Director

| | |
|---|---|
| *Corporate name* | **INGENICO GROUP** |
| *Legal form of company* | Public liability company (in French *"Société anonyme"* or *S.A.*) |
| *Registered office:* | 28-32 boulevard de Grenelle – 75015 Paris [France] |
| *Company registration number:* | 317 218 758 R.C.S. Paris (*Registration no. at Registry of Commerce and Companies of Paris*) |

### Statutory auditor

| | |
|---|---|
| *Company name:* | MAZARS |
| *Legal form of company:* | Public liability company |
| *Address:* | 61 rue Henri Regnault-Tour Exaltis 92400 Courbevoie |
| *Company Registration:* | 784 824 153 RCS NANTERRE *(Registration number at Registry of Commerce and Companies of Nanterre)* |

### Substitute Statutory auditor

| | |
|---|---|
| *Last name, First names* | Simon, Jean Louis |
| *Date and place of birth* | February 17, 1949 at Sarreguemines 57200 (France) |
| *Nationality:* | French |
| *Personal or professional address:* | 61 rue Henri Regnault, 92075 Paris La Défense CEDEX |

*Unofficial translation from the French for convenience and information purposes only*

**Registry of the Commercial Court of Paris**
1 Quai de la Corse
75198 Paris Cedex 04

File no. 2012B02877

## DETAILS RELATING TO ACTIVITY AND PRINCIPAL PLACE OF BUSINESS

| | |
|---|---|
| *Address of the principal place of business:* | 28-32 boulevard de Grenelle – 75015 Paris [France] |
| *Activities of the company:* | The main purpose of the company is the subscription or acquisition, management and transfer, directly or indirectly in any form whatsoever, of a portfolio of financial instruments, employee rights, current account advances or other financial rights, representing securities or rights of capital or of debt or giving access to their capital or right to the allocation of debt securities, in any company , Opcvm or any other legal entity. The company may use any means of financing, including in the form of a bank loan, and grant any guarantees necessary for the accomplishment of its main purpose. On an ancillary basis, the company may also provide study and advisory services for companies in the field of financial operations, industrial strategy and related matters, such as capital raising, capital structuring, valuation, creation, buy-out or mergers, investment research and financial analysis or any other form of general recommendation concerning the realization of transactions on financial instruments. |
| *Commencement date of the activities* | May 6, 2009 |
| *Origin of the company:* | By creation of a business |
| *Method of operation:* | Direct |

## DISSOLUTION OR DECLARATION OF NULLITY OF THE COMPANY

| | |
|---|---|
| *Note no. 10 dated February 12, 2018:* | Dissolution of the company-as all shares held by a sole shareholder as of January 18, 2018 pursuant to article 1844-5 of the [French] Civil Code. |

## DEREGISTRATION

| | |
|---|---|
| *Reason for deregistration:* | Fulfilment of complete transfer of assets and liabilities to the sole shareholder |
| *Deregistration date:* | March 7,2018 |
| *Note no. 10 dated March 7, 2018:* | Deregistration due to complete transfer of assets and liabilities to the sole shareholder |

## COMMENTS AND ADDITIONAL INFORMATION

| | |
|---|---|
| *- Note no. 1 dated February 9, 2012* | The company does not maintain any activity at its former registered office |
| *- Note no. 12 dated February 12, 2018* | Sole Shareholder: INGENICO GROUP SA 512 427 550 RCS Paris |

Clerk of Court [SEAL]
End of the extract