```
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2


 3


 4     ANYWHERE COMMERCE, INC., et al,   )
                          Plaintiffs,    )
 5                                       )
                                         )
 6     vs.                               )  CA No. 19-11457-IT
                                         )
 7                                       )
       INGENICO, INC., et al             )
 8                        Defendants.    )


 9


10     BEFORE:  THE HONORABLE INDIRA TALWANI


11


12                       TELEPHONE CONFERENCE


13


14


15           John Joseph Moakley United States Courthouse
                          Courtroom No. 9
16                        One Courthouse Way
                          Boston, MA 02210
17                     Monday, March 30, 2020
                             2:15 p.m.
18


19


20
                       Cheryl Dahlstrom, RMR, CRR
21                       Official Court Reporter
             John Joseph Moakley United States Courthouse
22                 One Courthouse Way, Room 3510
                          Boston, MA 02210
23            Mechanical Steno - Transcript by Computer


24


25
```

```
 1    APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFFS:

 3         RUDOLPH FRIEDMAN LLP
           By:  Robert P. Rudolph, Esq.
 4         92 State Street
           Boston, Massachusetts 02109
 5
           KUTAK ROCK LLP
 6         By:  Oliver D. Griffin, Esq.
                Melissa Ann Bozeman, Esq.
 7              Daniel Carmeli, Esq.
           1760 Market Street
 8         Philadelphia, Pennsylvania 19103

 9         DAVIS CEDILLO & MENDOZA, INC.
           By:  Ricardo G. Cedillo, Esq.
10         755 East Mulberry Avenue
           San Antonio, Texas 78212
11

12    ON BEHALF OF THE DEFENDANTS:

13         ADLER POLLOCK & SHEEHAN P.C.
           By:  Nicole J. Benjamin, Esq.
14              William K. Wray, Jr., Esq.
           One Citizens Plaza
15         Providence, Rhode Island 02903

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2         THE CLERK:  Starting with plaintiff, I'm going to have

 3   you please identify yourself for the record.  Good afternoon.

 4   Counsel, I'm going to ask you all, beginning with plaintiffs'

 5   counsel, to please identify yourselves for the record so that,

 6   when the judge gets on the line, we don't need to inconvenience

 7   her on the record with a bunch of names, No. 1.

 8         Number 2, anyone who's on a speakerphone, it doesn't

 9   work with these kinds of conferences.  So if you could please

10   take yourself off speakerphone, that would be great.

11         And one last thing.  Each time you speak when we're on

12   the record, if you could always identify yourselves, that will

13   be great.

14         So that said, plaintiffs' counsel, could I please have

15   your name?

16         MR. GRIFFIN:  Oliver Griffin and Melissa Bozeman and

17   Daniel Carmeli from Kutak Rock.  And I believe we also have on

18   local counsel and co-counsel in Texas, and I'll let them

19   introduce themselves.

20         THE CLERK:  Thank you.

21         MR. RUDOLPH:  Robert Rudolph, local counsel.

22         THE CLERK:  Thank you.

23         MR. CEDILLO:  Richard Cedillo, co-counsel.

24         THE CLERK:  Thank you.  So the only -- we do not have

25   -- Jonathan Friedman is not on this call today, is that
```

1    correct?

2            MR. GRIFFIN:  That's correct.

3            THE CLERK:  Defense counsel, please.

4            MS. BENJAMIN:  Yes, hello.  It's Nicole Benjamin from

5    Adler, Pollock & Sheehan on behalf of the defendants.  I

6    believe my colleague, William Wray, is also on the line.

7            MR. WRAY:  That is correct.

8            THE CLERK:  Excellent.  So we do not have Ms. Rocha or

9    Mr. Tarantino on the line, is that correct?

10           MS. BENJAMIN:  That's correct.

11           THE CLERK:  Unfortunately, I can't mute anything.  So

12   I'm going to just email the judge, and the next beep you hear

13   will be the judge saying "good afternoon."  And I'll call the

14   case, and we will be back on the record, okay?  Thanks,

15   everyone.

16           THE COURT:  Good afternoon.

17           THE CLERK:  Good afternoon, Judge.  I'll call the

18   case.  Thank you.  United States District Court is now in

19   session.  The Honorable Judge Indira Talwani presiding.  This

20   is Case No. 19-cv-11457, AnywhereCommerce, Inc., et al v.

