```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   ANYWHERECOMMERCE, INC. and          )
     BBPOS LIMITED,                       )
 5                                        )
             Plaintiffs,                  )
 6                                        )
        v.                                )    Civil Action No.
 7                                        )    1:19-cv-11457-IT
     INGENICO INC., INGENICO CORP., and   )
 8   INGENICO GROUP SA,                    )
                                          )
 9           Defendants.                   )
                                          )
10   _____

11

12       BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

13

14           MOTION HEARING BY VIDEOCONFERENCE

15

16                Wednesday, December 23, 2020
                          3:18 p.m.

17

18

19

20

21   John J. Moakley United States Courthouse
     Courtroom No. 9
22   One Courthouse Way
     Boston, Massachusetts
23

24   Robert W. Paschal, RMR, CRR
     Official Court Reporter
25   rwp.reporter@gmail.com
```

1                    **A P P E A R A N C E S**

2

   On behalf of the Plaintiffs:

3

        KUTAK ROCK LLP
4       BY:  MELISSA ANN BOZEMAN
        1760 Market Street
5       Suite 1100
        Philadelphia, PA  19103
6       (215) 299-4384
        melissa.bozeman@kutakrock.com
7


8

   On behalf of the Defendants:

9

        ADLER POLLOCK & SHEEHAN P.C.
10      BY:  WILLIAM K. WRAY, JR.
        One Citizens Plaza
11      8th Floor
        Providence, RI  02903
12      (401) 274-7200
        wwray@apslaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2          (In open court at 3:18 p.m.)

3          THE DEPUTY CLERK:  United States District Court is

4   now in session, the Honorable Judge Indira Talwani presiding.

5          This is Case Number 19-cv-11457, AnywhereCommerce,

6   Inc., et al., versus Ingenico, Inc., et al.  Will counsel

7   please identify themselves for the record.

8          MS. BOZEMAN:  Thank you.  Melissa Bozeman from

9   Kutak Rock on behalf of the plaintiffs.

10          THE COURT:  Good afternoon.

11          MS. BOZEMAN:  Thank you.

12          MR. WRAY:  Good afternoon.  William Wray, attorney

13   for defendants and counterclaimant Ingenico, Inc.  Also on

14   the call, although not speaking, are my colleagues Nicole

15   Benjamin and John Tarantino.

16          THE COURT:  Good afternoon.

17          So we are here on the motion to dismiss the second

18   amended counterclaims.  Specifically, Counterclaim 8, I

19   believe.  And so it's plaintiff's motion.  I'll let you

20   start.

21          MS. BOZEMAN:  Thank you, Your Honor.

22          Plaintiffs have moved to dismiss Ingenico's patent

23   infringement claim at Count 8 of its second amended

24   counterclaims on two bases:  The first is lack of standing,

25   and the second is failure to state a claim.

1          The lack of standing defect is incurable, and it's

2     readily apparent based on the record that's presently before

3     the Court.  This is something that can and should be decided

4     by the Court today.  It's an outrageous position, actually,

5     to be asserting these patent infringement claims that don't

6     belong to Ingenico and, in fact, belong to a nonparty and --

7     as well as two belonging to BBPOS.

8          This represents a wrongful cloud on title to all

9     nine of these patents in suit, and it isn't just a

10    theoretical problem.  It is an actual problem for at least

11    the nonparty, 436 Canada.  436 Canada is actively suing

12    Square, Inc., under six of the patents that are asserted in

13    this case, and that case is pending in the Northern District

14    of California, and the docket number is 19-cv-04311.

15         While those proceedings are stayed, IPR rulings are

16    expected to be rendered relatively soon, and at that time,

17    that district court case may resume.  But it's a real

18    problem, and it's -- and it's something that is just really

19    outrageous to us.  In analyzing standing in a patent

20    infringement case, a recent order that was --

21         THE COURT:  Ms. Bozeman, let's just start with what

22    facts I do or don't have about the 436 patent and to -- so to

23    break up what your arguments are.  There is a license

24    agreement between BBPOS and ROAM, and under that license

25    agreement, there's a very broad clause giving the exclusive

1   license to things that BBPOS -- BBPOS's intellectual

2   property.

3          And your assertion is that for seven of the nine,

4   the intellectual property belongs to 436 Canada and not to

5   BBPOS.  And so my question here is, given their allegation

6   that it belongs to BBPOS or that -- or that BBPOS has a

7   sufficient interest in it, what's your response to that?

8          MS. BOZEMAN:  Our response to that is that we -- we

9   have actually added for the record the two licensing

10  agreements that are in place between HomeATM, which is a

11  predecessor of 436 Canada and predates the ROAM data license,

12  and then there was another licensing agreement that was

13  entered into in July of 2013 between 436 Canada.

14         These -- these licensing agreements --

15         THE COURT:  Let me just stop you so I can follow

16  along.  The two license agreements that you just talked

17  about, are those the same two that are attached to Ingenico's

18  second amended counterclaim, the HomeATM BBPOS agreement and

19  the 436 Canada BBPOS agreement, or a different --

20         MS. BOZEMAN:  It's a different one.  And the reason

21  why we attached it is because there is actually language that

22  appears in these licensing agreements that are referenced in

23  the counterclaim, so it is an indispensable document that is

24  relevant, directly relevant to their claims, and it's

25  actually referenced by them in their pleadings.

1    THE COURT:  Okay.  Just so that I make sure I have

2 it, because I'm working right now off a printed copy, do you

3 have the docket number of the documents you're looking at or

4 were these --

5    MS. BOZEMAN:  I do.  So the -- there's --

6    THE COURT:  Go ahead.

7    MS. BOZEMAN:  I'm sorry.  My computer is breaking

8 up a little bit.

9    THE COURT:  Go on.  I asked you the docket number,

10 and you were about to give it to me.

11    MS. BOZEMAN:  79 is plaintiff's motion to dismiss,

12 and the licensing agreement, the original one between BBPOS

13 and HomeATM, is attached as Exhibit A; and then the second

14 license, which postdates ROAM's license, is attached.  Also,

15 as Exhibit C, there is a printout from -- from the U.S.

16 patent office which reflects the ownership of patents by

17 436 Canada.

18    THE COURT:  Got it.  Okay.  I just had it filed in

19 the wrong place, but here I've got it.  It is -- okay.  So

20 these are the documents that you have offered.  These aren't

21 ones -- I had them down as ones that were part of Ingenico's

22 pleading, but here we go.  Okay.  So they're part of your

23 pleading.  And you're saying that based on these, the license

24 that BBPOS received was nonexclusive?

