# EXHIBIT F

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

ANYWHERE COMMERCE, INC. and      )
BBPOS LIMITED,                   )
                Plaintiffs,      )
            v.                   )   CIVIL ACTION NO.:
INGENICO INC., INGENICO CORP.    )   1:19-cv-11457-IT
and INGENICO GROUPS, SA,         )
                Defendants.      )
_____    )

       The 30(b)(6) VIDEO DEPOSITION of MICHAEL KRON,

taken in the above-entitled cause, before Susan Steudel,

official reporter, on the 2nd day of November, 2021



Page 2

```
 1    APPEARANCES:
 2
 3         ADLER POLLOCK & SHEEHAN, P.C.
 4         Once Citizens Plaza, 8th Floor
 5         Providence, RI 02903-1345
 6         Ph:  401-274-1345
 7         Jtechentin@apslaw.com
 8         BY: Jeffrey K. Techentin,
 9              On behalf of the Defendants;
10
11         Kutak Rock
12         1760 Market Street, Suite 1100
13         Philadelphia, PA 19104-4104
14         Ph:  215-353-8484
15         Melissa.bozeman@kutakrock.com
16         BY: Melissa Bozeman,
17              On behalf of the Plaintiffs;
18
19
20    ALSO PRESENT:
21         David Oxilia, Videographer
22
23
24
25
```



Page 85

1  conversation.
2      Q.  Was one of the topics also your intention to sue?
3      A.  Yes.  That would have come up as well.
4      Q.  Had AnywhereCommerce already taken a decision to
5  sue Ingenico or the defendants prior to this conversation
6  with Mr. Lo?
7      A.  Yes.
8      Q.  When did that happen?
9      A.  It -- at some point in the preceding three-month
10 period.
11     Q.  And other than the knowledge that you've
12 described for me about what Mr. Lo told you as far as
13 trade secrets and the RP350X and the RP450X is concerned,
14 leaving that aside, what conduct by the defendants were
15 you aware of three months before this conversation in 2017
16 that justified suing Ingenico?
17     A.  Well, the conduct of tortious interference.
18     Q.  And we're not going to go over it all again, so
19 I'm going to try and get you to agree with the sort of
20 general statement.  So the decision to sue Ingenico was
21 based upon Ingenico's use of BBPOS's trade secret
22 information in its products; right?
23     A.  Yes.
24         MS. BOZEMAN:  Objection.  But you can answer.
25     A.  Principally.  But that would be the principle;



```
                                                              Page 86
 1    selling it and then -- yes, it falls under.  The buying it
 2    and ...
 3    BY MR. TECHENTIN:
 4         Q.   But the wrongful nature all stems --
 5         A.   Yes.  Yes.
 6         Q.   -- from the trade secret part; right?
 7         A.   Yes, definitely.
 8         Q.   At the time of that conversation it was still
 9    true that you hadn't done your own independent assessment
10    of the veracity of Mr. Lo's representations about the
11    trade secret issue; right?
12         A.   Correct.
13         Q.   During this conversation with Mr. Lo, did you and
14    he -- was it just you and him on the phone?
15         A.   Yes.
16         Q.   During that conversation did you and he discuss
17    the topic of sharing legal expenses?
18              MS. BOZEMAN:  Objection.  Attorney/client
19    privileged and I'm going to instruct the client -- the
20    witness not to answer that question.
21    BY MR. TECHENTIN:
22         Q.   Are you going to abide by that?
23         A.   I will.
24         Q.   Let me test that just a little bit.  Have you
25    ever received advice from your lawyers with respect to how
```



1  you should share legal expenses with Mr. Lo or BBPOS in
2  this case?
3        MS. BOZEMAN: Objection. Attorney/client
4  privileged, and I'm going to instruct the witness not to
5  answer that question.
6  BY MR. TECHENTIN:
7     Q.  Are you going to abide by that?
8     A.  Yes.
9     Q.  Who is obligated to pay the legal fees or
10 expenses related to this litigation?
11       MS. BOZEMAN: Objection. Attorney/client
12 privileged, and I am going to instruct the witness not to
13 answer this question.
14 BY MR. TECHENTIN:
15    Q.  Are you going to abide by that?
16    A.  Yes.
17    Q.  During this conversation with Mr. Lo, did you
18 discuss the topic of how potential litigation proceeds or
19 damages awards might be assessed as between
20 AnywhereCommerce and BBPOS?
21       MS. BOZEMAN: Objection. Attorney/client
22 privileged. I'm going to instruct the witness not to
23 answer that question.
24 BY MR. TECHENTIN:
25    Q.  Are you going to follow your counsel's



