UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


ANYWHERE COMMERCE, INC. and      )

BBPOS LIMITED,                   )

                 Plaintiffs,    )

                  v.         )   CIVIL ACTION NO.:

INGENICO INC., INGENICO CORP.    )   1:19-cv-11457-IT

and INGENICO GROUPS, SA,         )

               Defendants.    )

_____    )


The 30(b)(6) VIDEO DEPOSITION of MICHAEL KRON,

taken in the above-entitled cause, before Susan Steudel,

official reporter, on the 2nd day of November, 2021



Page 2

```
1   APPEARANCES:
2
3       ADLER POLLOCK & SHEEHAN, P.C.
4       Once Citizens Plaza, 8th Floor
5       Providence, RI 02903-1345
6       Ph: 401-274-1345
7       Jtechentin@apslaw.com
8       BY: Jeffrey K. Techentin,
9           On behalf of the Defendants;
10
11      Kutak Rock
12      1760 Market Street, Suite 1100
13      Philadelphia, PA 19104-4104
14      Ph: 215-353-8484
15      Melissa.bozeman@kutakrock.com
16      BY: Melissa Bozeman,
17          On behalf of the Plaintiffs;
18
19
20  ALSO PRESENT:
21      David Oxilia, Videographer
22
23
24
25
```

Page 3

```
1                        I N D E X
2
3   INDEX OF EXAMINATIONS:
4       EXAMINATION                    PAGE
5         BY MR. TECHENTIN              6
6         Reporter certification      155
7
8   EXHIBITS:
9       NUMBER    DESCRIPTION          PAGE
10
11  Exhibit 26    Notice of deposition for
                    December 2, 2021        8
12  Exhibit 27    Six-page document entitled
                    "AnywhereCommerce,
13                  Inc.'sResponse to Rule
                    30(B)(6)Deposition Notice."   9
14
15  Exhibit 28    Email                   17
16  Exhibit 29    Document entitled "License
                    Agreement and Non-competition
17                  Agreement."             19
18  Exhibit 30    Second amended counterclaims    25
19  Exhibit 31    AnywhereCommerce, Inc.'sand
                    BBPOSLimited's answer to
                    Ingenico Inc.'ssecond amended
20                  counterclaims           28
21  Exhibit 32    Engineering development and
                    license agreement dated May 4th,
22                  2010                    30
23  Exhibit 33    Email Subject: What's going on
                    in BBPOS side.          125
24
25  Exhibit 34    Email Subject: One last   129
```

Page 4

```
1
        Exhibit 36    Minutes of a board of directors
2                       meeting dated September 15th,
                        2014                    134
3
    PREVIOUSLY MARKED EXHIBITS REFERENCED:
4       NUMBER        PAGE / LINE
5       Exhibit 1      66 / 24
6       Exhibit 1     116 / 1
7       Exhibit       134 / 1
8
9   ADDITIONAL INFORMATION REQUESTED:
10      Page / Line
11       86 / 23
12       87 / 8
13       87 / 16
14       88 / 2
15       88 / 10
16       89 / 17
17       90 / 25
18       91 / 13
19       91 / 23
20      106 / 25
21
22
23
24
25
```

Page 5

```
1               MONTREAL, CANADA
2               December 2, 2021
3                   *****
4       (PROCEEDINGS COMMENCED AT 12:30 P.M.)
5       THE VIDEOGRAPHER:  Good afternoon.  We're now on
6   the record.
7       This begins videotape number 1 in the 30(b)(6)
8   deposition of Michael Kron in the matter of
9   AnywhereCommerce, Inc. and BBPOS Limited versus Ingenico
10  Inc., et al., in the United States District Court For the
11  District of Massachusetts, civil docket number
12  1:19-cv-11457-IT.  Today's date is December 2, 2021, and
13  the time on the video monitor is 2:34 P.M.
14      This deposition is being taken remotely via Zoom
15  in Montreal, Quebec, Canada, at the request of counsel for
16  Ingenico Inc. et al, Adler Polluck & Sheehan, P.C.
17  Videographer is David Oxilia of Magna Legal Services and
18  the court reporter is Susan Steudel, also with Magna.
19      Will counsel and all parties present state their
20  appearances and whom they represent.
21      MR. TECHENTIN:  Jeffrey Techentin on behalf of
22  the defendants.
23      MS. BOZEMAN:  Melissa Bozeman of Kutak Rock on
24  behalf of the plaintiffs.
25      THE VIDEOGRAPHER:  Thank you.  The court reporter
```



