UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANYWHERECOMMERCE, INC. and
BBPOS LTD.,
        Plaintiffs,


        v.                                          CIVIL ACTION NO. 19-11457-IT


INGENICO INC., INGENICO CORP.,
and INGENICO GROUP SA,
        Defendants.


ORDER ON DEFENDANTS' MOTION TO COMPEL (#164).

KELLEY, U.S.M.J.


I.      Introduction.

        This case concerns disputes between several companies in the business of mobile payment

processing. AnywhereCommerce and BBPOS filed this suit against (as they call it) "French

payments technology behemoth" Ingenico and related companies (which will be referred to here

collectively as "Ingenico") (#67, amended complaint, ¶ 1), generally alleging that Ingenico

tortiously interfered with AnywhereCommerce's contractual relations and stole trade secrets from

BBPOS. *Id*. ¶ 2.

        The factual allegations are complicated and are set out only to the extent necessary to put

the discovery disputes here in context. AnywhereCommerce is in the credit card processing

business. *Id*. ¶ 15. It developed and marketed a mobile payment dongle that connects to the

audioport of wireless devices such as smartphones and tablets, and thereby, as

AnywhereCommerce claims, "cornered the market on controlling the rights to all relevant patents

1

related to mobile payment transactions" done on wireless devices. *Id*. BBPOS designs and manufactures point of sale terminals for AnywhereCommerce and other companies. *Id*. ¶ 16. The amended complaint asserts that the two companies are closely aligned and that beginning in 2010 BBPOS "licensed certain rights to use technology and/or techniques owned or controlled by AnywhereCommerce" *Id*. ¶ 21.

In 2010, BBPOS entered into a licensing agreement with a company called ROAM Data, Inc., which provided for BBPOS to sell ROAM mobile payment devices and granted ROAM a license to freely use and sell the devices. *Id*. ¶¶ 27, 31-36. Ingenico, which was in the business of supplying terminals for merchants to process in-store payments, and which, according to plaintiffs, at the time it acquired ROAM was not active in "the mobile payments space," merged with ROAM starting in 2009. *Id*. ¶¶ 40-42. Once it acquired ROAM, plaintiffs allege that Ingenico improperly accessed and stole ROAM's trade and technology secrets, "including BBPOS's designs and trade secrets related to the products [BBPOS] was making for ROAM." *Id*. ¶ 47. Ingenico converted the stolen technology and trade secrets and used them, among other things, to develop a directly competitive product. *Id*. ¶ 49.

In its second amended counterclaim, among other claims, Ingenico alleges that ROAM bargained with BBPOS for an exclusive license to sell and use certain mobile payment devices, and for a worldwide exclusive license for related intellectual property (because Ingenico merged with ROAM, the agreement will be referred to here as "the Ingenico-BBPOS Agreement"). (#78 ¶ 1.) According to Ingenico, BBPOS breached the Ingenico-BBPOS Agreement in several respects, including by selling licensed devices and granting license rights to AnywhereCommerce, among other businesses. *Id*. ¶¶ 2, 19-21. In addition, BBPOS breached provisions of the Ingenico-BBPOS Agreement by bringing claims against Ingenico and by failing to indemnify Ingenico

2

against all costs that arose out of any claim brought by a third party. *Id*. ¶¶ 26-30.  Ingenico further

alleges that under the Ingenico-BBPOS Agreement, neither AnywhereCommerce nor BBPOS may

make or sell devices that involve certain patents that BBPOS allegedly granted to Ingenico, which

they wrongly did. *Id*. ¶¶ 86-105. The devices are set out in detail in the pleading. *Id*. ¶¶ 102-103.

