**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ANYWHERECOMMERCE, INC. and BBPOS LIMITED, <br><br>     **Plaintiffs,** <br><br>         **v.** <br><br> INGENICO INC., INGENICO CORP., and INGENICO GROUP SA, <br><br>     **Defendants.** | **Civil Docket No: 1:19-cv-11457-IT** <br><br><br>     **Jury Trial Demanded** |

**ANYWHERECOMMERCE, INC.'S AND BBPOS LIMITED'S**
**CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT ON INGENICO INC.'S**
**SECOND AMENDED COUNTERCLAIMS**

Jonathon D. Friedmann, Esq. (BBO # 180130)
Robert P. Rudolph, Esq. (BBO # 684583)
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA 02109
Tel.: (617) 723-7700
Fax: (617) 227-0313
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

and

KUTAK ROCK LLP
Oliver D. Griffin (Pro Hac Vice)
Pennsylvania Bar No. 88026
Oliver.griffin@kutakrock.com
Peter N. Kessler (Pro Hac Vice)
Pennsylvania Bar No. 209033
Peter.kessler@kutakrock.com
Melissa A. Bozeman (Pro Hac Vice)
Pennsylvania Bar No.  201116
Melissa.bozeman@kutakrock.com
1760 Market Street, Suite 1100
Philadelphia, PA  19103-4104
(215) 299-4384 (Telephone)
(215) 981-0719 (Facsimile)

Ricardo G. Cedillo, Esq. (pro hac vice)
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212

210-822-6666
rcedillo@lawdcm.com

Attorneys for Plaintiffs / Counterclaim-Defendants

## CONCISE STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiffs / Counterclaim-Defendants AnywhereCommerce, Inc. ("AC") and BBPOS Limited ("BBPOS," and together, "Plaintiffs"), by and through their attorneys, hereby submit this Concise Statement of Material Facts in support of their Motion for Summary Judgment on Defendant / Counterclaim-Plaintiff Ingenico Inc.'s Second Amended Counterclaims (the "Motion") as to which Plaintiffs contend there are no genuine issues of material fact.[1]

### A.   RELEVANT PROCEDURAL POSTURE & THE OPERATIVE PLEADINGS

1.      On December 20, 2018, Plaintiffs initiated this lawsuit against Defendants Ingenico Group S.A. ("Ingenico"), Ingenico Corp., and Ingenico Inc. (collectively, "Defendants")[2] in the United States District Court for the Northern District of Georgia (the "Transferor Court"). Complaint, Doc. No. 1.

2.      On July 2, 2019, the Transferor Court entered an Order, granting Defendants' Motion to Transfer Venue under 28 U.S.C. § 1404, whereby, in relevant part, the action was transferred to this District (the "Transferee Court").  Order, Doc. No. 36 at 2 (Order ¶1(a)).

3.      On August 15, 2019, Defendants answered the Complaint and filed seven counterclaims, on behalf of Ingenico only, against AC and BBPOS. Defendants' Answer and Ingenico Inc.'s Counterclaim, Doc. No. 58.

---

[1] Plaintiffs reserve the right to assets additional and/or different facts in any subsequent briefing submitted on dispositive motion practice, during oral argument, or other proceedings.

[2] On September 27, 2019, Defendant Ingenico Ventures SAS ("Ingenico Ventures") was voluntarily dismissed from the lawsuit, without prejudice, via a Joint Stipulation of Dismissal, based on information revealing that Ingenico Ventures dissolved no later than February 12, 2018 pursuant to Article 1844-5 of the French Civil Code and deregistered as a registered corporate entity on March 7, 2018. Stipulation of Dismissal, Doc. No. 64.

4.      On October 17, 2019, Plaintiffs filed an amended complaint. Amended Complaint (the "FAC"), Doc. No. 67.

5.      This case thus was transferred to this Court, subject to its application of the Transferor Court's choice-of-law rules, where applicable. Doc. No. 67 at 2 (FAC ¶4 n.1).

6.      On October 30, 2019, Defendants answered Plaintiffs' amended complaint and filed amended counterclaims on behalf of Ingenico Inc. Defendants' Answer to Amended Complaint and Ingenico Inc.'s Amended Counterclaims (the "Answer"), Doc. 68.

7.      On December 3, 2019, Ingenico Inc. filed amended counterclaims. Second Amended Counterclaims of Ingenico Inc. (the "SACC"), Doc. No. 78.

8.      On March 7, 2022, Ingenico Inc.'s counterclaim for patent infringement at Count VIII of its SACC was voluntarily dismissed. Stipulation of Dismissal as to Count VIII of Ingenico Inc.'s Second Amended Counterclaims, Doc. No. 178.

### B.      *THE RELEVANT PARTIES AND CORPORATE ACTORS*

#### 1.      <u>BBPOS</u>

9.      BBPOS is a mobile point-of-sale ("mPOS") solution provider, based out of Hong Kong, that was founded by Ben Lo ("Lo") and his business partners, Jimmy Tang and Daniel Tsai in 2008. Doc. No. 67 at 4-5 (FAC ¶¶16-17); SACC, Doc. No. 78 at 2-3 (SACC ¶¶4, 11); Deposition Transcript of Ben Lo dated December 8, 2021 ("Lo I Tr.") at 11:13-25 – 12:1-19; 18:3-13, a true and correct excerpted copy of which, is attached as Exhibit A.

10.     Lo has served as one of BBPOS's five directors, continuously, from the company's inception through the present, and also held the position of CEO for BBPOS from 2008 through 2016 and then, again, beginning in 2019 and continuing onward. Ex. A (Lo I Tr.) at 11:15-25 – 12:1-7.

11.     BBPOS was an early participant in the mPOS market and currently owns and maintains trade secrets at issue in this lawsuit relating to the manufacture of mobile payment devices, including but not limited to the data, formulae, patterns, programs, devices, methods, techniques, and product plans that relate to the development, use, sale, and distribution of mPOS devices. Doc. No. 78 at 11 (SACC ¶62); Doc. No. 67 at 4, 10, 32 (FAC ¶¶16, 37, 137); Ex. A (Lo I Tr.) at 18:3-25 – 19:1-15; Deposition Transcript of Christopher J. Rotsaert dated October 13, 2021 ("Rotseart I Tr.") at 105:1-8 (testifying that, around the timeframe of "before 2010, 2009[,]" "the mPOS was very new market. Before the mPOS, Ingenico had, let's say, bulky devices."), a true and correct excerpted copy of which, is attached as Exhibit B.

12.     BBPOS's trade secrets were shared with ROAM Data, Inc. ("ROAM"), a U.S. payments solutions software start-up, under the protections of an exclusive product license that was entered into between the two companies in 2010. Engineering Development and License Agreement dated May 4, 2010, as amended August 15, 2011, by and between BBPOS and ROAM [AC_02770544-554, IngenicoInc_0268234-238] (the "BBPOS-ROAM Licensing Agreement"), a true and correct copy of which is attached as Exhibit C.

13.     Defendants stole at least five of BBPOS's trade secrets to develop and sell competitive mPOS products, globally, including Ingenico's RP350X, RP750X, RP100 series and RP450 series of devices (the "Accused Products") – all without compensating BBPOS for the unlawful use of BBPOS's trade secrets and in violation of ROAM's confidentiality obligations as set forth in the exclusive product license and other statutory protections.  Expert Report of Ivan Zatkovich dated February 16, 2022 ("Zatkovich Report") at 25-26, a true and correct excerpted copy of which, is attached hereto as Exhibit D.

14.     This agreement was negotiated and executed by and between Lo, on behalf of BBPOS, and Will Graylin ("Graylin"), then CEO of ROAM. Deposition Transcript of William Graylin dated August 31, 2021 ("Graylin Tr.") at 17:14-24, a true and correct excerpted copy of which is attached as Exhibit E.

