## ENGINEERING DEVELOPMENT AND LICENSE AGREEMENT

THIS AGREEMENT is made as of the 4th day of May 2010

Between

**ROAM Data, Inc.**, a Delaware corporation with its head office situated at 280 Summer Street, Lobby Level, Boston, MA 02210, fax no. +1 617 249 1661 (the "Company");

And

**BBPOS LIMITED**, a Hong Kong corporation with its address situated at Room 810, 8/F, Grand City Plaza, 1 Sai Lau Kok Road, Tsuen Wan, H.K., (the "Partner").

WHEREAS

A.  The Company wishes to engage the Partner to provide services (the "Services") identified on Schedule I, including design, manufacturing and production of the devices identified in Schedule I (the "Products" and "Devices"), and including software development, in each case according to the scope of work, processes, specifications, schedule and milestone described in Schedule I (the "Specifications").

B.  The Company wishes to obtain an exclusive license to use and sell the products identified in Schedule I (the "Products").

C.  The Partner agrees to license the rights to the Products and provide the Products, Devices, and Services in accordance with the terms of this Agreement.

NOW IT IS AGREED as follows:

1.  **LICENSE**

1.1 The Partner hereby grants to the Company a worldwide, perpetual, fully-paid license to freely use and sell the Products.

1.2 The license granted in Section 1.1 is not transferrable or assignable in the event a sale of the Company to a competitor with its own POS products without prior written consent of the Partner, not to be unreasonably withheld.

1.3 The license granted in Section 1.1 is exclusive on a worldwide basis (with the exception of China, Philippines, as set forth below and clause 1.5). Without limiting the generality of the foregoing, the Partner may not, directly or indirectly, anywhere in the world, use or sell any Products, or any portion thereof, or any products similar to or based upon any Products (other than as explicitly provided in this Agreement) or grant any other person the right to use or sell any Products, any portion thereof, or any products similar to or based upon any Products. Notwithstanding the foregoing provisions of this Section 1.3, the Partner shall retain non-exclusive, non-transferrable right to sell the Products in China for use in China and sell the Products in Philippines and use in Philippines.

1.4

During the term of this Agreement, the Partner will have the nonexclusive right to resell the BBPOS and ROAMpay POS solution described on Schedule I, and the Partner shall be

entitled to a commission equal to 25% of the Net Profit of for recurring service revenue or transaction revenue relating to any such resale. "Net Profit" as used in this section is defined as the Company's revenue minus cost of goods sold, cost of customer acquisition and service. The terms of this resale arrangement shall be subject to and as set forth in a Reseller Agreement to be discussed by the parties following the date of this Agreement and where a simple means to account for 25% Net Profit or equivalent value will be agreed upon for disbursement of the commission to the Partner by the Company.

1.5  Notwithstanding the foregoing provisions of this Section 1.3, during the term of this Agreement, in the event that the Company is unable to provide the BBPOS and ROAMPay POS solution ("The Solution") in a region or country due to regional or national policies, or the Company's decision of not providing the solution to that region or country, the Partner shall have the option to jointly sell with the Company the BBPOS or ROAMpay POS in that region or country separately independent of the Solution. The ability to jointly sell preserves price integrity and brand integrity of the hardware, avoids channel conflict and can result in higher margin should there be no recurring revenue. To preserve price and branding integrity, the Partner shall sell the BBPOS and ROAMpay POS under ROAM branding. Under this circumstance where the Partner finds the customer and sells the BBPOS or ROAMpay POS jointly with the Company, and no backend services is required, the Partner would receive a commission of 50% of the Margin. Margin is defined as price of product minus cost manufacturing, packaging and Bill of Material.

## 2. APPOINTMENT

2.1  The Company engages the Partner to provide the Services, and the Partner accepts such appointment. The terms of this engagement shall be as set forth herein or in any Statement of Work ("SOW") signed by the parties from time to time. Except as otherwise agreed by the parties, each SOW shall contain each of the following items: description of the services and place of performance; schedule for provision of the Services and performance; the Company's right to own the Devices or any associated work product; costs of the Services and agreed expenses; and invoicing schedule. Any SOW shall be deemed a part of this Agreement. Products, Devices, Deliverables, Services or Specifications referred to in any SOW shall be deemed Products, Devices, Deliverables, Services or Specifications, respectively, under this Agreement.

