

Deposition of:
# William Graylin

*August 31, 2021*

In the Matter of:

# Anywhere Commerce Inc., Et Al. Vs. Ingenico Inc., Et Al.

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

Page 6

1  A   -- and then got my master's degrees.
2      Finished that up in 2000.
3  Q   All right. And what was your master's degree
4      in?
5  A   Electrical engineering, and computer science,
6      and business.
7  Q   And then you went to the US Nuclear Power
8      School, you said. What were the years for
9      that?
10 A   '93.
11 Q   Okay. And what did you do after graduating
12     from MIT in 2000?
13 A   I started four different companies and I'm
14     currently on my fifth and sixth.
15 Q   Okay. And could you tell me what the -- just
16     so I know, what were the companies you
17     started and roughly what the years were?
18 A   So in -- in 2000 I started EntitleNet. It
19     was acquired by BEA Systems, later Oracle.
20     And then in 2002, I started Way Systems and
21     later acquired by Verifone. And then, in
22     2007-ish, I started ROAM Data, and it was
23     acquired by Ingenico. And then, late 2012, I
24     started LoopPay and that was acquired later

Page 7

1      by Samsung.
2  Q   Okay. What was the business of LoopPay?
3  A   A digital wallet that lets you tap and pay
4      just about everywhere.
5  Q   Okay. And very briefly, what are the
6      companies that you are working on now, number
7      five and six?
8  A   OV Loop, which is a next-generation connected
9      commerce platform for engagement, loyalty,
10     and payments. And Indigo Technologies, which
11     is a next-generation electric vehicle
12     solution focused on delivery and ride-hail.
13 Q   Okay. So I want to focus now on ROAM Data
14     you started in 2007. What caused you to
15     start ROAM Data in 2007?
16 A   Well, it was mobile payments as I -- as I had
17     been working on. And for mobile payments, we
18     created a smartphone-based mobile payment
19     acceptance solution. And so that was the --
20     you know, the genesis between myself, my
21     co-founder. And we basically built a mobile
22     point of sale services platform.
23 Q   Okay. How did BBPOS play into ROAM Data's
24     business?

Page 8

1          MR. WRAY: Objection to form.
2  Q   You can answer. And goodness, I can't
3      imagine it'll happen. So let me just get it
4      out of the way, but if for some -- I don't
5      think you're represented today by anybody; is
6      that correct?
7  A   No.
8  Q   Okay. Well, then, so from time to time he
9      may object. From time to time if I -- if
10     he's asking questions at some point, I may
11     object.
12 A   Okay.
13 Q   But unless -- you know --
14 A   I mean, I should be -- yeah.
15 Q   -- you should go ahead and answer if you
16     understand.
17 A   Yeah. I -- I think I understand. I mean,
18     BBPOS was a vendor to -- to ROAM Data. And
19     so we used -- we used their reader solution
20     in our overall payment solution.
21 Q   How did you first become aware of BBPOS, if
22     you recall?
23 A   Let's see. I learned about Ben Lo that he
24     had a reader solution. So I called up Ben in

Page 9

1      Hong Kong to learn more about it. And then
2      -- and then from that early discussion I was
3      interested in his hardware with his firmware
4      that we could use because we were building,
5      you know, the applications, the back end, the
6      gateways in the United States. And it seemed
7      like a potential fit so we explored it. It
8      turned out to be a fit. We started acquiring
9      and purchasing some of their products.
10 Q   I'll show you documents at some point, but
11     I'd like to use as much of your memory as I
12     can before showing you documents. Do you
13     recall roughly what year or months that you
14     became acquainted with Ben Lo?
15 A   Let's see. I think it was somewhere around
16     -- I want to say somewhere around -- close to
17     '08.
18 Q   Could you tell me what -- when you say that
19     you started to do business with BBPOS, what
20     products or services did BBPOS supply to ROAM
21     Data?
22         MR. WRAY: Objection. Vague as to
23     time.
24 A   It was a reader, initially. And then --

Page 10

1 yeah.
2 Q   Okay. And when you say "Reader, initially,"
3     do you have a sense of when that came about?
4 A   I guess closer to '08, '09, somewhere around
5     there.
6 Q   Did the relationship between BBPOS and ROAM
7     Data evolve thereafter?
8 A   I mean, they were a supplier for -- for quite
9     some time, all the way up until even when I
10    was -- when I was leaving ROAM Data, they
11    were still a supplier.
12 Q   Okay. And when you say, "A supplier," a
13    supplier of readers?
14 A   Readers, yeah.
15 Q   Were they supplying anything else at the time
16    that you recall?
17 A   Mostly just readers. Yeah.
18 Q   Does the term CircleSwipe mean anything to
19    you?
20 A   I think it's the readers, you know, the same
21    -- same readers that we used to white-label
22    and sell to our -- our clients.
23 Q   Okay. What role did BBPOS then play in
24    connection with ROAM Data's selling of

Page 11

1    CircleSwipes?
2 A   We white-labeled the solution and they
3    manufactured it and delivered to us. And
4    then we -- we distributed it.
5 Q   What was ROAMpay?
6 A   ROAMpay.
7 Q   Yeah, if you recall.
8 A   I think it was just a branding that we had.
9    I mean, we had a -- we had a lot of
10   white-label solution that we branded for
11   customers.
12 Q   Okay.
13 A   Yeah.
14 Q   And what was the relationship between ROAM
15   and Ingenico?
16 A   Oh, Ingenico first invested in ROAM, and
17   later on they had a more significant -- more
18   significant stake, and then, eventually, they
19   acquired the company.
20 Q   Okay. Do you recall when they initially
21   invested in ROAM?
22 A   I want to say somewhere around '09. I think
23   --
24 Q   Okay.

