**Exhibit T**

## LICENSE AGREEMENT AND NON-COMPETITION AGREEMENT

**THIS AGREEMENT** is made on the 1ˢᵀ day of July , 2013,

between:

**4361423 Canada Inc.**, a Canadian corporation with its registered office situated at 4141 Sherbrooke Street West, Suite 400, Westmount, Quebec H3Z 1B8, Canada (the "**Licensor**");

and

**BBPOS LIMITED**, a company incorporated in Hong Kong with limited liability whose registered office is situated at Flat 810, Grand City Plaza, 1 Sai Lau Kok Road, Tsuen Wan, New Territories (the "**Licensee**").

**WHEREAS:**

A.   Homeatm Epayment Solution, a wholly owned subsidiary of the Licensor, entered into a License Agreement And Non-Competition Agreement with the Licensee dated 18 March 2010 (hereinafter referred to as the "**Existing Agreement**"), whereby Homeatm Epayment Solution granted a non-exclusive license to the Licensee to "use the Intellectual Property Rights in the Region in relation to the Products" as defined in the Existing Agreement. A copy of the Existing Agreement is attached hereto as Exhibit A.

B.   The Licensor and the Licensee (hereinafter referred to as "**the parties**") are desirous to enter into a new agreement (hereinafter referred to as the "**Agreement**") that supersedes the Existing Agreement.

C.   As such, the parties hereby agree that effective immediately, the Existing Agreement shall forthwith upon execution by both of the parties in writing of this Agreement be terminated and be of no effect.

**NOW THEREFORE**, in consideration of the foregoing and the mutual promises, covenants and agreements of the parties contained herein, the parties agree as follows:

**1.   DEFINITIONS**

Page 1 of 15

Confidential

AC_1169307

In this Agreement (including all Exhibits attached hereto), the following terms shall have the definitions ascribed to them below unless explicitly required otherwise elsewhere herein:

1.1  "Affiliate" means any person or entity which is directly or indirectly controlled by any of the parties or any person or entity which directly or indirectly controls any of the parties;

1.2  "Commencement Date" means the date on the top of page 1 of this Agreement;

1.3  "Confidential Information" means any information whether written or otherwise, which is identified as confidential (e.g., stamped "Confidential") when provided by one of the parties to the other party for any purpose;

1.4  "Licensed Patent Rights" means the patents and patent applications owned by the Licensor or its Affiliate and listed in Exhibit-B attached hereto in the jurisdictions listed thereunder, together with all patents issuing from any listed pending patent application, including any future divisionals, continuations, continuations-in-part, reissues, re-examinations and extensions thereof, and all foreign counterparts of such applications and patents;

1.5  "Minimum Royalty Payments" has the meaning ascribed to it in Section 4.3;

1.6  **"PRC Patent"** means the patent for apparatus and method for commercial transactions using a communication device filed by the Licensor in China on 22 July 2011 (serial number 201080005305.1);

1.7  "Products" means any and all hardware, software, systems, devices and methods that incorporate or are designed, manufactured or produced by the Licensee or its Affiliate, directly or indirectly, using the technologies and/or techniques encompassed within the Licensed Patent Rights and/or inventions claimed in the Licensed Patent Rights;

1.8  "Region" means worldwide;

1.9  "Royalty Payment" has the meaning ascribed to it in Section 4.1;

Confidential

AC_1169308

1.10    "Royalty Statement" has the meaning ascribed to it in Section 4.5;

1.11    "Sales" means, for any time period, the gross amount invoiced to third parties by the Licensee or its Affiliate during such time period for Products sold, excluding applicable sale tax and use tax, regardless of whether or not the Licensee collected the amount invoiced from such third parties. Sales shall also include the amount or fair market value of all other consideration received by the Licensee in exchange for Products;

1.12    "Sublicensee" means an Affiliate or any other entity with whom the Licensee enters into a sublicense arrangement to license some or all of the Licensed Patent Rights granted to the Licensee;

1.13    "Sublicense Agreement" means an agreement entered into by and between the Licensee and the Sublicensee;

1.14    "Referred Licensee" has the meaning ascribed to it in Section 5.1;

1.15    "US" means the United States of America; and

1.16    "USD" means US dollars, the lawful currency of the US.

