Page 1

1             UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3     -------------------------------x

4     ANYWHERECOMMERCE, INC. and       :

5     BBPOS LIMITED                    :

6              Plaintiffs              :

7     vs.                              : Civil Docket No:

8     INGENICO INC., INGENICO          : 1:19-cv-11457-IT

9     CORP., and INGENICO GROUP SA     :

10             Defendants              :

11    -------------------------------x

12          HIGHLY CONFIDENTIAL VIDEO-RECORDED

13             VIDEO CONFERENCE DEPOSITION OF

14                JENNIFER VANDERHART, Ph.D.

15    DATE:         WEDNESDAY, MAY 4, 2022

16    TIME:         10:19 A.M.

17    LOCATION:     JENNIFER VANDERHART'S RESIDENCE

18                  VIENNA, VIRGINIA

19    REPORTED BY:  SUZANNE MARIE ALONA ENDERSON

                    Reporter, Notary

20             Veritext Legal Solutions

            1250 Eye Street, NW, Suite 350

21              Washington, D.C.  20005

Page 114

1 A So other than this agreement? Are you
2 asking me if they entered into other agreements
3 prior to this one?
4 Q I'm asking pre-amendment, is there any
5 other royalty payment that would be due to BBPOS
6 in connection with the use of its intellectual
7 property?
8 A So this agreement has this entire
9 schedule with various payments. The second bullet
10 point is -- I don't know, as -- as you mentioned
11 in bullet point 1, whether any of those milestones
12 were achieved. And so I don't know if those
13 amounts were paid.
14 The second point, 50,000 to be paid at
15 the time of signing as part of the exclusive
16 license to the products, note that any funds from
17 previous contracts can be applied toward money due
18 to the company -- to the partner for -- let me
19 start again -- can be applied towards money due
20 from the company to the partner for this agreement
21 and future orders of the product.

Page 115

1 So that indicates or that implies that
2 there were some payments, at least, that had been
3 made on other products. But I don't know
4 specifically as to whether they incorporated the
5 trade secrets. They have not been accused in --
6 in this particular litigation.
7 Q Okay. Because products refers to either
8 the Circle Swipe or the Crypto Swipe or the
9 ROAMpay POS products under this agreement; is that
10 right?
11 MR. TECHENTIN: Object to form.
12 THE WITNESS: Well, if we go to the
13 definition of products specifically, it also --
14 it's the Crypto Swipe or the ROAMpay or including
15 any variance of this design. So including any
16 variance as well as the Crypto Swipe -- of the
17 Crypto Swipe, I think, is -- is what is stated
18 here.
19 BY MS. BOZEMAN:
20 Q And you testified that there were
21 payments of the $3 margin that you knew were made;

Page 116

1 is that right?
2 A So there were purchases of the products
3 made. And my understanding is that, based on this
4 schedule based on this agreement, that included as
5 part of those purchases would be this additional
6 margin, the $3 margin.
7 Now, as I stated, I don't recall exactly
8 when that started. And so I don't know if the $3
9 were paid prior to the amendment or after the
10 amendment. But after the amendment the $3 was
11 on -- was to be paid on the first 150,000 units
12 collectively.
13 So if they started payments on those
14 units prior to the amendment, then my
15 understanding of the -- of the document would be
16 that it would -- those would be included in the
17 first 150,000 units that were subject to the $3
18 royalty as opposed to the $2 royalty that came
19 into effect in 2011 with the amendment.
20 Q So besides the change in the margin
21 payment, was there anything else that you found to

Page 117

1 be significant to your analysis that came about as
2 a result of the amendment?
3 A So that -- there was -- again, I mean,
4 the entire amendment, of course, is important.
5 I'm trying to remember the specific changes.
6 There was some discussion of the partner
7 intellectual property very specifically that --
8 and there was some additional discussion that
9 specifically related to the copyrights,
10 trademarks, tradenames, trade secrets owned or
11 controlled by the partner.
12 I don't remember right now all of the
13 changes from -- in these particular sections, but,
14 you know, as the amendment does not amend every
15 single section. And so section 1.1 was amended.
16 Section 1.3 was amended.
17 And section 4.4 was a new section that
18 was added behind section 4.3. So all of those, of
19 course, were important. They comprised the
20 entirety of the amendment.
21 Q Do you view the 3 to $2 margin payment to

30 (Pages 114 - 117)

