**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ANYWHERECOMMERCE, INC. and BBPOS LIMITED, | |
| **Plaintiffs,** | **Civil Docket No: 1:19-cv-11457-IT** |
| **v.** | **Jury Trial Demanded** |
| INGENICO INC., INGENICO CORP., and INGENICO GROUP SA, | **ORDER GRANTED FOR PAGES TO EXCEED DATED JUNE 22, 2022** |
| **Defendants.** | |

**ANYWHERECOMMERCE, INC.'S AND BBPOS LIMITED'S**
**MEMORANDUM OF REASONS IN SUPPORT OF THEIR MOTION FOR SUMMARY**
**JUDGMENT ON INGENICO INC.'S SECOND AMENDED COUNTERCLAIMS**

Jonathon D. Friedmann, Esq. (BBO # 180130)
Robert P. Rudolph, Esq. (BBO # 684583)
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA 02109
Tel.: (617) 723-7700
Fax: (617) 227-0313
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

and

Oliver D. Griffin (Pro Hac Vice)
Pennsylvania Bar No. 88026
Peter N. Kessler (Pro Hac Vice)
Pennsylvania Bar No. 209033
Melissa A. Bozeman (Pro Hac Vice)
Pennsylvania Bar No.  201116
KUTAK ROCK LLP
1760 Market Street, Suite 1100
Philadelphia, PA  19103-4104
(215) 299-4384 (Telephone)
(215) 981-0719 (Facsimile)
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com
Melissa.bozeman@kutakrock.com

and

Ricardo G. Cedillo
DAVIS, CEDILLO & MENDOZA, INC.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
Tel: (210) 822-6666
Fax: (210) 822-1151
rcedillo@lawdcm.com

Dated: June 22, 2022.                    *Attorneys for Plaintiffs / Counterclaim-Defendants*

Table of Contents

Page

I.    INTRODUCTION ................................................................................................. 1

II.   SUMMARY OF MATERIAL FACTS............................................................... 4

III.  LEGAL ARGUMENT...................................................................................... 12

    A.    Standard of Review................................................................................ 12

    B.    Counts I and II Should Be Dismissed With Prejudice ....................... 13

        1.    Standard of Review (Counts I and II) ................................... 14

        2.    The Alleged Exclusivity Breaches Fail as a Matter of Law ................... 15

            a.    Ingenico Inc. Fails to Establish Any Breach of Bargained-for Exclusivity / Nor Any Agreement to Exclusivity on Devices Other Than CircleSwipe Family of Devices ................. 16

            b.    Ingenico Inc. Fails to Establish Actionable Harm ...................... 20

            c.    Ingenico Inc. Fails to Establish the Existence of Consideration ................................................................ 22

            d.    Ingenico Inc.'s "Exclusive IP Theory" Constitutes an Illegal or Unenforceable Restraint on Trade................................ 22

            e.    Alleged Parameters of Exclusivity, as Advanced by Ingenico Inc., is Vague, Ambiguous, and/or Insufficiently Definite to Enforce........................................................ 25

            f.    The Breaches Are Time-Barred under the 6-Year Statute of Limitations ................................................................ 28

        3.    The Alleged Indemnification Breaches ................................... 30

    C.    Counts III and IV Should Be Dismissed With Prejudice..................... 35

    D.    Counts V through VII Should Be Dismissed With Prejudice............................. 37

IV.  CONCLUSION................................................................................................. 39

## <u>CITATION OF SUPPORTING AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Armstrong v. Rohm & Haas Co., Inc.*,
   349 F. Supp. 2d 71 (D. Mass. 2004) ................................................................. 25-26

*Arvest Bank v. RSA Sec. Inc.*,
   1:15-CV-11798-IT, 2017 WL 4287358 (D. Mass. Sept. 27, 2017)........................34

*Atl. Rsch. Mktg. Sys., Inc. v. Saco Def., Inc.*,
   997 F. Supp. 159 (D. Mass. 1998) .......................................................................21

*Barclays Bank PLC v. Poynter*,
   710 F.3d 16 (1st Cir. 2013)...................................................................................19

*Carmona v. Toledo*,
   215 F.3d 124 (1st Cir. 2000).................................................................................12

*Channing Bete Co., Inc. v. Greenberg*,
   3:19-CV-30032-MGM, 2022 WL 43692 (D. Mass. Jan. 5, 2022) ................... 18-19

*Cooney Indus. Trucks, Inc. v. Toyota Motor Sales, U.S.A., Inc.*,
   978 F. Supp. 391 (D. Mass. 1997), *aff'd*, 168 F.3d 545 (1st Cir. 1999)........... 20-21

*Fafard Real Estate & Dev. Corp. v. Metro–Boston Broadcasting, Inc.*,
   345 F. Supp. 2d 147 (D. Mass. 2004) ..................................................................36

*FAMM Steel, Inc. v. Sovereign Bank*,
   571 F.3d 93 (1st Cir. 2009)...................................................................................38

*Farmers Ins. Exch. v. RNK, Inc.*,
   632 F.3d 777 (1st Cir. 2011)............................................................................13, 19

*Guilfoile v. Shields Pharmacy, LLC*,
   No. 16-CV-10652, 2021 WL 4459515 (D. Mass. Sept. 29, 2021) ........................21

*Hartsock v. Goodyear Dunlop Tires N. Am. LTD*,
   No. 2:13-CV-00419-PMD, 2013 WL 6919715 (D.S.C. Nov. 22, 3013)................28

*Haven Real Est. Grp., LLC v. Bell Atl. Mobile of Massachusetts Corp., Ltd.*,
   236 F. Supp. 3d 454 (D. Mass. 2017) ............................................................. 20-21

*IKON Office Sols., Inc. v. Belanger*,
   59 F. Supp. 2d 125 (D. Mass. 1999) ....................................................................23

*Innovative Mold Sols., Inc. v. Cent. Mut. Ins. Co., Inc.*,
   277 F. Supp. 3d 222 (D. Mass. 2017) ..................................................................35

*Jang v. Boston Scientific Scimed, Inc.*,
   729 F.3d 357 (3d Cir. 2013)..................................................................................14

*Jasty v. Wright Med. Tech., Inc.*,
   528 F.3d 28 (1st Cir. 2008)...................................................................................38

*Lass v. Bank of Am., N.A.*,
   695 F.3d 129 (1st Cir. 2012).................................................................................19

*Layne Christensen Co. v. Bro-Tech Corp.*,
   836 F. Supp. 2d 1203 (D. Kan. 2011), appeal dismissed (Fed. Cir. 12-
   1178)(Aug. 23, 2012)...........................................................................................14

*Lyons v. Gillette*,
   882 F. Supp. 2d 217 (D. Mass. 2012) ..................................................................36

*Patco Constr. Co. v. People's United Bank*,
  684 F.3d 197 (1st Cir. 2012) .......................................................................................13
*Peerless Industries Inc. v. Crimson AV, LLC*
  (2012 WL 3686774 (N.D. Ill. Aug. 24, 2012)) .................................................... 27-28
*Primarque Products Co. Inc. v. Williams W. & Witts Products Co.*,
  303 F. Supp. 3d 188 (D. Mass. 2018) ..........................................................................25
*Pure Distributors, Inc. v. Baker*,
  285 F.3d 150 (1st Cir. 2002) .......................................................................................36
*Rambus Inc. v. Hynix Semiconductor Inc.*,
  629 F. Supp. 2d 979 (N.D. Cal. 2009) .........................................................................14
*RTR Techs., Inc. v. Helming*,
  707 F.3d 84 (1st Cir. 2013) .........................................................................................39
*Terumo Americas Holding, Inc. v. Tureski*,
  251 F. Supp. 3d 317 (D. Mass. 2017) ..........................................................................20
*Triangle Trading Co. v. Robroy Indus., Inc.*,
  200 F.3d 1 (1st Cir. 1999) ...........................................................................................12
*Young v. Wells Fargo Bank, N.A.*,
  109 F. Supp. 3d 387 (D. Mass. 2015), aff'd, 828 F.3d 26 (1st Cir. 2016) .................20

## STATE CASES

*All Stainless, Inc. v. Colby*,
  308 N.E.2d 481 (Mass. 1974) .......................................................................................24
*Analogic Corp. v. Data Translation, Inc.*,
  358 N.E.2d 804 (Mass. 1976) .......................................................................................24
*Anthony's Pier Four, Inc. v. HBC Assocs.*,
  411 Mass. 451 (1991) ...................................................................................................14
*Bank v. Thermo Elemental Inc.*,
  888 N.E.2d 897 (Mass. 2008) .......................................................................................19
*Boylston Development Group, Inc. v. 22 Boylston St. Corp.*,
  412 Mass. 531, 591 N.E.2d 157 (1992) .......................................................................35
*Bulwer v. Mount Auburn Hosp.*,
  46 N.E.3d 24 (Mass. 2016) ....................................................................................14, 20
*Cellucci v. Sun Oil Co.*,
  2 Mass. App. Ct. 722, 320 N.E.2d 919 (1974) ............................................................35
*Club Aluminum Co. v. Young*,
  160 N.E. 804 (Mass. 1928) ....................................................................................20, 23
*Drucker v. Roland W. Jutras Assocs.*,
  370 Mass. 383 (1976) ...................................................................................................14
*Dulgarian v. Stone*,
  420 Mass. 843, 652 N.E.2d 603 (1995) .......................................................................13
*Dynamics Research Corp. v. Analytic Scis. Corp.*,
  9 Mass. App. Ct. 254, 400 N.E.2d 1274 (1980) ..........................................................25
*Ficara v. Belleau*,
  331 Mass. 80 (1954) .....................................................................................................21
*Gen. Convention on New Jerusalem in the U.S., Inc. v. MacKenzie*,
  874 N.E.2d 1084 (Mass. 2007) .....................................................................................19

*Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc.*,
　42 Mass. App. Ct. 162, 675 N.E.2d 403 (1997) ..................................................25
*Kerrigan v. Boston*,
　361 Mass. 24, 278 N.E.2d 387 (1972) ...............................................................14
*Kurker v. Hill*,
　44 Mass. App. Ct. 184, 689 N.E.2d 833 (1988) ................................................36
*Louise Caroline Nursing Home, Inc. v. Dix Const. Corp.*,
　362 Mass. 306 (1972) .........................................................................................21
*Marine Contractors Co., Inc. v. Hurley*,
　365 Mass. 280 (1974) .........................................................................................26
*McGirr v. Dugas*,
　62 Mass. App. Ct. 1102, No. 03-P-987 (Mass. App. Ct. Sept. 21, 2004).......... 26-27
*Mount Vernon Fire Ins. Co. v. Visionaid, Inc.*,
　76 N.E.3d 204 (Mass. 2017) ..............................................................................34
*Nortek Inc. v. Liberty Mut. Ins. Co.*,
　843 N.E.2d 706 (Mass. App. 2006) ....................................................................15
*Novelty Bias Binding Co. v. Shevrin*,
　175 N.E.2d 374 (Mass. 1961) ............................................................................24
*People's Choice Mortg., Inc. v. Premium Cap. Funding, LLC*,
　No. 06-3958-BLS2, 2010 WL 1267373 (Mass. Super. Mar. 31, 2010) .................21
*Polaroid Corp. v. Travelers Indem. Co.*,
　610 N.E.2d 912 (Mass. 1993) ............................................................................35
*Richmond Bros. v. Westinghouse Broad. Co.*,
　357 Mass. 106, 256 N.E.2d 304 (1970) .............................................................25
*Schwartz v. Travelers Indem. Co.*,
　740 N.E.2d 1039 (Mass. App. 2001) ..................................................................14
*Shea v. Bay State Gas Co.*,
　418 N.E.2d 597 (Mass. 1981) ............................................................................33
*Singarella v. Boston*,
　173 N.E.2d 290 (Mass. 1961) ......................................................................14, 20
*Situation Mgmt. Sys., Inc. v. Malouf, Inc.*,
　430 Mass. 875 (2000) .........................................................................................21
*Speers v. H.P. Hood, Inc.*,
　495 N.E.2d 880 (Mass. App. Ct. 1986) .............................................................33
*Swanset Dev. Corp. v. City of Taunton*,
　668 N.E.2d 333 (Mass. 1996) ............................................................................36
*Symmons v. O'Keeffe*,
　419 Mass. 288, 644 N.E.2d 631 (1995) .............................................................13
*Veridiem, Inc. v. Phelan*,
　17 Mass. L. Rptr. 8 (Sup. Ct. Mass. Sept. 26, 2003) .........................................26
*Warner Ins. Co. v. Commissioner of Ins.*,
　406 Mass. 354, 548 N.E.2d 188 (1990) .............................................................14

iv

# FEDERAL STATUTES

18 U.S.C.A. § 1836(d) ...................................................................................38
18 U.S.C. § 1836(b)(1) ..................................................................................38
Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. .....................................38

