UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANYWHERECOMMERCE, INC.<br>and BBPOS LIMITED,<br>            Plaintiffs,<br><br>v.<br><br>INGENICO INC., INGENICO CORP. and<br>INGENICO GROUP, SA,<br>            Defendants. | CIVIL ACTION NO.<br>1:19-cv-11457-IT |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to L.R. 56.1, Defendants Ingenico Inc., Ingenico Corp., and Ingenico Group S.A. (collectively "Defendants" or "Ingenico"), hereby submit the following statement of undisputed material facts in support of its Motion for Summary Judgment, which is contemporaneously filed herewith:

1.      Plaintiff AnywhereCommerce, Inc. ("AnywhereCommerce") is a foreign corporation incorporated under the laws of the Canada Business Corporations Act as of July 15, 2011. First Am. Compl. (Doc. No. 67) ¶ 5.

2.      AnywhereCommerce has a principal place of business in the United States located at 4585 North Maroa Avenue, Fresno, CA 93704. *Id.*

3.      HomeATM is the previous name for AnywhereCommerce. Nov. 29, 2021 Deposition of Mitchell Cobrin ("Cobrin Dep. I," attached as **Exhibit 1**) at 148:3-11.

4.      Plaintiff BBPOS Limited ("BBPOS") is a Hong Kong corporation with a principal place of business of Suite 1903-1904, Tower 2 Nina Tower, No. 8 Yeung UK Road, Tsuen Wan, N.T., Hong Kong. First Am. Compl. (Doc. No. 67) ¶ 6.

1

5.      Defendant Ingenico Group, SA was incorporated in France. Ans. and Countercl. (Doc. No. 58) ¶ 1.

6.      Defendants Ingenico, Inc. and Ingenico Corp. are subsidiaries of Defendant Ingenico Group, SA and were incorporated in the United States. *Id.*

7.      ROAM Data, Inc. ("ROAM") was a company that formerly participated in the business of mobile payments. Second Am. Countercl. (Doc. No. 78) ¶ 12.

8.      On December 31, 2017, ROAM merged with and into Ingenico. *Id.*; Dec. 10, 2021 BBPOS Rule 30(b)(6) Deposition ("BBPOS 30(b)(6) Dep.," attached as **Exhibit 2**) at 58:3-8.

9.      AnywhereCommerce is in the credit card processing business. First Am. Compl., (Doc. No. 67) ¶ 15.

10.     BBPOS designs and manufactures mobile point of sale ("mPOS") devices. Second Am. Countercl. (Doc. No. 78) ¶ 11; *see also* First Am. Compl. (Doc. No. 67) ¶ 16.

Agreement between ROAM and BBPOS

11.     On or around May 4, 2010, ROAM and BBPOS entered into an "Engineering Development and License Agreement" (the "ROAM-BBPOS Agreement," attached as **Exhibit 3**) that they amended on or around August 15, 2011. *See* Second Am. Countercl. (Doc. No. 78) ¶ 13; Ex. 2 (BBPOS 30(b)(6) Dep.) at 65:14-19.

12.     The ROAM-BBPOS Agreement reflects that Ingenico Inc. (and ROAM, before it merged with Ingenico Inc.) paid BBPOS and provided BBPOS with other valuable consideration in return for BBPOS' services, including the design, manufacture, and production of certain mobile payment devices. Second Am. Countercl. (Doc. No. 78) ¶ 14; Ex. 3 (ROAM-BBPOS Agreement) at 1-2.

13. BBPOS provided Ingenico Inc. with an exclusive license to certain mobile payment devices and related intellectual property. Second Am. Countercl. (Doc. No. 78) ¶ 14; Ex. 3 (ROAM-BBPOS Agreement) at 1-2.

14. The Ingenico-BBPOS Agreement states that BBPOS provided Ingenico with a "worldwide, perpetual, fully-paid license to freely use and sell the Products."

Ex. 3 (ROAM-BBPOS Agreement) at 1.

15. The exclusive license granted by BBPOS covers a magnetic swipe reader that interfaces with mobile devices or computers through an audio jack, a mobile payment unit with a Bluetooth interface, and an EMV terminal "based on the foundation of BBPOS." Second Am. Countercl. (Doc. No. 78) ¶ 15; Ex. 3 (ROAM-BBPOS Agreement) at 10.

