# **EXHIBIT 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.
1:19-cv-11457-IT

ANYWHERECOMMERCE, INC. )
and BBPOS LIMITED, )
    Plaintiffs )
 )
v. )
 )
INGENICO INC., INGENICO CORP. and )
INGENICO GROUP, SA, )
    Defendants )
 )

-----------------------------------------------------
Zoom Deposition of
MITCHELL COBRIN,
pursuant to Rule 30 of the
Federal Rules of Civil Procedure,
taken on NOVEMBER 29, 2021
-----------------------------------------------------



Page 2

```
 1      APPEARANCES:
 2      FOR PLAINTIFFS:
 3      MELISSA A. BOZEMAN, Esq.
        Kutak Rock LLC
 4      1760 Market Street
        Suite 1100
 5      Philadelphia, PA 19103,
        United States
 6      Tel: (215) 299-4384
        Tel: (215) 717-8489
 7      Melissa.bozeman@kutakrock.com
 8
 9      FOR DEFENDANTS:
10      JEFFREY K. TECHENTIN, Esq,
        Adler Pollock & Sheehan P.C.
11      One Citizens Plaza, 8th Floor
        Providence, RI 02903
12      United States
        Tel: (401) 274-7200
13      Fax: (401) 351-4607
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 50

1    of the people who had sales responsibilities at
2    Anywherecommerce, have any relationship with -- have
3    any responsibility for the relationship with First
4    Data?
5              A - I did.
6              Q - Was that your client?
7              A - It was.
8              Q - So, can you tell me, in your own
9    words, what the defendants did that you thought was
10   interfering with Anywherecommerce's relationship with
11   First Data that justified suing them?
12             MS. BOZEMAN:  Objection to the extent
13   that you're calling for the mental impressions and
14   legal conclusions of counsel.  You can factually
15   answer the question.
16   OBJECTION
17             A - So, based on the fact that we had
18   a healthy and established relationship with First
19   Data of good standing over a period of time, we
20   participated in -- so we had been selling product to
21   them for quite some time, uniquely, you know, on
22   a -- exclusively -- not on an exclusive arrangement
23   but just on the sheer fact that we were the only
24   ones that they were buying this product class from,
25   they were -- so there was that.  And then for the



Page 51

1  next iteration of orders, they issued an RFP, which
2  we participated in.  And in all instances, to the
3  best of my recollection, we had always been in first
4  or second position of the outcome of any given
5  aspect of the RFP.  Meaning, you know, if you're
6  number 1, it means your price was the best, or your
7  information was the best; or if you were number 2,
8  that someone had answered it, something in a more
9  favourable fashion.  But in any event, in most cases
10 we were always finishing the RFP question or item in
11 the number 1 position, and to a lesser extent in the
12 number 2 position.  And so that, coupled with the
13 fact that we were the incumbent, coupled with the
14 fact that we had a very longstanding, amicable, well
15 established relationship with the client, was very
16 bewildering to me when we suddenly got cut off, and
17 at that point we were told we had lost the
18 opportunity.
19             And then I pursued -- obviously you
20 can't, you know, they were such a significant part
21 of our business that I did as much investigation to
22 understand the essence of why that decision was
23 made, if by all reasonable empirical information in
24 front of us with the RFP, the incumbent position, et
25 cetera, it didn't make sense to me that we would



Page 52

