## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANYWHERECOMMERCE, INC. and BBPOS LIMITED, | |
| Plaintiffs, | |
| v. | Civil Docket No: 1:19-cv-11457-IT |
| INGENICO INC., INGENICO CORP., and INGENICO GROUP SA, | Jury Trial Demanded |
| Defendants. | |

## ANYWHERECOMMERCE, INC.'S AND BBPOS LIMITED'S
## CONCISE STATEMENT OF GENUINE DISPUTED MATERIAL FACTS FOR TRIAL
## SUBMITTED IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT (DOC. NO. 191)

Jonathon D. Friedmann, Esq. (BBO # 180130)
Robert P. Rudolph, Esq. (BBO # 684583)
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA 02109
Tel.: (617) 723-7700
Fax: (617) 227-0313
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

and

KUTAK ROCK LLP
Oliver D. Griffin (Pro Hac Vice)
Pennsylvania Bar No. 88026
Oliver.griffin@kutakrock.com
Peter N. Kessler (Pro Hac Vice)
Pennsylvania Bar No. 209033
Peter.kessler@kutakrock.com
Melissa A. Bozeman (Pro Hac Vice)
Pennsylvania Bar No.  201116
Melissa.bozeman@kutakrock.com
1760 Market Street, Suite 1100
Philadelphia, PA  19103-4104
(215) 299-4384 (Telephone)
(215) 981-0719 (Facsimile)

Ricardo G. Cedillo, Esq. (pro hac vice)
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
rcedillo@lawdcm.com


Attorneys for Plaintiffs / Counterclaim-Defendants

## CONCISE STATEMENT OF GENUINE DISPUTED MATERIAL FACTS FOR TRIAL

Pursuant to Local Rule 56.1, Plaintiffs AnywhereCommerce, Inc. ("AC") and BBPOS Limited ("BBPOS," and together, "Plaintiffs"), submit this Concise Statement of Genuine Disputed Material Facts for Trial in support of their Opposition to the Motion for Summary Judgment (the "Motion"), Doc. No. 191, filed by Defendants Ingenico Inc., Ingenico Corp., and Ingenico Group, SA ("Ingenico"; and, collectively, "Defendants"). Defendants' Motion should be denied, because genuine issues of material fact exist and for the reasons more particularly set forth in Plaintiffs' accompanying opposition papers.

## RESERVATION OF RIGHTS

Consistent with the requirements of Local Rule 56.1, each of Defendants' "Material Facts" that Plaintiffs contend to be subject to genuine dispute is reproduced below in *italics*, and immediately followed by Plaintiffs' concise statement of genuine disputed material facts for trial relevant thereto, with page references to affidavits, depositions, and other documentation, as well as copies of all referenced supplemental documentation, to the extent not previously filed of record in the case, attached as exhibits hereto.

Plaintiffs expressly reserve the right to assert additional and/or different facts in any subsequent briefing submitted during the course of dispositive motion practice, introduced via oral argument or at trial, or by way of any subsequent or related litigation proceedings involving the subject-matter of this lawsuit, and further reserve the right to controvert any of the factual allegations set forth by Defendants in their Concise Statement of Material Facts, Doc. No. 193, but as may not be affirmatively addressed herein, for any purpose other than the Court's determination of Defendants' instant Motion, as further provided under Local Rule 56.1.

## GENUINE DISPUTED MATERIAL FACTS

1. *OMITTED.*

3

2.      *OMITTED.*

3.      *HomeATM is the previous name for AnywhereCommerce. Nov. 29, 2021 Deposition of Mitchell Cobrin ("Cobrin Dep. I," attached as **Exhibit 1**) at 148:3-11.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

To the extent that this factual issue is determined to be "material," a genuine issue of fact exists with respect to this statement.

3(a).    When questioned "was that the same corporation only a different name," Mitchell Cobrin ("Cobrin") testified in his personal capacity that: "I believe it's the same, I believe it's the same corporation, different trade name." Exhibit 1 (Cobrin Dep. I at 148:6-11), Doc. No. 193-1 at 14, attached to Defendants' Statement of Undisputed Material facts re [191] Motion for Summary Judgment ("Def. Facts"), Doc. No. 193.

3(b).    The business activities of AC's parent company, 4361423 Canada Inc. ("436 Canada"), including those conducted under the trade name HomeATM, were essentially bifurcated in 2010, when AC was formally incorporated, at which point, 436 Canada's pre-existing activities related to selling mobile hardware products or gateway products or services, were taken over and continued by AC as a distinct corporate entity. Plaintiffs' Statement of facts ("Pl. Facts"), Doc. No. 188 at 8-9, ¶¶19-21 (citing Ex. F (Kron I Tr.) at Doc. No. 188-6 at 2).

4.      *OMITTED.*

5.      *OMITTED.*

6.      *OMITTED.*

7.      *OMITTED.*

8.      *OMITTED.*

9.      *OMITTED.*

10.     OMITTED.

11.     OMITTED.

12.     *The ROAM-BBPOS Agreement reflects that Ingenico Inc. (and ROAM, before it merged with Ingenico Inc.) paid BBPOS and provided BBPOS with other valuable consideration in return for BBPOS' services, including the design, manufacture, and production of certain mobile payment devices. Second Am. Countercl. (Doc. No. 78) ¶ 14; Ex. 3 (ROAM-BBPOS Agreement) at 1-2.*

**PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The above-referenced agreement (hereinafter, the "BBPOS-ROAM Licensing Agreement") is a written document that speaks for itself; however, there is a genuine issue of material fact as to specific amounts paid and "other valuable consideration" purportedly provided to BBPOS by ROAM and later Ingenico Inc. that is not "reflected" or otherwise evidenced by merely the agreement itself.

12(a).   The BBPOS-ROAM Licensing Agreement, for the most part, reflects future payments that were contemplated to be made by ROAM under the agreement, assuming certain conditions were met. Specifically, the BBPOS-ROAM Licensing Agreement at Schedule II and amended Schedule II, both entitled "PAYMENTS for Engineering Development and Licensing," sets forth these various contemplated payments to be made under the contract relative to BBPOS's development and engineering of a customized version of the EMV "BBPOS" device specially for ROAM (referred to therein as the "ROAMpay POS"), a $50,000 payment due at signing "as part of the exclusive license to the Products", a $3-2 per unit margin payment thereafter for each CircleSwipe or "Crypto Swipe" device manufactured by BBPOS and sold to ROAM, a contemplated $7 per unit margin payment for each ROAMpay POS device manufactured by BBPOS and sold ROAM (although none were), a $25,000 per month software service and support fees for dedicated four-person team of BBPOS programmers, certain stock options, and revenue sharing arrangement for any services referred to ROAM by BBPOS per §1.4 of the contract. Other than the $50,000

payment due at signing, the contract thus reflects only contemplated future payments to be made under the contract. Doc. No. 188-3 Ex. C (BBPOS-ROAM Licensing Agreement) at 11, 15-16.

12(b).   BBPOS earned a $3-2 per unit margin payment under the agreement for each CircleSwipe or "Crypto Swipe" device it manufactured and sold to ROAM; however, in the event that BBPOS's trade secrets and IP were leveraged in any way in connection with the sale of any of ROAM/Ingenico's mPOS products (whether permissibly or not), the agreement does not provide for any means by which BBPOS would be compensated for such use to the extent that such devices were not manufactured by BBPOS. Doc. 188 (Pl. Facts) at 18-19, ¶48 (citing Ex. E (Graylin Tr.), Doc. No. 188-5 at 6); 19, n.4 (citing Ex. X (Vanderhart Tr.), Doc. No. 188-5 at 2-3); 23, ¶60 (citing Ex. C (BBPOS-ROAM Licensing Agreement), Doc. No. 188-3 at 11); 24, ¶65 (citing Ex. V (5/30/2011 Thread), Doc. No. 188-21 at 1; Ex. C (BBPOS-ROAM Licensing Agreement), Doc. No. 188-3 at 15-16); 28-29, ¶75 (citing Ex. W (BBPOS Report), Doc. No. 188-23 at 3; ¶76 (citing Ex. X (Vanderhart Tr.), Doc. No. 188-5 at 2-3); and ¶77 (citing Ex. X (Vanderhart Tr.), Doc. No. 188-5 at 3).

13.   *BBPOS provided Ingenico Inc. with an exclusive license to certain mobile payment devices and related intellectual property. Second Am. Counterc. (Doc. No. 78) ¶ 14; Ex. 3 (ROAM-BBPOS Agreement) at 1-2.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS covers any mobile payment devices other than the CircleSwipe product family (i.e., CircleSwipe, Crypto Swipe, swiper, and/or ROAM's G3X, G4X, and G5X product lines).

13(a).   BBPOS granted ROAM an exclusive product license for one particular magnetic stripe reader-only product that connected to mobile phones/tablets via audio-jack plug, and, which, generally, was referred to as the "CircleSwipe." Ex. A (Lo I Tr.) at 26:13-15, Doc. No. 188-1 at 4 ("It was an audio

jack card reader. It only accept [magstripe card], and we call it Circle Swipe."). *See also* Declaration of Ben Lo ("Lo Dec.") at ¶4, a true and correct copy of which is attached as Exhibit 1. The exclusive product license grant does not cover, wholesale, every single mPOS device in BBPOS's inventory that was developed, manufactured, and sold from its inception through the present. Ex. 1 (Lo Dec.) at ¶5.

13(b).   The exclusive product license granted at §1.3 of the BBPOS-ROAM Licensing Agreement, as amended, specifically, covers any sales of "Products," which are then defined in Schedule I as the CircleSwipe device and a contemplated EMV ROAMpay POS unit (as yet to be developed). Doc. No. 188-3 Ex. C (BBPOS-ROAM Licensing Agreement) at 1, 10, 12-13.

13(c).   BBPOS's only grant of licensing rights relative to its IP, generally, appears at §9.2, and is narrowly construed to (i) IP owned by BBPOS and then only to the extent incorporated in the Products or Devices; (ii) carries no grant of exclusionary rights; and (iii) limited in permissible uses of developing, manufacturing, or selling the Products or Devices, the latter also defined at Schedule I as being the contemplated ROAMpay POS. Doc. No. 188-3 Ex. C (BBPOS-ROAM Licensing Agreement) at 7, 10.

