## Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                 DISTRICT OF MASSACHUSETTS
 3
 4   ANYWHERE COMMERCE, INC. and    )
 5   BBPOS LIMITED,                 )
 6                   Plaintiffs,    )
 7            v.          ) CIVIL ACTION NO.:
 8   INGENICO INC., INGENICO CORP.  )  1:19-cv-11457-IT
 9   and INGENICO GROUPS, SA,       )
10                   Defendants.    )
11   _____      )
12
13
14
15
16
17
18
19
20
21
22
23       The 30(b)(6) VIDEO DEPOSITION of BEN LO, taken in
24   the above-entitled cause, before Susan Steudel, official
25   reporter, on the 10th day of December, 2021
```

## Page 2

```
 1   APPEARANCES:
 2
 3       ADLER POLLOCK & SHEEHAN, P.C.
 4       Once Citizens Plaza, 8th Floor
 5       Providence, RI 02903-1345
 6       Ph:  401-274-1345
 7       Jtechentin@apslaw.com
 8       BY: Jeffrey K. Techentin,
 9            On behalf of the Defendants;
10
11       Kutak Rock
12       1760 Market Street, Suite 1100
13       Philadelphia, PA 19104-4104
14       Ph:  215-353-8484
15       Melissa.bozeman@kutakrock.com
16       BY: Melissa Bozeman,
17            On behalf of the Plaintiffs;
18
19   ALSO PRESENT: Mike Cooper, Videographer
20
21
22
23
24
25
```

## Page 3

```
 1                    I N D E X
 2
 3   INDEX OF EXAMINATIONS:
 4     EXAMINATION                                   PAGE
 5       By Mr. Techentin                              7
 6       Reporter certification                      231
 7
 8   EXHIBITS:
 9   NUMBER       DESCRIPTION                        PAGE
10   Exhibit 54   Notice of 30(b)(6) Deposition of
                  Plaintiff BBPOS Limited             24
11
     Exhibit 55   BBPOS Response to Rule 30(b)(6)
12                Deposition Notice                   26
13   Exhibit 56   BBPOS Updated Response to Rule
                  30(b)(6) Deposition Notice          33
14
     Exhibit 57   Email dated December 8, 2021        35
15
     Exhibit 58   Statement dated February 1, 2013    37
16
     Exhibit 59   License Agreement dated the 23rd
17                day of March, 2010                  38
18   Exhibit 60   Amendment to License Agreement      43
19   Exhibit 61   Document entitled "BBPOS
                  Information Package
20                Confidential"                       68
21   Exhibit 62   Document entitled " "MPOS
                  Everywhere."                         76
22
     Exhibit 63   BBPOS Chipper 2X specification
23                material                            80
     Exhibit 64   BBPOS Chipper 2X BT
24                specification material
                                                      80
25                MR. TECHENTIN:
```

## Page 4

```
 1   Exhibit 65   Chipper Mini 2 specification
                  material                            81
 2
     Exhibit 66   Chipper OTA material                83
 3
     Exhibit 67   Walker 1.0 specification
 4                material                            86
 5   Exhibit 68   Rambler 3.0 specification sheet     92
 6   Exhibit 69   Email dated June 11, 2012           96
 7   Exhibit 70   Document entitled "Cartes 2013
                  Paris MPOS solutions review"
 8                authored by Nabeel Choudhry.        98
 9   Exhibit 71   Cardreader promotional material
                  generated by Landi                 100
10
     Exhibit 72   Product review for RP350x Mobile
11                Card Reader                        102
12   Exhibit 73   Email dated February 12, 2013      104
13   Exhibit 74   Email dated May 7, 2013            114
14   Exhibit 75   Email dated November 11, 2012      117
15   Exhibit 76   Email dated August 27, 2013        120
16   Exhibit 77   Press release, ROAM RP350x         124
17   Exhibit 78   Technical drawings                 133
18   Exhibit 79   Email dated July 18, 2012          145
19   Exhibit 80   Email dated July 16, 2012          152
20   Exhibit 81   Email dated July 17, 2012          153
21   Exhibit 82   Email dated February 28, 2012      155
22   Exhibit 83   Email dated May 23, 2012           158
23   Exhibit 84   Email dated September 30, 2015     163
24   Exhibit 85   Email                              166
25   Exhibit 86   Email dated December 11, 2015      172
```



Page 53

1    Q.  And has BBPOS used for ROAM Data's benefit
2  BBPOS's best efforts to perfect and protect all
3  intellectual property rights in the products, devices,
4  deliverables and services?
5        MS. BOZEMAN:  Objection.  But you can answer.
6    A.  Yes.
7  BY MR. TECHENTIN:
8    Q.  Paragraph 3.12.  So now we're on page 4 of this
9  document.  Says that the partner, BBPOS:
10      --agrees that the company, ROAM Data, is and
11      shall be the sole and exclusive owner of all
12      right, title and interest, including all
13      intellectual property rights, in and to all
14      deliverables (other than the products.)"  Is
15      that right?
16   A.  Yes.
17   Q.  And that "all deliverables, (other than
18  products,) are deemed 'works for hire' for the company."
19  Do you understand that?
20   A.  Yes.
21   Q.  What does it mean that the deliverables would be
22  works for hire?
23   A.  That in this agreement ROAM Data also pay our
24  engineer to be -- work of some application for them.  And
25  this application are the deliverables.  That is work for

Page 54

1  hire.
2    Q.  What does it mean that it would be work for hire?
3    A.  Work for hire.  That means that they give the
4  instruction to us to deliver -- that gives the
5  specification of the products and the -- this is my
6  understanding.
7    Q.  And because it's a work for hire, ROAM Data would
8  own that product, the deliverable, whatever it is, as
9  opposed to BBPOS; right?
10       MS. BOZEMAN:  Objection.  But you can answer.
11   A.  Yeah.  Of the deliverable.  The deliverable is a
12  software.
13  BY MR. TECHENTIN:
14   Q.  And it is owned by ROAM Data because it was a
15  work for hire done by BBPOS; right?
16   A.  Yes.
17   Q.  And it continues that BBPOS "agrees that the
18  company is the sole and exclusive owner of all rights in
19  and to the software --" as that is defined "-- that no
20  proprietary rights including but not limited to copyrights
21  and patents in the software are being retained by or
22  transferred to the partner --" BBPOS "-- and that the
23  company is the exclusive owner of all right, title and
24  interest, including all intellectual property rights, in
25  and to any and all source code developed solely by or for

Page 55

1  the partner related to or in support of any object code of
2  the software."  Do you see that?
3    A.  Yes.
4    Q.  And it is clarified "as used in this section,
5  'software' means the mobile applications by the partner on
6  behalf of the company."  Right?
7    A.  Yes.
8    Q.  We go to the next page.  There's a section headed
9  3.18.  Do you see that?
10   A.  Yes.
11   Q.  And in that BBPOS agreed:
12      To indemnify and hold the company harmless from
13      any and all losses, costs, liabilities or
14      expenses, including court costs and reasonable
15      fees of attorneys and other professionals
16      arising out of or resulting from the breach of
17      any warranty, representation or other provision
18      of this agreement by the partner --" that is a
19      breach by BBPOS "-- arising out of or
20      resulting from any claim brought by a third
21      party against the company as a result of or
22      relating to any actual or alleged breach
23      thereof."
24  Do you see that?
25   A.  Yes.

Page 56

1    Q.  BBPOS agreed to indemnify and hold harmless ROAM
2  Data for any claims that arose out of its selling of
3  products that were sourced from BBPOS; right?
4        MS. BOZEMAN:  Objection.  But you can answer.
5    A.  Yes.
6  BY MR. TECHENTIN:
7    Q.  Has ROAM Data or its successor Ingenico made a
8  demand of BBPOS under this provision of the agreement?
9        MS. BOZEMAN:  Objection.  You can answer.
10   A.  Yes.
11  BY MR. TECHENTIN:
12   Q.  How many times?
13   A.  One.
14   Q.  And did BBPOS indemnify Ingenico?
15   A.  We asked Ingenico to provide further information
16  and they didn't provide.
17   Q.  I'll ask the question again.  Did BBPOS indemnify
18  Ingenico?
19   A.  No.
20   Q.  Did BBPOS hold Ingenico harmless?
21   A.  I don't know how to answer this question.  Hold
22  harmless.  So can you repeat your questions.
23   Q.  The question is:  Did you hold Ingenico harmless?
24   A.  Does Ingenico has any harmless?
25   Q.  Paragraph 5 of the agreement that we're looking



Page 57

1   at is entitled "Term and Termination."  Do you see that?
2       A.  Which page?  Page 5?  Yes.
3       Q.  5.1 says that:
4           This agreement shall become effective upon
5           execution and shall continue in full force
6           unless or until terminated by, (a), the written
7           consent of the parties or, (b), by either party
8           pursuant to section 5.3 below."
9        Right?
10      A.  Yes.
11      Q.  So this contract was perpetual until somebody
12  terminated it; right?
13      A.  Well, I don't know.
14      Q.  It didn't have an end date; right?
15      A.  No.
16      Q.  And I think you testified a little while ago that
17  nobody has terminated this license agreement; correct?
18      A.  Correct.
19      Q.  So it remains in effect?
20      A.  Well, this is too legal.  So I leave that to
21  lawyers.
22      Q.  All right.  Well, you haven't -- you haven't
23  entered into a written consent with Ingenico to terminate
24  this agreement; right?
25      A.  Yes.

Page 58

1       Q.  That's correct?  You have not?
2       A.  I had not.
3       Q.  And you understand that because Ingenico acquired
4   that 100 percent ownership interest in ROAM Data that you
5   mentioned a while ago this contract is now effectively
6   between BBPOS and Ingenico; right?
7       MS. BOZEMAN:  Objection.  But you can answer.
8       A.  Yes.
9   BY MR. TECHENTIN:
10      Q.  In fact, BBPOS has asserted a claim of breach of
11  contract against Ingenico for breaching this contract; is
12  that right?
13      A.  Yes.
14      Q.  So BBPOS concedes that Ingenico is a party to
15  this license agreement; right?
16      MS. BOZEMAN:  Objection.  But you can answer.
17      A.  Yes.  Ingenico company, so yes.
18  BY MR. TECHENTIN:
19      Q.  And then if we just go down to page 9, we can see
20  that you signed this; right?
21      A.  Yes.
22      Q.  And Will Graylin signed it on behalf of ROAM
23  Data?
24      A.  Yes.
25      Q.  Schedule 1 sets forth the products, devices,

Page 59

1   services and specifications for this contract, and some of
2   those terms we've already used here today.  One of them is
3   "the products."  Under "the products" it says:
4           Encrypted Circle Swipe reader, sometimes
5           referred to as the "Crypto Swipe" or "ROAMpay
6           Swipe" that has the ability to generate the
7           capacitance for encryption from the audio jack
8           of a mobile device or PC.  This was developed by
9           the partner -- meaning BBPOS -- and including
10           any variants of this design."
11       Do you see that?
12      A.  Yes.
13      Q.  And you've made reference to the "Circle Swipe"
14  earlier today.  The "Circle Swipe" is a -- that's a BBPOS
15  term; is that right?
16      A.  Yes.
17      Q.  And if I understand it correctly, the reason it's
18  called "Circle Swipe" is that the version of that that was
19  sold to ROAM Data had a half-moon shape on it's product
20  configuration?
21      A.  Yes.
22      Q.  Where was this document referred to as "Crypto
23  Swipe"?
24      A.  Crypto Swipe means the device is a Circle Swipe,
25  and also send the encrypted data.  So they call it crypto.

Page 60

1   Also call it crypto.  Data and crypto, so Crypto Swipe.
2       Q.  Who called it Crypto Swipe?
3       A.  Who called it Crypto Swipe?  I don't remember.
4       Q.  Who called it ROAMpay Swipe?
5       A.  I don't remember.  I think it's ROAM.  I think
6   Crypto Swipe or ROAMpay Swipe is also called by ROAM Data.
7       Q.  And separate from the bullet point for the Circle
8   Swipe reader and variants on that design, there's a second
9   bullet; right?
