### Page 1

```
 1            UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
 4
 5
    ANYWHERECOMMERCE, INC. and
 6  BBPOS LIMITED
 7       VS.              C.A. No. 1:19-cv-11457-IT
 8  INGENICO, INC., INGENICO
    CORP., INGENICO GROUP, SA,
 9  and INGENICO VENTURES SAS
10
11
12
13
14
15      VIDEOTAPED WEB CONFERENCE DEPOSITION OF
16                       BEN LO
17
18               December 8, 2021
19                  12:30 p.m.
20
21
22
23           Denise A. Webb, CSR, RPR
24
25
```

### Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3
 4  COUNSEL FOR THE PLAINTIFFS:
    LAW OFFICES OF KUTAK ROCK, LLP
 5  1801 CALIFORNIA STREET, SUITE 3000
    DENVER, COLORADO  80202
 6  BY:  OLIVER D. GRIFFIN, ESQUIRE
    BY:  MELISSA A. BOZEMAN, ESQUIRE
 7  oliver.griffin@kutakrock.com
    melissa.bozeman@kutakrock.com
 8
    COUNSEL FOR THE DEFENDANTS:
 9  LAW OFFICES OF ADLER, POLLOCK & SHEEHAN
    ONE CITIZENS PLAZA, 8TH FLOOR
10  PROVIDENCE, RHODE ISLAND  02903
    BY:   JEFFREY K. TECHENTIN, ESQUIRE
11  jtechentin@apslaw.com
12
13  ALSO PRESENT:  HEIDI STUART, VIDEOGRAPHER
```

### Page 3

```
 1                   I N D E X
 2
 3
 4  WITNESS:                              PAGE
 5  BEN LO
 6     EXAMINATION BY MR. TECHENTIN . . . . . . . .7
 7
 8
 9
10              E X H I B I T S
11
12  NO.        DESCRIPTION: DEFENDANT'S      PAGE
13  Exhibit 1   First Amended Complaint . . . . . .235
                (65pp)
14
    Exhibit 37  PCI Security Standards . . . . . . .235
15              Council  (17pp)
16  Exhibit 38  Third Amended . . . . . . . . . . .235
                Objections and Answers
17              (15pp)
18  Exhibit 39  History of Invention  . . . . . . .235
                (3pp)
19
    Exhibit 40  E-mail string  (3pp) . . . . . . . .235
20
    Exhibit 41  E-mail dated 7/23/12   . . . . . . .235
21              (2pp)
22  Exhibit 42  E-mail dated 2/16/12   . . . . . . .235
                (1p)
23
    Exhibit 43  E-mail string  (2pp) . . . . . . . .235
24
25
```

### Page 4

```
 1  INDEX PAGE CONTINUED:
 2
 3  NO.        DESCRIPTION: DEFENDANT'S      PAGE
 4  Exhibit 44  E-mail dated 8/4/10  . . . . . . . .235
                (1p)
 5
    Exhibit 45  E-mail string  (2pp) . . . . . . . .235
 6
    Exhibit 46  E-mail string  (6pp) . . . . . . . .235
 7
    Exhibit 47  E-mail dated 2/2/12  . . . . . . . .235
 8              (4pp)
 9  Exhibit 48  E-mail string  (2pp) . . . . . . . .235
10  Exhibit 49  E-mail dated 6/5/12  . . . . . . . .235
                (2pp)
11
    Exhibit 50  E-mail string  (4pp) . . . . . . . .235
12
    Exhibit 51  E-mail string  (6pp) . . . . . . . .235
13
    Exhibit 52  E-mail dated 6/13/12   . . . . . . .235
14              (1p)
15  Exhibit 53  Correspondence dated . . . . . . . .235
                6/15/12  (1p)
```



Page 109
1  Q. Sure. So in interrogatory number one, you
2     identified all the confidential and trade secret
3     information, and I'm asking, does BBPOS maintain
4     the confidentiality of that information by
5     burning off one of the fuses of the
6     microprocessor chips?
