

Deposition of:
# William Graylin

*August 31, 2021*

In the Matter of:

# Anywhere Commerce Inc., Et Al. Vs. Ingenico Inc., Et Al.

Veritext Legal Solutions
888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

Page 34

1  A   Correct.
2  Q   Later on in this paragraph, it says, "When
3      confronted by Graylin on August 29, 2012, to
4      stop transferring IP to Ingenico and to
5      catalog information Rotsaert obtained,
6      Rotsaert forwarded the files he obtained and
7      admitted" that -- "the quote, 'The most
8      interesting document is the schematics.'" Do
9      you have a recollection of that?
10 A   Yeah, I remember. Yeah.
11 Q   Does the paragraph accurately reflect your
12     recollection?
13 A   It accurately reflected what I remembered.
14 Q   What do you recall you understood him to
15     mean, your understanding, when he said or
16     wrote to you, "The most interesting documents
17     are the schematics"?
18     MR. WRAY: Objection, vague.
19     Compound.
20 A   He just meant that he was -- he had access to
21     -- at least seen it and then, you know, he
22     found that to be the most interesting.
23 Q   What were the schematics?
24 A   Schematics are basically diagrams for -- for

Page 35

1      how you lay out a circuit board and, you
2      know, design a circuit board.
3  Q   Okay. And a circuit board for what?
4  A   For the BBPOS products.
5  Q   Did BBPOS also play a role in helping ROAM to
6      design your reader products?
7  A   We collaborated with them on what we needed
8      for our market and then they did the work in
9      building the hardware.
10 Q   Okay. In building the hardware, were they
11     integrating both their own patents and
12     intellectual property and anything that
13     belonged to ROAM?
14     MR. WRAY: Objection, vague.
15     THE WITNESS: Say that again.
16 Q   Was BBPOS using its own intellectual property
17     when it was building the new readers?
18 A   Yeah, it would -- I mean, they're the --
19     they're the manufacturer and the engineering
20     firm that designed the product. We provided
21     our requirement, but they ended up designing
22     the product and manufacturing for us.
23 Q   So in Paragraph 49 when it says, "Other ROAM
24     intellectual property transferred to Ingenico

Page 36

1      and Rotsaert included industrial design files
2      from ROAM's new reader products," was that
3      intellectual property that belonged to BBPOS?
4      MR. WRAY: Objection, lack of
5      foundation.
6  A   Yeah, that says it's ROAM intellectual
7      property on some of what we were -- it was
8      our requirement. And BBPOS, at that point,
9      is considered a vendor to help us build it.
10     So they had their IP and we have our IP,
11     so...
12 Q   When -- in Paragraph 49 it says, "Rotsaert
13     freely admitted to multiple people inside of
14     ROAM that Ingenico planned on building a
15     competing EMV reader, and they would study
16     ROAM's industrial design, and make their own.
17     He even suggested that ROAM should cancel the
18     final industrial design for its EMV reader."
19     Do you recall, was that accurate at the time
20     it was in the complaint?
21 A   Yes.
22 Q   Do you still believe that it was accurate?
23 A   Yes. And that was -- those were just what --
24     what I learned at the time.

Page 37

1  Q   Do you know who Rotsaert -- do you recall
2      specifically who Rotsaert freely spoke to
3      respecting the admission that Ingenico
4      planned on building the competing EMV reader?
5  A   I don't remember who specifically it was.
6  Q   What do you recall of your dealings with Mr.
7      Rotsaert around this time respecting his
8      transfer of BBPOS' intellectual property to
9      Ingenico?
10     MR. WRAY: I'm sorry. Is there a way
11     to have that question read back?
12     THE WITNESS: Something about whether
13     Rotsaert knows the transfer of intellectual
14     property for BBPOS or something like that.
15     MR. KESSLER: Yeah.
16     THE WITNESS: You can ask it again if
17     you --
18     MR. KESSLER: Yeah.
19     THE WITNESS: -- want.
20 BY MR. KESSLER:
21 Q   Do you recall your interactions with Mr.
22     Rotsaert around that time respecting any
23     transfer of intellectual property belonging
24     to BBPOS from ROAM to Ingenico?