21   Ingenico, Inc., et al.

22           Counsel have previously identified themselves for the

23   record, and counsel are reminded to state their full names each

24   time they speak.  Thank you.

25           THE COURT:  Okay.  You requested a telephone

1    conference so here we are.  And just to reiterate what the

2    courtroom deputy told you, we need to be very careful to try

3    not to speak over each other.  And, also, I would remind

4    everyone to please not be on a speakerphone so we can try to

5    keep the sound quality good.

6           So I believe plaintiffs requested this call.

7           MR. GRIFFIN:  Yes, your Honor.  This is Oliver Griffin

8    from Kutak Rock for the plaintiffs, lead counsel in the case.

9    I had appeared before your Honor in August during our -- I

10   guess it was the first scheduling conference that we had, case

11   management conference.

12          THE COURT:  Okay.

13          MR. GRIFFIN:  You might -- with my colleague, Melissa

14   Bozeman, we were there, and with local counsel.  I'm trying to

15   put a face to a name if you do recall.

16          I asked for the call today because we have -- it seems

17   that we've come to an impasse, and I know that your local

18   procedure or your personal procedure is that we get the Court

19   involved sooner than later in order to avoid motion practice

20   and things of that nature.

21          THE COURT:  Correct.

22          MR. GRIFFIN:  And the dispute has been evolving, I

23   would say, for about a month; and so it was my opinion by the

24   end of last week that it had evolved to such a point that there

25   were clear positions being taken on what either side believed

1   to be true or accurate.  And so it should probably be brought

2   to the Court's attention sooner than later because it has the

3   potential to have significant impacts on the production of

4   documents which, in a case like this, is central to the entire

5   case.

6        And so with that being said, about a month or so ago,

7   during the ESI protocol negotiations, as they are, where the

8   parties were going to have to discuss all the search terms and

9   all the custodians and all of the protocols that were going to

10  go into the production of documents, an issue arose by the

11  defense with respect to this European Union privacy regulation.

12  And it was the position at the time that a European Union

13  privacy regulation prohibited the dissemination of documents

14  that included people's personal information one way or the

15  other; and because of that, there was going to have to be, in

16  my opinion, kind of an obstructive protocol to deal with that.

17       But, nevertheless, we appreciated that this could be

18  something that we have to deal with.  We are lawyers.  And so

19  we read the regulation, and we tried to figure out a way to

20  negotiate a way to produce the documents without running afoul

21  of this regulation and consistent with ordinary practice and

22  taking into account the discovery deadlines and all of those

23  things that you have to think about.  And that went into the

24  discussion on this EU privacy regulation.

25       Now, I didn't negotiate directly with opposing counsel

1    who introduced herself on the phone today.  My colleague,

2    Daniel Carmeli, did.  But I read every single email, and I had

3    calls with Dan after every single one of these calls.  And it

4    occurred to me after a few weeks of this back and forth that

5    there might be something going on with this issue.  And why it

6    occurred to me is because, coincidentally, last year I sat for

7    the bar exam in Ontario, Canada, and it had a very similar

8    regulation at issue.  We don't have these kind of regulations

9    in the United States.  We have more narrow regulations, HIPPA,

10   for instance.  But in some of these other countries, including

11   the EU and Canada, there are these privacy statutes that govern

12   the dissemination of people's personal information.

13          Well, there are exemptions to these regulations, and

14   the primary exemption that we found in the EU regulation at

15   issue exempts from this regulation the transfer of information

16   that is "necessary for the establishment, exercise or defense

17   of legal claims."

18          Now, my belief is, when we conclude this call today,

19   your Honor is going to likely order briefing.  That would be

20   actually my recommendation so you could take a look at the

21   regulation.  You could take a look at the exemption.  You could

22   take a look at our arguments.  You can take a look at the other

23   side's arguments in writing, of course.  Your Honor can rule,

24   and then we can streamline the process.

25          But the exemption, in our estimation, makes this EU

 1    privacy regulation moot, nonexistent.  It was a fun academic

 2    exercise for three weeks, a lot of emails, a lot of research.

 3    But, at the end of the day, I think the exemption is going to

 4    prevail.