25    MS. BOZEMAN:  That's right.  So the -- so the --

1    Exhibit A, it's dated March of 2010, and it's between HomeATM

2    and BBPOS limited.  HomeATM was a predecessor and -- to

3    AnywhereCommerce and is an affiliated party with 436 Canada.

4              But the document that I attached as Exhibit A, it

5    talks about what intellectual property rights were -- were

6    licensed to BBPOS at the time and before the ROAM data

7    licensing agreement.  And so the intellectual property

8    rights -- so if you go to Section 1.1 in that agreement, it

9    talks about what the intellectual property rights at issue

10   are.

11             And it talks about a "DTMF technology titled

12   Apparatus and Method for Commercial Transactions Using a

13   Communication Device."  And then it also defines *products* as

14   the communication device that uses that technology.

15             If you go to Section 2.1, it talks about the grant,

16   the license grant, and it's a nonexclusive license to use

17   those intellectual property rights in relation to the

18   products.

19             Also, at Section 9.1, there is a prohibition

20   against sublicensing.  So there was no -- there was no basis

21   for BP- -- BBPOS to be licensing any of these rights that may

22   have arisen under this document, and, certainly, if it was a

23   nonexclusive license that was being provided by the owner of

24   this technology to BBPOS, BBPOS wouldn't then thereafter have

25   an ability to grant an exclusive licensing --

1          THE COURT:  All right.  Okay.  You're frozen.

2          MS. BOZEMAN:  -- agreement.

3          THE COURT:  I'm afraid your connection isn't very

4     good, and you just froze there.  We didn't get the end of

5     your sentence.

6          MS. BOZEMAN:  Apologies.  What I was saying was

7     that, of course, BBPOS would only be able to confer rights it

8     actually had and not greater than what it -- was actually

9     conferred in the first instance.  So it could not then

10    transform a nonexclusive license into an exclusive license.

11         THE COURT:  Okay.  So, Mr. Wray, let me have you

12    respond just to that point right now.  If the plaintiff has

13    come forward with these documents and -- what's your

14    response?

15         MR. WRAY:  Thank you, Your Honor.

16         Our response is twofold.  First, it's important to

17    remember the 12(b)(6) standard here, and under that

18    amended -- the amended counterclaims, Ingenico alleged that,

19    as a factual matter, BBPOS had obtained the authority and the

20    rights that were necessary to confer the license that it

21    granted to ROAM.

22         THE COURT:  So one is that you're relying on the

23    fact that you don't have to have evidence; you can just make

24    the allegation.  And what's the second argument?

25         MR. WRAY:  And the second argument is that if you

1    actually refer to the document that Ms. Bozeman was referring

2    to, at page 11 in Section 9.2 thereof, this is a basis for

3    another one of the allegations in the second amended

4    counterclaims.  Ingenico alleged that 436 had expressly

5    acknowledged and consented to BBPOS's license to Ingenico.

6                 THE COURT:  Okay.  I'm sorry.  I wasn't able to

7    follow you there.  What section am I looking at?

8                 MR. WRAY:  Section 9.2, and at the bottom of the

9    page, it should state page 11 of 15.

10                THE COURT:  Okay.  So which document are we looking

11   at?

12                MR. WRAY:  This is ECF Number 79-2.

13                THE COURT:  Okay.

14                Okay.  What does that get me?

15                MR. WRAY:  So in this document, 436, which is the

16   current assignee of the patents, is expressly acknowledging

17   and consenting to BBPOS's agreement with Ingenico/ROAM.  Now,

18   that agreement specifically states that BBPOS is exclusively

19   licensing these patents --

20                THE COURT:  No.  It doesn't refer to any patents,

21   or it refers to one, but not these.  It says BP- -- BBPOS

22   is -- is exclusively licensing its, BBPOS's, intellectual

23   property, but if BBPOS doesn't have the intellectual

24   property, how can it license it?  And the fact they say we

25   know you have an agreement and we agree we're not going to

1    have anything to do with ROAM data, that's your customer,

2    we're not going to deal with you, how does that mean we agree

3    that our -- I mean, I'll tell you where the problem comes in

4    for me, is that there's this whole concept of an exclusive --

5    that a patent holder -- that somebody -- in order to enforce

6    this, you know, let's imagine somebody right now wants to sue

7    somebody who isn't one of you.  Who is it that you were

8    saying that 436 Canada is suing right now?

9              MS. BOZEMAN:  Square, Inc.

10             MR. WRAY:  Square.

11             THE COURT:  Okay.  So supposing one of you wanted

12   to sue Square, Inc., who gets to sue them?  And, Mr. Wray, by

13   your analysis, only you can sue Square, Inc.

14             MR. WRAY:  That may, indeed, be the case,

15   Your Honor, and --

16             THE COURT:  And so for you to get to that point,

17   what you're saying is that, in this language by acknowledging

18   and agreeing that it's not going to license anything to ROAM

19   data, it's given up its own patent rights to do other things.

20             MR. WRAY:  It's not that sentence of Section 9.2

21   that I'm focusing on here.

22             THE COURT:  Okay.

23             MR. WRAY:  Rather, I'm focusing on 436's express

24   acknowledgment and consent of the BBPOS/Ingenico agreement.

25   Now --

1          THE COURT:  Right, but the agreement doesn't say --

2   the agreement doesn't say on it, "I give you -- I'm giving

3   you 436 Canada's rights."  The agreement says, "I'm giving

4   you my rights."

5          MR. WRAY:  The agreement, Your Honor, doesn't

6   explicitly say, "We're giving you 436 Canada's rights," but

7   the way that the BBPOS/Ingenico agreement reads is that it

8   states that it's granting its rights over any and all patents

9   and patent applications relating to products.

10         Now, the --

11         THE COURT:  But it can't have rights -- it can't

12  give away rights it doesn't have.  You have -- you may well

13  have a breach of contract claim, if it made promises.  Or you

14  may have a fraudulent misrepresentation claim or a

15  detrimental reliance claim.  I don't know.

16         But to have a patent claim, they have to have had

17  the rights to give it away.  It's like I sold you my house,

18  but I didn't own my house.  You can sue me for breach of

19  contract, but if I didn't own the house, you can't get the

20  house out of me.  I didn't own it.