Page 88

```
 1    instruction?
 2        A.   Yes.
 3        Q.   During this discussion, did you and Mr. Lo
 4    discuss a potential joint defence agreement?
 5             MS. BOZEMAN:  Objection.  Attorney/client
 6    privileged and I'm going to instruct the witness not to
 7    answer this question.
 8    BY MR. TECHENTIN:
 9        Q.   You're going to abide by that?
10        A.   Yes.
11        Q.   At any point in time through the present has
12    there ever been such an agreement in effect?
13             MS. BOZEMAN:  You can answer.
14        A.   Sorry, what's the question?  Can you repeat the
15    question.
16    BY MR. TECHENTIN:
17        Q.   Sure.  At any point in time, has there ever been
18    a joint defence agreement in effect between you and BBPOS?
19        A.   At any time has there been a joint defence
20    agreement in effect.  Joint defence agreement; that's on
21    the counterclaims, you mean?
22        Q.   I don't know what it says.  I'm just asking you
23    if you have a joint defence agreement.
24        A.   That's not an engagement agreement with counsel?
25    That's something else you're asking about?  Or you're
```



Page 89

```
 1   asking if we have any kind of a joint agreement with
 2   counsel?
 3        Q.   I mean, I don't want to give you -- I don't want
 4   to give you an interpretation because I don't know what
 5   your agreements look like.
 6        A.   But there's a joint agreement between -- yes.
 7   There's a joint agreement between BBPOS and
 8   AnywhereCommerce and Kutak Rock.
 9        Q.   Does that agreement contain any provisions other
10   than governing the provision and payment for legal
11   services?
12             MS. BOZEMAN:  Objection.  Attorney/client
13   privileged.  I'm going to instruct the witness not to
14   answer that question.
15   BY MR. TECHENTIN:
16        Q.   Are you going to abide by that?
17        A.   Yes.
18        Q.   Are there any agreements between you and BBPOS
19   with respect to this litigation at to which Kutak Rock is
20   not a party?
21        A.   No.
22        Q.   Do you know who drafted the agreement between
23   you, BBPOS and Kutak Rock?
24        A.   Yes.  Kutak Rock.
25        Q.   Do you know the effective date of that agreement?
```



```
                                                           Page 90
 1        A.   Not offhand but I would say probably six months
 2   prior to the litigation.  Six to 12 months prior to
 3   litigation.
 4        Q.   I assume this agreement is in writing, yes?
 5        A.   Yes.
 6        Q.   Do you know its title?
 7        A.   No.
 8        Q.   Did you execute it on behalf of AnywhereCommerce?
 9        A.   Yes.
10        Q.   And Ben Lo on behalf of BBPOS?
11        A.   Yes.
12        Q.   Do you know who executed it on behalf of Kutak
13   Rock?
14        A.   Oliver Griffin.  Presumably.  I'm going to guess
15   Oliver Griffin.
16        Q.   So I'm going to ask you to exclude from your
17   answer any of counsel's legal advice or mental impressions
18   that might be reflected in the document.  But with that
19   caveat what are the terms of this agreement?
20             MS. BOZEMAN:  Objection.  Attorney/client
21   privileged and I'm going to instruct the witness not to
22   answer this question.
23   BY MR. TECHENTIN:
24        Q.   You're going to follow that?
25        A.   Yes.
```



Page 91

1         But I'll add that since Kutak Rock drafted the
2    agreement, it all falls under Kutak's best efforts to put
3    something in writing, their thoughts on how it should be
4    prepared.
5         Q.   Does the agreement that you have between you,
6    BBPOS and Kutak Rock contain any obligation of
7    AnywhereCommerce other than the payment of legal fees?
8              MS. BOZEMAN:  Objection.  Attorney/client
9    privileged, and I'm going to instruct the witness not to
10   answer this question.
11   BY MR. TECHENTIN:
12        Q.   You'll abide by that I assume.
13        A.   Yes.  Yes.
14        Q.   And same question with respect to BBPOS.  Does
15   this agreement that you have with the three of you contain
16   any obligations on the part of BBPOS other than the
17   payment of legal fees?
18             MS. BOZEMAN:  Objection.  Attorney/client
19   privileged.  I'm going to instruct the witness not to
20   answer the question.
21   BY MR. TECHENTIN:
22        Q.   You're going to follow that?
23        A.   Yes.
24        Q.   Has AnywhereCommerce been assigned or given by
25   any other party any rights as they pertain to this



Page 92

1  litigation?
2      A.  Not that I'm aware.
3      Q.  Same question for BBPOS.  Has it been assigned or
4  given any rights as they pertain to this litigation?
5      A.  I wouldn't know.
6      Q.  What about Kutak Rock?  Has it been assigned or
7  given any rights pertaining to this litigation?
8          MS. BOZEMAN:  Objection.  I mean, are you talking
9  outside the frame of an engagement -- or the joint
10 agreement that Mr. Kron is talking about?  I'm asking --
11 I'm just trying to clarify.
12         MR. TECHENTIN:  I'll be -- I'll be as clear with
13 you, Melissa, as I possibly can be.
14         MS. BOZEMAN:  Sure.
15         MR. TECHENTIN:  If this were an engagement
16 letter, if it was just an engagement letter, I wouldn't be
17 asking any of these questions.  But it's not.  And your
18 objection suggests to me that it's substantively different
19 from an engagement letter.  And so if you have some
20 formula for me to exclude, like, standard terms of
21 engagement, like, you know, hourly rates or contingency
22 fees or anything, I don't want to ask about that.
23         But if Kutak Rock is a business participant in
24 this lawsuit, I'm entitled to know about that.  So that's
25 what I'm getting at.