2  (Pages 2 to 5)

Page 42

1    confirm that?
2        Q. I'm asking you, unfortunately. So we'll get your
3    best recollection.
4        A. I'll say yes. It includes POGO.
5        Q. Is POGO a private, white labelled product?
6        A. Yes.
7        Q. Is it a white labelled version of Rambler?
8        A. I believe so. My best recollection.
9        Q. I'll ask this question and you're not going to
10   know the answer so my follow-up question is going to be
11   how we figure it out; okay? So just so you know, I'm not
12   trying to trick you. From May of 2014 forward, how much
13   revenue did AnywhereCommerce generate by selling products
14   that were either mag stripe with audio jack capability or
15   EMV capable and Bluetooth enabled?
16       A. You want an answer to the nearest million,
17   or ...?
18       Q. I told you you weren't going to know the answer.
19   Do you happen to know that? It would be a pretty
20   remarkable thing if you did.
21       A. No. I don't have that exact number, no.
22       Q. So my follow-up question is how would we figure
23   out? If we wanted to go through AnywhereCommerce's books
24   and records to try and figure out how many of these units
25   were sold and how much they sold for, how would we go

Page 43

1    about doing that?
2        A. We would just ask my controller to go through the
3    accounting records and then she could produce that report.
4        Q. Well, unfortunately she's not here and she
5    doesn't -- she's not on Ingenico's payroll. So do you
6    know if materials have been produced in this litigation to
7    the defendants that would allow them to figure that out?
8        A. I do not know.
9        Q. Have you been involved with the gathering of
10   documents for production in this case?
11       A. What do you mean by "involved"? I handed over my
12   computer and I handed over access to my computer and
13   everything was downloaded. Helped negotiate a contract.
14   I'm not involved beyond that. I did not look at any of
15   the documents that came out of the AnywhereCommerce
16   discovery process.
17       Q. What are you talking about, negotiating a
18   contract?
19       A. Well, I guess there's a company that had to take
20   all this information and maintain it and so we paid them
21   some fees.
22       Q. Understood. Okay.
23       A. That's my involvement.
24       Q. Have you had any role in terms of quarterbacking
25   the document gathering process for the company as a whole?

Page 44

1        A. My involvement was advising my counsel who have
2    -- who might have had relevant information that they
3    should be including in the discovery process. So the
4    names of employees. The names and introductions to
5    employees and that sort of thing.
6        Q. And I don't want to get involved in your
7    conversations with your lawyers about this, but did you
8    personally go out and solicit materials from anybody
9    including your controller, for example?
10       A. No. I did not personally solicit information. I
11   made introductions to the parties that did the soliciting.
12       Q. Did you take any -- did you -- let me start over.
13   Did you undertake any review of the materials that your
14   attorneys had gathered?
15       A. No.
16       Q. Have you done any review of the documents that
17   were actually produced in this case?
18       A. Did I review any documents that were produced in
19   this case?
20       Q. By AnywhereCommerce, I should say.
21       A. No, I don't recall reviewing documents that were
22   produced. Nothing comes to mind.
23       Q. So you're not familiar with the particulars of
24   the financial disclosures that have been made to us in
25   this case?

Page 45

1        A. I seem to recall a list. I seem to recall a list
2    of required documents, and I put parties together, and I
3    assume that all documents that were requested that I saw
4    on a list were provided but I didn't actually review each
5    response. But I did -- I do recall your requesting
6    financial information, et cetera, et cetera, so I presume
7    it was delivered. But I didn't actually verify everything
8    that was delivered.
9        Q. Did AnywhereCommerce ever seek any legal advice
10   with respect to the implications of the BBPOS-ROAM license
11   agreement on its ability to continue to sell products like
12   the Rambler?
13       MS. BOZEMAN: I'll just caution the client to
14   answer yes or no, but not to disclose the contents to the
15   extent that there was legal advice sought and provided.
16       A. No.
17   BY MR. TECHENTIN:
18       Q. Does AnywhereCommerce have any contract or other
19   agreement with BBPOS with respect to its own potential
20   liability for the sale of products that are subject to the
21   exclusive licenses in the BBPOS-ROAM Data agreement?
22       MS. BOZEMAN: Objection. And can I have that
23   read back. I'm sorry.
24       A. Yeah. Same here.
25       (REPORTER READS BACK)