The asserted patents are registered to either BBPOS or to AnywhereCommerce's parent company,

4361423 Canada Inc. ("436 Canada"). (#79 at 11.)

II.    <u>The Motion to Compel</u>.

   Ingenico moved to compel plaintiffs to provide the following discovery:

   a)  Production of documents related to document request Nos. 41, 43, and
       44, which relate to BBPOS's profit and loss statements and records of
       profits related to certain products;

   b)  Two documents included in BBPOS's privilege log and two documents
       included in AnywhereCommerce's privilege log that Ingenico contends
       are not protected by privilege;

   c)  Deposition answers regarding a 2017 telephone conversation between
       AnywhereCommerce's Michael Kron and BBPOS's Ben Lo; and

   d)  The agreement between Kutak Rock (counsel of record for plaintiffs)
       and plaintiffs.

(#164.)

   A.    <u>Document Request Nos. 41, 43, and 44</u>.

   As an initial matter, plaintiffs argue that the requests are not timely (#165 at 3), but the

court rejects this argument. Although they were made close to the end of fact discovery, the

requests were made before the close of fact discovery, and the court will consider them, given the

efforts that Ingenico made to confer about the issues raised, the fact that Ingenico had to review

millions of documents in discovery, and the importance of the documents to the issues in the case.

   In these requests, Ingenico seeks profit and loss statements, royalty reports, income

statements and other similar documents concerning certain products covered by the BBPOS-

Ingenico Agreement. (#164-1 at 4-5.) There is no dispute that the requested information is relevant to Ingenico's counterclaim that BBPOS breached its agreement with Ingenico not to use or grant licenses concerning certain devices covered under the Agreement to anyone other than Ingenico. *Id*. Nor is there any question that Ingenico requires the information on a "product-specific basis" for the years 2010-2014 and 2018 to the present. *Id*.

Plaintiffs oppose on the grounds that they already delivered a "massive production of responsive sales and financial information" to Ingenico pursuant to the parties' agreed-upon ESI protocol. (#165 at 3.) When defense counsel complained that he could not find the documents he required in the millions of documents produced, plaintiffs' counsel asked an "e-vendor to formulate a search of BBPOS's production" and culled approximately 10,000 documents from the ones already produced. *Id*. at 6. Plaintiffs complain that they cannot be required to create documents to provide to Ingenico, and that if the documents Ingenico is seeking are not in the millions already provided, or in the 10,000-document subset, they must not exist. *Id.* at 5-6. They argue that what defendants ask is "a nearly impossible undertaking under prevailing time constraints and would present an improper attempt by Defendants to shift the burden of their … review and analysis of BBPOS's sales and profit information to Plaintiffs." *Id*. at 6.

As counsel for Ingenico pointed out at the oral argument on this matter (#176), Ingenico's requests essentially ask for sales records, by product, over the requested period of time. The documents Ingenico received as a result of the ESI search did include some spreadsheets containing information that was useful, but only for certain years. According to Ingenico's counsel, when he met with plaintiffs' counsel for a meet and confer to ask if and why documents for certain years were missing, plaintiffs' counsel could only tell him that she had no idea what was in the production and was not going to look through it herself to find documents or to see if anything was

4

missing. When questioned by the court at the hearing, counsel for plaintiffs repeated these statements, saying that she "had no idea" why certain documents were present for some years and not others, that her e-vendor also "had no idea," and that she was helpless to go through the documents she had provided to Ingenico.

This is not how discovery works. Producing information pursuant to an ESI search does not relieve a party of its burden to produce relevant documents from other sources. The documents requested by Ingenico, namely, profit and loss statements, royalty reports, profit and loss statements, financial statements, and income statements pertaining to products that are specifically at issue in this case, are not obscure records that a business does not ordinarily keep. It is difficult to believe that plaintiffs do not have these documents. Finally, it is simply inefficient and wasteful to require Ingenico to go through millions of documents, apparently some of which are invoices for sales, and to attempt to calculate plaintiffs' sales of certain products. Since this information is critical to defendants' damages, plaintiffs themselves will have to come up with these figures in any event, to counter any claims defendants make.