15.     BBPOS granted ROAM an **exclusive product license** for one particular MasterCard magnetic stripe reader product that connected to mobile phones/tablets via audio-jack plug that was sometimes called the "CircleSwipe." Ex. E (Graylin Tr.) at 21:6-9 ("Q Okay. Now, this engineering and license agreement, this was a product license agreement, correct? **A I believe so. Yes.**"); 22:2-7 (confirming that the licensing agreement was not a transfer BBPOS's patents, adding: "No. **It was a technology development and license**."); 22:8-24 – 23:1-11 ("So for -- for CircleSwipe, I think -- I think it was exclusive with the exception of a . . . couple of areas."); 111:4-8 ("So in 1.4 it says, BBPOS is non-exclusive. **1.3 says that we have exclusive rights**, which to me was **the swiper solution, the CircleSwipe**, so that was what we white-labeled and branded."); 113:18-24 (". . . At this particular point in time [i.e., execution of the original licensing agreement], I recall we distinctively separated the two. **One was exclusive, which was CircleSwipe** and then **the other one was non-exclusive**, which . . . they were in the process of building for us . . . to sell. So that was what they named here as BBPOS, that's EMV-capable."); 143:22-24 – 144:1-7 ("Q On Page 1, you say here, 'Yes, I have told Ken Paull and others at ROAM and Ingenico that EMV/NFC is not part of the exclusivity. Good to see them admit it,' right? **A Uh-huh.** Q And again, you're saying this during the time that you're exploring the possibility of selling these devices with Ben Lo [after being by ROAM] , right? **A Yeah. But that was also my belief that the EMV was not exclusive**.").

16.     This CircleSwipe product is, at times, interchangeably referred to as the "Crypto Swipe," "swiper," "ROAMpay Swipe," and/or ROAM's G3X, G4X, and/or G5X product series. *See, e.g.*, Ex. C (BBPOS-ROAM Licensing Agreement) at §§1.1-1.3, Schedules I (defining "Products," in relevant part, as "Encrypted Circle Swipe reader, sometimes referred to as he 'Crypto Swipe' or 'ROAMpay Swipe' that has ability to generate capacitance for encryption from the audio jack of a mobile device or PC, this was developed by [BBPOS], and including any variance of this design") and II (referring to the "Crypto Swipe unit"); and Amendment at first and second recitals ("originally contemplated an exclusive product license"); Ex. B (Rotseart I Tr.) at 32:17-25 – 33:1-21 and 34:21-25 – 35:1-21 (referring to the G3X, G4X, and G5X products) and 112:12-24 and 172:2-19 (referring to the G4X and Swiper products); Ex. A (Lo I Tr.) at 26:4-25 – 27:1-22 (referring to the CircleSwipe product), 43:7-25 – 44:1-10 (referring to the G4X and G5X products), and 188:7-22 (referring to the Swiper product).

17.     Graylin also testified that, while the agreement granted ROAM exclusive rights in the sale of CircleSwipe devices outside of China and Philippines, the license grant was not intended by the parties at the time to confer upon ROAM any exclusionary rights in or to BBPOS's trade secrets or intellectual property, generally, or otherwise effectuate a purchase of BBPOS's IP. Ex. E (Graylin Tr.) at 22:8-24 – 23:1-11 ("[F]or **CircleSwipe**, I think . . . it was **exclusive** with the exception of a couple . . . of areas."); 111:4-8 ("So in 1.4 it says, **BBPOS is non-exclusive**. 1.3 says that **we have exclusive rights**, which to me was the **swiper solution**, **the CircleSwipe**, so that was what we white-labeled and branded."); 25:12-22; 113:18-24 (". . . I recall we distinctively separated the two. **One was exclusive**, which was **CircleSwipe** and then **the other one was non-exclusive**, . . . which they were in the process of building for us . . . to sell. So that was what they **named here as BBPOS, that's EMV-capable**."); 143:22-24 – 144:1-7 ("Q On Page 1, you say

7

here, 'Yes, I have told Ken Paull and others at ROAM and Ingenico that EMV/NFC is not part of the exclusivity. Good to see them admit it,' right? **A Uh-huh.** Q And again, you're saying this during the time that you're exploring the possibility of selling these devices with Ben Lo, right? **A Yeah. But that was also my belief that the EMV was not exclusive**."). *See also* Ex. A (Lo I Tr.) at 43:21-25 – 44:1-3 ("Q. Did -- you say that it's a different version of Circle Swipe. How many versions of Circle Swipe were there? **A. I forget.** There's many. Q. Were they all sold exclusively to ROAM Data? **A. For customer outside China, yes. But we also customize the form factor for some customer in China**.").

## 2.   AC

18.     AC participates in the mobile payments business, and is a global distributor of BBPOS's mobile payment devices and solutions. Doc. No. 78 at 3 (SACC ¶11) ("Ingenico Inc., BBPOS, and [AC] all participate in the business of mobile payments."); Deposition Transcript of Michael Kron dated November 30, 2021 ("Kron I Tr.") at 18:22-24, a true and correct excerpted copy of which, is attached as Exhibit F.

19.     Incorporated in 2006, AC's parent company, 4361423 Canada Inc. ("436 Canada"), currently holds rights to certain relevant patents invented by BBPOS's founders and/or otherwise related to mobile payment transactions conducted on smartphones / tablets, including a portion of the formerly asserted patents-in-suit under Ingenico Inc.'s now dismissed patent infringement claim. *See* Ex. F (Kron I Tr.) at 19:2-4; 34; Doc. No. 78 at 15 (SACC ¶¶87-88) ("The present assignees of the Asserted Patents are 4361423 Canada Inc. (AnywhereCommerce's parent company) or BBPOS.").

20.     From 2006 through 2010, 436 Canada was generally engaged in two types of business activities in the emerging mPOS market: (i) patent-licensing and IP-related activities; and

(ii) selling mobile hardware products or gateway products or services, trading, initially, as "HomeATM" (and related iterations, such as "HATM") (collectively, "HomeATM") and then later, as "AnywhereCommerce." *See* Ex. F (Kron I Tr.) at 19:2-11; 21:1-12.

21.    However, once AC was formally incorporated in 2010, 436 Canada's business activities were essentially bifurcated. That is, 436 Canada stopped acting as an operating company, engaged in the mobile payment business, trading as "AnywhereCommerce," and narrowed the scope of its on-going activities to IP-related matters; whereas the newly formed AC took over and continued the on-going mobile payment business activities as a distinct corporate entity. *See* Ex. F (Kron I Tr.) at 19:5-11; 21:17-25.

### 3.    ROAM

22.    ROAM was a Boston-based mPOS software company founded by Graylin in or around 2007. Doc. No. 68 at 7 (Answer ¶31); Ex. E (Graylin Tr.) at 7:12-22 ("we basically built a mobile point of sale services platform"); 24:9-24 – 25:1-11 (explaining "we didn't have any intentions to do that [i.e., to begin manufacturing and selling the CircleSwipe itself, reiterating] . . . Yeah. **And we were not a manufacturer ourselves**."); Ex. A (Lo I Tr.) at 30:7-8 ("Will Graylin told me that ROAM Data is a software company.").

23.    In November 2009, Ingenico invested approximately $6.5 million in ROAM, acquiring a 40.32% ownership interest in the company. *See* Houlihan Lokey Valuation Report dated April 12, 2013 [IngenicoInc_0000114-196] ("Houlihan Lokey Report") at 9, a true and correct copy of which is attached as Exhibit G.

24.    According to Jean-Marc Thienpont, Ingenico's global EVP of Strategy and M&A, at the time, Ingenico's investment in ROAM was motivated, in part, to "[p]rovide Ingenico with a mobile payments platform for its multichannel (physical / mobile / online) payments offering";

"[a]llow Ingenico to diversify its primarily hardware based revenue base with a recurring, transaction-based payment stream"; and "[p]otentially position Ingenico as a market leader (via [ROAM]) in the mobile payments sector[.]" *See* "Organisation du Groupe Ingenico Juillet 2012" [Ingenicolnc_0274189] at 5, which is an email attachment to an internal Ingenico email dated August 1, 2012 (the "8/1/2012 Email") [Ingenicolnc_0274188-217], a true and correct copy of which, is attached as Exhibit H; Ex. G (Houlihan Lokey Report) at 9-10.

25.     At or around this same time, Graylin learned that BBPOS had developed a card reader solution, prompting him to reach out to Lo in Hong Kong to learn more about it. This initial contact, ultimately, lead to the negotiation and consummation of the BBPOS-ROAM Licensing Agreement at issue in this lawsuit. Ex. E (Graylin Tr.) at 8:23-24 – 9:1; 11:14-23.

26.     In 2011, ROAM began seeking a venture capital infusion to fund its strategic growth plans and M&A activities, garnering the attention of several interested suitors, including Ingenico. Ex. G (Houlihan Lokey Report) at 9.