## 3. PARTNER REPRESENTATIONS, WARRANTIES AND COVENANTS

3.1  The Partner shall promptly provide and deliver to the Company the Products, Devices, Services or other work product ordered or requested by the Company as specified herein or in any SOW (collectively, the "Deliverables").

3.2  The Partner warrants and agrees that it will perform the Services in a professional manner, that it will at all times comply with applicable law in connection with this Agreement, that that it will exercise the highest level of skill and care in the provision of the Services, including without limitation in connection with the design and manufacture of the Devices. All Products, Devices, Deliverables and Services shall be provided in accordance with the applicable Specifications. In the event the Partner receives notice from the Company that any Product, Device, Deliverable or Service is not in compliance with the applicable Specifications or is otherwise not accepted by the Company pursuant to Section 4.1 below, the Partner, as a non-

2

Confidential                                                                                                    AC_0270545

      exclusive remedy of the Company, shall use best efforts to promptly correct such noncompliance or other problem or defect.

3.3    Without prejudice to any rights or remedies of the Company, the Partner shall notify the Company immediately in writing if it encounters any delays or problems in connection with its provision of the Services or otherwise in connection with any Deliverable and shall take all reasonable steps to mitigate any such delay or problem.

3.4    The Partner shall be responsible for ensuring that all Deliverables are provided to the Company in compliance with all applicable import and export laws. The Partner shall be responsible for the payment of all tariffs, duties, customs fees and taxes, and the like in connection with the provision of the Deliverables to the Company in accordance with this Agreement.

3.5    The Partner agrees that the Company may, at any time and for any reason, cancel or suspend any requested Services or Deliverables and that the Company shall not be required to pay for any Services performed or Deliverables delivered in contravention of any such cancelation or suspension.

3.6    To the extent permitted by the Company in writing, it is hereby agreed that the Partner is entitled to sub-contract or otherwise engage any third party that is not competitive with the Company to manufacture the Products pursuant hereto, provided that any such sub-contractor or other third party shall comply with this Agreement and the Partner shall be responsible for any breach hereof, or any other actions or inactions relating to this Agreement, by such sub-contractor or other third party.

3.7    Upon delivery and acceptance of a Deliverable, the Company shall hold good, valid and marketable title to the Deliverable, free and clear of any liens, encumbrances, and restrictions on use, resale or transfer.

3.8    The Partner agrees that, during or after the term of this Agreement, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Devices, or products substantially similar to the Devices, for any third party. The Partner also agrees that, during or after the term of this Agreement, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Products, or products substantially similar to the Products, for any third party (other than in China to the extent permitted in Section 1.3 above).

3.9    The Partner represents and warrants that it has full power to enter into this Agreement and to carry out its obligations pursuant to this Agreement. The Partner represents and warrants that it has obtained all corporate, third party, and governmental approvals and intellectual property rights necessary to enter into this Agreement and carry out the transactions contemplated hereby.

3.10   The Partner represents and warrants that that none of the Products, Devices, Deliverables or Services does or will infringe, misappropriate or violate any intellectual property right of any person. The Partner represents and warrants that that none of the Products, Devices, or Deliverables does or will contain any third-party software or products, other than any third-party software or product that is included therein with the Company's written consent and that in no manner interferes with or limits the Company's right to use or sell such Product, Device or Deliverable. The Partner represents and warrants that it has used, and will use for the Company's benefit, its best efforts to perfect and protect all intellectual rights in the Products, Devices, Deliverables and Services. The Partner shall sign all documents, make all

3

Confidential

AC_0270546

filings and take all actions reasonably requested by the Company in order to perfect and protect the Company's intellectual property rights in the Products, Devices, Deliverables or Services. The Partner shall promptly notify the Company if it becomes aware of any actual or alleged infringement with respect to any Products, Devices, Deliverables or Services.