Page 12

1 A   -- something like that, yeah.
2 Q   Mr. Wray can't help you with that one, but...
3 A   Yeah. I mean, you guys have the record.
4 Q   That's right.
5 A   Yeah.
6 Q   And, you know, again, I'm not trying to
7    create anything odd on the record, but it's
8    nice to just get your memory as you remember
9    it. What --
10 A  Yeah.
11 Q  Do you recall how much that initial
12   investment was?
13 A  It's a single-digit millions. Yeah.
14 Q  And then, you said that later they had a more
15   significant stake. Do you recall when that
16   was?
17 A  I think that was maybe closer to '11 --
18 Q  Okay.
19 A  -- 2011.
20 Q  And what --
21 A  Maybe -- maybe 2012. Could be early 2012.
22 Q  And what was the -- what was that more
23   significant stake, as you recall?
24 A  It was a few tens of millions. But I can't

Page 13

1    remember exactly how many tens of millions.
2 Q   Okay. And then, you said that eventually,
3    Ingenico acquired ROAM?
4 A   Yeah.
5 Q   Do you recall when that acquisition was
6    consummated?
7 A   They took majority -- they had majority
8    control by -- by 2012, and then, I think, the
9    rest of the conclusion was probably -- I want
10   to say '14, sometime. Sometime '14, I think.
11   Best I can recall.
12 Q   Okay.
13 A   Yeah. The specific dates you can find, I'm
14   sure.
15 Q   Do you recall being in litigation -- do you
16   recall being a part of a litigation by --
17   between yourself and Ingenico?
18 A   Uh-huh. Yes.
19 Q   What do you recall of the nature of that
20   litigation?
21 A   The nature of that litigation was regarding
22   -- was regarding the fairness and treatment
23   of the shareholders and -- and the shares
24   that ultimately were acquired by, you know,

4 (Pages 10 - 13)

Page 14

1  Ingenico at a particular price for all
2  shareholders.
3  Q   When you say fairness and treatment of
4      shareholders, what do you recall about your
5      concerns respecting the fairness and
6      treatment of shareholders?
7  A   I think we had a disagreement on what -- you
8      know, what Ingenico was going to pay the
9      shareholders for the rest of the shares, you
10     know, for the acquisition, and that was what
11     I recall.
12 Q   Okay.  Do you recall -- and I'm going to
13     mispronounce the name, I apologize -- a
14     fellow named Chris Rotsaert?
15 A   Rotsaert?
16 Q   Rotsaert, yeah.
17 A   Rotsaert.
18 Q   I was saying it a little French.  So it's
19     Rotsaert.  Yes.  What do you recall of him?
20 A   Yeah.  He was working for Ingenico at the
21     time and he was spending time at the Boston
22     office at ROAM Data.
23 Q   Do you recall any concerns about Mr.
24     Rotsaert's allegiances when he was working at

Page 15

1  the Boston office of ROAM Data?
2  A   I mean, it was clear that he was an employee
3      of -- of Ingenico, of course.  But overall,
4      you know, we -- at ROAM Data, Ingenico was
5      the largest shareholder.  You know, we were
6      partners with Ingenico, and -- but we were
7      not fully, you know, acquired at that time.
8  Q   Was ROAM paying part of Mr. Rotsaert's salary
9      at that time, if you recall?
10 A   I can't recall whether he was officially paid
11     by ROAM Data or Ingenico.  You'd -- you'd
12     have to look at the records.
13 Q   Got it.  Do you have any -- do you recall of
14     any concerns about Mr. Rotsaert's treatment
15     of intellectual property belonging to ROAM?
16 A   I mean, we gave them -- we gave them access
17     to our own data.  So we were partners, so we
18     were -- we were fairly freely sharing our own
19     intellectual property with -- with Ingenico
20     at that time, but there was still a wall
21     between ROAM Data and Ingenico as two
22     separate companies.
23 Q   Okay.  And were you concerned about the
24     treatment by Mr. Rotsaert of any intellectual

Page 16

1  property or learning that belonged to BBPOS?
2  A   I mean, he was doing some due diligence
3      because I recommended to Ingenico that, you
4      know, we make an acquisition of BBPOS at one
5      point, and -- and I think that net -- that
6      deal really never took place.  And I think --
7      I don't remember if Mr. Rotsaert was part of
8      the DD that went over to BBPOS to do due
9      diligence, but there was definitely some due
10     diligence that were done and, ultimately,
11     that didn't pan out.
12         MR. KESSLER:  I'm going to mark this
13     as Exhibit 1.
14 (Whereupon, Exhibit No. 1, the engineering
15     development and license agreement between
16     ROAM Data and BBPOS, is marked for
17     identification.)
18         MR. KESSLER:  Here you go.
19         MR. WRAY:  Thank you.
20         MR. KESSLER:  You're welcome.
21         THE WITNESS:  Thank you.
22     BY MR. KESSLER:
23 Q   I'm going to show you Exhibit 1 -- what's
24     been marked as Exhibit 1.  Please take