## 2.    DURATION OF THIS AGREEMENT

2.1    This Agreement shall commence on the Commencement Date and shall continue for a period of nineteen (19) years (hereinafter referred to as the "**Term**" of this Agreement), unless terminated by either one of the parties in accordance with Section 7 below. The parties shall commence any negotiation for a renewal of this Agreement no later than six (6) months prior to termination of this Agreement under Section 2.1.

## 3.    GRANT OF LICENSE

3.1    Subject to all the terms and conditions of this Agreement, Licensor hereby grants to Licensee, during the Term of this Agreement, a royalty bearing,

Confidential                                                                              AC_1169309

personal, non-transferable and non-exclusive license with a right to sub-license to Sublicensees (hereinafter referred to as the "License") to use and/or practice the Licensed Patent Rights for the purpose of manufacturing, distributing and selling Products in the Region.

## 4. PAYMENT TERMS

4.1 In consideration for the License, during the Term of this Agreement, the Licensee shall pay to Licensor a royalty (hereinafter referred to as the "Royalty Payment"), which shall be calculated as follows:

(a) for Sales of Products sold by the Licensee or any Sublicensee during the Term in the Region other than the People's Republic of China, the Royalty Payment shall be the greater of (i) the Royalty Payment calculated based on the percentages and thresholds set forth in the following table and (ii) the Royalty Payment calculated based on the total number of Products sold multiplied by the rate of USD0.5 per Product.

| Annual Sales for Products Sold within the Region (Range in USD) | Percentage (%) |
| --- | --- |
| $0 - $100,000 | 5% |
| $100,001 – OR MORE | 4% |

For example, for Product Sales of USD150,000, representing 10,000 Products at USD15 each, the Royalty Payment would be the greater of:

(i) (5% x USD100,000) + (4% x USD50,000) = USD7,000; and

(ii) 10,000 units * USD0.5 = USD5,000

In such a scenario, the Royalty Payment would be USD7,000, the greater of USD7,000 and USD5,000.

(b) for lease of Products whereby Licensee or any Sublicensee earns revenues such as rental payments on a lease of one or more Products, Licensee shall pay Licensor twenty percent (20%) of the gross profit from such a lease of Products as a Royalty Payment. Gross profit shall be determined based on gross revenue less cost of sales including interchange, hardware costs or other unforeseen costs on a case by case basis as would be accepted by



Confidential

AC_1169310

generally accepted accounting principles. For example, if Licensee leases a Product having a cost to the Licensee of USD10 for USD2 per month with a lease term of thirty-six (36) months, no Royalty Payment would be payable to the Licensor for the first five (5) months of that lease to cover the cost of the Product; however, starting in month six (6) of the lease until month thirty-six of the lease, Licensee would pay USD0.40 (i.e., 20% of USD2) per month on each Product leased to the Licensor as a Royalty Payment.

(c) for Sales of Products sold by the Licensee or any Sublicensee during the Term in the People's Republic of China using the PRC Patent, the Royalty Payment shall be calculated at the greater of (1) USD0.15 per unit of Products sold or (ii) 15% of the gross margin of each Products sold. The gross margin is defined as the sales price of the Product minus the material cost of the Product, the manufacturing cost and other agent or service fee

4.2    Royalty Payments shall be paid by Licensee to Licensor within twenty-one (21) calendar days following the end of each calendar quarter for all sales and leases made during that calendar quarter.   For example, Royalty Payments on all sales and leases made during the first calendar quarter of 1 January through 31 March shall be paid by 21 April.