Page 118

1  be a royalty for the use of intellectual property?
2  A   So it includes any royalty, any value of
3  the intellectual property.  But it also includes,
4  for instance, any potential return that -- that
5  BBPOS would be -- would require itself to -- to
6  make.  And so it contains within it the value of
7  any intellectual property.
8  Q   And what was the trigger for the payment
9  of this margin?
10 A   I don't understand the question.
11 Q   Under this -- under your -- your
12 understanding of this document, when would this
13 margin payment need to be made, if at all?
14 A   I'm trying to look for a specific
15 language.  My understanding was that this payment
16 was made for any of the devices that included the
17 intellectual property and that BBPOS was selling
18 to ROAM.
19     So the Crypto Swipe and the Circle Swipe,
20 I think, and the data is there, the G4, the G5X at
21 least.  And so when it purchased these units from

Page 119

1  ROAM, those amounts were included in that purchase
2  price as -- as stated here in this agreement.
3  Q   If ROAM or Ingenico used any of the
4  intellectual property of BBPOS in a different
5  device that it would sell, would there be a margin
6  payment due to BBPOS?
7  A   And so I think that's this case, right.
8  And so they're saying they did not use any
9  intellectual property of BBPOS.  And so this
10 licensing agreement does not contemplate that
11 specific scenario.
12 Q   So in other words, this agreement would
13 not require ROAM or Ingenico to pay any amount for
14 the use of BBPOS's intellectual property in any of
15 its devices?
16 A   Well, for these particular devices that
17 they got from BBPOS, they have to pay for any
18 other devices.  Again, they don't believe
19 anyway -- their -- their assertion is that they
20 don't use the intellectual property.  This
21 agreement does not separately have any such --

Page 120

1  such paragraphs or statements requiring any
2  specific payments for any devices other than
3  what's listed here.
4  Q   Okay.  Let's go back to your report which
5  is Exhibit 2.  And if I could take you to page 25,
6  just let me know when you're there.
7  A   Okay.
8  Q   In paragraph 61, the last sentence of
9  paragraph 61 which is on page 25, it says, "As
10 discussed in section 4, the ROAM-BBPOS agreement
11 included, among other things, an exclusive license
12 to trade secrets relating to the products licensed
13 in the agreement as well as any products similar
14 to or based on those licensed products."
15     Do you see that?
16 A   Yes.
17 Q   With respect to "any products similar to
18 or based on those licensed products," what does
19 that mean to you?
20 A   Any other products that BBPOS -- again,
21 I'm not going to interpret the contract from a

Page 121

1  legal perspective.  And so just reading that, you
2  know, "any products similar to or based on those
3  products," just a plain English reading of that --
4  of that sentence is all that I could give.  But
5  any other products that BBPOS created related to
6  or based on those products.
7  Q   Okay.  And with respect to any products
8  similar to or based on those licensed products
9  that may have been manufactured and sold
10 exclusively by ROAM or Ingenico, is it your
11 testimony that this agreement does not require any
12 sort of margin payment to be made to BBPOS?
13 A   I don't have any opinions on -- on that.
14 I don't know if that would be included here.  I
15 used this to benchmark exactly that.
16     And so that is the way that I used this
17 agreement in order to come up with a benchmark of
18 what they would pay.  But that -- again, that's
19 assuming liability.  And the parties, again, did
20 not anticipate that situation when entering into
21 this agreement.  I don't believe, anyway.

31 (Pages 118 - 121)

Page 198

1  What -- what, in particular, did you review?
2  A    So as I note here in the -- in the
3  footnote, I looked at the complaint itself. And I
4  state here, Since the IOENGINE litigation had
5  other products than those covered under the
6  ROAM-BBPOS license, I allocate the total legal
7  fees associated with the litigation by considering
8  an equal weight share of the litigation expenses
9  and fees by product category since the BBPOS
10 products all fall into one of the categories.
11     Q    Did you undertake any analysis of the
12 actual amount of accused products involved in that
13 litigation?
14     A    So if we look at -- let's see. Where do
15 I cite to? I cite to Exhibit D -- for the accused
16 products and category, see Exhibit D-10.
17     Q    And Exhibit D-10, it outlines the
18 products that were accused in that -- in the
19 IOENGINE litigation; is that right?
20     A    That's correct.
21     Q    Okay. But do you have an understanding

Page 199

1  of, in total, what the accused products -- what
2  the accused products would be in that litigation?
3  Like the number.
4     A    So this is based -- if you look at the
5  footnote in this -- in this Exhibit D-10, I refer
6  to the -- the answer affirmative defenses and
7  counterclaims in that product. And these are the
8  products that are cited to there. So that's --
9  that's what I used in order to determine the
10 specific products that were alleged.
11    Q    So they're divided into three categories;
12 is that right?
13    A    That's my understanding, yes.
14    Q    Okay. And for category 1 which is
15 identified as the mPOS card readers, there are --
16 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 -- 11 different
17 products; is that right?
18    A    That's correct.
19    Q    And only three of those relate to
20 products that were sold by BBPOS to ROAM or
21 Ingenico -- Ingenico. Would you agree with that?