# STATE STATUTES

M.G.L.A. ch. 93, §4 ......................................................................................23
M.G.L.A. ch. 93, §19 ....................................................................................38
M.G.L.A. ch. 93, §42 ....................................................................................38
M.G.L.A. ch. 93, §42B ..................................................................................38
M.G.L.A. ch. 93A §2 ....................................................................................38
M.G.L.A. ch. 93A, §11 ..................................................................................38
M.G.L.A. ch. 260, §2 ................................................................................14-15
M.G.L.A. ch. 260, §2A ..................................................................................36
M.G.L.A. ch. 260, §5A ..................................................................................39

# OTHER AUTHORITIES

118 American Jurisprudence Proof of Facts, 3d 1, §26 ...................................28
Fed. R. Civ. P. 56 ............................................................................................1
Fed. R. Civ. P. 56(a) .....................................................................................12
Local Rule 56.1 ...............................................................................................1
RAYMOND T. NIMMER, LAW OF COMPUTER TECHNOLOGY § 7.44 (Dec.
2021) .............................................................................................................19
WILLISTON ON CONTRACTS § 4:18 (4th ed. 1990).....................................25

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiffs / Counterclaim Defendants BBPOS Limited ("BBPOS") and AnywhereCommerce, Inc. ("AC") (together, the "Movants"), by and through their attorneys, hereby submit this Memorandum of Reasons in support of their Motion for Summary Judgment on Counts I through VII of Defendant / Counterclaim Plaintiff Ingenico Inc.'s Second Amended Counterclaims (the "Motion"). Movants are entitled to judgment as a matter of law, on the grounds that there is no genuine issue as to any material fact regarding any of Ingenico Inc.'s remaining seven counterclaims.

For the reasons set forth below, the counterclaims asserted by Ingenico Inc. are, on balance, overwhelmingly legally unsound, smack of unfairness and overreach, and contradict or otherwise lack sufficient support in the record evidence adduced to date, warranting the entry of an Order, granting judgment in favor of Movants on each of Ingenico Inc.'s counterclaims, and dismissing them with prejudice, as a matter of law.

## I.    INTRODUCTION

This lawsuit largely arises out of the unlawful theft of trade secrets, know-how, and proprietary technology that was invented, pioneered, and/or controlled, in part, via patent protection by BBPOS and AC relative to the manufacturing of mobile point-of-sale ("mPOS") devices.

BBPOS's trade secrets[7] were shared with ROAM Data, Inc. ("ROAM"), a U.S. payments solutions software start-up, under the contractual protections of an exclusive product license – i.e., the Engineering Development and License Agreement, dated May 4, 2010, as amended August 15, 2011 entered into between BBPOS and Ingenico Inc.'s predecessor-in-interest, ROAM

---

[7] Defendants stole five of BBPOS's trade secrets to develop and sell competitive mPOS products, globally, including Ingenico's RP350X, RP750X, RP100 series and RP450 series of devices (the "Accused Ingenico Products"). Ex. D (Zatkovich Report), Doc. No. 188-4 at 29-30.

[AC_02770544-554, IngenicoInc_0268234-238] (the "BBPOS-ROAM Licensing Agreement")[8] – that was entered into between the two companies in 2010. Under this agreement, BBPOS granted ROAM an exclusive product license for the development and sale of a single "CircleSwipe" device, being a MasterCard magnetic stripe reader that connected to mobile phones / tablets via audio-jack plug. This device enables merchants to accept MasterCard payments from their customers "on the go" by simply swiping their credit cards. The parties interchangeably, at times, refer to this product as the "CircleSwipe," "Crypto Swipe," "swiper," "ROAMpay Swipe," and/or ROAM's G3X, G4X, and G5X product series.

After obtaining a controlling interest stake in ROAM in February of 2012, Defendant Ingenico Group SA ("Ingenico") immediately began using its French appointees to ROAM, such as Christopher Rotsaert ("Rotsaert"), among others, to covertly commandeer BBPOS's protected trade secrets and then leak them, internally, to Ingenico's own research and development teams located in Valance, France and a newly-acquired manufacturing arm based out of China, Fujian Landi Commercial Equipment Co Ltd. ("Landi"), to build a competitive line of mPOS products. At that time, Ingenico's engineers had yet to independently replicate the underlying mPOS technology necessary to compete with BBPOS on an equal footing. Beginning in 2012, however, BBPOS's relationship with its now majority-owned mPOS entity, ROAM, presented the opportunity and eventual means by which Ingenico was able to shortcut its way to the marketplace with a competitive mPOS product suite built on a foundation of stolen trade secrets.

In 2012, ROAM's CEO, Will Graylin ("Graylin"), the person who had negotiated and executed the BBPOS-ROAM Licensing Agreement on behalf of ROAM, complained of Ingenico's suspected improper disclosures of BBPOS's trade secrets, in an internal email directed

---

[8] Ex. C (BBPOS-ROAM Licensing Agreement), Doc. No. 188-3.

to Rotsaert, observing "[a]pparently you are still not comprehending the gravity of the situation[,]" stating:

> Just because you sent me an email to me, does not mean you have my agreement and my permission to start **transferring IP that does not belong to Ingenico**. **Your assumption that the reader IP belongs to ROAM was already incorrect**, then to further transfer them further to Ingenico without my explicit permission and without any commercial agreement in place was a **real mistake**. Apparently you are still not comprehending the gravity of the situation. Your actions and assumptions are threatening the very fabric of ROAM's relationship with its most important supplier. You are transferring value from one company to another company unilaterally without agreement or consideration. **There is an apparent lack of respect for the IP or BBPOS and ROAM**, and for my role as CEO of ROAM.[9]

Of course, Movants, at the time, had no knowledge of the theft coverup and corporate infighting, which were unfolding behind-the-scenes.  BBPOS believed it was about to be acquired by Ingenico; Defendants, however, had re-focused their efforts in trying to secure curative access to certain mPOS patents held by AC's parent company, 4361423 Canada Inc. ("436 Canada")[10] – first, indirectly, purportedly on BBPOS's behalf, and then graduating to "aggressively trying create a direct relationship with [AC] for IP licencing [sic]" from 436 Canada.  In 2013, however, ROAM was notified that its request for a direct licensing agreement, among other things, to " 'shore up Roam's access to HomeATM's IP'"[11] was being rejected by letter dated May 14, 2013. Apparently, more than six years later, Ingenico has decided to unilaterally "shore up" its access to BBPOS's trade secrets and 436 Canada's intellectual property through a use of judicial means.

---

[9] Ex. I (9/17/2012 Thread) at IngenicoInc_0071720, Doc. No. 188-9 at 1 (emphasis added).

[10] Ex. F (Kron I Tr.) at 19:2-4, 34, Doc. No. 188-6 at 2, 3; Doc. No. 78 at 15 (SACC ¶¶87-88) ("The present assignees of the Asserted Patents are 4361423 Canada Inc. (AnywhereCommerce's parent company) or BBPOS.").

[11] Ex. V (May 2013 Rejection Letter) [AC_0098843], Doc. No. 188-22 at 1.

## II.    SUMMARY OF MATERIAL FACTS[12]

In or around 2007, ROAM began as a software mPOS services platform provider, based out of Boston, Massachusetts, which had been co-founded and lead by serial tech entrepreneur, Graylin.[13] In 2009, Ingenico invested $6.5 million in ROAM's business.[14]  In February 2012, Ingenico secured a controlling ownership interest of approximately 704.71% in ROAM, after closing on an investment in the company of approximately $48 million.[15] By January 1, 2015, Ingenico acquired 100% of the ownership interests in ROAM, and, on December 31, 2017, ROAM merged with and into Ingenico Inc. (a wholly owned U.S. subsidiary of Ingenico) and, consequently, out of corporate existence.[16] Ingenico acquired 100% of the ownership interests in ROAM by January 1, 2015.[17] Thus, no later than December 2017, all business activities related to ROAM/Ingenico's G3X, G4X, G5X product lines at issue in this case and other competitive mPOS products, within the United States, at least, would have begun flowing through and out of Ingenico's U.S. headquarters situated in Georgia.[18]

It was in early 2010 when Graylin first contacted Ben Lo ("Lo") of BBPOS.[19] Graylin testified that ". . . from that early discussion I was interested in his hardware with his firmware that we could use because we were building, you know, the applications, the back end, the gateways

---

[12] All of the facts and documentary evidence set forth in Movants' accompanying Concise Statement of Material Facts are incorporated herein by reference.
[13] Ex. E (Graylin Tr.) at 6:21-23, 7:16-22, Doc. No. 188-5 at 2; Ex. A, (Lo I Tr.) at 30:4-12, Doc. No. 188-1 at 5 ("Will Graylin told me that ROAM Data is a software company.").
[14] Ex. G (Houlihan Lokey Report) [IngenicoInc_0000114-196] at 9, Doc. No. 188-7 at 13.
[15] Ex. G (Houlihan Lokey Report) at 9, Doc. No. 188-7 at 13; Doc. 68 at 9 (Answer ¶45).
[16] Doc. No. 68 at 3 (Answer ¶¶7-8); Doc. No. 68 at 11 (SACC ¶54).
[17] *See* Answer, ¶¶8, 53.
[18] Doc. No. 68 at 1, 3 (Answer ¶¶7-8); Doc. No. 78 at 3 (SACC ¶12).
[19] Ex. A (Lo Tr.) at 27:23-25 – 28:1-9, Doc. No. 188-1 at 4.

in the United States. And it seemed like a potential fit so we explored it. It turned out to be a fit.

We started acquiring and purchasing some of their products."[20]

     The licensing agreement at issue in this case was negotiated by and between Lo, on behalf

of BBPOS, and Graylin, as then CEO of ROAM.[21] Negotiations of agreement centered heavily on

the product exclusivity aspect of the deal, as reflected in the parties' contemporaneous writings.[22]

---

[20] Ex. E (Graylin Tr.) at 9:2-9, Doc. No. 188-5 at 2.

[21] Ex. E (Graylin Tr.) at 17:14-24, Doc. No. 188-5 at 4.

[22] *See, e.g.,* Ex. M, 3/1/2010 Thread [IngenicoInc_0020386-392], Doc. No. 188-13 at 4 (framing of the issue by Lo at Ingenicolnc_0020389 as: "**Exclusivity means the design (outlook and protocol) is dedicated for your company** OR **you want us to sell this type of product only to your company**? If you are talking about the previous scenario, it is possible. It is probably the best for us to start business and build relationship. If the product is custom made for you, you can own the product and even find other manufacturers to produce the device, if our price is not competitive or quality is not good enough. I propose $25K NRE, $ OK tooling fee and the unit price of the device is US$4.5 for quantity of 2K. I will provide you with BOM, CAD drawing, Circuit diagram, PCB Gerber file, API for the device. **If you are talking about the later scenario, it is possible only if you are one of the investors in our company.**") (emphasis added); Ex. N 4/12/2010 Thread [Ingenicolnc_0020801-802], Doc. No. 188-14 at 1-2 ("We would like your help on a legal agreement with BBPOS limited to get **exclusive rights to use and sell the Encrypted Circle Swipe reader** they developed, as well as the "ROAM pos EMV terminal" that they have developed, and **will build a custom version for us**. The exclusivity carves out the territory of China for now. The terms of the agreement is outlined in the 11 points in the document here.") (emphasis added); Ex. O 4/22/2010 Thread [IngenicoInc_0020913-915], Doc. No. 188-15 at 1-3 (reiterating, at IngenicoInc_0020914-915, Lo's unwillingness and legal inability to restrict the sales of the "BBPOS" device, and reprising the spirit of Graylin's April 12[th] instructions to counsel, proposing to develop a custom version of that product for ROAM better suited to use in a market segment with a heavier concentration of smart phone usage; and, stating, at IngenicoInc_0020913: "My business model for BBPOS is to sell BBPOS at very low cost and charge a monthly license fee so that our company has some recurrent revenue. **If I give you an exclusive right to sell BBPOS and getting a monthly license fee for each BBPOS you sold. That's good to me. But I also design the ROAMpos for RoamData. ROAMpos completes with BBPOS in some sense. If you have to top up some montly fee for each BBPOS you sold, you might focus in selling ROAMpos.** Is it possible for me to get a fixed amount per month or % of your monthly fee for each BBPOS & ROAMpos you sold?") (emphasis added); Ex Q 4/24/2010 Thread [IngenicoInc_0020924-929], Doc. No. 188-17 at 4 (internally discussing, generally, the value of the deal metrics for ROAM, including at IngenicoInc_0020927: "[we are **licensing their product exclusively**, they have **already developed it**, our bigger value is not earning a few cents per device, but getting them to package our software longer term. I'm not worried about them getting rich on hardware sale and **getting a royalty off device IP that we don't own**. The **other products we have them build is a different story**, they don't have rights

5

Not only was Graylin aware that BBPOS was actively engaged in the sale of mPOS products (including its EMV-capable BBPOS device sales) prior to inking the BBPOS-ROAM Licensing Agreement, Graylin also understood that those sales, along with any other mPOS development and sales activities in which BBPOS chose to engage, certainly could (and presumably would) continue, unhindered, in the event that the parties ultimately were able to reach a deal on the exclusivity for the CircleSwipe and contemplated custom-built EMV device.