16. The exclusive license extends to those specified devices, to products "similar to or based upon" such devices, and in the case of the swipe reader and the mobile payment unit with a Bluetooth interface, to any portion of the device.[1]  Second Am. Countercl. (Doc. No. 78) ¶ 15; Ex. 3 (ROAM-BBPOS Agreement) at 10.

17. BBPOS promised in the ROAM-BBPOS Agreement that this license is exclusive even as to BBPOS (except that BBPOS has a non-exclusive, non-transferrable right to sell two specific devices in China and the Philippines—an exception that applies to all licenses referenced therein).  Ex. 3 (ROAM-BBPOS Agreement) at 12-13; Ex. 2 (BBPOS 30(b)(6) Dep.) at 49:4-9.

18. Specifically, BBPOS agreed that it would not use or sell any of the Covered Mobile Payment Devices, that it would not grant any rights to intellectual property related to

---

[1] Collectively, the devices (and portions of devices) covered by the exclusive license are referred to as "Covered Mobile Payment Devices."

3

Covered Mobile Payment Devices to develop or sell such devices, and that it would not design, produce, or assist in the design or production of Covered Mobile Payment Devices for any other party. Ex. 3 (ROAM-BBPOS Agreement) at 12-13; Ex. 2 (BBPOS 30(b)(6) Dep.) at 50:4-10.

19. BBPOS also promised that it will indemnify and hold Ingenico Inc. harmless from any and all losses, costs, liabilities, or expenses—including attorneys' fees—that arise out of the breach of any of its promises, and BBPOS' obligation to indemnify Ingenico Inc. extends, inter alia, to "any claim brought by a third party against [Ingenico Inc.] as a result of or relating to any actual or alleged breach hereof." Ex. 3 (ROAM-BBPOS Agreement) §§ 3.2, 3.10, 3.18; Ingenico Indemnity Demand (attached as **Exhibit 4**); Ex. 2 (BBPOS 30(b)(6) Dep.) at 55:8-56:5.

20. The ROAM-BBPOS Agreement defines "confidential information" to include confidential or proprietary information including, *inter alia*, technical information shared pursuant to the agreement. Ex. 3 (ROAM-BBPOS Agreement) § 3.18.

21. The agreement imposes a duty on a receiving party to keep information confidential where it is "marked 'Confidential' and/or 'Proprietary' […]." *Id.*

22. That duty of confidence does not apply as to "information that is disclosed in publicly available sources [or] is in the rightful possession of the party receiving the confidential information without an obligation of confidentiality." *Id.*

23. The ROAM-BBPOS Agreement does not contain any terms describing the manner in which "Confidential Information" must be protected by the receiving party. *Id*

24. The ROAM-BBPOS Agreement was never terminated and remains in effect. Ex. 2(BBPOS 30(b)(6) Dep.) at 50:11-15.

BBPOS Breached the Ingenico-BBPOS Agreement

25. In December 2015, BBPOS attempted to sell Covered Mobile Payment Devices to one of Ingenico Inc.'s customers, North American Bancard, LLC, in violation of the Ingenico-BBPOS Agreement. Ex. 2 (BBPOS 30(b)(6) Dep.) at 176:3-6.

26. BBPOS sold and continues to sell Covered Mobile Payment Devices to AnywhereCommerce. *Id.* at 70:9-12.

27. The Ingenico-BBPOS Agreement was in effect when BBPOS sold Covered Mobile Payment Devices to AnywhereCommerce. *Id.* at 87:24-88:2.

28. BBPOS has itself and has permitted third parties, including AnywhereCommerce, to use some or all of the licensed intellectual property rights in violation of the Ingenico-BBPOS Agreement. *Id.* at 70:9-12.

29. BBPOS sold Covered Mobile Payment Devices to NMA. *Id.* at 180:14-181:19.

30. BBPOS sold Covered Mobile Payment Devices to Shopify. *Id.* at 180:14-181:25.

31. BBPOS sold Covered Mobile Payment Devices to its customers in Mexico. *Id.* at 70:9-19.

32. Ingenico made demand upon BBPOS for attorneys' fees and other costs related to claims by third parties that the use or sale of Covered Mobile Payment Devices or other deliverables or services that BBPOS provided under the Agreement. Second Am. Countercl. (Doc. No. 78) ¶ 29; Ex. 2 (BBPOS 30(b)(6) Dep.) at 56:7-13.