```
 1     lose the opportunity.
 2                 And I was, I spoke with the, my
 3     counterpart at First Data who had basically said the
 4     decision was made by his superiors and was out of
 5     his control, despite the fact that he owned the
 6     product.  He was, I forget his title, I believe it
 7     must have been VP product at the time, he had made
 8     all decisions up until that, to the best of my
 9     knowledge, and suddenly that decision was passed
10     down from his superiors.
11                 So -- and then it -- and then on other
12     conversations, he said it was out of his control.
13                 And then in a conversation with a much
14     more senior individual by the name of O.B. Rawls, he
15     had told me that it was based on political choices
16     not product choices.  And that is where we got to
17     today.
18                 Q - All right.  And I understand your
19     testimony earlier that after Anywherecommerce had
20     taken the decision to sue the defendants for this
21     misconduct, it was later learned, as you say, that
22     additionally this act, as you described it, had been
23     done with the benefit of some sort of IP
24     infringement; right?
25                 MS. BOZEMAN:  Objection to the
```



Page 54

1    ask you about that.  But focusing on the information
2    that you had when you made the decision, when
3    Anywherecommerce made the decision to sue, what was
4    it that any of the defendants had done that was
5    against the law or wrongful in your view?
6              MS. BOZEMAN:  Objection, to the extent
7    that your answer calls for the mental impressions or
8    legal strategy of counsel, then I'll instruct you
9    not to answer, portion.
10   OBJECTION
11             WITNESS:  I will abide by my counsel's
12   recommendation.
13   BY MR. TECHENTIN:
14             Q - Okay.  And just -- she can explain
15   it better than I can, obviously, she's your lawyer,
16   she can tell you not to answer the question; she told
17   you that to answer it without revealing your lawyer's
18   advice, and that's fine, that's fine, but my question
19   isn't what did your lawyers tell you, my question is
20   what did the defendants do wrong?
21             A - They used their dominant market
22   position to almost put us out of business.
23             Q - And in your view that was wrong?
24             A - Obviously, yes.
25             Q - And so just, just so we're clear,



Page 57

1    OBJECTION
2              A - I can't possibly speculate if they
3    misrepresented or mischaracterized their capacity or
4    knowledge to provide the product or service that
5    they were bidding on.
6    BY MR. TECHENTIN:
7              Q - And did, do you have any reason to
8    think that Ingenico somehow maligned Anywherecommerce
9    or its products in the course of that RFP process?
10             A - How could I possibly know, sir?
11             Q - Well -- and if you didn't, fair to
12   say that your decision to sue the defendants wasn't
13   based upon some thought that there had been some
14   disparagement of your products by Ingenico; right?
15             MS. BOZEMAN:  Objection.  You can
16   answer.
17   OBJECTION
18             A - So, the reason we're suing them is
19   probably clearly defined in our complaint, right?
20   We believed that they used their, their size and
21   might and capacity to influence a decision that was
22   not, you know, a logical outcome.
23   BY MR. TECHENTIN:
24             Q - So that --
25             A - And it was further corroborated,



Page 91

1    complaint, there's an allegation that on
2    February 20th, 2013, First Data supplied
3    Anywherecommerce its Request for Proposal for mobile
4    PEDs for its ENEA region; right?
5             A - Yeah.
6             Q - And then you say, in August of 2013
7    Anywherecommerce received an invitation from First
8    Data to participate in a live action (sic) for its
9    signature POGO -- or POGO -- devices with the
10   magnetic stripe reader; right?
11            A - Is that a question?
12            Q - Yeah, I'm trying to orient us to
13   the dates.  Are these, are these the right dates that
14   are in the complaint?
15            A - Yes.
16            Q - All right.  And then if you turn
17   the page to paragraph 90, there's a reference to
18   another invitation from First Data in mid-October of
19   2013 for another RFP to provide MSR devices globally;
20   right?
21            A - Yes.
22            Q - So, it would be fair to say that
23   from 2008 until 2013, that is during the period of
24   time when your legs hadn't been cut out from under
25   you by anybody, including the defendants, you had not



Page 92

1    succeeded in selling these other strategic
2    partnership opportunities to First Data; right?
3              A - Correct.
4              Q - Paragraph 92, there's some
5    allegations about discount pricing that was offered
6    by Anywherecommerce to First Data; do you see that?
7              A - I see that, yes.
8              Q - Are those in fact discounted
9    prices?
10             A - Yes.
11             Q - Discounted from what?
12             A - Well, the initial price that we
13   were selling the Rambler at, to my recollection, was
14   about $24 initially, plus or minus, right?  So that
15   would be the baseline by which we then discounted.
16             Q - Well, you know, one of the
17   discounts that's mentioned here is Walker prices,
18   $34.46 per unit for up to 250,000 units, but that's
19   not a discount from $24, right?  So what does it mean
20   for that to be a discount?
21             A - No, I'm talking about the Rambler.
22   I was talking, referring to the Rambler.  So that
23   the Walker -- the Walker by comparison, you know,
24   today is about -- actually, depending on, you know,
25   procurement delays that are more modern-day issues,



Page 102

1    don't know, but it was significant.
2                 Q - And when you, do you have any idea
3    what that meant in terms of revenue for the company?
4                 A - Well, we were shipping.  Yeah, I
5    mean we were, we did a few million dollars with
6    them.  Again, I don't know the numbers offhand, but
7    it was, again, 30, 40 percent.  We were doing, call
8    it $4 million, plus or minus, so those are, the
9    figures we're noodling around.
10                Q - And then in paragraph 111, still on
11   page 26, this is where the complaint talks about your
12   conversation with O.B. Rawls, and I know we talked
13   about that before, but I'll ask some of the same sort
14   of follow-up questions.
15                Did Mr. -- did your communications
16   with Mr. Rawls ever get reduced to writing in any
17   way?
18                A - No.
19                Q - And I assume all these
20   communications were verbal; is that right?
21                A - Yes.  Yes.
22                Q - Was anyone else there for these
23   conversations?
24                A - No, these were phone calls.
25                Q - Same thing with Mr. Bobier, was



Page 125

1               MS. BOZEMAN:  He said "other than
2      you"; he already identified them as a source.  Ask
3      him the question again.
4               MR. TECHENTIN:  Let me ask a clearer,
5      let me ask a clearer question.  Back and forth
6      between the lawyers doesn't make for a good record.
7               WITNESS:  It's okay.  Better in,
8      better in your pay.
9      BY MR. TECHENTIN:
10              Q - Is there somebody else at
11     Anywherecommerce or BBPOS who has some knowledge
12     about this allegation of bundling and discounting
13     products and services to unfairly inflate Ingenico's
14     products -- profits and shut out competition?
15              A - No, I'm the source.
16              COURT REPORTER:  You're what?  You're
17     what?  I didn't hear that.
18              A - I am the source.
19              COURT REPORTER:  Thank you.
20     BY MR. TECHENTIN:
21              Q - Is there anything wrong with
22     bundling products and services?
23              A - I am not the Competition Bureau,
24     so I don't know the rules or regulations, but, you
25     know, if you're doing so to adversely, you know,



Page 126

1    hurt or put a client, a competitor out of business,
2    you know, I don't -- again, I think there's laws
3    against that.
4             Q - But is there anything wrong with
5    discounting the price of your products to get the
6    business?
7             A - No.
8             Q - In fact, that's what, that's what
9    you did just a couple years before this; right?
10            A - I just said that, exactly, yeah.
11   There's something wrong with stealing recipes
12   though, and then displacing the competition with
13   their own recipe.  I mean that's kind of, kind of
14   bad at most.
15            Q - But you don't know what the recipe
16   was that was stolen; right?
17            A - It was the BBPOS recipe.
18            COURT REPORTER:  It was the V -- what?
19   BY MR. TECHENTIN:
20            Q - Recipe for what?
21            A - The BBPOS recipe that we were
22   using in concert with BBPOS, we've learned through
23   this complaint that Ingenico stole it, hit
24   copy/paste, reverse engineered it, whatever language
25   we want to utilize; and to add insult to injury,



Page 148