13(d).   During his deposition, ROAM's founder and former CEO confirmed that the scope of exclusive license grant set forth in the BBPOS-ROAM Licensing Agreement, as amended, was limited to the CircleSwipe family of devices. Doc. 188 (Pl. Facts) at 6, ¶15 (citing Ex. E (Graylin Tr.), Doc. No. 188-5 at 6 ("So for -- for CircleSwipe, I think -- I think it was exclusive with the exception of a . . . couple of areas."); 11 ("So in 1.4 it says, BBPOS is non-exclusive. **1.3 says that we have exclusive rights**, which to me was **the swiper solution, the CircleSwipe**, so that was what we white-labeled and branded."); 11 (". . . At this particular point in time [i.e., execution of the original licensing agreement], I recall we distinctly separated the two. **One was exclusive, which was CircleSwipe** and then **the other one was non-exclusive**, which . . . they were in the process of building for us . . . to sell. So that was what they named here as BBPOS, that's EMV-capable."); 12 ("Q On Page 1, you say here, 'Yes, I

have told Ken Paull and others at ROAM and Ingenico that EMV/NFC is not part of the exclusivity. Good to see them admit it,' right? **A Uh-huh.** Q And again, you're saying this during the time that you're exploring the possibility of selling these devices with Ben Lo [after being terminated by ROAM], right? **A Yeah. But that was also my belief that the EMV was not exclusive**.") (emphasis added).

13(e).   Graylin also confirmed that, while the agreement granted ROAM exclusive rights in the sale of CircleSwipe devices outside of China and Philippines, the license grant was not intended by the parties at the time to confer upon ROAM any exclusionary rights in or to BBPOS's trade secrets or intellectual property, generally, or otherwise effectuate a purchase of BBPOS's IP. Doc. 188 (Pl. Facts) at 6, ¶15 (citing Ex. E (Graylin Tr.), Doc. No. 188-5 at 5 ("Q Okay. Now, this engineering and license agreement, this was a product license agreement, correct? **A I believe so. Yes.**"); 6 (confirming that the licensing agreement was not a transfer BBPOS's patents, adding: "No. **It was a technology development and license**.").

14.     *OMITTED.*

15.     *The exclusive license granted by BBPOS covers a magnetic swipe reader that interfaces with mobile devices or computers through an audio jack, a mobile payment unit with a Bluetooth interface, and an EMV terminal "based on the foundation of BBPOS." Second Am. Countercl. (Doc. No. 78) ¶ 15; Ex. 3 (ROAM-BBPOS Agreement) at 10.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS covers any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product lines).

15(a).   Because the contemplated EMV ROAMpay POS project (being the anticipated other type of Product / Device identified under the agreement at Schedule I) was never completed, the exclusive

product license grant does not extend to such device having the described functionality thereof under the BBPOS-ROAM Licensing Agreement (i.e., "a mobile payment unit with a Bluetooth interface, and an EMV terminal 'based on the foundation of BBPOS.'"). *See* 30(b)(6) Deposition Transcript of Ben Lo dated December 10, 2021 ("Lo II Tr.") at 60:7-25 – 61:1-10 (referring to the term "EMV-capable POS unit with Bluetooth interface" as listed on Schedule I as a "Product," which was never completed for the contemplated casino project, stating "[t]his product has never been finished.") and 63:8-23 (referring to the term "ROAMpay POS EMV terminal" as listed on Schedule I as a "Device," stating it was a "special terminal" that was to be used for the abandoned casino project), a true and correct excerpted copy of which is attached as Exhibit 2.

16.     *The exclusive license extends to those specified devices, to products "similar to or based upon" such devices, and in the case of the swipe reader and the mobile payment unit with a Bluetooth interface, to any portion of the device.[1] Second Am. Countercl. (Doc. No. 78) ¶ 15; Ex. 3 (ROAM-BBPOS Agreement) at 10.*

## **PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS covers any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product lines).

16(a).   The "similar to or based upon" and "or any portion thereof" language in the BBPOS-ROAM Licensing Agreement, as amended, was understood by the parties as clarifying that the exclusive product license grant would also cover immaterial variations of the CircleSwipe and contemplated EMV ROAMpay POS product, such as in physical form factor, which accounts for the differences in

---

[1] *Collectively, the devices (and portions of devices) covered by the exclusive license are referred to as "Covered Mobile Payment Devices."*

nomenclature between the G3X, G4X, and G5X versions of the CircleSwipe (all indisputably covered). Doc. No. 188-1 at 4, Ex. A (Lo I Tr.) at 26:20-23; at 6, Ex. A (Lo I Tr.) at 43:7-25 – 44:1-10 (confirming that BBPOS exclusively sold to ROAM all versions of its CircleSwipe device outside of China). *See also* Ex. 1 (Lo Dec.) at ¶6.

17.     *BBPOS promised in the ROAM-BBPOS Agreement that this license is exclusive even as to BBPOS (except that BBPOS has a non-exclusive, non-transferrable right to sell two specific devices in China and the Philippines—an exception that applies to all licenses referenced therein). Ex. 3 (ROAM-BBPOS Agreement) at 12-13; Ex. 2 (BBPOS 30(b)(6) Dep.) at 49:4-9.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS covers any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product lines).

17(a).  Ben Lo's ("Lo") referenced corporate designee testimony, confirming that the scope of the exclusive product license grant extended to just two products, was specifically limited to Lo's understanding thereof "as of May 4th of 2010 when this agreement was entered into[.]" Exhibit 2 to Def. Facts, Doc. No. 193-2 at 5 (BBPOS 30(b)(6) Dep. at 49:4-17).

18.     *Specifically, BBPOS agreed that it would not use or sell any of the Covered Mobile Payment Devices, that it would not grant any rights to intellectual property related to Covered Mobile Payment Devices to develop or sell such devices, and that it would not design, produce, or assist in the design or production of Covered Mobile Payment Devices for any other party. Ex. 3 (ROAM-BBPOS Agreement) at 12-13; Ex. 2 (BBPOS 30(b)(6) Dep.) at 50:4-10.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS or other related restrictive covenants in the agreement cover any mobile payment devices other than the

CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product lines).

18(a).   The term "Covered Mobile Payment Devices" does not appear in the BBPOS-ROAM Licensing Agreement, is a term that was first defined by Defendants for litigation purposes, and presents a contractual interpretation that is inconsistent with the parties' original intent, understanding, and performances under the agreement. Ex. 1 (Lo Dec.) at ¶7; Doc. No. 188-3 (BBPOS-ROAM Licensing Agreement); Defendants' Answer and Ingenico Inc.'s Counterclaims, Doc. No. 58 at 27, ¶14; Doc. No. 188 (Pl. Facts) at 14-18, ¶¶38-46 (regarding the negotiations of the contract and citing Ex. M (3/11/2010 Thread), Doc. No. 188-13; Ex. N (4/12/2010 Thread), Doc. No. 188-14; Ex. O (4/22/2010 Thread), Doc. No. 188-15; Ex. P (4/23/2010 Draft), Doc. No. 188-16; Ex. Q (4/24/2010 Thread), Doc. No. 188-17); and Ex. E (Graylin Tr.), Doc. No. 188-5 at 5-6, 11-12); Doc. No. 188 (Pl. Facts) at 24, 28-29, ¶¶65, 75-77 (regarding the parties' understanding of and performances under the contract and citing Ex. U (5/30/2011 Thread), Doc. No. 188-21; Ex. W (BBPOS Report), Doc. No. 188-23 at 3; and Ex. X (Vanderhart Tr.), Doc. No. 188-24 at 2-3).  *See also* above Genuine Disputed Material Facts at ¶¶13(a) – (e)

   19.    *BBPOS also promised that it will indemnify and hold Ingenico Inc. harmless from any and all losses, costs, liabilities, or expenses—including attorneys' fees—that arise out of the breach of any of its promises, and BBPOS' obligation to indemnify Ingenico Inc. extends, inter alia, to "any claim brought by a third party against [Ingenico Inc.] as a result of or relating to any actual or alleged breach hereof." Ex. 3 (ROAM-BBPOS Agreement) §§ 3.2, 3.10, 3.18; Ingenico Indemnity Demand (attached as **Exhibit 4**); Ex. 2 (BBPOS 30(b)(6) Dep.) at 55:8-56:5.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

   The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the indemnification obligations are enforceable, in part or in whole, under the circumstances.

19(a).   Ingenico Inc. initiated affirmative litigation proceedings against IOEngine LLC, which were unresolved at the time demands for indemnification were issued. Doc. No. 188 (Pl. Facts) at 23-24, ¶63 (citing Ex. C (BBPOS-ROAM Licensing Agreement), Doc. No. 188-3 at 3-5); at 30, ¶80 (citing Ex. AA (Indemnity Letters), Doc. No. 188-27); at 32, ¶87 (citing Ex. CC (Vanderhart Report), Doc. No. 188-29 at 43-44 and 86); at 32, ¶88 (citing Ex. DD (IOEngine Docket), Doc. No. 188-30 at 4-6, 13).

19(b).   Ingenico Inc. promised to keep BBPOS informed of the status of various claims, but then failed to do so. Doc. No. 188 (Pl. Facts) at 30, ¶80 (citing Ex. AA (Indemnity Letters), Doc. No. 188-27); at 32-33, ¶89 (citing Ex. AA (Indemnity Letters), Doc. No. 188-27 and Ex. BB (Declaration of Melissa Bozeman), Doc. No. 188-28). *See also* Ex. 1 (Lo Dec.) at ¶8.

19(c).   Ingenico Inc. failed to provide any advance notice or evidence of reasonableness of settlements purportedly reached. Doc. No. 188 (Pl. Facts) at 31, ¶¶83-84 (citing Ex. CC (Vanderhart Report), Doc. No. 188-29 at 43-44 and 86); at 31-32, ¶¶85-86 (citing Ex. X (Vanderhart Tr.), Doc. No. 188-24 at 4-6). *See also* Ex. 1 (Lo Dec.) at ¶9.

19(d).   Ingenico Inc. failed to provide any evidence of reasonableness of attorneys' fees and costs allegedly purportedly incurred.  Doc. No. 188 (Pl. Facts) at 31, ¶¶83-84 (citing Ex. CC (Vanderhart Report), Doc. No. 188-29 at 43-44 and 86); at 31-32, ¶¶85-86 (citing Ex. X (Vanderhart Tr.), Doc. No. 188-24 at 4-6).