10      A.  Yes.
11      Q.  And that says "EMV-capable POS unit with
12  Bluetooth interface."  Right?
13      A.  Yes.
14      Q.  So one of the products that's exclusive to ROAM
15  Data is an EMV-capable point of sale unit with Bluetooth
16  interface; right?
17      MS. BOZEMAN:  Objection.  But you can answer.
18      A.  This product has never been finished.  This
19  product inside the agreement is completing the
20  certification, but eventually the certification has not
21  been finished.  So I can say that the order never exists.
22  BY MR. TECHENTIN:
23      Q.  Let me understand your testimony correctly.
24  You're saying that BBPOS never produced an EMV-capable
25  point of sale device with Bluetooth connectivity?



Page 61

1     A.  You're talking about this specific product?  This
2  product is it never complete certification or casino use
3  purpose.
4  BY MR. TECHENTIN:
5     Q.  Could you repeat that, please.
6     A.  I mean this is the product which is supposed to
7  be used by ROAM Data for casino project.  So this product
8  has to complete the casino certifications.  And after we
9  did the certifications the certification is not complete.
10  This product is not complete.
11  BY MR. TECHENTIN:
12     Q.  At the time that this agreement was signed in May
13  of 2010, did BBPOS have any EMV-capable POS product?
14     A.  When you say EMV-capable, then from engineer
15  point of view normally we're referring to a terminal which
16  has passed EMV certification.  So I would say that by then
17  BBPOS has no product which passed EMV certification.
18     Q.  Had no products that passed?
19     A.  No product passed EMV-certifications.
20     Q.  And then the next definition is for the solution.
21  That says:
22        Payment solution using the BBPOS or ROAMpay POS
23        as the customer facing hardware terminal and
24        transact via any ROAM Data payment gateway or
25        equivalent software backend for recurring

Page 62

1        revenue and services."  Right?
2     A.  Yes.
3     Q.  Is the solution a software item?
4     A.  No.  Solution is solution.  Solution consists of
5  like what we said.  A middleware, a product and also a
6  gateway service.  So all you get is a solution that
7  product offering.
8     Q.  So what is "middleware"?
9     A.  I think here is ROAMpay POS is the software.  It
10  is the application that some of our engineer paid by ROAM
11  Data to perfect.  By that time ROAM already has ROAMpay
12  POS.  ROAMpay POS is one product, and we helping them to
13  perfect.
14     Q.  And the ROAMpay POS resides where?
15     A.  Can you repeat your questions?
16     Q.  Sure.  So in these mPOS solutions we have a
17  Dongle; right?
18     A.  Yes.
19     Q.  And we have a Smartphone that the Dongle plugs
20  into; right?
21     A.  Yes.
22     Q.  And in the case of some of these the Dongle
23  connects to the Smartphone by the audio jack; right?
24     A.  You remind me something.  So this solution is --
25  I remember that this solution is the casino project

Page 63

1  solution.  You saying some products that ROAMpay POS.
2  POS.  They call it ROAMpay POS.  And this -- it also has a
3  ROAMpay gateway.  So the whole solution is use the ROAMpay
4  POS or BBPOS communicates with the casino systems, and
5  they use ROAM Data payment gateway as the payment backend.
6  So this is the whole solution is also how the casino
7  project.
8     Q.  The next definition is "devices."  Do you see
9  that?
10     A.  Yes.
11     Q.  And that says the:
12        ROAMpay POS EMV terminal developed by the
13        contractor based on the foundation of BBPOS is
14        the device that will be owned by ROAM."  Right?
15     A.  Yes.  Yes.
16     Q.  What was the ROAMpay POS EMV terminal?
17     A.  It is also a very special terminal.  Also for
18  casino purpose.  So that's why ROAM own this project.  The
19  interface with casino is quite different than interface
20  with other merchants.  And the casino also have their very
21  specific requirement.  So this is a very specific product
22  specifically for this solution.  And then ROAM Data offer
23  the whole solution to a casino.
24     Q.  The next definition is the services and
25  specifications; right?

Page 64

1     A.  Yes.
2     Q.  And it says:
3        The services shall include appropriate design
4        and manufacturing services to produce the Crypto
5        Swipe devices including, without limitation, key
6        injection and support with respect to software,
7        to port to ROAMplayers on a variety of devices."
8        Right?
9     A.  Yes.
10     Q.  And under this agreement, those services that
11  BBPOS was providing, the result of those would be owned by
12  ROAM Data; right?
13     A.  Yes.
14     Q.  And ROAM Data would own all the IP associated
15  with those services; correct?
16     A.  Yes.
17     Q.  And then it goes on to say "the services shall
18  include software development services."  Right?
19     A.  The service is basically we have ROAM Data to
20  perfect ROAMplayer and ROAMplayer is a product of ROAM
21  Data as far as I know.  First time meet Will Graylin, he
22  told me that ROAM is product of ROAMplayer.  But
23  ROAMplayer is not perfect.  And then they want to use the
24  ROAMplayer for different projects casino and then they
25  know that with BBPOS which is not completed yet but it



Page 69

1    A. Yes.

2    Q. This is entitled "BBPOS Information Package

3  Confidential."  Do you see that?

4    A. Yes.

5    Q. Do you recognize this document?

6    A. Yes.

7    Q. What is it?

8    A. This is the document that we prepare for the

9  company to pitch to potential investor.

10    Q. Do you know when this was prepared?

11    A. If I recall correctly, I think I prepare this

12  document in 2012 or '13.  That's around this timeframe.

13    Q. All right.  Well, if you look at page 21 of the

14  document, you'll see that there's a slide that's entitled

15  "New Products in 2013"?

16    A. Yes.  Yes.  '13.  '12 or 13, yes.

17    Q. The next page, page 22, says "new chip-based

18  products 2013."  What is a chip-based product?

19    A. Chip based product is a product which can read

20  the EMV card reader.

21    Q. I'm sorry.  I didn't quite catch that.  Say that

22  again.

23    A. Chip means E, Europay; M, for MasterCard; V, for

24  Visa card.  So chip is EMV card.  So this is the reader to

25  read EMV card.  Is that clear?

Page 70

1    Q. Thank you.

2      There are two products shown on this page.  The

3  EMV swipe and the WisePad.  The EMV swipe product.  Is

4  that something that was actually sold by BBPOS?

5    MS. BOZEMAN:  Are you referring to page 21?

6    MR. TECHENTIN:  No.  I'm on 22.

7    A. Yes.

8  BY MR. TECHENTIN:

9    Q. Who did you sell the EMV swipe to?

10    A. Well, we sell to many customers including ROAM

11  Data, AnywhereCommerce and some customers in Mexico and

12  maybe China.

13    Q. Is that the same customer or customers in Mexico

14  that you were referring to before?

15    A. I don't remember.  But -- I don't remember.  But

16  maybe same or different customers.  I'm pretty sure that

17  there are some customers in Mexico.  Oh, I remember.  It's

18  pay clip.  It's pay clip.  Clip.  Pay clip.  Yes.  The

19  customer is clip.  Pay clip.  P-a-y c-l-i-p.

20    Q. Is this EMV swipe one of the products on which

21  BBPOS pays a royalty to AnywhereCommerce?

22    A. Yes.

23    Q. When I asked you before which products BBPOS is

24  paying a royalty to AnywhereCommerce for, you only

25  identified the Circle Swipe and the Chipper; right?

Page 71

1    A. Yes.

2    Q. So should we add EMV swipe to that list?

3    A. Yeah.  Later on before Chipper.  We give it

4  better marketing name.  EMV swipe is so difficult to

5  pronounce.  So all our marketing person later on call it

6  Chipper.

7    Q. So this is the same product as Chipper?

8    A. Yes.

9    Q. Is there any difference between this product and

10  the first generation of Chipper?

11    A. I think this is the first generation of Chipper,

12  if I remember correctly.  This is the first generation of

13  Chipper.

14    Q. This product.  So does this product process mag

15  stripe?

16    A. Yes.

17    Q. And it connects to the phone via an audio jack?

18    A. Yes.

19    Q. Was 2013 the first time that there was ever a

20  version of Chipper?

21    A. I think so, if this -- if this -- yeah.  I think

22  so.  This is the first time that we really have an EMV

23  product.

24    Q. Prior to the EMV swipe BBPOS had never had a

25  product that could handle the Europay, MasterCard, Visa

Page 72

1  standard; correct?

2    A. Let me make sure that I understand your question

3  correctly.  I mean the EMV swipe.  If any product claim

4  they can do EMV transaction as to finish EMV

5  certifications.  So we say that this is the first product

6  which can officially process EMV transaction.  This is a

7  product with the EMV level 1 and level 2 certifications.

8    Q. That's true for both the EMV swipe and the

9  WisePad; correct?

10    A. Yes, correct.

11    Q. And both of those products were introduced in

12  2013; correct?

13    A. Correct.

14    Q. Prior to 2013, if I understand your answer just a

15  moment ago, prior to 2013 BBPOS did not have any products

16  that had been certified for EMV?

17    A. Correct.

18    Q. There's a annotation at the bottom by the EMV

19  swipe that says PCIS RED.  Do you know what that stands

20  for?

21    A. Yes.  That stands for payment card industry

22  security read card reader -- secure read encrypted device.

23    Q. This was not PCI PTS certified; correct?

24    A. Correct.

25    Q. The WisePad was, though?



Page 89
1  Exhibit 67 as having been manufactured by BBPOS; right?
2      A.  Yes.
3      Q.  And I'm sorry.  Which BBPOS product does Walker
4  1.0 correspond to?
5      A.  I think Chipper.  Chipper.
6      Q.  Which Chipper?
7      A.  Just Chipper.
8      Q.  So we had -- just so I'm clear, we had EMV swipe
9  which later became branded as Chipper; right?
10     A.  Yeah.  EMV swipe.  Yes.
11     Q.  So looking at Walker 1.0 and its specifications
12  does that tell you which version of Chipper this would
13  correspond to?
14     A.  I think first version, but I'm not sure.
15     Q.  When you manufacture the Chipper, rebranded as
16  the Walker for AnywhereCommerce, do you have to pay a
17  license fee to AnywhereCommerce?
18     A.  I just told them one price.  So if -- I just told
19  them one price.
20     Q.  How is the Walker 1.0 different from the Circle
21  Swipe?
22     A.  Well, in many way.  From the function, the
23  Walker 1.0 has EMV features, [indiscernible] the Circle
24  Swipe, and this one you can say it is circle.  From the
25  [indiscernible] feature.  The Circle Swipe has no battery

Page 90
1  and this one has battery.  And also the communication
2  method.  This one communicate by USB and Circle Swipe
3  cannot.  And there's a few other.  Like there are -- like
4  the lanyard holder.  So it is a whole difference.
5      Q.  I think you said earlier that the early versions
6  of the Chipper had a USB port but it only provided
7  charging and wasn't useable for device connectivity.  Do
8  you remember that?
9      A.  Yes.
10     Q.  And this specification indicates micro-USB port
11  for charging and/or device connection.  Do you see that?
12     A.  Yes.
13     Q.  So does that change your analysis in terms of
14  where this corresponds to the BBPOS product offerings?
15         MS. BOZEMAN:  Wait.  Objection.  And I'm just
16  going to note for the record that this also does not bear
17  any Bates stamping.  So is it the same situation that this
18  was not obtained through discovery?
19         MR. TECHENTIN:  Correct.  It was taken from your
20  client's website.
21         MS. BOZEMAN:  When you say "your client" you're
22  referring to AnywhereCommerce?
23         MR. TECHENTIN:  Your client.  Yeah.
24         MS. BOZEMAN:  Well, there's two.
25         MR. TECHENTIN:  Yeah.

Page 91
1         MS. BOZEMAN:  Right.  Okay.
2      A.  Because I said that the Chipper, we have one
3  version for charging and then we have also a version
4  for -- for connection.  So I don't know.  This one, the
5  Chipper, but the Chipper is also configurable.  So the
6  first version for charging only.  And then later on we
7  have version to communicate via USB.  So we still call it
8  Chipper, but its configuration is a little bit different.
9  I believe this is one with the connecting via USB
10  capability.