7     A. No. This is one of the ways to protect some
8     of the trade secret. But, of course, it can't
9     protect all of the trade secret. It's just one
10    of the ways.
11 Q. What about password protection? Does BBPOS
12    password protect all of the information contained
13    in response to interrogatory number one?
14    A. Not all but some.
15 Q. The next notation is "Nondisclosure." What does
16    that mean.
17    A. Nondisclosure agreement.
18 Q. That's -- just to orient you, it says,
19    "Nondisclosure," and then it says, "Entry into
20    nondisclosure agreement." So what do you mean by
21    nondisclosure?
22    A. Well, we enter into a nondisclosure
23    agreement, so nondisclosure is the same as the
24    nondisclosure agreement.
25 Q. Is it BBPOS's contention that the information

Page 110
1     that's set forth in response to interrogatory
2     number one, as well as anything that you told me
3     earlier on was a trade secret, that that
4     information has never been shared with a third
5     party except under an NDA?
6     A. That's correct.
7  Q. And then it ends by saying, "and generally
8     through best business practices of industrial
9     design." Do you know what that means?
10    A. I think (inaudible) share the trade secret.
11    So we share the standard NDA.
12 Q. Do you know what's referred to by best business
13    practices of industrial design?
14    A. I don't know.
15 Q. So I'd like to ask you -- let me just ask it this
16    way. How did the defendants get ahold of this
17    trade secret information?
18    A. The defendant is ROAM Data, or are you
19    talking about Ingenico?
20 Q. I'm not trying to limit -- you've alleged trade
21    secret misappropriation by the defendants. And
22    my question is, how did the defendants
23    misappropriate this information?
24    A. Well, I was told that ROAM Data transfer our
25    trade secret to the defendants.

Page 111
1  Q. Who told you that?
2     A. Well, Will Graylin told me that.
3  Q. When did Will Graylin tell you that?
4     A. Can you repeat the question?
5  Q. When did Will Graylin tell you that?
6     A. Well, he told me that in 2012.
7  Q. Did Will Graylin tell you specifically that ROAM
8     Data had communicated information to Ingenico,
9     Inc.?
10    A. No. He just said that -- he just told me
11    that he -- Ingenico steal our IP.
12 Q. So you don't know -- there's three defendants
13    here, right? There's Ingenico, Inc., Ingenico
14    Corporation -- there's four, I guess -- Ingenico
15    Group SA, and Ingenico Ventures SAS. You're
16    familiar with that?
17    A. Well, I treat them all Ingenico.
18 Q. All right. So that probably answers my question.
19    Will Graylin didn't say -- didn't differentiate
20    between the different Ingenico entities when he
21    said whatever he said about the trade secrets,
22    right?
23    A. Yes.
24 Q. Did Will Graylin tell you which IP had been sent
25    by ROAM to Ingenico?

Page 112
1     A. No. There was no detail.
2  Q. Did you ask him?
3     A. I ask him, but he didn't give me any detail.
4  Q. So how do you know now -- as you've set forth in
5     your response to these interrogatories, how do
6     you know that this information was
7     misappropriated by the defendants?
8     A. We saw the defendant has a similar product in
9     a trade show in 2014. Then remind me what Will
10    Graylin told me before. But at that period of
11    time, I believe that the defendant steal my IP.
12 Q. So in 2012, Will Graylin told you that ROAM Data
13    had transferred your IP to Ingenico, right?
14    A. Yes.
15 Q. And what did you do in response to that
16    information?
17    A. Well, when Will Graylin call me, he deliver
18    me to message. One message was he was fired by
19    ROAM Data. So he say (inaudible) angry. And at
20    the same time, he said that ROAM Data steal your
21    IP. So he told me this is one of the reasons why
22    he was fired. So I was -- I did nothing. I was
23    quite skeptical about that.
24 Q. What was one of the reasons he was fired?
25    A. He said that he has a different opinion with



Page 113
1   some of the -- with the owner of the -- with the
2   top member of the ROAM Data.  He has a different
3   opinion with them.