10 (Pages 34 - 37)

Page 38

1  A   At that time, I did -- I believe I have a
2      interaction with Rotsaert about, you know,
3      accessing our intellectual property and these
4      -- these comments, right?  So this is what --
5      what -- you know, I felt Rotsaert was -- was
6      supposed to keep our intellectual property to
7      us at that time.
8  Q   Okay.
9  A   Because we have access to -- we have access
10     to our intellectual property and BBPOS
11     provided us some access -- of course, not all
12     access -- to their intellectual property.
13     This is independent of the -- the acquisition
14     discussion that we had.  So the acquisition,
15     due diligence, I think they exposed, you
16     know, more things to the Ingenico team than
17     what BBPOS would otherwise probably provide
18     to us as their -- you know, as their
19     distribution partner.
20 Q   What do you recall the content of your
21     conversations with Mr. Rotsaert being?
22 A   I don't recall specifically the conversation.
23     But I remember just, you know, he was in and
24     around our building.  We had some issues with

Page 39

1      -- with him, you know, which I stated in
2      here.
3  Q   When you say, "stated in here," you stated in
4      the complaint?
5  A   In the complaint, yeah.  Which included, you
6      know, our product roadmap and -- and so
7      forth.
8  Q   Okay.  We've got -- let me find another
9      document I'd like to mark for you.  It may
10     take a moment.
11         MR. KESSLER:  Let's mark this as
12     Exhibit 3.
13 (Whereupon, Exhibit No. 3, E-mails regarding
14     allegations between Chris and William, is
15     marked for identification.)
16         MR. WRAY:  Thank you.
17         MR. KESSLER:  Okay.  Thank you.
18 Q   Before we even look at that, let me ask, what
19     did you do to prepare the -- to prepare for
20     this deposition today?
21 A   Nothing.
22 Q   Okay.  And you spoke with -- I don't need to
23     know the contents of any conversation you
24     might have had with counsel, but did you

Page 40

1      speak with any attorneys representing you
2      respecting this deposition?
3  A   I have no one representing me.
4  Q   Okay.  Did you speak of the substance of this
5      deposition and its -- sort of the nature of
6      this meeting with me at any point?
7  A   No.
8  Q   Okay.  Did you discuss the substance of this
9      deposition with anybody representing the
10     defendants at any point?
11 A   No.
12 Q   Okay.  Did you review any e-mails in
13     preparation for this deposition?
14 A   No.
15 Q   All right.  You came in cold.
16 A   Cold.
17 Q   All right.  Let's look at Exhibit 3.  I want
18     to ask you if you recognize what it is.
19         MR. WRAY:  One moment, please.  I
20     noticed this is marked "Highly Confidential."
21         MR. KESSLER:  Okay.
22         MR. WRAY:  Has Mr. Graylin signed a
23     protective order?
24 Q   Have you signed a protective order, sir?

Page 41

1  A   What's -- a protective order for --
2          MR. KESSLER:  You know, I'll get a
3      copy of the printed word.  Do you have an
4      objection to us proceeding now?
5          MR. WRAY:  I think, under the terms
6      of the protective order, before you use this
7      in the deposition you should review it, sign
8      it, and agree to be bound by it.
9          MR. KESSLER:  Okay.  We don't -- why
10     don't we adjourn so we can get that taken
11     care of?  That part is going to just -- it's
12     going to lengthen the time of the deposition,
13     but it's something --
14         THE WITNESS:  I mean, this is -- I
15     mean, these documents are just previous
16     e-mails between me and -- and Coonen, right?
17         MR. KESSLER:  Yes.  You know, and I
18     agree, it's -- you know, it is e-mails
19     between you and Coonen, but opposing counsel
20     is raising this objection and I want to work
21     with opposing counsel on this.  So we're
22     going to adjourn the deposition while I get a
23     copy of that.  Sorry, it's going to -- it's
24     just going to prolong the deposition, but we

Page 46

1    -- of IP that would basically mean, you know,
2    less revenue for us to be able to -- to do
3    with our own product line.
4  Q  Were you concerned about the transfer of
5    ROAM's IP?
6  A  Yeah.
7  Q  Were you also concerned about the transfer of
8    BBPOS' IP?
9  A  Sure. Because that's part -- you know,
10   there's -- there's a part of that that
11   belongs to BBPOS.
12 Q  Were you concerned about the transfer helping
13   Ingenico to build a competing product?
14 A  Yes. At that time, you know, that was part
15   of our -- part of the discussions that I
16   wanted to have with -- with Philippe, you
17   know, and I wanted to -- I wanted to bring
18   attention to that at the next board meeting.
19       MR. WRAY: I object to that question.
20   It's vague.
21 Q  I think it's a little late. Let's move on to
22   -- I see Section -- I see bullet point 3 --
23   or number 3. It says "Controls and
24   operational constraints by the majority

Page 47

1    investor exerted onto the company, not part
2    of the Investor Rights Agreement, that can
3    harm the value of ROAM's shareholders. One,
4    the BBPOS relationship is critical to ROAM.
5    Ingenico's interference with its acquisition
6    and the current commercial negotiations can
7    damage its relationship and harm the value to
8    ROAM's shareholders irreparably. Damaging
9    the relationship with BBPOS can lead to a
10   loss of IP, revenue, along with technical
11   capabilities to ROAM which will make a large
12   negative impact on ROAM's valuation." Do you
13   recall what you were concerned about when you
14   wrote that bullet point 1?
15 A  Yeah. Basically, you know, we wanted to make
16   an acquisition of BBPOS at the time. I
17   recommended it. My perception was that BBPOS
18   was an important part of helping us grow our
19   revenue. So, you know, I had a concern about
20   them interfering with our acquisition -- you
21   know, our desire to -- to have an
22   acquisition. But, you know, ultimately, that
23   deal didn't happen, but, you know, it's
24   pretty well -- pretty well reflected in my