 5           Secondarily, the federal courts in the United States

 6    don't enforce this EU regulation for the reasons I just

 7    described:  there's an exemption.  And if we were to follow

 8    this EU regulation to the letter that the defense believes we

 9    should follow it, the documents will be being produced two

10    years from now.  It would be thousands and thousands of hours

11    of redacting, then fighting over redactions, this, that, and

12    the other thing.  I think it's either a red herring or

13    nonexisting issue.

14           Moreover, the defense would have the obligation, I

15    believe, to produce authority to your Honor in the federal

16    court system of the United States where at least one federal

17    court in the United States has ever followed this regulation in

18    a circumstance like ours.  You may hear from the defense

19    arguing U.S. v. Microsoft.  I think, when your Honor gets down

20    to the bottom of that case, Supreme Court case, your Honor will

21    find that this five-factor test that they weighed is not

22    applicable to the issues before us; and if it was, every single

23    case that involved the EU or Canada would be bogged down in

24    these regulations and would, in fact, never be -- you know,

25    never make it to trial; and if it did, it would add another

1    hundred thousand hours of redacting and other really

2    interesting lawyering skills.

3         So I think that frames the issue.  I think we're going

4    to have to brief it.  I'm sure my opposing counsel has a

5    different point of view, but that's what I have to say for the

6    time being.

7         THE COURT:  Before I hand it over to your opposing

8    counsel, let me just ask a very basic question.  This dispute

9    is a business dispute, contract dispute.  There's a patent

10   counterclaim.  What is the nature of the personal privacy, the

11   documents that would contain private information?

12        MR. GRIFFIN:  Well, your Honor -- this is Oliver

13   Griffin again.  I don't know the answer to that because I'm not

14   the one producing them.  But just to expand a little bit on

15   your Honor's characterization of the case, it's a trade secret.

16   From the plaintiffs' point of view, it's trade secret theft and

17   tortious interference.  There would be significant discussion

18   regarding the decisions to either steal my client's trade

19   secret, as we allege, of course, or to engage in tortious

20   interference revolving around the time that those decisions

21   were made.  That's the nature of the communications that we're

22   looking for:  decision-making communications that give

23   circumstantial weight to the proofs that are required in our

24   allegations.  Those are the kind of documents that we really,

25   really want.  They would eventually become hot documents, I

1    assume.

2         The defendants have to produce those.  We don't have,

3    of course, copies of the emails.

4         THE COURT:  I didn't mean to open that up for a whole

5    other round.  I was just trying to understand.  We're not

6    looking at customer records or --

7         MR. GRIFFIN:  No.

8         THE COURT:  -- bank records or things of that sort?

9         MR. GRIFFIN:  Maybe we'll look at those later with

10   respect to damages; but for the purposes of, I think, this ESI

11   issue, it's internal emails at Ingenico that we're seeking to

12   get and we're running into this regulation.

13        THE COURT:  Okay.  Let me hear from defendants.

14        MS. BENJAMIN:  Thank you, your Honor.  This is Nicole

15   Benjamin on before of the defendants.  The issue did arise in

16   the context of a negotiation of the ESI protocol that I know

17   your Honor entered this morning.

18        If I can just share a little bit of background on

19   those negotiations.  When the parties were conferring, one of

20   the things that we had talked about and which is memorialized

21   in the ESI protocol is a process for identifying both

22   custodians and search terms.  And in that process, it came to

23   my attention that we were likely going to need to contend with

24   the data privacy regulations in the context of this case.

25   Ingenico Group SA, one of the defendants, is a French company.

     1          So in the course of these discussions, one of the

     2     things that I had proposed is that we table the issues related

     3     to data privacy and that we include some language in the ESI

     4     protocol to indicate that we would be dealing with those issues

     5     separately.  And that was the discussion that we had over the

     6     course of several weeks and the discussions that we had

     7     including, you know, late last week.

     8          From my perspective, what I don't want to do is hold

     9     up the discovery process at all.  And my suggestion was that

    10     the parties move forward as best they can in working through

    11     production of documents that are not subject potentially to the

    12     GDPR in this case and move things along that way.

    13          My understanding, in the course of the discussions, is

    14     that there is a similar issue on the plaintiffs' side.  One of

    15     the plaintiffs is a Hong Kong entity; and although the GDPR

    16     which we've been talking about being applicable to Ingenico

    17     doesn't apply to Hong Kong, there are similar data privacy laws

    18     that apply in Hong Kong.  So we looked at this at many points

    19     as being a similar issue that we have on both sides of this

    20     case.