21         MR. WRAY:  We concur that BBPOS could only give

22  away that which it had, but we also allege that at the time

23  this -- I'm sorry -- the BBPOS/Ingenico agreement, ROAM and

24  BBPOS did have the rights to the 436 patents at that time.

25         THE COURT:  Okay.  So that's two different

1    arguments.  One argument is they did have the rights, and the

2    second argument is the ratification.  And if this is what

3    you're basing the ratification on, I don't think this gets

4    you to ratifying -- giving away exclusive rights to a patent

5    that -- with this language.  I don't -- I don't think that

6    gets you there.

7              So let's get to your question on the first thing,

8    which is that you're saying that, at the time, separate from

9    this ratification argument, that, in fact, BBPOS has all of

10   the rights to these patents.  And you're alleging that, and

11   so for purposes here, you want me to deny the motion based on

12   that allegation, despite the -- and to not consider the

13   factual matter presented by Ms. Bozeman?

14             MR. WRAY:  Your Honor, you can consider the factual

15   matter presented by Ms. Bozeman.  Defendants have no

16   objection to the Court considering either of the two exhibits

17   to the motion that plaintiff -- that plaintiffs filed to

18   dismiss the case.

19             However, as is alleged and as was the case, when

20   ROAM entered into this agreement with BBPOS in 2011, it

21   wasn't in a vacuum.  It knew about the relationship between

22   BBPOS and AnywhereCommerce and the various forms of

23   intellectual property that went into the BBPOS devices.

24             BBPOS just had devices that included technology

25   that Ben Lo, who is the founder of BBPOS, had invented.  And

1    all of these 436 patents, by the way, were actually patents

2    that were invented by Ben Lo.  Although 4361423 Canada is

3    listed as the owner of the patent currently, they were also

4    listed as Mr. Lo being the inventor of them.  So at the

5    time --

6            THE COURT:  But the inventor -- if the patent has

7    been assigned to someone, that's the person who would have

8    the standing, not the inventor, right?

9            MR. WRAY:  That's -- that's correct.  I'm

10   explaining the context by which Ingenico understood that, in

11   2011, why BBPOS had the rights that it had in 436's patents.

12           THE COURT:  But -- so to the extent that you're

13   saying, "We thought they had it, and we had really good

14   reasons for thinking it, and they led us to believe they had

15   it" -- that's why I'm saying, you may have -- I don't know.

16   You may have a fraudulent misrepresentation claim.  You may

17   have a breach of contract claim.  You may have a lot of

18   different claims.

19           But if they, in fact, didn't have it, their

20   representations to you that they did have it or giving you

21   the appearance that they did have it doesn't mean they did

22   have it.  So it's just sort of a factual question, did they

23   or didn't they have those rights?

24           MR. WRAY:  I concur, Your Honor, that that is a

25   factual question and that we pled both a breach of contract

1  claim against BBPOS and --

2          THE COURT:  And the breach of contract claim isn't

3  subject to the motion to dismiss.

4          MR. WRAY:  That's correct, Your Honor; however, we

5  do --

6          THE COURT:  Go on.

7          MR. WRAY:  We do allege that, at the time this 2011

8  license was made, BBPOS did have the requisite authority on

9  behalf of AnywhereCommerce -- I'm sorry -- 436 to grant an

10  exclusive license in those patents.  And the existence in

11  2011 of that authority is -- is shown circumstantially

12  through the existence of this 2013 agreement to that

13  exclusive license.

14          THE COURT:  Okay.

15          MR. WRAY:  I --

16          THE COURT:  So if -- if that's the -- I mean,

17  because I'm not sure that if I were to simply say this thing

18  is decided on a motion to dismiss, because I can look at

19  plaintiff's documents -- I'm not sure I would agree, even

20  though you're willing to concede the point, that they're

21  properly included without giving you a chance to make a

22  response.

23          So if I were to convert it into a summary judgment

24  motion, are you saying to me that your response to the

25  summary judgment motion would be this ratification argument?

1    Because that's sort of circular.  Then we're back to the

2    ratification argument.  My question is, what's the evidence

3    that in -- that at the time of the agreement, that BBPOS, in

4    fact, had the intellectual property to give away, had the

5    exclusive right?

6          MR. WRAY:  And, Your Honor, at this point, I'm not

7    prepared to identify what all of the evidence supporting that

8    allegation is.  All I can say is that the 2010 license

9    between 436 and -- I'm sorry -- HomeATM at the time and BBPOS

10   and the 2013 license between 436 and BBPOS would be among the

11   evidence listed.  Notwithstanding the Court's presumption of

12   them today, those would be among the evidence listed.

13         There's other evidence as well.  For example, one

14   of the other specific factual allegations that are in the

15   second amended counterclaim is Mr. Lo's statement that these

16   patents shouldn't be in the name of 436 because he invented

17   them and there was a defect in the assignment or there was a

18   lack of consideration.

19         So while I'm not prepared to list all the evidence,

20   it is alleged that BBPOS had the authority to grant the

21   exclusive license, and the 2013 license is just one of the

22   specific pieces of evidence that supports that allegation.

23         And the last thing I would point out, Your Honor,

24   is that this argument does not relate to the entire patent

25   counterclaim.

1      THE COURT:  It's --

2      MR. WRAY:  It relates to only a subset.

3      THE COURT:  I understand that.

4      So with regard to the subset, Ms. Bozeman, it does

5  seem to me that the allegation, which is that BBPOS had the

6  exclusive right, gets past the 12(b)(6) and that your

7  documents suggest that you're going to prevail on the claim

8  if that's the evidence, but not in this posture.

9      And so I guess the question is, would you like to

10  convert your motion into a motion for summary judgment and

11  have them respond, and then we'll have the record and resolve

12  it on that?

13      MS. BOZEMAN:  Well --

14      THE COURT:  As to the seven patents.  We'll address

15  the other two, but --

16      MS. BOZEMAN:  Okay.  Well, Your Honor, I would

17  suggest that the concession that this 2013 licensing

18  agreement is evidence that should be considered by the Court,

19  that this is evidence that directly contradicts their

20  allegations.

21      If BBPOS had any rights to the intellectual

22  property of 436 Canada, that would make this document

23  meaningless, right?  Why -- they would never need to have

24  entered into this 2013 agreement had BBPOS had those rights.