Page 100

1  no, until Ben Lo told me that he had that intention any
2  other conversation would be hearsay.
3      Q.  Well, I'm trying to explore whether when Ben Lo
4  called you and said something like hey, let's talk about
5  suing Ingenico --
6      A.  Yes.
7      Q.  -- whether at that point you knew that he was on
8  board or not?
9      A.  I wouldn't have known if he was on board because
10 I'm not big on second-hand information and I like to hear
11 it from, you know, directly from the party.  So too much
12 broken telephone that takes place and people change their
13 minds.  So I, you know, I only believe what people say to
14 me directly and what they sign in writing.
15     Q.  And then after -- sometime after your
16 conversation with Ben Lo there's a document that's created
17 by Kutak Rock.  It's an agreement that the three parties
18 then sign; right?
19     A.  Right.  Because there was no discussion about us
20 jointly becoming party to an agreement in advance.  So
21 until I spoke to Ben Lo about it, that was not
22 ascertained.  So, yeah.  And the business terms between us
23 were not ascertained until we had a discussion.  So
24 certainly I didn't have information that -- it couldn't
25 have happened before the conversation because we had to



Page 101

1    agree as business people as to how, you know, we might
2    proceed.
3        Q.   Sure.  And that agreement, I think you said, was
4    reached something like six months before the litigation
5    was filed?
6        A.   Yeah.  The written agreement.  The written
7    agreement.  Yeah.  Must have been.  Must have been.  It
8    feels like it must have taken six months to go from an
9    agreement to, you know, filing of a lawsuit.
10       Q.   Would it be fair to say that as of the first call
11   that you had with Mr. Lo in 2017 that he was not a joint
12   client with you of Kutak Rock?
13       A.   Not on that phone call.  No.  He was not.
14       Q.   Do you know if, during that phone call, he was
15   already represented by Kutak Rock?
16       A.   I don't.  Do you mean for this particular case or
17   other cases?
18       Q.   For this case.
19       A.   Well, does someone have to sign a paper to be
20   represented or is verbal adequate?
21       Q.   Let me ask a clearer question that doesn't
22   require you to reach legal conclusions.  Did anyone tell
23   you that Kutak Rock represented Ben Lo in connection with
24   suing Ingenico?
25       A.   No.



1        Q.   At any time prior to that conversation?
2        A.   No.
3        Q.   Did Ben Lo say to you, "I've hired Kutak Rock to
4    be my lawyers, too"?
5        A.   No.  No, he did not.
6        Q.   Did Ben Lo say anything that suggested he hadn't
7    hired lawyers yet?
8        A.   Yes.  He said that he had the intention of hiring
9    Kutak Rock; that they weren't hired yet.
10       Q.   And during that phone call -- strike that.
11            Prior to that phone call did you have any agreement
12   with Mr. Lo with respect to the confidentiality of the
13   communications during that phone call?
14       A.   No.  Not that I know of.  I don't know if a
15   general NDA between the two companies just is in
16   existence.  I'm not sure if that would -- we didn't have a
17   specific NDA about that phone call, but I believe there's
18   an ongoing NDA as part of our agreement between the two
19   companies.
20       Q.   In fact, you didn't have any discussions with Mr.
21   Lo about any parameters for this conversation before the
22   conversation happened; right?
23       A.   Right.  Nothing specific.  No.
24       Q.   All right.  How long did that phone call take?
25       A.   Couldn't have been long.  Maybe 15 minutes.



Page 103

1  Q. And how many more times did you discuss this
2  litigation with Mr. Lo before this contract was signed?
3  A. Can't recall having further conversations with
4  Mr. Lo privately. I would imagine the next conversation
5  would have included counsel because there were
6  conversations where Oliver Griffin was a party to the
7  conversation. And then there was emails on the paperwork
8  to counsel driving the email communications among the
9  three of us.
10  Q. Okay. At some point did Ben Lo hire Kutak Rock?
11  A. Did Ben Lo hire Kutak Rock?
12  Q. For this lawsuit?
13  MS. BOZEMAN: Individually or?
14  MR. TECHENTIN: I'm sorry. Fair point. Fair
15  point.
16  BY MR. TECHENTIN:
17  Q. Did BBPOS hire Kutak Rock?
18  A. Other than through a three-way agreement, I'm not
19  aware that he hired them separately.
20  Q. And that's sort of my question. Are you aware
21  one way or the other whether BBPOS had engaged Kutak Rock
22  prior to the signing of that letter, of that contract?
23  A. No, I guess not. I guess not. They could have.
24  I guess not. I don't think they did, but ...
25  Q. Okay.



MAGNA
LEGAL SERVICES