1   being offered by Ingenico at a trade show that looked very
2   much like our products and they could not have put these
3   -- these products came out of nowhere and he didn't
4   believe these products could have just been developed in
5   this short period of time as when he -- I guess he saw
6   their last set of products. I don't know on what basis he
7   said that it was a short period of time. I don't know
8   what reference point he was using, but that's just what he
9   said. I don't know.
10      Q. And I realize this was a long time ago, but I'll
11   ask this anyway. But you keep saying products, plural.
12   Was he referring to plural products or a single product?
13   Do you remember one way or the other?
14      A. Good question. No, I don't remember if it was
15   plural products. Because it could be like the Walker, you
16   know, that has multiple products called Walker, just
17   different features. So he didn't specify whether they
18   had, you know, four versions of the same factor that did
19   different things. So there was no specification.
20      Q. Did he say which BBPOS products -- product or
21   products, these Ingenico products resembled?
22      A. Yes. The Chipper. The Chipper at a high level.
23   He didn't specify which Chipper. So I took it as any
24   Chipper and variation of Chipper.
25      Q. I apologize for making you say this again, but

1   remind me what Chipper is functionally?
2      A. Chipper's like Walker. So it's an EMV reader
3   that may or may not have mag stripe and it may or may not
4   have Bluetooth and it may not have tap, but it comes in
5   different versions. With tap. Without tap. But I'm not
6   sure which Chipper version he was referring to.
7      Q. Does it have an audio jack?
8      A. At one point it did and at one point it didn't.
9   I -- I'm not sure. At one point it did maybe and it
10   didn't. So this might have -- you know. Probably a
11   non-audio jack reader and a chip card reader. Sometimes
12   you can put an audio jack slider just on the side. Not
13   sure if Chipper had that. But I think it didn't. I would
14   think it would be chip only.
15      Q. Is that why it's called Chipper?
16      A. Yeah.
17      Q. Do you know?
18      A. Yeah, because of the chip card feature. Because
19   it can accept chip cards, yeah. And Swiper, because it's
20   only a swipe card.
21      But, again, I didn't name them, so ...
22      Q. So when was the next time Mr. Lo made any
23   representations to you about their being trade secret
24   information incorporated into the Ingenico technology?
25      A. At some point later. At some point he

1   communicated to me that there was a lawsuit between Will
2   Graylin and Ingenico in which Will Graylin mentions that
3   he believed that Ingenico is taking trade secrets from
4   BBPOS. That was part of a lawsuit. So I think that was
5   the next time, and I don't remember when that was when the
6   lawsuit took place, when -- that would have been the next
7   reference to trade secret theft, was a reference to a
8   lawsuit.
9      Q. And did he provide you with any greater detail in
10   terms of what the nature of the theft was or the trade
11   secrets that were being violated?
12      A. No. It didn't change. It was the same, you
13   know, schematics. I understood schematics. But it wasn't
14   limited to schematics. It was just a high level
15   discussion.
16      Q. Did you review any of the documents from the
17   Graylin litigation?
18      A. I seem to recall perusing the Graylin litigation
19   at some point out of curiosity.
20      Q. What was the next time that Mr. Lo made any
21   representations about the trade secrets?
22      A. Right around the time he decided to engage
23   counsel to file a lawsuit.
24      Q. Right around the time Ben Lo hired lawyers to
25   file a lawsuit?

1      A. Yes. In that time period it would have come --
2      Q. When was that?
3      A. Would have been 2017, I'm presuming. I forget
4   the exact day of the lawsuit, but I'm sure it took six to
5   nine months to write it up, so I'm just going by memory.
6   I presume it was 2017.
7      Q. So tell me about that conversation, the one that
8   you just referenced.
9      MS. BOZEMAN: And I will caution you if this was
10   a conversation that was had between you and Ben but it
11   reflected any sort of legal analysis or legal advice that
12   you had received, then I would be instructing you not to
13   answer.
14      A. Yes, it did. It had to do with conversations
15   that he had with his counsel.
16   BY MR. TECHENTIN:
17      Q. So let's break that down just a little bit. Was
18   this a telephone call?
19      A. Yes.
20      Q. When did it occur?
21      A. In the 2017 time period. I can't give you an
22   exact day.
23      Q. Who participated in that phone call?
24      A. Just me and him.
25      Q. Where were you?