As the court ordered at the hearing, plaintiffs' counsel must ask her clients, not the e-vendor, for these documents and produce them to Ingenico, from 2010 to January 2022.

B.      Two Documents Included in BBPOS's Privilege Log and Two Documents Included in AnywhereCommerce's Privilege Log that Ingenico Contends Are Not Protected by Privilege.

Plaintiffs have the burden of establishing that an applicable privilege applies to these communications. *In re Grand Jury Subpoena*, 220 F.R.D. 130, 140 (D. Mass. 2004) (citing *FDIC v. Ogden Corp.*, 202 F.3d 454, 460 (1st Cir. 2000)). Wigmore has set out the elements of the attorney-client privilege:

(1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser (8) except the protection be waived.

*Cavallaro v. United States*, 284 F.3d 236, 245 (1st Cir. 2002) (quoting 8 J.H. Wigmore, *Evidence* § 2292, at 554 (McNaughton rev. 1961)). The privilege is limited in that it "applies only to the extent necessary to achieve its underlying goal of ensuring effective representation between lawyer and client." *In re Grand Jury Subpoena (Custodian of Records, Newparent, Inc.)*, 274 F.3d 563, 571 (1st Cir. 2001) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)); *see also In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 22 (1st Cir. 2003) (attorney-client privilege is narrowly construed because it "stands as an obstacle of sorts to the search for truth").

The court has read the communications at issue. The entries from the BBPOS privilege log consist of two emails from Michael Kron, who has been described as the president and CEO of AnywhereCommerce, to Ben Lo of BBPOS. (#165 at 8.) The privilege log describes the first email, dated March 28, 2017, as "Email providing confidential information necessary to render legal advice regarding internal investigation." *Id*. The privilege log describes the second email, dated April 17, 2017, as "Email providing legal advice regarding pending or potential litigation." Plaintiffs explain the basis for the claim of privilege:

Mr. Lo and Mr. Kron were respective agents of BBPOS and [436 Canada, the parent company of AnywhereCommerce] at the time of their correspondences at issue in 2017. Their interests, represented by their separately retained attorneys, were aligned in opposing Ingenico's demand for indemnity directed to BBPOS under the BBPOS-ROAM licensing agreement relative to a claim for alleged patent infringement. Because BBPOS and 436 Canada had a common legal interest at the time of these communications, they are protected by the privilege, and the privilege has not been waived because there was no sharing of this information with any third party.

*Id*.

Ingenico, not surprisingly, argues that since the privilege log identifies only Mr. Kron and Mr. Lo, who are not lawyers, as the participants on the emails, the emails cannot be privileged, as Mr. Kron and Mr. Lo could not be providing legal advice to each other. (#164-1 at 9.) However, in the emails, Mr. Kron is forwarding Mr. Lo communications from attorneys, a fact which the privilege log should have mentioned. Thus, the descriptions of the contents of the emails, as "providing confidential information necessary to render legal advice" and "providing legal advice" refer to the communications from the attorneys, not between Mr. Kron and Mr. Lo.

The common-interest doctrine, sometimes referred to as the joint defense privilege, is not an independent privilege but is an exception to the rule that the attorney-client privilege is waived when privileged information is disclosed to a third party. *Cavallaro*, 284 F.3d at 250. This doctrine applies when parties share a substantially identical interest in the subject matter of a legal communication.[1] *Id.* (citing *In re Grand Jury Subpoena*, 274 F.3d at 573). The First Circuit recognizes this doctrine, which

> protects communications between an individual and an attorney for another when the communications are "part of an on-going and joint effort to set up a common defense strategy." In order to establish the existence of a joint defense privilege, the party asserting the privilege must show that (1) the communications were made in

---

[1] This exception to the waiver rule goes by many names, *see, e.g.*, *Hilsinger v. Eyeego, LLC*, 2015 WL 11120842, at *2 (D. Mass. Aug. 13, 2015). For the sake of consistency the court here will refer to the "common-interest doctrine," a term which the court in *Cavallaro* applied to a situation concerning multiple parties with different attorneys, *see* 284 F.3d at 249. The First Circuit there acknowledged that the nomenclature was less important than the analysis. *Id.* at 250 ("Whether one refers to . . . 'common interest,' 'joint defense,' 'joint client,' or 'allied lawyer' doctrines does not change the outcome of this case.").

the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived.