27.     After rejecting term sheets submitted by two of these investor groups, on or about February 6, 2012, ROAM and Ingenico closed on a second round of investments into the company in the amount of $48,704,998, increasing Ingenico's ownership stake in ROAM to approximately 74.71%. Ex. G (Houlihan Lokey Report) at 9; Doc. 68 at 9 (Answer ¶45).

28.     One of ROAM's first objectives, post-investment, was to acquire BBPOS; however, that proposed deal terminated, unsuccessfully, by the summer of 2012. Ex. E (Graylin Tr.) at 47:15-23 ("[W]e wanted to make an acquisition of BBPOS at the time. I recommended it. My perception was that BBPOS was an important part of helping us grow our revenue. . . I had a concern about [Ingenico] interfering with our acquisition . . . But, you know, ultimately, that deal didn't happen . . .").

29.     Following his failed bid to acquire BBPOS through the summer of 2012, Graylin's employment with ROAM was soon thereafter terminated effective September 20, 2012, amidst a swirl of (as-yet) unsubstantiated accusations[3] that Ingenico had stolen BBPOS's trade secrets to build a competing EMV device; eventually, a buy-out of Graylin's remaining ownership interests in the company was brokered for an undisclosed amount.  *See* Ex. G (Houlihan Lokey Report) at 1, 3 n.4; Ex. __ (Graylin Tr.) at 29:2-24 – 25:1-23; 16:2-11; 55:7-16; 63:21-24 – 64:1-24. *See* Email Thread dated September 17, 2012 [IngenicoInc_0071720-723] ("9/17/2012 Thread"), a true and correct copy of which is attached as Exhibit I.

30.     By January 1, 2015, Ingenico acquired 100% of the ownership interests in ROAM, and, on December 31, 2017, ROAM merged with and into Ingenico Inc. (a wholly owned U.S. subsidiary of Ingenico) and, consequently, out of corporate existence. Doc. No. 68 at 3 (Answer ¶¶7-8); Doc. No. 68 at 11 (SACC ¶54).

### 4.    Ingenico Group

31.     Ingenico is a French payments solutions company that was incorporated in 1980. Doc. No. 68 at 1, 9 (Answer ¶¶1, 40).

---

[3] In an email to Christopher Rotsaert, Ingenico recent appointee to ROAM, Graylin observed "[a]pparently you are still not comprehending the gravity of the situation[,]" outraged by Ingenico France's theft of BBPOS's trade secrets, stating:

> Just because you sent me an email to me, does not mean you have my agreement and my permission **to start transferring IP that does not belong to Ingenico**. Your assumption that the reader IP belongs to ROAM was already incorrect, then to further transfer them further to Ingenico without my explicit permission and **without any commercial agreement in place was a real mistake**. Apparently you are still not comprehending the gravity of the situation. Your actions and assumptions are threatening the very fabric of ROAM's relationship with its most important supplier. You are transferring value from one company to another company unilaterally without agreement or consideration. There is **an apparent lack of respect for the IP or BBPOS** and ROAM, and for my role as CEO of ROAM.

*See* Ex. I (9/17/2012 Thread) at IngenicoInc_0071720 (emphasis added).

32.     By 2010 (and, particularly, at the time BBPOS and ROAM were inking the exclusive product license for BBPOS's market-ready CircleSwipe device), Ingenico was one of the leading global manufacturers and sellers of card-based, electronic POS payment terminals in the countertop retail and multilane large retail merchant sectors, but it had yet to emerge as an active participant in mPOS space. *See* 30(b)(6) Deposition Transcript of Ben Lo dated December 10, 2021 ("Lo II Tr.") at 45:25 – 46:1-11 (noting, at this time, "Ingenico is manufacturer of a traditional POS terminal"), a true and correct excerpted copy of which is attached as Exhibit J; Group Strategy – Executive Summary dated June 4, 2012 [IngenicoInc_0274190], generally, and at 9 ("Ingenico is a leader in terms of its Point-of-Sale installed base, its expertise in payment protocols, its universal Telium platform, and its retailer relationships."), a true and correct copy of which is attached as Exhibit K.

33.     Internally, however, the company's strategic growth plans shifted towards online and mobile electronic payment solutions to meet growing consumer demand through targeted acquisitions of smaller companies (like ROAM) already in operation within the mPSO space. *See* Ex. H (8/1/2012 Email) at 4 of the attachment, entitled "Strategy 9Dec2011_Exec Summary v3.pdf" [IngenicoInc_0274191-217] (reviewing progress on the company's three "2008 Strategic Pillars," and noting, specifically, under its third pillar, entitled "Build A Bridge Between The Digital And The Physical World," of meeting its goal to invest in a "mobile payment specialist" with the successful competition of its ROAM investments). *See also* ABI Research's 2013 mPOS Competitive Assessment [IngenicoInc_0276980-1032] at 1-2 (ranking Ingenico's recently acquired ROAM in first place, and AC in third, in overall mPOS hardware market share for the first half of 2013 (although, notably, failing to mention their single supplier source – BBPOS) and noting, in part, that "Ingenico continues to position itself at the forefront of POS innovation and

within the mPOS market and its strategy remains no different."), a true and correct copy of which is attached, as an attachment to an internal Ingenico email dated April 10, 2014 [IngenicoInc_0276976-7033] (the "4/10/2014 Email") at Exhibit L.

34.    With respect to the other Ingenico-related parties in the case, i.e., Ingenico Corp. and Ingenico Inc., they were then (and continue to be) Ingenico's Georgia-based operational arm for business activities conducted within the United States. Doc. No. 68 at 1 (Answer ¶1).

35.    Ingenico Corp. is a Delaware corporation, that is registered to do business in Georgia, with a principal place of business in Alpharetta, Georgia; it is a holding company for Ingenico Inc. No. 68 at 3 (Answer ¶¶7-8).

36.    Ingenico Inc. is a Georgia corporation, having a principal place of business in Alpharetta, Georgia; it is subsidiary of Ingenico Corp. and the successor-in-interest to ROAM by way of merger as of December 31, 2017. Doc. No. 78 at 3 (SACC ¶12).

37.    There are multiple high-ranking Ingenico corporate actors who had significant involvement in the acts complained of by Plaintiffs in this lawsuit. These actors include: (i) Philippe Lazare ("Lazare"), Ingenico's then highest ranking officer, as the global Chairman and CEO for the company, serving as a director for Ingenico, Ingenico Inc., and ROAM, during the relevant timeframe; (ii) Christopher Coonen ("Coonen"), who headed Ingenico's global Solutions / Mobility Payment Business Line and was also a director for ROAM, during the relevant timeframe; and (iii) Christopher Rotsaert ("Rotsaert"), who, immediately prior to his appointment to ROAM as its VP of mPOS Product Management, beginning in 2012, finished leading Ingenico's two-year M&A integration efforts of its also recently acquired Chinese POS manufacturer, Fujian Landi Commercial Equipment Co Ltd. ("Landi"), concurrently assuming the position as Head of Product Management and R&D for Ingenico's global Mobility Payment Business Line no later

than mid-2012. Doc. No. 68 at 9-10 (Answer ¶¶45-46); Ex. H (8/1/2012 Email) at the attachment, entitled "Organisation du Groupe Ingenico Juillet 2012" [IngenicoInc_0274189] at 3, 51, 54-55; Ex. B (Rotsaert I Tr.) at 18:11-25 – 19:1-13; 28:7-25 – 29:1-9.

C.    *NEGOTIATIONS OF THE SCOPE OF "EXCLUSIVITY" UNDER THE BBPOS-ROAM LICENSING AGREEMENT*

38.    Negotiations of the BBPOS-ROAM Agreement between Lo and Graylin began in February 2010 and continued through the date of the agreement's execution in May 2010 – much of which centered on the product exclusivity aspect of the deal, as reflected in the parties' contemporaneous writings. *See, e.g.,* ¶¶ 39-46, hereinafter.

39.    In an email thread dated March 1, 2010 [IngenicoInc_0020386-392] ("3/1/2010 Thread"), Lo reframed Graylin's preliminary inquiries about exclusivity as implicating two distinct possibilities in his imbedded February 22, 2010 email therein at IngenicoInc_0020389:

> **Exclusivity means the design (outlook and protocol) is dedicated for your company** OR **you want us to sell this type of product only to your company**? If you are talking about the previous scenario, it is possible. It is probably the best for us to start business and build relationship. If the product is custom made for you, you can own the product and even find other manufacturers to produce the device, if our price is not competitive or quality is not good enough. I propose $25K NRE, $ OK tooling fee and the unit price of the device is US$4.5 for quantity of 2K. I will provide you with BOM, CAD drawing, Circuit diagram, PCB Gerber file, API for the device. **If you are talking about the later scenario, it is possible only if you are one of the investors in our company.**

(Emphasis added).  A true and correct copy of the 3/1/2010 Thread is attached hereto as Exhibit M.