3.11 The Company may in its discretion, in connection with the performance by the Partner of its obligations under this Agreement, provide the Partner with the use of rights or property owned or used by the Company ("Company Property"). Company Property shall be used by the Partner only for its intended purpose during the term of this Agreement and shall be promptly returned to the Company upon termination of this Agreement or earlier at the request of the Company. Company Property and all rights therein shall at all times remain the sole property of the Company, subject only to the Partner's limited right to use Company Property as set forth in this Section 3.11. Without limiting the generality of the foregoing provisions of this Section 3.11, the Partner shall not use any Company Property in connection with the provision of products or services for any person other than the Company.

3.12 The Partner agrees that the Company is and shall be the sole and exclusive owner of all right, title and interest, including all intellectual property rights, in and to all Deliverables (other than Products), that all Deliverables (other than Products) are deemed "works for hire" for the Company, and that all rights in all Deliverables (other than Products) that are not otherwise vested in the Company are hereby irrevocably assigned and transferred to the Company. Without limiting the generality of the foregoing, the Partner agrees that the Company is the sole and exclusive owner of all rights in and to the Software (as defined below), that no proprietary rights, including but not limited to copyrights and patents in the Software, are being retained by or transferred to the Partner, and that the Company is the exclusive owner of all right, title and interest, including all intellectual property rights, in and to any and all source code developed solely by or for the Partner related to or in support of any object code of the Software. As used in this section, "Software" means the mobile applications developed by the Partner on behalf of the Company.

3.13 The Partner represents and warrants that each Deliverable will not contain any malicious code, programs or other components (e.g., computer "virus", computer "worm", computer time bomb, "Trojan horse", "back door", or similar component) or any other code, program or other component that would have the effect of damaging, destroying, disabling, or otherwise shutting down, or altering the functionality of or specifications for, or restricting the use of or access to, all or any portion of any Deliverable.

3.14 The Partner acknowledges that this Agreement contains no minimum purchase commitments and that the Company is not expressing or implying any commitment or guarantee as to the scope of work or orders from the Partner.

3.15 The Partner shall at its own cost maintain adequate and appropriate insurance policies as are necessary to cover its obligations and liabilities under this Agreement and shall furnish to the Company upon request proof of such insurance.

3.16 The Partner hereby warrants to the Company and its customers that for 12 months the Products, Devices and Deliverables will be free from defects and operate as intended and in accordance with all applicable Specifications and other documentation.

4

Confidential                                                                                                    AC_0270547

3.17 The Products and Devices will be packaged and shipped by the Partner. The Company will pay for appropriate shipping costs from Hong Kong to Boston, MA.

3.18 The Partner agrees to indemnify and hold the Company harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Partner or arising out of or resulting from any claim brought by a third party against the Company as a result of or relating to any actual or alleged breach hereof.

## 4. COMPANY REPRESENTATIONS, WARRANTIES AND COVENANTS

4.1 In consideration of and subject to the Partner complying with its obligations under this Agreement, the Company agrees to pay the Partner the consideration referred to in Schedule II. All cash payments are paid in U.S. dollars, it being understood that any prices quoted are for FOB Hong Kong (unless otherwise specified). The Company will have 10 days upon delivery to inspect the Products, Devices, or Deliverables and shall be required to remit payment to the Partner only upon the Company's acceptance thereof. Such acceptance by the Company of any Product, Device or Deliverable shall not be deemed a waiver of any rights or remedies of the Company with respect thereto. If the Company does not accept any Product, Device or Deliverable, it shall notify the Partner in writing of such non-acceptance and the reason therefor. The Company may withhold from any payments any amounts that the Company reasonably determines are appropriate under applicable law.

4.2 The Company represents and warrants that it has full power to enter into this Agreement and to carry out its obligations pursuant to this Agreement. The Company also represents and warrants that it has obtained all corporate, third party, and governmental approvals and intellectual property rights associated with the Products necessary to enter into this Agreement and carry out the transactions contemplated hereby.