Page 17

1  whatever time you need to review it.  My
2  first question to you will be:  Do you
3  recognize this?
4  A   Let me grab my glasses.
5  Q   Sure.
6  A   Thinner than --
7          MR. WRAY:  I'm sorry.  Did that come
8      out of here?
9          THE WITNESS:  Yeah.
10         MR. KESSLER:  Yeah.  All right.
11         THE WITNESS:  Okay.  Yeah.
12     BY MR. KESSLER:
13 Q   And what is it you're looking at now?
14 A   This is the engineering development and
15     license agreement from May of 2010 between
16     ROAM Data and BBPOS.
17 Q   Okay.  Did you play a hand in negotiating
18     this?
19 A   Yeah, I did.
20 Q   Okay.  Who did you negotiate this with?
21 A   Just Ben.
22 Q   Were you the primary person from ROAM Data
23     who was negotiating this?
24 A   Yep.

Page 18

1  Q  I want to ask you about the warehouse clause
2     on Page 1 of the agreement, specifically,
3     "Warehouse Clause B" where it says "The
4     company wishes to obtain an exclusive license
5     to use and sell the products identified in
6     Schedule 1." Do you recall what that meant or
7     referred to?
8  A  Yeah, I think we were -- we were getting an
9     exclusive deal from BBPOS to -- to distribute
10    in our territory.
11 Q  To distribute the products in your territory?
12 A  Yeah.
13 Q  Okay. And I see Schedule 1 is referenced,
14    and Schedule 1 is on Page 10 of the document.
15 A  Yeah.
16 Q  And what was your -- what is your
17    understanding of the products that were
18    actually at issue in the disagreement?
19 A  Really the readers. And then, later on, they
20    were going to look at maybe buildings and
21    additional readers beyond the plug-in. So
22    the first one was plugging into the, you
23    know, audio jack. And then, later on, there
24    was a Bluetooth version.

Page 19

1  Q  Okay. I see a reference to -- on Page 10 to
2     the products. And the first -- there are two
3     bullet points.
4  A  Uh-huh.
5  Q  The first bullet point starts, "Encrypted
6     CircleSwipe readers, sometimes referred to as
7     a crypto swipe or ROAMpay Swipe." If you
8     could tell me more about what that one was?
9     I apologize if this is --
10 A  Yeah, no, this is just a plug-in -- plug-in
11    reader into the audio jack.
12 Q  Okay. And when you say, "Just a plug-in
13    reader into the audio jack," for somebody
14    who's not -- not nearly technically savvy as
15    you, what does that mean?
16 A  That means you can plug in a reader into the
17    audio jack of a phone and be able to
18    communicate and capture a track data from the
19    reader, and then putting it back into the
20    application, and then the application can
21    send it off as a point of sale device.
22 Q  Okay. And the reader, of course, is a credit
23    card reader.
24 A  Yes.

Page 20

1  Q  Okay. And why did ROAM enter into this
2     contract with BBPOS for this CircleSwipe or
3     crypto swipe, if you know?
4  A  Yeah. Why?
5  Q  Yes.
6  A  Because they had a good product that we could
7     use and -- and market. Yeah.
8  Q  So let me ask you about the second bullet
9     point under the report that's on Exhibit 1.
10 A  Uh-huh.
11 Q  It says, "EMV capable POS" -- point of sale
12    -- "unit with Bluetooth interface, sometimes
13    referred to as the BBPOS, currently
14    completing certification."
15 A  Okay.
16 Q  Could you tell me what that was about?
17 A  So that's -- instead of connecting through
18    the -- through the audio jack, this would
19    communicate via Bluetooth. And it's a reader
20    that BBPOS was building at the time, but it
21    was not yet ready for market. So we
22    anticipated that we would -- we would utilize
23    that product for -- for market.
24 Q  And would that be a product that was -- it

Page 21

1     would be called ROAMpay; do you recall?
2  A  I think we just branded it ROAMpay as a
3     product name for -- for our readers. So
4     ROAMpay was kind of a generic branding for --
5     for our solution.
6  Q  Okay. Now, this engineering and license
7     agreement, this was a product license
8     agreement, correct?
9  A  I believe so. Yes.
10 Q  Okay. I'd like to ask you about -- back to
11    Page 1 of this. It says under 0.1 License,
12    specifically 1.2, it says, "The license
13    granted in Section 1.1 is not transferable or
14    assignable in the event of sale of the
15    company to a competitor with its own point of
16    sale products without prior written consent
17    of the partner, not to be unreasonably
18    withheld." Do you recall what that meant?
19 A  Yeah. I think it's pretty well
20    self-explanatory. You know, basically, it
21    says that without -- without BBPOS prior
22    knowledge, you know, this -- this agreement
23    is not transferable or assignable in the
24    event of a sale of the company to a