4.3    During the Term of this Agreement, the Licensee shall pay the Licensor a minimum amount of Royalty Payments in the amount of USD400,000 for each 12-month period commencing from 1 July each calendar year (hereinafter referred to as the "**Minimum Royalty Payments**"). The calculation of the Minimum Royalty Payments shall include both Royalty Payments made directly by the Licensee to the Licensor pursuant to Section 4.1 as well as any payments made by Referred Licensees pursuant to Section 5 below. In the event that the Royalty Payments made by the Licensee plus the payments made by Referred Licensees (hereinafter referred to as the "**Annual Total Payments**") do not equal or exceed UDS400,000 for each 12-month period commencing from 1 July each calendar year, the Licensee shall pay the Licensor the difference between USD400,000 and the Annual Total Payments for each such 12-month period. For example, in a 12-month period commencing on 1 July, if the Licensee makes total Royalty Payments in in the amount of USD300,000, and one or more Referred Licensees make collective

Page 5 of 15

payments in the amount of USD75,000, the Licensee would pay the Licensor USD25,000 in accordance with Section 4.3. The Minimum Royalty Payment shall be paid by Licensee to Licensor within forty-five (45) calendar days following the end of each 12-month period, if necessary.

4.4 All Royalty Payments made by Licensee to the Licensor under this Agreement shall be made in USD, and such Royalty Payments shall be made by wire transfer to one or more bank accounts to be designated in writing by Licensor. All Royalty Payments to the Licensor stemming from Sales made by Licensee and any Sublicensee outside the US shall be first determined in the currency in which they are earned and shall then be converted into an amount in USD using the noon buying rate as published in the Asia Wall Street Journal for the last day of the calendar quarter ending before the calendar quarter in which such Royalty Payment is being determined.

4.5 The Licensee shall furnish Licensor, along with each Royalty Payment, a written royalty statement in order for the Licensor to establish the accuracy and completeness of the determination of the Royalty Payment made by the Licensee (hereinafter referred to as a "**Royalty Statement**"). Each Royalty Statement shall include a description and the quantity of the Products sold, leased or otherwise disposed of, the name of the customer receiving the Product(s), the serial number sequences for each such Product and a detailed calculation of the Royalty Payments made during the calendar quarter in question. Each Royalty Statement shall be certified as accurate by a duly authorized officer of Licensee.

4.6 Upon reasonable prior written notice, Licensee shall, at the cost of the Licensor, make such books of account and records available for inspection and audit during normal business hours at the principal offices of the Licensee for the sole purpose of determining whether appropriate accounting and Royalty Payments have been made by the Licensee hereunder (hereinafter referred to as an "**Inspection**"). Such Inspection shall be conducted by an audit representative of the Licensor and/or an independent accounting firm appointed by Licensor and acceptable to the Licensee. The Licensee shall include in each Sublicense Agreement a statement requiring the Sublicensee to grant access to such books of account and records for an Inspection by an audit representative of the Licensor and/or an independent accounting firm appointed by Licensor. Any such Inspection shall be carried out at the expense

Page 6 of 15

AC_1169312

of the Licensor unless such Inspection reveals a deficiency of three percent (3%) or more of the Royalty Payments remitted for the period elapsed since the most recent audit or, if none, the Commencement Date of this Agreement in which event Licensee shall pay the costs thereof. Payment of such costs and any Royalty Payment deficiency shall be made by Licensee within fifteen (15) days after the date of receipt by Licensee of a notice from Licensor together with a copy of the auditor's report and fee note showing the amounts due. Any such Royalty Payment deficiency shall carry an annual interest of ten percent (10%) from the date the Royalty Payment was originally due, calculated prorata on a daily basis.

## 5.   REFERRAL FEE

5.1     During the term of this Agreement, Licensee may refer to Licensor persons or entities that prefer to enter into a licensing agreement with the Licensor directly and not as a Sublicensee of the Licensee (hereinafter referred to as a **"Referred Licensee"**). In such situations, the Licensee shall be entitled to a referral fee of twenty-five percent (25%) of the total amount of royalties received by the Licensor pursuant to any licensing agreement entered into by the Licensor with such Referred Licensee(s) (hereinafter referred to as a **"Referral Fee"**). All Referral Fees shall be shall be paid to the Licensee within thirty (30) days following the end of each calendar quarter.