Page 200

1  A    So I don't know for certain. So I know
2  that the G3X, 4X and 5X. I don't know if maybe in
3  the past the G2 may have also been sold by ROAM to
4  Ingenico.
5     Q    Well, would you agree that BBPOS would
6  not be responsible for each of these products that
7  are identified in this one category?
8     A    So I would agree that it could be not all
9  of these were sold by BBPOS. But in terms of
10 identifying the costs associated with the
11 litigation, this category of products included the
12 BBPOS products. So that's how I've done the
13 allocation here because those fall into those
14 categories.
15        So with the basic, you know, underlying
16 assumptions that certain of the litigation costs
17 would have been associated with the categories --
18 the broader categories themselves, I thought that
19 this was a reasonable way to estimate the costs.
20        In addition, this would really
21 understate, you know, what the incremental value

Page 201

1  would be associated just for these products. For
2  instance, if there was a litigation that included
3  only these products, because some of the work that
4  has to be done from a legal perspective would be
5  done no matter how many products are associated in
6  the litigation.
7     Q    Did you do anything to independently
8  analyze whether or not the cost have been properly
9  allocated or accurate and reasonable?
10    A    That was not my -- I was not asked to do
11 that, no.
12    Q    And the one-third allocation is
13 appropriate with respect to the underlying
14 litigation but not appropriate with respect to the
15 IPR; is that correct?
16    A    So the IPR I understood to affect all of
17 the products. And so, you know, regardless of
18 whether it was just these products or other
19 products. So all of the patents associated with
20 the IPR I understood to -- to be associated with
21 the -- the BBPOS products.

51 (Pages 198 - 201)

Page 202

1 Q How is that different from the underlying
2 litigation?
3 A Well, because the IPR -- you're looking
4 at just -- you're not looking at -- it's not
5 product specific. So you're just looking at the
6 patents that are being asserted. And the patents
7 were all being asserted against the BBPOS
8 products.
9 Q Do you have an understanding of how many
10 patent infringement claims are comprised of -- of
11 this category of damages?
12 A I don't understand the question.
13 Q Well, you identified the one lawsuit,
14 right. The I -- IOENGINE litigation. But are
15 there other litigation matters that you considered
16 and contribute to this damages figure?
17 A Yes. And so I -- I list those -- those
18 matters in -- is it D-12? I'm sorry. In Exhibit
19 D-13.
20 Q And did you -- did you review the -- any
21 of the litigation documents in connection with the

Page 203

1 other matters that are listed here in D-13, other
2 than the I -- IOENGINE matter?
3 A No. My understanding was that for the
4 other matters there was no allocation needed, that
5 all of the products would be subject to
6 indemnification.
7 Q All of the accused products in those
8 matters were related to the devices that were sold
9 by BBPOS to ROAM or Ingenico; is that right?
10 A Just more generally, my understanding was
11 that these matters, at least up until the point
12 where these are smaller amounts, that -- the
13 allegation is that the entirety of the matter
14 would be subject to indemnification. I don't -- I
15 don't know the specifics of that.
16 Q And that was based on information from
17 counsel; is that right?
18 A That's correct.
19 Q And is that the basis for your assumption
20 that no allocation would be appropriate for the
21 remaining four matters?