Following these discussions, in May of 2010, BBPOS and ROAM entered into the BBPOS-ROAM Licensing Agreement. Section 1.1, as amended, sets forth the scope of licensing grant at issue herein:

> The Partner hereby grants to the Company a worldwide, perpetual, fully-paid license to freely **use the Partner Intellectual Property** to make, have made, develop, have developed, use, sell, offer for sale, import and distribute **the Products, any portion thereof, or any products similar to or based upon any Products**. . .

(Emphasis added). Section 1.3, as amended, sets forth the "exclusivity" parameters of the license grant, carving out a territorial exception therefrom consisting of China and the Philippines:

> The license granted in Section 1.1 is exclusive on a worldwide basis (with the exception of China, Philippines, as set forth below and Section 1.5). Without limiting the generality of the foregoing, the Partner may not, directly or indirectly, anywhere in the world, use or sell any Products, or any portion thereof, or any products similar to or based upon any Products (**other than as explicitly provided in this Agreement**) or grant any other person rights to the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and distribute any Products, any portion thereof, or any products similar to or based upon any Products. Notwithstanding the foregoing provisions of this Section 1.3, **the Partner shall retain the non-exclusive, non-transferrable right to sell the Products in China for use in China and sell the Products in Philippines for use in Philippines**.

---

to sell it at all.]) (emphasis added); Ex. P 4/23/2010 Draft [IngenicoInc_0000248-257] at proposed language appearing in §§1.4, 1.5, and Schedule I, Doc. No. 188-16 at 2, 10 (referring to grant of rights in the "BBPOS" device in addition to the ROAMpay POS solution).

(Emphasis added). The terms "Product" under the agreement at Schedule I relates to just two devices, namely, the CircleSwipe and contemplated ROAMpay POS (to be developed).[23]

Section 1.2 explicitly provides that the license granted to ROAM therein is not transferable or assignable "in event a sale of the Company to a competitor with its own POS products" – unless prior written consent is given by BBPOS.[24]   There was, at least, one major distinction between ROAM and Ingenico, at this time, that bore on the rationale for inclusion of anti-assignment language as articulated in §1.2 of the licensing agreement; namely, the bargained-for economic benefits of the bargain could be upset by an unrestrained assignment of the licensing agreement from a software company (like ROAM) to a competitor with POS manufacturing capabilities (such as Ingenico).[25]   Thus, in no event later than January 1, 2015, there was an attempted transfer or

---

[23] Per Schedule I, "Products" refers to (a) "Encrypted Circle Swipe reader, sometimes referred to as he 'Crypto Swipe' or 'ROAMpay Swipe' that has ability to generate capacitance for encryption from the audio jack of a mobile device or PC, this was developed by the Partner, and including any variance of this design" and (b) "EMV capable POS unit with Bluetooth interface, sometimes referred to as the 'BBPOS' currently completing certification."

[24] This was a late, but material change to the BBPOS-ROAM Licensing Agreement's final deal terms that can be seen by comparing §1.2 of the 4/23/2010 Draft to the final executed version.  *Cf.* Ex. P (4/23/2010 Draft) at §1.2, Doc. No. 188-16 at 1; Ex. C (BBPOS-ROAM Licensing Agreement) at §1.2, Doc. No. 188-3 at 1.

[25] Ex. E (Graylin Tr.) at 24:9-24 – 25:1-11, Doc. No. 188-5 at 6 (testifying, when asked what would happen to BBPOS's margin payments under the agreement if ROAM began manufacturing and selling the CircleSwipe itself, "**I mean, we didn't have any intentions to do that . . . so that was not part of the – the agreement. Yeah. And we were not a manufacturer ourselves**.").  *See also* Ex. J (Lo II Tr.) at 45:25 – 46:1-11, Doc. No. 188-10 at 2 ("Q. BBPOS is in this mPOS mobile point of sale business; right? **A. Yes.** Q. And in that context were you aware of Ingenico? **A. No. Ingenico is manufacturer of a traditional POS terminal.** Q. I understand . . . you're saying it's different from the mPOS terminal? **A. Yes.** Q. But was BBPOS aware of Ingenico as a participant in the point of sale credit card industry? **A. No. You're talking about -- no**."); 119:18-24 – 120:1-11, Doc. No. 188-10 at 3 (confirming, respectively, when asked whether his comments, in a November 2012 email following Graylin's ROAM exit, that "ROAM relies on us much more than we relies (sic) on them," and that "ROAM needs us but not the other way around" are true, "[t]hat's true because **ROAM is a software company and we are a hardware company**. ROAM wanted to buy the product from us. So I strongly believe that, like, they make sure that our product is good. And as I say, **we take a few years to come up with good products**. So I think that they want to have some like guy to come to like make sure that we are really good[,]" and, as to his second

assignment of the license to Ingenico. Despite the fact that Ingenico was a clear competitor to BBPOS with its own POS products, no prior written consent was ever given by BBPOS with respect to either transaction.

Section 3.8 of the BBPOS-ROAM Licensing Agreement purports to forever bar BBPOS from engaging in certain design and production activities as they related to the Products or "Devices" (which, effectively, is merely a placeholder for some future developed device under Schedule I):

> The Partner agrees that, **during or after the term of this Agreement**, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Devices, or products substantially similar to the Devices, for any third party. The Partner also agrees that, **during or after the term of this Agreement**, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Products, or products substantially similar to the Products, for any third party (other than in China to the extent permitted in Section 1.3 above).

(Emphasis added).  At §3.10, BBPOS represents and warrants, in relevant part, that "none of the Products, Devices, Deliverables or Services does or will infringe, misappropriate or violate any intellectual property right of any person."

Section 9.2 of the agreement sets forth the only grant of licensing rights under the agreement relative to BBPOS's IP, generally, as compared to the exclusive rights granted in the CircleSwipe, that is limited to (i) IP owned by BBPOS and only to the extent incorporated in the Products or Devices; (ii) carries no grant of exclusionary rights; and (iii) may be used only for the limited purposes of developing, manufacturing, or selling the Products or Devices, stating, in relevant part: "If the Products or Devices incorporate **Partner-owned IP**, the Company is hereby

---

comment, that "[w]e need ROAM. Yes. When need ROAM for the revenue, **but ROAM need us**. So ROAM make money and we make money. But, . . . **ROAM is hardware and software solution**, but for us, without ROAM we can still sell some product in China. So this is what I mean.").

granted a worldwide, perpetual, fully paid, sublicensable license to use the Partner IP to continue developing, manufacturing and selling the Products and Devices[26]." (Emphasis added).  Finally, Section 12.1[27] contains an integration clause, and §16.1 contains the parties' choice of law designation for the agreement to be governed and construed by Massachusetts law.

Although other potentially covered products were originally contemplated, BBPOS granted thereunder to ROAM an **exclusive product license** ultimately for a single MasterCard magnetic stripe reader product that connected to mobile phones/tablets via audio-jack plug that was called the "CircleSwipe" device (and, at times, interchangeably referred to as the "Crypto Swipe," "swiper," "ROAMpay Swipe," and/or ROAM's G3X, G4X, and/or G5X product series).[28]

---

[26] Per Schedule I, "Device" refers to "[t]he 'ROAMpay POS' EMV terminal developed by the Contactor based on the foundation of BBPOS, is the 'Device' that will be owned by ROAM. ROAMpay POS[.]"

[27] Section 12.1 states: "All agreements and obligations herein contained shall be in substitution for and shall superceded all and any previous agreement or understandings, oral or written, between the parties with respect to the subject matter hereof."

[28] Ex. E (Graylin Tr.) at 21:6-9, Doc. No. 188-5 at 5 ("Q Okay. Now, this engineering and license agreement, this was a product license agreement, correct? **A I believe so. Yes.**"); 22:2-7 (confirming that the licensing agreement was not a transfer BBPOS's patents, adding: "No. **It was a technology development and license.**"); 22:8-24 – 23:1-11, Doc. No. 188-5 at 6 ("So for -- for CircleSwipe, I think -- I think it was exclusive with the exception of a . . . couple of areas."); 111:4-8 ("So in 1.4 it says, BBPOS is non-exclusive. **1.3 says that we have exclusive rights**, which to me was **the swiper solution, the CircleSwipe**, so that was what we white-labeled and branded."); 113:18-24, Doc. No. 188-5 at 11 (". . . At this particular point in time [i.e., execution of the original licensing agreement], I recall we distinctively separated the two. **One was exclusive, which was CircleSwipe** and then **the other one was non-exclusive**, which . . . they were in the process of building for us . . . to sell. So that was what they named here as BBPOS, that's EMV-capable."); 143:22-24 – 144:1-7, Doc. No. 188-5 at 12 ("Q On Page 1, you say here, 'Yes, I have told Ken Paull and others at ROAM and Ingenico that EMV/NFC is not part of the exclusivity. Good to see them admit it,' right? **A Uh-huh.** Q And again, you're saying this during the time that you're exploring the possibility of selling these devices with Ben Lo [after being by ROAM] , right? **A Yeah. But that was also my belief that the EMV was not exclusive.**"); Ex. B (Rotseart I Tr.) at 32:17-25 – 33:1-21 and 34:21-25 – 35:1-21, Doc. No. 188-2 at 4-5 (referring to the G3X, G4X, and G5X products) and 112:12-24 and 172:2-19 (referring to the G4X and Swiper products); Ex. A (Lo I Tr.) at 26:4-25 – 27:1-22, Doc. No. 188-1 at 4 (referring to the CircleSwipe product), 43:7-25 – 44:1-10, Doc. No. 188-1 at 6 (referring to the G4X and G5X products), and 188:7-22, Doc. No. 188-1 at 7 (referring to the Swiper product).

Moreover, while the agreement granted ROAM exclusive rights in the sale of CircleSwipe devices outside of China and Philippines, the license grant was not intended by the parties at the time to confer upon ROAM any exclusionary rights in or to BBPOS's trade secrets or intellectual property, generally, or otherwise effectuate a purchase of BBPOS's IP.[29]

In or around 2011, ROAM successfully sought to amend the original terms of the licensing agreement to reflect a negotiated reduction on per unit margin price for the CircleSwipe devices, as reflected in amended Schedule II. In an internal email dated May 30, 2011, Graylin articulated his understanding that ROAM's continued right to exclusivity in the sale of the CircleSwipe under the agreement is tied to payment of the margin set forth under Schedule II, as amended, stating: "In his original contract, outside of cost of material, we gave him $3 margin per unit **based on getting exclusivity for the product**, now he has agreed to go to $2 per unit margin." Ex. U (5/30/2011 Thread) [IngenicoInc_0034925-926], Doc. No. 188-21 at 1-2 (emphasis added).