33. BBPOS refused Ingenico's indemnification demand. Ex. 2 (BBPOS 30(b)(6) Dep.) at 56:17-19.

BBPOS's Purported Trade Secrets

34. In Plaintiffs' First Amended Complaint, Plaintiffs do not specify how many trade secrets Ingenico allegedly misappropriated. *See* First Am. Compl. (Doc. No. 67).

35. In Plaintiffs' First Amended Complaint, Plaintiffs do not identify in any way the trade secrets Ingenico allegedly misappropriated. *See id.*

36. In Plaintiffs' First Amended Complaint, Plaintiffs do not specify how many trade secrets Ingenico allegedly misappropriated. *See id.*

37. In Plaintiffs' Amended Complaint, Plaintiffs do not identify in any way the trade secrets Ingenico allegedly misappropriated. *See id.*

38. BBPOS sent emails to third parties with documents it later described as trade secrets. Ex. 2 (BBPOS 30(b)(6) Dep.) at 153:19-154:16; 202:16-203:23; 204:22-205:7.

39. On February 28, 2012, BBPOS emailed a document listed as "swiper API android guy.doc" that contains information BBPOS considers trade secrets. Ex. 2 (BBPOS 30(b)(6) Dep.) at 155:9-25.

40. On July 17, 2012, BBPOS sent an email with the PayPal G4X schematic attached, which BBPOS now considers a trade secret. *Id.* at 153:19-154:16.

41. BBPOS did not mark the schematics it emailed as "Confidential." *Id.* at 145:14-15.

42. BBPOS also sent an email on another occasion containing trade secrets pertaining to the DUKPT method. *Id.* at 205:9-206:7.

43. BBPOS maintains that all of its engineering files are confidential. *Id.* at 141:2-3.

44. BBPOS's employment agreements with its engineers have restrictions on the distribution of confidential information. *Id.* at 140:15-24.

45. Ben Lo, as the Rule 30(b)(6) designee of BBPOS, testified that he was "not sure" if the files containing BBPOS's trade secrets were password protected. *Id.* at 139:13-140:14.

46. The only protection BBPOS had in place was its practice of having the employees who had unfettered access to the trade secrets ask for permission to disburse the information containing trade secrets. *Id.* at 141:4-18.

47. Mr. Lo was not even certain who had this authority. BBPOS 30(b)(6) Dep. at 141:4-18. 141:23-142:4.

48. When asked if there were other people besides Mr. Lo who could authorize the disclosure of confidential information, Mr. Lo replied, "maybe." BBPOS 30(b)(6) Dep. at 141:4-18. 141:23-142:1.

49. On April 30, 2013, ROAM issued a press release announcing the RP350X. *See* April 30, 2013 Press Release (attached as **Exhibit 5**).

50. Plaintiffs' expert Ivan Zatkovich acknowledged that certain of the information at issue "was sent directly by BBPOS to Ingenico." Dec. 11, 2022 Deposition of Ivan Zatkovich ("Zatkovich Dep.," attached as **Exhibit 6**) at 76:2-5.

51. Plaintiffs' expert Stephen Scherf agreed that BBPOS "actually sent the [Intellectual Property] that is being asserted as a trade secret in this case to Ingenico." May 12, 2022 Deposition of Stephen Scherf ("Scherf Dep.," attached as **Exhibit 7**) at 111:11-112:19.

52. In his report, Defendants' expert Michael Shamos states that BBPOS sent confidential information to Ingenico in an email concerning a joint development workshop between BBPOS and Ingenico and that BBPOS was fully aware of the people copied on the technical emails and raised no objection at the time because the work being conducted was joint. Expert Report of Michael Shamos ("Shamos Report," attached as **Exhibit 8**) at 15.

53. In their First Amended Complaint, Plaintiffs fail to identify "Power Management" design as an alleged BBPOS trade secret. *See* First Am. Compl. (Doc. No. 67).

54. In his report, Mr. Zatkovich identifies five purported "BBPOS Trade Secrets," namely (1) "Audio Jack Polarity detection"; (2) "Power Management design"; (3) "Signal control settings and auto gain control"; (4) "Communication Formats"; and (5) "Data Security/Encryption methods." Expert Report of Ivan Zatkovich ("Zatkovich Report," attached as **Exhibit 9**) at 24-26.

55. In its First Set of Interrogatories served to Defendants, Ingenico asked BBPOS to, *inter alia*, identify and describe in detail "each and every trade secret that forms the basis of Counts II through IX of Plaintiffs' Amended Complaint." BBPOS's Third Am. Ans. to Interrogs. (attached as **Exhibit 10**) at Interrog. No. 1.