```
1      email that is dated May 20, 2010, and it talks about
2      a scope of business relationship, HomeATM-ROAM.
3      HomeATM is the previous name for your
4      Anywherecommerce business; right?
5               A - Yes.
6               Q - Is it, was that the same
7      corporation only a different name, or was there, was
8      there actually a change in corporation entity
9      associated with that name change?
10              A - I believe it's the same, I believe
11     it's the same corporation, different trade name.
12              Q - Did you draw up this scope of
13     business relationship?
14              A - Well, I assume so, assuming you
15     got this from our corporate counsel, then this would
16     be from me.
17              Q - Yeah.  No, I know you're shown as
18     being the author of the email, my question is whether
19     this is actually, you know, you put this information
20     together?
21              A - I don't know who would have.
22     Like, if this is my email, did I, you're asking if I
23     authored the contents of this email?
24              Q - Yes.
25              A - I assume so, if you received this
```



Page 161

```
 1
 2                C E R T I F I C A T I O N
 3
 4       I HEREBY CERTIFY THE FOREGOING to be a true and
 5   accurate transcription of my shorthand notes to the
 6   best of my skill and ability.
 7
 8       I FURTHER CERTIFY that I am neither attorney nor
 9   counsel for, nor related to or employed by, any of
10   parties to the action in which this deposition was
11   taken, and further that I am not a relative or
12   employee of any attorney or counsel employed in this
13   action, nor am I financially interested in this
14   case.
15
16            ___Marc Beebe___
17                MARC BEEBE, O.C.R.
18             Computer-Aided Transcription
19
20
21
22
23
24
25
```