19(e).   BBPOS requested in writing, through its counsel, information necessary for it to fully analysis Ingenico Inc.'s indemnification demands; despite indicating its amenability of entering into a Common Interest Agreement as Ingenico Inc.'s condition to providing the requested information on December 3, 2018, no further response was provided and none of the requested information was disclosed to BBPOS until the close of this lawsuit. Doc. No. 188 (Pl. Facts) at 30, ¶80 (citing Ex. AA (Indemnity Letters), Doc. No. 188-27); at 30, ¶81 (citing Ex. BB (Declaration of Melissa Bozeman), Doc. No. 188-

28); at 30-31, ¶82 (citing Ex. BB (Declaration of Melissa Bozeman), Doc. No. 188-28); at 31-32, ¶86

(citing Ex. X (Vanderhart Tr.), Doc. No. 188-24 at 5-6); at 32-33, ¶89 (citing Ex. AA (Indemnity Letters),

Doc. No. 188-27); Ex. BB (Declaration of Melissa Bozeman), Doc. No. 188-28)). *See also* Ex. 2 (Lo II

Tr.) at 56:14-16 ("Q. And did BBPOS indemnify Ingenico? **A. We asked Ingenico to provide further**

**information and they didn't provide**."). *See also* Ex. 1 (Lo Dec.) at ¶10.

20. *The ROAM-BBPOS Agreement defines "confidential information" to include* *confidential or proprietary information including, inter alia, technical information shared pursuant to* *the agreement. Ex. 3 (ROAM-BBPOS Agreement) § 3.18.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however,

a genuine issue of material fact exists as to the scope of the confidentiality obligations and protections set

forth under the agreement.

20(a).  Section 6.1 of the BBPOS-ROAM Licensing Agreement provides:

> Both parties agree to treat the other's Confidential Information (as defined below) as confidential, to take all reasonable measures to protect and prevent the disclosure of and/or unauthorized use by third parties of the other parties' Confidential Information, to exercise at least the same degree of care exercised for the protection of its own Confidential Information, and to not use Confidential Information other than for its intended purpose under this Agreement.

Doc. No. 188-3 at 6, Ex. C (BBPOS-ROAM Licensing Agreement).

20(b).  Section 6.2 provides:

> "Confidential Information" shall mean information (whether written or oral) of a confidential or propriety nature concerning this Agreement or the assets, products or business of any party hereto that either party shall have obtained as a result of discussions or communications related to this Agreement or the transactions contemplated undertaken by this Agreement, including (but not limited to) in the case of the Company, the technical and other information concerning the Products and Devices and related documentation. Without limiting the generality of the foregoing, if either party hereto receives from the other party written information that is marked "Confidential" and/or "Proprietary", such information shall be deemed "Confidential Information." The obligation to keep Confidential Information confidential shall not apply to information that has been

disclosed in publicly available sources; if, through no fault of the party receiving the confidential information, hereafter disclosed in a publicly available source; or is in the rightful possession of the party receiving the confidential information without an obligation of confidentiality.

Doc. No. 188-3 at 6, Ex. C (BBPOS-ROAM Licensing Agreement).

20(c).   Section 6.3 provides, in relevant part:

Notwithstanding any provision herein to the contrary, a party may disclose Confidential Information on a need-to-know basis to its contractors, lawyers, accountants and agents, provided that any such person is bound by a duty of confidentiality, and such party shall be responsible for any disclosure or use by any such third party in contravention hereof. . .

Doc. No. 188-3 at 6, Ex. C (BBPOS-ROAM Licensing Agreement).

21.     *The agreement imposes a duty on a receiving party to keep information confidential where it is "marked 'Confidential' and/or 'Proprietary' [...]." Id.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however,

a genuine issue of material fact exists as to the scope of the confidentiality obligations set forth under the

agreement. *See* above Genuine Disputed Material Facts at ¶¶20(a) – (c).

22.     *That duty of confidence does not apply as to "information that is disclosed in publicly available sources [or] is in the rightful possession of the party receiving the confidential information without an obligation of confidentiality." Id.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however,

a genuine issue of material fact exists as to the scope of the confidentiality obligations set forth under the

agreement. *See* above Genuine Disputed Material Facts at ¶¶20(a) – (c).

23.     *The ROAM-BBPOS Agreement does not contain any terms describing the manner in which "Confidential Information" must be protected by the receiving party. Id.*

14

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to the scope of the confidentiality obligations set forth under the agreement. *See* above Genuine Disputed Material Facts at ¶¶20(a) – (c).

24.     *OMITTED.*

25.     *In December 2015, BBPOS attempted to sell Covered Mobile Payment Devices to one of Ingenico Inc.'s customers, North American Bancard, LLC, in violation of the Ingenico-BBPOS Agreement. Ex. 2 (BBPOS 30(b)(6) Dep.) at 176:3-6.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS or other related restrictive covenants in the agreement cover any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product lines). *See* above Genuine Disputed Material Facts at ¶18(a) (disputing the propriety of Defendants' use of the defined term "Covered Mobile Payment Devices").

A genuine issue of material fact also exists as to whether any conduct (remediated or otherwise) undertaken by BBPOS with respect to NAB violated the BBPOS-ROAM Licensing Agreement. *See* above Genuine Disputed Material Facts at ¶16(a).

25(a).  In or around December 2015, BBPOS unintentionally accepted a purchase order for CircleSwipes (or "swipers") from NAB, but thereafter promptly canceled the order, when Ingenico Inc. brought the error to BBPOS's attention. Ex. EE (12/9/2015 Thread), Doc. No. 188-31. *See also* Internal BBPOS Email Thread dated December 11, 2015 [BBPOS_0000070-073] ("12/11/2015 Thread")

(instructing "Do not take the order from NAB re swiper"), a true and correct copy of which is attached as Exhibit 3.

25(b).   Ingenico Inc. was aware of the circumstances of the alleged "attempt[] to sell" no later than December 9, 2015. Ex. EE (12/9/2015 Thread), Doc. No. 188-31.

25(c).   BBPOS has never sold any CircleSwipe devices to NAB. Doc. No. 188-1 at 6, Ex. A (Lo I Tr.) at 43:7-25 – 44:1-10 (confirming that BBPOS exclusively sold to ROAM all versions of its CircleSwipe device outside of China). *See also* Ex. 1 (Lo Dec.) at ¶¶11, 12.

26(d).   Lo's referenced corporate designee testimony neither confirms any alleged attempt by BBPOS to sell "Covered Mobile Payment Devices" to NAB nor confirms any intentional or attempted violations of the exclusivity provisions of the BBPOS-ROAM Licensing Agreement; rather, Lo testified that BBPOS has purposely marketed and sold its Chipper device to NAB – but not the CircleSwipe device, *see* Ex. 2 (Lo II Tr.) at 169:2-25 – 170:1-12; that if BBPOS, hypothetically, attempted to sell NAB the CircleSwipe, "then we shall stop," *id.* at 171:18-25 – 172:1-6; and that internal instruction "Do not take the order from NAB re swiper" in the 12/11/2015 Thread meant "[BBPOS] cannot take the order from NAB as we are an agreement with ROAM Data for not selling Circle Swipe to NAB. So we should cancel the order[,]" *id.* at 172:24-25 – 173:1-7; Ex. 3 (12/11/2015 Thread).

*26.   BBPOS sold and continues to sell Covered Mobile Payment Devices to AnywhereCommerce. Id. at 70:9-12.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS or other related restrictive covenants in the agreement cover any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product

lines). *See* above Genuine Disputed Material Facts at ¶18(a) (disputing the propriety of Defendants' use of the defined term "Covered Mobile Payment Devices").

26(a).   BBPOS has never sold any CircleSwipe devices to AC. Doc. No. 188-1 at 6, Ex. A (Lo I Tr.) at 43:7-25 – 44:1-10 (confirming that BBPOS exclusively sold to ROAM all versions of its CircleSwipe device outside of China). *See also* Ex. 1 (Lo Dec.) at ¶¶11, 13.

26(b).   Lo's referenced corporate designee testimony neither confirms any sale of "Covered Mobile Payment Devices" to AC nor confirms any violations of the exclusivity or restrictive covenant provisions of the BBPOS-ROAM Licensing Agreement; rather, Lo testified that BBPOS sold its Chipper device to AC, which is a "Chip based product . . . which can read the EMV card reader." Ex. 2 (Lo II Tr.) at 69:13-25 – 71:1-8.

27.     *The Ingenico-BBPOS Agreement was in effect when BBPOS sold Covered Mobile Payment Devices to AnywhereCommerce. Id. at 87:24-88:2.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS or other related restrictive covenants in the agreement cover any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product lines). *See* above Genuine Disputed Material Facts at ¶18(a) (disputing the propriety of Defendants' use of the defined term "Covered Mobile Payment Devices"); ¶¶26(a) – (b).

28.     *BBPOS has itself and has permitted third parties, including AnywhereCommerce, to use some or all of the licensed intellectual property rights in violation of the Ingenico-BBPOS Agreement. Id. at 70:9-12.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS or other related restrictive covenants in the agreement cover any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product lines). *See* above Genuine Disputed Material Facts at ¶¶13(a) – (e), 26(b).

28(a).  Section 9.2 of the BBPOS-ROAM Licensing Agreement states, in relevant part:

> If the Products or Devices incorporate **Partner-owned IP**, the Company is hereby granted a worldwide, perpetual, fully paid, sublicensable license to use the Partner IP to continue developing, manufacturing and selling the Products and Devices.

Doc. No. 188-3 at 7, Ex. C (BBPOS-ROAM Licensing Agreement) (emphasis added). *See also* Doc. No. 188 (Pl. Facts) at 22-23, ¶59 (referring to the limited and non-exclusive nature of BBPOS's grant of IP licensing rights under §9.2).

29.  *BBPOS sold Covered Mobile Payment Devices to NMA. Id. at 180:14-181:19.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS or other related restrictive covenants in the agreement cover any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product lines). *See* above Genuine Disputed Material Facts at ¶18(a) (disputing the propriety of Defendants' use of the defined term "Covered Mobile Payment Devices").

29(a).  BBPOS has never sold any CircleSwipe devices to NMA. Doc. No. 188-1 at 6, Ex. A (Lo I Tr.) at 43:7-25 – 44:1-10 (confirming that BBPOS exclusively sold to ROAM all versions of its CircleSwipe device outside of China). *See also* Ex. 1 (Lo Dec.) at ¶¶11, 14.

29(b).  Lo's referenced corporate designee testimony neither confirms any sale of "Covered Mobile Payment Devices" to NMA nor confirms any violations of the exclusivity or restrictive covenant provisions of the BBPOS-ROAM Licensing Agreement; in fact, Lo actually testified that he was not sure whether NMA was even a customer: "**A. So you're asking whether they're our customer?** Q. Yes. . . Q. NMA? **A. NMA?** Q. Yes. **A. A for apple? I'm not sure.**" Ex. 2 (Lo II Tr.) at 181:12-19.