11  BY MR. TECHENTIN:
12     Q.  Are there any other differences that you know of
13  between this Walker 1.0 and the Circle Swipe?
14     A.  Yeah.  By the shape, the battery, the features,
15  the communication method.  Yeah.
16     Q.  What about the circuitry that's associated with
17  the audio jack?  Is that different?
18     A.  I think they're the same.
19     Q.  What about the circuitry that is associated with
20  the mag stripe reading?  Is that the same?
21     A.  Well, we made it different.  Because the Circle
22  Swipe has limited power.  So we -- I remember that we
23  simplify the method with the circuit.  But this one has a
24  battery.  So this one, we may put an equipment IC instead
25  of use the equipment component for the MasterCard

Page 92
1  decoding.
2      Q.  So what is the -- where does that difference get
3  implemented in the two devices?
4      A.  So the -- it will affect the swiping speed.  That
5  is Circle Swipe, the MasterCard reading mechanism, the
6  MasterCard circuit is implemented by the switch component.
7  Like we use the resistor, capacitor, some transistor to
8  implement the MasterCard circuit.  But for this one
9  instead of implement the MasterCard reading circuit by
10  component, we use a MasterCard reading IC.  So because of
11  that, an IC is focussed on doing this method of card
12  reading features.  So this one has the capability to read
13  the MasterCard in a much better way.  Like swiping faster
14  speed or slower speed and then you can still read it.  But
15  Circle Swipe, you can swipe so fast or so slow.  It's
16  quite limited.
17         MR. TECHENTIN:  I'm going to mark Exhibit 68
18  which is it another AnywhereCommerce spec sheet.  This is
19  for the Rambler 3.0.
20         (Exhibit 68 was marked for identification
21         and is attached hereto.)
22  BY MR. TECHENTIN:
23     Q.  Do you recognize the Rambler 3.0 as a product
24  manufactured by BBPOS?
25     A.  Yes.



Page 93

1    Q.  And what does it correspond to in the BBPOS
2    product line?
3    A.  It didn't correspond to any BBPOS product line.
4    Q.  It doesn't correspond to any?
5    A.  No.
6    Q.  So the Rambler 3.0 was exclusive to
7    AnywhereCommerce?
8    A.  Yes.
9    Q.  How is it different from Chipper?
10   A.  Well, this one has a battery, different shape,
11   and then they have like flexible grips which can be
12   mounted to a phone.
13   MS. BOZEMAN:  Jeff.  Sorry to interject, but I
14   have a COVID test I have to take.  I sent you an email
15   about a hard stop.  Can we take a break now?
16   MR. TECHENTIN:  Can I just finish with this
17   exhibit?  It is literally like two minutes.
18   MS. BOZEMAN:  Yes.  That's fine.
19   MR. TECHENTIN:  I was conscious of that and I was
20   aiming for that 3:30 or 12:30 time.  I appreciate that.
21   MS. BOZEMAN:  Great.
22   BY MR. TECHENTIN:
23   Q.  Who designed the industrial design for the
24   Rambler 3.0?
25   A.  AnywhereCommerce.

Page 94

1    Q.  What about the -- what about the internal
2    operational aspects of it?  Who designed that?
3    A.  We design it.
4    Q.  How does the audio jack functionality in the
5    Rambler 3.0 differ, if it does, from Circle Swipe?
6    A.  The audio jack in this device the audio jack will
7    get the power from the phone.  And Circle Swipe get the
8    power from the phone.  So the design is very big
9    different.  So as the Circle Swipe get the power from the
10   phone and then, you know, we have some circuit to extract
11   the power from the phone.  And then the phone has to play
12   some sign.  So the Circle Swipe has to communicate with
13   the phone.  It is more like two-way communication.  The
14   phone will play the sign, and the Circle Swipe will make
15   use of the sign to convert into energy to power Circle
16   Swipe, but for this device, it did not extract the power
17   from the phone.  It has an internal battery to power the
18   phone device.  So the circle design is way different.
19   Q.  So how -- and how does the -- how does the mag
20   stripe reader in the Rambler 3.0 different from what you
21   just described for the Chipper?
22   A.  Chipper?
23   Q.  Well, sorry.  Let me ask that again.  We talked a
24   little bit about the Walker and you explained how its mag
25   stripe capabilities and functionalities differed from

Page 95

1    Circle Swipe; right?  Remember that?
2    A.  Yes.
3    Q.  How do the mag stripe functionalities and
4    capabilities differ between Rambler and Walker?
5    A.  I think the Rambler and Walker, both of them has
6    battery.  So they are capable to power the MasterCard
7    reading IC.  So the design of this part is the same.
8    MR. TECHENTIN:  I'm going to move on.  So why
9    don't we take a break now.  I think you said you needed a
10   half hour or so.
11   MS. BOZEMAN:  Yeah.  If we could come back at
12   1:00 that should be sufficient, if that's okay on your
13   end.
14   MR. TECHENTIN:  That's fine.
15   THE VIDEOGRAPHER:  Off the record at 12:27 P.M.
16   (PROCEEDINGS RECESSED)
17   THE VIDEOGRAPHER:  Start of video file number 3.
18   We're back on the record at 1:06 P.M.
19   BY MR. TECHENTIN:  Mr. Lo, had a chance to look for some
20   of the documents that you had mentioned having reviewed in
21   preparation for today's deposition.  And I mentioned this
22   before, but one of the ones that you mentioned had a
23   specific Bates number, and I actually -- I pulled the
24   wrong document.  You mentioned an Ingenico email, but I
25   happen to -- when I was looking for that I accidently

Page 96

1    found an AnywhereCommerce email with the exact same
2    number, very curiously, that I'd like to show you.  I'm
3    going to have it marked as Exhibit 69.
4    (Exhibit 69 was marked for identification
5    and is attached hereto.)
6    BY MR. TECHENTIN:
7    Q.  It's an email from Michael Kron to Mitch Cobrin
8    and Mark Diamond.  You know all those individuals at
9    AnywhereCommerce; right?
10   A.  Yes.
11   Q.  And this is -- it's an email chain.  But in the
12   middle -- in the middle of the page, you've forwarded an
13   email from a gentleman named Jean-Marc Thienpont; right?
14   A.  Yes.
15   Q.  Jean-Marc had written to you on June 11th, 2012;
16   right?
17   A.  Yes?
18   Q.  And he's with Ingenico; right?
19   A.  Yes.
20   Q.  And his email to you says "Hi Ben.  Our chairman,
21   Philippe Lazare is currently in HK."  That's Hong Kong;
22   right?
23   A.  Yes.
24   Q.  "He would be delighted to meet you.  He's
25   available between 5:00 and 7:00 P.M. in case you



Page 105

1    the EMV news and also re the agreement.  Let's
2    try to talk soon.  Enjoy and have a prosperous
3    New Year.  Ken."
4         And that email quoted yours; correct?
5    A.  Yes.
6    Q.  And your email was a response to another one from
7    Ken Paull which was sent on January 19th, 2013; right?
8    A.  Yes.
9    Q.  And on January 19th, 2013, Ken Paull wrote to
10   you:
11       Hi Ben.  Sorry I missed seeing you if you were
12       in the US recently.  I heard from Bill that you
13       were upset about hearing that there is an
14       Ingenico EMV prototype that we are showing."
15   Do you see that?
16   A.  Yes.
17   Q.  And so Ken Paull wrote to you on January 9th,
18   2013, about your concerns about the EMV prototype that was
19   being shown; right?
20   A.  This email, I didn't see the prototype.
21   Q.  I'm sorry?
22   A.  I didn't see the actual, actual device.  I just
23   heard that they are -- they are coming with a
24   competitive -- Ingenico coming with a competitive product,
25   but I don't see the product yet.  At that period of time

Page 106

1    I'm still trying to sell my Chipper to ROAM Data.
2    Q.  Isn't it a fact, Mr. Lo, that the Cartes trade
3    show at which you saw an EMV prototype put out by Ingenico
4    was in 2012 and not 2014?
5    A.  Can you repeat your questions.
6    MR. TECHENTIN:  Would you mind reading that back.
7       (REPORTER READS BACK)
8    A.  No.
9    BY MR. TECHENTIN:
10   Q.  You say no?
11   A.  No.
12   Q.  Do you know when the RP350x came out?
13   A.  I think 2014.
14   Q.  Why do you think that?
15   A.  This is the time when Ingenico has the HO
16   [phonetic] devices and then they are promoting in the
17   trade show.
18   Q.  So the trade show, according to you, the trade
19   show happens at the end of the year; right?
20   A.  Yes.
21   Q.  And so there's a trade show at the end of some
22   year where you see a prototype device for an EMV reader
23   that would be released by ROAM Data; right?
24   A.  Yes.
25   Q.  And then in January of 2013 you have on your

Page 107

1    computer an announcement that the RP350x is coming out in
2    June of 2013; right?
3    A.  Yes.  That's the announcement, but yes.
4    Q.  And then your testimony is that sometime in 2014
5    the actual product is released into the marketplace; is
6    that right?
7    A.  Yes.  Because the product, it can be -- design
8    can be sold consumer.  Until your product is market-ready,
9    you cannot sell the product.
10   Q.  So it's market-ready in 2014.  That's what you're
11   saying?
12   A.  Yes.
13   Q.  And then at the end of 2014, so after it's market
14   ready, you see a prototype of it?
15   A.  End of 2014 I saw the prototype.  I saw the
16   product in the Ingenico booth.
17   Q.  You saw a prototype?
18   A.  I saw a product.
19   Q.  So now it was the completed product that you saw
20   at the booth?
21   A.  I think so.  Because some of the customers then
22   come to our booth and then ask me whether this is your
23   product, you sell similar products.  So I believe the
24   Ingenico start selling the product in 2014 to some of the
25   customer.

Page 108

1    Q.  Does that make any sense to you that they would
2    start selling the product in 2014 and then they would have
3    a prototype at a trade show at the end of the year?
4    MS. BOZEMAN:  Objection.  But you can answer
5    that.
6    A.  Well, but for a company like Ingenico, for a
7    company like us, if the product is a prototype, we won't
8    put in a trade show to show.  Normally we put into a
9    cabinet or the secret showroom to show the product and to
10   tell the customer that this is a prototype of something we
11   are coming.  But if you really show it at a trade show,
12   then I believe that this is a product where at least we're
13   doing something like this.  Like we have -- we have a
14   presentation and then we show the product first.  Show the
15   features of design, show the prototype, but all of this
16   product is not available yet.  And then just showing --
17   then just to explore the possibility of selling the
18   product.  Because you really invest a lot of money to
19   finish all the certification on this protect.  So it is
20   highly unlikely until this product has a certification,
21   everything ready, so it is highly unlikely to show in a
22   trade show a prototype which is no certification, not
23   market ready.  So if it is sold at a trade show, the
24   product is ready.
25   BY MR. TECHENTIN:



Page 113

1    A. Okay.

2    Q. So Ken is telling you that they have a device and

3  it's sufficiently well developed that he can tell you that

4  it's based on an existing Landi product; right?

5    A. How Ken know that?

6    Q. How does Ken know that?

7    A. Ken is not an engineer.  Ken is not an expertise

8  in his area.  How can Ken assure that?  How can he assure

9  that there's no commonality in terms of architecture,

10  firmware and power.  How can he do that?

11    Q. So what did you do when you got an email from Ken

12  that said --

13    A. I complained.

14    Q. You complained?

15    A. Yes.

16    Q. So what Ingenico EMV prototype is Bill talking

17  about in this email that had gotten you upset?

18    A. I don't know.  He just said that they have a

19  prototype.  And if -- if exactly like what like Ken said,

20  if they said that it's low commonality in terms of

21  architecture, firmware, why he want me to work together

22  with Ingenico?  Why?  Why want the license our technology?