4   Q.  He has a different opinion with a board member of
5     ROAM Data?
6   A.  Yes.
7   Q.  About what?
8   A.  About a transfer of BBPOS trade secret to
9     Ingenico.
10  Q.  So what was the difference of opinion?
11  A.  He does not agree to transfer, you know,
12    and -- so he don't agree to transfer.
13  Q.  So Will Graylin told you that he was fired by
14    ROAM Data because ROAM Data was going to transfer
15    information to Ingenico, and he disagreed with
16    that; is that -- do I understand you correctly?
17  A.  Well, he just -- no.  He just said that he
18    has different opinion.  Just different opinion.
19  Q.  But a different opinion about whether to transfer
20    IP to Ingenico, right?
21  A.  Yes.
22  Q.  Anything else?
23  A.  No.
24  Q.  Did you believe him when he called you?
25  A.  I don't believe him.

Page 114
1   Q.  You didn't believe him that he had been fired?
2   A.  Yeah.  Of course he was fired at ROAM Data.
3     ROAM Data is one of our biggest customer.  So it
4     seemed to me that he tried to arrange to destroy
5     everything.  So I don't believe him.
6   Q.  So did you believe him that he had been fired?
7   A.  Well, I believe he had been fired.  He was
8     fired.  He was quite angry.
9   Q.  And why do you think he was fired?
10  A.  He told me that.  He told me that he was
11    fired.  And after that -- after that, I no
12    longer -- the contact (inaudible).  My contact
13    with ROAM Data is no longer Will Graylin.
14  Q.  Your contact point is no longer Will Graylin?
15  A.  Yes.
16  Q.  Who became your contact point?
17  A.  If I remember correctly, (inaudible) CEO,
18    Copeal (phonetic).  Bill.  Yeah.  It's bill.  I
19    miss -- the last name is Backwan (phonetic).  I
20    just know the first name is Bill.
21  Q.  So when Will calls you and says, they're stealing
22    your IP, you didn't believe him?
23  A.  I don't believe him.
24  Q.  Did you do anything to verify that?
25  A.  No, I didn't do anything to verify that.

Page 115
1   Q.  Did you have any reason to think that information
2     was actually making its way to Ingenico.
3   A.  No.
4         THE WITNESS:  Can I have a break?  I
5     have a (inaudible).
6         MR. TECHENTIN:  If you can just answer
7     the question that's pending.  We can take a break
8     right after that.
9         THE WITNESS:  What was the question?
10        MR. TECHENTIN:  Could read it back,
11    please?
12        (PENDING QUESTION READ)
13  A.  No.
14        MR. TECHENTIN:  How long do you want to
15    break for?
16        MR. GRIFFIN:  I think that's a bathroom
17    issue.  Why don't we take five minutes.
18        MR. TECHENTIN:  All right.  That's
19    fine.
20        THE VIDEOGRAPHER:  This marks the end
21    of media unit four.  The time is 1:36 p.m.  We
22    are off the record.
23        (OFF THE RECORD)
24        THE VIDEOGRAPHER:  This marks the
25    beginning of media unit five.  The time is

Page 116
1     1:42 p.m.  We are on the record.
2   Q.  So, Mr. Lo, how was it that ROAM Data obtained
3     the trade secret and confidential information
4     that's set forth in Exhibit 1 and that you've
5     described today in your testimony?
6   A.  Once upon a time, ROAM Data would like to
7     acquire our company.  So we signed (inaudible).
8     And then ROAM Data start the (inaudible) process.
9     This is the period of time that we transfer all
10    of these trade secrets to ROAM Data.
11  Q.  And that's -- so if I understand you correctly,
12    you're saying that at some point ROAM Data made
13    overtures about acquiring BBPOS; is that right?
14  A.  Yes.
15  Q.  And there was an agreement signed to explore
16    those talks?