Page 48

1    statement here.
2  Q  Got it. I want to ask you now -- I want to
3    mark something else. I want to mark this as
4    Exhibit 5.
5  (Whereupon, Exhibit No. 5, Continuation of e-mails
6    between Chris and William, is marked for
7    identification.)
8       MR. WRAY: Thank you.
9  Q  What is Exhibit 5?
10 A  Yeah. This is just a follow-on from earlier,
11   a --
12 Q  Okay.
13 A  -- continuation of my dialogue with Rotsaert.
14 Q  Okay.
15 A  Yeah.
16 Q  When you write, "Just because you sent me an
17   e-mail to me does not mean you have my
18   agreement and my permission to start
19   transferring IP that does not belong to
20   Ingenico. Your assumption that the reader IP
21   belongs to ROAM was already incorrect. And
22   to further transfer them further to Ingenico
23   without my explicit permission and without
24   any commercial agreement in place was a real

Page 49

1    mistake." I'm a little curious. When you
2    write, "Your assumption that the reader IP
3    belongs to ROAM was already incorrect," do
4    you recall what you meant?
5  A  So there are two parts of the IP. Part of it
6    is our requirements, our design, our -- our
7    form factor. And then there's other
8    components because they are the engineering
9    firm that -- that built it -- were licensing
10   their technology. Basically, you know, two
11   parts are all mixed.
12 Q  Okay. And when you say the two parts are
13   mixed, does -- did BBPOS own some of that
14   reader IP then?
15 A  I mean it's their -- their hardware design,
16   our form factor.
17 Q  Okay. So I'll just ask it again. Is that --
18   some of that IP is --
19 A  Some of it is -- belongs to BBPOS.
20 Q  Okay. Now, do you recollect Rotsaert
21   believing that all of the reader IP belonged
22   to ROAM as opposed to only some of it?
23 A  He may be under the assumption that all of
24   that belongs to ROAM. But, you know, to me

Page 50

1  there's a component that -- that belongs to
2  BBPOS. And so in my -- in my opinion, he
3  shouldn't have done that.
4  Q   Okay. And with respect to the BBPOS
5  intellectual property that he transferred
6  from ROAM to Ingenico, why should he not have
7  done that?
8  A   It says we -- I stated in here, you know, we
9  don't have in a -- you know, it's ROAM, which
10 is still a separate entity from -- from
11 Ingenico. You know, ROAM has an agreement
12 with BBPOS, but Ingenico does not have an
13 agreement directly with BBPOS.
14 Q   Do you know why Ingenico was transferring
15 BBPOS' IP from ROAM to itself?
16         MR. WRAY: Objection. Misstates
17 testimony. Leading.
18 A   Well, I can tell you, you know, from
19 Christopher Rotsaert's point of view, he was
20 looking at -- and he was product management
21 so he was partly supposed to help me with
22 product management, but he was also probably
23 thinking that the property -- and we have
24 NDAs between ROAM and -- and Ingenico, so he

Page 51

1  probably felt that, you know, he was going to
2  transfer -- my concern, of course, was he was
3  going to transfer information over to
4  Ingenico and Ingenico can, you know, create a
5  competing product. That was my concern. My
6  other concern was that, you know, him
7  transferring -- transferring data to Ingenico
8  contained some parts of IP that -- that not
9  just belonged to us, but also belonged to
10 someone else.
11 Q   And did Ingenico create a competing product?
12 A   That was after my -- you know, I was -- I was
13 terminated from my employment days after this
14 e-mail.
15 Q   So do you know one way or another whether
16 Ingenico created a competing product?
17 A   I couldn't tell you for sure because I was no
18 longer involved.
19 Q   When you say that it was -- "To further
20 transfer them further to Ingenico without my
21 explicit permission and without any
22 commercial agreement in place was a real
23 mistake," commercial agreement in place with
24 whom?