    21          So my suggestion and recommendation was that we phase

    22     things so that we're starting on the easier side and we're

    23     moving forward on what we can produce.  And what I've learned

    24     that there are some documents that are discrete requests so a

    25     request for a particular agreement, a request for a particular

1   type of documents, that is not likely to implicate the concerns

2   under GDPR.

3        Where the concerns start to arise though is when we

4   start the process of search terms across broad groups of

5   custodians because under the GDPR there are two types of

6   restrictions.  One is on moving documents that are potentially

7   protected outside of the country into a country that doesn't

8   recognize similar GDPR obligations, and then there's also a

9   concern about the production of documents that potentially have

10  this -- these privacy concerns.

11       And to answer your Honor's question about what kinds

12  of privacy concerns are we talking about here, unfortunately,

13  the GDPR is very, very broad in what it covers, and any

14  personal identifying information is covered by GDPR.  My

15  understanding is that something as seemingly simple as

16  somebody's signature block on an email could potentially be

17  covered by GDPR.  And I know that that's very unconventional

18  and not how we treat things here in U.S. litigation.

19       To my knowledge, there have only been two reported

20  decisions where there has been this intersection between GDPR

21  obligations and U.S. discovery obligations, and those two cases

22  were teed up before the Court in two different ways.  One of

23  them came up in the context of a motion for a protective order,

24  and one of them came up in the context of a motion to compel.

25  So in the context of my discussions with opposing counsel, what

1    I have suggested that perhaps we file some sort of either joint

2    submission or competing motions on this issue so that we can

3    get further guidance from the Court because I do think at some

4    point the Court will need to make a ruling as to the

5    applicability or not of GDPR.

6           But I was very hopeful that, before we even get there,

7    we could continue to work through the process of working with

8    our client to understand what is potentially protected by GDPR.

9    There's a consent process under the GDPR.  So there is a

10   mechanism for obtaining consent from custodians to produce

11   their personal information.  That's a process that we can work

12   through.

13          And then, finally, with respect to the exception that

14   Mr. Griffin identified, my understanding is that that exception

15   does not apply in the way -- it would be ideal if it did, but

16   does not apply to broadly say that simply because the

17   information is being requested in U.S. litigation that it must

18   be produced.  My understanding is that -- and I heard the

19   comment that I made mention the Microsoft case.  I'll mention

20   it only to say there was a brief, an amicus brief, filed in the

21   United States Supreme Court by the European Commission.  And

22   the European Commission took the position that that language in

23   the GDPR does not exclude -- or does not provide an exemption

24   to GDPR for the production of documents in U.S. litigation.

25   What it does allow for is a process under the Hague Convention

1      for the production of documents, very different than just

2      simply responding to discovery requests.

3            So all of that is to say we certainly don't mean to

4      impede the process.  We're trying our best to work within the

5      confines of GDPR and do what we can to produce documents in

6      this litigation.  And if that means that the Court would be

7      inclined to order a phased approach to this, that would give us

8      more of an opportunity to work to obtain the consent that we

9      would need and could perhaps eliminate some of the concerns

10     that we have now.  Alternatively, we would ask for permission

11     to brief the issue in the manner that the Court would like.

12           THE COURT:  So let me ask you a question.  I assume

13     all initial disclosures have been completed, correct?

14           MS. BENJAMIN:  That's correct, your Honor.

15           THE COURT:  And did you include in the initial

16     disclosures production of documents or just identification of

17     documents?

18           MS. BENJAMIN:  Just identification of documents.

19           THE COURT:  Is production of those documents, your

20     initial disclosures, is that something that's being held up by

21     this concern?

22           MS. BENJAMIN:  I think that potentially -- because of

23     the breadth of the information that we're talking about here, I

24     think, in part, yes, that is correct, because we would be

25     saying that anything that requires an email search really is

1    where the issue is arising.

2        THE COURT:  Right, but your initial disclosures, you

3    were supposed to identify the documents that you intend to rely

4    on to support your claim or defense.  So I'm just wondering, as

5    to the documents that you intend to use to support your claim

6    and defense, do we still have the same issue?