25  It's completely counterintuitive for them to have done so.

1          THE COURT:  But once we are -- once we are opening

2   this up to evidence -- and I appreciate that Mr. Wray is not

3   disputing that this is an accurate -- you know, there's no

4   dispute that this would be considered, and it's part of the

5   picture.  It does seem that I don't get to make a decision

6   and say, well, I'm opening it up without giving them an

7   opportunity.  I mean, that's pretty straightforward rules

8   under 12(b)(6), that if I do consider other evidence --

9          MS. BOZEMAN:  Well, yes, Your Honor.  We would like

10  to convert this to a motion for summary judgment, then.

11         THE COURT:  Okay.  So let's address the remaining

12  part of this and then see where we are and what makes sense

13  to do.

14         So the second argument, which still needs to be

15  addressed either way, because that goes to the remaining

16  two -- even if you could successfully knock out these seven,

17  Ms. Bozeman, you still have the other two patents.

18         MS. BOZEMAN:  Well -- right.  But we also have our

19  arguments related to that, which is based on these documents,

20  where we do think that these are properly subject to --

21         THE COURT:  We just lost you.  We just --

22         MS. BOZEMAN:   -- are not --

23         THE COURT:  Ms. Bozeman, we lost you.  You said,

24  "We do think these are properly," and then we didn't get you

25  after that.

```
 1              MS. BOZEMAN:  So we do also have arguments relative
 2     to all of the patents collectively that are based in these
 3     documents as well and, also, the plaintiff's own concessions
 4     in its -- in its pleadings where they have conceded the fact
 5     that there was a purchase of ROAM/Ingenico -- there was a
 6     purchase of ROAM by Ingenico, which under the ROAM/BBPOS
 7     licensing agreement directly prohibit any sort of
 8     assignability or transferability of any license in that
 9     event.  That occurred in 2015.
10              THE COURT:  So here's the part I don't understand
11     about that argument.
12              MS. BOZEMAN:  Uh-huh.
13              THE COURT:  The -- you're dealing with ROAM.  Your
14     client is dealing with ROAM in this -- under this contract.
15     And this is a contract that's -- continues in place until
16     when?  When did this -- when did this --
17              MS. BOZEMAN:  The licensing agreement?
18              THE COURT:  Yeah.  Yes.
19              MS. BOZEMAN:  I'm sorry.  It's breaking up a little
20     bit.  But the licensing agreement was perpetual.  So there
21     was -- there were sublicensing rights.  Those rights, though,
22     this exclusivity aspect of it, if you look at this document,
23     it is not -- it's not an exclusive right to IP.  It's an
24     exclusive product license, and I think it's an important
25     distinction, because POS was the right -- a license to freely
```

1    use and sell these products.

2         THE COURT:  Okay.  So let me ask this question:

3    How long did you continue selling these products or having

4    Ingenico paying BBPOS money?

5         MS. BOZEMAN:  Right.  Well, and that's an important

6    part to kind of point out to the Court's attention, too, that

7    this product -- there's two products that are actually --

8    they're -- it's a defined term in this licensing agreement

9    with BBPOS.  One of them is called the CircleSwipe.  The

10   other one is called the ROAM -- the ROAM POS.  It was, like,

11   an EMV reader, POS product.

12        That product was to be designed and manufactured

13   and developed under this -- under this agreement.  It never

14   was.  So there's one -- one product at issue.  It's called

15   the CircleSwipe, and that had been sold by BBPOS to ROAM, I

16   think -- I'm not sure if they still are selling it, but at

17   least during the usefulness of this one particular product.

18        THE COURT:  So I guess what I'm trying to figure

19   out, opposing counsel refers to this as the BBPOS/Ingenico

20   agreement.  Has Ingenico been paying BBPOS any money under

21   this agreement?

22        MS. BOZEMAN:  In connection with the purchase of

23   these products.

24        THE COURT:  Yeah.

25        MS. BOZEMAN:  Yes.  Yes.

1          THE COURT:  So -- so you have an agreement which

2     has a clause that says, "If you're purchased, we get right of

3     first refusal, which will not be unreasonably withheld."  And

4     you're saying the transactions that happened amounted to

5     being sold, and they didn't ask permission.  But I guess I'm

6     saying, and then after that, it appears that you continued to

7     function under this agreement, no?

8          MS. BOZEMAN:  Yes, Your Honor.  So the -- I would

9     have two responses to that, the first being that a license

10    here is distinguishable between the act of selling a product,

11    right?  So there was consideration that was supporting the

12    sale of these products.

13         The licensing issue is a prohibition on the

14    transferability of that license to Ingenico.

15         THE COURT:  I'm just trying to -- I'm backing up a

16    little bit from your arguments and maybe from Mr. Wray's, and

17    maybe I'm coming out of left field here.  But what you're

18    saying is there was this opportunity to end this

19    relationship, right?  The contract says it remains in force,

20    except if there's a sale, we get to weigh in, right?  That's

21    what you're saying.  And then it appears there's a sale, and

22    you don't weigh in.

23         MS. BOZEMAN:  Well, they -- yes.  They were

24    allowed -- uh-huh.

25         THE COURT:  So why --

```
 1              MS. BOZEMAN:  Well, there's also antiwaiver
 2      language in here, which would be --
 3              THE COURT:  Okay.  There is antiwaiver?
 4              MS. BOZEMAN:  Yes, there is, but -- I can -- I
 5      think it's Section 11, Your Honor.  11.1.
 6              THE COURT:  Okay.  Okay.  So -- so let me then make
 7      sure I understand what I have in the pleadings for when
 8      transaction happened, which is that ROAM -- their
 9      shareholders -- you have allegations about different
10      shareholders and how much Ingenico did or didn't own; but in
11      addition to that, there is a point when ROAM no longer is an
12      entity and there's a merger?
13              MS. BOZEMAN:  Right.  So there's two different
14      issues.  There's the 100 percent sale of all the stock in
15      ROAM to Ingenico, and that was effectuated in 2015.  And then
16      there was -- at the end of the year of 2017, there was a
17      merger.  And so the -- the cutoff point here is when there
18      was that sale of the 100 percent of the interests in ROAM, at
19      least, we say.
20              THE COURT:  Okay.  So, Mr. Wray, on that point,
21      putting aside for a minute the 70 percent ownership or
22      100 percent ownership, I -- I do tend to think about
23      corporations as having -- sort of being discrete entities
24      even if they're wholly owned.  So it does appear I had a
25      discrete entity that was ROAM, and then at some point, ROAM
```

1  has a merger regardless of how much is owned or not owned.