1      A. I would have been in Montreal most likely.
2      Q. Do you know where he was?
3      A. No.
4      Q. Do you know if he was in the United States?
5      A. I do not.  No, I do not.  Because he travels
6  around the world so it's like he doesn't always tell.  I
7  don't even ask him.  That's why I say I don't know because
8  it could have been anywhere.
9      Q. Do you have reason -- oh, sorry.
10     A. He's literally been to 50 countries at least
11 selling products.
12     Q. He lives in Hong Kong; correct?
13     A. He lives in Hong Kong, but he travels probably --
14 used to travel five, six months of the year back then.
15     Q. Do you have any reason to believe that he was in
16 the US?
17     A. He could have been.  I don't have any reason to
18 believe that he was or wasn't.  He has an office.  He has
19 an office in the US so he could have been in the US, but
20 he's got offices in different parts of the world.
21     Q. Who initiated this conversation?
22     A. He did.
23     Q. Did he tell you why he did?
24     A. Why he did what?
25     Q. Initiated the conversation.

1      A. To let me know that he was planning to litigate
2  against Ingenico for trade secret theft.  Just inform me.
3  Just to be informative.
4      Q. Let's back that up.  Did he send you a text or an
5  email that says hey, let's talk?
6      A. No.  He just calls me.
7      Q. What were the topics of your conversations with
8  him?
9      MS. BOZEMAN:  I would just caution you not to
10 disclose any information that involves legal advice.
11     A. All of it had to do with his conversation with
12 his counsel.
13 BY MR. TECHENTIN:
14     Q. At the time that this conversation occurred in
15 2017 were you already represented by Kutak Rock?
16     A. Yes.  On multiple matters, yes.  In other
17 matters, yes.
18     Q. Had you engaged them with respect to potential
19 litigation regarding Ingenico?
20     A. You mean had I signed off on that litigation?
21     Q. No.  Were they providing you with advice with
22 respect to potential litigation?
23     A. Yes.
24     Q. And you'd had communications with Kutak Rock on
25 that subject before you had this conversation with Mr. Lo?

1      A. Yes.
2      Q. Do you know if Mr. Lo had ever spoken with anyone
3  from Kutak Rock before that conversation you had with him?
4      A. I believe he'd already -- see he's engaged Kutak
5  Rock for unrelated matters, as have I, but I can't tell
6  you specifically the first time he engaged Kutak Rock on
7  unrelated matters.  I'm not sure if this is the first
8  matter with which he discussed with Kutak Rock.  He might
9  have had other discussions prior to this discussion which
10 is my answer.  On other matters.
11     Q. So excluding counsel's legal advice or mental
12 impressions that might have been shared with you what were
13 the general subject matter topics that you discussed with
14 Mr. Lo in this conversation?
15     A. There was nothing that wasn't part of discussions
16 with counsels.  Either my discussions with my counsel or
17 his discussion with his counsel.
18     Q. And let me be clear.  I'm trying to make sure
19 that I'm not asking you to tell me what advice your lawyer
20 gave.  I'm asking you what topics were discussed and
21 perhaps the discussion included the exchange of that
22 protected type of information, but what was the topic?
23     A. The topic was his intention to litigate against
24 Ingenico.  That was the topic.  There was no other topic.
25 There was no business topic of a different sort in that

1  conversation.
2      Q. Was one of the topics also your intention to sue?
3      A. Yes.  That would have come up as well.
4      Q. Had AnywhereCommerce already taken a decision to
5  sue Ingenico or the defendants prior to this conversation
6  with Mr. Lo?
7      A. Yes.
8      Q. When did that happen?
9      A. It -- at some point in the preceding three-month
10 period.
11     Q. And other than the knowledge that you've
12 described for me about what Mr. Lo told you as far as
13 trade secrets and the RP350X and the RP450X is concerned,
14 leaving that aside, what conduct by the defendants were
15 you aware of three months before this conversation in 2017
16 that justified suing Ingenico?
17     A. Well, the conduct of tortious interference.
18     Q. And we're not going to go over it all again, so
19 I'm going to try and get you to agree with the sort of
20 general statement.  So the decision to sue Ingenico was
21 based upon Ingenico's use of BBPOS's trade secret
22 information in its products; right?
23     A. Yes.
24     MS. BOZEMAN:  Objection.  But you can answer.
25     A. Principally.  But that would be the principle;