*United States v. Bay State Ambulance & Hosp. Rental Serv.*, 874 F.2d 20, 28 (1st Cir. 1989) (quoting *In re Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120, 126 (3d Cir. 1986)). "[A] primary requirement of a joint defense agreement is that there be something against which to defend. In other words, a joint defense agreement may be formed only with respect to the subject of potential or actual litigation. . . . Common sense suggests that there can be no joint defense agreement when there is no joint defense to pursue." *In re Grand Jury Subpoena*, 274 F.3d at 575 (citation omitted); *see Ken's Foods, Inc. v. Ken's Steak House, Inc.*, 213 F.R.D. 89, 93 (D. Mass. 2002) ("While a written agreement is not a prerequisite for invoking the common interest doctrine, parties seeking to invoke the exception must establish that they agreed to engage in a joint effort and to keep the shared information confidential from outsiders." (citation omitted)); *United States v. Sawyer*, 878 F. Supp. 295, 297 (D. Mass. 1995) (rejecting defendant's contention he had an unwritten, informal joint defense agreement on facts presented).

The court finds that the emails, and the communications from attorneys forwarded in the emails, are privileged. It is obvious that the emails contain communications soliciting and providing legal advice in order to defend against a shared legal problem concerning potential litigation. Although a better description for the log would have been "reflecting" rather than "providing" legal advice, plaintiffs may withhold these emails from Ingenico.

The entries from the AnywhereCommerce log are described as "Email[s] providing legal advice rega[r]ding pending or potential litigation." (#165 at 8.) The first email, dated November 14, 2018, is from Mr. Kron to Mitchell Cobrin, who was a co-founder of AnywhereCommerce. Mark Diamond of AnywhereCommerce is copied on both emails; the court does not know what his role was at the company. The email is forwarding an email from an attorney, along with an

attachment that is not included in the materials the court received, which concerns services provided by a law firm. The second email is actually a chain, dated November 15, 2018, which starts with an email from Mr. Cobrin to Mr. Kron, again, with Mr. Diamond copied, and then a response from Mr. Kron to Mr. Cobrin, with Mr. Diamond again copied. This chain is part of the same communication from the first email regarding a service provided by a law firm.

The emails between Mr. Kron and Mr. Cobrin are not providing legal advice, as the privilege log describes; again, a better description for the log would have been "reflecting legal advice." Nevertheless, the emails are privileged and plaintiffs will not be required to produce them.

C.   Deposition Answers Regarding a 2017 Telephone Conversation Between Mr. Kron and Mr. Lo.

During depositions of Mr. Kron and Mr. Lo, their counsel instructed them not to answer questions about a conversation they had with each other in early 2017, including questions about their sharing of legal fees and litigation proceeds, and questions concerning their prosecution and defense of this case, on the basis of attorney-client privilege. (#164-1 at 12.) Ingenico argues that the fact that Mr. Lo had not retained Kutak Rock to represent his company in this case at the time of the conversation in 2017 means that there was no joint defense agreement, and therefore the conversation could not be privileged. *Id.* at 13. As is clear from the above discussion of the privileged emails from this same time period, however, bringing this suit against Ingenico was not the only legal issue that Mr. Kron and Mr. Lo might have been discussing, and their interests were, in fact, aligned so that they fulfilled the requirements of the common interest doctrine. Mr. Kron and Mr. Lo need not answer deposition questions concerning their conversation in 2017 beyond the answers they have already provided.