40.    As their negotiations on the point progressed, Graylin asks a legal advisor to draft language to reflect the then current of the negotiations regarding the contemplated exclusive licensing rights as to the CircleSwipe and a new EMV-capable product to be custom-built for ROAM in an email dated April 12, 2010 [IngenicoInc_0020801-802] ("4/12/2010 Thread"):

> We would like your help on a legal agreement with BBPOS limited to get **exclusive rights to use and sell the Encrypted Circle Swipe reader** they developed, as well as the "ROAM pos EMV terminal" that they have developed, and **will build a custom version for us**. The exclusivity carves out the territory of China for now. The terms of the agreement is outlined in the 11 points in the document here.

(Emphasis added). A true and correct copy of the 4/12/2010 Thread is attached hereto as Exhibit N.

41.    Upon reviewing proposed language on the revised exclusivity terms that newly inserted the "BBPOS" device as being subject to the contemplated exclusive product licensing grant, Lo reiterates his unwillingness and legal inability to restrict the sales of this device, and, reprising the spirit of Graylin's April 12th instructions to counsel, proposes developing a custom version of that product for ROAM better suited to use in a market segment with a heavier concentration of smart phone usage in an email thread dated April 22, 2010 [IngenicoInc_0020913-915] ("4/22/2010 Thread") at IngenicoInc_0020914-915:

> I read the agreement and notice that the exclusivity includes both CircleSwipe and BBPOS device. **I think it is about CircleSwipe only in the terms sheet**. BBPOS limited and Hong Kong government invests approx $350K into device and HK government expects its investment to be paid back when we sell the device. (Enclosed please find the contract from HK government). In this agreement, it looks like you will sell ROAMpay POS and does not allow us to sell BBPOS except in China. Signing this agreement may lead to lawsuit between BBPOS Limited and FIK government. BBPOS is designed to work together with very low cost feature phones. The feature phone is used as modern only. No special software is running in the feature phone. I see big market for the product in developing countries. Look like you would like to use ROAMpay POS with smart phone like iPhone, Android phone, etc. **Maybe we distinguish BBPOS and ROAMpay POS in this way**. OR I grant you exclusivity in North American so that BBPOS didn't compete with ROAMpay POS? Give me some thought.

(Emphasis added). A true and correct copy of the 4/22/2010 Thread is attached hereto as Exhibit O.  *See also* April 23, 2010 redlined mark-ups to an April 19, 2010 draft of the agreement [IngenicoInc_0000248-257] ("4/23/2010 Draft") at §§1.4, 1.5, and Schedule I (referring to grant

of rights in the "BBPOS" device in addition to the ROAMpay POS solution), a true and correct copy of which is attached as Exhibit P.

42.      Again, in the 4/22/2010 Thread, Lo emphasizes that additional consideration and certain assurances would need to be forthcoming for any deal on exclusive licensing rights to its existing BBPOS device to make it an economically viable alternative to its then-existing business model for sales of this device, stating at IngenicoInc_0020913:

> My business model for BBPOS is to sell BBPOS at very low cost and charge a monthly license fee so that our company has some recurrent revenue. **If I give you an exclusive right to sell BBPOS and getting a monthly license fee for each BBPOS you sold. That's good to me. But I also design the ROAMpos for RoamData. ROAMpos completes with BBPOS in some sense. If you have to top up some montly fee for each BBPOS you sold, you might focus in selling ROAMpos.** Is it possible for me to get a fixed amount per month or % of your monthly fee for each BBPOS & ROAMpos you sold?

Exhibit O, 4/22/2010 Thread (Emphasis added).

43.      These contemporaneous communications show, in part, that not only was Graylin aware that BBPOS was actively engaged in the sale of mPOS products (including its EMV-capable BBPOS device sales) prior to inking the BBPOS-ROAM Licensing Agreement, he also understood that those sales, along with any other mPOS development and sales activities in which BBPOS chose to engage, certainly could (and presumably would) continue, unhindered, in the event that the parties ultimately were able to reach a deal on the exclusivity for the CircleSwipe and contemplated custom-built EMV device. *See also* April 24, 2010 email thread [Ingenicolnc_0020924-929] ("4/24/2010 Thread"), generally, a true and correct copy of which is attached as Exhibit Q.

44.      After largely hammering out his and Lo's consensus now to exclude the "BBPOS" device from the scope of any exclusive product license grant, Graylin sought corporate buy-in on the proposed deal terms from the company's CFO, John Frontz ("Frontz"), listing "several facts"

in an imbedded April 24, 2010 email thread that Frontz "should understand" to more properly

assess the deal metrics, including:

> 1) **They [referring to BBPOS] have been developing the Cyrpto Swipe well before I met them,** this is **THEIR product,** and **their IP** on encryption with no battery power. The fact we can demo it now is because of they had been working on it. Our own FSK reader design would still take a while for it to be done and much testing to perfect, we may still use it in the future, but less in a hurry to do it.
>
> 2) The $3 mark-up is more than reasonable with our cost is at around $8.50. Most accessory devices are several times this amount. **Given it is their product, they normally have a right to sell it in the market to other people which would confuse the market,** as we have seen with ID Tech selling to NAB. I am convincing them to take it off the market and give us exclusivity. and we still have a sub $10 reader. This price is more than fair. If we sell 20,000 units, they make $3 per unit, that's $60K, our revenue per merchant per year is $100 plus.
>
> 3) **The BBPOS low cost debit unit is also THEIR product**, we are going to modify it for our needs for Casino and potentially apple, and still get the unit at sub $50, and with printer our target price is sub $75. They plan to get the unit EMV certified by June. They can sell a lot of these units without us. I am getting them to work with us here and jointly sell these units so we can maintain higher margins and not confuse the market. . .

*See* Ex. Q (4/24/2010 Thread) at IngenicoInc_0020925 (emphasis added).

45.    This exchange was in further follow up to Graylin's April 20, 2010 responses (as

indicated in brackets with added emphasis in bold below) to a number of questions and issues

posed by Frontz in an earlier imbedded email therein dated April 19, 2010, including the following:

> 1.3 — They have a non-exclusive China right — given that we are paying to finalize a specific product, we should get a 5-10% royalty for any sales they book in China for the products they develop with our money? We are giving them critical funding to survive and be able to sell anything and for that we should get something for anything they sell that we pay to develop. If they could sell on their own without us that would be different. **[we are <u>licensing their product exclusively</u>, they have <u>already developed it</u>, our bigger value is not earning a few cents per device, but getting them to package our software longer term. I'm not worried about them getting rich on hardware sale and <u>getting a royalty off device IP that we don't own</u>. The <u>other products we have them build is a different story</u>, they don't have rights to sell it at all.]**

*See* Ex. Q (4/24/2010 Thread) at IngenicoInc_0020927 (underline emphasis added).

46.     These contemporaneous writings concerning the agreed-upon scope of exclusivity being limited to the CircleSwipe device (and, potentially, any other customized EMV POS unit specially developed by BBPOS for Ingenico under the agreement), are reflected in the final execution version of the BBPOS-ROAM Licensing Agreement (as discussed below), but, moreover, consistent with the uncontroverted deposition testimony given by Graylin in this case – being the most competent person as to the particulars of these negotiations (other than Lo) and ROAM's 2010 decision to proceed with exclusive product license as memorialized in the written agreement. *See, e.g.,* Ex. E (Graylin Tr.) at 21:6-9, 22:2-7, 22:8-24 – 23:1-11, 25:12-22, 111:4-8, 113:18-24, 143:22-24 – 144:1-7.

> **D.** **THE ADDITION OF ANTI-ASSIGNMENT LANGUAGE IN §1.2: "IN THE EVENT A SALE OF THE COMPANY TO A COMPETITOR WITH ITS OWN POS PRODUCTS"**

47.     A late, but nonetheless material change to the BBPOS-ROAM Licensing Agreement's final deal terms can be seen by comparing §1.2 of the 4/23/2010 Draft to the final executed version.   *Cf.* Ex. P (4/23/2010 Draft) at §1.2; Ex. C (BBPOS-ROAM Licensing Agreement) at §1.2. Unlike prior drafts produced in discovery, the final executed version includes the bargained-for anti-assignment language, which states that the license grant is "not transferable or assignable in the event a sale of [ROAM] to a competitor with its own POS products without prior written consent of [BBPOS], not to be unreasonably withheld."