4.3 The Company agrees to indemnify and hold the Partner harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Company or arising out of or resulting from any claim brought by a third party against the Partner as a result of or relating to any actual or alleged breach hereof by the Company. In the event of any such claim, the Partner agrees to notify the Company promptly of the claim and to permit the Company at the Company's expense, to assume control of the defence thereof with counsel of the Company's choosing, and cooperate with the Company in such defence at the Company's expense.

## 5. TERM AND TERMINATION

5.1 This Agreement shall become effective upon execution and shall continue in full force unless or until terminated (a) by the written consent of the parties or (b) by either party pursuant to Section 5.3 below. Nothing in this clause shall prejudice the continued application of those terms and conditions intended to have effect after termination of this Agreement.

5.2 Upon termination of this Agreement, the Partner shall, at the Company's option, either (a) immediately deliver to the Company all finished and incomplete

Confidential                                                                AC_0270548

Case 1:19-cv-11457-IT   Document 188-3   Filed 06/22/22   Page 6 of 16

May 06 2010 8:12AM    ROAM DATA                    6179040151                    p.6

        Deliverables at costs payable by the Company or (b) the Partner may sell such finished Products in China until such Products are sold out.

5.3    Either party may immediately terminate this Agreement by notice to the other party in the event that:

    (a)    the other party becomes insolvent, files for bankruptcy, discontinues all or a substantial portion of its business operations, and cannot perform its obligations; or

    (b)    the other party breaches any provision of this Agreement and such breach is not remedied within 30 days after receipt of notice from the first party requiring it to remedy such breach.

5.4    The Company agrees that it and its affiliated companies shall distribute the minimum aggregated total of 10,000 Products from the Partner in each full calendar year for the duration of this Agreement. In the event the company fails to meet the Minimum order for a full calendar year starting 2011, the Partner may immediately terminate this agreement.

6.    **CONFIDENTIALITY**

6.1    Both parties agree to treat the other party's Confidential Information (as defined below) as confidential, to take all reasonable measures to protect and prevent the disclosure of and/or unauthorized use by third parties of the other parties' Confidential Information, to exercise at least the same degree of care exercised for the protection of its own Confidential Information, and to not use Confidential Information other than for its intended purpose under this Agreement.

6.2    "Confidential Information" shall mean information (whether written or oral) of a confidential or proprietary nature concerning this Agreement or the assets, products or business of any party hereto that either party shall have obtained as a result of discussions or communications related to this Agreement or the transactions contemplated undertaken by this Agreement, including (but not limited to) in the case of the Company, the technical and other information concerning the Products and Devices and related documentation. Without limiting the generality of the foregoing, the terms and conditions of this Agreement are hereby deemed Confidential Information. Also without limiting the generality of the foregoing, if either party hereto receives from the other party written information that is marked "Confidential" and/or "Proprietary", such information shall be deemed "Confidential Information." The obligation to keep Confidential Information confidential shall not apply to any information that has been disclosed in publicly available sources; is, through no fault of the party receiving the confidential information, hereafter disclosed in a publicly available source; or is in the rightful possession of the party receiving the confidential information without an obligation of confidentiality.

6.3    Notwithstanding any provision herein to the contrary, a party may disclose Confidential Information on a need-to-know basis to its contractors, lawyers, accountants and agents, provided that any such person is bound by a duty of confidentiality, and such party shall be responsible for any disclosure or use by any such third party in contravention hereof. In addition, a party may disclose Confidential Information if such party reasonably determines that such disclosure is required by law, provided that such party shall endeavour to minimize the extent of such disclosure and, if possible, provide the other party with prior notice of the disclosure

6

Confidential                                                      AC_0270549

May 06 2010 8:14AM  ROAM DATA  6179040151  p.7

so as to allow such other party to seek a protective order to prevent or limit the disclosure.

6.4 Upon termination of this Agreement, each party shall promptly return to the other, or certify that it has destroyed, any documents or other materials containing Confidential Information of the other party. In addition, during the term of this Agreement, at the request of a party, the other party shall return any documents or other materials containing Confidential Information of the requesting party.