Page 22

1 competitor.
2 Q Now, does this -- does this agreement come
3 into play as a transfer of patents in some
4 way?
5 MR. WRAY: Objection to form.
6 A No. It was a technology development and
7 license.
8 Q Thank you. Do you recall, was -- did this
9 agreement prevent BBPOS from selling the very
10 same crypto swipe or CircleSwipe readers that
11 ROAM is selling in, say, North America?
12 A I think there was some level of exclusivity
13 in our territory as I recall. There's some
14 -- like, okay, it says here in 1.4, "During
15 the term of this agreement, partner will have
16 non-exclusive rights to resell BBPOS, ROAMpay
17 POS solution described in Schedule A. The
18 partner entitled to a combination of 25
19 percent net profit of recurring service
20 revenue," blah-blah-blah, and profits, blah.
21 So it says -- earlier says, "We desire to
22 have exclusivity." But I don't know if
23 ultimately --
24 Q Now, let me direct you to 1.3. It does say,

Page 23

1 "The license granted in Section 1.1 is
2 exclusive on a worldwide basis with the
3 exception of China, Philippines, and set
4 forth in Clause 1.5."
5 A Okay. Yes. So --
6 Q Does that help? I -- and I --
7 A Yeah. Yeah.
8 Q Yes.
9 A So for -- for CircleSwipe, I think -- I think
10 it was exclusive with the exception of a
11 couple -- a couple of areas.
12 Q Okay.
13 A Yeah.
14 Q All right.
15 A That's right.
16 Q Understood.
17 A Yeah, the other product was non-exclusive. I
18 think it was part exclusive and part
19 non-exclusive.
20 Q Okay. Oh, and back to Section 1.2, do you
21 understand Ingenico to have been a competitor
22 of BBPOS?
23 A I think you could say that in certain --
24 certain circles, yes. Certain territory.

Page 24

1 Q Okay. I'd like to turn now to Schedule 2,
2 which is on Page 11.
3 A Schedule 2.
4 Q Yes, sir.
5 A Okay.
6 Q Oh, and I'd like to draw your attention to
7 the third bullet point down.
8 A Okay.
9 Q Where it says, "ROAM will be the exclusive
10 distributor of the products and devices,
11 crypto swipe, branded ROAMpay Swipe, and ROAM
12 will provide a margin of $3 per crypto swipe
13 unit and $7 per BBPOS or ROAMpay POS unit
14 above cost of manufacturing, packaging, and
15 bill of material paid to BBPOS for delivering
16 the units to ROAM as part of the invoice from
17 hardware." Do you recall the significance of
18 that provision?
19 A Yeah, it was just a way to set a price that,
20 you know, guarantees a certain amount -- a
21 certain amount of -- of net profit to -- to
22 BBPOS.
23 Q What would happen if ROAM started
24 manufacturing the very same part that the

Page 25

1 BBPOS manufactured and calling it the same
2 crypto swipe and then selling it on the
3 market? Would ROAM then be paying BBPOS per
4 unit in that case as well?
5 MR. WRAY: Objection to the form.
6 Objection, calls for speculation.
7 Q And you can answer.
8 A I mean, we didn't have any intentions to do
9 that so -- so that was not part of the -- the
10 agreement. Yeah. And we were not a
11 manufacturer ourselves.
12 Q In working on these solutions with BBPOS,
13 what was ROAM's understanding of BBPOS'
14 rights to its designs and trade secrets and
15 intellectual property?
16 A To their own --
17 Q Yes.
18 A -- stuff? I mean, they -- they own their own
19 IP.
20 Q So this engineering and development license
21 renewal, it wasn't a purchase of the IP?
22 A No.
23 Q Okay. Why don't we leave that for a minute,
24 or ten minutes, or half an hour, or what have

Page 26

1  you? Let me leave that. Let me mark
2  something else now.
3          MR. WRAY: I'll take that.
4          THE WITNESS: Thank you.
5          MR. KESSLER: I'm showing you what's
6  been marked as Exhibit 2. It's BBPOS 1588127
7  through 1588148.
8  (Whereupon, Exhibit No. 2, BBPOS 1588127 through
9      1588148, is marked for identification.)
10 Q  Please take whatever time you need to look at
11    it. And my question to you will be: Do you
12    recognize it?
13 A  Yep.
14 Q  What is it?
15 A  Oh, this is a complaint that we filed on
16    behalf of the shareholders, yeah, against
17    Ingenico and the CEO at the time, Philippe
18    Lazare.
19 Q  And the complaint is captioned, "William
20    Graylin et al. v. Philippe Lazare; is that
21    correct?
22 A  Yes.
23 Q  Is this the complaint that you were -- is
24    this the lawsuit that you were mentioning

Page 27

1    earlier?
2  A  Correct.
3  Q  Did you supply information for the
4     allegations in this complaint?
5  A  I did.
6  Q  I'd like to direct your attention to Page 8
7     of the complaint, which is 1588135. And
8     specifically, I'd like to draw your attention
9     to Paragraphs 43 and 44.
10 A  Okay.
11 Q  Okay. And Paragraph 43 says, "In reliance on
12    Ingenico's promise to make 35 million
13    available to ROAM to be used to fund its
14    expansion and grow the value of ROAM shares
15    for all shareholders, ROAM rejected the
16    proposals made by the other two investment
17    firms and accepted Ingenico's proposal."
18 A  Uh-huh.
19 Q  Do you recall -- what do you recall that --
20    is that an accurate statement?
21 A  Yeah.
22 Q  Okay. Then Paragraph 44 says, "In February
23    2012, Ingenico closed the investment of
24    approximately 48 million in ROAM giving it a