5.2     All Referral Fees payable to the Licensee under Section 5.1 shall be made in USD, and such Referral Fees shall be made by check or wire transfer to one or more bank accounts to be designated in writing by Licensee. All Referral Fees payable to the Licensee stemming from licensing agreements with Referred Licensees that are based outside the US shall be first determined in the currency in which they are earned and shall then be converted into an amount in USD using the noon buying rate as published in the Asia Wall Street Journal for the last day of the calendar quarter ending before the calendar quarter in which such Referral Fee is being determined.

5.3     The Licensor shall furnish Licensee, along with each payment of a Referral Fee, a written Referral Fee Statement in order for the Licensee to establish the accuracy and completeness of the determination of the Referral Fee made by the Licensor (hereinafter referred to as a **"Referral Fee Statement"**).   Each Referral Fee Statement shall include a description and the quantity of the

Confidential                                                          AC_1169313

Products sold, leased or otherwise disposed of by each Referred Licensee, the serial number sequences for each such Product, the amount of royalties received by the Licensor from each Referred Licensee and a detailed calculation of the Referral Fee payable in the calendar quarter in question. Each Referral Fee Statement shall be certified as accurate by a duly authorized officer of Licensor.

## 6.   INTELLECTUAL PROPERTY AND OTHER UNDERTAKINGS

6.1     The Licensor warrants that it is the sole beneficial owner of all Licensed Patent Rights free from any encumbrances.

6.2     The Licensor is not aware of any rights of any third party that would be infringed by use of the Licensed Patent Rights by the Licensee.

6.3     The Licensor and any successor thereto (e.g., a purchaser of the Licensor) will make a best effort to continue to comply with the terms and conditions set forth herein despite a change in control of the Licensor.

6.4     The Licensor hereby undertakes that during the Term of this Agreement it shall not register or accept the request for registration of ROAM Data, Inc, Ingenico S.A. and/or any of their Affiliates as a shareholder or shareholders of the Licensor without the prior written consent of the Licensee. In addition, during the Term of this Agreement the Licensor shall demand that its shareholders shall not take any action that results in over 50% of the direct or indirect ownership interests of the Licensor being transferred to ROAM Data, Inc, Ingenico S.A. or any of their Affiliates unless with the prior written consent of the Licensee.

6.5     The Licensor will hold harmless and indemnify the Licensee for any claims of patent infringement made against the Licensee arising from the Licensee's use of the technology claimed in the Licensed Patent Rights.

6.6     Licensee shall notify Licensor if it becomes aware of any infringement or potential infringement by a third party of any Licensed Patent Rights within ten (10) days of becoming aware of such infringement or potential infringement. Licensor shall have the exclusive right to take action against any infringer of any of the Licensed Patent Rights, in its sole discretion. Licensee

Confidential

AC_1169314

shall cooperate reasonably in any action Licensor may take against any such infringer, upon Licensor's request and at Licensor's expense.

6.7     Licensee shall mark, in accordance with the applicable patent marking statute (e.g., 35 U.S.C. § 287), all Products, and their containers, which have been made, used, sold or otherwise transferred to a third party within the US. The Licensee may mark Products by (i) fixing the word "patent" or the abbreviation "pat." on the Product together with all patent numbers that claim the Product or a portion thereof or (ii) fixing the word "patent" or the abbreviation "pat." on the Product together with an address of a posting on the Internet, accessible to the public without charge for accessing the address, that associates the Product with all patent numbers that claim the Product or a portion thereof. If the Licensee prefers to mark under option (i), the Licensor shall provide all patent numbers that must be marked on the Products and shall update such list of patent numbers from time-to-time as is necessary. If the Licensee prefers to mark under option (ii), the Licensor shall be responsible for maintaining such a website and will provide the address of such website to the Licensee. The Licensee shall inform the Licensor of its preferred method of marking within fifteen (15) days of the Commencement Date.