Page 204

1 A That's correct.
2 Q What is the basis of your understanding
3 of a possible indemnification obligation owed by
4 BBPOS with respect to litigation between PayPal
5 and IOENGINE?
6 A Well, as I state in my report, "There is
7 a litigation between PayPal and IOENGINE involving
8 Ingenico products licensed from BBPOS, where
9 Ingenico may be required to indemnify PayPal for
10 fees and costs resulting from the litigation."
11 Q And it's -- and in 101 of your report,
12 you say, "A similar allocation of fees and costs
13 as described for the Ingenico-IOENGINE matter
14 would [sic] be appropriate in connection with the
15 PayPal-IOENGINE litigation"?
16 A I say "could be used," "should amounts
17 associated with that need to be indemnified." So
18 yes, in terms of identifying various groups of
19 products and allocating them that way.
20 Q You didn't undertake any analysis of
21 actually counting up the actual accused products

Page 205

1 at issue in either of the IOENGINE litigation
2 matters, did you?
3 A So I don't understand -- you keep asking
4 me that question about the first one, but I went
5 to G-2, the specific exhibit that I created that
6 has the products that I assume to be the accused
7 products. And so there's not that many of them.
8 I can certainly count them.
9 As to the PayPal matter, no. I haven't
10 done any further analysis into the PayPal matter.
11 I simply say that that allocation methodology
12 could be used in that matter, but I haven't
13 actually applied that to the PayPal litigation.
14 Q I think maybe I'm -- I'm being too
15 general when I'm -- I think my -- my -- I think my
16 questions are -- were being too general. But what
17 I'm actually trying to ask you is, did you
18 undertake an analysis that would actually count
19 each device that would comprise of the devices
20 identified in all -- in those three different
21 categories, the number -- like the actual number

52 (Pages 202 - 205)

Page 206

1 sold?
2   A   Oh, the actual number sold. Well, that's
3 different. So that would be -- you know, in terms
4 of the number sold -- and the litigation costs
5 aren't going to be associated with the number of
6 devices sold.
7       In term of damages, that's -- in terms of
8 indemnifying for damages, that's a completely
9 different thing. And, presumably, the damage
10 analysis would specify the damages that are
11 associated with the different products. And then
12 those -- those amounts could be identified with
13 specificity.
14      And so at that point in time that
15 analysis could be done in terms of identifying
16 the -- the specific damages associated with the
17 products themselves. But in terms of identifying
18 the legal costs, that's not -- that wouldn't be a
19 methodology that I would -- that I would propose
20 using.
21  Q   Why not?

Page 207

1   A   Because it simply isn't -- isn't
2 relevant. And so whether or not there is 1,000
3 units sold or a million units sold isn't going to
4 necessarily impact the litigation costs
5 associated. It's going to impact damages for
6 sure. But the litigation costs associated aren't
7 necessarily going to change.
8   Q   With respect to 6.3. of your report which
9 relates to BBPOS tortious interference claim, you
10 calculate damages associated with sales to any
11 NAB, which I believe is North American Bancard.
12 What is the underlying product that informs your
13 damages figure of $753,475?
14  A   And so, again, as I've stated, the
15 information available to me did not break out
16 customer and product level information. My
17 understanding is that the sales by BBPOS to North
18 American Bancard were the products that --
19 Ingenico was selling them to North American
20 Bancard.
21      And North American Bancard basically

Page 208

1 went -- I'm sorry. BPOS went to North American
2 Bancard and said, we can sell these to you. Let's
3 cut out the middle man. We'll sell these to you
4 directly.
5       And so what I have done is allocate sales
6 as best as I can on a customer-level basis,
7 looking at the sales that North American Bancard
8 made -- the sales that BBPOS made to North
9 American Bancard. And those sales I have included
10 here in my damages analysis as being part of a
11 tortious interference claim.
12  Q   Do you have an understanding of whether
13 or not that figure includes sales of a Swiper, the
14 Swiper device, the Swiper category?
15  A   Again, as I've stated many times, the
16 information given to me does not break out sales
17 by product and by customer. And so there's no way
18 for me to identify specifically the sales of a
19 specific product to a specific customer given the
20 data that has been provided to me.
21  Q   But you, nonetheless, opine that these

Page 209

1 damages are subsumed in the damages figure that
2 amounts to roughly 56 million; is that right?
3   A   That's right. These are not the -- we
4 would not double count these. So if you're
5 looking at total damages, you would not add these
6 on top of those amounts.
7   Q   Not added them, I think that's what you
8 said?
9   A   That's right.
10  Q   With respect to section 6.4. of your
11 report which is the AnywhereCommerce tortious
12 interference and trade secret misappropriation
13 counts, did you have an opportunity to review
14 Mr. Scherf's opinion that this is a double
15 counting of damages?
16  A   I did, yes. I saw his opinion on that.
17  Q   Do you have any response to that?
18  A   Yes. It is not. And so both
19 AnywhereCommerce and BBPOS make profits on these
20 products. And so, for one, I've done this at the
21 profit level. And so the profits associated with