As a result, the $3 per unit margin price set forth under the original Schedule II for the CircleSwipe was reduced to a $3-2 margin, in relevant part, at the third bullet point of amended Schedule II:

> ROAM will be the exclusive distributor of the Products and Devices, Cyrpto (sic) Swipe (branded ROAMpay Swipe) and **ROAM will provide margin of $3 per Crypto Swipe unit (which shall be reduced to a margin of $2 per unit for sales above 150,000 cumulative units)** and $7 per BBPOS or ROAMpay POS unit above cost of manufacturing, packaging and BOM (Bill of Material), paid to BBPOS for delivering the units to ROAM as part of the invoice for hardware. These margins will be built into the price per unit charged to ROAM which also include BOM and manufacturing costs. For the case of BBPOS or ROAMpay POS sales referred by the Partner and where only hardware is sold, both parties will split the margin with 50% of the Margin going to the Partner, in accordance with section 1.5 of this agreement.

---

[29] Ex. E (Graylin Tr.) at 25:12-22, Doc. No. 188-5 at 6.

(Emphasis added). Neither the anti-assignment language at §1.2 of the agreement nor the limitation at §9.2 on the grant of licensing rights in BBPOS's IP, generally, was amended by the parties in 2011, each of which then "confirm[ed] and acknowledge[d] the continuing validity and enforceability" of the remaining original terms of the agreement to the extent not amended thereby in the amendment at §6.

In the July 5, 2012 BBPOS Report [IngenicoInc_0047329-334], Graylin identifies "several areas of contention that would likely need to be resolved in court" concerning the BBPOS-ROAM Licensing Agreement that he suggests to Ingenico would be better avoided by approving the contemplated BBPOS acquisition on terms acceptable to BBPOS, including, in relevant part:

> 2 b) Based on the last amendment that we signed Nov 2011, we reduced their margin to $2/unit from $3/unit for exclusively distributing products they supply us. **They feel that this margin we pay them includes the royalties we pay for their IP, which was the intension (sic) discussed with them early on** but not specified clearly in the contract.
>
>        *             *             *
>
> 2 d) The contract talked about margin per unit but did not directly talk about the price including royalties, **they felt that the price does include royalties**. They feel that **if we don't buy the finished products from them then we must pay royalties for units sold**. Otherwise they can seek to terminate the agreement for breach and fight it out in court, which can cause IP to be fought over not only with them, but if our BBPOS contract gets terminated, **we can be exposed to HATM patent suit or royalties**.
>
> 2 e) Further, they feel they have been developing the NFC and EMV readers as well as a new PIN entry device technology **at their own cost**. Ben stated all the engineers development we paid for were specifically for **ROAMpay API, ROAMplayer, and other software that we own** but their hardware team worked on new products **without our commission and on their own investments**, and **are not part of the original products we licensed**, so if we were to stop paying them royalties for units, and fight them, then we may not get access to those product rights.[30]

When Graylin was asked what would happen to BBPOS's margin payments if ROAM began manufacturing and selling the CircleSwipe itself, he testified, "I mean, we didn't have any intentions to do that . . . so that was not part of the – the agreement. Yeah. And we were not a

---

[30] Ex. W (BBPOS Report) at IngenicoInc_0047331, Sections 2 b), 2 d), 2 e), Doc. No. 188-23 at 3 (emphasis added).

manufacturer ourselves."[31] Defendants' damages expert, Dr. Vanderhart, offered her opinion that the $3-2 per unit margin payment payable to BBPOS under the amended Schedule II upon the sale of each CircleSwipe does, in fact, include "a royalty for the use of intellectual property" as well as "any potential return that . . . BBPOS would . . . require itself to . . . make."[32] However, she further acknowledged that the agreement does not provide a contractual mechanism by which BBPOS is to be compensated for the use of its IP in any product (whether rightly or wrongly) that BBPOS has not manufactured itself:

> Q If ROAM or Ingenico used any of the intellectual property of BBPOS in a different device that it would sell, would there be a margin payment due to BBPOS? **A And so I think that's this case, right. And so they're saying they did not use any intellectual property of BBPOS. And so this licensing agreement does not contemplate that specific scenario.** Q So in other words, this agreement would not require ROAM or Ingenico to pay any amount for the use of BBPOS's intellectual property in any of its devices? **A Well, for these particular devices that they got from BBPOS, they have to pay for any other devices. Again, . . . their assertion is that they don't use the intellectual property. This agreement does not separately have any such . . . paragraphs or statements requiring any specific payments for any devices other than what's listed here.**[33]

## III.   LEGAL ARGUMENT

### A.   Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the party moving for summary judgment to establish that there are no genuine disputes of material fact. *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000). A dispute of fact is considered genuine if "a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quotation

---

[31] Ex. E (Graylin Tr.) at 24:9-24 – 25:1-11, Doc. No. 188-5 at 6.
[32] Ex. X (Vanderhart Tr.) at 117:21 – 119:1-6, Doc. No. 188-24 at 2-3.
[33] Ex. X (Vanderhart Tr.) at 119:3-21 – 120:1-3, Doc. No. 188-24 at 3.

omitted). A fact is material if "it has the potential of determining the outcome of the litigation." *Patco Constr. Co. v. People's United Bank*, 684 F.3d 197, 207 (1st Cir. 2012) (quotation omitted). Critically, the Court must view the entire record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 779-80 (1st Cir. 2011). "[The] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates ... that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Dulgarian v. Stone*, 420 Mass. 843, 846, 652 N.E.2d 603 (1995), quoting from *Symmons v. O'Keeffe*, 419 Mass. 288, 293, 644 N.E.2d 631 (1995).

### B.     Counts I and II Should Be Dismissed With Prejudice

Ingenico Inc.'s Counts I and II for breach of contract and breach of the contractual duty of good-faith and fair dealing against BBPOS allege two types of contractual breaches, namely:

- o  *That BBPOS allegedly breached the exclusivity provision of the BBPOS-ROAM Licensing Agreement[34] at §1.3, by allegedly selling covered mPOS products to North American Bancard, LLC ("NAB"), AC, and others, under its "exclusive IP license" contract interpretation (the "Alleged Exclusivity Breaches"); and*
- o  *That BBPOS allegedly breached its duty "to indemnify and hold the Company [i.e., ROAM] harmless" under §3.18 of the BBPOS-ROAM Licensing Agreement by purportedly failing to undertake a "duty to defend / prosecute" in connection with certain alleged "claim[s] brought by a third party against the Company as a result of or relating to any actual or alleged breach" of BBPOS's warranties and representations at §3.10 "that none of the Products, Devices, Deliverables or Services does or will infringe, misappropriate or violate any intellectual property right of any person" (the "Alleged Indemnification Breaches").*

These two related claims fail as a matter of law, however, and should be dismissed with prejudice, for the reasons set forth below.

---

[34] BBPOS and Ingenico Inc.'s predecessor-in-interest, ROAM Data, Inc. ("ROAM"), entered into the Engineering Development and License Agreement, dated May 4, 2010, as amended August 15, 2011 [AC_02770544-554, IngenicoInc_0268234-238] (the "BBPOS-ROAM Licensing Agreement") (Exhibit C), Doc. No. 188-3.

1.      <u>Standard of Review (Counts I and II)</u>

"To prevail on a claim for breach of contract, a plaintiff must demonstrate that there was [1] an agreement between the parties; [2] the agreement was supported by consideration; [3] the plaintiff was ready, willing, and able to perform his or her part of the contract; [4] the defendant committed a breach of the contract; and [5] the plaintiff suffered harm as a result." *Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 39 (Mass. 2016) (citing *Singarella v. Boston*, 173 N.E.2d 290, 291 (Mass. 1961)). The statute of limitations for contract actions under Massachusetts law is six years. *See* Mass. Gen. L. c. 260, § 2 ("Actions of contract ... shall, except as otherwise provided, be commenced only within six years next after the cause of action accrues."); *Schwartz v. Travelers Indem. Co.*, 740 N.E.2d 1039 (Mass. App. 2001).

"Every contract implies good faith and fair dealing between the parties to it." *Warner Ins. Co. v. Commissioner of Ins.*, 406 Mass. 354, 362 n. 9, 548 N.E.2d 188 (1990) (quoting *Kerrigan v. Boston*, 361 Mass. 24, 33, 278 N.E.2d 387 (1972)). This implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . ." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991) (quoting *Drucker v. Roland W. Jutras Assocs.*, 370 Mass. 383 (1976)).

Conduct that does not breach the express terms of the contract still may violate the covenant of good faith and fair dealing if it constitutes an evasion of the spirit of the bargain or violates community standards of decency, fairness, or reasonableness. *See, e.g., Jang v. Boston Scientific Scimed, Inc.*, 729 F.3d 357 (3d Cir. 2013) (applying Massachusetts law). Nevertheless, the implied covenant cannot be used to create new rights or obligations not contemplated in the contract. *See, e.g., Rambus Inc. v. Hynix Semiconductor Inc.*, 629 F. Supp. 2d 979 (N.D. Cal. 2009) (applying California law); *Layne Christensen Co. v. Bro-Tech Corp.*, 836 F. Supp. 2d 1203 (D. Kan. 2011), appeal dismissed, (Fed. Cir. 12-1178)(Aug. 23, 2012) (applying Delaware law); *Jang v. Boston*

14

*Scientific Scimed, Inc.*, *supra* (applying Massachusetts law). This claim is likewise subject to a six-year statute of limitations. *See* Mass. Gen. L. c. 260, § 2; *Nortek Inc. v. Liberty Mut. Ins. Co.,* 843 N.E.2d 706, 711 (Mass. App. 2006).

        2.        <u>The Alleged Exclusivity Breaches Fail as a Matter of Law</u>

Counts I and II allege, in part, that BBPOS breached the exclusivity provision of the BBPOS-ROAM Licensing Agreement at §1.3, by allegedly selling the covered mPOS products to NAB, AC, and others, applying its "exclusive IP license" contract interpretation. For the purposes of this lawsuit, Ingenico Inc. now articulates the license grant under the BBPOS-ROAM Licensing Agreement as purportedly conferring: (a) "a worldwide, perpetual, fully-paid license"; (b) "to use a broadly-defined set of BBPOS' intellectual property"; (c) "and sell" the entirety of BBPOS's mPOS product lines or otherwise as Defendants collectively defined and refer to as the "Covered Mobile Payment Devices"; (d) that is "exclusive even as to BBPOS (except that BBPOS has a non-exclusive, non-transferrable right to sell two specific devices in China and the Philippines . . .)" Doc. No. 78 at 3, 4, 5 (SACC ¶¶15-16, 19-22, 25).

Dismissal with prejudice of the Alleged Exclusivity Breaches portion of Count I, amounting to $56+ million in calculated unjust enrichment under Defendants' "exclusive IP license" theory, is warranted, for, at least, seven reasons, including: (i) no breach of bargained-for exclusivity / no agreement to exclusivity on devices other than CircleSwipe ; (ii) failure to establish actionable harm; (iii) lack of consideration; (iv) prohibited assignment as a material breach; (v) constitutes an illegal or unenforceable restraint on trade; (vi) vague, ambiguous, and/or insufficiently definite to enforce; and/or (vii) time-barred under the 6-year statute of limitations. Moreover, if this portion of the claim fails, so do Counts III and IV, both of which depend on proof of alleged exclusivity obligations as essential elements thereof.

      a.      *Ingenico Inc. Fails to Establish Any Breach of Bargained-for Exclusivity / Nor Any Agreement to Exclusivity on Devices Other Than CircleSwipe Family of Devices*

Defendants' *ad hoc* legal strategy in framing the exclusive license grant as purportedly covering the entirety of BBPOS's mPOS products (i.e., the allegedly "Covered Mobile Payment Devices") fails to comport to the record facts, which overwhelmingly demonstrate that there was no agreement to exclusivity on devices other than BBPOS's CircleSwipe device, thus, fatally dooming this and interrelated, dependent aspects of Ingenico Inc.'s primary defensive and offensive litigation strategy in the case.[35]

    Section 1.1, as amended, sets forth the current scope of licensing grant at issue herein:

The Partner hereby grants to the Company a worldwide, perpetual, fully-paid license to freely **use the Partner Intellectual Property**[36] to make, have made, develop, have developed, use, sell, offer for sale, import and distribute **the Products, any portion thereof, or any products similar to or based upon any Products**.