56. In response to the above-mentioned interrogatory, BBPOS failed to identify "Power Management" design as an alleged trade secret. *Id.* BBPOS instead identifies "Documentation of Battery Life Estimates" as an alleged trade secret. *Id.*

57. In response to the above-mentioned interrogatory, BBPOS failed to reference any documents that identify "Power Management" design. *Id.*

58. During his deposition as BBPOS's Rule 30(b)(6) designee, Ben Lo failed to identify "Power Management" design as an alleged BBPOS trade secret.

59. BBPOS's Power Management systems enable a microprocessor to place the mPOS device in sleep mode whenever the device is not active, and then to automatically turn on the device when needed. Ex. 9 (Zatkovich Report) at 30. The purpose of these systems is to optimize the power usage of the batteries in BBPOS devices. *Id.* at 29. Accordingly, the

systems require a reliable method to determine the correct "trigger threshold" that will reliably wake up the device when a card transaction is performed. *Id.* at 30.

60. The "Battery Life" documentation sets forth formulas for calculating the service life of BBPOS's 1-track and 2-track devices. Ex. 10 (BBPOS's Third Am. Ans. to Interrogs.) at Interrog. No. 1.

61. When addressing the "Battery Life" documentation in his report, Mr. Zatkovich cites to an email from Daniel Tsai of BBPOS to Christopher Rotsaert of Ingenico advising to "[p]lease check attached documents *about battery estimation* and format ID list." Ex. 9 (Zatkovich Report) at 56.

AnywhereCommerce and Ingenico

62. AnywhereCommerce does not allege that Ingenico improperly procured trade secrets or business plans from AnywhereCommerce. Dec. 2, 2021 Rule 30(b)(6) Deposition of Michael Kron ("AnywhereCommerce 30(b)(6) Dep.," attached as **Exhibit 11**) at 117:5-15.

63. Plaintiffs' expert is not aware of any trade secrets that AnywhereCommerce uses or otherwise has control over. Ex. 6 (Zatkovich Dep.) at 8:19-21.

64. Besides the fact that an AnywhereCommerce/Ingenico deal did not materialize, there is no evidence to support the allegation that Ingenico's offers regarding a potential business deal with AnywhereCommerce were a sham. Nov. 30, 2021 Deposition of Michael Kron ("Kron Dep.," attached as **Exhibit 12**) at 139:14-22.

65. Third party company First Data made a request for proposals ("RFP") that garnered interest from both Ingenico and AnywhereCommerce. Ex. 1 (Cobrin Dep. I) at 50:17-52:17.

66. From 2008 until 2013, AnywhereCommerce had not succeeded in selling "strategic partnership opportunities" to First Data (Paragraph 82 in Complaint). Ex. 1 (Cobrin Dep. I) at 91:22-92:3

67. AnywhereCommerce refers to the RFP as the "POGO RFP." *Id.* at 50:17-52:17.

68. Michael Kron Doesn't have any evidence as to why First Data rejected AnywhereCommerce's bid for the POGO RFP statement of work. Ex. 12 (Kron Dep.) at 154:6-10.

69. AnywhereCommerce has no evidence as to how First Data evaluated any of competitors' RFP submissions. Ex. 11 (AnywhereCommerce 30(b)(6) Dep.) at 69:13-20.

70. AnywhereCommerce has no evidence that it was the low bidder for any RFP except for the live RFP in 2013. *Id.* at 69:6-12.

71. AnywhereCommerce has no evidence that, if First Data concluded that one of AnywhereCommerce's competitors other than Ingenico offered a better value than AnywhereCommerce did, First Data would not have chosen that. *Id.* at 71:13-17

72. Based on conversations with Dan Bobier and O.B. Rawls, Mitchell Cobrin believed "there was pressure placed upon First Data by Ingenico to displace [AnywhereCommerce] and [to] use [Ingenico] exclusively." December 2, 2021 Deposition of Mitchell Cobrin ("Cobrin Dep. II," attached as **Exhibit 13**) at 39:18-21; 40:10-13.

73. The conversations with O.B. Rawls (as alleged in Paragraph 111 of Complaint) were never reduced to writing in any way, nor was anyone else present for these alleged conversations. Ex. 1 (Cobrin Dep. I) at 102:10-23.