 30. *BBPOS sold Covered Mobile Payment Devices to Shopify. Id. at 180:14-181:25.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS or other related restrictive covenants in the agreement cover any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product lines). *See* above Genuine Disputed Material Facts at ¶18(a) (disputing the propriety of Defendants' use of the defined term "Covered Mobile Payment Devices").

30(a).  BBPOS has never sold any CircleSwipe devices to Shopify. Doc. No. 188-1 at 6, Ex. A (Lo I Tr.) at 43:7-25 – 44:1-10 (confirming that BBPOS exclusively sold to ROAM all versions of its CircleSwipe device outside of China). *See also* Ex. 1 (Lo Dec.) at ¶¶11, 15.

30(b).  Lo's referenced corporate designee testimony neither confirms any sale of "Covered Mobile Payment Devices" to Shopify nor confirms any violations of the exclusivity or restrictive covenant provisions of the BBPOS-ROAM Licensing Agreement; rather, Lo merely confirmed that Shopify is a customer: "**A. So you're asking whether they're our customer?** Q. Yes. . . Q. NMA? **A. NMA?** Q. Yes. **A. A for apple? I'm not sure.**" Ex. 2 (Lo II Tr.) at 181:12-19.

 31. *BBPOS sold Covered Mobile Payment Devices to its customers in Mexico. Id. at 70:9-19.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS or other related restrictive covenants in the agreement cover any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product lines). *See* above Genuine Disputed Material Facts at ¶18(a) (disputing the propriety of Defendants' use of the defined term "Covered Mobile Payment Devices").

31(a).   BBPOS has never sold any CircleSwipe devices to its customers in Mexico. Doc. No. 188-1 at 6, Ex. A (Lo I Tr.) at 43:7-25 – 44:1-10 (confirming that BBPOS exclusively sold to ROAM all versions of its CircleSwipe device outside of China). *See also* Ex. 1 (Lo Dec.) at ¶¶11, 16.

31(b).   Lo's referenced corporate designee testimony neither confirms any sale of "Covered Mobile Payment Devices" to customers in Mexico nor confirms any violations of the exclusivity or restrictive covenant provisions of the BBPOS-ROAM Licensing Agreement; rather, Lo testified that BBPOS sold its Chipper device in Mexico, which is a "Chip based product . . . which can read the EMV card reader." Ex. 2 (Lo II Tr.) at 69:13-25 – 71:1-19.

*32.     Ingenico made demand upon BBPOS for attorneys' fees and other costs related to claims by third parties that the use or sale of Covered Mobile Payment Devices or other deliverables or services that BBPOS provided under the Agreement. Second Am. Countercl. (Doc. No. 78) ¶ 29; Ex. 2 (BBPOS 30(b)(6) Dep.) at 56:7-13.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the exclusive product license granted by BBPOS or other related restrictive covenants in the agreement cover any mobile payment devices other than the CircleSwipe product family (i.e., Crypto Swipe, Swiper, and ROAM's G3X, G4X, and G5X product

lines). *See* above Genuine Disputed Material Facts at ¶18(a) (disputing the propriety of Defendants' use of the defined term "Covered Mobile Payment Devices").

32(a).   Ingenico Inc. made demands upon BBPOS for attorneys' fees and other costs related to claims by third parties that explicitly involved non-BBPOS accused products / services or otherwise could be reasonably construed to involve non-BBPOS accused products / services. Doc. No. 188-1 at 6, Ex. A (Lo I Tr.) at 43:7-25 – 44:1-10 (confirming that BBPOS exclusively sold to ROAM all versions of its CircleSwipe device outside of China). *See also* Ex. 1 (Lo Dec.) at ¶11.

31(b).   Lo's referenced corporate designee testimony neither confirms any sale of "Covered Mobile Payment Devices" to customers in Mexico nor confirms any violations of the exclusivity or restrictive covenant provisions of the BBPOS-ROAM Licensing Agreement; rather, Lo testified that BBPOS sold its Chipper device in Mexico, which is a "Chip based product . . . which can read the EMV card reader." Ex. 2 (Lo II Tr.) at 69:13-25 – 71:1-19. *See also* Ex. 1 (Lo Dec.) at ¶¶11, 16.

33.   *BBPOS refused Ingenico's indemnification demand. Ex. 2 (BBPOS 30(b)(6) Dep.) at 56:17-19.*

## **PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether the indemnification obligations are enforceable, in part or in whole, under the circumstances. *See* above Genuine Disputed Material Facts at ¶¶19(a) – (e).

33(a).   Lo's referenced corporate designee testimony does not state that BBPOS "refused" the indemnification demand; rather, when asked whether BBPOS indemnified Ingenico Inc., Lo testified that "We asked Ingenico to provide further information and they didn't provide." Ex. 2 (Lo II Tr.) at 56:14-16.

34.   *In Plaintiffs' First Amended Complaint, Plaintiffs do not specify how many trade secrets Ingenico allegedly misappropriated. See First Am. Compl. (Doc. No. 67).*

Plaintiffs' First Amended Complaint is a written document that speaks for itself.

35.     *In Plaintiffs' First Amended Complaint, Plaintiffs do not identify in any way the trade secrets Ingenico allegedly misappropriated. See id.*

Plaintiffs' First Amended Complaint is a written document that speaks for itself.

36.     *In Plaintiffs' First Amended Complaint, Plaintiffs do not specify how many trade secrets Ingenico allegedly misappropriated. See id.*

Plaintiffs' First Amended Complaint is a written document that speaks for itself.

37.     *In Plaintiffs' Amended Complaint, Plaintiffs do not identify in any way the trade secrets Ingenico allegedly misappropriated. See id.*

Plaintiffs' Amended Complaint is a written document that speaks for itself.

38.     *BBPOS sent emails to third parties with documents it later described as trade secrets. Ex. 2 (BBPOS 30(b)(6) Dep.) at 153:19-154:16; 202:16-203:23; 204:22-205:7.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether BBPOS was aware of corporate affiliations of each of the recipients of such emails (i.e., ROAM, Ingenico, or both) and whether, irrespective thereof, the disclosures were made at the direction of ROAM or otherwise covered by the confidentiality obligations set forth in the agreement, including under §6.3, or otherwise.

38(a).   Lo's referenced corporate designee testimony does not admit that BBPOS knowingly sent trade secret information to third parties; to the contrary, Lo, in fact, denied doing so, when he was asked why trade secret information was shared via email with a third party, stating: "This is not a third party. Christopher [Rotsaert] is a ROAM people. So they may want to -- I sent to ROAM, so they may want to review it." Ex. 2 (Lo II Tr.) at 153:9-25 – 154:1-22 (discussing two emails between BBPOS and Christopher Rotsaert ("Rotsaert")). *See also* Ex. 2 (Lo II Tr.) at 202:16-25 – 203:1-21 (testifying about

an email where Rotsaert is directing BBPOS to communicate with an Ingenico engineer, Lo reiterates "[b]ut Christopher is a ROAM -- is introduced to me by Will Graylin is ROAM. So I still believe that this is -- this is ROAM introduce one of their partner to us who is Ingenico. So Christopher here I still think that he's from ROAM."); 204:3-25 – 206:1-11 (testifying about two more emails between BBPOS and Rotsaert, with respect to one that shared trade secret information with the Ingenico engineer at Rotsaert's direction, Lo states: "This is a trade secret, and this secret we sent to ROAM Data. And also suggested to protected by the 6.3. . . of the ROAM agreement."). *See also* Ex. 1 (Lo Dec.) at ¶¶17-18.

38(b).  BBPOS understood Rotsaert to be a corporate representative for ROAM at the time BBPOS disclosed its trade secrets and other confidential information to him and/or others, at his specific direction. Doc. No. 188 at 13-14, ¶37 (referencing Rotsaert's appointment to ROAM as its VP of mPOS Product Management, beginning in 2012, while, concurrently, assuming the position as Head of Product Management and R&D for Ingenico's global Mobility Payment Business Line no later than mid-2012 and citing Ex. H (8/1/2012 Email), Doc. No. 188-8 at 57; Ex. B (Rotsaert Tr.), Doc. No. 188-2 at 2-3. *See also* Ex. 1 (Lo Dec.) at ¶17.

38(c).  BBPOS made certain disclosures of its Confidential Information under the BBPOS-ROAM Licensing Agreement at the request of ROAM, for the ostensible benefit of ROAM and / or BBPOS, or otherwise in furtherance of purposes and intents of the agreement, including to affiliated Ingenico parties, from time to time, with the understanding or belief that such disclosures would be subject to the confidentiality obligations pursuant to §§6.1 and / or §6.3. Ex. 2 (Lo II Tr.) at 142:5-25 – 144:1 (explaining that, if requested by ROAM, "6.3 of the agreement, that for information that we send to ROAM, that ROAM will take care, will treat this document as confidential document."). *See also* Ex. 1 (Lo Dec.) at ¶¶17-18.

39.    On February 28, 2012, BBPOS emailed a document listed as "swiper API android guy.doc" that contains information BBPOS considers trade secrets. Ex. 2 (BBPOS 30(b)(6) Dep.) at 155:9-25.

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether BBPOS was aware of corporate affiliations of each of the recipients of such emails (i.e., ROAM, Ingenico, or both) and whether, irrespective thereof, the disclosures were made at the direction of ROAM or otherwise covered by the confidentiality obligations set forth in the agreement, including under §6.3, or otherwise. *See* above Genuine Disputed Material Facts at ¶¶38(a) – (c).

39(a).   Lo's referenced corporate designee testimony does not admit that BBPOS knowingly sent trade secret information to third parties; to the contrary, when asked why BBPOS was sending trade secrets to Rotsaert in an email that copied at least one Ingenico engineer, Lo testified: "I don't remember. But like when ROAM asked me to send some data to them, they must be -- have some reason. . .". Ex. 2 (Lo II Tr.) at 155:9-25 – 156:1-2). *See also* Ex. 1 (Lo Dec.) at ¶¶17-18.

40.    On July 17, 2012, BBPOS sent an email with the PayPal G4X schematic attached, which BBPOS now considers a trade secret. Id. at 153:19-154:16.

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether BBPOS was aware of corporate affiliations of each of the recipients of such emails (i.e., ROAM, Ingenico, or both) and whether, irrespective thereof, the disclosures were made at the direction of ROAM or otherwise covered by the confidentiality obligations set forth in the agreement, including under §6.3, or otherwise. *See* above Genuine Disputed Material Facts at ¶¶38(a) – (c), 39(a).