23  Why?  They do it different.  They don't even like -- they

24  don't even need to let me know.  Just go ahead.  If it is

25  totally different product, go ahead.  Why he told me about

Page 114

1  that?  Is it too much?  Too stupid?  Why?

2    MR. TECHENTIN:  I'd like to show you another

3  document from AnywhereCommerce.  This is -- excuse me.

4  This is an email from you to Mitch Cobrin.  This is

5  Exhibit 74.

6    (Exhibit 74 was marked for identification

7    and is attached hereto.)

8  BY MR. TECHENTIN:

9    Q. And this is a little later in 2013.  So this is

10  after you have the RP350x announcement.  It's after you've

11  had this back and forth with Ken Paull about the prototype

12  that you're upset about.  Do you remember this email?

13    A. Yes.

14    Q. And you write to Mitch:  "ROAM wants to sell

15  their EMV audio jack card reader from Landi, a product

16  competing with Walker."  Right?

17    A. Yes.

18    Q. So as of May 7th, 2013, you knew that there was a

19  ROAM product made by Landi that was competing with the

20  Walker product; right?

21    A. ROAM want to sell Landi products, but I don't

22  know which Landi product.

23    Q. It says "ROAM wants to sell their EMV audio jack

24  card reader."  That's the ROAM EMV audio jack card reader;

25  right?

Page 115

1    A. From Landi.

2    Q. That they get from Landi; right?

3    A. Yes.

4    Q. That's what you're writing?

5    A. Yes.  They get from Landi.  Yes.

6    Q. You know that that ROAM EMV card reader from

7  Landi is going to compete with Walker; right?

8    A. Yes.

9    Q. And Walker is Chipper; right?

10    A. Yes.

11    Q. So by this time you know that this is 18 months

12  before this trade show in 2014.  You've seen a product

13  release form.  You've had Ken Paull explain to you that

14  you shouldn't be surprised that we're doing this because

15  we've talked about it.  And now you're telling

16  AnywhereCommerce that ROAM is selling -- is going to be

17  selling an EMV audio jack card reader from Landi; right?

18    MS. BOZEMAN:  Objection.  But you can answer.

19    A. Yes.  This is what they told me that they want

20  to.  Like the previous email.  They told me that they want

21  to sell the card reader which is equivalent to EMV audio

22  jack card reader from Landi or some card reader from

23  Ingenico.  So everything is co-related.  I'm not happy

24  with Ken Paull and as I'm working together for a long

25  time.  We sell them the Chipper then all of a sudden

Page 116

1  they want dual sources.  That's quite weird.  We have good

2  relationship and why they want a dual card reader.  And

3  before the Chipper, then we sell them the Circle Swipe.

4  They were very happy, and then now -- the customers.  Then

5  why all of a sudden they want to swap?

6    Now, I try my best to tell Ken Paull and Bill that

7  our product is the best and it is not easy to come up with

8  audio jack card reader.  We don't need second source.  We

9  have enough capability to manufacture enough product for

10  them.  And then at the same time I also share my angry,

11  I'm unhappy.  They're trying to come up -- they're trying

12  to come up with an EMV card reader in order to compete.

13  Compete with us.

14  BY MR. TECHENTIN:

15    Q. And you even knew that this was going on at least

16  as early as the end of 2012; right?

17    MS. BOZEMAN:  Objection.  You can answer.

18    A. What's the question?

19  BY MR. TECHENTIN:

20    Q. You knew that ROAM Data and Ingenico were

21  developing a new EMV card reader that would compete with

22  yours in 2012; right?

23    MS. BOZEMAN:  Objection.  You can answer.

24    A. They always were very competitive.  They try to

25  be very competitive in 2012, '15, but I never -- in my



Page 121

1 email if it helps.  But Mark Diamond writes to Michael
2 Kron:  "Both AC --" which is Anywhere Commerce "-- and
3 BBPOS want to hurt Ingenico.  How can we cooperate to make
4 this happen?"  That is dated August 27th of 2013.
5      My question for you, Mr. Lo, is is that true?  In
6 August of 2013 did BBPOS want to hurt Ingenico?
7      A.  That's an idiot question.  How do we hurt
8 Ingenico.  I think they -- they just know my email.
9 Otherwise this idea, how I do hurt Ingenico.
10      Q.  My question is whether he's right.  Did BBPOS
11 want to hurt Ingenico in 2013?
12      A.  In what way?
13      Q.  I don't know.  However it wanted to?
14      A.  If you don't know then I don't know in what way?
15 Ingenico is company.  In what way we hurt Ingenico?  You
16 don't know.  You ask me but I don't know.  Whether I know,
17 I don't know.  I don't know what I don't know.  I don't
18 know what I don't know.
19      Q.  Did you attempt to cooperate with
20 AnywhereCommerce in order to hurt Ingenico?
21      A.  No.
22      Q.  Eventually, though, you sued them; right?  You
23 sued Ingenico along with AnywhereCommerce; right?
24      A.  I sued them, we will hurt them?  I sued them to
25 get what I didn't get.  Actually I want to add that

Page 122

1 Ingenico hurt us first.  So I -- I would get that money
2 from them.
3      Q.  So if we go back to Exhibit 74 really quickly,
4 that is the May 7th, 2013 email that you sent to Mitch
5 Cobrin of AnywhereCommerce.  It's a little couple of
6 months before AnywhereCommerce is discussing the fact that
7 both they and you want to hurt Ingenico, and you say to
8 Mitch Cobrin, "We need to leverage our IP portfolio to
9 develop recurring revenue model in some markets."  And
10 that's after you talk about the fact that ROAM wants to
11 complete with an EMV reader; right?
12      A.  Yes.
13      Q.  Leveraging your IP portfolio is a euphemism for
14 asserting patent infringement; right?
15      A.  Can you repeat your questions.
16      Q.  Leveraging your IP portfolio is a euphemism for
17 asserting patent infringement; right?
18      MS. BOZEMAN:  Objection.  You can answer.
19      A.  No.  We are saying we are using our IP portfolio
20 to develop recurring revenue.  So clear in the email.  How
21 come you come up with this interpretation assuming patent
22 infringement?
23 BY MR. TECHENTIN:
24      Q.  Well, how does an IP portfolio develop recurring
25 revenue?

Page 123

1      A.  Because AnywhereCommerce has gateways and then we
2 have the hardware.  We are exploring, just exploring is it
3 possible to develop revenue with a current revenue model?
4 Let us sell the product and get some transactions free.
5 So this is just exploring.
6      Q.  How does your IP portfolio generate recurring
7 revenue?
8      A.  IP mean many thing.  AnywhereCommerce, at that
9 period of time, they have the gateway.  They have the
10 payment gateway and then we have a product.  So product is
11 also IP.  I think together with our product, with the
12 gateway, the application, together offer an important
13 solution to a customer to create revenue.  This is what I
14 mean.  I don't mean a pattern specifically with this
15 email.  An IP portfolio is a portfolio of products.
16      MR. TECHENTIN:  Can we take a break for like ten
17 minutes?  I'm going to switch gears.
18      THE VIDEOGRAPHER:  Off the record at 1:54 P.M.
19      (PROCEEDINGS RECESSED AT 1:54 P.M.)
20      (PROCEEDINGS RECONVENED AT 2:11 P.M.)
21      THE VIDEOGRAPHER:  Back on the record at
22 2:11 P.M.
23      MR. TECHENTIN:  Mr. Lo, before we turn to another
24 topic I just wanted to ask you about one more document.
25 I'm going to mark this as Exhibit 77.  This is not a Bates

Page 124

1 numbered document, but my understanding is that the
2 document was produced.  It has a Bates number.  It's an
3 Ingenico Bates number of 0089952.  And Mr. Lo, this is the
4 press release from Ingenico announcing the release of its
5 RP350x product.
6      (Exhibit 77 was marked for identification
7      and is attached hereto.)
8 BY MR. TECHENTIN:
9      Q.  Have you seen this before?
10      A.  No.
11      Q.  This is dated April 30th of 2013, and it
12 announces that ROAM, an Ingenico company in the leading
13 mobile commerce platform provider today announced the
14 release of the RP350x the world's first ever PCI-PTS and
15 SRED-certified chip and sign mobile card reader.  Do you
16 see that?
17      A.  Yes.
18      Q.  Does BBPOS do anything to keep itself abreast of
19 developments in the mPOS marketplace?
20      A.  Can you rephrase your questions.
21      Q.  Does BBPOS pay attention to the competitive
22 environment for mPOS devices?
23      A.  No.
24      Q.  You don't do anything to figure out what your
25 competitors are doing?



Page 125

1    A.  We just have one major customer, called ROAM.  So
2    we don't do much product competitive analysis.
3        Q.  So you wouldn't pay attention to the fact that
4    your only customer, ROAM, issued a press release
5    announcing that they had a product that directly competed
6    with your Chipper product?
7        A.  No.  I just trust my customer.
8        Q.  Does this refresh your recollection as to when
9    the RP350x was actually a competitive product on the
10   market?
11       A.  No.
12       Q.  You'd agree with me, though, that if the RP350x
13   was actually released as a final product on April 30th of
14   2013 it wouldn't make any sense for there to be a
15   prototype of that product at a trade show over 18 months
16   later; right?
17           MS. BOZEMAN:  Objection.  But you can answer.
18       A.  You're talking about it came out later in October
19   2014?  As I said, 2014 I saw the actual product in
20   exhibition.  So I didn't read this news.  So what's your
21   question?  Are you asking did I read this news saw the
22   product?  I didn't witness news.
23   BY MR. TECHENTIN:
24       Q.  So in early -- in January of 2013 you're upset
25   with ROAM because they're talking about two tracking the

Page 126

1    EMV reader; right?
2        A.  Yes.
3        Q.  And in -- also in January of 2013 you receive an
4    announcement that there's this product called the RP350x
5    that's going to be coming out and that's going to compete
6    directly with your Chipper; right?
7        A.  I don't receive this announcement.
8        Q.  Well, the announcement was on your computer in
9    January of 2013; right?
10           MS. BOZEMAN:  Objection.  But you can answer.
11       A.  Well, there's so many that's in the world.
12   There's so many documents in the world, so I didn't read
13   this document.
14   BY MR. TECHENTIN:
15       Q.  Just so we're clear, we're talking about
16   Exhibit 72 which is a product preview for a ROAM Data
17   RP350x mobile card reader that says it's going to be
18   available in June 2013, and it's -- and you're the
19   custodian of this document.  You are telling me you never
20   saw this?
21       A.  This is like a -- I share with you that this is
22   a -- I don't see these products.  The actual products.
23   This is just a brochure.
24       Q.  Right.  You saw the brochure, though; right?
25       A.  The brochure can be design.  It can be something

Page 127

1    fake.  So this is for review only.
2        Q.  You thought that this brochure was a deep fake
3    and there really wasn't an RP350x?
4        A.  I don't know.
5        Q.  So you see -- so you acknowledge you saw this
6    brochure; right?
7        A.  Yes.
8        Q.  You put it on your computer -- you saved it to
9    your computer; right?
10       A.  Yes.
11       Q.  So in January of 2013 you see this product
12   preview for a product that's going to come out of the
13   market from your primary customer that's going to directly
14   compete with your primary product; right?
15           MS. BOZEMAN:  Objection.  But you can answer.
16       A.  Yes.
17   BY MR. TECHENTIN:
18       Q.  But you didn't think maybe this is a thing I need
19   to pay attention to?
20       A.  Yes.  But ROAM Data can -- well, first of all
21   this is just a brochure, and then ROAM Data can -- well,
22   if they want, they can use any product like from Ingenico
23   or from Landi.  But just -- just -- I wrote Ken Paull then
24   well, BBPOS product is the best.
25       Q.  And so your testimony today on behalf of BBPOS is

Page 128

1    that despite having this brochure and despite the fact
2    that the RP350x became commercially available in April of
3    2013, you didn't know anything about that product's
4    existence, the actual product, until you saw it at a trade
5    show at the end of 2014?