17  A.  Yes.
18  Q.  And it was during that period of time that you
19    say that BBPOS sent all of this information to
20    ROAM Data?
21  A.  Yes.
22  Q.  And was that in response to a request from ROAM
23    Data?
24  A.  Yes.
25  Q.  Was that request in writing?



Page 173
1   including designs and trade secrets from ROAM's
2   exclusive vendor BBPOS Limited without any
3   commercial agreement in place between ROAM and
4   Ingenico."  Do you see that?
5      A.  Yes.
6   Q.  Then it says, "In July 2012, Rotsaert organized a
7   multiday visit with Ingenico engineering
8   personnel to interview BBPOS personnel on design
9   and trade secrets on the products BBPOS was
10  making for ROAM."  Do you see that?
11     A.  Yes.
12  Q.  Is that accurate?
13     A.  I don't know.
14  Q.  It says, "The documents requested by Rotsaert
15  included schematics, data output format files,
16  design files and even source code."  Is that
17  accurate?
18     A.  Well, I don't know.  This is -- you said this
19  is according court filing.  I don't know whether
20  this is (inaudible) or not.
21  Q.  So if this court filing is correct, the meeting
22  that you described in which confidential and
23  trade secret information was disclosed to ROAM
24  Data occurred in July 2012, correct?
25     A.  I don't know.

Page 174
1   Q.  But this court filing that you quote in your
2   complaint says July 2012 is the date of the
3   meeting, right?
4      A.  Yes.
5   Q.  And the materials that are described in this
6   paragraph as having been disclosed, those are the
7   things that you're complaining about in this case
8   as your trade secrets, right?
9      A.  Yes.
10  Q.  So if the court filing is correct in its timing,
11  the disclosures that were made in person in Hong
12  Kong took place in July of 2012, right?
13     A.  Well, this is -- but this is -- this is the
14  court filing.  And then if I go back to -- so you
15  ask me when Will Graylin told me he was sue
16  Ingenico.  So I don't know whether this is true
17  or not true.  And this is court filing by Will
18  Graylin, so I don't know whether what he says is
19  true or not true.  I just don't know.
20  Q.  He also makes reference to the fact that the
21  multiday visit which was with Ingenico
22  engineering personnel.  Do you see that?
23     A.  I see that.
24  Q.  Do you have any reason to believe that
25  Mr. Graylin is wrong about who it was that

Page 175
1   visited at BBPOS in July of 2012?
2      A.  Depending on which time period.  What you're
3   talking about at (inaudible) Will Graylin told me
4   that in 2012, then I think that he was angry, so,
5   I don't know.
6   Q.  Then it says, Further -- it says, "All files
7   except for source code were turned over to
8   Rotsaert."  Is that true, that you gave Rotsaert
9   all the information he was looking for except
10  source code?
11     A.  I don't remember that.  I'm not sure.
12  Q.  If then says, "Further detailed interviews were
13  conducted by Rotsaert and Ingenico engineers to
14  deduce the trade secrets used in the making of
15  ROAM's products by BBPOS."  Is that true?
16     A.  Can you repeat your question?
17  Q.  Is it true that after the meeting in Hong Kong
18  where you say trade secrets were disclosed, that
19  Rotsaert and Ingenico engineers conducted further
20  detailed interviews to deduce the trade secrets
21  used in the making of ROAM's products by BBPOS?
22     A.  I'm not sure, but I think so.
23  Q.  And did BBPOS provide answers in response to
24  those interview questions?
25     A.  I think so.

Page 176
1   Q.  So, in the summer of 2012, because Will Graylin
2   was angry, you didn't think that you needed to
3   worry about these trade secrets being misused; is
4   that your testimony?
5           MR. GRIFFIN:  Objection.  Asked and
6   answered.
7      A.  Yes.
8   Q.  And I think your testimony earlier today was that
9   you didn't concern yourself with this issue until
10  some time later when you saw a competitive
11  product at a trade show; is that right?
12     A.  Yes.
13  Q.  And I think you identified that as being in 2014?
14     A.  Yes.
15  Q.  Do you recall when in 2014 that trade show
16  occurred?
17     A.  I think the trade show was CARTES in France,
18  so it's (inaudible) in 2014.