Page 52

1  A   A, there should be a -- you know, there
2  should be a commercial agreement. If ROAM
3  Data's products was going to be produced by
4  Ingenico, we need a commercial agreement
5  because, A, that would take away our revenue
6  source, so ROAM and Ingenico does not have a
7  commercial agreement about, you know,
8  development of this, you know, additional
9  product. So that was my reference primarily.
10 Q   Yes. Would it also negatively impact BBPOS?
11 A   Well, we pay a royalty to BBPOS. So as -- as
12 a result, that also can impact our partners.
13 Q   When you wrote, "Your actions and assumptions
14 are threatening the very fabric of ROAM's
15 relationship with its most important
16 supplier," who was the most important
17 supplier you're referencing there?
18 A   I was referencing BBPOS.
19 Q   Okay. And why did you feel that Mr.
20 Rotsaert's actions and assumptions was
21 threatening the very fabric of that
22 relationship?
23 A   For this -- his assumptions and his actions
24 of transferring data basically feel like it's

Page 53

1  -- it's -- you know, it's not good for our
2  relationship between BBPOS and ROAM. It
3  certainly hurts ROAM. And I think it can
4  hurt BBPOS as well. But, you know, we should
5  have respect for their intellectual property.
6  And so at that time, what I saw Rotsaert
7  wrote was that he was making assumptions that
8  that intellectual property belonged to ROAM
9  and that he could, you know, transfer it. It
10 says, "If ROAM has been using BBPOS' design"
11 -- you know, he's making the -- the inference
12 that he thinks he should be able to transfer
13 it and I disagreed.
14 Q   Okay. And do you have -- do you still
15 disagree, one way or another?
16         MR. WRAY: Objection. Vague.
17 A   For me, I think, what I wrote at the time was
18 -- was my disagreement with Mr. Rotsaert and,
19 you know, to me that was pretty well-written
20 on paper.
21 Q   Got it. When you wrote, "There is an
22 apparent lack of respect for the IP or
23 BBPOS," is that supposed to be "of BBPOS," or
24 is it "or BBPOS"? Do you know?

Page 54

1  A   I think it should be of as opposed to or.
2  Q   Why do you think there was a disrespect from
3      Mr. Rotsaert toward the IP of BBPOS?
4  A   Pretty well, as I stated -- I mean, you don't
5      -- you don't normally transfer, you know,
6      data to another development team without
7      permission from either me as the CEO of ROAM
8      or some kind of an agreement, you know, from
9      -- from BBPOS.
10 Q   Were you concerned about Ingenico
11     reverse-engineering the IP that they'd
12     received that --
13 A   Well, my --
14 Q   -- was BBPOS'?
15 A   -- my concern was a competing product that
16     competed against our distribution which had
17     wrong data at the time. So this is why I
18     raised the issue and, you know, whether they
19     continued on with that process after I was
20     terminated, that was -- you know, that's
21     something separate.
22 Q   Got it.
23 A   But, you know, I raised my -- raised my
24     concerns to Mr. Rotsaert and also to, you

Page 55

1      know, Philippe and Christopher.
2  Q   And when you say Christopher, do you mean
3      Christopher Coonen?
4  A   Right. And Philippe --
5  Q   And Philippe Lazare?
6  A   Correct.
7  Q   Okay. How long after this -- okay. Thank
8      you for testifying about this e-mail. I
9      appreciate it.
10 A   Yep.
11 Q   How long after you sent this e-mail on
12     September 17, 2012, were you terminated from
13     your position at ROAM?
14 A   It was the following board meeting, so I
15     think it was later that month.
16 Q   Later in the month of September?
17 A   If I recall the board meeting being -- yeah,
18     that month.
19 Q   Okay. So roughly within two weeks of sending
20     this --
21 A   Yeah. Yeah.
22 Q   -- e-mail you were terminated?
23 A   Correct. Right.
24 Q   All right. Did you have an understanding of

Page 56

1      the relationship between HomeATM and BBPOS?
2      Do you recollect that?
3  A   I remember there's some relationship between
4      -- Ben was telling me some -- some
5      relationship between them. I can't really
6      recall what the exact relationship between --
7      between these guys -- is that when they
8      changed their name later to AnywhereCommerce
9      or Anywhere --
10 Q   I'm just trying to get your memory of --
11 A   Yeah.
12 Q   -- HomeATM, but if you don't --
13 A   Yeah. I mean --
14 Q   -- it's fine.
15 A   -- yeah, I mean, there's -- most of my
16     dealings was with Ben.
17 Q   You've mentioned acquisition prior. Was
18     there a point in time in which there was a
19     consideration of acquisition from ROAM for
20     Ingenico to BBPOS?
21 A   More from ROAM. I mean, I was trying to make
22     the acquisition.
23 Q   What's your recollection of your records to
24     make the acquisition?