7        MS. BENJAMIN:  I believe, your Honor, that they were

8    broadly identified.  So I think that, arguably, there are some

9    documents that would fall within that category.

10        THE COURT:  Okay.  So this would be my suggestion.  I

11    have two reactions to where you are in discovery, and they're

12    somewhat opposing or counter -- I'm not sure the right word

13    there.  They head in different directions here, but I think

14    they apply in different contexts.  The one is, to the extent

15    that there are document requests for specific documents, things

16    that are not involved -- that don't involve electronic

17    searching, it seems to me that your obligation to produce

18    documents, if you have a concern or objection to the -- making

19    your objection but to be very clear in your response what you

20    have and you haven't done.  And that would allow us to tee

21    things up, perhaps do privilege logs, address those as we need

22    to do based on the documents involved.  And, as you said, maybe

23    there's consent.  But as to individual documents, I see no

24    reason to hold those up for briefing, and, yes, you should

25    start producing them.

1           With regard to ESI, the fear about not getting ESI

2    right on the front end is just the cost, that you end up doing

3    searches twice or you end up reviewing documents twice or you

4    -- so it does seem to me that maybe we should have a bifurcated

5    approach here, which is, move full steam ahead on your

6    production of things that are not tied to the ESI protocol, and

7    then let's brief up the ESI issues so we can get it addressed

8    before you spend a lot of money on reviewing documents.

9           MR. GRIFFIN:  Can I weigh in on that?  This is Oliver

10   Griffin.

11          THE COURT:  Certainly.

12          MR. GRIFFIN:  I agree with the bifurcation of the

13   issue, but what I disagree with -- not your opinion, your

14   Honor, but I disagree with the phased approach.  I think if we

15   wait, as opposing counsel has suggested, to do this GDPR

16   business down the road, it's going to -- the GDPR discovery, as

17   I understand it after watching this issue for a month, is like

18   99 percent of the discovery.  So we've got to deal with it now.

19          We've got to brief this issue.  There's a nice Capital

20   Partner case.  I think it's right on point.  We can have

21   clarity from your Honor on this privacy issue regarding this

22   Hong Kong deal.  We looked at it.  Same exemption applies from

23   our point of view.  Producing documents from our Hong Kong

24   client will not be held up by these privacy statutes.

25          THE COURT:  So, Mr. Griffin, maybe we're not -- you're

1    not understanding what I'm saying or I'm not understanding what

2    you're saying.  So let me just try and address it again.

3              MR. GRIFFIN:  Okay.

4              THE COURT:  To the extent that you can answer a

5    discovery response -- a discovery request with either specific

6    documents that you're going to turn over or specific documents

7    that you're going to withhold, I don't see any reason not to

8    move forward with that process because, as to that, if there's

9    documents that can be turned over for which this issue doesn't

10   arise, we'll get them turned over.  And if there are documents

11   in response to specific requests where someone is asserting

12   this issue, you can tee it up in a way that is focused

13   concerning what's there, what needs to be addressed.  Is this,

14   you know, an important document, not important document?  I'm

15   suggesting simultaneously.

16             MR. GRIFFIN:  Okay.  Sorry, your Honor.

17             THE COURT:  Simultaneously, we tee up the issue for

18   the ESI because I'm suggesting that to do the ESI without

19   teeing this issue up might end up in an enormous extra cost.

20             MR. GRIFFIN:  I agree; I agree.  I didn't realize that

21   your Honor was saying simultaneous, but now I realize that.

22   And, of course, I agree.

23             THE COURT:  So with that, do you want a briefing

24   schedule?  Do you want to work that out amongst yourselves?

25             MR. GRIFFIN:  Let's get a briefing schedule.  I'd

1    prefer that.

2              THE COURT:  Okay.  Do you want to file the first

3    brief?

4              MR. GRIFFIN:  They're objecting based on this statute,

5    so maybe they should file the first brief.

6              THE COURT:  It's one or the other:  either a motion

7    for protective order or a motion to compel.  So you can flip a

8    coin.  I don't have a position on it.  If you can't work it

9    out, then why --

10             MR. GRIFFIN:  You know what, your Honor?  We'll file a

11   motion to compel.

12             THE COURT:  Okay.  And what we're talking about would

13   be trying to give me the framework so I can give you guidance,

14   might end up being helpful in both halves of what we're doing

15   here but, in particular, will be helping sort of frame the ESI

16   process.