2  At some point, it no longer exists because it has been merged

3  into another company.

4        And do I understand, Mr. Wray, that your argument

5  here is simply that merger is different than sale, or is

6  there some different argument that I'm missing?

7        MR. WRAY:  There are a number of arguments, Judge.

8  That is one of them.  The first point that I would make is

9  that all of this goes, if anything, only to the question of

10  how long Ingenico would be able to recover damages for patent

11  infringement, because the statute of limitations for patent

12  infringement is six years.  This counterclaim was filed in --

13  I don't recall if it was 2019 or 2018; but in any event, for

14  at least part of that six-year period, it's undisputed that

15  ROAM had not been sold to a competitor with its own POS

16  products.

17        So while Ms. Bozeman may bring this up as an issue

18  that has to do with how long Ingenico should be able to

19  recover damages for, it certainly isn't an argument that

20  should result in the dismissal of the entire count.

21        Secondly, Your Honor, as you pointed out, there are

22  a number of issues, factual issues, relating to the parties'

23  continued performance under this contract that simply aren't

24  appropriate to raise in a 12(b)(6) motion when that hasn't

25  been the subject of allegations by either side.  There has

1   been continued performance under this with payment coming

2   from Ingenico to BBPOS after this license purportedly ended.

3           That is one of many facts that would show that even

4   if there was, under the meaning of the agreement, a sale of

5   the company to a competitor with its own POS products, an

6   indication that the license did not, in fact, come to an end.

7   The license doesn't state it automatically terminates.  It

8   says that there can't be such an assignment without prior

9   written consent of BBPOS, not to be unreasonably withheld.

10          So there is additionally a fact issue as to whether

11  BBPOS gave written consent to Ingenico, or if it withheld it,

12  whether it did so unreasonably.  All of those are issues that

13  are not properly raised by the pleadings, and at this stage,

14  the Court should accept Ingenico's allegation that it does

15  continually enjoy the rights under that agreement.

16          THE COURT:  Well, I can't take your allegations

17  over the contract language.  I take your point.  It's a fair

18  point that I can -- if something goes beyond the contract

19  language here, I shouldn't be doing that on a 12(b)(6).  But

20  the fact that you're saying it goes on -- you've alleged that

21  it goes on forever doesn't mean it does if the contract says

22  it doesn't.

23          MR. WRAY:  Well, the contract does not say it would

24  terminate.  It doesn't state that the license -- in the event

25  of a sale of the company to a competitor, the license

1    terminates.  It states that it cannot be transferred or

2    assigned without BBPOS's consent, not to be unreasonably

3    withheld.  Now, whether --

4          THE COURT:  Would that mean, then, that the --

5    right now, the reason that there is not a lawsuit being

6    brought by ROAM, but instead there is a lawsuit being brought

7    by Ingenico, don't you have to establish that Ingenico is the

8    party to whom this contract runs?  I mean, you've called it

9    the "Ingenico contract," but I've got -- don't I have to

10   figure out whether, in fact, you can sue on this contract?

11         MR. WRAY:  Yes, Your Honor.  And we've alleged that

12   Ingenico, Inc., did receive the rights under the BBPOS/ROAM

13   contract, which I now call the Ingenico/BBPOS contract.  The

14   license -- the entire agreement states that it's actually

15   freely transferable and assignable except for these

16   circumstances.

17         THE COURT:  Okay.  And so they're saying these

18   circumstances apply here.  And why -- why isn't that

19   something that I should resolve off the contract language?

20   Maybe they're right, maybe they're wrong about how they're

21   reading the contract language, but how can you just allege

22   something different than the contract language?

23         MR. WRAY:  Because matters that occurred after the

24   signing of the contract are relevant to determining whether

25   events that are listed in there occurred.  For example, we --

1    we cited law stating that purchase of 100 percent of the

2    ownership interests in a company does not actually consummate

3    a sale and --

4              THE COURT:  But that part -- I haven't gotten

5    there.  That's the 70 to 100 percent.  I'm at the merger

6    moment.  You're not arguing that the merger doesn't

7    constitute a sale, does it, or are you also?

8              Because to me, the way I'm thinking about it -- and

9    I haven't gone and read the case that either of you cited yet

10   on this point, but the way I think about it is that there is

11   something to a corporate form.  And so I tend to agree with

12   you, Mr. Wray, that whoever owns it isn't meaning that --

13   that doesn't mean that the corporation has been sold.  That's

14   just the stock in the corporation has been sold.

15             But if the corporation is now no longer in

16   existence, that seems to me it's -- this is a different

17   transaction here.

18             MR. WRAY:  It is a different transaction.  It's not

19   one that is -- necessarily appropriately described by the

20   term "sale."  The parties are free to add the term "merger"

21   into the contract, but they didn't here.  It states it's not

22   transferable or assignable in the event of a sale of the

23   company to a competitor.  The parties chose not to include

24   the word "merger" in there.  It's not clear why they did

25   that, but a merger doesn't fall within the restriction on

1   transferability or assignability here.

2          And further, Your Honor, there's significant

3   factual questions about whether the terms of this provision

4   were fulfilled.  For example, it doesn't just state that

5   there has to be a sale.  It has to be a sale to a competitor

6   with its own POS products.  Those are point-of-sale products.

7          Now, there's no doubt that today Ingenico, Inc.,

8   has mobile point-of-sale products, but we're discussing a

9   different entity, which was Ingenico Ventures SAS, which took

10  the ownership interest in the -- in the license agreement.

11         THE COURT:  When did that -- I'm -- just so I'm

12  clear, the -- are you talking about when they became the

13  shareholders or when the merger happened?

14         MR. WRAY:  I am talking about the -- when they

15  became the shareholders.  And it is correct that -- I don't

16  know, Your Honor.  It's not alleged that at the time that

17  Ingenico, Inc., purchased or, rather, merged with ROAM that

18  they had POS products at the time.  My understanding -- and

19  this is outside the pleadings -- is that the company that had

20  mobile point-of-sale products was Ingenico Ventures, and that

21  Ingenico, Inc., sold terminal products which are -- which are

22  different from these.

23         THE COURT:  Okay.

24         MR. WRAY:  So in addition to the other issues we've

25  raised, including, most importantly, the statute of

1    limitations and the fact that at least for part of the

2    statute of limitations there was no alleged sale and the

3    license was in place, there's no demonstration that there

4    would have been an automatic termination of the license.