MAGNA
LEGAL SERVICES

```
                                              Page 102
1         Q.  At any time prior to that conversation?
2         A.  No.
3         Q.  Did Ben Lo say to you, "I've hired Kutak Rock to
4    be my lawyers, too"?
5         A.  No.  No, he did not.
6         Q.  Did Ben Lo say anything that suggested he hadn't
7    hired lawyers yet?
8         A.  Yes.  He said that he had the intention of hiring
9    Kutak Rock; that they weren't hired yet.
10        Q.  And during that phone call -- strike that.
11         Prior to that phone call did you have any agreement
12    with Mr. Lo with respect to the confidentiality of the
13    communications during that phone call?
14        A.  No.  Not that I know of.  I don't know if a
15    general NDA between the two companies just is in
16    existence.  I'm not sure if that would -- we didn't have a
17    specific NDA about that phone call, but I believe there's
18    an ongoing NDA as part of our agreement between the two
19    companies.
20        Q.  In fact, you didn't have any discussions with Mr.
21    Lo about any parameters for this conversation before the
22    conversation happened; right?
23        A.  Right.  Nothing specific.  No.
24        Q.  All right.  How long did that phone call take?
25        A.  Couldn't have been long.  Maybe 15 minutes.
```

```
                                              Page 103
1         Q.  And how many more times did you discuss this
2    litigation with Mr. Lo before this contract was signed?
3         A.  Can't recall having further conversations with
4    Mr. Lo privately.  I would imagine the next conversation
5    would have included counsel because there were
6    conversations where Oliver Griffin was a party to the
7    conversation.  And then there was emails on the paperwork
8    to counsel driving the email communications among the
9    three of us.
10        Q.  Okay.  At some point did Ben Lo hire Kutak Rock?
11        A.  Did Ben Lo hire Kutak Rock?
12        Q.  For this lawsuit?
13           MS. BOZEMAN:  Individually or?
14           MR. TECHENTIN:  I'm sorry.  Fair point.  Fair
15    point.
16    BY MR. TECHENTIN:
17        Q.  Did BBPOS hire Kutak Rock?
18        A.  Other than through a three-way agreement, I'm not
19    aware that he hired them separately.
20        Q.  And that's sort of my question.  Are you aware
21    one way or the other whether BBPOS had engaged Kutak Rock
22    prior to the signing of that letter, of that contract?
23        A.  No, I guess not.  I guess not.  They could have.
24    I guess not.  I don't think they did, but ...
25        Q.  Okay.
```

```
                                              Page 104
1         A.  They didn't tell me they did.
2         Q.  Other than anything we've talked about up to this
3    point, did AnywhereCommerce do any further investigation
4    into the facts that support its tortious interference
5    claim before it filed suit?
6         A.  You mean AnywhereCommerce or its counsel?
7         Q.  Or its counsel or private investigators.  I don't
8    care who did it.  Did you investigate any facts beyond
9    what's already been disclosed here today to support your
10    contentions about tortious interference before filing your
11    complaint?
12           MS. BOZEMAN:  I'm going to caution him to not
13    disclose any substance of legal advice or investigations
14    that were done by counsel.  But setting that aside you may
15    answer.
16        A.  The investigations were with counsel.  All
17    investigations included counsel.  We did not hire any
18    third parties other Kutak Rock to help make this
19    assessment.
20    BY MR. TECHENTIN:
21        Q.  What facts did you learn as a result of any
22    investigations that were performed on your behalf that
23    pertained to the validity of your tortious interference
24    claim?
25           MS. BOZEMAN:  I'm going to instruct you not to
```

```
                                              Page 105
1    answer to the extent that the factual circumstances relate
2    to the legal or mental impressions of counsel and would
3    include any sort of information received by you for the
4    purposes of obtaining legal advice.  So if there's
5    anything separate, you may answer.
6         A.  There's nothing separate.
7           MR. TECHENTIN:  And, counsel, if you want to have
8    a discussion that's off the record, we can.  I take
9    exception to your instruction.  Facts aren't privileged
10    and my question was not designed to elicit legal advice or
11    impressions of counsel.  But I'm trying to probe the Rule
12    11 basis for filing this claim, and so I would like to
13    know what facts were available to him that would support
14    the allegation of a tortious interference claim here.  If
15    you want to block me from getting those, fine.  But I
16    think it's improper because I'm asking about facts.  If
17    the facts were communicated to him, I'm entitled to know
18    about them.
19           MS. BOZEMAN:  Well, I do disagree with you.
20    Because sometimes facts when they are compiled into a
21    certain order, they can take on significance that reflects
22    the mental impressions of counsel.  So to the extent that
23    you're asking for a selection of a universe of information
24    that was at play during the investigation of, you know,
25    relevant facts related to this lawsuit, those, the
```

MAGNA ◗
LEGAL SERVICES