D.    The Agreement Between Kutak Rock and Plaintiffs.

Ingenico wants plaintiffs to produce their "written agreement" with Kutak Rock, arguing that it was the subject of a document request and that it is not protected by privilege. (#164-1 at 16-17.)  Plaintiffs argue that the agreement is "subject to attorney-client privilege because it contains the mental processes and/or legal theories of Plaintiffs and information which can be considered legal analysis." (#165 at 13.) It appears that plaintiffs are arguing that the agreement constitutes work product.

"While the attorney-client privilege shields communications between attorney and client (and in some cases third parties), the work product doctrine protects an attorney's written materials and 'mental impressions.'" *Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1, 17 (1st Cir. 2012) (quoting *Comm'r of Revenue v. Comcast Corp.*, 901 N.E.2d 1185, 1200 (Mass. 2009)). Such written materials are protected if prepared in anticipation of litigation, but "[t]he protection can be overcome if the party seeking discovery demonstrates 'substantial need of the materials' and cannot obtain the 'substantial equivalent' by other means without undue hardship." *Id.* at 17-18.

The court has reviewed two documents submitted by plaintiffs: the agreement and a modification of the agreement, and finds that they consist of boilerplate concerning engagement of the firm, billing, attorneys' fees and costs, and other topics typically found in engagement letters. The only legal analysis one might glean from it is a waiver of conflict, which again is typically found in engagement letters where attorneys are representing multiple clients. There are no legal theories mentioned or any communications about the merits of the case at all in the letter, and certainly no legal analysis, as plaintiffs claim.

Typically, an engagement letter is not privileged. *Fine v. Sovereign Bank*, No. 06-cv-11450-NG, 2008 U.S. Dist. LEXIS 130949, at *17 (D. Mass. Mar. 7, 2008) (finding that retention agreement itself and related deposition questions were not protected by attorney client privilege or

10

work product privilege); *see Utesch v. Lannett Co.*, No. 16-cv-5932, 2020 U.S. Dist. LEXIS 232413, at *20-21, *23 (E.D. Pa. Dec. 9, 2020) (finding engagement letter not privileged); *United States ex rel. Rubar v. Hayner Hoyt Corp.*, No. 5:14-cv-830, 2018 U.S. Dist. LEXIS 189274, at *28 (N.D.N.Y. Nov. 5, 2018) (finding engagement letter not privileged because fact of retainer, identity of client, and fee arrangements not protected); *see also Montgomery Cty. v. Microvote Corp.*, 175 F.3d 296, 304 (3d Cir. 1999) (holding that fee agreement letter between counsel and client was not privileged as an attorney-client communication or work product).

Ingenico still must establish that the agreements are relevant, however, and it has not done so. Simply being curious as to how any potential monetary award is going to be divided up, or who might be paying what costs in the litigation, is not enough to establish relevance to the parties' claims or defenses in this action under Fed. R. Civ. P. 26(b)(1). Defendants argue that the agreements are relevant to "the prosecution and defense, at least, of those causes of action that the plaintiffs have asserted jointly" (#164-1 at 12),  but the court cannot see how the plaintiffs' agreement with their attorney and each other concerning the division of money or costs impacts anything about the causes of action plaintiffs have asserted. The court denies Ingenico's request for the agreements.

III.   Conclusion.

Ingenico's motion to compel (#164) is ALLOWED in part and DENIED in part. For the reasons set out above, (1) plaintiffs shall provide defendants with documents in response to document requests Nos. 41, 43, and 44, from 2010 to January 2022; (2) the two documents from BBPOS's privilege log are deemed privileged and need not be produced; (3) the two documents from AnywhereCommerce's privilege log are deemed privileged and need not be produced; (4) Mr. Kron and Mr. Lo need not answer deposition questions concerning their

conversation in 2017; and (5) defendants' request for the written agreements between Kutak Rock and plaintiffs is denied.

/s/ M. Page Kelley
M. Page Kelley
February 3, 2022                                              Chief United States Magistrate Judge