48.     There was, at least, one major distinction between ROAM and Ingenico, at this time, that bore on the rationale for inclusion of anti-assignment language as articulated in §1.2 of the BBPOS-ROAM Licensing Agreement; namely, the bargained-for economic benefits of the bargain could be upset by an unrestrained assignment of the licensing agreement from a software company (like ROAM) to a competitor with POS manufacturing capabilities (such as Ingenico).

*See* Ex. E (Graylin Tr.) at 24:9-24 – 25:1-11 (testifying, when asked what would happen to BBPOS's margin payments under the agreement if ROAM began manufacturing and selling the CircleSwipe itself, "**I mean, we didn't have any intentions to do that . . . so that was not part of the – the agreement. Yeah. And we were not a manufacturer ourselves**.").[4] *See also* Ex. J (Lo II Tr.) at 45:25 – 46:1-11 ("Q. BBPOS is in this mPOS mobile point of sale business; right? **A. Yes.** Q. And in that context were you aware of Ingenico? **A. No. Ingenico is manufacturer of a traditional POS terminal.** Q. I understand . . . you're saying it's different from the mPOS terminal? **A. Yes.** Q. But was BBPOS aware of Ingenico as a participant in the point of sale credit card industry? **A. No. You're talking about -- no**."); 119:18-24 – 120:1-11 (confirming, respectively, when asked whether his comments, in a November 2012 email following Graylin's ROAM exit, that "ROAM relies on us much more than we reles (sic) on them," and that "ROAM needs us but not the other way around" are true, "[t]hat's true because **ROAM is a software company and we are a hardware company**. ROAM wanted to buy the product from us. So I strongly believe that, like, they make sure that our product is good. And as I say, **we take a few years to come up with good products**. So I think that they want to have some like guy to come to like make sure that we are really good[,]" and, as to his second comment, that "[w]e need ROAM. Yes. When need ROAM for the revenue, **but ROAM need us**. So ROAM make money

---

[4] Under deposition questioning, Defendants' damages expert, Dr. Jennifer Vanderhart, offered her opinion that the licensing agreement "does not contemplate [the] specific scenario" where BBPOS would be contractually entitled to a margin payment relative to ROAM's use of BBPOS's IP in a device not manufactured by BBPOS. *See* Exhibit X, Deposition Transcript of Jennifer Vanderhart, Ph.D. dated May 4, 2022 ("Vanderhart Tr.") at Vanderhart Tr. at 117:21 – 120:1-3 ("And so I think that's this case, right. And so [Defendants are] saying they did not use any intellectual property of BBPOS. And so this licensing agreement does not contemplate that specific scenario.").

and we make money. But, . . . **ROAM is hardware and software solution**, but for us, without

ROAM we can still sell some product in China. So this is what I mean.").

49.     This concern on the part of BBPOS became a reality in 2015, when it was

understood that Ingenico had acquired ROAM, as articulated by BBPOS's then CEO, Bob Cook

("Cook"), in an internal email dated December 11, 2015:

> First we should officially notify them that **we are not approving to assign the
> agreement to ING**. This does not mean will will (sic) not continue to sell to them
> just not under the current agreement conditions. **ING is a competitor and we need
> to protect our interests**. In a new agreement we should not agree to any
> exclusivity.

*See* Email Thread dated December 11, 2015 [BBPOS_0003629-632] ("12/11/2015 Thread") at

BBPOS_0003629, a true and correct copy of which is attached as Exhibit R (emphasis added).

50.     When asked to explain the meaning of Cook's statement, Lo testified:

> I think **in 2015 Ingenico acquire ROAM**, and as we are doing business with
> ROAM that means **ROAM become Ingenico in 2015 and we are competitor**. I
> think this is what Bob Cook try to say that if our agreement, **if there is transfer of
> ownership to a company with competitive products that we should terminate
> the exclusivity relationship**. I think this is what Bob is trying to say.

*See* Ex. R (12/11/2015 Thread) at 177:16-22.

**E.     *PERTINENT PROVISIONS OF THE VARIOUS LICENSING AGREEMENTS
AT ISSUE HEREIN, INCLUDING THE BBPOS-ROAM LICENSING
AGREEMENT***

51.     The scope and limitations of BBPOS's licensing rights as to certain intellectual

property belonging to and/or controlled by 436 Canada Inc. are evidenced, in part, by two

contracts, namely: (i) the License Agreement and Non-Competition Agreement dated March 18,

2010 [AC_0000917-922] (the "HATM-BBPOS License"), by and between HomeATM and

BBPOS; and (ii) the License Agreement and Non-Competition Agreement dated July 1, 2013

[AC_1169307-325] (the "436-BBPOS License"), by and between 436 Canada and BBPOS.  True

and correct copies of HATM-BBPOS License and 436-BBPOS License are attached as Exhibits S and T, respectively.[5]

## 1.  The HATM-BBPOS License

52.     Pursuant to §2.1 of the HATM-BBPOS License, BBPOS was granted "**a non-exclusive licence** [sic] to use the Intellectual Property Rights in the Region in relation to the Products."  *See* Ex. S (HATM-BBPOS License) at §2.1 (emphasis added).

53.     Section 1.1 contains the following pertinent definitions:

> [']Intellectual Property Rights' means trademark, design, or patent and other intellectual property rights of **DTMF technology titled the Apparatus and Method for Commercial Transactions Using a Communication Device**;
>
> 'Products' means the communication device using the DTMF technology".

*See* Ex. S (HATM-BBPOS License) at §1.1 (emphasis in original).

> The rights and benefits arising under the contract were not assignable to any unrelated third party "without the prior written consent of the other party [thereto].

*See* Ex. S (HATM-BBPOS License) at §9.1.

54.     The rights and benefits arising under the contract were not assignable to any unrelated third party "without the prior written consent of the other party [thereto], *see* §9.1, and the license was terminable by either party for any reason upon three months' advance notice in accordance with §§3.1 and 6.1.  *See* Ex. S_ (HATM-BBPOS License) at §§3.1, 6.1.

## 2.  The BBPOS-ROAM Licensing Agreement

55.     On May 4, 2010, BBPOS and ROAM entered into the exclusive product license for the CircleSwipe devices at issue in this lawsuit. *See* Ex. C (BBPOS-ROAM Licensing Agreement).

---

[5] Each license is addressed in order that they were executed (or amended) relative to the BBPOS-ROAM Licensing Agreement.

56.     Prior to being amended on August 15, 2011, the BBPOS-ROAM Licensing Agreement at §§1.1 and 1.3 originally granted to ROAM "a worldwide, perpetual, fully-paid license to freely use and sell the Products" that is "exclusive" on a "worldwide basis" (with the exception of China and the Philippines) within the United States, and elsewhere. *See* Ex. C (BBPOS-ROAM Licensing Agreement) at §§1.1, 1.3.

57.     Section 1.2 explicitly provides that the license granted to ROAM therein is not transferable or assignable "in event a sale of the Company to a competitor with its own POS products" – unless prior written consent is given by BBPOS. *See* Ex. C (BBPOS-ROAM Licensing Agreement) at §1.2.

58.     The terms "Products" under the agreement relates to just two devices, namely, the CircleSwipe and contemplated ROAMpay POS (to be developed).[6]  *See* Ex. C (BBPOS-ROAM Licensing Agreement) at Schedule I.

59.     Section 9.2 sets forth the only grant of licensing rights under the agreement relative to BBPOS's IP, generally, as compared to the exclusive rights granted in the CircleSwipe, that is limited to (i) IP owned by BBPOS and only to the extent incorporated in the Products or Devices; (ii) carries no grant of exclusionary rights; and (iii) may be used only for the limited purposes of developing, manufacturing, or selling the Products or Devices, stating, in relevant part:

> If the Products or Devices incorporate **Partner-owned IP**, the Company is hereby granted a worldwide, perpetual, fully paid, sublicensable license to use the Partner IP to continue developing, manufacturing and selling the Products and Devices[7].

---

[6] Per Schedule I, "Products" refers to (a) "Encrypted Circle Swipe reader, sometimes referred to as he 'Crypto Swipe' or 'ROAMpay Swipe' that has ability to generate capacitance for encryption from the audio jack of a mobile device or PC, this was developed by the Partner, and including any variance of this design" and (b) "EMV capable POS unit with Bluetooth interface, sometimes referred to as the 'BBPOS' currently completing certification."