6.5 The obligation not to disclose shall continue for a period of five (5) years after the termination of this Agreement.

## 7. NO PARTNERSHIP OR AGENCY

7.1 Nothing in this Agreement shall have the effect of constituting either the Company or the Partner as an agent of the other, and neither is authorized to make any representation nor incur any obligation of any kind on behalf of the other party, nor to bind the other party in any way. This Agreement shall not be construed as creating any joint venture, partnership or agency agreement between the Company and the Partner.

## 8. AMENDMENT

8.1 Any amendment or waiver to this Agreement shall be in writing and signed by the parties.

## 9. ASSIGNMENT, SUB-LICENSING

9.1 The Partner shall have no right to assign, sub-licence, divest or otherwise delegate or purport to transfer any of its rights and obligations under this Agreement without the prior written consent of the Company except as expressly set out in this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

9.2 The Company shall have rights to the design of the ROAMpay POS, and to all engineering and Gerber files, and tooling so that it can manufacture the Products with a vendor of its choice. If Partner is not able to perform the Services properly or cost effectively, as determined by the Company, the Company has the right to source the Services elsewhere, and the Partner will provide all required or requested materials and information to the Company. If the Products or Devices incorporate Partner-owned IP, the Company is hereby granted a worldwide, perpetual, fully paid, sublicensable license to use the Partner IP to continue developing, manufacturing and selling the Products and Devices. The Company shall have to right to request such designs, files, tooling from the Partner provided all payments to the Partner within this agreement has been paid for.

## 10. SEVERABILITY

10.1 If, at any time, any one or more of the provisions in this Agreement is or are deemed to be invalid, illegal, unenforceable or incapable of performance in any respect, the validity, legality, enforceability or performance of the remaining provisions of this Agreement shall not be affected.

## 11. WAIVER

7

Confidential

AC_0270550

11.1 No failure or delay by either party in exercising any right, power or privilege to which it is entitled shall operate as a waiver nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise.

11.2 For the avoidance of doubt, any waiver of any breach of the Agreement by either party shall not be construed as a waiver of any subsequent breaches of that same or any other provision.

## 12. ENTIRE AGREEMENT

12.1 All agreements and obligations herein contained shall be in substitution for and shall supersede all and any previous agreements or understandings, oral or written, between the parties with respect to the subject matter hereof.

## 13. SCHEDULES

13.1 All schedules to this Agreement constitute integral parts of this Agreement.

## 14. HEADINGS

14.1 The headings inserted in this Agreement are for convenience only and shall not affect the construction of this Agreement.

## 15. NOTICES

15.1 Any notice or other information required or authorised by this Agreement to be given by either party to the other may be given by hand or sent (by reputable International courier that guarantees delivery in 5 or fewer days, or by facsimile transmission) to the other party at its address referred to in preamble of this Agreement.

15.2 Any notice or other information served pursuant to 15.1 shall be deemed to have been served when delivered by hand at the time of delivery and, when sent by international courier as provided above, 5 days after the date of sending and, when sent by facsimile, on the date of transmission.

## 16. APPLICABLE LAW

16.1 This Agreement shall be governed by and construed in all respects in accordance with the laws of Massachusetts, USA and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the courts of Massachusetts. Either party may require that any dispute concerning this Agreement that is not resolved by the parties within 30 days be resolved by binding arbitration in Boston, Massachusetts using one arbitrator and the Commercial Arbitration Rules of the American Arbitration Association.

Confidential                                                                       AC_0270551

IN WITNESS whereof the parties hereto have executed this Agreement the day and year first above written.

SIGNED by

for and on behalf of
**ROAM Data, Inc.**

Will Graylin, CEO,

SIGNED by

for and on behalf of
**BBPOS (Hong Kong) Limited**

Ben Lo, CEO

9

Confidential                                                                                                                AC_0270552

## SCHEDULE I

### PRODUCTS, DEVICES, SERVICES AND SPECIFICATIONS

#### The Products

- Encrypted Circle Swipe reader, sometimes referred to as the "Crypto Swipe" or "ROAMpay Swipe" that has ability to generate capacitance for encryption from the audio jack of a mobile device or PC, this was developed by the Partner, and including any variance of this design.
- EMV capable POS unit with Bluetooth interface, sometimes referred to as the "BBPOS" currently completing certification.