Page 28

1     74.2 percent interest in the company on a
2     fully diluted basis. Ingenico received the
3     right to appoint two persons to serve on
4     ROAM's board of directors, and the appointed
5     was there and included into the board." Is --
6  A  That's correct.
7  Q  That's correct -- that was accurate?
8  A  Yeah.
9  Q  Okay. I'd like to skip down to Paragraph 46.
10    "Following Ingenico's investment, the defense
11    Lazare and Coonen engaged in a scheme to
12    redirect value from ROAM to Ingenico and
13    thwart the new growth of ROAM and
14    misappropriate its highly valuable
15    intellectual property in order to depress the
16    value of a minority stockholders' interest to
17    the benefit of Ingenico's interest. The
18    defendant's unlawful scheme included a plan
19    to breach its contract, provide 35 million to
20    fund ROAM's growth, and a plan to force
21    agreement from the company he founded and
22    nurtured for six years." Do you recall if
23    that's accurate?
24 A  That's -- that was what we felt at the time,

Page 29

1     yes.
2  Q  Okay. Paragraph 47 -- well, when you say,
3     "That was what we felt at the time," have you
4     changed your mind about that now?
5  A  I mean, that was -- that was our perception
6     of the case, and then, eventually, they
7     settled this case. So -- so they ultimately
8     paid out and -- and, you know, settled from
9     what we originally, you know, felt was wrong
10    to our shareholders.
11 Q  Okay.
12 A  So --
13 Q  In your view, it's been many years since
14    this?
15 A  Yeah.
16 Q  In your view, eventually, they made it right
17    with you. Is that what I'm picking up?
18 A  Yes.
19 Q  Okay.
20 A  That was -- there was an eventual settlement
21    and the two parties -- or two sides, I should
22    say -- ended up, you know, settling and
23    moving forward. But at the time, this --
24    this was our gripe when we filed the -- the

8 (Pages 26 - 29)

Page 46

1  -- of IP that would basically mean, you know,
2  less revenue for us to be able to -- to do
3  with our own product line.
4  Q  Were you concerned about the transfer of
5  ROAM's IP?
6  A  Yeah.
7  Q  Were you also concerned about the transfer of
8  BBPOS' IP?
9  A  Sure. Because that's part -- you know,
10  there's -- there's a part of that that
11  belongs to BBPOS.
12  Q  Were you concerned about the transfer helping
13  Ingenico to build a competing product?
14  A  Yes. At that time, you know, that was part
15  of our -- part of the discussions that I
16  wanted to have with -- with Philippe, you
17  know, and I wanted to -- I wanted to bring
18  attention to that at the next board meeting.
19  MR. WRAY: I object to that question.
20  It's vague.
21  Q  I think it's a little late. Let's move on to
22  -- I see Section -- I see bullet point 3 --
23  or number 3. It says "Controls and
24  operational constraints by the majority

Page 47

1  investor exerted onto the company, not part
2  of the Investor Rights Agreement, that can
3  harm the value of ROAM's shareholders. One,
4  the BBPOS relationship is critical to ROAM.
5  Ingenico's interference with its acquisition
6  and the current commercial negotiations can
7  damage its relationship and harm the value to
8  ROAM's shareholders irreparably. Damaging
9  the relationship with BBPOS can lead to a
10  loss of IP, revenue, along with technical
11  capabilities to ROAM which will make a large
12  negative impact on ROAM's valuation." Do you
13  recall what you were concerned about when you
14  wrote that bullet point 1?
15  A  Yeah. Basically, you know, we wanted to make
16  an acquisition of BBPOS at the time. I
17  recommended it. My perception was that BBPOS
18  was an important part of helping us grow our
19  revenue. So, you know, I had a concern about
20  them interfering with our acquisition -- you
21  know, our desire to -- to have an
22  acquisition. But, you know, ultimately, that
23  deal didn't happen, but, you know, it's
24  pretty well -- pretty well reflected in my

Page 48

1  statement here.
2  Q  Got it. I want to ask you now -- I want to
3  mark something else. I want to mark this as
4  Exhibit 5.
5  (Whereupon, Exhibit No. 5, Continuation of e-mails
6  between Chris and William, is marked for
7  identification.)
8  MR. WRAY: Thank you.
9  Q  What is Exhibit 5?
10  A  Yeah. This is just a follow-on from earlier,
11  a --
12  Q  Okay.
13  A  -- continuation of my dialogue with Rotsaert.
14  Q  Okay.
15  A  Yeah.
16  Q  When you write, "Just because you sent me an
17  e-mail to me does not mean you have my
18  agreement and my permission to start
19  transferring IP that does not belong to
20  Ingenico. Your assumption that the reader IP
21  belongs to ROAM was already incorrect. And
22  to further transfer them further to Ingenico
23  without my explicit permission and without
24  any commercial agreement in place was a real