6.8     The Licensor may encumber some or all of the Licensed Patent Rights by using one or more of the Licensed Patent Rights as collateral for one or more loans. In the event that the Licensor uses one or more of the Licensed Patent Rights as collateral, the Licensor shall notify the Licensee of such a loan within fifteen (15) days after entering into such a loan. In the event that the Licensor defaults or intends to default on such a loan, the Licensor shall notify the Licensee of such a default or intended default. At such time, the Licensee may satisfy the loan and all fees and charges associated therewith on behalf of the Licensor (i.e., the Licensee may pay off the loan for the Licensor). If the Licensee satisfies the loan, the Licensor shall assign the patent(s) used as collateral for that paid off loan to the Licensee such that the Licensee becomes the sole owner of such patent(s).

6.9     The Licensor shall notify the Licensee when the Licensor want to sell the Licensed Patent Right to a purchaser. The Licensor shall not sell fewer than all of the Licensed Patent Rights to a purchaser. The Licensor shall only sell the Licensed Patent Rights to a purchaser that agrees to assume all obligations of

Confidential

the Licensor under this Agreement and undertakes to enter into a new agreement with the Licensee for the remainder of the Term on terms that are (i) identical to the terms set out herein; or (ii) no less favorable to the Licensee than the terms set out herein.

## 7.    TERMINATION OF AGREEMENT

7.1    Either party may terminate this Agreement immediately by giving written notice to the other party in the event that:

(i)    either party becomes insolvent, enters into or is about to enter into liquidation (whether voluntary or compulsory) or has a receiver appointed in respect of the whole or any part of its assets or undertaking; or

(ii)    either party commits a material breach of one or more of the provisions of this Agreement and such a breach is not remedied by the breaching party within ninety (90) days of receipt of written notice of such breach from the other party.

## 8.    CONFIDENTIALITY

8.1    The parties shall treat all Confidential Information of the other in strict confidence and shall not use any Confidential Information of the other party for any purpose except for the purpose of exercising or performing its rights and obligations under this Agreement.   Further, the parties shall not disclose any Confidential Information of the other party to any person or entity other than any of its officers or employees directly or indirectly concerned with this Agreement, or its professional advisers, provided that, prior to disclosure to any such officer, employee or professional adviser, the party informs such person of the confidential nature of the information and is responsible for such person's compliance with the confidentiality obligations set out in Section 8 of this Agreement and, if necessary, shall promptly enforce such obligations either on its own motion or at the request of the disclosing party. Subject to Section 8.2 and Section 8.3 of this Agreement, no Confidential Information disclosed by one party to the other may be disclosed to a third party without the prior written consent of the other party.

8.2    The provisions of Section 8.1 shall not apply to such information that:

(a)    was known or available on a non-confidential basis to the receiving party before it was disclosed to it by the disclosing party;

Page 10 of 15

AC_1169316

(b)  is or becomes generally available to the public (otherwise than through a breach of Section 10 of this Agreement);

(c)  the parties agree in writing is not confidential or may otherwise be disclosed; or

(d)  subject to Section 8.3 below, the receiving party is required to disclose by law, court order or any governmental or regulatory authority provided that, to the extent the receiving party is legally permitted to do so, the receiving party gives the disclosing party as much notice of such disclosure as possible and takes into account the reasonable requests of the disclosing party in relation to the content of such disclosure.

8.3    Where the disclosure of Confidential Information is required by a governmental body, court of law or other tribunal having jurisdiction over either party, the disclosing party undertakes to the other party to disclose only so much information as is necessary and shall use all reasonable efforts to obtain from such body, court or tribunal a written undertaking not to disclose such information to any third party.