(Emphasis added). Section 1.3, as amended, sets forth the "exclusivity" parameters of the license grant, carving out a territorial exception therefrom consisting of China and the Philippines:

---

[35] Ex. E (Graylin Tr.) at 17:14-24, Doc. No. 188-5 at 4.

[35] *See, e.g.,* Ex. M 3/1/2010 Thread at IngenicoInc_0020389, Doc. No. 188-13 at 4; Ex. N 4/12/2010 Thread at IngenicoInc_0020801-802, Doc. No. 188-14 at 1-2; Ex. O 4/22/2010 Thread at IngenicoInc_0020914-915 and IngenicoInc_0020913, Doc. No. 188-15 at 1-3; Ex Q 4/24/2010 Thread at IngenicoInc_0020927, Doc. No. 188-17 at 4; Ex. P (4/23/2010 Draft) at §§1.4, 1.5, and Schedule I), Doc. No. 188-16 at 2, 10.

[36] For purposes of this Agreement, "Partner Intellectual Property" shall mean: (a) any and all patents and patent applications relating to the Products, including without limitation US Patent Application Number 12/767,831 for secure audio coupled card swiper filed on April 27, 2010 with the United States Patent and Trademark Office (the "Patent Application") and any patents issuing on the Patent Application, including (i) any reissues, renewals, reexaminations, substitutions or extensions thereof and foreign equivalents of the foregoing; (ii) any claim of a continuation-in-part application or patent that is entitled to the priority date of, and is directed specifically to subject matter specifically described in, the Patent Application; (iii) any foreign counterpart thereof (including PCTS); and (iv) any supplementary protection certificates and any other patent term extensions, restorations and exclusivity periods and the like of the Patent Application; and (b) any copyrights, trademarks, trade names, trade secrets, knowledge, data and information owned or controlled by the Partner relating to the Products.

The license granted in Section 1.1 is exclusive on a worldwide basis (with the exception of China, Philippines, as set forth below and Section 1.5). Without limiting the generality of the foregoing, the Partner may not, directly or indirectly, anywhere in the world, use or sell any Products, or any portion thereof, or any products similar to or based upon any Products (**other than as explicitly provided in this Agreement**) or grant any other person rights to the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and distribute any Products, any portion thereof, or any products similar to or based upon any Products. Notwithstanding the foregoing provisions of this Section 1.3, **the Partner shall retain the non-exclusive, non-transferrable right to sell the Products in China for use in China and sell the Products in Philippines for use in Philippines**.

(Emphasis added). The term "Product" under the agreement at Schedule I relates to just two devices, namely, the CircleSwipe and contemplated ROAMpay POS (to be developed).

In effect, Ingenico Inc.'s counterclaims tee-up two competing interpretations of the bolded language in amended §1.1's articulated scope of license grant as pertaining to: "the Products, **any portion thereof,** or any products **similar to or based upon** any Products." Ingenico Inc.'s position is that this language covers any mPOS device whatsoever; whereas Movants' position is that this language was included to ensure it covered more than merely exact identity (e.g., it *does* include G3X, G4X, G5X, and all variations thereof as customized for PayPal, among others; it does *not* include completely different mPOS devices). In other words, immaterial changes to the product, such as using a slightly different name, color, brand of component part, *etc*., would be captured within the scope of the license grant. Thus, Movants' interpretation of §1.1 simply gives effect to the bargained-for exclusivity under §1.3 by giving it enough flexibility that it cannot be too easily circumvented; conversely, Ingenico Inc.'s *ad hoc* interpretation substantially alters §1.3.

Conversely, Section 9.2 of the agreement sets forth the (only) grant of licensing rights under the agreement relative to BBPOS's IP, generally, as compared to the exclusive rights granted in the CircleSwipe, that is limited to (i) IP owned by BBPOS and only to the extent incorporated in the Products or Devices; (ii) carries no grant of exclusionary rights; and (iii) may be used only

17

for the limited purposes of developing, manufacturing, or selling the Products or Devices, stating, in relevant part:

> If the Products or Devices incorporate **Partner-owned IP**, the Company is hereby granted a worldwide, perpetual, fully paid, sublicensable license to use the Partner IP to continue developing, manufacturing and selling the Products and Devices[37].

(Emphasis added).

Although other potentially covered products were originally contemplated, BBPOS granted thereunder to ROAM an **exclusive product license** ultimately for a single MasterCard magnetic stripe reader product that connected to mobile phones/tablets via audio-jack plug that was called the "CircleSwipe" device (and, at times, interchangeably referred to as the "Crypto Swipe," "swiper," "ROAMpay Swipe," and/or ROAM's G3X, G4X, and/or G5X product series).[38] Graylin also confirmed that, while the agreement granted ROAM exclusive rights in the sale of CircleSwipe devices outside of China and Philippines, the license grant was not intended by the parties at the time to confer upon ROAM any exclusionary rights in or to BBPOS's trade secrets or intellectual property, generally, or otherwise effectuate a purchase of BBPOS's IP.[39]

Interpretation of the scope of a license grant generally involves two elements: "(1) a description of to what information, rights, or resources the license pertains, and (2) a description of agreed uses and contractual limitations on use." *Channing Bete Co., Inc. v. Greenberg*, 3:19-

---

[37] Per Schedule I, "Device" refers to "[t]he 'ROAMpay POS' EMV terminal developed by the Contactor based on the foundation of BBPOS, is the 'Device' that will be owned by ROAM. ROAMpay POS[.]"

[38] Ex. E (Graylin Tr.) at 21:6-9; 22:2-7; 22:8-24 – 23:1-11; 111:4-8; 113:18-24; 143:22-24 – 144:1-7, Doc. No. 188-5 at 5, 6, 11, 12; Ex. B (Rotseart I Tr.) at 32:17-25 – 33:1-21 and 34:21-25 – 35:1-21, Doc. No. 188-2 at 4, 5 (referring to the G3X, G4X, and G5X products) and 112:12-24 and 172:2-19, Doc. No. 188-2 at 7, 8 (referring to the G4X and Swiper products); Ex. A (Lo I Tr.) at 26:4-25 – 27:1-22, Doc. No. 188-1 at 4 (referring to the CircleSwipe product), 43:7-25 – 44:1-10, Doc. No. 188-1 at 6 (referring to the G4X and G5X products), and 188:7-22, Doc. No. 188-1 at 7 (referring to the Swiper product).

[39] Ex. E (Graylin Tr.) at 25:12-22, Doc. No. 188-5 at 6.

CV-30032-MGM, 2022 WL 43692, at *5 (D. Mass. Jan. 5, 2022) (quoting RAYMOND T. NIMMER, LAW OF COMPUTER TECHNOLOGY § 7.44 (Dec. 2021)). This undertaking is governed by principles of state contract law. *Id.* (citation omitted).

"Under Massachusetts law, '[a] court interpreting a contract must first assess whether the contract is ambiguous,' which is a question of law." *Channing Bete Co., Inc. v. Greenberg*, 3:19-CV-30032-MGM, 2022 WL 43692, at *5 (D. Mass. Jan. 5, 2022) (quoting *Farmer's Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 783 (1st Cir. 2011)). This is done by examining " 'the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or intention of the parties.' " *Id.* (citing *Barclays Bank PLC v. Poynter*, 710 F.3d 16, 21 (1st Cir. 2013) (quoting *Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897, 907 (Mass. 2008))). Ambiguity exists in specified language " 'if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.' " *Id.* (quoting *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 134 (1st Cir. 2012) (internal quotation marks omitted)). It does not exist merely because the parties may disagree as to its meaning. *Id.* (citing *Farmers Ins. Exch.*, 632 F.3d at 783). "If the court determines that the contract is free from ambiguity, all words are construed according to 'their usual and ordinary sense' and 'must be considered in the context of the entire contract rather than in isolation.' " *Id.* (quoting *Gen. Convention on New Jerusalem in the U.S., Inc. v. MacKenzie*, 874 N.E.2d 1084, 1087 (Mass. 2007)).

Here, construing all words according to "their usual and ordinary sense" when "considered in the context of the entire contract rather than in isolation," Movants respectfully submit that the license granted by BBPOS was limited in nature to the CircleSwipe device as well as any products that actually ended up being developed particularly for ROAM. None were, however; thus, the exclusive license grant relates solely to the CircleSwipe product. To find otherwise would be to

ignore the import of §9.2, reaffirmed upon amendment, conferring a general, non-exclusive license to BBPOS's IP used in the Products or Devices (i.e., CircleSwipes, only).

> b. *Ingenico Inc. Fails to Establish Actionable Harm*

Harm is an essential element of a breach of contract claim. *Bulwer v. Mount Auburn Hosp.,* 46 N.E.3d 24, 39 (Mass. 2016) (*citing Singarella v. Boston,* 173 N.E.2d 290, 291 (Mass. 1961)). Courts routinely grant summary judgment in the defendant's favor when a plaintiff alleging breach of contract cannot present evidence of harm. *Haven Real Est. Grp., LLC v. Bell Atl. Mobile of Massachusetts Corp., Ltd.,* 236 F. Supp. 3d 454, 463-64 (D. Mass. 2017) (granting summary judgment on breach of contract claim when there was no evidence that plaintiff suffered any damages); *Young v. Wells Fargo Bank, N.A.*, 109 F. Supp. 3d 387, 393–96 (D. Mass. 2015), aff'd, 828 F.3d 26 (1st Cir. 2016) (same); *Terumo Americas Holding, Inc. v. Tureski*, 251 F. Supp. 3d 317, 328 (D. Mass. 2017) (same). Because Ingenico cannot establish that Plaintiff's alleged breaches of contract caused any harm, summary judgment is appropriate.

To satisfy the "harm" element of a breach of contract claim, a plaintiff must prove damages that could *actually be awarded* on a breach of contract claim. In *Young,* the plaintiff's "claims of mental or emotional distress" were insufficient damages to save her breach of contract claim because "such claims are generally not cognizable in a breach of contract claim." 109 F. Supp. 3d at 395. In *Cooney Indus. Trucks, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 978 F. Supp. 391 (D. Mass. 1997), *aff'd*, 168 F.3d 545 (1st Cir. 1999), a jury reached a verdict finding that plaintiff suffered no damages in relation to a breach of a contract claim and the court entered judgment for the defendant. On post-trial motions, the plaintiff "ask[ed] the court to interpret the jury's several separate findings of no damage as falling short of an overall finding that plaintiff has proved no harm." *Id.* at 412. The court rejected the plaintiff's argument, noting that the plaintiff failed to "identify an *authorized measure* of harm or damage and call attention to evidence supporting its

submission," and even in post-trial briefing failed to identify "any additional proposed measure of *recoverable* harm." *Id.* at 413 (emphasis added). The court found that "the jury findings of no harm are decisive," and that the defendant was therefore "entitled to judgment against plaintiff on all breach of contract claims." *Id.* at 414.