74. There is no written statement from Mr. Bobier to the effect that the decision to not go with AnywhereCommerce "was not a product decision." Ex. 13 (Cobrin Dep. II) at 44:13-11.

75. AnywhereCommerce has no evidence that, but for Ingenico's wrongful alleged conduct, AnywhereCommerce would have actually sold any mPOS devices to any of the companies listed in Paragraph 116 of the Complaint. Ex. 11 (AnywhereCommerce 30(b)(6) Dep.) at 114:11-5.

76. Other than selling products that have technology that incorporates trade secrets of some entity other than AnywhereCommerce, AnywhereCommerce doesn't have any evidence that Ingenico engaged in tortious conduct with respect to AnywhereCommerce's contracts with Global Payments, TSYS, Priority Payments, or ProPay, or any other contracts between AnywhereCommerce and a third party. *Id.* at 57:4-59:21.

77. Mitchell Cobrin believed that Ingenico had a "vendetta" against AnywhereCommerce resulting from (1) Ingenico's alleged misrepresentation of their intentions of wanting to buy AnywhereCommerce; and (2) Ingenico's failed attempt to coerce AnywhereCommerce into extending some contractor IP rights. Ex. 13 (Cobrin Dep. II) at 41:8-43:5.

78. The alleged "coercion" was "just a consistent bad behavior" in trying to get AnywhereCommerce to extend patent rights, purporting to want to buy AnywhereCommerce. *Id.* at 43:6-16.

79. Mitchell Cobrin believes that Ingenico "us[ing] their dominant market position to almost put [AnywhereCommerce] out of business" was wrong. Ex. 1 (Cobrin Dep. I) at 54:14-24.

80. Mitchell Cobrin believes that Ingenico "used their . . . size and might and capacity to influence a decision that was not . . . a logical outcome." *Id.* at 57:15-22.

81. Mitchell Cobrin states that nobody else at AnywhereCommerce or BBPOS has any knowledge of the allegation in Paragraph 109 of the Complaint that Ingenico began "bundling and discounting products to unfairly inflate profits and shut out competition." *Id.* at 125:10-15.

82. Mitchell Cobrin admits that there's nothing wrong with discounting prices to get business. *Id.* at 126:4-7.

83. Mitchell Cobrin believes that Ingenico "exerted undue pressure" on First Data to "for all intents and purposes, try to put [AnywhereCommerce] out of business." Ex. 13 (Cobrin Dep. II) at 40:18-21; 41:3-6.

84. AnywhereCommerce does not have any evidence of unlawful conduct relating to the leveraging of Ingenico's historic POS terminal influence globally. Ex. 12 (AnywhereCommerce 30(b)(6) Dep.) at 123:3-15.

85. AnywhereCommerce has not undertaken any assessment of its purported damages as a result of Ingenico's alleged tortious interference with AnywhereCommerce and First Data's contract. *Id.* at 65:15-19.

          INGENICO INC., INGENICO CORP. AND INGENICO GROUP, SA,

          By their attorneys,

/s/ *Jeffrey K. Techentin*
JOHN A. TARANTINO (BBO #492230)
PATRICIA K. ROCHA (BBO #542348)
NICOLE J. BENJAMIN (BBO #666959)
JEFFREY K. TECHENTIN (*pro hac vice*)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
jtechentin@apslaw.com
Dated: June 22, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2022, I caused to be served via electronic mail a true copy of the within document on the following counsel of record:

| | |
|---|---|
| Jonathon D. Friedmann, Esq.<br>Robert P. Rudolph, Esq.<br>Rudolph Friedmann LLP<br>92 State Street<br>Boston, MA 02109<br>JFriedmann@rflawyers.com<br>RRudolph@rflawyers.com | Oliver D. Griffin, Esq.<br>Peter N. Kessler, Esq.<br>Melissa A. Bozeman, Esq.<br>Kutak Rock LLP<br>303 Peach Street, N.E., Suite 2750<br>Atlanta, GA 30308<br>Oliver.griffin@kutakrock.com<br>Peter.kessler@kutakrock.com<br>Melissa.bozeman@kutakrock.com |
| | Ricardo G. Cedillo, Esq.<br>755 E. Mulberry Ave., Ste 500<br>San Antonio, Texas 78212<br>rcedillo@lawdcm.com |

          /s/ *Jeffrey K. Techentin*
           Jeffrey K. Techentin

1123554.v1