40(a).  This statement refers to one of the same emails addressed at above Genuine Disputed Material Fact at ¶38(a). Again, Lo's referenced corporate designee testimony does not admit that BBPOS knowingly sent trade secret information to third parties; to the contrary, Lo, in fact, denied doing so, when he was asked why trade secret information was shared via email with a third party, stating: "This is not a third party. Christopher [Rotsaert] is a ROAM people. So they may want to -- I sent to ROAM, so they may want to review it." Ex. 2 (Lo II Tr.) at 153:9-25 – 154:1-22. *See also* Ex. 1 (Lo Dec.) at ¶¶17-18.

41.     *BBPOS did not mark the schematics it emailed as "Confidential." Id. at 145:14-15.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to the scope of the confidentiality obligations and protections set forth under the agreement. *See* above Genuine Disputed Material Facts at ¶¶20(a) – (c).

41(a).  Lo's referenced corporate designee testimony does not confirm or acknowledge any obligation to specifically mark information "Confidential" in order for it to nonetheless be protected under the BBPOS-ROAM Licensing Agreement; to the contrary, Lo, testified that information shared with a customer, and particularly, "engineering, schematic issues," would qualify as confidential. Ex. 2 (Lo II Tr.) at 145:1-12.

42.     *BBPOS also sent an email on another occasion containing trade secrets pertaining to the DUKPT method. Id. at 205:9-206:7.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The BBPOS-ROAM Licensing Agreement is a written document that speaks for itself; however, a genuine issue of material fact exists as to whether BBPOS was aware of corporate affiliations of each of the recipients of such emails (i.e., ROAM, Ingenico, or both) and whether, irrespective thereof, the disclosures were made at the direction of ROAM or otherwise covered by the confidentiality obligations

set forth in the agreement, including under §6.3, or otherwise. *See* above Genuine Disputed Material Facts at ¶¶38(a) – (c), 39(a), 40(a).

42(a).   This statement also refers to one of the same emails addressed at above Genuine Disputed Material Fact at ¶38(a). Again, Lo's referenced corporate designee testimony does not admit that BBPOS knowingly shared trade secret information regarding its unique implementation of DUKPT key management with an Ingenico engineer without any confidentiality protections in place; to the contrary, Lo, in fact, denied that the information was shared for the benefit of a third party at all, stating: "This is a trade secret, and this secret we sent to ROAM Data. And also suggested to protected by the 6.3. . . of the ROAM agreement."). Ex. 2 (Lo II Tr.) at 205:9-25 – 206:1-11. *See also* Ex. 1 (Lo Dec.) at ¶¶17-18.

43.     *OMITTED.*

44.     *OMITTED.*

45.     *OMITTED. Ben Lo, as the Rule 30(b)(6) designee of BBPOS, testified that he was "not sure" if the files containing BBPOS's trade secrets were password protected. Id. at 139:13-140:14.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to whether BBPOS undertook sufficiently reasonable measures to maintain the secrecy of its trade secrets at issue in the case.

45(a).   In reference to *one particular set of schematics for an audio jack* (i.e., Deposition Exhibit 78), when asked "how is this set of schematics kept confidential at BBPOS," Lo testified that he was unsure whether BBPOS's electronic file for the same was password protected, but noted that it is file that normally is not necessary to send to anyone. Ex. 2 (Lo II Tr.) at 138:14-25 – 140:1-14.

45(b).   BBPOS maintains its electronic files on a local server. To access the local server, a recognized username and password successful login is required. Ex. 1 (Lo Dec.) at ¶20.

45(c).   BBPOS's electronic files containing trade secrets are stored on computers, that are password protected which can only be accessed by a certain engineer, who acts as both custodian / gatekeeper, subject to standing instructions against any unauthorized distribution thereof. Ex. 2 (Lo II Tr.) at 139:13-25 – 140:1-12; Ex. 1 (Lo Dec.) at ¶19.

45(d).   With the exception of possibly Jimmy Tang, or some "very early senior staff," Lo testified that he is the only person at BBPOS who has the authority to authorize a third party disclosure of any of BBPOS's engineering files, all of which are considered to be confidential as a matter of course. Ex. 2 (Lo II Tr.) at 141:2-25 – 142:1-4.  *See also* Ex. 1 (Lo Dec.) at ¶19.

45(e).   With respect to the five trade secrets at issue in this case, Lo authorized the disclosures to made to ROAM, as requested, under the protections of the BBPOS-ROAM Licensing Agreement. Lo is the only person at BBPOS who is authorized to disclose its trade secrets. Ex. 1 (Lo II Tr.) at 142:5-19. *See also* Ex. 1 (Lo Dec.) at ¶¶17-19, 22-23.

46.     *The only protection BBPOS had in place was its practice of having the employees who had unfettered access to the trade secrets ask for permission to disburse the information containing trade secrets. Id. at 141:4-18.*

## **PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:

A genuine issue of material fact exists with respect to whether BBPOS undertook sufficiently reasonable measures to maintain the secrecy of its trade secrets at issue in the case. *See* above Genuine Disputed Material Facts at ¶¶45(a) – (e).

46(a).   No employee of BBPOS had "unfettered access" to the trade secrets at issue in the case, and further sign nondisclosure agreements from disclosing information they may have access to; moreover, the disclosures were made at the direction of Lo, not as a result of any employee seeking permission to do so. Ex. 2 (Lo II Tr.) at 142:5-19; Ex. 1 (Lo Dec.) at ¶¶24-26.

*47.     Mr. Lo was not even certain who had this authority. BBPOS 30(b)(6) Dep. at 141:4-18.*
*141:23-142:4.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST**
**RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to whether BBPOS undertook sufficiently

reasonable measures to maintain the secrecy of its trade secrets at issue in the case. *See* above Genuine

Disputed Material Facts at ¶¶45(a) – (e), ¶46(a).

47(a).  Lo's referenced corporate designee testimony does not address, with particularity, the

disclosure of trade secrets; rather, Lo testified that, with the exception of possibly Jimmy Tang, or some

"very early senior staff," no one other than himself would have the authority to disclose the company's

engineering files, which are considered to be confidential as a matter of course. Ex. 2 (Lo II Tr.) at 141:2-

25 – 142:1-4; Ex. 1 (Lo Dec.) at ¶¶19, 21-22.

*48.     When asked if there were other people besides Mr. Lo who could authorize the disclosure*
*of confidential information, Mr. Lo replied, "maybe." BBPOS 30(b)(6) Dep. at 141:4-18. 141:23-142:1.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST**
**RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to whether BBPOS undertook sufficiently

reasonable measures to maintain the secrecy of its trade secrets at issue in the case. *See* above Genuine

Disputed Material Facts at ¶¶45(a) – (e), 46(a), 47(a).

*49.     On April 30, 2013, ROAM issued a press release announcing the RP350X. See April 30,*
*2013 Press Release (attached as **Exhibit 5**).*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST**
**RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to the timeliness of Plaintiffs' claims asserted

in this lawsuit under applicable statutory and controlling federal and state legal jurisprudence.

49(a).   Sometime in 2012, Lo testified that he received a call from Graylin during which he expressed a concern that Rotsaert may have improperly shared BBPOS's IP with Ingenico. *See* Deposition Transcript of Ben Lo dated December 8, 2021 ("Lo I Tr.") at 111:1-25 – 115:1-3; 176:1-12, a true and correct excerpted copy of which, is attached as Exhibit 4. *See also* Deposition of William Graylin dated August 31, 2021 ("Graylin Tr.") at 100:11-24 – 102:1; 145:14-21, a true and correct excerpted copy of which is attached as Exhibit 5.

49(b).   In an internal BBPOS email dated October 11, 2012, Lo states, in relevant part:

> ROAM's new product manager called RAM is going to visit us on Tuesday. Please don't disclose too much technical information to him. After last visit, Christopher and the two Ingenico R&D guys must collect some info back to Ingenico. Will told me that Ingenico passes some info to Landi for making terminal to compete with us. We should not trust any hardware guy from Ingenico or ROAM anymore.

*See* Email dated October 11, 2012 [BBPOS_0658887] ("10/11/2012 Email") (Lo 30b6 Exhibit 75), a true and correct copy of which is attached as Exhibit 6.

49(c).   During his deposition, Lo was questioned about this 2012 phone call and testified that Graylin "just told me that . . . Ingenico steal our IP." Ex. 4 (Lo I Tr.) at 111:10-11.

49(d).   Lo testified that he found Graylin's 2012 statements not credible and, in any event, incapable of substantiation:

(1) Graylin neither identified which Ingenico entity (or entities) stole BBPOS's IP nor what IP had been stolen, stating that "[t]here was no detail . . . I ask him, but he didn't give me any detail" (Ex. 4 (Lo I Tr.) at 111:10-25 – 112:1-3);

(2) During this call, Graylin "deliver[ed] to me message" – one that "he was fired by ROAM Data[,]" and was "quite angry", and, secondly, that one of the reasons why he had been fired was because ROAM stole BBPOS's IP Lo Tr. at 112:17-22; 114:7-8 – specifically, telling Lo that "he ha[d] different opinion with some of the - - with the owner of the - - with the top member of the ROAM Data . . . about whether to transfer IP to Ingenico" (Ex. 4 (Lo I Tr.) at 112:25 – 113:1-21);

(3) At the time, Lo "did nothing" and "was quite skeptical about that [i.e., Graylin's allegation that Ingenico stole BBPOS's IP]" (Ex. 4 (Lo I Tr.) at 112:19-23);

(4) Lo added "I don't believe him" (Ex. 4 (Lo I Tr.) at 113:24-25; 114:21-23) and then clarified that he believed that Graylin had been fired (in fact, he observed that to be objectively true as his point of contact for ROAM contemporaneously changed), (Ex. 4 (Lo I Tr.) at 114:1-2; 114:10-20), but that, given how angry Graylin was and the fact that ROAM was one of BBPOS's biggest customers, "it seemed to me that [Graylin] tried to arrange to destroy everything[,] [s]o I don't believe him" (Ex. 4 (Lo I Tr.) at 114:3-8; 114:21-22; 176:1-7); and

(5) Lo "didn't do anything to verify" Graylin's claims at the time, further confirming that he did not "have any reason to think that information was actually making its way to Ingenico." Ex. 4 (Lo I Tr.) at 114:24-25 – 115:1-3.

49(e).  Graylin testified that his "personal complaint and all of the rest of the minority shareholders' complaint . . . somewhat is a separate case from what [Lo] has to deal with as a supplier . . . for ROAM and for Ingenico." Ex. 5 (Graylin Tr.) at 146:7-12.