6            MS. BOZEMAN:  Objection to the introduction of a
7    fact that this was commercially available in 2013.  Mr. Lo
8    never testified to that.
9    BY MR. TECHENTIN:
10       Q.  I know that.  You can answer the question now.
11       A.  What is your question?
12       Q.  Your testimony today is that despite having
13   knowledge going back to 2012 that ROAM was developing a
14   competitive product to the Chipper product, and in 2013
15   complaining about that as being unfair, and in 2013
16   knowing that the product was -- that Ingenico was saying
17   it was going to come out in June, you knew nothing about
18   this product until you actually saw one at a trade show
19   over a year and a half later?
20       A.  Yes.  I -- when ROAM Data come up with a product,
21   so this product is a brochure.  In 2014 I saw an actual
22   product in the Ingenico booth and then before that I never
23   see actual products.  Everything I saw is just a -- like
24   just a -- just a -- just some brochure.  I don't see the
25   actual product.  I don't assess the actual product.



Page 133

1  information, 1, as a part of Ingenico's purported due
2  diligence investigation in or around 2012 in relation to
3  its supposed interest in acquiring the plaintiff and, 2,
4  from ROAM, through Ingenico's acquisition thereof."
5  Do you see that?
6      A.  Yes.
7      Q.  Is it accurate to state that the trade secrets
8  that have been asserted here were obtained as part of
9  purported due diligence efforts?
10     A.  Yes.
11     MR. TECHENTIN:  All right.  So let's talk about
12  that a little bit.  I'm going to have marked as Exhibit 78
13  a set of schematics.
14        (Exhibit 78 was marked for identification
15        and is attached hereto.)
16  BY MR. TECHENTIN:
17     Q.  And they are Bates numbered BBPOS-0005601 through
18  5606.
19        Do you recognize these schematics?
20     A.  Yes.
21     Q.  And are these part of the trade secrets that you
22  contend were misappropriated in this case?
23     A.  I leave that to the experts.  As all technical
24  information that we sent to ROAM Data can potentially be a
25  trade secret.  All the information that we send to ROAM

Page 134

1  Data, we will consider them a trade secret.  I'm not sure
2  whether this is trade secret being misappropriated by ROAM
3  Data.  I'm no expert.  I hire the expert to do that.
4      Q.  I'm asking about ROAM Data's contentions in this
5  case, and you're here.  Respectfully you're here to
6  testify for ROAM.  So my question is, are these schematics
7  among the trade secrets that BBPOS contends that Ingenico
8  stole?
9      MS. BOZEMAN:  You were referring to him appearing
10  on behalf of ROAM Data?
11     MR. TECHENTIN:  Did I say that?
12     MS. BOZEMAN:  Yes.
13     MR. TECHENTIN:  Obviously that would be awkward
14  so, no.  He's here on behalf of BBPOS.  Sorry about that.
15  BY MR. TECHENTIN:
16     Q.  As the representative of BBPOS is it your
17  contention that these schematics form part of the trade
18  secrets that were stolen by Ingenico?
19     A.  Yes.
20     Q.  What is the -- what's the function that is
21  described by these schematics in Exhibit 78?
22     A.  What's the function?  This is a schematic of the
23  Chipper.  So in this diagram you see that, like the first
24  page, the first page about the MCU.  The second page, like
25  about the EMV card reader circle.  The third page is the

Page 135

1  magnetic strips card reader circuit.  The fourth page is a
2  -- another MCU sub-circuit.  And with a power circuit.
3  Last one, circuit.  So all of these circuits is the
4  component, one of the components of the card reader.
5      Q.  And which, if any, of these secret designs are
6  present in any Ingenico products?
7      A.  I leave that to the IP experts to answer the
8  questions.
9      Q.  And I think we can short circuit this because you
10  testified about this on Wednesday, and I understand you've
11  adopted all that testimony.
12     BBPOS has relied primarily upon its outside expert
13  to analyse these issues; correct?
14     A.  Yes.
15     Q.  And the only internal investigation that you made
16  reference to on Wednesday was done by your primary
17  hardware engineer; correct?
18     A.  Well, at this time if you ask me, I will say yes,
19  it was.  All the circuit may be adopted by Ingenico, but
20  adopted by Ingenico, but eventually I believe that --
21     If you ask my opinion, I would say that anything
22  you can copy, improve it, modify it to change it, but
23  specifically which part Ingenico referred to, I leave that
24  to IP expert.  Even though engineer Daniel then -- well,
25  people say -- if on the other hand Ingenico is saying

Page 136

1  that's the circuit diagram and then they will -- and come
2  up with maybe a better circuit or similar circuit.  So
3  which part has been copied or which part has been used in
4  the Ingenico product I leave that to IP experts.
5      Q.  I'm sorry.  I don't know that that was responsive
6  to my question.
7      MR. TECHENTIN:  So I'm going to ask, if I may, to
8  have the court reporter read that question back, again
9  please.
10        (REPORTER READS BACK)
11     A.  Yes.
12  BY MR. TECHENTIN:
13     Q.  And that's Daniel is the engineer?
14     A.  Yes.
15     Q.  And I think you said that he had examined at
16  least one of the Ingenico devices; correct?
17     A.  Yes.
18     Q.  And he had reported to you that the circuit
19  associated with the automatic gain control was the same in
20  the Ingenico product as was in the Chipper; is that right?
21     A.  Many part like these, the audio jack part and
22  automatic gain control.  There are many parts the same.
23     Q.  What did he say, then?  Explain.  Explain what he
24  described to you as was the result of his investigation.
25     A.  Well, he just verbally talked to me.  I don't



Page 137

1 remember that.  But he said some circuit that Ingenico
2 copy us.
3     Q.  Which circuit?
4     A.  Like the polarity.  The audio jack polarity.  The
5 automatic gain control.
6     Q.  Anything else?
7     A.  I don't remember.  If you ask me, I don't
8 remember.
9     Q.  Is this something you discussed with Daniel in
10 your most recent telephone call with him?
11    A.  I just asked him whether he remembered, you know,
12 how much -- which product, which part is copied.  And then
13 Daniel told me that he -- yeah, yesterday he told me that
14 he was pretty sure the audio jack part, Ingenico copied
15 us.
16    Q.  What does that mean, "the audio jack part"?
17    A.  Because the audio jack has this like a polarity
18 issue.  We solved the polarity issue.  There must be a way
19 to do that.  And this is what Daniel told me yesterday,
20 that he pretty sure that polarity part, Ingenico copied
21 us.
22    Q.  Did Daniel say anything else about what he found
23 when he examined the Ingenico product?
24    A.  He don't remember that.  He just got them sure
25 this polarity part.  This is what he told me.

Page 138

1     Q.  Did he say anything to you when you talked
2 yesterday about automatic gain control?
3     A.  No.
4     Q.  So you yesterday asked Daniel what he remembered
5 about the investigation and he said polarity, but he
6 didn't say automatic gain control; right?
7     A.  Yes.  He told me that polarity issue, and that he
8 opened -- open the devices and he do the investigation,
9 but it's too long.  Long time ago.  He don't remember.
10 But he's pretty sure the polarity part, they copied us.
11    Q.  Did you happen to ask Daniel which device or
12 devices he had examined?
13    A.  He forget that.
14    Q.  And I think you said that page 6 of this
15 Exhibit 78 are the -- is the schematic for the audio jack;
16 right?
17    A.  I guess.  I just guess.  But I'm not a -- I'm not
18 an actual designer of this product.
19    Q.  Can you tell me where the -- or whether the
20 schematic at page 6 of this exhibit discloses the polarity
21 solution that BBPOS implements?
22    A.  I'm not an expert in this area.  So I will leave
23 that to the experts.
24    Q.  Would Daniel know the answer to that question?
25    A.  Yes.

Page 139

1     Q.  So it would be fair to say that BBPOS is capable
2 of answering that question as an organization; right?
3     A.  Yes.
4     Q.  But you can't?
5     A.  I cannot.
6         MS. BOZEMAN:  As to this one particular schematic
7 you're asking?
8         MR. TECHENTIN:  Well, we're going to have more of
9 those, but yes.
10    A.  I leave that to expert.  I don't know what this
11 specific schematic.  I don't know.
12 BY MR. TECHENTIN:
13    Q.  So we talked a little bit on Wednesday about the
14 efforts that BBPOS employs to keep its secrets secret.
15 How is this set of schematics kept confidential at BBPOS?
16    A.  How is it kept confidential?  Put that in our --
17 in our PC.
18    Q.  And what steps are taken to protect its
19 confidentiality?
20    A.  What steps to protect the confidentiality?
21    Q.  Yes.
22    A.  Well, just -- we just store in the PC, and the PC
23 can only be accessed by certain engineer.
24    Q.  Are there any restrictions on the distribution of
25 these materials?

Page 140

1     A.  Yes.  Absolutely.
2     Q.  What are the instructions?
3     A.  We won't -- we won't send a circuit diagram to
4 anyone if it's not necessary.
5     Q.  So how are those restrictions imposed?
6     A.  Well, we just don't send.
7     Q.  Well, is there some control on the file that
8 would prevent it from being distributed without a
9 permission?
10    A.  Yes.  This file is normally, you know, keeping
11 our engineer.  So we -- it's not necessary for us to send
12 to anyone.  So no.
13    Q.  Are the files password protected?
14    A.  I'm not sure.
15    Q.  Do you have employment agreements with the
16 engineers who work with you?
17    A.  Yes.
18    Q.  Do those employment agreements have restrictions
19 on the distribution of confidential information?
20    A.  Yes.
21    Q.  And so presumably those employment agreements
22 prevent the engineers from simply sending out company
23 confidential information; right?
24    A.  Yes.
25    Q.  How do they know whether a particular document is



Page 141

1 company confidential?

2    A. All engineering file confidential. Basically all
3 engineering file are confidential.

4    Q. And what does that mean? If it's confidential,
5 under what circumstances would someone be permitted to
6 share the document?

7    A. Well, I told them to send to -- if I told them to
8 forward to customer like ROAM then they would follow my
9 instruction.

10    Q. Is that true for Daniel Tsai?

11    A. Yes.

12    Q. Does he have the right to make that decision
13 himself?

14    A. Does he have the right to make the decision to
15 send this file to anyone without my instruction? No, he
16 doesn't have the right to send to anyone without my --
17 well, if I told him to send he would send; otherwise, he
18 would not send.

19    Q. So Daniel Tsai still has to get permission from
20 you before he would share any of this information;
21 correct?

22    A. Yes.

23    Q. Is there anyone else in the company other than
24 yourself who can authorize the disclosure of confidential
25 information?

Page 142

1    A. Maybe. Like Jimmy Tang. Like some very senior
2 staff. Some early, very early senior staff. But most of
3 the time it is Jimmy Tang and Daniel Tsai will do the
4 distribution.

5    Q. Why was this set of schematics provided to ROAM?

6    A. Because Will Graylin told me to do that.

7    Q. Why did Will tell you to do that?

8    A. No. Because this is -- this document is ROAM
9 Data request me to do that, to send to them for review.

10    Q. Why did they need to review it?

11    A. Why do they want to review? I don't know.

12    Q. Was that enough reason for you to disclose
13 company confidential information to ROAM?

14    A. Because we have an agreement with ROAM that we
15 give -- if ROAM ask me -- if ROAM request us to give
16 information for them to review we have to do that.

17    Q. And is that -- so you have an agreement with ROAM
18 and the agreement with ROAM says you have to give us any
19 documents we ever ask for?

20    A. Yeah. And if necessary that if they need to get
21 the document from me and then send to other for review,
22 yes, we send to them. But for all document that we send
23 to ROAM, they are protected by agreements.

24    Q. What agreement with ROAM requires you to give
25 them any documents that they ask for?

Page 143

1    A. Well, if there's a partner agreement we send to
2 them. But if we send the document to them, we send the
3 document to them, but this document still protected, the
4 confidentiality of this document is protected by the
5 agreement. And then if we have to work together, maybe
6 they want to review, maybe they have their own reasons.
7 So for ROAM and BBPOS. So we will send to them, and this
8 information will be protected by agreement.