19  Q.  It's what Q4?
20     A.  Fourth quarter, October -- October, November.
21  But I don't remember the exact date.
22  Q.  But you recall that it was the CARTES show,
23  C-A-R-T-E-S, in Paris during Q4 2014?
24     A.  Yes.
25  Q.  And tell me what you saw.



Page 177
1   A. I saw -- I saw a product which is similar to
2      Chipper in an Ingenico booth, and that this is
3      the period of time that I start to worry.
4   Q. So Ingenico has a booth at this trade show, yes?
5   A. Yes.
6   Q. And you visited the booth, correct?
7   A. Yes.
8   Q. And you saw -- what did you see that caused you
9      to worry?
10  A. I saw a device which is similar to Chipper.
11     Then I start to worry about my business with ROAM
12     Data.
13  Q. All right. And Chipper -- we talked about this
14     before. Chipper does ENV and magstripe, yes?
15  A. Yes.
16  Q. And in 2014, the Chipper had an audio jack; is
17     that right?
18  A. Yes.
19  Q. Did the product that you see have an audio jack?
20  A. Yes.
21  Q. What other aspects of it made you think it looked
22     like Chipper?
23  A. Well, it look like Chipper with audio jack
24     and magstripe and EMD card.
25  Q. Magstripe and EMD card?

Page 178
1   A. Yes.
2   Q. So where it's -- was it similar looking or
3      similar in function or both?
4   A. Both. Similar in service and looking.
5   Q. In what way was it same looking to Chipper?
6   A. We try to promote the Chipper to ROAM Data
7      from 2012, 2013, 2014, and we also sell some
8      product to ROAM Data. And then in 2014, when I
9      see Ingenico has similar product, which looks
10     similar, that is the form factor, the shape is
11     quite similar, then I start to worry.
12  Q. So the form factor was quite similar?
13  A. Yes.
14  Q. Other than size, what other aspects -- strike
15     that. Was the size similar?
16  A. Yes.
17  Q. What, other than size, was similar in terms of
18     the form factor?
19  A. The shape -- the shape and size.
20  Q. Anything else?
21  A. No.
22  Q. I think you also mentioned, was this prototype
23     EMV capable?
24  A. Yes.
25  Q. How do you know that?

Page 179
1   A. Because he has opening. So he has opening
2      for little insert the EMD card.
3   Q. And could it read a magstripe?
4   A. No. The magstripe you have to swipe it.
5   Q. So the prototype you saw could not read a
6      magstripe?
7   A. It could read a magstripe. The first time I
8      saw it, if I remember, is with a magstripe as
9      well as the chip card (phonetic).
10  Q. So it was EMV and magstripe?
11  A. Yes.
12  Q. And other than seeing the slot into which you
13     would insert a card for EMV transactions, how do
14     you know that the prototype was capable of EMV
15     card reading?
16  A. I didn't know. I just see something that
17     made me feel worried.
18  Q. Did you use the prototype?
19  A. I didn't.
20  Q. You did not?
21  A. I did not.
22  Q. Did you talk to anyone about the prototype?
23  A. No. When I see the prototype, I also
24     communicate with Michael Kron of
25     AnywhereCommerce, and then I also try to ask

Page 180
1      him -- because Ingenico will treat me as a
2      competitor, so I talk to Michael Kron, and ask me
3      to go check and see whether he can collect more
4      information for me.
5   Q. So -- okay. So you saw this product and said,
6      this looks like Chipper, and you didn't talk to
7      anybody at the booth; is that right?
8   A. I didn't talk -- I talked to Michael Kron,
9      and also some of my staff in the booth.
10  Q. So you were accompanied by other people?
11  A. No. AnywhereCommerce also has a booth in
12     (inaudible), so I go to talk to Michael Kron and
13     then ask him to collect more information.
14  Q. And for the court reporter's benefit, Michael
15     Kron is K-R-O-N, yes?
16  A. Yeah. K-R-O-N.
17  Q. All right. So -- and I'm just trying to get this
18     sort of step by step here. So you're at the
19     Ingenico booth. You see the prototype. Do you
20     talk to anyone while you're there at the
21     prototype?