Page 57

1  A   I made a proposal, and -- and then, I think,
2      Ingenico wanted to do some due diligence
3      also. And so I think ultimately after the
4      experience, Ben ended up rejecting the -- the
5      deal and it never took place.
6          MR. KESSLER: Okay. Let me mark this
7      as Exhibit 6.
8  (Whereupon, Exhibit No. 6, Summary of terms of
9      acquisitions of BBPOS, is marked for
10     identification.)
11         MR. KESSLER: Thank you.
12 Q   Please take all the time you need to feel
13     comfortable with it. My first question is:
14     Do you know what it is, Exhibit 6?
15 A   It looks like our term sheet, yeah.
16 Q   When you say, "Our term sheet," you mean the
17     term sheet respecting the acquisition --
18     proposed acquisition of BBPOS by ROAM Data?
19 A   Yeah.
20 Q   Okay. Did you have a hand in negotiating
21     this?
22 A   Yeah.
23 Q   What role did you play in negotiating this?
24 A   I was -- I was the CEO, so I had a signed

Page 98

1 chip -- did the Telium solution relate to
2 ROAM's solution for its readers?
3 A Telium in ROAM?
4 Q Uh-huh.
5 A When I was there, I don't -- I don't remember
6 if -- I don't think we had any Telium
7 solution that we sold.
8 Q Was there ever an effort to integrate the
9 solution being pursued by Ingenico with the
10 solutions that had already been found by
11 ROAM?
12 A I think we had discussions about a
13 longer-term roadmap. But I don't remember
14 where the Telium solution ended up going.
15 Q Let me mark this as -- thank you. This is a
16 short Exhibit 13. Ingenico Inc. 0069335.
17 Do you recognize this?
18 (Whereupon, Exhibit No. 13, E-mail from Ben Lo, is
19 marked for identification.)
20 A It looks like a notification for -- for them
21 sending samples.
22 Q Okay. And samples of what?
23 A Samples of a reader, G4X in PayPal form
24 factor.

Page 99

1 Q Okay. And what's the significance of having
2 them sent to Boston by FedEx?
3 A That way we can check it out and see if it
4 works.
5 Q Okay. Now, I noticed that Christopher
6 Rotsaert is copied on this?
7 A Uh-huh.
8 Q What role would he play in checking out the
9 six samples of G4X sent by Ben Lo?
10 A I think it was in the same time period. Same
11 thing, we were trying to -- trying to get G4X
12 as a product on our roadmap to sell.
13 Q And was Mr. Rotsaert working at this point in
14 his capacity as an employee of ROAM or in his
15 capacity as an employee of Ingenico?
16 A I think that was the same -- same deal.
17 During that time he was -- he was half paid
18 by us and half paid by -- by Ingenico. But
19 he was supposed to be in our office working
20 for us.
21 Q Okay. So did this -- does this e-mail raise
22 any concerns as other e-mails in terms of Mr.
23 Rotsaert's sending of materials to Ingenico?
24 A No. I mean, I think this is pretty -- this

Page 100

1 one's pretty standard. This is us getting
2 samples to our team just knowing, you know,
3 when we can start testing and potentially
4 selling.
5 Q Okay. I was not sure. So I mean, who is
6 Landi?
7 A Landi is -- was. I don't know where it is
8 now -- Ingenico's subsidiary in China. It
9 was a Chinese -- Chinese company that made
10 POS for China market.
11 Q Do you recall ever informing Ben Lo that
12 Ingenico was passing information to Landi for
13 making terminals to compete with BBPOS?
14 A Yeah. I think those were some of the
15 discussions that we had.
16 Q And what was the basis for your understanding
17 of that?
18 A I don't remember how I learned about their
19 connections with -- well, Ingenico and Landi
20 obviously very close, and I think when we
21 were talking about next-generation product,
22 they wanted us to -- to ultimately use maybe
23 their own product. But, you know, that was
24 -- I think Landi was -- was building products

Page 101

1 in China, POS products.
2 Q Did you understand that there was an effort
3 by Ingenico then to compete with BBPOS in
4 China?
5 A I don't know if it's just in China versus
6 they're -- Landi clearly was already building
7 and selling POS in China but it was more
8 competing agains
9 al POS vendors for, you know, the mobile phone POS
10 which is another category.
11 Q Okay. Was there some concern though that
12 Ingenico was supplying Landi with mobile POS
13 solutions?
14 A Was there any concern that Ingenico was
15 providing Landi with the POS solutions that
16 we were working on --
17 Q Yes.
18 A -- with BBPOS?
19 Q Yes.
20 A Eventually, there was, which -- which was --
21 eventually there was, which was a concern
22 that I had brought up in the complaint.
23 Q Okay. And you voiced that concern to Ben Lo
24 as well?

26 (Pages 98 - 101)

Page 102

1 A Yeah.
2 MR. KESSLER: Give me a -- let's take
3 a break for two minutes. Let me think if I
4 have any other questions I want to ask you.
5 VIDEOGRAPHER: The time is 4:55 p.m.
6 We're off record.
7 (Whereupon, the parties go off the record.)
8 VIDEOGRAPHER: The time is 4:58 p.m.
9 We're on record.
10 BY MR. KESSLER:
11 Q So subsequent to your departing -- oh, I'm
12 sorry, are you ready?
13 A Okay.
14 Q So subsequent to your departing ROAM, did you
15 have conversations with Mr. Rotsaert about
16 his sending -- about a statement that he'd
17 sent ROAM and BBPOS designs and intellectual
18 property to Ingenico for Ingenico to build
19 some reader?
20 A Subsequent, after I left?
21 Q Yes.
22 A I don't remember.
23 Q Okay. Have you had dealings with Mr.
24 Rotsaert since you left ROAM?