17             MR. GRIFFIN:  Okay.

18             THE COURT:  How soon do you want to file?

19             MR. GRIFFIN:  One week from today?

20             THE COURT:  Okay.  And for defendants, can you file

21   two weeks later?

22             MS. BENJAMIN:  That sounds fine, your Honor.

23             THE COURT:  Okay.  I urge you to try to -- if there

24   isn't a lot of case law here, you know, you're going to need to

25   focus me on the principles that you think are going to be

1    controlling without a whole lot of embellishment and trust that

2    I will, in fact, read the scheme -- those particular schemes

3    here that we have to deal with.  Let's see if we can do it

4    cleanly; and, hopefully, I get you a response quickly that way.

5              MS. BENJAMIN:  That sounds great.  Thank you, your

6    Honor.

7              MR. GRIFFIN:  Thank you, your Honor.

8              THE COURT:  Can I ask you a question about the pending

9    motion to dismiss one claim, which I guess is plaintiffs'

10   motion?  Is the discovery related to that motion being held up

11   or is it proceeding with everything else?

12             MR. GRIFFIN:  That motion is not holding up discovery,

13   your Honor.

14             THE COURT:  Okay, okay.  I will try to get to that,

15   but it sounds like this will be more urgent.

16             Okay.  Anything else?

17             MR. GRIFFIN:  Well, yes.  While I have your Honor on

18   the call and we're all here, I know that the Court has moved

19   discovery to September.  We're thankful for that, of course,

20   because all of these concern related issues.  But I anticipate

21   we may need more time for -- due to issues that don't pertain

22   to today's call but will pertain to future calls, I imagine.

23   Would you like us to wait for that or ask for it now?

24             THE COURT:  I'd like you to wait for it.  And when you

25   file such a motion, it's helpful for me to know what you've

1    already completed and what you haven't been able to do because

2    -- I assume you're talking about the limitations on travel and

3    depositions and things like that?

4         MR. GRIFFIN:  Yes, ma'am, yup.

5         THE COURT:  So it would be -- you know, it will be

6    pretty -- it would look good if you have been successful in

7    moving forward on the written discovery that you were able to

8    do during this period, and you, you know, let me know what's

9    happened with depositions because of travel restrictions.

10   Obviously, we have to figure out how to work it.  I do know we

11   all hate not doing in-person depositions, but I can tell you

12   we're working through it at the court to be able to do even

13   criminal sentencings and things like that.  I sort of feel, if

14   we can figure that out, you might be able to figure out the

15   depositions, also.

16        MR. GRIFFIN:  Yes, your Honor.

17        MS. BENJAMIN:  Your Honor, this is Nicole Benjamin.

18   So I had proposed that in this case -- I think, you know,

19   perhaps I had proposed it just as things were starting to

20   evolve on the COVID-19 front, and perhaps the plaintiffs' view

21   is different today.  But I had great success in conducting the

22   remote depositions, and the technology is good.  They've gone

23   well, and we have not had problems at all.  So, you know, I

24   certainly, on behalf of defendants, would advocate for that in

25   this case.

1            THE COURT:  The fact that you're able to now break

2    into conference -- separate conference rooms on the videos and

3    come back in and things like that, I do think helps.  It's

4    obviously not perfect, and you want to be able to show people

5    documents and things get confusing and delayed.  But I think

6    we're going to be living with travel restrictions for a while;

7    and if we don't want all of our litigation to grind to a halt,

8    I think we need to be creative about it.

9            MS. BENJAMIN:  Right.

10            MR. GRIFFIN:  Understood, your Honor.

11            THE COURT:  Okay.  Thank you.  Stay healthy, everyone.

12            ALL:  Thank you, your Honor.

13            THE CLERK:  Court is in recess.

14    (Whereupon, at 2:45 p.m. the hearing concluded.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I certify that the foregoing is a correct transcript

5     of the record of proceedings in the above-entitled matter to

6     the best of my skill and ability.

7

8

9

10

11

12     /s/Cheryl Dahlstrom

13     Cheryl Dahlstrom, RMR, CRR

14     Official Court Reporter

15

16     Dated:  November 2, 2020

17

18

19

20

21

22

23

24

25