5              THE COURT:  Okay.  So, Ms. Bozeman, would you agree

6    that at least as to the period before the change in

7    ownership, however you want to define it, but the period

8    before that, that can't be addressed on this argument of your

9    motion?

10             MS. BOZEMAN:  Well, I think it can, Your Honor,

11   because we cited to a case that talked about how a transfer

12   of a license agreement would be a material breach of the

13   contract, so I think that that would be a sufficient basis

14   for the Court to hold that this license is no longer

15   enforceable by them.

16             The -- if we think about what's enforceable in a

17   patent infringement case, it's the right to exclude.  And if

18   there has been a material breach here, the right to exclude,

19   I think, shouldn't be extinguished.

20             THE COURT:  So you would say -- let's assume you

21   have -- an exclusive license goes to somebody, and at some

22   point, that relationship ends.  There's a breach.  The

23   contract's over.

24             MS. BOZEMAN:  Uh-huh.

25             THE COURT:  During the period of the exclusive

1    license, a third party was infringing on the patent.

2              MS. BOZEMAN:  Uh-huh.

3              THE COURT:  Who would be able to sue?  During that

4    period, who could sue against the third party?

5              MS. BOZEMAN:  Well, so no one would, because if you

6    look at -- so the one case that -- there was this recent

7    order that came out in the Northern District of California,

8    December 4, 2020, and it's this -- it's this really

9    interesting discussion about how standing works.  And so one

10   aspect of this order, which is called Uniloc USA, Inc., v.

11   Apple, Inc., one aspect of this order talks about this

12   distinction between statutory standing and constitutional

13   standing.

14             And so when you have -- when we're talking about

15   statutory standing, that means you need to be a patentee,

16   right, and that you need to have some sort of -- you need to

17   have all or substantially all of the interests in the patent,

18   right, just to qualify to bring such a claim.

19             But the -- what this court focuses on is the

20   constitutional aspect of it, the Article III standing, which

21   is really grounded in whether or not a plaintiff has -- it's

22   something that needs to be --

23             THE COURT:  We just -- we lost you from "it's

24   grounded on whether or not a plaintiff."

25             MS. BOZEMAN:  Has exclusionary rights.

1          THE COURT:  Okay.  But --

2          MS. BOZEMAN:  So those exclusionary rights can

3     change over time based on the licensing.

4          THE COURT:  But you're saying that if a contract

5     terminates, you're therefore not getting the benefits of the

6     contract before termination either?  It doesn't -- that

7     doesn't really make sense.  And when you --

8          MS. BOZEMAN:  I --

9          THE COURT:  I was posing it against a third party

10    to sort of show -- I mean, in the scenario I was saying -- so

11    the person who had had the exclusive license -- which they no

12    longer have, but they had it for this time period -- they

13    want to bring a claim against a third party, and the third

14    party gets to assert as a defense, "Oh, you were in a breach

15    of -- with the patent holder; and, therefore, no one can

16    bring a claim against me.  I have a right to it"?

17         MS. BOZEMAN:  Yes.  That is exactly what this

18    order -- that's exactly what this order says.

19         The -- and I can give the Westlaw cite.  It's

20    2020 WL 7122617.  And this just was issued December 4, 2020.

21    But it talks about --

22         THE COURT:  Is -- who is the judge?

23         MS. BOZEMAN:  The judge is --

24         MR. WRAY:  William Alsup, Your Honor.

25         MS. BOZEMAN:  Alsup.

1           THE COURT:  Thank you.

2           MS. BOZEMAN:  And so this talks about how you

3    can -- as a defendant, you are challenging the right -- the

4    standing of someone to bring a patent infringement case.

5           And I agree with Your Honor, there could be other

6    kinds of claims that are brought as a result of a contractual

7    or a tortious claim, but to have standing to bring a patent

8    infringement case, you need to be -- you need to be

9    statutorily qualified as well as to have this exclusionary

10   right.  If this exclusionary right is gone, you don't have

11   that right to exclude.  You can't bring that claim.

12          THE COURT:  And you're saying that once the

13   contract is over, for all period under contractual, anyone

14   can do what they want?  I mean, once the contract is over,

15   the period of time where there was a license agreement, the

16   world is free to infringe on the patent?

17          MS. BOZEMAN:  When -- when a license -- I'm sorry.

18   Could you repeat that question?

19          THE COURT:  What I think you're saying to me --

20   let's say you have a five-year period of time where a

21   patent -- there's a license to another party.  And that party

22   had that license for that five-year period of time, exclusive

23   license.  At the end of that five years, that contract is not

24   renewed, but the infringement that happened, happened during

25   the period of the contract.  And so you're saying, at that

1  point, it reverts to the patent holder or it gets to no one

2  to --

3          MS. BOZEMAN:  It goes to no one.

4          THE COURT:  I will read Judge Alsup's decision.

5          Okay.  We're getting close to the end of our time

6  here.  I think where I am on the first argument, which is the

7  argument that the seven were held by 436 Canada, I'm going to

8  allow you to convert your motion into a summary judgment

9  motion if you want to.  It may be simpler if you refile it so

10  it's limited -- it's addressing that issue.  And then

11  Mr. Wray will have a chance to respond with an evidentiary

12  response to that.

13          With regard to this question of whether the

14  pleadings are sufficient to allege that, at least for some

15  part of the time, there was a -- they had the exclusive

16  license, I'm -- was swayed by Mr. Wray's argument, but I will

17  go back and read this case that you've cited and see where I

18  come out after I read that.

19          And then you had a third argument, which just has

20  to do with the specificity of the allegations, I believe,

21  their 12(b)(6) argument.  And I guess they've responded that

22  they've put you on notice that they're claiming that you're

23  infringing these patents and --

24          MS. BOZEMAN:  Right.

25          THE COURT:  -- what more do you need.

1          MS. BOZEMAN:  Right.  And if I could just add one

2    more argument as to the seven patents.  This is just the

3    legal argument.  With respect to the standing issue, if you

4    go to the statutory standing aspect of it, you have --

5    there's three different situations, really, where someone

6    might want to assert a patent infringement claim.

7          One is where they have all -- all -- substantially

8    all of the rights in the patent.  And we all agree, I

9    think -- I don't think Mr. Wray would disagree that that's

10   not the situation that Ingenico was asserting its claims

11   here.