[7] Per Schedule I, "Device" refers to "[t]he 'ROAMpay POS' EMV terminal developed by the Contactor based on the foundation of BBPOS, is the 'Device' that will be owned by ROAM. ROAMpay POS[.]"

*See* Ex. C (BBPOS-ROAM Licensing Agreement) at §9.2 (emphasis added).

60.     The original Schedule II provides at the third bulleted point:

> ROAM will be the exclusive distributor of the Products and Devices, CyrptoSwipe (sic) (branded ROAMpay Swipe) and ROAM will provide margin of $3 per Crypto Swipe unit and $7 per BBPOS or ROAMpay POS unit above cost of manufacturing, packaging and BOM (Bill of Material), paid to BBPOS for delivering the units to ROAM as part of the invoice for hardware. These margins will be built into the price per unit charged to ROAM which also include BOM and manufacturing costs. For the case of BBPOS or ROAMpay POS sales referred by the Partner and where only hardware is sold, both parties will split the margin with 50% of the Margin going to the Partner, in accordance with section 1.5 of this agreement.

*See* Ex. C (BBPOS-ROAM Licensing Agreement) at Schedule II.

61.     Section 3.8 of the BBPOS-ROAM Licensing Agreement purports to forever bar BBPOS from engaging in certain design and production activities as they related to the Products or "Devices" (which, effectively, is merely a placeholder for some future developed device):

> The Partner agrees that, **during or after the term of this Agreement**, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Devices, or products substantially similar to the Devices, for any third party. The Partner also agrees that, **during or after the term of this Agreement**, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Products, or products substantially similar to the Products, for any third party (other than in China to the extent permitted in Section 1.3 above).

*See* Ex. C (BBPOS-ROAM Licensing Agreement) at §3.8 (emphasis added).

62.     At §3.10, BBPOS represents and warrants that "none of the Products, Devices, Deliverables or Services does or will infringe, misappropriate or violate any intellectual property right of any person." *See* Ex. C (BBPOS-ROAM Licensing Agreement) at §3.10.

63.     Section 3.18 sets forth the indemnification obligations of BBPOS under the BBPOS-ROAM Licensing Agreement:

> The Partner agrees to indemnify and hold the Company harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any

> warranty, representation or other provision of this Agreement by the Partner or arising out of or resulting from **any claim brought by a third party against the Company** as a result of or relating to any actual or alleged breach hereof.

*See* Ex. C (BBPOS-ROAM Licensing Agreement) at §3.18 (emphasis added).

64.    ROAM's indemnification obligations under the contract appear at §4.3 (where differences in the language used at §3.18 appear in bold), which states:

> The Company agrees to indemnify and hold the Partner harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Partner or arising out of or resulting from any claim brought by a third party against the Company as a result of or relating to any actual or alleged breach **by the Company. In the event of any such claim, the Partner agrees to notify the Company promptly of the claim and to permit the Company at the Company's expense, to assume control of the defence (sic) thereof with counsel of the Company's choosing, and cooperate with the Company in such defence (sic) at the Company's expense.**

*See* Ex. C (BBPOS-ROAM Licensing Agreement) at §4.3 (emphasis added).

### 3.    The Amendment to the BBPOS-ROAM Licensing Agreement

65.    In or around 2011, ROAM sought to amend the original terms of the BBPOS-ROAM Licensing Agreement in a number of respects, including on per unit margin price and the scope of license grant. *See* Email Thread dated May 30, 2011 [IngenicoInc_0034925-926] ("5/30/2011 Thread") (referencing Graylin's understanding that ROAM's continued right to exclusivity in the sale of the CircleSwipe under the agreement is tied to payment of the margin set forth under Schedule II, as amended, stating: "In his original contract, outside of cost of material, we gave him $3 margin per unit **based on getting exclusivity for the product**, now he has agreed to go to $2 per unit margin.") (emphasis added), a true and correct copy of which is attached hereto as Exhibit U; Ex. C (BBPOS-ROAM Licensing Agreement) at IngenicoInc_0268234-238 (amending and replacing original §§1.1, 1.3, and Schedule II, adding a new §4.4, and at §6:

"confirm[ing] and acknowledge[ing] the continuing validity and enforceability of the [BBPOS-ROAM Licensing Agreement] as amended [t]hereby.").

66.     With respect to the scope of license grant, the original §1.1 is amended and replaced to include rights to certain "Partner Intellectual Property," in light of BBPOS's recently filed U.S. Patent Application Number 12/767,831. *See* Ex. C (BBPOS-ROAM Licensing Agreement), *generally*; Amendment at first and second recitals; §1.

67.     Amended §1.1 of the BBPOS-ROAM Licensing Agreement sets forth the current scope of license grant under the agreement:

> The Partner hereby grants to the Company a worldwide, perpetual, fully-paid license **to freely use the Partner Intellectual Property** to make, have made, develop, have developed, use, sell, offer for sale, import and distribute **the Products, any portion thereof, or any products similar to or based upon any Products**. For purposes of this Agreement, "**Partner Intellectual Property**" shall mean: (a) any and all patents and patent applications relating to the Products, including without limitation US Patent Application Number 12/767,831 for secure audio coupled card swiper filed on April 27, 2010 with the United States Patent and Trademark Office (the "Patent Application") and any patents issuing on the Patent Application, including (i) any reissues, renewals, reexaminations, substitutions or extensions thereof and foreign equivalents of the foregoing; (ii) any claim of a continuation-in-part application or patent that is entitled to the priority date of, and is directed specifically to subject matter specifically described in, the Patent Application; (iii) any foreign counterpart thereof (including PCTS); and (iv) any supplementary protection certificates and any other patent term extensions, restorations and exclusivity periods and the like of the Patent Application; and (b) any copyrights, trademarks, trade names, trade secrets, knowledge, data and information owned or controlled by the Partner relating to the Products.

*See* Ex. C (BBPOS-ROAM Licensing Agreement) at §1.1, as amended (emphasis added).

68.     Section 1.3, as amended, sets forth the exclusivity parameters of the license grant, again, carving out a territorial exception therefrom consisting of China and the Philippines:

> The license granted in Section 1.1 is exclusive on a worldwide basis (with the exception of China, Philippines, as set forth below and Section 1.5). Without limiting the generality of the foregoing, the Partner may not, directly or indirectly, anywhere in the world, use or sell any Products, or any portion thereof, or any products similar to or based upon any Products (**other than as explicitly provided**

> in this Agreement) or grant any other person rights to the Partner Intellectual
> Property to make, have made, develop, have developed, use, sell, offer for sale,
> import and distribute any Products, any portion thereof, or any products similar to
> or based upon any Products. Notwithstanding the foregoing provisions of this
> Section 1.3, **the Partner shall retain the non-exclusive, non-transferrable right
> to sell the Products in China for use in China and sell the Products in
> Philippines for use in Philippines**.

*See* Ex. C (BBPOS-ROAM Licensing Agreement) at §1.3, as amended (emphasis added).

69.     The $3 per unit margin price set forth under the original Schedule II for the

CircleSwipe was reduced to a $3-2 margin, in relevant part, at the third bulleted point of amended

Schedule II:

> ROAM will be the exclusive distributor of the Products and Devices, Cyrpto (sic)
> Swipe (branded ROAMpay Swipe) and **ROAM will provide margin of $3 per
> Crypto Swipe unit (which shall be reduced to a margin of $2 per unit for sales
> above 150,000 cumulative units)** and $7 per BBPOS or ROAMpay POS unit
> above cost of manufacturing, packaging and BOM (Bill of Material), paid to
> BBPOS for delivering the units to ROAM as part of the invoice for hardware. These
> margins will be built into the price per unit charged to ROAM which also include
> BOM and manufacturing costs. For the case of BBPOS or ROAMpay POS sales
> referred by the Partner and where only hardware is sold, both parties will split the
> margin with 50% of the Margin going to the Partner, in accordance with section 1.5
> of this agreement.

*See* Ex. C (BBPOS-ROAM Licensing Agreement) at Schedule II, as amended (emphasis added).