#### The Solution

- Payment solution using the BBPOS or ROAMpay POS as the customer facing hardware terminal and transact via any ROAM Data payment gateway or equivalent software backend for recurring revenue and services.

#### The Devices

- The "ROAMpay POS" EMV terminal developed by the Contactor based on the foundation of BBPOS, is the "Device" that will be owned by ROAM. *ROAMpay POS*

#### The Services and Specifications

- The Services shall include appropriate design and manufacturing services to produce the Cyrpto Swipe devices, including without limitation key injection and support with respect to software to port to ROAMplayers on a variety of devices.

- The Services shall include Software development services.

- The Services and Devices shall include the design and development of the ROAMpay POS device which includes EMV L1, L2, and PCI certifications. ROAMpay POS shall contain, enough memory to run applications including a ROAMplayer, it shall contain WIFI, has ability to interface with other mobile phones like the iPhone, and can adapt to a portable low cost printer. This printer shall be produced by the Partner. Future versions of the ROAMpay POS may contain NFC.

- The Partner shall provide at minimum one dedicated resource with iPhone, Android, Blackberry development skills to help with ROAMplayer and mobile application development, and at minimum two dedicated resource for server side development, with DB, C#, .Net skills. Four development resources along with a project manager will be made full time available to Company.

- Other Devices, Services and Specifications may be set forth in any SOW.

10

Confidential                                                                    AC_0270553

## SCHEDULE II

## PAYMENTS for Engineering Development and Licensing

- $250,000 for development, certification and Licensing of ROAMpay POS, which can include additional cost for certification, to be paid as follows: $50,000 upon signing of this agreement, $50,000 upon working prototype of the ROAMpay POS product, $50,000 upon PCI PED certification, and $50,000 upon EMV L1 and L2 certification, $50,000 upon integrating EMV application with ROAMplayer application via Bluetooth. *Additional out of pocket cost of EMV and PCI PED certification of the ROAMpay POS will be paid by Company to Partner.*

- $50,000, to be paid at the time of signing as part of the exclusive license to the Products. Note that any funds from previous contracts on FSK reader and non-encrypted reader can be applied towards money due from the Company to the Partner for this agreement and future orders of product.

- ROAM will be the exclusive distributor of the Products and Devices, Cyrpto Swipe (branded ROAMpay Swipe) and ROAM will provide margin of $3 per Crypto Swipe unit and $7 per BBPOS or ROAMpay POS unit above cost of manufacturing, packaging and BOM (Bill of Material), paid to BBPOS for delivering the units to ROAM as part of the invoice for hardware. These margins will be built into the price per unit charged to ROAM which also include BOM and manufacturing costs. For the case of BBPOS or ROAMpay POS sales referred by the Partner and where only hardware is sold, both parties will split the margin with 50% of the Margin going to the Partner, in accordance with section 1.5 of this agreement.

- $25,000 per month for four (4) dedicated programmers or development resources include one (1) project manager to help the Company with ongoing software development for ROAMplayer, ROAM Server side work, Internationalization, and other software work. ROAM may request to scale these development resources up or down based on its discretion, and what is happening in the market. To be clear, the Company is separately outsourcing the Partner in this clause to provide development resources for the Company, which can go up or down, this variable cost is purely for engineering development and is not consideration for licensing under this agreement.

- The Company will issue the Partner an option or warrant to purchase 100,000 shares of Company common stock option, with strike price of $0.12, subject to Company board approval and the parties entering into an option or warrant agreement (which shall provide, among other provisions, that upon termination of this Agreement the option or warrant shall terminate and the Company shall have the right to repurchase the shares), and subject to the Company being satisfied that it has obtained all required corporate or contractual consents for the issuance and that such issuance is in compliance with applicable law.