Page 49

1  mistake." I'm a little curious. When you
2  write, "Your assumption that the reader IP
3  belongs to ROAM was already incorrect," do
4  you recall what you meant?
5  A  So there are two parts of the IP. Part of it
6  is our requirements, our design, our -- our
7  form factor. And then there's other
8  components because they are the engineering
9  firm that -- that built it -- were licensing
10  their technology. Basically, you know, two
11  parts are all mixed.
12  Q  Okay. And when you say the two parts are
13  mixed, does -- did BBPOS own some of that
14  reader IP then?
15  A  I mean it's their -- their hardware design,
16  our form factor.
17  Q  Okay. So I'll just ask it again. Is that --
18  some of that IP is --
19  A  Some of it is -- belongs to BBPOS.
20  Q  Okay. Now, do you recollect Rotsaert
21  believing that all of the reader IP belonged
22  to ROAM as opposed to only some of it?
23  A  He may be under the assumption that all of
24  that belongs to ROAM. But, you know, to me

Page 54

1 A I think it should be of as opposed to or.
2 Q Why do you think there was a disrespect from
3   Mr. Rotsaert toward the IP of BBPOS?
4 A Pretty well, as I stated -- I mean, you don't
5   -- you don't normally transfer, you know,
6   data to another development team without
7   permission from either me as the CEO of ROAM
8   or some kind of an agreement, you know, from
9   -- from BBPOS.
10 Q Were you concerned about Ingenico
11   reverse-engineering the IP that they'd
12   received that --
13 A Well, my --
14 Q -- was BBPOS'?
15 A -- my concern was a competing product that
16   competed against our distribution which had
17   wrong data at the time. So this is why I
18   raised the issue and, you know, whether they
19   continued on with that process after I was
20   terminated, that was -- you know, that's
21   something separate.
22 Q Got it.
23 A But, you know, I raised my -- raised my
24   concerns to Mr. Rotsaert and also to, you

Page 55

1   know, Philippe and Christopher.
2 Q And when you say Christopher, do you mean
3   Christopher Coonen?
4 A Right. And Philippe --
5 Q And Philippe Lazare?
6 A Correct.
7 Q Okay. How long after this -- okay. Thank
8   you for testifying about this e-mail. I
9   appreciate it.
10 A Yep.
11 Q How long after you sent this e-mail on
12   September 17, 2012, were you terminated from
13   your position at ROAM?
14 A It was the following board meeting, so I
15   think it was later that month.
16 Q Later in the month of September?
17 A If I recall the board meeting being -- yeah,
18   that month.
19 Q Okay. So roughly within two weeks of sending
20   this --
21 A Yeah. Yeah.
22 Q -- e-mail you were terminated?
23 A Correct. Right.
24 Q All right. Did you have an understanding of

Page 56

1   the relationship between HomeATM and BBPOS?
2   Do you recollect that?
3 A I remember there's some relationship between
4   -- Ben was telling me some -- some
5   relationship between them. I can't really
6   recall what the exact relationship between --
7   between these guys -- is that when they
8   changed their name later to AnywhereCommerce
9   or Anywhere --
10 Q I'm just trying to get your memory of --
11 A Yeah.
12 Q -- HomeATM, but if you don't --
13 A Yeah. I mean --
14 Q -- it's fine.
15 A -- yeah, I mean, there's -- most of my
16   dealings was with Ben.
17 Q You've mentioned acquisition prior. Was
18   there a point in time in which there was a
19   consideration of acquisition from ROAM for
20   Ingenico to BBPOS?
21 A More from ROAM. I mean, I was trying to make
22   the acquisition.
23 Q What's your recollection of your records to
24   make the acquisition?

Page 57

1 A I made a proposal, and -- and then, I think,
2   Ingenico wanted to do some due diligence
3   also. And so I think ultimately after the
4   experience, Ben ended up rejecting the -- the
5   deal and it never took place.
6      MR. KESSLER: Okay. Let me mark this
7   as Exhibit 6.
8 (Whereupon, Exhibit No. 6, Summary of terms of
9   acquisitions of BBPOS, is marked for
10   identification.)
11      MR. KESSLER: Thank you.
12 Q Please take all the time you need to feel
13   comfortable with it. My first question is:
14   Do you know what it is, Exhibit 6?
15 A It looks like our term sheet, yeah.
16 Q When you say, "Our term sheet," you mean the
17   term sheet respecting the acquisition --
18   proposed acquisition of BBPOS by ROAM Data?
19 A Yeah.
20 Q Okay. Did you have a hand in negotiating
21   this?
22 A Yeah.
23 Q What role did you play in negotiating this?
24 A I was -- I was the CEO, so I had a signed

Page 62

1 Inc." meetings of the -- "minutes of the
2 meeting of the Board of Directors" from
3 around June 27, 2012. Have you seen this
4 before?
5 A Yeah, I think it's June -- June meeting's
6 minutes.
7 Q I just quickly want to draw your attention to
8 what's been Bates stamped ROAM 75 at
9 Paragraph marker 10, "BBPOS acquisition
10 update/discussion."
11 THE WITNESS: If you don't mind, I'm
12 going to -- it's quite hot in here. I'm
13 going to take off my jacket.
14 MR. WRAY: You can check that
15 thermostat behind you.
16 MR. KESSLER: You know, I'm going to
17 do that because it's --
18 MR. WRAY: I've been looking at it
19 longingly for this entire deposition.
20 MR. KESSLER: Will, if you're
21 uncomfortable, please say something.
22 THE WITNESS: Yeah, yeah. No
23 worries.
24 MR. WRAY: It's placebo, isn't it?