## 9.    NON-COMPETITION

9.1    Licensor and Licensee are in similar businesses. Licensee agrees not to solicit any person or entity introduced to Licensee by Licensor for the purpose of selling the Products to such person or entity during the Term of this Agreement plus six (6) months after termination of this Agreement under Section 2 or under Section 7 (hereinafter referred to as the "**Non-Competition Period**").

9.2    Licensor hereby expressly acknowledges that Licensee previously entered into an Engineering and Development and License Agreement with ROAM Data, Inc., a subsidiary of Ingenico S.A., dated May 4, 2010, and Licensor hereby consents to such agreement, and Licensor acknowledges and agrees that Licensor shall not enter into any licensing agreement with ROAM Data, Inc., Ingenico S.A. or any of their respective Affiliates in relation to the use of the Licensed Patent Rights in the Region during the term of this Agreement.

9.3    During the term of this Agreement, the Licensee shall not directly sell Products to or attempt to add as a Sublicensee any person or entity that

Confidential

AC_1169317

Licensor or any of its Affiliates have shipped or sold any Products as well as the entities listed in Exhibit C attached hereto.

Confidential

AC_1169318

**10.  ASSIGNABILITY**

10.1    Except as provided herein, neither the Licensor nor the Licensee shall be entitled to assign any of its rights or benefits, or transfer or purport to transfer any of its duties or obligations, under this Agreement to any third party without the prior written consent of the other party.

**11.  WAIVER**

11.1    No failure or delay by either party in exercising any of its rights under this Agreement shall be deemed to be a waiver of that right, and no waiver by either party of any breach of this Agreement by the other shall be considered as a waiver of any subsequent breach of the same or any other provision of this Agreement.

**12.  SEVERABILITY**

12.1    Should any provision or Section of this Agreement be deemed to be invalid or unenforceable by a court of competent jurisdiction such provision or Section shall be severed from the Agreement and the balance hereof shall not be affected and will continue in full force and effect.

**13.  ENTIRE AGREEMENT**

13.1    The parties acknowledge that this Agreement constitutes the entire agreement between them and that this Agreement supersedes any previous oral or written agreements or understandings between them with respect to the subject matter hereof.

**14.  HEADINGS**

14.1    The headings set out in this Agreement are for convenience only and shall not in any way affect the interpretation hereof.

**15.  AMENDMENTS**

15.1    This Agreement may only be amended by both parties in writing.

Confidential

AC_1169319

## 16.  NOTICES

16.1    All notices required or permitted by this Agreement shall be in writing and in the English language and sent to the address of the recipient set out below, or as otherwise directed by the recipient. Notices shall be delivered by hand or sent by pre-paid mail, courier or by facsimile. If delivered by hand or sent by courier, notice will be effective on the date of receipt, if sent by facsimile, on the date of transmission and, if sent by pre-paid mail, three days after being posted.

16.2    The addresses and facsimile numbers of the parties are as follows:

Licensor:
4361423 Canada Inc.
376 Victoria, Suite 418, Westmount, Quebec, H3Z 1C3
Attention: CEO or CEO@anywherecommerce.com
Fax Number: 1 (408) 516-8079

Licensee:
Flat 810, Grand City Plaza,
1 Sai Lau Kok Road,
Tsuen Wan, New Territories
Fax Number: 21809790

## 17.  APPLICABLE LAW AND DISPUTE RESOLUTION

17.1    This Agreement shall be governed by, and construed in all respects in accordance with, the laws of the State of Delaware of the United States.

17.2    Except as otherwise provided in this Agreement, any dispute, controversy or claim arising out of or relating to this Agreement, including the validity, invalidity, breach or termination hereof, shall be settled by arbitration in Delaware in accordance with the Federal Arbitration Act (hereinafter referred to as the "Act") in force when the Notice of Arbitration (defined in the Act) is submitted in accordance with the Act. The number of arbitrators shall be one. The claimant or claimants (collectively referred to as the "Claimant") and the respondent or respondents (collectively referred to as the "Respondent") in the arbitration proceedings shall jointly appoint the arbitrator. The arbitration proceedings shall be conducted in English. Any award made pursuant to

Confidential

AC_1169320

arbitration under this section shall be a reasoned award and shall be final and binding upon each of the Claimant and the Respondent and each of the Claimant and the Respondent agrees to be bound thereby and to act accordingly.