"The usual rule for damages in a breach of contract case is that the injured party should be put in the position they would have been in had the contract been performed." *Guilfoile v. Shields Pharmacy, LLC,* No. 16-CV-10652, 2021 WL 4459515, at *5 (D. Mass. Sept. 29, 2021) (*citing Situation Mgmt. Sys., Inc. v. Malouf, Inc.,* 430 Mass. 875, 880 (2000)). Plaintiff is "entitled to be made whole and no more." *Ficara v. Belleau,* 331 Mass. 80, 82 (1954). "The 'fundamental principle' of damages that governs all contract cases is compensation, or the value that the plaintiff would have received had the contract been honored." *Haven Real Est. Grp., LLC v. Bell Atl. Mobile of Massachusetts Corp., Ltd.,* 236 F. Supp. 3d 454, 463 (D. Mass. 2017) (*citing Louise Caroline Nursing Home, Inc. v. Dix Const. Corp.,* 362 Mass. 306, 311 (1972)). "Plaintiffs are not entitled to be made more than whole or put 'in a better position than if the defendant had carried out his contract.'" *Id.*

Here, Ingenico Inc. cannot establish actionable harm. It cannot establish a single sale that it lost or failed to secure based upon BBPOS's alleged breaches of exclusivity. *See, e.g., Atl. Rsch. Mktg. Sys., Inc. v. Saco Def., Inc.,* 997 F. Supp. 159, 170 (D. Mass. 1998) (granting summary judgment on breach of contract claim where the plaintiff failed to establish any lost sales). In fact, Ingenico Inc. does not even try. Ingenico's damages expert calculates Ingenico Inc.'s alleged breach of contract damages as "the unjust enrichment that BBPOS derived from the accused products." Ex. CC (Vanderhart Report) ¶86, Doc. No. 188-29 at 40. Unjust enrichment, however, is not a proper measure of damages on a breach of contract claim. *People's Choice Mortg., Inc.*

*v. Premium Cap. Funding, LLC,* No. 06-3958-BLS2, 2010 WL 1267373, at *11 (Mass. Super. Mar. 31, 2010), judgment entered, (Mass. Super. 2010) (rejecting a "disgorgement theory of damages" on a breach of contract claim and finding "no authority for any but the traditional measure of damages on a breach of contract claim").  Because Ingenico Inc. fails to establish an essential element of breach of contract – harm – summary judgment is appropriate.

c. *Ingenico Inc. Fails to Establish the Existence of Consideration*

An exchange of consideration is another essential element of an enforceable promise that is lacking in applying Defendants' *ad hoc* "exclusive IP license" theory. In particular, under Schedule II of the BBPOS-ROAM Licensing Agreement, there is no margin payable (nor any other discernable benefit conferred elsewhere in the agreement) to BBPOS that would compensate BBPOS's alleged promise to Ingenico Inc. of a measure of exclusivity from BBPOS in the sale of mPOS devices, generally, on a worldwide basis (except in China and the Philippines) in perpetuity. Defendants' damages expert, Dr. Vanderhart, admitted during her deposition that no such margin payment was contemplated under terms of contract – this would apply equally to CircleSwipe manufactured by anyone other than BBPOS as well as any other mPOS devices improperly using BBPOS's trade secrets or other IP.

d. *Ingenico Inc.'s "Exclusive IP Theory" Constitutes an Illegal or Unenforceable Restraint on Trade*

The BBPOS-ROAM Licensing Agreement provided at §1.3, as amended, that "the Partner [*i.e.*, BBPOS] may not, directly or indirectly, anywhere in the world, use or sell any Products, or any portion thereof, or any products similar to or based upon any Products (other than as explicitly provided in this Agreement) . . ." Section 3.8 of the BBPOS-ROAM Licensing Agreement purports to forever bar BBPOS from engaging in certain design and production activities as they related to

the Products or "Devices" (which is an placeholder term in the BBPOS-ROAM Licensing

Agreement):

> The Partner agrees that, **during or after the term of this Agreement**, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Devices, or products substantially similar to the Devices, for any third party. The Partner also agrees that, **during or after the term of this Agreement**, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Products, or products substantially similar to the Products, for any third party (other than in China to the extent permitted in Section 1.3 above).

(Emphasis added).

These restrictive covenants, as construed by Defendants, constitute an illegal or

unenforceable restraint on trade. M.G.L.A. ch. 93, §4 ("Every contract, combination in the form

of trust or otherwise, or conspiracy, in restraint of trade or commerce in the commonwealth shall

be unlawful.").  Notably, competition alone is not a protectible interest; moreover, the restrictive

covenants as drafted are vague, overbroad, and durationally and geographically unlimited.

The BBPOS-ROAM Licensing Agreement at §10.1 provides for severability in such cases:

> If, at any time, any one or more of the provisions in this Agreement is or are deemed to be invalid, illegal, unenforceable or incapable of performance in any respect, the validity, legality, enforceability or performance of the remaining provisions of this Agreement shall not be affected.

Massachusetts courts have imposed restrictions on the enforcement of agreements not to

compete: "In deciding whether to enforce a particular agreement, a court should consider if the

covenant (1) is necessary to protect the legitimate business interest of the party seeking to enforce

it, (2) is supported by consideration, (3) is reasonably limited in all circumstances, including time

and space, and (4) is otherwise consonant with public policy." *IKON Office Sols., Inc. v. Belanger*,

59 F.Supp.2d 125, 128 (D.Mass. 1999).

One is not entitled by contract to restrain ordinary competition. *Club Aluminum Co. v.

Young*, 160 N.E. 804, 806 (Mass.1928).  While "confidentially acquired [information] as to details

of business" and "the good will of an established business[,]" may present legitimate business interests subject to protection by restrictive covenant, a plaintiff cannot by contract prevent a party "from using the skill and intelligence acquired or increased and improved through experience or through instruction received in the [term of contract and/or relationship]." Any restraint must be consistent with the protection of the confidential information and/or good will rightfully belonging to the business. The restrained party must be in a position where he can harm that business interest in some way that is akin to an unfair competitive advantage. *All Stainless, Inc. v. Colby*, 308 N.E.2d 481, 486 (Mass.1974).

"It is well settled in this Commonwealth that a covenant restricting trade or competition will be enforced if it 'is reasonably limited in time and space, and is consonant with the public interest.'" *Analogic Corp. v. Data Translation, Inc.*, 358 N.E.2d 804, 807-08 (Mass. 1976) (quoting *Novelty Bias Binding Co. v. Shevrin*, 175 N.E.2d 374, 376 (Mass. 1961)). In considering whether a permanent injunction was necessary to protect the plaintiff's business interests, and applying the same standards as are applicable to non-competes, the Massachusetts Supreme Court reversed and remanded the lower court's imposition of a permanent injunction relating to a device that was found to have been based on misappropriated trade secrets, given that "a device which has been described in trade journals and placed on the market is generally open to duplication by skilled engineers" and, therefore, the judge erred in not considering the following: (1) "expert testimony as to the amount of time needed to engineer in reverse the plaintiff's device . . . in determining a reasonable duration of the defendants Molinari's and Fishman's covenants not to divulge confidential information" and (2) "evidence that other manufacturers have been able to design and produce devices nearly identical to Analogic's 'MP 6912.'" *Id.*

Here, Ingenico Inc. cannot establish the necessary relation between protecting its business interest and the indefinite duration of the non-compete period – especially one that was not contemplated by the parties nor compensated under the terms of the licensing agreement itself. *Primarque Products Co. Inc. v. Williams W. & Witts Products Co*., 303 F.Supp.3d 188, 206-07 (D. Mass. 2018) (citing *Richmond Bros. v. Westinghouse Broad. Co*., 357 Mass. 106, 110, 256 N.E.2d 304, 307 (1970) (in determining whether restriction as to time is reasonable courts consider the nature of plaintiff's business, situation of parties, necessity of restriction for protection of plaintiff's business and right of defendant to earn livelihood); *Dynamics Research Corp. v. Analytic Scis. Corp*., 9 Mass. App. Ct. 254, 278, 400 N.E.2d 1274, 1288 n.32 (1980) (suggesting that analysis that could turn a non-disclosure agreement into an "open-ended" non-competition agreement is unenforceable as against public policy).

     e.    *Alleged Parameters of Exclusivity, as Advanced by Ingenico Inc., is Vague, Ambiguous, and/or Insufficiently Definite to Enforce*

These alleged restrictive covenants are insufficiently definite to enforce.  While the terms "Products" and "Device(s)" are defined in the licensing agreement, the meanings of (i) a "portion" of the Products/Device, (ii) products that are "substantially similar" to Products/Device, and (iii) "products similar to or based upon any Products" are open to interpretation, as noted above.

"In order to create an enforceable contract, '[i]t is a necessary requirement that [the] agreement ... be sufficiently definite to enable the courts to give it an exact meaning.' " *Armstrong v. Rohm & Haas Co., Inc*., 349 F.Supp.2d 71, 78 (D.Mass.2004) (quoting WILLISTON ON CONTRACTS § 4:18 (4th ed. 1990)); *Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc*., 42 Mass.App.Ct. 162, 165, 675 N.E.2d 403 (1997) (noting that "a contract is not held to be unenforceable 'if, when applied to the transaction and construed in light of the attending circumstances, the meaning can be ascertained with reasonable certainty' "). "Whether an alleged

contract is legally enforceable in light of indefinite terms is a question of law for the court." *Armstrong*, 349 F.Supp.2d at 78.

Under Massachusetts law (like most states), restrictive covenants and non-competes should be narrowly construed; if a restrictive covenant is determined to be ambiguous, it should be held unenforceable. *See, e.g., Veridiem, Inc. v. Phelan,* 17 Mass.L.Rptr. 8, *2 (Sup. Ct. Mass. Sept. 26, 2003) (explaining that employee covenants not to compete generally are enforceable only to the extent that they are necessary to protect the legitimate business interests of the employer and describing "legitimate business interests" as potentially including "trade secrets, other confidential information, or, particularly relevant here, the good will the employer has acquired through dealings with its customers…. Protection of the employer from ordinary competition, however, is not a legitimate business interest, and a covenant not to compete designed solely for that purpose will not be enforced.") (citing *Marine Contractors Co., Inc. v. Hurley,* 365 Mass. 280, 287-88 (1974) (collecting cases)); *McGirr v. Dugas*, 62 Mass. App. Ct. 1102, No. 03-P-987 at *1 (Mass. App. Ct. Sept. 21, 2004) (regarding restrictive covenants, explaining that the court must "first" determine if the language of a restrictive covenant is ambiguous on its face, which it is if the phraseology lends itself to multiple interpretations).

In every sense, paragraph 1.3 of the Agreement is a restrictive covenant and agreement not to compete. The agreement is clear that – with limited exceptions as to China and the Philippines -- BBPOS may not use or sell "the Products." It is unclear what is meant by the language "or any portion thereof or any products similar to or based upon any Products" since those terms are not defined. Under Massachusetts law, the court's first step in this circumstance should be to determine if the language is ambiguous on its face. If so, it should consider whether extrinsic

evidence would clarify the language or whether it should be stricken as indefinite. *McGirr v. Dugas*, 62 Mass. App. Ct. 1102, No. 03-P-987 at *1 (Mass. App. Ct. Sept. 21, 2004).

A district court in Illinois considered an analogous circumstance:  a supply agreement that apparently contained a noncompetition provision with regard to "similar products."  There, the agreement used "subjective terms such as 'substantially the same appearance' and 'reflects' and is limited solely by reference to [the buyer's] 'reasonable judgment'." *See, e.g., Peerless Industries Inc. v. Crimson AV, LLC* (2012 WL 3686774 at **2-3 (N.D. Ill. Aug. 24, 2012)).  The court held that the term "similar products" was not reasonably defined and struck the noncompetition provision altogether from the agreement. *Id.* (declining to "blue pencil" the provision and explaining that "[d]ue to the technical nature of the noncompetition provision at issue, it is not clear that the definition of 'Similar Products' can be brought into conformity with Illinois law simply by adding or deleting a few offending terms.").  Minimally, the restrictive covenant in §1.3 of the BBPOS-ROAM Licensing Agreement should be stricken as undefined and ambiguous, or, alternatively, narrowly construed under principles akin to employee non-compete agreements.

Comparatively, the "products similar to or based upon" provision of §1.3 seems even more indefinite and more ambiguous than in *Peerless*, as the BBPOS-ROAM Licensing Agreement does not even attempt to define the term.  While other provisions of the agreement seem to reflect that the parties simply intended that BBPOS not be able to simply use the same specific designs and specifications that may be developed under the license to essentially mass produce the same products for other customers, *see e.g.,* §§3.11 (pertaining to use of Company Property) and 3.12 (regarding the Company's ownership of Deliverables and Software), there is no guidance whatsoever as to the scope of "products similar to or based upon" in §1.3.  Thus, the ambiguities

here require that the provision be stricken, just like in *Peerless*.  The prohibitions of §§3.11 and 3.12 ably protect ROAM's interests.

If the Court declines to strike the provision altogether, the term "products similar to or based upon" should be construed as any products that are basically the same as the Products specifically designed for ROAM under the agreement and specified in the license, such as with a different name, color, brand of component part, *etc.  See, e.g.,* 118 AMJUR POF 3d 1 at Section 26 (in the context of discovery for a products liability case, suggesting a definition of "similar products" as "products other than 'the product' that are essentially and substantially similar to 'the product' with regard to design, specifications, material composition, make, and model" and contrasting this with a definition for "comparable products," which is defined to mean "products other than 'the product' or 'similar products' that are similar as to design, specifications, dimensions, or material composition, or have the same general uses as 'the product' or 'similar products.'"); *see also* BBPOS-ROAM Licensing Agreement at §3.8 (using the term "substantially similar"); *Hartsock v. Goodyear Dunlop Tires N. Am. LTD*, No. 2:13-CV-00419-PMD, 2013 WL 6919715, at *8 (D.S.C. Nov. 22, 3013) (noting, in a product liability case, "discovery of similar, if not identical, models is generally permitted" and denied only when they "are not substantially similar to the model at issue").  There are products that are rebranded from the products G3X, G4X, and G5X products designed and made for ROAM under the license (i.e., the PayPal version of swiper).