49(f).  Graylin was unable to specifically recall either the substance of this conversation with Lo or Lo's precise reaction to his suspicions, other than to say that "we were just lamenting the . . . challenges that I went through being terminated by . . . Ingenico and, of course, [Lo / BBPOS] still had a relationship with Ingenico that . . . he needs to and wants to maximize" as well as "to the extent that [Lo] has a contract with Ingenico, he needs to carry that forward." Ex. 5 (Graylin Tr.) at 145:22-24 – 146:1-7; 147:1-11.

49(g).  Graylin then confirmed that "the substance of the conversation included [Lo's] reaction that he has an ongoing relationship with Ingenico," stating that, like himself in his continuing capacity as a minority shareholder of ROAM, "[c]learly, [Lo] has . . . an obligation as well as an incentive to make sure that that relationship [with ROAM / Ingenico] works . . ." Ex. 5 (Graylin Tr.) at 147:12-22.

49(h).  Graylin also freely admitted that, at the time of his 2012 discussion with Lo, he had no actual knowledge (and to this day still has no actual knowledge or evidence) as to whether any of BBPOS's IP was, in fact, improperly used by Ingenico in the development and sale of the accused products at issue after he left his position with ROAM that same year. Ex. 5 (Graylin Tr.) at 171:7-24 – 172:1-19.

30

49(i).   Graylin was merely aware of the unauthorized disclosure of BBPOS's IP to Ingenico and its recently acquired Chinese POS manufacturer, Fujian Landi Commercial Equipment Co Ltd. ("Landi") via Rotsaert, and certain unconfirmed reports within the company that Ingenico "planned on building a competing EMV reader." Ex. 5 (Graylin Tr.) at 35:5-24 – 37:1-5; 38:1-24 – 39:1-7; 48:2-24 – 51:1-10 (referring Doc. No. 188-9 at 1, Ex. I (9/17/2012 Thread) (an internal email thread dated September 17, 2012 among Graylin and Rotsaert, wherein Mr. Graylin sets forth certain concerns that "[Rotsaert] was going to transfer information over to Ingenico" to "create a competing product" and regarding "him transferring . . . data to Ingenico [that] contained some parts of IP that . . . not just belonged to us, but also belonged to someone else" (i.e., BBPOS)).

49(j).   Graylin testified that he was concerned "that [competing products] would take away [ROAM's] revenue source" and, when asked if this could "also negatively impact BBPOS[,]" he commented "[w]ell, we pay a royalty to BBPOS. So as . . . a result, that also can impact our partners." Ex. 5 (Graylin Tr.) at at 52:1-12.

49(k).   Graylin testified that he disagreed with Rotsaert's unauthorized decision to transfer BBPOS's IP here as being "certainly" harmful to ROAM, potentially harmful to BBPOS, and indicative of a lack of "respect for [BBPOS's] intellectual property." Ex. 5 (Graylin Tr.) at 52:19-24 – 54:1-9.

49(l).   During the 30(b)(6) deposition of Lo for BBPOS, Lo was asked about a one-page product preview sheet for Ingenico's RP350x mobile card device that had been received by him in January 2013. Ex. 2 (Lo II Tr.) at 126:3-25 – 127:1-24. *See also* January 16, 2013 specification sheet [BBPOS_15859552] ("January 2013 Spec. Sheet"), a true and correct copy of which is attached as Exhibit 7.

49(m). Lo testified that he did not recall seeing the document, but, in any event, considered it to be aspirational (or a mockup flyer), having never seen the subject product in reality at that time, but

nonetheless prompting him to reasonably follow up with Ken Paull ("Paull") of ROAM in an effort to sure up BBPOS preferred vendor status with ROAM for the manufacturing of mPOS products. Ex. 2 (Lo II Tr.) at 127:20-25 – 128:1-25.

49(n).   During Lo's 30(b)(6) deposition, he was also shown a previously unproduced email thread dated February 12, 2013 [IngenicoInc_0162912-919] ("2/12/2013 Thread") among Paull of ROAM and Lo. Lo 30b6 Tr. at 104:5-114:1. *See also* 2/12/2013 Thread, a true and correct copy of which is attached as Exhibit 8.

49(o).   In this email thread, on January 19, 2013, Mr. Paull assures BBPOS that any fears of IP theft are unfounded and suggests that their strategic partnership remained on good footing, writing:

> I heard from Bill that you were upset about hearing that there is an Ingenico EMV prototype that we are showing. I'm confused as you and I spoke about this, our need to move to a dual supply chain as we move to handle demand from around the world and even the possibility of ROAM licensing BBPOS software for potentially a unified SDK/API that would support both product lines. **I can assure you that there is no commonality in terms of architecture, firmware or power with the Ingenico device as it is based off of an existing Landi product.**
>
> **We are also anxious to start showing your product ASAP in the market** and that's why I asked our team to start getting all the product information, timelines, costs, etc. from you so that we can begin proposing it. We have a few very large customers and prospects who are demanding a dual supply chain and we want to try to capture 100% of their business instead of only a split.

Ex. 8 (2/12/2013 Thread) at IngenicoInc_0162912 (emphasis added).

49(p).   Lo testified that, at the time of his inquiries, he had not seen any alleged EMV prototype, and then emphasized, "I didn't see the actual, actual device. I just heard that they are -- they are coming with a competitive -- Ingenico coming with a competitive product, but I don't see the product yet."  Ex. 2 (Lo II Tr.) at 105:17-25.

49(q).   Lo testified that he was "upset" at the time because this information was at odds with BBPOS's impression that it was partnering with ROAM to sell BBPOS's Chipper EMV device to PayPal

and others, more generally, in bringing new mPOS devices to a rapidly emerging market sector. Lo 30b6 Tr. at 109:1-25 – 112:1-15. He testified that prototype devices, such as the rumored Ingenico EMV device discussed herein, are not generally shown in trade shows; rather, "if it is sold at a trade show, the product is ready." Ex. 2 (Lo II Tr.) at 108:1-24.

49(r).  Lo freely acknowledged, however, that Ingenico is entitled to compete with BBPOS on mPOS technology, and that there is "nothing inherently wrong with Ingenico" attempting to do so, Ex. 2 (Lo II Tr.) at 184:10-19 – assuming that, as Paull had (falsely) assured BBPOS was the case, BBPOS's trade secrets were not being improperly used in the development of Ingenico's accused products – and, instead, went about trying to sure up BBPOS's perceived strategic partnership with ROAM in the hopes that Ingenico would ultimately abandon its competitive development / manufacturing activities upon demonstration of the superiority of BBPOS's Chipper to any comparable product in the marketplace due to BBPOS's greater expertise and track record of success in the mPOS space. Ex. 2 (Lo II Tr.) at 116:6-10 ("Now, I try my best to tell Ken Paull and Bill that our product is the best and it is not easy to come up with audio jack card reader. We don't need second source. We have enough capability to manufacture enough product for them.").

49(s).  During his deposition, Lo was shown an Ingenico press release dated April 30, 2013 (as referenced at the outset of this section) purporting to announce an upcoming release of its RP350x product that had been produced by Ingenico during discovery. Exhibit 5 to Def. Facts, Doc. No. 193-5 (Press Release; Ex. 2 (Lo II Tr.) at 123:23-25 – 128:1-25. Lo testified that he had not seen the document before. Ex. 2 (Lo II Tr.) at 124:9-10 ("Q. Have you seen this before? A. No.").

49(t).  When asked whether BBPOS "pa[id] attention to the competitive environment for mPOS devices" at that time, Lo testified that BBPOS did not because it had "one major customer, called ROAM" and that BBPOS "trust[ed] [its] customer." Lo 30b6 Tr. at 124:21-25 – 125:1-7.  The press release, upon

defense counsel's questioning, further did not "refresh" Lo's "recollection as to when the RP350x was actually a competitive product on the market." Ex. 2 (Lo II Tr.) at 125:8-11.

49(u).  It was not, in fact, "a competitive product on the market" at that time. The following table sets forth, for each accused product at issue in the case, its first date of sale in market based on internal sales data produced in this lawsuit:

| ACCUSED PRODUCT | FIRST DATE OF RECORDED SALE | REFERENCE [IngenicoInc_0126787] |
|---|---|---|
| RP757c | February 4, 2014 | Line 4 |
| RP350x | July 9, 2014 | Line 5 |
| RP755x | September 5, 2014 | Line 8 |
| RP170c | October 15, 2015 | Line 64 |
| RP150 | January 29, 2016 | Line 104 |
| RP170 | March 4, 2016 | Line 124 |
| RP457c | March 15, 2016 | Line 129 |
| RP457c-BT | June 15, 2017 | Line 580 |

See PDF Conversion of Native Excel (Book I) VictorYoung-9 (Sales Data) [IngenicoInc_0126787] ("First Sales Data"), a true and correct copy of which is attached as Exhibit 9.

49(v).  Lo testified that he did not see "the actual [Ingenico / Landi RP350x] product" until October 2014 in exhibition. Ex. 2 (Lo II Tr.) at 125:12-22; 106:1-25 – 107:1-25.

49(w).  Lo testified that the first time that he began to "worry" that Defendants had, in fact, stolen BBPOS's trade secrets was not until the mPOS Cartes trade show held in Paris, France during the fourth quarter of 2014. Ex. 2 (Lo II Tr.) at 125:12-22; 106:1-25 – 107:1-25.

49(x).  At the trade show, Mr. Lo "saw a device which is similar to Chipper" for the first time "in an Ingenico booth[.]" Ex. 4 (Lo I Tr.) at 112:8-10 ("We saw the defendant has a similar product in a trade show in 2014. Then remind me what Will Graylin told me before."); Ex. 4 (Lo I Tr.) at 176:8-25 – 186:1-6; Ex. 2 (Lo II Tr.) at 107:4-25. Although he did not observe a demonstration or physically handle the device, the similarities, visually, included EMV and magstripe capabilities, audio jack interface, a similar

look in size and shape (i.e., form factor requested by PayPal), and a slot into which you would insert a

card for EMV transactions – all of which were present in BBPOS's Chipper device. Ex. 4 (Lo I Tr.) at

177:13-25 – 178:1-17.

49(y).   Lo attempted neither to use this device nor discuss the same with ROAM / Ingenico during

the trade show, now that it was clear to him that ROAM / Ingenico was now a direct competitor of BBPOS,

but, instead, asked AC's Michael Kron (as a mPOS device distributor) to attempt to investigate the product

further. Ex. 4 (Lo I Tr.) at 178:18-25 – 183:1-10.

49(z).   Lo repeated again that he was now "worried" that ROAM would be forced to buy the device

from Ingenico, and it triggered his memory of what Will Graylin had told him back in 2012, but

concluding, "what can I do?" Ex. 4 (Lo I Tr.) at 183:11-16 – 184:1-2.