9    Q. What does that it mean, that it is protected by
10 the agreement?

11    A. The 6.3 of the agreement, that for information
12 that we send to ROAM, that ROAM will take care, will treat
13 this document as confidential document.

14    Q. So before you gave away -- before you gave these
15 schematics to ROAM, did you have any agreement with ROAM
16 in place that would require these to be confidential?

17    A. Yes. The document protect us that all of this
18 information shall be keep confidential.

19    Q. And what's that agreement?

20    A. The development -- the engineering -- the
21 agreement that you showed to me before.

22    Q. That's the --

23    A. -- license agreement, yeah.

24    Q. That agreement requires ROAM to treat any
25 information that you give them ever as confidential?

Page 144

1    A. Yes.

2    Q. Maybe we should take a look at it. You were able
3 to cite a very specific provision in that agreement a few
4 minutes ago. Can you direct my attention to where that
5 provision can be found in that agreement?

6    A. Can you show me the agreement.

7    Q. Sure. It's Exhibit 23.

8    A. Document 23?

9    Q. Exhibit 23. It's document 8, I think.

10    MS. BOZEMAN: That's just the amendment. 7 is
11 the licensing agreement.

12    MR. TECHENTIN: No.

13    MS. BOZEMAN: Oh, sorry.

14    MR. TECHENTIN: Yeah, it's 23.

15    MS. BOZEMAN: I'm sorry. I apologize.

16    A. Page 6, provision 6.3, under "Confidentiality."

17 BY MR. TECHENTIN:

18    Q. So you're referring to 6.3. 6.3 talks about
19 disclosure of confidential information to contractors.
20 ROAM is not your contractor, though; right?

21    A. Yeah. Contractor. Lawyer. Accountant. Agent.

22    Q. I think, in fairness, if you look at 6.1, 6.1
23 talks about treating each other's confidential information
24 confidentially. Do you see that?

25    A. Yes.



Page 145

1    Q. And then 6.2 has a definition of confidential
2 information because that's a capitalized term in this
3 agreement; right?
4    A. Yes.
5    Q. And in order for it to be Confidential
6 Information, capital C, capital I, you have to tell the
7 other party that it's confidential; right?
8       MS. BOZEMAN:  Objection.
9    A. I'm not a lawyer.
10      For information that we send to a party, and in
11 particular the engineering, schematic issues, I would
12 think that they're confidential.
13 BY MR. TECHENTIN:
14    Q. Did you mark these schematics as "confidential"?
15    A. No.
16    Q. So why did you make this disclosure of schematics
17 to ROAM?  What was the purpose of communicating them?
18    A. I forget.
19    Q. Was it part of due diligence?
20    A. I forget.
21       MR. TECHENTIN:  I'm going to show you Exhibit 79.
22       (Exhibit 79 was marked for identification
23       and is attached hereto.)
24 BY MR. TECHENTIN:
25    Q. This is an email from Jimmy Tang to Christopher

Page 146

1 Rotsaert, and it's a short email.  "Hi Chris.  This is the
2 draft of the EMV flow and two-way communication docs.
3 Jimmy."  Does Jimmy have the right to disclose company
4 confidential information without reporting to you?
5    A. No.  Jimmy report to me.  And then if he want to
6 send confidential information to anyone, he has to let me
7 know.  So normally I told Jimmy to send.
8    Q. So did you approve of Jimmy sending this material
9 to Christopher Rotsaert?
10    A. Yes.
11    Q. And is this attached information, this EMV flow
12 document dated 2nd July, 2012, is that trade secret
13 information?
14    A. I would think so, yes.
15    Q. And the same thing with this two-way
16 communication document dated 19th June, 2012?
17    A. Yes.
18    Q. Why was this information shared with ROAM?
19    A. I don't remember the reason why.
20    Q. What it part of due diligence?
21    A. I don't know.
22    Q. Well, I think we agreed on Wednesday that the due
23 diligence period would have run from when the term sheet
24 was signed by BBPOS and ROAM at the end of March of 2012,
25 and would have ended by the time of your meeting with

Page 147

1 Mr. Lazare which happened, I think we agreed today, on
2 June 11th; right?
3    A. Yes.
4    Q. And this email is being sent on July 18th, 2012,
5 so it would not be in the due diligence period; correct?
6    A. Yes.
7    Q. So why was Jimmy Tang sending ROAM Data the EMV
8 flow and two-way communication docs on July 18th, 2012?
9    A. Again, ROAM Data is a software company and we're
10 a hardware company, and then not only the due diligence.
11 I think before [indiscernible] somehow we're sending
12 information to ROAM, but for what specific reason, I don't
13 know.
14    Q. Did BBPOS -- strike that.
15       Was BBPOS engaged in a collaborative effort during
16 2012 with Ingenico in order to be able to create a new EMV
17 capable mPOS device?
18    A. I think that we may discuss that.  We may discuss
19 that, but the detail, I forget.
20    Q. Isn't it the fact, Mr. Lo, that during 2012,
21 BBPOS was engaged in two different efforts to be able to
22 come out with an EMV capable reader?
23    A. Yes.
24    Q. And one of those efforts was internal; correct?
25    A. One of the efforts internal?  What is the

Page 148

1 previous question?
2    Q. One of the efforts that BBPOS was engaged in to
3 create an EMV capable mPOS reader during 2012 was to try
4 to create it itself; right?
5    A. Yes.
6    Q. And the other effort that was underway in 2012
7 was to explore the possibility of utilizing BBPOS's audio
8 jack technology in connection with the Telium-based mPOS
9 technology that had been developed by Valence at Ingenico;
10 right?
11    A. Well, in my opinion this is still ROAM.  We
12 assist ROAM not Ingenico.
13    Q. Well, you understood that Ingenico and ROAM were
14 different companies; right?
15    A. Yes.
16    Q. But, in any event, you understood that Ingenico
17 at its France R&D laboratory in Valence --
18    A. Yes.
19    Q. -- was working on technology that included
20 something called a "Telium chip"; right?
21    A. Yes.
22    Q. And -- and the Telium chip was a much more robust
23 chip set than what was in the Circle Swipe; right?
24    A. Yes.
25    Q. And that made it more expensive; correct?



Page 153

1    A. Correct.
2    Q. This was provided in order to enable the
3   engineers who were attempting to integrate the Telium
4   product and your audio jack solution to be able to
5   complete that engineering; right?
6        MS. BOZEMAN: Objection. But you can answer.
7    A. Maybe.
8   BY MR. TECHENTIN:
9    Q. Do you have any other explanation as to why you
10  were sharing this trade secret confidential information
11  with a third party?
12       MS. BOZEMAN: Objection. You can answer.
13   A. This is not a third party. Christopher is a ROAM
14  people. So they may want to -- I sent to ROAM, so they
15  may want to review it.
16  BY MR. TECHENTIN:
17   Q. ROAM Data is not part of BBPOS; right?
18   A. Yes.
19       MR. TECHENTIN: I'm going to show you Exhibit 81,
20  and this is another Daniel Tsai email to Christopher
21  Rotsaert.
22       (Exhibit 81 was marked for identification
23        and is attached hereto.)
24  BY MR. TECHENTIN:
25   Q. And this attaches more schematics; right?

Page 154

1    A. Yes.
2    Q. Do you know what these schematics represent?
3    A. Email. This is PayPal G4X. G4X method.
4    Q. This is the G4X?
5    A. Yes.
6    Q. Is that -- that's a product that ROAM sells to
7   PayPal; right?
8    A. Yes.
9    Q. And it bought that from BBPOS?
10   A. Can you repeat your questions?
11   Q. The G4X, it bought that from BBPOS; right?
12   A. Yes.
13   Q. And that's -- so that's reflected in the subject
14  line which is "PayPal G4X - schematic."
15       Are these schematics trade secrets?
16   A. Yes.
17   Q. And they were shared on July 17th, 2012. Do you
18  know why Daniel Tsai sent this to Christopher Rotsaert?
19   A. I think Chris -- I think ROAM Data may want to be
20  together with PayPal about some circuit. Because customer
21  like PayPal. They would like to be before they buy the
22  product from ROAM Data.
23   Q. Do you know if the information contained in this
24  exhibit was incorporated into the RP350x?
25   A. I don't know.

Page 155

1    Q. You'd agree that the July 17th transfer date
2   takes this outside of the scope of due diligence; right?
3    A. Yes.
4        MR. TECHENTIN: I'm going to have marked
5   Exhibit 82.
6        (Exhibit 82 was marked for identification
7        and is attached hereto.)
8   BY MR. TECHENTIN:
9    Q. This is an email from Jimmy Tang to Christopher
10  Rotsaert with a bunch of CCs: You see that; right?
11   A. Yes.
12   Q. And this has a subject line "re: IWL-android
13  with ROAM Data solution." Do you see that?
14   A. Yes.
15   Q. These are the attachments to this which are
16  listed as "swiper API android guy.doc." Is that a trade
17  secret?
18   A. Yes.
19   Q. I think you would agree that the February 28th,
20  2012 transfer date would fall outside of the due diligence
21  period; right?
22   A. Yes.
23   Q. So why was Jimmy Tang sending trade secret
24  information to Christopher Rotsaert in February?
25   A. I don't remember. But like when ROAM asked me to

Page 156

1   send some data to them, they must be -- have some reason.
2   But I don't remember the exact reason.
3    Q. The CCs for this include a guy by the name of
4   Jerome Grandemenge. Do you see that?
5    A. Yes.
6    Q. And he's with Ingenico in Valence; right?
7    A. Yes. I think so. I'm not sure.
8    Q. Does the IWL subject line -- strike that.
9        Earlier today you made some -- you offered some
10  testimony about a project that you had been working on
11  with ROAM that concerned technology that would be for a
12  casino.
13   A. Yes.
14   Q. Is that the IWL project?
15   A. I don't remember that. I'm not sure.
16   Q. Because you'd also mentioned that that had to do
17  with the ROAM player. You remember that; right?
18   A. Yes.
19   Q. And if you look through this email before you get
20  to the attachment, there are numerous, or at least a few,
21  references to ROAM player.
22   A. You said this email talking about ROAM players?
23   Q. Sorry, I couldn't hear that.
24   A. You said this email talking about ROAM players?
25   Q. Yes. I think if you look on the fourth page,



BEN LO 30B6
ANYWHERE COMMERCE V INGENICO

December 10, 2021
169–172

Page 169

1    A. I don't know.

2    Q. And Bob at David -- Bob and Chris discussed the

3  fact that BBPOS and NAB openly discussed NAB's

4  cancellation of an order for MSR devices that NAB recently

5  placed with ROAM Data that is scheduled to be fulfilled by

6  BBPOS prior to year end; right?

7    A. I don't know.

8    Q. Do you remember this situation happening at the

9  end of 2015?

10   A. I remember that.  Like we are selling some

11  product to North American Bancard for Chipper.  But

12  MasterCard, I don't remember that we get order from them.

13  We get order from them.  Like we cancel because of the

14  ROAM agreement.  But after we receive this email from

15  Ingenico, it is highly likely that we will cancel the

16  order with North American Bancard.

17   Q. So North American Bancard had placed an order for

18  devices with ROAM that were going to be fufilled by BBPOS;

19  correct?

20   A. Yes.

21   Q. And BBPOS contacted North American Bancard to try

22  to sell directly to North American Bancard; right?

23   A. We contact North American Bancard to sell

24  Chipper.

25   Q. You contacted North American Bancard to sell

Page 170

1  directly to North American Bancard; right?

2    A. Yes.  For Chipper.  For Chipper product.

3    Q. You wanted to sell to ROAM's customer but you

4  wanted to sell a different product; is that what you're

5  saying?

6    A. Yes.  Because this email says "ROAM-type MSR

7  device."  What's that?  Is it Circle Swipe, or ...?  I

8  don't know what's that.

9    Q. And you knew that North American Bancard had

10  actually placed an order because you were scheduled to

11  fulfill that order; right?