22  A. No.
23  Q. Are you alone there?
24  A. Yes.
25  Q. I assume there are Ingenico people and other



Page 181
1   people around there, but you're not there with
2   anyone else from BBPOS?
3   A.  That's what -- there's so many people in the
4   (inaudible).  I'm alone.  I'm just myself go to
5   the booth.
6   Q.  Did you take any pictures?
7   A.  No.
8   Q.  Did you handle the prototype?
9   A.  What do you mean by "handle"?
10  Q.  Did you touch it?
11  A.  No.  I just saw it.
12  Q.  Did you see a demonstration of it?
13  A.  No.
14  Q.  How long did you stay at the booth?
15  A.  I don't remember that.
16  Q.  Short time?
17  A.  Short time, yes.
18  Q.  And after you left the booth, did you go to the
19  AnywhereCommerce booth?
20  A.  Yes.
21  Q.  And you talked to Michael Kron?
22  A.  Yes.
23  Q.  And you asked him if he could find out more about
24  this --
25  A.  Yes.

Page 182
1   Q.  -- prototype, yes?
2   A.  Yes.
3   Q.  Did you say anything else to him?
4   A.  No.
5   Q.  Did you tell him about the prototype you just
6   saw?
7   A.  Yeah.  I told Michael that Ingenico has a
8   product which competes with our Chipper.  It
9   looks similar to our Chipper.  And I asked
10  Michael to go to Ingenico booth to find out more
11  information.
12  Q.  Did he do that?
13  A.  I think so.
14  Q.  Did he tell you anything about that?
15  A.  It's the same.  It's almost the same as our
16  product.
17  Q.  Michael Kron told you that the prototype at the
18  Ingenico booth was almost the same as the
19  Chipper?
20  A.  Yes.
21  Q.  And did he explain what he meant by that?
22  A.  No.
23  Q.  Do you know if Michael Kron saw a demonstration
24  of the product?
25  A.  I don't know.

Page 183
1   Q.  Do you know if Michael Kron used the product?
2   A.  I don't know.
3   Q.  Do you know if he even touched it?
4   A.  I don't know.
5   Q.  Do you know if he was able to determine any
6   information about that prototype that you hadn't
7   seen?
8   A.  I don't know.
9   Q.  So what did you do after you and Michael had each
10  seen this prototype?
11  A.  What did I do?  What can I do?  I do nothing.
12  Q.  Well, you said you were worried, right?
13  A.  I was -- can you repeat?
14  Q.  You were worried?
15  A.  Yeah, I was worried.  Except worried, what
16  can I do?
17  Q.  Why were you worried?
18  A.  Because ROAM Data is buying the product from
19  us, and then Ingenico has similar product.  So I
20  start to worry that, you know, ROAM Data may be
21  forced to buy the product from Ingenico.  And it
22  also remind me about what Will Graylin said in
23  2012.  Because if Ingenico has a product which
24  function same as the Chipper, like (inaudible)
25  like the Chipper, then ROAM Data can simply sell

Page 184
1   Ingenico product to their customers instead of
2   buying from BBPOS.
3   Q.  So if I understood you correctly, you were
4   worried for two reasons.  One is that if Ingenico
5   had its own version of a product that would
6   compete directly with Chipper, ROAM Data might
7   prefer to do business with Ingenico rather than
8   BBPOS, right?
9   A.  Yes.
10  Q.  And you would agree with me that that's a
11  competitive business concern, yes?
12  A.  Yes.
13  Q.  And there's nothing inherently wrong with
14  Ingenico coming out with a product that would
15  compete with your Chipper product, right?
16  A.  Yes.
17  Q.  They were free to compete on that technology,
18  right?
19  A.  Yeah.  They are free to compete.
20  Q.  But you had another worry, a separate worry,
21  which was, that you remembered what Will Graylin
22  had said, and you questioned whether this
23  prototype was made using BBPOS trade secrets?
24  A.  Yes.
25  Q.  What made you think that that prototype might



Page 185

1  utilize BBPOS trade secrets?
2  A.  Well, when I see the product, it just make me
3     recall what Will Graylin said.