Page 103

1 A I don't recall other than, you know, we had
2 litigation that went on for, you know,
3 probably a good year and-a-half plus, so --
4 yeah, I don't remember having -- having, you
5 know, direct interactions with him.
6 MR. KESSLER: Okay. I don't have any
7 further questions. Thank you very much. I'm
8 sure he has a whole bunch.
9 MR. WRAY: I do. I hope to go
10 quickly and I hope to let you make your
11 flight.
12 CROSS EXAMINATION
13 BY MR. WRAY:
14 Q First thing I want to hand you is what's been
15 pre-marked as Exhibit 14. This is a cross
16 notice of deposition in this matter. Did you
17 receive this before today, Mr. Graylin?
18 A No.
19 Q Via e-mail, have you ever seen this before?
20 A Cross notice. Yeah, I noticed somebody tried
21 to serve me. Is that what this is --
22 earlier?
23 Q I'll move on to the next question. If you
24 don't --

Page 104

1 A Yeah.
2 Q -- recognize the document, that's fine.
3 A Yeah.
4 Q As you just alluded to, did you -- do you
5 know if you received or allowed someone to
6 received a subpoena on your behalf?
7 A Yeah. I mean, somebody came by my house when
8 I was at the office. I told him that he
9 could just drop it off but, yeah, that was a
10 few days ago.
11 Q Okay. So I'm going to hand you what's been
12 pre-marked as Exhibit 15. If you'll look at
13 this document, in particular, just a couple
14 of pages in. Right after Exhibit A, do you
15 see how it says, "Subpoena to testify at a
16 deposition in a civil action"? Is this the
17 document you were referring to before?
18 A Yeah, I think this is what somebody tried to
19 drop off for me.
20 Q Okay. And you had a telephone conversation
21 with --
22 A Right.
23 Q -- that person and said that they --
24 A You can just drop it off, yeah.

Page 105

1 Q Okay. Thank you. Now, I'm handing you
2 what's been pre-marked as Exhibit 16. When
3 you had that telephone conversation before
4 with the individual -- by the way, do you
5 remember their name -- his or her name?
6 A Yeah. Somebody left me a voice mail and I
7 called him back.
8 Q Was it Keith?
9 A I think it was Keith.
10 Q Keith Wheeler (phonetically spelled)?
11 A Yeah.
12 Q Okay. Did you tell Keith he could leave the
13 subpoena with Alex Graylin?
14 A Yeah.
15 Q Okay. Who is Alex Graylin?
16 A He's my son.
17 Q Okay. I would like to go back to what
18 opposing counsel marked as Exhibit 1.
19 A Okay.
20 Q It's the engineering, development, and
21 license agreement. So this says it was made
22 as of about May 4, 2010, right?
23 A Uh-huh.
24 Q So that's well over a decade ago from now,

27 (Pages 102 - 105)

Page 142

1  Q   And whatever you concluded wasn't exclusive
2      in the document is what you were potentially
3      going to sell with Ben, right?
4  A   Yes. That would --
5  Q   Okay.
6  A   -- that would be the case, but that was a
7      very -- very cursory exploration.
8  Q   Sure.
9  A   Yeah.
10 Q   Did it -- during the previous questioning,
11     Mr. Kessler showed you an e-mail. It was
12     from, I think, January 2013 or thereabouts?
13 A   Uh-huh.
14 Q   I'll try to pull that one up. Exhibit 11.
15     Could you turn to Exhibit 11?
16 A   Yep.
17 Q   Okay. So in this e-mail you're talking with
18     him about how you're free to compete with
19     ROAM because of some language in your
20     contract, right? Do you see that, like --
21 A   Uh-huh.
22 Q   -- three or four paragraphs down?
23 A   Yeah.
24 Q   And this is you discussing with him this

Page 143

1      potential venture for selling other mobile
2      point of sale products, right?
3  A   Yeah. This is part of the exploration that I
4      told you.
5  Q   Right. And so at this time that he sends you
6      an e-mail saying -- and this is on the third
7      page of the document, he sends you an e-mail
8      basically saying that Ken Paull says that the
9      ROAM-BBPOS agreement only does the swiper,
10     and not the EMV or NFC, right?
11 A   Correct.
12         MR. KESSLER: Objection. The
13     document speaks for itself.
14         MR. WRAY: You're lucky I didn't pull
15     that objection out during your examination.
16         MR. KESSLER: What are you
17     insinuating?
18         MR. WRAY: That you just used the
19     documents a lot.
20         MR. KESSLER: Yeah, but I didn't
21     misquote them.
22 Q   On Page 1, you say here, "Yes, I have told
23     Ken Paull and others at ROAM and Ingenico
24     that EMV/NFC is not part of the exclusivity.