12         The second situation would be when there is -- when

13   you have a right to exclude, you -- but what you have to do

14   is also name -- you also have to join the patentee, the owner

15   of that patent.  And with respect to the 7436 Canada patents,

16   the failure to join 436 Canada is a -- is an absolute defect.

17         THE COURT:  What about their argument that that

18   rule doesn't apply if the person you're suing is the patent

19   holder?

20         MS. BOZEMAN:  They're not suing 436 Canada.

21   They're suing AnywhereCommerce, and they're separate

22   companies.

23         THE COURT:  Okay.  Mr. Wray, what's your answer to

24   that?  And they're suing BBPOS, which is a separate company.

25         MR. WRAY:  Your Honor, we have a number of

1    responses to that.  First, in our response, we have alleged

2    that we are an exclusive licensee with all substantial rights

3    in the asserted patents.  There's a list of all the

4    substantial rights that constitute that under the law, and if

5    you compare that to the BBPOS license, Ingenico/ROAM were

6    granted all of those rights, including the exclusive right to

7    bring claims for infringement.

8            Secondly --

9            THE COURT:  I don't think there was an exclusive

10   right to bring claims for infringement, was it, or was I

11   reading an earlier version?  I thought it was a right to

12   bring claims for infringement, but not an exclusive right.

13   Am I misreading?

14           MR. WRAY:  Allow me to pull up that specific

15   language.

16           It says that in the event -- and I'm reading

17   from -- this is ECF Document 78-1.  This is the

18   Ingenico/BBPOS agreement, and we're at what the system

19   describes and what the exhibit describes as page 13 of 16.

20   And this paragraph states that Ingenico/ROAM shall have the

21   first right, but the not the obligation, to institute,

22   prosecute, and control legal proceedings to prevent or

23   restrain such infringement.  I paraphrased a little bit,

24   Your Honor, but --

25           THE COURT:  So -- but first right, but not the

1    obligation doesn't mean exclusive right.

2              MR. WRAY:  It means that BBPOS could not institute

3    claims for infringement without first allowing Ingenico to do

4    so.

5              THE COURT:  Right.  But it doesn't mean that only

6    Ingenico can bring it.  I mean, the problem with -- the

7    reason that you have to bring the patent holder in, in these

8    things, is that you don't want third parties to get sued from

9    a bunch of different people.

10             MR. WRAY:  Correct.

11             THE COURT:  So why isn't she right that, to the

12   extent you're suing on 436 Canada's patents, you can't sue

13   these parties without 436 Canada's joining in?

14             MR. WRAY:  She's incorrect for two reasons,

15   Your Honor.  The first is that Ingenico does enjoy

16   substantially all of the rights in the patent as that phrase

17   is used in precedent.  And the second reason is that the

18   exception that we discussed in the context of the *Duckweed*

19   case, *Duckweed USA v. Behrens*, does apply here.

20             THE COURT:  Why?

21             MR. WRAY:  This exception -- it extends from an

22   original Supreme Court decision from 1891 in equity where it

23   decided that the title remains in the owner of the patent and

24   suit must be brought in his name and never in the name of the

25   licensee alone unless that is necessary to prevent an

1    absolute failure of justice, as where the patentee is the

2    infringer and cannot sue himself.

3            THE COURT:  But her point is the patentee can't sue

4    themselves because that -- that was my -- I read your thing.

5    You convinced me, but she pointed out, you're not suing

6    436 Canada.

7            MR. WRAY:  436 Canada is the parent company of

8    AnywhereCommerce here, and while I agree with you,

9    Your Honor, that that's not literally the same person, this

10   is an equitable exception.  This isn't a rigidly legalistic

11   exception.

12           THE COURT:  Okay.  Put aside for a minute

13   AnywhereCommerce.  You're asserting BBPOS as well.

14           MR. WRAY:  That's correct.  And there's no question

15   that 436 could sue BBPOS because they have a license from

16   436.

17           THE COURT:  Oh, that -- the question here -- you're

18   suing BBPOS, and you're saying you don't need to include

19   436 Canada because what?

20           MR. WRAY:  There are several reasons, Your Honor.

21   First, BBPOS as alleged in its own pleading, is in a tight

22   partnership with AnywhereCommerce, and I can pull up the

23   exact language of that.  They refer to a very close

24   partnership where they've locked up together.  Now --

25           THE COURT:  I -- I have a -- you know, I have to

1    say, it's such a funny thing when you're dealing with

2    corporations.  Everybody wants a corporate form when it's

3    helpful, and everyone wants to pretend the corporate form

4    isn't there when it's not helpful.  I have a separate -- I

5    don't care that they're good partners and they love each

6    other today.  Tomorrow they come in and they're fighting with

7    each other.  They're separate corporate entities.

8         MR. WRAY:  Your Honor, we would also point out that

9    this is an equitable exception.  It's designed to address the

10   kind of observed situation where we would have here, if we

11   attempted to bring in somebody that Ms. Bozeman represents,

12   her firm has accepted service of a subpoena to 436 Canada,

13   and have that person be suing the other person that she's

14   representing, now, I agree, Your Honor --

15        THE COURT:  Well, that's not -- that's not the

16   determination of which their counsel is.  The question is --

17   well, I guess I should say this:  Do you have authority for

18   the idea that this exception, which has been there for a long

19   time, is used where they are different corporate entities,

20   not the same corporate entity?

21        MR. WRAY:  We have not found a case where -- or we

22   did not identify yet a case where it wasn't the same

23   identical corporate entity and would suggest that, under both

24   *Waterman* and *Duckweed*, the reason that this rule exists is to

25   prevent, they say, a failure of justice as where the patentee

1    is the infringer, and that's giving an example of why it says

2    "to prevent an absolute failure of justice, as where the

3    patentee is the infringer."

4         Now, here, we're just outside of that literal

5    example that they've given, where it would be effectively the

6    patentee as the infringer.  Yes, separate corporate forms,

7    but in particular circumstances here, it would -- it would be

8    an absurdity for 436 to sue BBPOS.

9         One of the reasons it would be an absurdity for 436

10   to be the plaintiff suing BBPOS, apart from counsel, is the

11   fact that there is this license in existence which expressly

12   licenses those patents to BBPOS.  There's not -- there's no

13   concern here, Your Honor, that --

14        THE COURT:  Well, but -- I mean, if your version of

15   this is correct, then BBPOS takes a license and -- the --

16   BBPOS goes and takes -- represents that there's an exclusive

17   license that can be given -- in 436 Canada that can be given

18   to your client.