70.     Neither the anti-assignment language at §1.2 of the agreement nor the limitation at

§9.2 on the grant of licensing rights in BBPOS's IP, generally, was amended by the parties, who

then "confirm[ed] and acknowledge[d] the continuing validity and enforceability" of the remaining

original terms of the agreement to the extent not amended thereby.  *See* Ex. C (BBPOS-ROAM

Licensing Agreement) at §§1.2, 9.2; Amendment at §6.

71.     Likewise, Sections 11.1 and 11.2 of the BBPOS-ROAM Licensing Agreement,

addressing the issue of waiver, remain in full force and effect:

11.1 No failure or delay by either party in exercising any right, power or privilege to which it is entitled shall operate as a waiver nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise.

11.2 For the avoidance of doubt, any waiver of any breach of the Agreement by either party shall not be construed as a waiver of any subsequent breaches of that same or any other provision.

*See* Ex. C (BBPOS-ROAM Licensing Agreement) at §§11.1, 11.2.

### 3.   The 436-BBPOS License

72.     After certain alleged infirmities in BBPOS's intellectual property rights arising under the HATM-BBPOS License got flagged during M&A due diligence, ROAM attempted, unsuccessfully, to resolve those issues, first, by way of an amended licensing agreement between 436 Canada and BBPOS, and then later, by seeking a direct license to 436 Canada's IP in its own right, well after the contemplated BBPOS acquisition had been terminated. Ex. G (Houlihan Lokey Report) at 6-7 (quoting Ernst &Young Valuation Analysis of Common Shareholders' Equity of ROAM Data, Inc. as of September 20, 2012, pages 32-33); letter dated May 14, 2013[8] [AC_0098843] (the "May 2013 Rejection Letter") (rejecting ROAM's request for a direct license to 436 Canada's IP), a true and correct copy of which is attached as Exhibit V.

73.     On July 1, 2013, 436 Canada and BBPOS signed a new license agreement that replaced the first with "a royalty bearing, personal, non-transferable and non-exclusive license" to

---

[8] By letter dated May 14, 2013, Mitchell Cobrin advised ROAM of its decision to, among other things, decline ROAM's request for a direct license to 436 Canada's IP, stating, in part:

We have carefully considered Roam's request for an amendment to the March 2010 agreement with BBPOS LIMITED to **"shore up Roam's access to HomeATM's IP"**. In summary, your email requested: (i) amending the Prime License to delete the provision allowing each of HomeATM and BBPOS to terminate upon 90 days' notice, (ii) having HomeATM formally consent to the existing Sublicense between BBPOS and Roam, and (iii) **giving Roam a direct license from HomeATM** in the event the Prime License were to be terminated for any reason.

*See* Ex. V (May 2013 Rejection Letter) at 1 (emphasis added).

BBPOS "with a right to sub-license to Sublicensees (hereinafter referred to as the 'License') to use and/or practice the Licensed Patent Rights for the purpose of manufacturing, distributing and selling Products in the Region." *See* Ex. T (436-BBPOS License) at §3.1. Even under the second agreement, BBPOS and any potential sublicensors have no right to exclude others. *See id*.

74.     While Ingenico Inc. purports to have properly succeeded to ROAM's exclusive license arising under the BBPOS-ROAM Licensing Agreement for purposes of this lawsuit and its counterclaims, Ingenico Inc. points to no prior written consent given by BBPOS to the transfer of ROAM's license, following its sale to a competitor with POS products, nor any other documentary or testimonial evidence relative to this point; indeed, none exists.

75.     In Graylin's "Report on BBPOS deal, IP, position, recommendations" dated July 5, 2012 [IngenicoInc_0047329-334] (the "BBPOS Report"), he identifies "several areas of contention that would likely need to be resolved in court" concerning the BBPOS-ROAM Licensing Agreement that he suggests would be better avoided by approving the contemplated BBPOS acquisition on terms acceptable to BBPOS. Those "areas of contention" include, in part, the following:

> 2 b) Based on the last amendment that we signed Nov 2011, we reduced their margin to $2/unit from $3/unit for exclusively distributing products they supply us. **They feel that this margin we pay them includes the royalties we pay for their IP, which was the intension (sic) discussed with them early on** but not specified clearly in the contract.
>
> *               *               *
>
> 2 d) The contract talked about margin per unit but did not directly talk about the price including royalties, **they felt that the price does include royalties**. They feel that **if we don't buy the finished products from them then we must pay royalties for units sold**. Otherwise they can seek to terminate the agreement for breach and fight it out in court, which can cause IP to be fought over not only with them, but if our BBPOS contract gets terminated, **we can be exposed to HATM patent suit or royalties**.
>
> 2 e) Further, they feel they have been developing the NFC and EMV readers as well as a new PIN entry device technology **at their own cost**. Ben stated all the engineers development we paid for were specifically for **ROAMpay API,**

> **ROAMplayer, and other software that we own** but their hardware team worked on new products **without our commission and on their own investments**, and **are not part of the original products we licensed**, so if we were to stop paying them royalties for units, and fight them, then we may not get access to those product rights.

*See* Ex. W (BBPOS Report) at IngenicoInc_0047331, Sections 2 b), 2 d), 2 e) (emphasis added).

76.    Relevant to the points flagged by Graylin at 2 b) and 2 d) above, Defendants' damages expert, Dr. Vanderhart, offered her opinion that the $3-2 per unit margin payment payable to BBPOS under the amended Schedule II upon the sale of each CircleSwipe does, in fact, include "a royalty for the use of intellectual property" as well as "any potential return that . . . BBPOS would . . . require itself to . . . make." Ex. X, Vanderhart Tr. at 117:21 – 119:1-6.

77.    And, yet, Dr. Vanderhart acknowledged that the agreement does not provide a contractual mechanism by which BBPOS is to be compensated for the use of its IP in any product (whether rightly or wrongly) that it has not manufactured itself:

> Q If ROAM or Ingenico used any of the intellectual property of BBPOS in a different device that it would sell, would there be a margin payment due to BBPOS? **A And so I think that's this case, right. And so they're saying they did not use any intellectual property of BBPOS. And so this licensing agreement does not contemplate that specific scenario.** Q So in other words, this agreement would not require ROAM or Ingenico to pay any amount for the use of BBPOS's intellectual property in any of its devices? **A Well, for these particular devices that they got from BBPOS, they have to pay for any other devices. Again, . . . their assertion is that they don't use the intellectual property. This agreement does not separately have any such . . . paragraphs or statements requiring any specific payments for any devices other than what's listed here**.

*See* Ex. X (Vanderhart Tr.) at 119:3-21 – 120:1-3.

78.    In a September 27, 2011 email that Graylin directed to Lo [IngenicoInc_0044582-585] ("9/27/2011 Forward"), Graylin forwards along an internal email regarding AC's sales of BBPOS's manufactured EMV Chipper device specially branded for AC as the "Rambler" that

includes pictures of the cracked open casing for the internal circuitry, a true and correct copy of which is attached hereto as Exhibit Y.

79.     In December 2015, Ingenico Inc. reported on internal audit findings on procurement at 17, noting, in part, "[c]urrently, BBPOS continues to honor and abide by the contract signed in July 2013. No issues have been noted related to product quality or deliveries[,]" in Ingenico Mobile Solutions Business Review December 2015 [IngenicoInc_0104763] (the "12/2015 Business Review"), a true and correct copy of which is attached hereto as Exhibit Z.

### E.     *INGENICO INC.'S DEMANDS FOR INDEMNIFICATION*

80.     Ingenico Inc.'s demands for indemnification for alleged infringement directed to BBPOS arise under §§3.18 and 3.10 of BBPOS-ROAM Licensing Agreement and relate to five separate claims alleging infringement (true and correct copied of sample letters in the record [add bates-cites] attached, collectively, at Exhibit AA (the "Indemnity Letters"), none of which that predate January 19, 2017 (i.e., after Ingenico acquired ROAM and had stolen BBPOS's trade secrets and breach the confidentiality obligations under the contract).

81.     Before instituting these proceedings, on behalf of BBPOS, Kutak Rock LLP ("KR") wrote a letter dated November 2, 2008, reserving all rights/remedies, demanding an extensive amount of information related to each pending demand for indemnity necessary in order to analyze the various claims and alleged indemnity obligations, a true and correct copy of which is attached as Exhibit A to the Declaration of Melissa Bozeman, which is attached as Exhibit BB (KR Letter).

82.     Ingenico Inc.'s outside counsel wrote an email asking that a Common Interest Agreement be signed "before going further with [BBPOS's] requests" on November 9, 2018 with the last communication on indemnity being from BBPOS to Ingenico Inc. on December 3, 2018:

"Subject to our client's final approval, we would be interested in a comprehensive Common Interest Agreement.  Will you please send me a proposed draft for our review?  Thank you."  *See* Ex. BB (Decl. of Melissa Bozeman).

83.     The indemnification damages set forth by Ingenico Inc.'s damages expert, Dr. Vanderhart, (at Exhibit D-13 to Vanderhart Report) identify five categories of claims, which purportedly amount to $3,959,343 in indemnification damages. Ex. CC (Vanderhart Report) at Exhibit D-13, ¶¶96-101 (noting at ¶100 that "total fees to be indemnified by BBPOS for all matters, including these and the IOENGINE matter, would be $3.96 million. *See* **Exhibit D-13**.") (emphasis in original); Exhibit D-13 at [H], entitled "Remaining exclsuive (sic) region accused product profits".

84.     Generally, Ingenico Inc.'s damages expert simply added up the claimed amount of incurred attorneys' fees and costs, as supplied to her by defense counsel, for each infringement matter, but admittedly, neither undertook any independent investigation to verify that such claimed amounts were properly allocated, accurate, and reasonable nor otherwise undertook any efforts to determine the actual number of accused units sold by Ingenico Inc.  *See generally* Ex. CC (Vanderhart Report).

85.     Dr. Vanderhart did not independently verify whether the alleged indemnifiable legal fees / costs were properly allocated, accurate, or reasonable: "Q Did you do anything to independently analyze whether or not the cost have been properly allocated or accurate and reasonable? **A That was not my -- I was not asked to do that, no.**" Ex. X (Vanderhart Tr.) at 201:7-11.

86.     Nor did she undertake any effort to determine the number of accused products actually sold, testifying that "the litigation costs aren't going to be associated with the number of

devices sold" and that an "analysis . . . identifying . . . the specific damages associated with the products themselves" can only be undertaken with specificity once damages have been assessed in the proceeding, which, presumably, would have been premature at the time of rendering her report. Ex. X (Vanderhart Tr.) at 205:14-21 – 206:1-20.

87.     The bulk of Ingenico Inc.'s claimed damages for indemnity, i.e., \$3,561,084, relate to certain affirmative proceedings commenced by Ingenico Inc. against IOEngine LLC ("IOEngine") – namely, the lawsuit commenced by Ingenico Inc., captioned *Ingenico, Inc. v. IOENGINE, LLC*, No. 1:18-cv-00826-WCB, pending in the District of Delaware, and related IPR proceedings commenced by Ingenico Inc. related thereto. Ex. CC (Vanderhart Report) at ¶¶97-98, Exhibit D-13.

88.     With respect to the two IOEngine proceedings, Dr. Vanderhart applied a one-third allocation to Ingenico Inc.'s claimed legal fees / costs incurred in the district court proceeding because the accused BBPOS mPOS devices fell within one of the three accused product categories, but applied no similar allocation for the related IPR proceedings because she understood "all of the patents associated with the IPR . . . to be associated with the . . . BBPOS products." (IOEngine Docket) ref: pleadings at Doc. Nos. 1, 12, 93, a true and correct copy of which, being subject to judicial notice, is attached hereto as Exhibit DD.

89.     Ingenico's demands for indemnification herein also relate to the following documents, true and correct copies of which are attached as indicated:

    a.  There are roughly five separate claims of alleged infringing activities (sample letters in the record attached at Ex. AA, collectively, the "Indemnity Letters")[9];

    b.  On behalf of BBPOS, Kutak Rock LLP ("KR") wrote a letter dated November 2, 2008, reserving all rights/remedies, demanding an extensive amount of information related to each pending demand for indemnity necessary in order to analysis the

---

[9] *See* Ex. CC, Vanderhart Report at Exhibit D-13.

various claims, attached as Exhibit A to Exhibit BB, the Declaration of Melissa Bozeman (the "Request for Indemnity Information");

c.   Ingenico Inc.'s counsel wrote an email asking that a Common Interest Agreement be signed "before going further with [KR's] requests" on November 9, 2018 (attached – not in the record) attached as Exhibit B to Melissa Bozeman's Declaration at Exhibit BB;

d.   The last communication on indemnity was from KR to Sunstein on December 3, 2018: "Subject to our client's final approval, we would be interested in a comprehensive Common Interest Agreement.  Will you please send me a proposed draft for our review?  Thank you."  *See* Ex. BB.

e.   No further information was supplied by Ingenico on these claims in response to KR's requests for further information, until the close of this lawsuit. Ex. BB, Decl. of Melissa Bozeman.

90.   Ingenico's damages expert calculates Ingenico Inc.'s alleged breach of contract damages on the Alleged Exclusivity Breaches as "the unjust enrichment that BBPOS derived from the accused products." Ex. CC (Vanderhart Report) at ¶86.

91.   Ingenico Inc.'s damages expert applied an unjust enrichment measure of damages in the non-additive amount of $753,475 for the tortious interference claim at Count III in "calculat[ing] the profit made by BBPOS from the sales of products to NAB after December 2015." Ex. CC (Vanderhart Report) at ¶¶103-104 (noting at ¶104 that "[s]umming these profits across years after 2015, when the alleged tortious interference began, total damages are $753,475. *See* **Exhibit D-14**. Note that these damages are contained within the overall breach of contract damages owed by BBPOS and are not additive if BBPOS is found liable on all three claims."); Exhibit D-9 at [J], entitled "Estimated North American Bancard profits"; Exhibit D-14 at [D], entitled "BBPOS tortious interference").

92.   Ingenico Inc.'s damages expert applied an unjust enrichment measure of damages in the amount of $12,918,548 for the tortious interference claim at Count IV in "calculat[ing] the amount of profit that [AC] made by selling the accused products in the exclusive region, which

resulted from BBPOS's breach of the ROAM-BBPOS agreement." Ex. CC (Vanderhart Report) at ¶105 (noting at ¶109 that "[t]he damages amount owed by [AC] due to the alleged tortious interference is the sum of total calculated profits of accused products in the exclusive region. Total damages are equal to $12,918,548. *See* **Exhibits E-9 and E-10.**")(emphasis in original); Exhibit E-9 at [I], entitled "Total accused profits"; Exhibit E-10 at [A], entitled "AnywhereCommerce tortious interference").

93.     Ingenico Inc. was aware of the circumstances of BBPOS unintentionally accepting a purchase order for CircleSwipes (or "swipers") from NAB in an email thread dated December 9, 2015 [IngenicoInc_0250839] (the "12/9/2015 Thread"), a true and correct copy of which is attached as Exhibit EE.

94.     Ingenico Inc. was aware of having no entitlement to sublicensing rights as of January 18, 2012 as evidenced, in part, by an email thread between Graylin and Kron (on behalf of AC) [IngenicoInc_0008703] (the "1/18/2012 Thread"), a true and correct copy of which is attached as Exhibit FF.

Dated: June 22, 2022.

Respectfully submitted,

Plaintiffs / Counterclaim-Defendants,

By their attorneys,

*/s/ Melissa Bozeman*
MELISSA A. BOZEMAN
OLIVER D. GRIFFIN
PETER N. KESSLER
Kutak Rock LLP
1760 Market Street, Suite 1100
Philadelphia, PA 19103
Tel: (215) 288-4384
Fax: (215) 981-0719
Melissa.bozeman@kutakrock.com

Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com

JONATHON D. FRIEDMANN
ROBERT P. RUDOLPH
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
Tel: (617) 723-7700
Fax: (617) 227-0313
jfriedmann@rflawyers.com
rrudolph@rflawyers.com

RICARDO G. CEDILLO
Davis, Cedillo & Mendoza, Inc.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
Tel: (210) 822-6666
Fax: (210) 822-1151
rcedillo@lawdcm.com

*Attorneys for Plaintiffs / Counterclaim-Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2022, I caused to be served via electronic mail a true copy

of the foregoing document on the following counsel as follows:


John A. Tarantino
Patricia K. Rocha
Nicole J. Benjamin
Jeffrey K. Techentin
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
jtechentin@apslaw.com


Jonathon D. Friedmann, Esq.
Robert P. Rudolph, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
JFriedmann@rflawyers.com
RRudolph@rfllawyers.com


Ricardo G. Cedillo, Esq.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
rcedillo@lawdcm.com


                                        */s/Melissa A. Bozeman*
                                        Melkissa A. Bozeman