- In the event the Partner refers any services to the Company, the Company shall pay to Partner an amount equal to 25% of the Company's net profits from such services as described in section 1.4 of this agreement.

11

Confidential                                                                                                    AC_0270554

## AMENDMENT TO ENGINEERING DEVELOPMENT AND LICENSE AGREEMENT

Amendment to Engineering Development and License Agreement made as of May 4, 2010 (the "Agreement") by and between ROAM Data, Inc., a Delaware corporation with its head office situated at 280 Summer Street, Lobby Level, Boston, MA 02210, fax no. +1 617 249 1661 (the "Company"), and BBPOS LIMITED, a Hong Kong corporation with its address situated at Room 810, 8/F, Grand City Plaza, 1 Sai Lau Kok Road, Tsuen Wan, H.K., (the "Partner").

WHEREAS, the Agreement originally contemplated an exclusive product license; and

WHEREAS, Partner filed or caused to be filed US Patent Application Number 12/767,831 for secure audio coupled card swiper filed on April 27, 2010 with the United States Patent and Trademark Office (the "Patent Application"); and

WHEREAS, the Company and Partner wish to amend the Agreement to include the Patent Application within the scope of the exclusive license grant under the Agreement, to clarify that the scope of the license grant under the Agreement includes any other intellectual property rights of the Partner relating to the Products and to make certain further amendments to the Agreement;

NOW THEREFORE, for good and valuable consideration the receipt of which is hereby acknowledged, the Company and Partner hereby agree as follows:

1. Section 1.1 of the Agreement is hereby amended and restated to read in its entirety as follows:

    "1.1 The Partner hereby grants to the Company a worldwide, perpetual, fully-paid license to freely use the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and distribute the Products, any portion thereof, or any products similar to or based upon any Products. For purposes of this Agreement, "Partner Intellectual Property" shall mean: (a) any and all patents and patent applications relating to the Products, including without limitation US Patent Application Number 12/767,831 for secure audio coupled card swiper filed on April 27, 2010 with the United States Patent and Trademark Office (the "Patent Application") and any patents issuing on the Patent Application, including (i) any reissues, renewals, reexaminations, substitutions or extensions thereof and foreign equivalents of the foregoing; (ii) any claim of a continuation-in-part application or patent that is entitled to the priority date of, and is directed specifically to subject matter specifically described in, the Patent Application; (iii) any foreign counterpart thereof (including PCTs); and (iv) any supplementary protection certificates and any other patent term extensions, restorations and exclusivity periods and the like of the Patent Application; and (b) any copyrights, trademarks, trade names, trade secrets, knowledge, data and information owned or controlled by the Partner relating to the Products."

2. Section 1.3 of the Agreement is hereby amended and restated to read in its entirety as follows:

CONFIDENTIAL

IngenicoInc_0268234

"1.3 The license granted in Section 1.1 is exclusive on a worldwide basis (with the exception of China, Philippines, as set forth below and Section 1.5). Without limiting the generality of the foregoing, the Partner may not, directly or indirectly, anywhere in the world, use or sell any Products, or any portion thereof, or any products similar to or based upon any Products (other than as explicitly provided in this Agreement) or grant any other person rights to the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and distribute any Products, any portion thereof, or any products similar to or based upon any Products. Notwithstanding the foregoing provisions of this Section 1.3, the Partner shall retain the non-exclusive, non-transferrable right to sell the Products in China for use in China and sell the Products in Philippines for use in Philippines."

3. The following new Section 4.4 is hereby inserted immediately following Section 4.3 of the Agreement:

"4.3 In the event that any person is infringing or misappropriating the Partner Intellectual Property within the Company's exclusive geographic field, the Company shall have the first right, but not the obligation, to institute, prosecute and control legal proceedings and/or administrative proceedings to prevent or restrain such infringement or misappropriation, at its own expense. In the event that the Company elects to initiate legal proceedings and/or administrative proceedings in accordance with the preceding sentence, the Company shall be required to deliver notice of such election to the Partner. The Partner shall assist in the prosecution of such proceedings as reasonably requested by the Company at the Company's expense, and the Partner may participate in such proceedings with its own counsel, at its sole cost and expense. Any recoveries from such proceedings shall first be used to reimburse the Company for the costs and expenses associated with the proceedings (including amounts used to reimburse the Partner for expenses incurred by the Partner for assistance requested by the Company). If any recoveries still remain, the balance shall be paid to the Company."

4. That Schedule II to the Agreement is hereby deleted in its entirety and replaced by Schedule II attached hereto.

5. Any capitalized terms used herein without express definition shall have the respective meanings defined for them in the Agreement.

6. The parties hereby confirm and acknowledge the continuing validity and enforceability of the Agreement as amended hereby.

CONFIDENTIAL

IngenicoInc_0268235

IN WITNESS whereof the parties hereto have executed this Amendment to Engineering Development and License Agreement, effective as of August 15, 2011.

SIGNED by )
)
for and on behalf of )
**ROAM Data, Inc.** )
in the presence of:- )

_____      _____
**Will Graylin, CEO,**

SIGNED by )
)
for and on behalf of )
**BBPOS (Hong Kong) Limited** )
in the presence of:- )

_____      _____
**Ben Lo, CEO**

CONFIDENTIAL
IngenicoInc_0268236

## SCHEDULE II

### PAYMENTS for Engineering Development and Licensing

- $250,000 for development, certification and Licensing of ROAMpay POS, which can include additional cost for certification, to be paid as follows: $50,000 upon signing of this agreement, $50,000 upon working prototype of the ROAMpay POS product, $50,000 upon PCI PED certification, and $50,000 upon EMV L1 and L2 certification, $50,000 upon integrating EMV application with ROAMplayer application via Bluetooth. *Additional out of pocket cost of EMV and PCI PED certification of the ROAMpay POS will be paid by Company to Partner.*

- $50,000, to be paid at the time of signing as part of the exclusive license to the Products. Note that any funds from previous contracts on FSK reader and non-encrypted reader can be applied towards money due from the Company to the Partner for this agreement and future orders of product.

- ROAM will be the exclusive distributor of the Products and Devices, Cyrpto Swipe (branded ROAMpay Swipe) and ROAM will provide margin of $3 per Crypto Swipe unit (which shall be reduced to a margin of $2 per unit for sales above 150,000 cumulative units) and $7 per BBPOS or ROAMpay POS unit above cost of manufacturing, packaging and BOM (Bill of Material), paid to BBPOS for delivering the units to ROAM as part of the invoice for hardware. These margins will be built into the price per unit charged to ROAM which also include BOM and manufacturing costs. For the case of BBPOS or ROAMpay POS sales referred by the Partner and where only hardware is sold, both parties will split the margin with 50% of the Margin going to the Partner, in accordance with section 1.5 of this agreement.

- $25,000 per month for four (4) dedicated programmers or development resources include one (1) project manager to help the Company with ongoing software development for ROAMplayer, ROAM Server side work, Internationalization, and other software work. ROAM may request to scale these development resources up or down based on its discretion, and what is happening in the market. To be clear, the Company is separately outsourcing the Partner in this clause to provide development resources for the Company, which can go up or down, this variable cost is purely for engineering development and is not consideration for licensing under this agreement.

- The Company will issue the Partner an option or warrant to purchase 100,000 shares of Company common stock option, with strike price of $0.12, subject to Company board approval and the parties entering into an option or warrant agreement (which shall provide, among other provisions, that upon termination of this Agreement the option or warrant shall terminate and the Company shall have the right to repurchase the shares), and subject to the Company being satisfied that it has obtained all

CONFIDENTIAL

IngenicoInc_0268237

required corporate or contractual consents for the issuance and that such issuance is in compliance with applicable law.

* In the event the Partner refers any services to the Company, the Company shall pay to Partner an amount equal to 25% of the Company's net profits from such services as described in section 1.4 of this agreement.

CONFIDENTIAL

IngenicoInc_0268238