Page 63

1 Can we go off the record for a second?
2 MR. KESSLER: Sure.
3 VIDEOGRAPHER: The time is 3:37 p.m.
4 We're off the record.
5 (Whereupon, the parties go off the record.)
6 VIDEOGRAPHER: It is 3:38 p.m. We're
7 on the record.
8 BY MR. KESSLER:
9 Q So I'm looking at this -- what's been marked
10 as Exhibit 8. Do you recollect the
11 discussion that's commemorated at Paragraph
12 10?
13 COURT REPORTER: Are we leaving the
14 door open on purpose, or --
15 MR. KESSLER: We can close -- yeah,
16 we can close it. I think, you know, it's not
17 that much of a --
18 COURT REPORTER: There's music
19 playing out there.
20 MR. KESSLER: Right.
21 Q Okay. What do you recall of this discussion
22 -- this board discussion that took place on
23 or around June 27, 2012, respecting the
24 proposed acquisition of BBPOS by ROAM Data?

Page 64

1 A What was the -- say again?
2 Q What do you recall of this discussion that
3 took place on June 27, 2012, at the board
4 meeting --
5 A Yeah.
6 Q -- respecting the proposed acquisition of
7 BBPOS by ROAM?
8 A I think Section 10 of the -- the minutes were
9 pretty explicit in the way that we discussed
10 that deal.
11 Q Having reviewed that section now, do you
12 disagree with any aspect of the rendering of
13 it?
14 A No. It was pretty well reflected, the -- the
15 nature of the discussion.
16 Q Okay. At this time, you remained interested
17 in having ROAM acquire BBPOS?
18 A Yeah, I was still interested at -- you know,
19 at that time.
20 Q Okay. And it says on Bates stamp 876,
21 "Philippe said he would not sign such a deal
22 that would give Ben the Chinese market by
23 himself." Is that Philippe Lazare?
24 A Uh-huh.

Page 65

1 Q Okay. And then he said, "He then asked Mr.
2 Graylin to find others to do the work for
3 us." What did you understand him to mean by
4 that?
5 A Oh, just find another source.
6 Q Oh, so cut out BBPOS altogether?
7 A Could be. I mean, it's -- you know, it's not
8 unusual to find another source. But -- but
9 BBPOS was our -- was our supplier at the
10 time. And, you know, you could see that I --
11 I felt that they were the -- the best vendor
12 for us, and there were others that were, in
13 my opinion at the time, not as good.
14 Q And then, Mr. Philippe Lazare, he says,
15 "Dismissively, he indicated that he did not
16 believe that a few people in China were that
17 critical for Ingenico with ROAM's success in
18 its marketplace." What do you believe he
19 meant by that?
20 A Say that again? What did --
21 Q What did he mean by that, "A few people in
22 China"?
23 A Well, I mean --
24 Q Is that BBPOS?

17 (Pages 62 - 65)

Page 110

1  MR. KESSLER: Objection. Calls for a
2  legal conclusion.
3  THE WITNESS: Well, as -- as I recall
4  Section 1.4 specifically references BBPOS.
5  So if you look at Section 1.4 in the very
6  beginning of the exhibit. So as I recall
7  that they have two products. One was
8  exclusive, which was the crypto swiper,
9  CircleSwipe, and we wanted exclusivity for
10 that anywhere except for, of course, they
11 were selling into China and Philippines, but
12 the BBPOS or otherwise, you know, known as
13 ROAMpay POS, at the time, that one -- that
14 BBPOS was an EMV reader that they were
15 developing. And that one, they didn't want
16 to give exclusivity, so that was a
17 non-exclusive to resell.
18 Q  Okay. So subject to whatever is in 1.4,
19    right?
20 A  Yeah.
21 Q  Which you've, I think, just attempted to
22    summarize. 1.3 says that it will be an
23    exclusive to Ingenico, right?
24    MR. KESSLER: Objection. Compound.

Page 111

1  Objection. Argumentative. Asked and
2  answered as well. You just don't like his
3  answer.
4  A  So in 1.4 it says, BBPOS is non-exclusive.
5    1.3 says that we have exclusive rights, which
6    to me was the swiper solution, the
7    CircleSwipe, so that was what we
8    white-labeled and branded.
9  Q  Uh-huh. And when you were discussing BBPOS'
10    IP or intellectual property or trade secrets
11    when opposing counsel was questioning you
12    before, you were talking about IP in
13    connection with the swipe readers, right?
14    MR. KESSLER: Objection. Compound.
15    Objection. Misstates prior testimony.
16 A  Can you just repeat that?
17 Q  Sure. So when Mr. Kessler was questioning
18    you before and he was asking you questions
19    about BBPOS' IP, you were referring to their
20    IP with the swipe reader, right?
21    MR. KESSLER: Objection. Compound.
22    Objection. Misstates prior testimony.
23    Objection. Vague. He's testified -- he's
24    spent hours testifying to answer that.

Page 112

1  MR. WRAY: I've refrained from
2  putting coaching comments or any -- or, you
3  know, just random comments on the record.
4  I'd ask that you do the same.
5  MR. KESSLER: I'm not coaching, but I
6  am objecting to -- particularly that
7  question, that you --
8  MR. WRAY: I've heard your question
9  and I've heard your objections before, so --
10 Q  Do you recall the question?
11 A  I think you were asking whether the reference
12    to the BBPOS IP was only the swiper?
13 Q  It was in reference to the swiper,
14    intellectual property.
15    MR. KESSLER: Objection. Vague.
16 A  Well, I mean, I'll answer the question on --
17    on what I believe to be the BBPOS IP. So
18    there are -- there are BBPOS IP of them
19    designing the product for us. There's also
20    patents that they had filed which either STEM
21    or -- or HomeATM -- there's a set of IP
22    related to the patents. For us and the
23    license that we cared about the most was
24    getting product for a combination of audio

Page 113

1  jack readers with -- with swipers. That was
2  where were we originally started and we sold,
3  you know, quite a bit of volume with -- with
4  that particular product.
5  Then, the next line of product
6  involved chip readers, which -- otherwise
7  known as EMV. And those chip readers, and
8  the ability to interact with the -- the
9  readers, and the same -- same application
10 that we were using which we built here to
11 interact with these readers, they were
12 different sets of products, but they were all
13 designed and manufactured by the -- BBPOS for
14 us.
15 Where we talked about exclusivity in
16 at least this original agreement, again,
17 later on, we have the -- we had a amendment
18 to it. At this particular point in time, I
19 recall we distinctively separated the two.
20 One was exclusive, which was CircleSwipe and
21 then the other one was non-exclusive, which
22 -- which they were in the process of building
23 for us to -- to sell. So that was what they
24 named here as BBPOS, that's EMV-capable.

29 (Pages 110 - 113)

Page 142

1  Q   And whatever you concluded wasn't exclusive
2      in the document is what you were potentially
3      going to sell with Ben, right?
4  A   Yes. That would --
5  Q   Okay.
6  A   -- that would be the case, but that was a
7      very -- very cursory exploration.
8  Q   Sure.
9  A   Yeah.
10 Q   Did it -- during the previous questioning,
11     Mr. Kessler showed you an e-mail. It was
12     from, I think, January 2013 or thereabouts?
13 A   Uh-huh.
14 Q   I'll try to pull that one up. Exhibit 11.
15     Could you turn to Exhibit 11?
16 A   Yep.
17 Q   Okay. So in this e-mail you're talking with
18     him about how you're free to compete with
19     ROAM because of some language in your
20     contract, right? Do you see that, like --
21 A   Uh-huh.
22 Q   -- three or four paragraphs down?
23 A   Yeah.
24 Q   And this is you discussing with him this

Page 143

1      potential venture for selling other mobile
2      point of sale products, right?
3  A   Yeah. This is part of the exploration that I
4      told you.
5  Q   Right. And so at this time that he sends you
6      an e-mail saying -- and this is on the third
7      page of the document, he sends you an e-mail
8      basically saying that Ken Paull says that the
9      ROAM-BBPOS agreement only does the swiper,
10     and not the EMV or NFC, right?
11 A   Correct.
12          MR. KESSLER: Objection. The
13     document speaks for itself.
14          MR. WRAY: You're lucky I didn't pull
15     that objection out during your examination.
16          MR. KESSLER: What are you
17     insinuating?
18          MR. WRAY: That you just used the
19     documents a lot.
20          MR. KESSLER: Yeah, but I didn't
21     misquote them.
22 Q   On Page 1, you say here, "Yes, I have told
23     Ken Paull and others at ROAM and Ingenico
24     that EMV/NFC is not part of the exclusivity.

Page 144

1      Good to see them admit it," right?
2  A   Uh-huh.
3  Q   And again, you're saying this during the time
4      that you're exploring the possibility of
5      selling these devices with Ben Lo, right?
6  A   Yeah. But that was also my belief that the
7      EMV was not exclusive.
8  Q   Earlier we discussed how you shared with Mr.
9      Lo your feelings about how you believe Mr.
10     Rotsaert improperly shared intellectual
11     property with Ingenico, right?
12 A   (No verbal response.)
13 Q   This complaint was from November of 2012,
14     right?
15 A   (No verbal response.)
16 Q   Did you delay from filing the complaint to
17     talking about these things with Mr. Lo?
18 A   Did I delay -- did I talk to Mr. Lo after I
19     filed the complaint?
20 Q   Right.
21 A   Yes.
22 Q   Okay. What did he say when you shared these
23     allegations or thoughts or concerns?
24          MR. KESSLER: Objection. Content.

Page 145

1  Q   Strike that. What did he say when you shared
2      these concerns?
3  A   What did he say -- I don't really recall but
4      we had some e-mail exchanges, and, you know,
5      we were just trying to figure out whether
6      there's -- there is, you know, any business
7      that we could do. I was trying to be helpful
8      if I could, and I think, you know, it's no
9      secret about my, you know, my concerns at the
10     time and -- and which is what led to the --
11     to the litigation.
12 Q   All right.
13 A   Yeah.
14 Q   But do you remember, I mean, you're saying
15     that you spoke with him, and you said
16     basically you were concerned that Chris
17     Rotsaert shared BBPOS IP with Ingenico,
18     right?
19 A   (No verbal response.)
20 Q   Sorry, you have to say yes or no for the --
21 A   Yes.
22 Q   -- record. Do you remember him having a
23     reaction of any kind to this?
24 A   I mean, I think we were just lamenting the,