17.3   Each of the Claimant and the Respondent agrees to bear its own costs of arbitration (including solicitors' costs) and to equally share the fees of the arbitral tribunal and the actual costs of arbitration, if any, unless otherwise directed by the arbitral tribunal.

17.4   Any arbitral award rendered in accordance with the provisions of Section 17 of this Agreement may be enforced by any court having competent jurisdiction over the party against which the arbitral award has been rendered or the assets of such party, wherever the same may be located.

Confidential

IN WITNESS WHEREOF, the Licensor and the Licensee have executed this Agreement on the day and year first above written.

SIGNED by Michael Kron
for and on behalf of the Licensor
in the presence of:

SIGNED by Mr. Chi Wah Lo
for and on behalf of the Licensee
in the presence of:

Page 16 of 15

Confidential

AC_1169322

**EXHIBIT B**

**Licensed Patent Rights**

| Country | Serial No. / Priority | Filing Date | Title | Status |
|---|---|---|---|---|
| United States | 13/283,314 | 10/27/11 | APPARATUS AND METHOD FOR COMMERCIAL TRANSACTIONS USING A COMMUNICATION DEVICE | Pending |
| United States | 13/239,512 | 09/22/11 | APPARATUS AND METHOD FOR COMMERCIAL TRANSACTIONS USING A COMMUNICATION DEVICE | Patented as U.S. Pat. No. 8,281,998 on 10/09/2012 |
| United States | 13/162,001 | 06/16/11 | APPARATUS AND METHOD FOR COMMERCIAL TRANSACTIONS USING A COMMUNICATION DEVICE | Patented as U.S. Pat. No. 8,286,875 on 10/16/2012 |
| Canada | 2,752,053 | 08/09/11 | APPARATUS AND METHOD FOR COMMERCIAL TRANSACTIONS USING A COMMUNICATION DEVICE | Pending |
| China | 201080005305.1 | 07/22/11 | APPARATUS AND METHOD FOR COMMERCIAL TRANSACTIONS USING A COMMUNICATION DEVICE | Pending |
| Europe | 10745874.7 | 06/27/11 | APPARATUS AND METHOD FOR COMMERCIAL TRANSACTIONS USING A COMMUNICATION DEVICE | Pending |

Page 1 of 2

Confidential

AC_1169323

| India | 5158/CHENP/2011 | 07/18/11 | APPARATUS AND METHOD FOR COMMERCIAL TRANSACTIONS USING A COMMUNICATION DEVICE | Pending |
|-------|-----------------|----------|---------------------------------------------------------------------------------|---------|

Confidential

AC_1169324

## Exhibit C
## Protected Customers of Licensor by Country

**USA and Canada:** First Data Corporation (all markets) and their RSA partners (Bank of America, Wells Fargo, Citi, Sovereign Bank, Sun Trust ), ChasePaymentech, TransFirst, WorldPay, Global Payments, Mercury Payments, Heartland Payments, Vantiv, TSYS, Equinox, VeriFone, ProPay, Moneris and any another existing customer.

**Mexico:** Prosa, Azteca, Mitec, Stratus, Banorte, Banamex,

**Paraguay:** Black Friday

**Ecuador:** SatelCorp, Hiper S.A. Business Wise

**Caribbean:** Evertec, Global Processing Center, CSC

**Argentina:** Codamation

**Guatemala:** Interlink Soft

**Brazil:** Cielo

**Greece:** Cardlink S.A, VePay

**Japan:** Rakuten, Edy

Page 1 of 1

AC_1169325