### f.    *The Breaches Are Time-Barred under the 6-Year Statute of Limitations*

Both prior to execution of the BBPOS-ROAM Licensing Agreement and at all times afterward (until this lawsuit, that is), ROAM/Ingenico Inc. was aware of BBPOS's continued sales of mPOS products (in addition to its sales of the CircleSwipe products to ROAM/Ingenico Inc.). *See* Ex. Q (4/24/2010 Thread), Doc. No. 188-17 (ROAM's internal email thread dated April 24,

2010, discussing the value of the exclusively licensing the CircleSwipe product from BBPOS).
After largely hammering out his and Lo's consensus now to exclude the "BBPOS" device from
the scope of any exclusive product license grant, Graylin sought corporate buy-in on the proposed
deal terms from the company's CFO, John Frontz ("Frontz"), listing "several facts" in an imbedded
April 24, 2010 email which Frontz "should understand" to assess the deal metrics, including:

> 1) **They [referring to BBPOS] have been developing the Cyrpto Swipe well before I met them**, this is **THEIR product**, and **their IP** on encryption with no battery power. The fact we can demo it now is because of they had been working on it. Our own FSK reader design would still take a while for it to be done and much testing to perfect, we may still use it in the future, but less in a hurry to do it.
> 2) The $3 mark-up is more than reasonable with our cost is at around $8.50. Most accessory devices are several times this amount. **Given it is their product, they normally have a right to sell it in the market to other people which would confuse the market**, as we have seen with ID Tech selling to NAB. I am convincing them to take it off the market and give us exclusivity. and we still have a sub $10 reader. This price is more than fair. If we sell 20,000 units, they make $3 per unit, that's $60K, our revenue per merchant per year is $100 plus.
> 3) **The BBPOS low cost debit unit is also THEIR product**, we are going to modify it for our needs for Casino and potentially apple, and still get the unit at sub $50, and with printer our target price is sub $75. They plan to get the unit EMV certified by June. They can sell a lot of these units without us. I am getting them to work with us here and jointly sell these units so we can maintain higher margins and not confuse the market. . .

If BBPOS's continued mPOS business activities constituted a breach of the licensing grant,
it was an immediate and unabating breach that accrued no later than May 2011 and is therefore
untimely under the six-year statute of limitations. Further confirmation of the untimeliness of any
such claim can be found in ROAM's September 27, 2011 email and attached pictures regarding
AC's sales of BBPOS's EMV Chipper device specially branded for AC as the "Rambler." Ex. Y
(9/27/2011 Forward) [IngenicoInc_0044582-585], Doc. No. 188-25.

This was not a breach of the agreement, of course, as it was written and understood at the
time. This is consistent with Ingenico Inc.'s December 2015 internal audit findings on procurement
at 17, noting, in part, "[c]urrently, BBPOS continues to honor and abide by the contract signed in
July 2013. No issues have been noted related to product quality or deliveries[,]" in Ingenico Mobile

Solutions Business Review December 2015. Ex. Z (12/2015 Business Review) [IngenicoInc_0104763] at 17, Doc. No. 188-26 at 18.

### 3.      The Alleged Indemnification Breaches

Regarding the second type of alleged contractual breaches for indemnification, dismissal of the remainder of Count I with prejudice is warranted, in whole or in part, for five reasons: (i) failure to establish the existence of a duty to defend (vs. duty to indemnify); (ii) failure to establish the existence of a duty to prosecute; (iii) failure to keep informed; (iv) lack of advance notice and/or evidence of reasonableness of settlements; and/or (v) lack of evidence of reasonableness of attorneys' fees and costs allegedly incurred.

Section 3.18 sets forth the indemnification obligations of BBPOS under the BBPOS-ROAM Licensing Agreement in the nature of a "duty to indemnify":

> The Partner agrees to indemnify and hold the Company harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Partner or arising out of or resulting from **any claim brought by a third party against the Company** as a result of or relating to any actual or alleged breach hereof.

(Emphasis added). Whereas ROAM's indemnification obligations under the contract appear at §4.3 and also contemplate a "duty to defend" (where differences in the language used at §3.18 appear in italics below), which states:

> The Company agrees to indemnify and hold the Partner harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Partner or arising out of or resulting from any claim brought by a third party against the Company as a result of or relating to any actual or alleged breach *by the Company. In the event of any such claim, the Partner agrees to notify the Company promptly of the claim and to permit the Company at the Company's expense, to assume control of the defence (sic) thereof with counsel of the Company's choosing, and cooperate with the Company in such defence (sic) at the Company's expense.*

30

Ingenico Inc.'s demands for indemnification for alleged infringement directed to BBPOS arise under §§3.18 and 3.10 of BBPOS-ROAM Licensing Agreement and relate to five separate claims alleging infringement of BBPOS's CircleSwipe device (sample letters in the record attached, collectively, at Ex. AA (Indemnity Letters), Doc. No. 188-27, none of which pre-date January 19, 2017 (i.e., after Ingenico acquired ROAM and had stolen BBPOS's trade secrets and breach the confidentiality obligations under the contract). Before instituting these proceedings, on behalf of BBPOS, Kutak Rock LLP wrote a letter dated November 2, 2008, reserving all rights/remedies, demanding information related to each pending demand for indemnity necessary in order to analyze the various claims and alleged indemnity obligations. Ex. BB (Decl. of Melissa Bozeman at Ex. A), Doc. No. 188-28 at 3-8.  Ingenico Inc.'s outside counsel wrote an email asking that a Common Interest Agreement be signed "before going further with [BBPOS's] requests" on November 9, 2018 with the last communication on indemnity being from BBPOS to Ingenico Inc. on December 3, 2018: "Subject to our client's final approval, we would be interested in a comprehensive Common Interest Agreement.  Will you please send me a proposed draft for our review?  Thank you."  Ex. BB (Decl. of Melissa Bozeman at ¶ 4), Doc. No. 188-28 at 2.

The indemnification damages set forth by Ingenico Inc.'s damages expert, Dr. Vanderhart, (at Exhibit D-13 to Vanderhart Report) identify five categories of claims, which purportedly amount to $3,959,343 in indemnification damages. Ex. CC (Vanderhart Report) at Exhibit D-13, ¶¶96-101, Doc. No. 188-29 at 43-44, 86 (noting at ¶100 that "total fees to be indemnified by BBPOS for all matters, including these and the IOENGINE matter, would be $3.96 million. *See* **Exhibit D-13**.") (emphasis in original); Exhibit D-13 at [H], entitled "Remaining exclsuive (sic) region accused product profits".

Generally, Ingenico Inc.'s damages expert simply added up the claimed amount of incurred attorneys' fees and costs, as supplied to her by defense counsel, for each infringement matter, but admittedly, neither undertook any independent investigation to verify that such claimed amounts were properly allocated, accurate, and reasonable[40] nor otherwise undertook any efforts to determine the actual number of accused units sold by Ingenico Inc.[41]

The bulk of Ingenico Inc.'s claimed damages for indemnity, i.e., $3,561,084, relate to certain affirmative proceedings[42] commenced by Ingenico Inc. against IOEngine LLC ("IOEngine") – namely, the lawsuit commenced by Ingenico Inc., captioned *Ingenico, Inc. v. IOENGINE, LLC*, No. 1:18-cv-00826-WCB, pending in the District of Delaware, and related IPR proceedings commenced by Ingenico Inc. related thereto.[43] With respect to the two IOEngine proceedings, Dr. Vanderhart applied a one-third allocation to Ingenico Inc.'s claimed legal fees / costs incurred in the district court proceeding because the accused BBPOS mPOS devices fell within one of the three accused product categories, but applied no similar allocation for the related IPR proceedings because she understood "all of the patents associated with the IPR . . . to be associated with the . . . BBPOS products."[44]

---

[40] Dr. Vanderhart did not independently verify whether the alleged indemnifiable legal fees / costs were properly allocated, accurate, or reasonable: "Q Did you do anything to independently analyze whether or not the cost have been properly allocated or accurate and reasonable? **A That was not my -- I was not asked to do that, no.**" Ex. X (Vanderhart Tr.) at 201:7-11, Doc. No. 188-24 at 4.
[41] Nor did she undertake any effort to determine the number of accused products actually sold, testifying that "the litigation costs aren't going to be associated with the number of devices sold" and that an "analysis . . . identifying . . . the specific damages associated with the products themselves" can only be undertaken with specificity once damages have been assessed in the proceeding, which, presumably, would have been premature at the time of rendering her report. Ex. X (Vanderhart Tr.) at 205:14-21 – 206:1-20, Doc. No. 188-24 at 5-6.
[42] Ex. DD (IOEngine Docket) ref: pleadings at Doc. Nos. 1, 12, 93, Doc. No. 188-30.
[43] Ex. CC (Vanderhart Report) at ¶¶97-98, Exhibit D-13, Doc. No. 188-29 at 43, 86.
[44] Dr. Vanderhart did not apply any further proration of costs, notwithstanding the fact that the accused BBPOS products only comprised three to four of the eleven accused mPOS devices in the mPOS grouping of accused products as set forth in Exhibit D-10:

In Massachusetts, courts interpret indemnity provisions in the same manner as ordinary contracts. *Speers v. H.P. Hood, Inc*., 495 N.E.2d 880, 881 (Mass. App. Ct. 1986). Massachusetts courts do not construe indemnity provisions with bias toward either the indemnifying or the indemnified party. They try to fairly and reasonably construe the provisions to determine the parties' intentions and the purpose they sought to accomplish. *Shea v. Bay State Gas Co.*, 418 N.E.2d 597, 600 (Mass. 1981).

First, the IOEngine proceedings are affirmative matters instituted by Ingenico Inc. that do not trigger indemnification obligations by the very language of §3.18, which in relevant part, covers losses: "arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Partner or arising out of or resulting from **any claim brought by a third party against the Company** as a result of or relating to any actual or alleged breach hereof."

Second, even assuming arguendo that it was covered, such claim is premature. Massachusetts recognizes the distinction between a "duty to defend" and a "duty to indemnify,"

---

Q So they're divided into three categories; is that right? **A That's my understanding, yes.** Q Okay. And for category 1 which is identified as the mPOS card readers, there are -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 -- 11 different products; is that right? **A That's correct.** Q And only three of those relate to products that were sold by BBPOS to ROAM or Ingenico -- Ingenico. Would you agree with that? **A So I don't know for certain. So I know that the G3X, 4X and 5X. I don't know if maybe in the past the G2 may have also been sold by ROAM to Ingenico.** Q Well, would you agree that BBPOS would not be responsible for each of these products that are identified in this one category? **A So I would agree that it could be not all of these were sold by BBPOS. But in terms of identifying the costs associated with the litigation, this category of products included the BBPOS products. So that's how I've done the allocation here because those fall into those categories. So with the basic, you know, underlying assumptions that certain of the litigation costs would have been associated with the categories -- the broader categories themselves, I thought that this was a reasonable way to estimate the costs."**
Ex. X (Vanderhart Tr.) at 199:11-21 – 200:1-19, Doc. No. 188-24 at 4. *See also* Ex. CC (Vanderhart Report) at ¶98, Exhibit D-10, Doc. No. 188-29 at 43, 83.

as Your Honor aptly noted in the Memorandum and Order issued in *Arvest Bank v. RSA Sec. Inc.*, 1:15-CV-11798-IT, 2017 WL 4287358, at *4 (D. Mass. Sept. 27, 2017) (explaining that the duty to indemnify "contemplates reimbursement for a loss suffered[;]" any right to indemnification arises when the scope of an indemnitee's liability is established) (citation omitted). Here, BBPOS's obligation, *if any*, is the latter.

Compared to the indemnification obligations of ROAM/Ingenico Inc., BBPOS's indemnity duty set forth in §3.18 is a duty to indemnify, i.e., losses incurred or arising out of a covered claim, and does not implicate any duty to undertake the defense of any such claim – and certainly does not include a duty to prosecute any claims related thereto. *See Mount Vernon Fire Ins. Co. v. Visionaid, Inc*., 76 N.E.3d 204, 211-212 (Mass. 2017) (holding that an insurer is not required to prosecute counterclaims as part of any enforceable duty to defend). Unlike the obligations set forth in §4.3, BBPOS has no right to notice or assumption of the defense for purportedly covered claims. Given their affirmative nature (i.e., Ingenico Inc.'s declaratory action for non-infringement, IPR '047 patent), these matters fall outside the scope of any indemnity obligations.

Here, any alleged breach of the indemnification obligations with respect to the IOEngine litigation matters is a claim that cannot even accrue under Massachusetts law, if at all, until there has been a settlement and/or entry of judgment, at which point, the nature and scope of actually assessed damages drive whether the indemnifying party (here, BBPOS) is liable to reimburse the indemnified party but only as far as BBPOS's accused products may be responsible.

"A successful assertion of equitable estoppel requires: (1) '[a] representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made[;] (2)[a]n actual act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made[;] (3)[and]

detriment to such person as a consequence of the act or omission.' " *Boylston Development Group, Inc. v. 22 Boylston St. Corp*., 412 Mass. 531, 542, 591 N.E.2d 157 (1992) (quoting *Cellucci v. Sun Oil Co*., 2 Mass.App.Ct. 722, 728, 320 N.E.2d 919 (1974).

Here, this legal principle provides an affirmative defense to any subsequent renewal of Ingenico Inc.'s requests for indemnity (as here), where the Indemnity Letters promise to keep BBPOS informed as to the status of such matters – and then failed to do so – and also failed to provide the requested and necessary information to BBPOS in order for it to properly assess its duty to indemnify, if at all, as set forth in the Request for Indemnity Information. Ex. AA (Indemnity Letters), Doc. No. 188-27; Ex. BB (Request for Indemnity Information, attached as Exhibit A to Bozeman Declaration), Doc. No. 188-28 at 3-8.

Finally, Ingenico Inc. bears the burden of demonstrating the reasonableness of any recovery of its claimed attorneys' fees and costs, which neither Ingenico Inc. nor its expert has undertaken to do, and some means by which BBPOS could theoretically demonstrate that those costs (in their entirety or in part) relate to covered losses, which cannot be demonstrated at this point. *Innovative Mold Sols., Inc. v. Cent. Mut. Ins. Co., Inc*., 277 F. Supp. 3d 222, 225 (D. Mass. 2017); *Polaroid Corp. v. Travelers Indem. Co*., 610 N.E.2d 912, 922 & n.22 (Mass. 1993).

### C.   Counts III and IV Should Be Dismissed With Prejudice

Ingenico Inc.'s Counts III and IV for tortious interference against BBPOS and AC, respectively, allege as follows:

- **COUNT III - Tortious Interference with Advantageous Business Relations (Ingenico Inc. v. BBPOS):**
  - *That BBPOS allegedly tortiously interfered with Ingenico Inc.'s customer relationship with NAB by "attempting to sell" accused mPOS devices to NAB in December 2015; and*

- **COUNT IV - Tortious Interference with Contractual Relations (Ingenico Inc. v. AC):**
  - *That AC allegedly tortiously interfered with Ingenico Inc.'s contractual relationship with BBPOS by intentionally and knowingly inducing BBPOS to breach the contract or preventing it from performing its contractual obligations via 436 Canada's alleged acknowledgement and consent to the ROAM-BBPOS Licensing Agreement.*

Both claims fail as a matter of law. "There are four elements required to establish interference with advantageous business relations: (1) [plaintiffs-in-counterclaim] had a business relationship for economic benefit with a third party, (2) the [defendants-in-counterclaim] knew of that relationship, (3) the [defendants-in-counterclaim] interfered with the relationship through improper motive or means, and (4) the [plaintiff-in-counterclaim's] loss of the advantage resulted directly from the defendants' conduct." *Fafard Real Estate & Dev. Corp. v. Metro–Boston Broadcasting, Inc.*, 345 F.Supp.2d 147, 154 (D. Mass. 2004) (citing *Kurker v. Hill*, 44 Mass.App.Ct. 184, 689 N.E.2d 833 (1988)).

To establish a claim for intentional interference, a plaintiff must allege (1) "the existence of a contract or a business relationship which contemplated economic benefit" for the claimant; (2) "the defendants' knowledge of the contract or business relationship"; (3) "the defendants' intentional interference with the contract or business relationship for an improper purpose or by improper means"; and (4) damages. *Swanset Dev. Corp. v. City of Taunton*, 668 N.E.2d 333 (Mass. 1996). The applicable statute of limitations for both claims is three years. Mass. Gen. L. Ann. ch. 260, § 2A; *Lyons v. Gillette*, 882 F.Supp.2d 217, 235 (D. Mass. 2012) ("The limitations period on this claim is three years."); *Pure Distributors, Inc. v. Baker*, 285 F.3d 150, 154-55 (1st Cir. 2002).

There are three reasons why these claims fail as a matter of law. First, for the reasons set forth above, which require the dismissal with prejudice of the portions of Counts I and II relating to the Alleged Exclusivity Breaches, Counts III and IV likewise fail insomuch as each depends on

proofs that establish a breach of the ROAM-BBPOS Licensing Agreement as essential elements thereof. Second, based on the same rationale set forth above, warranting dismissal of the portions of Counts I and II relating to the Alleged Exclusivity Breaches absent actionable harm, Ingenico Inc. similarly fails to establish actionable harm as to these claims by where its damages expert applies an unjust enrichment measure of damages in "calculat[ing] the profit made by BBPOS from the sales of products to NAB after December 2015,"[45] and "calculat[ing] the amount of profit that [AC] made by selling the accused products in the exclusive region, which resulted from BBPOS's breach of the ROAM-BBPOS agreement,"[46] respectively. Finally, where these counterclaims were not filed until August 15, 2019, both are time-barred under the applicable three-year statute of limitations as evidenced, in part, by the fact that Ingenico Inc. was aware of the circumstances of BBPOS unintentionally accepting a purchase order for CircleSwipes (or "swipers") from NAB no later than December 8, 2015 as documented in the 12/9/2015 Thread [Ingenicolnc_0250839][47], and, generally, for the same reasons Counts I and II are time-barred.

### D.     Counts V through VII Should Be Dismissed With Prejudice

The Court should similarly dismiss with prejudice Ingenico Inc.'s Counts VI and VI for trade secret theft against AC and Count VII for unfair / deceptive trade practices against Movants, which allege as follows:

---

[45] Ex. CC (Vanderhart Report) at ¶¶103-104, Doc. No. 188-29 at 45 (noting at ¶104 that "[s]umming these profits across years after 2015, when the alleged tortious interference began, total damages are $753,475. *See* **Exhibit D-14**. Note that these damages are contained within the overall breach of contract damages owed by BBPOS and are not additive if BBPOS is found liable on all three claims.")(emphasis in original).

[46] Ex. CC (Vanderhart Report) at ¶105, Doc. No. 188-29 at 45 (noting at ¶109 that "[t]he damages amount owed by [AC] due to the alleged tortious interference is the sum of total calculated profits of accused products in the exclusive region. Total damages are equal to $12,918,548. *See* **Exhibits E-9 and E-10.**")(emphasis in original).

[47] Ex. EE (12/9/2015 Thread), Doc. No. 188-31 at 1.

- **COUNT V & VI - Violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.& Massachusetts Trade Secrets Act, M.G.L. Ch. 93, § 19 (Ingenico Inc. v. AC):**
  - *That AC allegedly misappropriated various, albeit unspecified, BBPOS trade secrets as to which Ingenico Inc. purports to have a superior, proprietary interest via the BBPOS-ROAM Licensing Agreement; and*

- **COUNT VII - Violation of Mass. Gen. L. Ann. ch. 93A, § 11 (Ingenico Inc. v. BBPOS & AC):**
  - *That BBPOS and AC allegedly engaged in unfair competition / deceptive acts which purportedly constitute "willful or knowing violations of M.G.L. Ch. 93A § 2."*

To prevail on a claim for violations of the Defend Trade Secrets Act, a plaintiff must prove four elements: (1) that a plaintiff's alleged trade secrets meet the statutory definition of trade secrets; (2) that the defendant misappropriated those trade secrets; (3) that the plaintiff has been actually harmed as a direct result of the misappropriation; and (4) that the alleged trade secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce. *See* 18 U.S.C. § 1836(b)(1). Under Massachusetts General Laws, "a complainant is entitled to recover damages for misappropriation of information qualifying as a trade secret." M.G.L.A. ch. 93, §42B. To prevail on a claim for violations of Massachusetts Trade Secrets Act, a plaintiff must prove three elements: (1) that a plaintiff's alleged trade secrets meet the statutory definition of trade secrets; (2) that the defendant misappropriated those trade secrets; and (3) that the plaintiff has been actually harmed as a direct result of the misappropriation. M.G.L.A. ch. 93, §§42, 42B. Both claims have three-year statutes of limitations. *Id.* at § 42E; 18 U.S.C.A. § 1836(d).

In determining a ch. 93A violation, the court must assess whether the defendant used or employed an unfair or deceptive act or practice declared unlawful by the act. A ch. 93A claim "requires a showing of conduct that: (1) 'falls within the penumbra of some common-law, statutory, or other established concept of unfairness'; (2) is 'immoral, unethical, oppressive, or unscrupulous'; and (3) 'causes substantial injury to [consumers or other business persons].'" *FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 107 (1st Cir.2009) (citing *Jasty v. Wright Med.*

*Tech., Inc.*, 528 F.3d 28, 37 (1st Cir.2008)). This claim has a four-year statute of limitations. *See* Mass. Gen. L. Ann. ch. 260, § 5A; *RTR Techs., Inc. v. Helming*, 707 F.3d 84, 92 (1st Cir. 2013).

Both claims suffer the same deficiencies as the claims discussed above, and further assert zero independent evidence (other than that already discussed herein) to withstand a motion for summary judgment. As to the statutory trade secret theft claims, Ingenico Inc. lacks standing because it has no valid claim of ownership over BBPOS's trade secrets and IP, fails to even identify any allegedly stolen trade secrets or demonstrate how they are allegedly being misused by AC, , and likely are time-barred, insomuch as ROAM was indisputably aware that it had no entitlement to sublicensing rights for the 436 Canada IP as of January 18, 2012, as evidenced, in part, by an email thread between Graylin and Kron (on behalf of AC) [IngenicoInc_0008703]. Ex. FF (1/18/2012 Thread), Doc. No. 188-32 at 1. As to Count VII, Ingenico Inc. fails to identify any unfair or deceptive act or actionable harm, and likely is time-barred for the same reasons.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs / Counterclaim Defendants BBPOS Limited ("BBPOS") and AnywhereCommerce, Inc. respectfully respect that the Court grant their Motion, dismiss with prejudice Counts I through VII of Defendant / Counterclaim Plaintiff Ingenico Inc.'s Second Amended Counterclaims, and enter such further relief as may be just or appropriate.

Dated: June 22, 2022.

Respectfully submitted,

Plaintiffs / Counterclaim-Defendants,

By their attorneys,

*/s/ Melissa Bozeman*
MELISSA A. BOZEMAN
OLIVER D. GRIFFIN
PETER N. KESSLER
Kutak Rock LLP

1760 Market Street, Suite 1100
Philadelphia, PA 19103
Tel: (215) 288-4384
Fax: (215) 981-0719
Melissa.bozeman@kutakrock.com
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com

JONATHON D. FRIEDMANN
ROBERT P. RUDOLPH
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
Tel: (617) 723-7700
Fax: (617) 227-0313
jfriedmann@rflawyers.com
rrudolph@rflawyers.com

RICARDO G. CEDILLO
Davis, Cedillo & Mendoza, Inc.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
Tel: (210) 822-6666
Fax: (210) 822-1151
rcedillo@lawdcm.com

*Attorneys for Plaintiffs / Counterclaim-Defendants*

## <u>CERTIFICATE OF SERVICE</u>

 I, Melissa A. Bozeman, hereby certify that this Motion, in accordance with L.R. 4.5(c) and 5.2(b), was filed through the ECF system on June 22, 2022 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) via the court's transmission facilities.

*/s/ Melissa A. Bozeman*
Melissa A. Bozeman, Esq.