49(aa). When he was asked whether "there [was] anything about the product in particular that made

[him] think that it might be built using BBPOS IT," Ex. 4 (Lo I Tr.) at 185:4-6, Lo testified:

> Yes. Because Ingenico is not the type of company who deals mobile POS sales. Ingenico
> is the biggest transitional POS terminal manufacturer in the world. So they're using
> transitional POS. And all of a sudden, they have this Chipper like product. So I start to
> worry, worry. How come Ingenico come up with this type of product? This is not their
> main business?

Ex. 4 (Lo I Tr.) at 185:7-14.

49(bb). When asked what he meant by the phrase "all of a sudden," Lo elaborated:

> Well, because ROAM Data kept buying the product from us. Since Will Graylin told me
> he was no longer with ROAM Data, he was fired by ROAM Data, and then -- you know,
> he was fired by ROAM Data. I'm still selling product to ROAM Data in 2012, 2013, even
> 2014. So ROAM Data just keep buying product from us. So when I saw the product in
> Ingenico booth, that's why I feel that it's weird. That's why I said all of a sudden, Ingenico
> has an impulse to compete with us.

Ex. 4 (Lo I Tr.) at 185:15-25 – 186:1-6.

49(cc). Lo was also shown an internal BBPOS email dated December 11, 2015 ("12/11/2015 Thread") [BBPOS_0003629-632], wherein BBPOS's then CEO, Bob Cook ("Cook"), states, in relevant part:

> First we should officially notify them that we are not approving to assign the agreement to ING. This does not mean will will (sic) not continue to sell to them just not under the current agreement conditions. ING is a competitor and we need to protect our interests. In a new agreement we should not agree to any exclusivity.

Ex. 3 (12/11/2015 Thread).

49(dd). When asked to explain his understanding of this statement by Cook, Lo testified:

> I think in 2015 Ingenico acquire ROAM, and as we are doing business with ROAM that means ROAM become Ingenico in 2015 and we are competitor. I think this is what Bob Cook try to say that if our agreement, if there is transfer of ownership to a company with competitive products that we should terminate the exclusivity relationship. I think this is what Bob is trying to say.

Ex. 2 (Lo II Tr.) at 177:16-22.

49(ee). Unsure whether the exclusivity was, in fact, terminated in response to Cook's comments, Lo added that this was Cook's "opinion" as BBPOS's "CEO at that period of time." Ex. 2 (Lo II Tr.) at 177:24-25 – 178:1-2.

49(ff).  When Lo was asked whether he "ever performed any analysis of the RP350x or any other Ingenico product to determine how, if at all, it utilizes any of the information that [BBPOS] identified as trade secret," Lo testified as follows:

> No. I didn't do that by myself, but I had hired IP expert. They confirm . . . that the Ingenico device is quite similar and misuse of our trade secret.

Ex. 4 (Lo I Tr.) at 194:20-25 – 195:1-8.

50.    *OMITTED.*

51.    *OMITTED. Plaintiffs' expert Stephen Scherf agreed that BBPOS "actually sent the [Intellectual Property] that is being asserted as a trade secret in this case to Ingenico." May 12, 2022 Deposition of Stephen Scherf ("Scherf Dep.," attached as **Exhibit 7**) at 111:11-112:19.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

To the extent that this factual issue is determined to be "material," a genuine issue of fact exists with respect to this statement.

51(a).   While Mr. Scherf at first agreed that BBPOS had supplied certain of its IP at issue to Ingenico, he quickly corrected his response, mid-sentence, to reflect: "I don't know if he sent it to Ingenico. I know it was sent to ROAM." Exhibit 7 (Scherf Dep. at 112:15-22), Doc. No. 193-7 at 7, to Defendants' Statement of Undisputed Material facts re [191] Motion for Summary Judgment ("Def. Facts"), Doc. No. 193.

52.     *In his report, Defendants' expert Michael Shamos states that BBPOS sent confidential information to Ingenico in an email concerning a joint development workshop between BBPOS and Ingenico and that BBPOS was fully aware of the people copied on the technical emails and raised no objection at the time because the work being conducted was joint. Expert Report of Michael Shamos ("Shamos Report," attached as **Exhibit 8**) at 15.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

The content of this "Material Fact" presents inadmissible hearsay, upon which, Defendants may not properly rely for purposes of moving for summary judgment. However, even assuming, for the sake of argument, that it presented competent testimony, a genuine issue of material exists as to whether BBPOS was "fully aware of the people copied on technical emails" and whether BBPOS was sufficiently apprised of the circumstances afoot to competently raise a timely objection. *See* above Genuine Disputed Material Facts at ¶¶38(a) – (c), 39(a), 40(a), 42(a).

53.     *In their First Amended Complaint, Plaintiffs fail to identify "Power Management" design as an alleged BBPOS trade secret. See First Am. Compl. (Doc. No. 67).*

Plaintiffs' First Amended Complaint is a written document that speaks for itself.

54.     *In his report, Mr. Zatkovich identifies five purported "BBPOS Trade Secrets," namely (1) "Audio Jack Polarity detection"; (2) "Power Management design"; (3) "Signal control settings and*

*auto gain control"; (4) "Communication Formats"; and (5) "Data Security/Encryption methods." Expert Report of Ivan Zatkovich ("Zatkovich Report," attached as **Exhibit 9**) at 24-26.*

Mr. Zatkovich's Expert Report is a written document that speaks for itself.

*55.    OMITTED.*

*56.    In response to the above-mentioned interrogatory, BBPOS failed to identify "Power Management" design as an alleged trade secret. Id. BBPOS instead identifies "Documentation of Battery Life Estimates" as an alleged trade secret. Id.*

Plaintiffs' interrogatory responses is a written document that speaks for itself.

*57.    In response to the above-mentioned interrogatory, BBPOS failed to reference any documents that identify "Power Management" design. Id.*

Plaintiffs' interrogatory responses is a written document that speaks for itself.

*58.    During his deposition as BBPOS's Rule 30(b)(6) designee, Ben Lo failed to identify "Power Management" design as an alleged BBPOS trade secret.*

The transcript of this deposition is a written document that speaks for itself. By way of further response, *see* Ex. 2 (Lo II Tr.) at 89:20-25 – 90:1-92:1-16; 94:1-95:1-7; 134:16-25 – 135:1-8 (discussing principles related to BBPOS's trade secret concerning power management).

## **\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

*59.    BBPOS's Power Management systems enable a microprocessor to place the mPOS device in sleep mode whenever the device is not active, and then to automatically turn on the device when needed. Ex. 9 (Zatkovich Report) at 30. The purpose of these systems is to optimize the power usage of the batteries in BBPOS devices. Id. at 29. Accordingly, the systems require a reliable method to determine the correct "trigger threshold" that will reliably wake up the device when a card transaction is performed. Id. at 30.*

Mr. Zatkovich's Expert Report is a written document that speaks for itself.

## **\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

*60.    The "Battery Life" documentation sets forth formulas for calculating the service life of BBPOS's 1-track and 2-track devices. Ex. 10 (BBPOS's Third Am. Ans. to Interrogs.) at Interrog. No. 1.*

Plaintiffs' interrogatory responses is a written document that speaks for itself.

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

61.     *When addressing the "Battery Life" documentation in his report, Mr. Zatkovich cites to an email from Daniel Tsai of BBPOS to Christopher Rotsaert of Ingenico advising to "[p]lease check attached documents **about battery estimation** and format ID list." Ex. 9 (Zatkovich Report) at 56.*

The report is a written document that speaks for itself.

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

62.     *OMITTED.*

63.     *OMITTED.*

64.     *Besides the fact that an AnywhereCommerce/Ingenico deal did not materialize, there is no evidence to support the allegation that Ingenico's offers regarding a potential business deal with AnywhereCommerce were a sham. Nov. 30, 2021 Deposition of Michael Kron ("Kron Dep.," attached as **Exhibit 12**) at 139:14-22.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to Ingenico's subjective motives and whether it was acting in good faith, which is supported by circumstantial evidence, with all favorable inferences, based on the allegations in Plaintiffs' pleadings and testimony of its witnesses and representatives, and, particularly, as cited to herein and in Doc. No. 188 (Pl. Facts).

65.     *OMITTED.*

66.     *From 2008 until 2013, AnywhereCommerce had not succeeded in selling "strategic partnership opportunities" to First Data (Paragraph 82 in Complaint). Ex. 1 (Cobrin Dep. I) at 91:22-92:3[.]*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

Plaintiffs' FAC and deposition transcript of Mitchell Cobrin are written documents that speak for themselves; however, a genuine issue of material fact exists as to statement.

66(a).  On September 27, 2012, AC and First Data entered into a Purchase and Services Agreement for the supply of mPOS hardware within the United States; the parties also agreed to a Statement of Work dated September 27, 2012, addressing the pricing structure that would govern the supplier arrangement.  Performance on the contract had already long been underway.  Doc. No. 67 at 20-21 (FAC) at ¶¶81, 84-87.

66(b).  Over the next several years, AC was consistently invited to bid on requests for proposals issued by First Data and was awarded projects, expanding the scope of its preferred mPOS hardware supplier arrangement with the company. Doc. No. 67 at 21-23 (FAC) at ¶¶88-90, 93, 95.

66(c).  As evidenced, in part, in a document dated "November 19, 2014", which was produced by First Data under the designation of "Highly Confidential – Attorneys' Eyes Only" ("AEO"), entitled "ROAM Data – Project Reprieve Site Visit" [FISV-AC-0000357], a meeting was held between representatives of ROAM and First Data to discuss the parameters of replacing AC with ROAM as First Data's preferred hardware supplier of mPOS products, which identifies the following two topics under the heading "Conversion Considerations:" "Need to determine if Roam can support interfacing with the current AC readers – Not likely" and "Cannot support AC hardware within Roam infrastructure[.]" A true and correct fully redacted version of this document (with the exception of solely the quoted language herein) is attached as Exhibit 10.

66(d).  As evidenced, in part, in a document dated November 21, 2014, which was produced by First Data under the designation of AEO, entitled "Reprieve Status Meeting Deliverables for upcoming meeting 11/21/14" [FISV-AC-0000092], there is a generic listing of ROAM's inventory of "Card readers" designated "Audio-jack" and "Bluetooth" with functionalities that match, in addition to the G3X, G4X, and G5X product line, the accused products in this case. A true and correct fully redacted version of this document (with the exception of solely the quoted language herein) is attached as Exhibit 11.

66(e).   As evidenced, in part, in a document dated October 1, 2014, which was produced by First Data under the designation of AEO, entitled "Project Reprieve Meeting" [FISV-AC-0000043], there is a comment: "**Moving ahead with ROAM** is likely the fastest path away from Apriva, given much upfront work is complete and our strategic relationship w/Ingenico." (Emphasis in original). A true and correct fully redacted version of this document (with the exception of solely the quoted language herein) is attached as Exhibit 12.

66(f).   By applying a simple sorting function for the customer "First Data Corp" to Defendants' produced sales data, the data shows that Defendants earned revenues of $12,405,200.00 and incurred costs of $7,921,512.95, which resulted in an unjust enrichment in the amount of $4,483,687.95, for the reviewed period. *See* PDF FD Conversion of Native Excel (Book I) VictorYoung-9 [IngenicoInc_0126787] ("FD Sales Data"), a true and correct copy of which is attached as Exhibit 13.

66(g).   In 2013, AC was a leading mPOS hardware (i.e., 3rd overall in market share with approximately 15%). Doc. No. 188-12 at 6, 12 (4/10/2014 Email) (attaching ABI Research's 2013 mPOS Competitive Assessment [IngenicoInc_0276980-1032] that ranked Ingenico's recently acquired ROAM in first place, and AC in third, in overall mPOS hardware market share for the first half of 2013.

66(h).   AC earns royalties in the range of 4-5% in connection with BBPOS's sales of certain mPOS devices that speak to its patents, which are often paid to AC in the nature of offsets, and which then filter upstream, in part, to its parent company, 4361423 Canada Inc. ("436 Canada"). Deposition Transcript of Michael Kron dated November 30, 2021 ("Kron I Tr.") at 52:20-25 – 53:1-13, 53:23-25 – 54:1-15, 55:4-25 – 56:1-4, 56:16-20, a true and correct excerpted copy of which, is attached as Exhibit 14.

66(i).   After certain alleged infirmities in BBPOS's intellectual property rights arising under the HATM-BBPOS License got flagged during M&A due diligence, ROAM attempted, unsuccessfully, to resolve those issues, first, by way of an amended licensing agreement between 436 Canada and BBPOS,

and then later, by seeking a direct license to 436 Canada's IP in its own right, well after the contemplated BBPOS acquisition had been terminated. Doc. No. 188-7 at 10-11, Ex. G (Houlihan Lokey Report) (quoting Ernst & Young Valuation Analysis of Common Shareholders' Equity of ROAM Data, Inc. as of September 20, 2012, pages 32-33); Doc. No. 188-22, Ex. V (May 2013 Rejection Letter) (rejecting ROAM's request for a direct license to 436 Canada's IP).

66(j).   When Defendants were unable to obtain these licensing rights from AC, legally, Defendants simply decided to leverage this IP in their accused products without paying for this use, as evidenced by its theft of BBPOS's trade secrets, as discussed further below.  Doc. No. 188-22, Ex. V (May 2013 Rejection Letter).

67.   *OMITTED.*

68.   *Michael Kron Doesn't (sic) have any evidence as to why First Data rejected AnywhereCommerce's bid for the POGO RFP statement of work. Ex. 12 (Kron Dep.) at 154:610.*

**PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to First Data's subjective motives and whether it (or Defendants) was acting in good faith, which is supported by circumstantial evidence, with all favorable inferences, based on the allegations in Plaintiffs' pleadings and testimony of its witnesses and representatives, and, particularly, as cited to herein and in Doc. No. 188 (Pl. Facts). *See also* Genuine Disputed Material Facts above at ¶¶66(a) – (j).

69.   *AnywhereCommerce has no evidence as to how First Data evaluated any of competitors' RFP submissions. Ex. 11 (AnywhereCommerce 30(b)(6) Dep.) at 69:13-20.*

**PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to First Data's subjective motives and whether it (or Defendants) was acting in good faith, which is supported by circumstantial evidence, with all

favorable inferences, based on the allegations in Plaintiffs' pleadings and testimony of its witnesses and representatives, and, particularly, as cited to herein and in Doc. No. 188 (Pl. Facts). *See also* Genuine Disputed Material Facts above at ¶¶66(a) – (j).

70.     *AnywhereCommerce has no evidence that it was the low bidder for any RFP except for the live RFP in 2013. Id. at 69:6-12.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to First Data's subjective motives and whether it (or Defendants) was acting in good faith, which is supported by circumstantial evidence, with all favorable inferences, based on the allegations in Plaintiffs' pleadings and testimony of its witnesses and representatives, and, particularly, as cited to herein and in Doc. No. 188 (Pl. Facts). *See also* Genuine Disputed Material Facts above at ¶¶66(a) – (j).

71.     *AnywhereCommerce has no evidence that, if First Data concluded that one of AnywhereCommerce's competitors other than Ingenico offered a better value than AnywhereCommerce did, First Data would not have chosen that. Id. at 71:13-17[.]*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to First Data's subjective motives and whether it (or Defendants) was acting in good faith, which is supported by circumstantial evidence, with all favorable inferences, based on the allegations in Plaintiffs' pleadings and testimony of its witnesses and representatives, and, particularly, as cited to herein and in Doc. No. 188 (Pl. Facts). *See also* Genuine Disputed Material Facts above at ¶¶66(a) – (j).

72.     *OMITTED.*

73.     *OMITTED.*

74.     *OMITTED.*

75.     *AnywhereCommerce has no evidence that, but for Ingenico's wrongful alleged conduct, AnywhereCommerce would have actually sold any mPOS devices to any of the companies listed in Paragraph 116 of the Complaint. Ex. 11 (AnywhereCommerce 30(b)(6) Dep.) at 114:11-5.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to First Data's subjective motives and whether it (or Defendants) was acting in good faith, which is supported by circumstantial evidence, with all favorable inferences, based on the allegations in Plaintiffs' pleadings and testimony of its witnesses and representatives, and, particularly, as cited to herein and in Doc. No. 188 (Pl. Facts). *See also* Genuine Disputed Material Facts above at ¶¶66(a) – (j); Ex. 9 (First Sales Data).

76.     *Other than selling products that have technology that incorporates trade secrets of some entity other than AnywhereCommerce, AnywhereCommerce doesn't have any evidence that Ingenico engaged in tortious conduct with respect to AnywhereCommerce's contracts with Global Payments, TSYS, Priority Payments, or ProPay, or any other contracts between AnywhereCommerce and a third party. Id. at 57:4-59:21.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to First Data's subjective motives and whether it (or Defendants) was acting in good faith, which is supported by circumstantial evidence, with all favorable inferences, based on the allegations in Plaintiffs' pleadings and testimony of its witnesses and representatives, and, particularly, as cited to herein and in Doc. No. 188 (Pl. Facts). *See also* Genuine Disputed Material Facts above at ¶¶66(a) – (j); Ex. 9 (First Sales Data).

77.     *OMITTED.*

78.     *OMITTED.*

79.     *OMITTED.*

80.     *OMITTED.*

81.     *Mitchell Cobrin states that nobody else at AnywhereCommerce or BBPOS has any knowledge of the allegation in Paragraph 109 of the Complaint that Ingenico began "bundling and discounting products to unfairly inflate profits and shut out competition." Id. at 125:10-15.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to First Data's subjective motives and whether it (or Defendants) was acting in good faith, which is supported by circumstantial evidence, with all favorable inferences, based on the allegations in Plaintiffs' pleadings and testimony of its witnesses and representatives, and, particularly, as cited to herein and in Doc. No. 188 (Pl. Facts). *See also* Genuine Disputed Material Facts above at ¶¶66(a) – (j); Ex. 9 (First Sales Data).

82.     *OMITTED.*

83.     *OMITTED.*

84.     *AnywhereCommerce does not have any evidence of unlawful conduct relating to the leveraging of Ingenico's historic POS terminal influence globally. Ex. 12 (AnywhereCommerce 30(b)(6) Dep.) at 123:3-15.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to First Data's subjective motives and whether it (or Defendants) was acting in good faith, which is supported by circumstantial evidence, with all favorable inferences, based on the allegations in Plaintiffs' pleadings and testimony of its witnesses and representatives, and, particularly, as cited to herein and in Doc. No. 188 (Pl. Facts). *See also* Genuine Disputed Material Facts above at ¶¶66(a) – (j); Ex. 9 (First Sales Data).

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

85.     *AnywhereCommerce has not undertaken any assessment of its purported damages as a result of Ingenico's alleged tortious interference with AnywhereCommerce and First Data's contract. Id. at 65:15-19.*

**\*\*PLAINTIFFS CONTEND THAT GENUINE ISSUE(S) OF MATERIAL FACT EXIST RELATED HERETO, INCLUDING AS FOLLOWS:**

A genuine issue of material fact exists with respect to First Data's subjective motives and whether it (or Defendants) was acting in good faith, which is supported by circumstantial evidence, with all favorable inferences, based on the allegations in Plaintiffs' pleadings and testimony of its witnesses and representatives, and, particularly, as cited to herein and in Doc. No. 188 (Pl. Facts). *See also* Genuine Disputed Material Facts above at ¶¶66(a) – (j); Ex. 9 (First Sales Data).


Dated: July 13, 2022.

<div style="margin-left:40%;">

Respectfully submitted,

Plaintiffs / Counterclaim-Defendants,

By their attorneys,

*/s/ Melissa Bozeman*
MELISSA A. BOZEMAN
OLIVER D. GRIFFIN
PETER N. KESSLER
Kutak Rock LLP
1760 Market Street, Suite 1100
Philadelphia, PA 19103
Tel: (215) 288-4384
Fax: (215) 981-0719
Melissa.bozeman@kutakrock.com
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com

JONATHON D. FRIEDMANN
ROBERT P. RUDOLPH
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
Tel: (617) 723-7700
Fax: (617) 227-0313
jfriedmann@rflawyers.com
rrudolph@rflawyers.com

</div>

RICARDO G. CEDILLO
Davis, Cedillo & Mendoza, Inc.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
Tel: (210) 822-6666
Fax: (210) 822-1151
rcedillo@lawdcm.com

*Attorneys for Plaintiffs / Counterclaim-Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2022, I caused to be served via electronic mail a true copy of the foregoing document on the following counsel as follows:

John A. Tarantino
Patricia K. Rocha
Nicole J. Benjamin
Jeffrey K. Techentin
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
jtechentin@apslaw.com

Jonathon D. Friedmann, Esq.
Robert P. Rudolph, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
JFriedmann@rflawyers.com
RRudolph@rfllawyers.com

Ricardo G. Cedillo, Esq.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
rcedillo@lawdcm.com

*/s/Melissa A. Bozeman*
Melissa A. Bozeman