12   A. Yes.  It can be Chipper.

13   Q. Well, the order was for whatever ROAM was going

14  to sell them; correct?

15   A. I don't know.

16   Q. Let's break this down.  North American Bancard

17  placed an order for magnetic stripe reader devices from

18  ROAM Data; right?

19   A. Yes.

20   Q. And you were scheduled to fulfill those before

21  the end of 2015; right?

22   A. Yes.

23   Q. And instead of that happening you got in touch

24  with North American Bancard and tried to sell something

25  else to them instead of what ROAM had already sold to

Page 171

1  them; right?

2    A. I think we're trying to sell Chipper to NAB, yes.

3    Q. And you wanted -- and you accepted an order for

4  that so that you could sell your product directly to NAB

5  and cut out ROAM Data from the order that it had already

6  received NAB; right?

7    A. No.  No.

8    Q. Well, you discussed with NAB -- BBPOS discussed

9  with NAB cancel your order with ROAM Data because we can

10  sell you this Chipper product instead; right?

11   A. I don't remember that.

12   Q. That's what David is saying to Bob in this email;

13  right?

14   A. Yes.

15   Q. And in fact North American Bancard reached out

16  ROAM Data and said cancel our order; right?

17   A. That's what the email said, yeah.

18   Q. And BBPOS requested that ROAM Data permit North

19  American Bancard to cancel the purchase order so that

20  BBPOS could fulfill it; right?

21   A. I don't know.

22   Q. What was BBPOS's reaction to receiving this cease

23  and desist letter?

24   A. When received this letter?  I think that we will

25  be asked to stop selling.  If we are really selling Circle

Page 172

1  Swipe to NAB, then we shall stop.  We stop sell it.

2    Q. What was the last part?  I'm sorry.  I didn't

3  catch that?

4    A. We shall stop selling.

5    Q. You stopped selling?

6    A. Yes.

7      MR. TECHENTIN:  So I'll show you Exhibit 86.

8      (Exhibit 86 was marked for identification

9      and is attached hereto.)

10  BY MR. TECHENTIN:

11   Q. This is an email from Matthew Ng.  Is he your

12  finance director?

13   A. Yes.

14   Q. If you go through this email, after David

15  Szczepanski sent that cease and desist, Alex Choi wrote to

16  Bob Cook, you and Matthew Ng suggesting that you have a

17  meeting as soon as you're back in the office; right?

18   A. Yes.

19   Q. Did you have that meeting?

20   A. Yes.

21   Q. And that's reported in Matthew Ng's email at the

22  beginning of this exhibit; rights?

23   A. Yes.

24   Q. And he -- so he informs Bob:

25      Ben, Alex and I had a quick discussion and



BEN LO 30B6                                    December 10, 2021
ANYWHERE COMMERCE V INGENICO                              173—176

Page 173

1    concluded as below as recap and update you."
2        The first one is "do not take the order from NAB
3    re Swiper as BBPOS is not well prepared for it."
4        What does that mean?
5        A. That means we cannot take the order from NAB as
6    we are an agreement with ROAM Data for not selling Circle
7    Swipe to NAB. So we should cancel the order.
8        Q. Then it says:
9        Alex will reply below formal email from Ingenico
10       and bring me in as formal contact point, details
11       can refer to Alex, reply email to be sent out."
12       And then the last bullet point reads:
13       We will need to plan for cooperation strategy
14       with ROAM in short term and long term," and then
15       it's in all caps "WISELY." What did that mean?
16       A. That means that if it happen again we have to
17   tell ROAM Data that how to deal with the situation instead
18   of take order from NAB and do this stupid thing. So my
19   view is get wise and talking. So we cannot take order
20   without Swiper from any other customer except ROAM. So
21   except with some strategy with ROAM Data to -- if customer
22   come directly to us, we refer to them, or even if we take
23   the order, we have to pass all the profit back to ROAM. I
24   think this is what he means.
25       MR. TECHENTIN: So I'll mark Exhibit 87.

Page 174

1        (Exhibit 87 was marked for identification
2        and is attached hereto.)
3    BY MR. TECHENTIN:
4        Q. This is an email chain. Starts with a David
5    Szczepanski email. There's a back and forth that leads up
6    to this. But David Szczepanski writes to Alex Choi and
7    says:
8        Dear Alex, thank you for your prompt response.
9        ROAM Data appreciates that this may be a
10       misunderstanding at the BBPOS headquarters
11       level. Nevertheless ROAM Data urgently requires
12       the following assurances from BBPOS."
13   The first one is to confirm that BBPOS "will instruct its
14   US sales force to cease and desist from interfering with
15   ROAM Data's contractual relationship with NAB or any other
16   ROAM Data customers." Right?
17       A. Yes.
18       Q. Did BBPOS do that?
19       A. Yes.
20       Q. The second is:
21       Please confirm that BBPOS will fulfill ROAM
22       Data's orders for the MSRs destined for NAB."
23       Did BBPOS do that?
24       A. Yes.
25       Q. And then:

Page 175

1        Please confirm that BBPOS will respect the
2    exclusivity provisions of the May 4th, 2010
3    "Engineering Development and License Agreement"
4        between ROAM Data and BBPOS and will not sell
5        any MSR devices directly to ROAM customers
6        including NAB."
7        Did BBPOS do that?
8        A. Yes.
9        Q. So BBPOS has never sold a magnetic stripe reader
10   device to NAB since this happened?
11       A. Yes.
12       Q. Has ROAM Data sold -- excuse me. Has BBPOS sold
13   any card readers to NAB since this communication?
14       MS. BOZEMAN: Objection.
15       A. I think we sell a chip card type product to ROAM
16   Data.
17   BY MR. TECHENTIN:
18       Q. To ROAM Data or NAB?
19       A. To NAB.
20       Q. And that's a magnetic stripe reader product?
21       A. That is a EMV card reader.
22       Q. It doesn't read a mag stripe?
23       A. It's EMV card reader. It also has -- it also can
24   read the MSR.
25       Q. So I'll ask that question again: Has BBPOS sold

Page 176

1    any MSR devices to NAB since December 11th, 2015?
2        A. MSR only? No.
3        Q. I'm going to ask the question again. I'll
4    rephrase it slightly. Has BBPOS sold any devices capable
5    of MSR to NAB since December 11th, 2015?
6        A. Yes.
7        MR. TECHENTIN: Exhibit 88 which I'm having
8    marked now.
9        (Exhibit 88 was marked for identification
10       and is attached hereto.)
11   BY MR. TECHENTIN:
12       Q. It is an email from Bob Cook to Alex Choi and
13   Matthew Ng, still part of the same chain. It's a response
14   to the email that we just looked at. Bob Cook says:
15   "These are fair requests from ROAM." Do you agree with
16   that?
17       A. This is ROAM to me?
18       Q. Do you agree that the three items that were in
19   David's email were fair requests that ROAM made of BBPOS?
20       A. Yes.
21       Q. But then there -- Bob Cook says: "Not aware of
22   any NAB agreement we would be interfering with. We did
23   not solicit NAB. They came to us." Is that true?
24       A. Is what Bob said? Yes.
25       Q. The third bullet point is "notify them we are



Page 177

1  not --"
2      Let's back up so it's clear. Bob says: "Ingenico
3  is a competitor and we need to protect our interests." Do
4  you see that?
5      A. Yes.
6      Q. "In a new agreement we should not agree to any
7  exclusivity." Right?
8      A. Yes.
9      Q. And then number 3 of his responses is "notify
10 them --" I think he means Ingenico "-- that we are not
11 approving assignment of the agreement to Ingenico and
12 consider this notification of cancellation." What did he
13 mean there?
14      MS. BOZEMAN: Objection. Objection to
15 identifying "them" as Ingenico.
16      A. I think in 2015 Ingenico acquire ROAM, and as we
17 are doing business with ROAM that means ROAM become
18 Ingenico in 2015 and we are competitor. I think this is
19 what Bob Cook try to say that if our agreement, if there
20 is transfer of ownership to a company with competitive
21 products that we should terminate the exclusivity
22 relationship. I think this is what Bob is trying to say.
23 BY MR. TECHENTIN:
24      Q. But you didn't do that; right?
25      A. I don't know. Maybe, did I or did I do -- I

Page 178

1  don't know. This is his opinion to -- our CEO at that
2  period of time.
3      Q. We agreed at the beginning of today's deposition
4  that nobody's ever terminated the contract between BBPOS
5  and ROAM; right?
6      A. Yeah. Terminated the contract. And in this
7  email Bob said that a new agreement. So maybe he's
8  talking about a new agreement with Ingenico.
9      Q. Bob doesn't say anything in here about --
10      A. He said that. He said "In a new agreement, we
11 should not agree to any exclusivity."
12      Q. Sorry. I'm moving on with a different question.
13 Bob doesn't say anything in this email about what are they
14 talking about? We're selling Chipper. That's not part of
15 the exclusivity. He doesn't say that, does he?
16      A. What's the questions?
17      Q. Bob doesn't make any reference to the fact that
18 what you were trying to sell NAB was Chipper and therefore
19 not part of the exclusivity. Correct?
20      A. Yes.
21      Q. And, in fact, throughout this entire dialogue
22 between Ingenico and BBPOS, and even the interim
23 discussions of BBPOS in these emails, nobody is saying
24 what you're saying today which is, hey, it's Chipper.
25 It's not part of the exclusivities; right?

Page 179

1      A. Yes.
2      MR. TECHENTIN: The last document I'll have you
3  look at in this context is Exhibit 89.
4      (Exhibit 89 was marked for identification
5      and is attached hereto.)
6  BY MR. TECHENTIN:
7      Q. This is from Matthew Ng to Alex Choi and David
8  Szczepanski copying a number of people, including you.
9  And this is the formal agreement by BBPOS that it would
10 cease to interfere with ROAM Data's contractual
11 relationship with NAB; right?
12      A. Yes.
13      Q. And then it says:
14      Our legal department has reviewed the May 4th,
15      2010 "Engineering Development and License
16      Agreement" between ROAM Data and ourselves, (the
17      agreement) and noted the acquisition of RD by
18      Ingenico has triggered the event of RD to a
19      competitor under section 1.2 and the agreement
20      was deemed terminated as a result."
21 So did Matthew Inc. terminate the contract between
22 BBPOS -- between BBPOS and ROAM Data on December 17th,
23 2015.
24      A. I'm not sure.
25      Q. So I understood your testimony earlier today as

Page 180

1  the representative of BBPOS to be clear and unambiguous
2  that the 2010 license agreement remained in effect through
3  today. Was that incorrect?
4      A. Can you repeat your questions?
5      MR. TECHENTIN: Do you mind reading that back,
6  please.
7      (REPORTER READS BACK)
8      MS. BOZEMAN: Objection to the characterization.
9  You can answer.
10      A. No. That we must not terminate.
11 BY MR. TECHENTIN:
12      Q. The agreement is not terminated?
13      A. Correct. The agreement is not terminated.
14      Q. Has BBPOS ever sold to ProPay?
15      A. ProPay. I don't remember that.
16      Q. You don't know one way or the other?
17      A. I don't know.
18      Q. What about iPayment?
19      A. Can you repeat that.
20      Q. iPayment.
21      A. iPayment? I don't remember that.
22      Q. You say you don't remember that.
23      A. I don't remember that.
24      Q. Do you know who they are?
25      A. I don't know who they are.



Page 181

1   Q. You do not know who they are?
2   A. I do not.
3   Q. Are you familiar with Central Payment?
4   A. No.
5   Q. Merchant Warehouse?
6   A. No.
7   Q. Subway?
8   Q. Subway?  The company selling hot dog?  Sandwich?
9   Q. Sure.  Have you sold to them?
10  A. No.
11  Q. TSYS?
12  A. So you're asking whether they're our customer?
13  Q. Yes.
14  A. I'm not sure.
15  Q. Sage?
16  A. Sage.  Not sure.
17  Q. NMA?
18  A. NMA?
19  Q. Yes.
20  A. A for apple?  I'm not sure.
21  Q. NAB we've already talked about.  You've sold to
22  them; yes?
23  A. Yes.
24  Q. Shopify?
25  A. Yes.

Page 182

1   Q. What about Evo?  E-v-o.
2   A. I'm not sure.
3   Q. BlackPod?
4   A. BlackPod?  I'm not sure.
5   Q. Stella & Dot?
6   A. I'm not sure.
7   Q. Silpada?
8   A. I'm not sure.
9   Q. Cynergy?  C-y-n-e-r-g-y.
10  A. I'm not sure.
11  Q. MPC?
12  A. I'm not sure.
13  Q. Vantiv?
14  A. I'm not sure.
15      MR. TECHENTIN:  Let me show you Exhibit 90.  This
16  is an email from Ingenico to you BBPOS dated January 19th
17  of 2017.
18      (Exhibit 90 was marked for identification
19      and is attached hereto.)
20  BY MR. TECHENTIN:
21      Q. Subject line is "letter from REM Holdings 3 LLC
22  relating to headphone jack patents."  Do you remember
23  receiving this letter?
24  A. Yes.
25  Q. This is a demand for indemnification; correct?

Page 183

1   A. Yes.
2      MS. BOZEMAN:  Objection.
3   BY MR. TECHENTIN:
4      Q. Has BBPOS indemnified Ingenico for this claim?
5      A. We requested Ingenico to provide more information
6   but they didn't want more information.
7      Q. What information was required?
8      A. Well, because by that period of time Ingenico
9   already have their own products and our CEO request
10  Ingenico to send more information for our checking like
11  which products and what IPE are in French, but Ingenico
12  did not reply.
13     Q. Have you reached out to the party making a demand
14  to obtain information from them about this?
15     A. Can you repeat your questions?
16     Q. So the demand was made on behalf of REM Holdings
17  3 LLC.  Did you reach out to REM Holdings 3 LLC for the
18  information you needed to evaluate this demand.
19     A. No.  We asked Ingenico to provide what orders and
20  what IP was in French and Ingenico never reply.  For your
21  information, after 2014, I think most of the products sold
22  by ROAM Data are from Ingenico.  They only buy the Circle
23  Swipe and PayPal from us.
24     And ROAM Data, I believe -- I believe after 2014,
25  some of this order may -- some of this product include the

Page 184

1   IP.  But IP maybe steal from us.  So we request ROAM Data
2   to provide more information and what product and what IP
3   they're talking about.  And ROAM Data or Ingenico just
4   does not reply and does not provide further information.
5      MR. TECHENTIN:  I'm going to show you Exhibit 91.
6      (Exhibit 91 was marked for identification
7      and is attached hereto.)
8   BY MR. TECHENTIN:
9      Q. Exhibit 91 is a letter dated February 28th, 2017.
10  So this is the next month.  Did you get this letter as
11  well?
12  A. Yes.
13     Q. This letter writes:  "I write to follow up
14  regarding our January 19th, 2017 letter."  The one we just
15  looked at as Exhibit 90; right?
16  A. Yes.
17  Q. And he says:
18      In that letter we notified you of BBPOS's duty
19      to indemnify and hold harmless ROAM Data
20      pursuant to section 3.18 of their agreement."
21      Right?
22  A. Yes.
23  Q. "And pursuant to the representations and
24      warranties made in section 3.9 and section 3.10
25      in connection with REM's Holdings 3 LLC's



BEN LO 30B6                                          December 10, 2021
ANYWHERE COMMERCE V INGENICO                                   201—204

Page 201
1      Q.  He writes:
2          Discussed with Ingenico head of R&D this morning
3          about the swipe and chip EMV L2 for solution
4          based on Thunder and Ingenico Telium solution."
5   Do you see that?
6      A.  Yes.
7      Q.  Do you know what "Thunder" means?
8      A.  I don't know.
9      Q.  Is that a chip set?
10     A.  I don't know.
11     Q.  He asks:
12         Could you please arrange Daniel and a firmware
13         engineer to travel to France for a two days
14         workshop in Valence during this week."
15  Did that happen?
16     A.  Yes.
17     Q.  You write back and say:
18         Hi Chris, let me arrange Daniel and Derek to fly
19         to Valence."
20         Right?
21     A.  Yes.
22     Q.  And the rest of your email is a discussion of
23  some of the technicalities of the project that you're
24  working on with ROAM; right?
25     A.  With ROAM, yes.

Page 202
1      Q.  And that would include Ingenico's R&D department
2   in Valence; right?
3      A.  Yes.
4      Q.  And that, if you look at the Bates number on the
5   lower right corner, the Bates number on this is BBPOS
6   0000001.  Do you see that?
7      A.  Can you say again?
8      Q.  Right below Exhibit 97 you see -- do you see the
9   exhibit sticker?
10     A.  Yes.
11     Q.  Do you see the Bates number underneath that?
12     A.  Yes.
13     Q.  This is the very first document that BBPOS
14  produced in this case; right?
15     A.  Yes.
16         MR. TECHENTIN:  I'm going to show you Exhibit 98.
17  This is a document from a little earlier, April 26th of
18  2012.  And the top email is from Christopher Rotsaert to
19  you, copies to Jerome Grandemenge and Jimmy Tang.  Subject
20  is "meeting ROAM API Ingenico-BBPOS."
21         (Exhibit 98 was marked for identification
22         and is attached hereto.)
23  BY MR. TECHENTIN:
24     Q.  At the bottom of page 1 of this email again
25  there's a quoted email from Christopher Rotsaert to you,

Page 203
1   April 26th.  To you see that?  At the very bottom it says
2   "Hi Ben"?
3      A.  Yes.
4      Q.  It says:
5          I'd like to introduce you to Jerome who is our
6          Ingenico mobility line software architect
7          manager.  He will be in charge for the MBL and
8          global architecture definition on Ingenico's
9          side."
10  Do you see that?
11     A.  Yes.
12     Q.  So you knew at least as early as April 26th that
13  Jerome was an Ingenico engineer; right?
14     A.  But Christopher is a ROAM -- is introduced to me
15  by Will Graylin is ROAM.  So I still believe that this
16  is -- this is ROAM introduce one of their partner to us
17  who is Ingenico.  So Christopher here I still think that
18  he's from ROAM.
19     Q.  You think Christopher is from ROAM; yes?
20     A.  Yes.
21     Q.  But you know that Jerome is from Ingenico;
22  correct?
23     A.  Yes.
24         MR. TECHENTIN:  And then Exhibit 99.
25         (Exhibit 99 was marked for identification

Page 204
1          and is attached hereto.)
2   BY MR. TECHENTIN:
3      Q.  An email from you to Christopher Rotsaert,
4   March 27th, 2012.  And can you tell me what this email
5   discussion is about?
6      A.  Talk about a -- maybe talk about a Landi solution
7   which is a low-cost solution.
8      Q.  Landi solution for what?
9      A.  For EMV level 2.  So EMV level 2 is one of the
10  EMV standard.
11     Q.  Why were you discussing a Landi solution for EMV
12  level 2 in March of 2012?
13     A.  I think we come up with a product which is maybe
14  expensive, and maybe Christopher said that for Landi can
15  come up with an EMV level 2 solution below $20.  And that
16  they want us to check whether we can come up with an EMV
17  solution at a similar cost.
18     Q.  We talked earlier today about the fact that the
19  hardware that was used by the engineers in France and
20  Ingenico, this Telium product, was more robust and more
21  expensive than the product that BBPOS was developing;
22  right?
23     A.  Yes.
24     Q.  And so is the consideration of Landi here a way
25  to avoid the high cost associated with the French



Page 205

1  solution?

2      MS. BOZEMAN:  Objection.

3      A.  I don't remember that.  Just like -- I don't

4  remember that.

5      MR. TECHENTIN:  Exhibit 100.

6      (Exhibit 100 was marked for identification

7      and is attached hereto.)

8  BY MR. TECHENTIN:

9      Q.  So Exhibit 100 is an email from Christopher

10  Rotsaert to Jimmy Tang.  And the subject line is "TR,"

11  which I think is the French for forwarding "ROAM

12  Data/Google/DUKPT.  We talked about DUKPT was the DUKPT

13  encryption acronym; correct?

14      A.  Yes.

15      Q.  Do you recall what this email exchange was about

16  and I note that you're on some of these emails.  You're

17  not on all of them, but your name does appear starting on

18  page 2.

19      A.  I don't remember.  Maybe this is about

20  explanation of the DUKPT method.  Maybe it explain our

21  DUKPT method.

22      Q.  So you -- on page 2, Jimmy Tang had explained to

23  Jerome, and he's the Ingenico engineer in France:

24      The DUKPT key management is the exact

25      implementation of the ANSI X9.24-1:2009

Page 206

1      standard.  We are using the PIN key variant as

2      the key for track data encryption."

3      Is that information trade secret?

4      A.  So you're talking about the Ingenico engineer?

5      Q.  No.  I'm asking:  The part that I just read that

6  Jimmy tells Jerome, is that trade secret?

7      A.  Yes.  Because we're using the PIN key log in as

8  the key for track data.  So people don't use that in this

9  way.  This is a trade secret, and this secret we sent to

10  ROAM Data.  And also suggested to protected by the 6.3.

11  6.3 of the ROAM agreement.

12      Q.  And then Jerome's response to Jimmy is:

13      Thanks Jimmy.  On Telium we limit the use of PIN

14      key variant to PIN encryption and only allow

15      data encryption to use data key variant.  So we

16      will need to tweak our implementation to support

17      format 10 encryption."

18  Did you think that that was a trade secret you were

19  getting from Ingenico?

20      A.  I think this is Ingenico engineer after we

21  disclose a trade secret to Ingenico, Ingenico engineer

22  respond to Jimmy that they need tweak their implementation

23  to support use the PIN key for data encryption.

24      So Ingenico has to change the way they use to

25  implement this output.  Because we -- I think in the phone

Page 207

1  call we may tell them why we want to do that.  So I think

2  in this email Ingenico engineer just agree to tweak the

3  implementation.

4      MR. TECHENTIN:  I'd like to switch gears here for

5  a little bit and talk about damages in this case.  BBPOS

6  is seeking damages; yes?

7      A.  Yes.

8      Q.  And what form do its -- what are its damages?

9      A.  For every product with our IP or trade secret, we

10  should entitled some of the money of the product.

11      Q.  And?

12      A.  And Ingenico used some of our stolen trade

13  secrets to come up with a product.  So we believe that we

14  should be entitled some of the profit from the product

15  with IP stolen from us.

16      Q.  Does that include the RP350x?

17      A.  Yes.

18      Q.  Does it include the RP450x?

19      A.  I leave that to the IP expert to determine that.

20      Q.  What about the RP457c?

21      A.  I also leave to the IP expert.

22      Q.  What about the RP750x?

23      A.  I also leave to the IP expert.

24      Q.  RP755x?

25      A.  I also leave to IP expert.

Page 208

1      Q.  RP757c?

2      A.  I also leave that to IP expert.

3      Q.  ISMP?

4      A.  I also leave that to IP expert.

5      Q.  What about the G4X?

6      A.  G4X is a product we provide.  We sold to ROAM

7  Data.

8      Q.  That doesn't incorporate any stolen trade

9  secrets, does it?

10      A.  No.  This is the product we made and we sold to

11  ROAM Data.

12      Q.  Is that the same for the G5X?

13      A.  Yes.

14      Q.  So you said that you think that as damages BBPOS

15  is entitled to some of the money associated with the sales

16  of whichever of those Ingenico products your IP expert

17  might identify as a problem; right?

18      A.  Yes.

19      Q.  Do you -- does BBPOS have a position with respect

20  to how much of the money associated with the sales it

21  should get as damages?

22      A.  Well, I don't have the detail.  I don't have

23  detail yet.

24      Q.  Okay.  Well, tell me what you do know.

25      A.  What's the question?