4  Q.  Was there anything about the product in
5     particular that made you think that it might be
6     built using BBPOS IT?
7  A.  Yes.  Because Ingenico is not the type of
8     company who deals mobile POS sales.  Ingenico is
9     the biggest transitional POS terminal
10    manufacturer in the world.  So they're using
11    transitional POS.  And all of a sudden, they have
12    this Chipper like product.  So I start to worry,
13    worry.  How come Ingenico come up with this type
14    of product?  This is not their main business?
15 Q.  You say "all of a sudden."  Did you have some
16    idea as to how long it took Ingenico to develop
17    that product?
18 A.  I have no idea.
19 Q.  So why did you say all of a sudden, they have the
20    product?
21 A.  Well, because ROAM Data kept buying the
22    product from us.  Since Will Graylin told me he
23    was no longer with ROAM Data, he was fired by
24    ROAM Data, and then -- you know, he was fired by
25    ROAM Data.  I'm still selling product to ROAM

Page 186

1  Data in 2012, 2013, even 2014.  So ROAM Data just
2  keep buying product from us.
3     So when I saw the product in Ingenico booth,
4  that's why I feel that it's weird.  That's why I
5  said all of a sudden, Ingenico has an impulse to
6  compete with us.
7  Q.  And just to complete a point you just made,
8     Ingenico or ROAM, or however you want to think
9     about them, continued to buy product from you
10    until 2018, right?
11 A.  Can you repeat your question?
12 Q.  Yeah.  Sure.  Ingenico -- you had said that ROAM
13    Data was still buying your products in 2013 and
14    2014, but they were also buying your products in
15    2015, 2016, 2017 and 2018, right?
16 A.  Yes.
17 Q.  So now that you have this worry after you've been
18    to the booth and you've seen this product and you
19    talked with Michael Kron and you have a worry
20    that maybe Will Graylin was right, what did you
21    do to investigate whether there was a problem
22    here with your -- with respect to your trade
23    secrets?
24 A.  What can I do?  I didn't do -- I don't do
25    anything.

Page 187

1  Q.  So did you ever see a product -- strike that.
2     Was that prototype that you saw at the CARTES
3     trade show in 2014 released as a product?
4  A.  Can you repeat your question?
5  Q.  The device you saw at the trade show was a
6     prototype, correct?
7  A.  I think so.
8  Q.  Was that ever turned into a commercial product?
9  A.  I think so.  I think so.
10 Q.  Why do you say "I think so"?
11 A.  Because in 2014 -- originally, I try to sell
12    my Chipper to ROAM Data, and, also, we are trying
13    to work together to sell the product to pay
14    (inaudible).  And, eventually, PayPal use
15    Ingenico devices, not us.  So I believe that
16    their product has been commercialized and already
17    sold -- already sold in the market.
18 Q.  If you knew -- you're familiar with your Swiper
19    SDK, yes?
20 A.  Yes.
21 Q.  Does that Swiper SDK allow for the -- allow for
22    the processing of an EMV transaction?
23 A.  No.
24 Q.  You can't -- if you're running the Swiper SDK on
25    an mPOS device, you can't actually perform an EMV

Page 188

1  transaction, correct?
2  A.  Correct.
3  Q.  Do you have any basis to think that Ingenico or
4     any of the defendants have ever misused any BBPOS
5     SDK?
6  A.  Can you repeat the question?
7  Q.  Do you have any reason to believe that any of the
8     defendants have ever misused a BBPOS SDK?
9  A.  You said defendants.  You mean Ingenico?
10 Q.  Yes.
11 A.  I think so.
12 Q.  How?
13 A.  Yeah.  Because they -- because the product --
14    they communicate with the -- because ROAM Data
15    sell the product to PayPal, and the PayPal using
16    our audit, the Swiper.  And then as we do the
17    Mastercard transaction, and the next generation
18    of the product is a Chipper, one Chipper also has
19    the Mastercard functions.  So to make sure that
20    is comparable, so one of the function is to make
21    sure that the Mastercard is -- the Mastercard is
22    the same.  The Mastercard is the same.
23 Q.  I'm not understanding what you're saying the
24    defendants did wrong.
25       MR. GRIFFIN:  What is the question?



Page 193

1   A. I haven't done anything yet.
2   Q. And then when you lost the business to PayPal,
3     did you do anything to figure out if Ingenico's
4     product utilized your trade secrets?
5   A. No. I don't have energy to do that.
6   Q. You don't have energy?
7   A. Yeah. Because by that period of time, I just
8     need to focus on the business. When ROAM Data,
9     they don't buy the product, the new order from
10    us, we are losing money. So I don't have enough
11    time or resources to do the investigation.
12  Q. So when you lost the business to PayPal, did that
13    increase your concern about the trade secret
14    issue?
15  A. Yes.
16  Q. At that point, did you think that the trade
17    secrets had been stolen and misused?
18  A. Yes.
19  Q. And what year is that?
20  A. Repeat.
21  Q. What year?
22  A. It's 2014, 2015.
23  Q. Is that before or after you see the prototype at
24    the trade show?
25  A. After.

Page 194

1   Q. And we said before, that's the end of 2014, so
2     does that -- does that orient you to the time
3     when you would have lost the PayPal business to
4     Ingenico?
5   A. Yeah. We lost the business -- we lost the
6     business of PayPal to Ingenico in 2015.
7   Q. And at that point, you think your trade secrets
8     had been violated, but you didn't terminate the
9     contract you had with ROAM Data, right?
10  A. Correct.
11  Q. And, in fact, even in 2016 and 2017 and 2018, you
12    never terminated that contract, right?
13  A. I still got some business from ROAM Data, so
14    I don't terminate the contract.
15  Q. Even though you thought they had stolen your
16    trade secrets and they were competing with you
17    using devices that unlawfully used those trade
18    secrets, right?
19  A. Yes. I still need their revenue.
20  Q. So have you ever performed any analysis of the
21    RP350X or any other Ingenico product to determine
22    how, if at all, it utilizes any of the
23    information that you've identified as trade
24    secret?
25  A. No. And --

Page 195

1   Q. Go ahead.
2   A. No. I didn't do that by myself, but I had
3     hired IP expert. They confirm -- they confirm
4     that.
5   Q. Who did you hire?
6   A. I hire IP expert. They confirm that the
7     Ingenico device is quite similar and misuse of
8     our trade secret.
9   Q. So who is this expert?
10  A. IP -- external IP expert.
11  Q. Who is it?
12  A. I think his name is Daniel.
13  Q. Daniel?
14  A. Yeah.
15  Q. Does Daniel have a last name?
16  A. Yes. I don't know.
17  Q. Does Daniel have a company?
18  A. I'm sorry. I think our Daniel -- our Daniel
19    assist the IP expert called Ivan to do the
20    analysis. Daniel is our Daniel. Daniel Tsaia is
21    our hardware Daniel, and I think the IP expert is
22    called Ivan.
23  Q. Ivan, I-V-A-N?
24  A. Yes.
25  Q. And does Ivan have a last name?

Page 196

1   A. I don't know.
2   Q. Does Ivan have a company?
3   A. I just communicate with him via e-mail, so I
4     don't remember the company name.
5   Q. When did you first start talking to Ivan?
6   A. It's not myself that talk to Ivan. It's
7     Daniel. So that's why I miss that. It's our
8     Daniel talk to Ivan.
9   Q. Did Ivan and Daniel copy you on their e-mail
10    correspondence?
11  A. No.
12  Q. So when did anybody from BBPOS first start
13    talking with Ivan?
14  A. 2018.
15  Q. Do you know where in the world Ivan is situated?
16  A. He's in United States.
17  Q. Do you know where?
18  A. I don't know. I just communicate with him --
19    Daniel communicate with him via e-mail. So I do
20    not care where he is in U.S.
21  Q. And what did you provide to Ivan so that he could
22    perform his analysis?
23  A. I provide our (inaudible) schematic, our
24    source code. So -- and I just have Daniel to
25    provide as much detail as possible to Ivan to do