Page 144

1      Good to see them admit it," right?
2  A   Uh-huh.
3  Q   And again, you're saying this during the time
4      that you're exploring the possibility of
5      selling these devices with Ben Lo, right?
6  A   Yeah. But that was also my belief that the
7      EMV was not exclusive.
8  Q   Earlier we discussed how you shared with Mr.
9      Lo your feelings about how you believe Mr.
10     Rotsaert improperly shared intellectual
11     property with Ingenico, right?
12 A   (No verbal response.)
13 Q   This complaint was from November of 2012,
14     right?
15 A   (No verbal response.)
16 Q   Did you delay from filing the complaint to
17     talking about these things with Mr. Lo?
18 A   Did I delay -- did I talk to Mr. Lo after I
19     filed the complaint?
20 Q   Right.
21 A   Yes.
22 Q   Okay. What did he say when you shared these
23     allegations or thoughts or concerns?
24         MR. KESSLER: Objection. Content.

Page 145

1  Q   Strike that. What did he say when you shared
2      these concerns?
3  A   What did he say -- I don't really recall but
4      we had some e-mail exchanges, and, you know,
5      we were just trying to figure out whether
6      there's -- there is, you know, any business
7      that we could do. I was trying to be helpful
8      if I could, and I think, you know, it's no
9      secret about my, you know, my concerns at the
10     time and -- and which is what led to the --
11     to the litigation.
12 Q   All right.
13 A   Yeah.
14 Q   But do you remember, I mean, you're saying
15     that you spoke with him, and you said
16     basically you were concerned that Chris
17     Rotsaert shared BBPOS IP with Ingenico,
18     right?
19 A   (No verbal response.)
20 Q   Sorry, you have to say yes or no for the --
21 A   Yes.
22 Q   -- record. Do you remember him having a
23     reaction of any kind to this?
24 A   I mean, I think we were just lamenting the,

Page 146

1 you know, the challenges that I went through,
2 being terminated by -- terminated by Ingenico
3 and, of course, he still had a relationship
4 with Ingenico that, you know, he needs to and
5 wants to maximize. So to the extent that,
6 you know, he has a contract with Ingenico, he
7 needs to carry that forward. And, you know,
8 my personal -- my personal complaint and all
9 of the rest of the minority shareholders'
10 complaint, you know, somewhat is a separate
11 case from what he has to deal with as a
12 supplier for -- for ROAM and for Ingenico.
13 And ROAM, if you recall at the time,
14 was still considered technically 74 percent
15 owned by -- owned by Ingenico, but the rest
16 of the minority shareholder, you know, at
17 that time was still kind of left hanging out
18 there. And it wasn't until later that the
19 acquisition -- the rest of the shares were
20 acquired, you know, with a fair market value
21 and so forth, that it finally got settled.
22 So there was definitely a -- a -- I guess, an
23 unsettled -- unsettled shareholder dispute
24 that needed to be resolved.

Page 147

1 Q  Uh-huh. So is it fair to say you don't
2    remember Ben's exact words to you when you
3    disclosed --
4 A  I don't --
5 Q  -- this?
6 A  -- I don't remember that, you know, exact
7    interaction or the conversation and how he
8    reacted and so forth. But I just remember
9    having a -- having a dialogue and sharing --
10 Q  And this --
11 A  -- my information.
12 Q  And the substance of the conversation
13    included his reaction that he has an ongoing
14    relationship with Ingenico, right?
15 A  Yeah. Clearly, he has -- he has an
16    obligation as well as an incentive to make
17    sure that that relationship works. And I
18    recognize that and I -- I also had a
19    incentive to make sure that that
20    relationship, you know, continues because,
21    you know, I was still a shareholder of ROAM
22    Data at the time.
23 Q  Uh-huh. Pardon me, I just want to find a
24    document that's in here. This is Exhibit 11,

Page 148

1    and you actually have it in front of you.
2    Could you turn to the document that has 811
3    at the bottom right?
4 A  Okay.
5 Q  And you see where it says "To ROAM/Ingenico
6    realities"?
7 A  Yep.
8 Q  It's kind of in the middle of that paragraph.
9    Do you see where it says, "The attached
10   public record of the suit can be useful to
11   you in multiple ways"? Is that you sending
12   the complaint to Mr. Lo?
13 A  The public records of the suit -- "The
14   attached public records of the suit can be
15   useful to you in multiple ways." Yeah.
16 Q  All right. Did you ever work with a customer
17   and entity called First Data?
18 A  Yeah. They were, you know, a client.
19 Q  A client of which company?
20 A  ROAM Data.
21 Q  Do you know when they became a client?
22 A  I don't recall.
23 Q  But they were a client during the time that
24   you were there?

Page 149

1 A  I wonder if they actually bought -- well,
2    they were one of the major POS providers, but
3    I don't know if we actually sold directly to
4    them. They were not one of our big clients,
5    but they were a significant merchant service
6    provider. So how did we work with them? We
7    may -- we may -- we may be -- we may be
8    interacting with their gateway for -- but I
9    don't know if they ordered any products from
10   us. But I do think that we connected to
11   their gateway or to their acquiring
12   processor.
13 Q  So you were familiar with them from the time
14   you were at ROAM?
15 A  Oh, yeah, yeah. I knew --
16 Q  Okay.
17 A  -- I knew First Data.
18 Q  Were you familiar with an RFP from them for
19   something called Pogo, P-O-G-O?
20 A  Vaguely. I don't -- I don't recall.
21 Q  Okay.
22 A  That's not in Exhibit 11, is it?
23 Q  No. Thank you. I'm going to show you a
24   document marked as Exhibit 19. You can take

38 (Pages 146 - 149)

Page 170

1  appear to be the same document.
2       THE WITNESS: Yeah, it's a different
3  -- different --
4       MR. WRAY: Okay. It's a data --
5       THE WITNESS: -- different schematic.
6  Yeah.
7       MR. KESSLER: Are you referring -- in
8  your objection, were you referring to the
9  schematic or to the data output format
10 document?
11      MR. KESSLER: Data output format
12 document.
13      MR. WRAY: Okay.
14      MR. KESSLER: Just so the record's
15 clear, the first one has 15 pages and the
16 second one, I think, has 13 pages.
17 BY MR. WRAY:
18 Q   And if you could turn to Page 9666.
19 A   Okay. 9666.
20 Q   It should just say "Produced in" --
21 A   Yep.
22 Q   -- "native form." And then in the following
23     page -- one, two, three pages, I'm going to
24     ask you about those.

Page 171

1  A   Uh-huh. The phones supported?
2  Q   Yeah. So do you know what that list
3      represents?
4  A   I think it just represents iOS and Android
5      phones on the market at that time that were
6      able to be supported.
7  Q   Okay. So when you wrote to Mr. Rotsaert, and
8      when you wrote to Mr. Coonen, and Mr. Lazare
9      about concerns about having IP transferred to
10     Ingenico, you were referring to the documents
11     that we just went through, right?
12 A   Yes.
13 Q   Okay. Do you know if Ingenico Valence ever
14     developed any mobile point of sale devices?
15 A   I do not, no.
16 Q   Actually, I should back up. What is Ingenico
17     Valence?
18 A   I think they're an R&D center.
19 Q   Okay. And what does -- do you know what
20     Valence refers to?
21 A   The location.
22 Q   And you don't know that Ingenico actually
23     used any IP from BBPOS to create their own
24     devices, right?

Page 172

1  A   I can't confirm that, no.
2  Q   Okay. And you don't know whether ROAM used
3      any of BBPOS' IP to create their own devices,
4      right?
5  A   Not after I left, no.
6  Q   When you say that, so you're saying that
7      while you were there they used some of BBPOS'
8      IP in their own devices, correct?
9  A   Yes. BBPOS was helping make the devices that
10     we used.
11 Q   So it was pursuant to -- to your
12     understanding, the agreement with BBPOS,
13     correct?
14 A   Correct.
15 Q   Okay. And you aren't familiar with any use
16     of BBPOS' IP while you were at ROAM that
17     wasn't in compliance with the agreement,
18     correct?
19 A   Correct.
20 Q   Earlier we discussed your thoughts about a
21     potential acquisition or investment in your
22     partnership with HomeATM, right?
23 A   (No verbal response.)
24 Q   Did you ever fake an interest in acquiring

Page 173

1      HomeATM for any purpose?
2  A   Well, I don't know what you mean by, fake an
3      interest?
4  Q   Did you ever pretend to have an interest in
5      acquiring or working with HomeATM for the
6      purpose of acquiring confidential information
7      from them?
8  A   Not for the purpose of acquiring confidential
9      information so much as just making sure that
10     we were able to -- we were able to, you know,
11     license from the rightful owner because there
12     were cross-claims as to, you know, whether
13     they own it, whether BBPOS own it, which is
14     ultimately why we, you know, why I asked Ben
15     to even lay out all of it. So, you know, I'm
16     not going to deny anybody that says, you
17     know, they own the IP unless it's really
18     clear that either they don't own it, in which
19     case we don't need to deal with them. If
20     they do own it, we should continue to have a
21     dialogue until we sort out the truth, so --
22 Q   Do you know when, if ever, Ben began working
23     with HomeATM?
24 A   Well, according to the -- Ben's own

44 (Pages 170 - 173)