19        So it would seem if they did that -- I mean, maybe

20   it's not a patent claim, but it would seem like 436 Canada

21   could sue BBPOS for interfering -- for trying to sell their

22   patent rights that they didn't have.

23        MR. WRAY:  I'm not aware -- not where 436 has

24   expressly acknowledged and consented to that license in

25   question.

1          THE COURT:  Well, this is a question of how we're

2     interpreting that.

3          MS. BOZEMAN:  The whole thing exposes the

4     absurdity.

5          THE COURT:  You just -- I don't know if you froze

6     or you stopped.  You said that this whole thing exposes the

7     absurd, and that's all we got.

8          MS. BOZEMAN:  The absurdity of their position to

9     begin with, because it exposes the fact that they have no

10    rights in these patents, and that's why they're reluctant to

11    bring 436 Canada in, because 436 Canada has licensed both of

12    the -- all of their patents to these two entities that

13    they're suing.  So it doesn't make any sense.

14         THE COURT:  Well, but that's their point.  They're

15    saying you've licensed them to those things, so 436 Canada

16    isn't going to sue them and that they have now taken those

17    patents and licensed them to Ingenico, so Ingenico can

18    complain if they're not getting the benefit of that license,

19    is the argument.  I mean --

20         MS. BOZEMAN:  But that could happen in any

21    situation.  They are still separate entities.  436 Canada is

22    still the patentee, and the letter of the law is -- is

23    settled on this, that they need to be joined.  They need to

24    be joined, then.

25         MR. WRAY:  Respectfully, the letter of the law

1    isn't settled.  There's an exception for when the current

2    assignee of the patent needs to be joined.  That exception

3    concerns when it would be an absolute failure of justice to

4    attempt to bring in a third of Ms. Bozeman's clients to sue

5    the other two of her clients.  And I understand the Court's

6    point that, presumably, they would get separate counsel at

7    that point.

8            But my point is that the interests of BBPOS,

9    AnywhereCommerce, and 436, both under the law and as they've

10   alleged it, are the same here.  And it would be joining

11   almost a defendant itself to join 4361423 Canada.  And as to

12   the -- the situation itself, Your Honor, the broader context

13   of this is that when Ingenico was dealing with BBPOS back in

14   2011 -- and at the time it was ROAM -- it was entering into

15   an agreement about the production of mobile point-of-sale

16   devices.  It knew at the time that when it was dealing with

17   BBPOS, there was a number of different sources of

18   intellectual property that underlay those devices.

19           Some of it belonged to HomeATM or 436, and some of

20   it belonged to BBPOS and negotiated this agreement whereby,

21   in exchange for paying for these devices, which was done

22   continuously up through 2019 and perhaps at present, it would

23   have an exclusive right to all this intellectual property.

24           And AnywhereCommerce knew that, 4361423 Canada knew

25   that, BBPOS knew that, and all were -- blessed the deal in

1      writing, giving Ingenico all of the substantial rights and

2      all of the patents related to this.  Only afterwards,

3      apparently, when BBPOS became disappointed in the broader

4      relationship, did they decide to go off on their own and

5      become their own manufacturer.

6            THE COURT:  Okay.  So I will think about these

7      other arguments on this specific issue about the seven

8      patents and who holds them in light of your concerns about --

9      this is a cloud on the title, et cetera.

10           MS. BOZEMAN:  Right.

11           THE COURT:  I would suggest that -- go ahead and do

12      your briefing on that separate from the rest of these

13      arguments.  I know some of these arguments could make that

14      unnecessary if you were to prevail, but I think let's keep it

15      separate for now.

16           MS. BOZEMAN:  As to just the seven, Your Honor?

17           THE COURT:  As to the specific question about the

18      seven, which is the issue that -- whether BBPOS had the

19      license -- had the exclusive license so that it could then

20      pass it on and/or the ratification -- those two parts of the

21      question on the seven.

22           MS. BOZEMAN:  Okay.  Yes.  Thank you, Your Honor.

23           THE COURT:  Mr. Wray, anything else?

24           MR. WRAY:  My only question, Your Honor, is whether

25      the Court would like the defendant and counterclaimant to

1    respond to the citation to *Uniloc v. Apple*, a case that I

2    wasn't aware plaintiffs would rely on until the hearing

3    today.

4             THE COURT:  If you want to submit something really

5    short, like two pages kind of short, I'll go read it, and I

6    may or may not -- I may think it's relevant or not relevant.

7    I don't know.  I haven't read it.  And I don't know whether

8    you have it in your mind either, but I'll give you something

9    very brief.

10            MR. WRAY:  Thank you, Your Honor.

11            MS. BOZEMAN:  And, Your Honor, as far as timing for

12   the motion, is there a constraint on that with the holidays

13   or -- we, obviously, want it done as expeditiously as

14   possible, but --

15            THE COURT:  It's the holidays.  It's the holidays.

16   I'm not expecting you to get this done over the holidays.

17            MS. BOZEMAN:  Okay.

18            THE COURT:  But I recognize that you want to get

19   something done, and --

20            MS. BOZEMAN:  We do.

21            THE COURT:  -- so I guess I would encourage you to

22   get it in when you can in January, and then they'll have

23   their three weeks to respond.  It's summary judgment.

24            MS. BOZEMAN:  Right.

25            THE COURT:  And I would -- even though I am

1    designating it summary judgment, I'm not asking you to brief

2    anything larger than this question that you're, essentially,

3    saying I should decide it on these contracts.  And you may

4    want to just rest on these contracts.  They may be something

5    more; they may be something else.  But Mr. Wray is suggesting

6    that he's -- has other arguments and other evidence, and

7    he'll certainly be allowed to -- to offer that in response.

8              I don't typically allow a reply as a matter of

9    course, but under our local rules on a summary judgment, you

10   do get a reply.

11             MS. BOZEMAN:  Okay.

12             THE COURT:  So that's due two weeks after the

13   opposition.  Okay?

14             Thank you very much.  Have a good holidays,

15   everyone.

16             MS. BOZEMAN:  You too.

17             MR. WRAY:  Thank you, Your Honor.

18             MS. BOZEMAN:  Thank you, Your Honor.

19             THE DEPUTY CLERK:  Thank you, Your Honor.

20             The Court is in recess.

21             (Court in recess at 4:21 p.m.)

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 13th day of January, 2021.

/s/ Robert W. Paschal

_____

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter