UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANYWHERECOMMERCE, INC. and BBPOS LIMITED, | |
| Plaintiffs, | |
| v. | Civil Docket No: 1:19-cv-11457-IT |
| INGENICO INC., INGENICO CORP., and INGENICO GROUP SA, | **LEAVE TO FILE UP TO 40 PAGES GRANTED ON JULY 6, 2022** |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  STANDARD OF REVIEW .................................................................................. 3

III. ARGUMENT ....................................................................................................... 3

   A.   Plaintiffs' Argument Regarding the Breach of Exclusivity Is Based Upon Factual Assertions to be Resolved by the Fact-Finder. ......................................................................... 3

   B.   Plaintiffs Materially Misstate the Scope of the BBPOS-ROAM License ...................................... 4

   C.   The Exclusive Rights Afforded to Ingenico Under the Agreement Constitute Neither An Illegal Nor An Unenforceable Restraint on Trade. ........................................................................ 6

   D.   Ingenico Has Established Actionable Harm Because the Unjust Enrichment that BBPOS Derived from the Sales of Ingenico's Products is the Proper Measure of Damages for Ingenico's Breach of Contract Claim. ........................................................................................ 11

   E.   Defendants' Claims Are Not Barred by the Applicable Statutes of Limitation. ......................... 14

   F.   Sections 3.10 and  3.18 of the Agreement are Unambiguous and Ingenico Is Entitled to Relief Thereunder. .................................................................................................... 17

     1.   Sections 3.10 and 3.18 are Unambiguous. .................................................................. 18

     2.   Plaintiffs Simultaneously Ignore Contractual Language and Add Contractual Terms to Abdicate BBPOS's Responsibilities to Ingenico. ............................................................. 19

     3.   Even if the Court Credits Plaintiffs' Argument that the IOEngine Indemnification Claim is Premature, the Claim Should Not be Dismissed With Prejudice. ......................................... 21

     4.   Plaintiffs' Selective Focus on "the Bulk" of Ingenico's Indemnification Damages Ignores the Remainder of the Damages, Precluding Summary Judgment on that Claim. ............................ 21

   G.   If This Court Finds That the Agreement's Terms Are Ambiguous, a Question of Fact Then Arises That May Not Be Resolved By Summary Judgment. ...................................................... 23

IV.  CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*Addamax Corp. v. Open Software Found., Inc.*, 888 F.Supp. 274 (D. Mass. 1995) ................................. 9

*All Stainless, Inc. v. Colby*, 308 N.E.2d 481 (Mass. 1974)....................................................................... 7

*Analogic Corp. v. Data Translation, Inc.*, 358 N.E.2d 804 (Mass. 1976)........................................ 7, 10

*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332 (1982)..................................................................... 9

*Arvest Bank v. RSA Sec. Inc.*, 1:15-CV-11798-IT, 2017 WL 4287358 (D. Mass. Sept. 27, 2017)........ 20

*Bank v. Int'l Bus. Machines Corp.*, 145 F.3d 420 (1st Cir. 1998) .......................................................... 23

*Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.*, 768 F.2d 5 (1st Cir. 1985) .... 23

*Boulanger v. Dunkin' Donuts Inc.*, 815 N.E.2d 572 (Mass. 2004) ............................................................ 9

*Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988)..... 8

*Cadle Co., v. Hayes*, 116 F.3d 957 (1st Cir. 1997)...................................................................................... 3

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................................... 3, 4

*Cernelle v. Graminex, L.L.C.*, 437 F. Supp. 3d 574 (E.D. Mich. 2020)..................................................... 13

*Children's Med. Ctr. Corp. v. Celgene Corp.*, No. CV 13-11573-MLW, 2016 WL 5746358 (D. Mass. Sept. 30, 2016) ...................................................................................................................................... 23

*City of New Bedford v. AVX Corp.*, No. CV 15-10242-WGY, 2015 WL 13697608 (D. Mass. Aug. 27, 2015) ............................................................................................................................................... 18, 19

*Club Aluminum Co. v. Young*, 160 N.E. 804 (Mass. 1928) ............................................................... 7, 8, 9

*Cofman v. Acton Corp.*, 958 F.2d 494 (1st Cir. 1992)............................................................................. 19

*D.A. Sullivan & Sons, Inc. v. City of Springfield*, 91 Mass. App. Ct. 1117, 83 N.E.3d 199 (2017)....... 23

*Dynamics Research Corp. v. Analytic Scis. Corp.*, 400 N.E.2d 1274 (Mass. App. Ct. 1980) ................ 7

*Elecs. Communications Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240 (2d Cir. 1997) ..... 8

*Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11 (1st Cir. 2004).................................................................. 8

*Feinstein v. Brown*, 432 F. Supp. 2d 258 (D.R.I. 2006) .......................................................................... 23

*Fin. Res. Network, Inc. v. Brown & Brown, Inc.*, 867 F. Supp. 2d 153 (D. Mass. 2012)..................... 19

*Fisher v. HSBC Bank*, 332 F. Supp. 3d 435 (D. Mass. 2018) ................................................................. 14

*Freudenberg Bldg. Sys., Inc. v. Architectural Floor Sys., Inc.*, No. CIV. A. 94-10654-GAO, 1995 WL 598827 (D. Mass. Oct. 3, 1995)........................................................................................................... 14

*Hefter Impact Techs., LLC v. Sport Maska, Inc.*, No. CV 15-13290-FDS, 2017 WL 3317411 (D. Mass. Aug. 3, 2017) ........................................................................................................................................... 3

*Hill v. Whitcomb*, 12 F. Cas. 182 (C.C.D. Mass. 1874)............................................................................ 7

*IKON Office Solutions, Inc. v. Belanger*, 59 F. Supp.2d 125 (D. Mass 1999) ........................................ 6

*In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332 (1st Cir. 1992) ................................................ 19

*In re Clemens*, No. CV 18-MC-91252-IT, 2020 WL 5946621 (D. Mass. Oct. 7, 2020) ...................... 21

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503-DJC, 2015 WL 5458570 (D. Mass. Sept. 16, 2015) ...................................................................................................... 9

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346 (Fed. Cir. 1999) ........................................................... 7

*Ivers v. Lincoln Nat'l Life Ins. Co.*, No. 20CV10507-LTS, 2020 WL 4673569 (D. Mass. Aug. 12, 2020) ..................................................................................................................................... 18, 19, 20

*Jefferson Ins. Co. v. Holyoke*, 503 N.E.2d 474 (1987) ........................................................................... 23

*Kansas v. Nebraska*, 574 U.S. 445 (2015) ............................................................................................. 13

*Laurin v. DeCarolis Const. Co.*, N.E.2d 675 (Mass. 1977)..................................................................... 12

*Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49 (1st Cir. 2001) ................................... 18

*M & H Tire Co. v. Hoosier Racing Tire Corp.,* 733 F.2d 973 (1st Cir.1984) ........................ 8

*Medina-Rivera v. MVM, Inc.*, 713 F.3d 132 (1st Cir. 2013) ................................................ 2

*Moore v. Valle Auto Mall, Inc.*, 92 Mass. App. Ct. 1117, 2017 WL 6002817 (Mass. App. Dec. 5, 2017) ....................................................................................................................... 14

*Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44 (1st Cir. 2004) ...................................... 3

*Nicolaci v. Anapol*, 387 F.3d 21 (1st Cir. 2004)........................................................ 18, 19

*Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.1978) ............................................ 8

*People's Choice Mortg., v. Premium Cap. Funding, LLC*, No. 06-3958-BLS2, 2010 WL 1267373 (Mass. Super. Mar. 31, 2010) ....................................................................................... 11

*Pitcherville Sand & Gravel, Inc. v. Holden Sand & Gravel Co.*, No. 200700531D, 2008 WL 2745262 (Mass. Super. June 20, 2008)......................................................................................... 23

*Shedd v. Sturdy Mem'l Hosp., Inc.*, No. 2173CV00498C, 2022 WL 1102524 (Mass. Super. Apr. 5, 2022) ................................................................................................................. 11, 12

*SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp.2d 1069 (D. Colo. 2013)................ 7

*Southern Union Co. v. Dep't of Pub. Utils.*, 458 Mass. 812 (2011)................................... 18

*Starr v. Fordham*, 420 Mass. 178, 648 N.E.2d 1261 (1995) ............................................ 19

*Taylor v. Sawyer*, No. CV 20-11080-GAO, 2022 WL 975961 (D. Mass. Mar. 31, 2022) ........ 22

*United States v. Pena-Gonzalez*, 62 F. Supp. 2d 358 (D.P.R. 1999) ................................. 14

*Wells v. Wells*, 400 N.E.2d 1317 (Mass. App. Ct. 1980)................................................... 9

*Williams v. Ely*, 668 N.E.2d 799 (Mass. 1996)............................................................. 14

*Winlake II, Inc. v. Mercier*, No. MICV200500043C, 2006 WL 1360855 (Mass. Super. May 3, 2006)23, 24

*Zhao v. CIEE Inc.*, 3 F.4th 1 (1st Cir. 2021)................................................................. 19

**Other Authorities**
HOLD HARMLESS, Black's Law Dictionary (11th ed. 2019)........................................... 19

Restatement (Third) of Restitution and Unjust Enrichment § 39 (2011) ....................... 12, 13

**Rules**
Fed. R. Civ. P. 56(a) ................................................................................................ 22

Defendants Ingenico, Inc., Ingenico Corp., and Ingenico Group SA (collectively "Defendants"), hereby submit their opposition to Plaintiffs' Motion for Summary Judgment (the "Motion").  For the reasons set forth below, Defendants respectfully submit that this Court should deny Plaintiffs' Motion in its entirety.

## I.   <u>INTRODUCTION</u>

Plaintiffs' Motion ultimately asks the Court to disregard the plain language of the agreement that lies at the center of this case, generally, and Defendants' claims, specifically, namely the Engineering Development and License Agreement entered into by BBPOS and ROAM Data, Inc. ("ROAM") in 2010 and amended in 2011 (the "Agreement").  *See* Agreement (Pls.' Statement of Material Facts in Support of their Mot. For Summ. J., Ex. C), Doc. No. 188-3.  The Agreement is straightforward.  BBPOS granted to ROAM all of its intellectual property rights that were associated with two products, one already on the market and the other in development, as well as any components of those products or any other products that were similar to or based upon the identified products.  In exchange, ROAM would purchase goods from BBPOS with guaranteed margins.  The rights were exclusive:  even BBPOS could not utilize the licensed IP except to serve ROAM under the Agreement or to sell its products in a limited geographic region.  As is customary in such agreements, the parties committed to indemnify and hold one another harmless in the event that third parties brought claims alleging infringement of intellectual property rights.

ROAM, and Defendants after ROAM was merged into Ingenico, Inc., kept their side of the bargain, purchasing millions of dollars of products from BBPOS from the beginning of the relationship until 2018.  BBPOS, however, never lived up to its promises and instead committed a series of acts that are classic examples of unfair business practices.  BBPOS utterly disregarded the exclusivity restrictions, selling products that were exclusive to Defendants and products that utilized exclusively-licensed IP, earning for itself tens of millions of dollars in wrongful profits.  In this, it was abetted by

its co-Plaintiff AnywhereCommerce, which had explicitly acknowledged the terms of the Agreement and yet purchased products from BBPOS that it knew were exclusive to Defendants.  BBPOS poached Defendants' business by selling directly to Defendant's customers.  And when its products were accused of infringing third parties' IP rights, BBPOS refused to hold Defendants harmless.

Plaintiffs' response to having been caught flagrantly violating the Agreement is to attempt to rewrite the Agreement itself.  Now, they say, its broad and inclusive grants of rights should be narrowly construed to cover only a single product.  Now, they say, the Agreement itself is illegal and contrary to public policy.  Now, they say, it never agreed to hold Defendants harmless.  Now, they say, Defendants never really had a meaningful right to exclude BBPOS from using the licensed IP outside of the territory defined in the Agreement.

But that is not what BBPOS promised, and it is not what the Agreement provides.  BBPOS's arguments are contrary to the plain and unambiguous language of the Agreement, either unsupported or supported only by inadmissible parol evidence, and, ultimately, would require that the Court determine adjudicative facts that are questions for the jury.[1]  The Motion should be denied in its entirety.

---

[1]     Plaintiffs requested and took full advantage of 20 extra pages for their brief, in addition to the six pages (with five footnotes) of brief-in-disguise captioned as a motion.  Despite this volume, Plaintiffs' Memorandum invokes, but does not provide any analysis of, a number of legal arguments.  For example, on Page 15 Plaintiffs state that summary judgment on Count I is warranted for "at least, seven reasons," including "prohibited assignment as a material breach."  Plaintiffs included a number of purportedly undisputed material facts on this subject, and yet did not develop that argument in any fashion.  *See* Pls.' Statement of Material Facts in Support of their Mot. For Summ. J., Doc. No. 188 ¶¶ 47-50.

Even ignoring the undue burden associated with forcing Defendants to respond to "undisputed material facts" that have nothing whatsoever to do with the actual arguments advanced in the Motion, such undeveloped arguments should be deemed waived and Defendants should be under no obligation to respond to them substantively.  If the Plaintiffs cannot be bothered to develop the arguments, it should not fall to the Defendants to craft those arguments any more than it should be the job of the Court.  *See Direnzo Towing & Recovery, Inc. v. Owner-Operator Indep. Drivers Ass'n, Inc.*, No. 4:16-CV-10073-TSH, 2018 WL 1940310, at *9 (D. Mass. Mar. 9, 2018) (refusing to "take up [the plaintiff's] underdeveloped categorical arguments.") (citing *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 140-41 (1st Cir. 2013) (citation omitted)).

## II.     STANDARD OF REVIEW

"When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor." *Cadle Co., v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997). Summary judgment is appropriate only where the evidence in the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although "[c]ontract interpretation questions, under Massachusetts law, are ordinarily questions of law for a court"; where a contract presents an ambiguous term, that term's meaning often "'presents a question of fact for a jury.'" *Hefter Impact Techs., LLC v. Sport Maska, Inc.*, No. CV 15-13290-FDS, 2017 WL 3317411, at *2 (D. Mass. Aug. 3, 2017) (quoting *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 48 (1st Cir. 2004)).

## III.    ARGUMENT

### A.     Plaintiffs' Argument Regarding the Breach of Exclusivity Is Based Upon Factual Assertions to be Resolved by the Fact-Finder.

Plaintiffs' reliance on parol evidence in support of their argument that Ingenico has failed to prove breach of the exclusivity provision of the contract is not permitted at the summary judgment stage. Plaintiffs present parol evidence in the form of deposition testimony in an attempt to establish the intent of the parties during contract formation. *See* Pls.' Mem., Doc. No. 190 at 18 & nn.38-39. More specifically, Plaintiffs argue that some of the devices Ingenico bases its claims upon are not covered by the Agreement and that the parties did not intend to include such devices. *See id.* To consider such extrinsic evidence, a Court would have to deem the exclusivity provision ambiguous, and the meaning of the exclusivity provision must then be determined by a jury. *See Hefter Impact Techs., LLC*, 2017 WL 3317411, at *2; *see also* Section G, *infra*. Whether particular devices are

3

covered by the Agreement, specifically a provision that is considered ambiguous, is a genuine issue of material fact.  As such, this Court should not grant summary judgment.  *See Celotex Corp.*, 477 U.S. at 322.

**B.      Plaintiffs Materially Misstate the Scope of the BBPOS-ROAM License**

To escape the full consequences of their knowing and material breaches of the exclusive rights granted by BBPOS in the Agreement, Plaintiffs ask this Court to effectively rewrite the grant of license so that it covers only a single device.  *See* Pls.' Mem., Doc. No. 190 at 16-20.  Plaintiffs explicitly request that the Court determine that the proper scope of the exclusive license was "limited in nature to the CircleSwipe device as well as any products that actually ended up being developed particularly for ROAM," and because, they say, there were no products developed specifically for ROAM, "the exclusive license grant relates solely to the CircleSwipe product."  *Id.* at 19.  Because this interpretation conflicts with the plain and unambiguous language of the Agreement, it should be rejected in favor of the contract language itself.

The Agreement contains no restrictions to a single device and has no limitation as to products that might be "developed particularly for ROAM."  Rather, as amended, it grants exclusive rights to ROAM (now Ingenico) to:

> Freely use the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and distribute the Products, any portion thereof, or any products similar to or based upon any Products."

Agreement, Doc. No. 188-3 §1.1.  Section 1.3 of the Agreement clarifies the exclusive nature of this arrangement, stating:

> Without limiting the generality of the foregoing, the Partner may not, directly or indirectly, anywhere in the world, use or sell any Products, or any portion thereof, or any products similar to or based upon any Products (other than as explicitly provided in this Agreement) or grant any other person rights to the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and distribute any Products, any portion thereof, or any products similar to or based upon any

4

Products [except in China for use in China and in Philippines for use in Philippines].

Agreement, Doc. No. 188-3 §1.3.

The term "Products" is defined in Schedule I of the Agreement (which was not amended), and specifically calls out two different devices: an "Encrypted Circle Swipe reader" and an "EMV capable POS unit with Bluetooth interface." BBPOS's proffered interpretation of the Agreement would literally redefine a defined term in the Agreement, eliminating one of the enumerated products and striking the language "or any portion thereof, or any products similar to or based upon any Products."

BBPOS's sole legal argument for re-writing the contact in this manner is based upon Section 9.2 of the Agreement, a catch-all provision that provides a guaranty that ROAM will be able to enjoy the benefits of the Agreement. *See* Pls.' Mem., Doc. No. 190 at 17 ("Section 9.2 of the agreement sets forth the (only) grant of licensing rights under the agreement relative to BBPOS's IP, generally [. . . .]"), 19-20. Plaintiffs offer no explanation as to how a separate and additional grant of rights in Section 9.2 might limit the express scope of Sections 1.1 and 1.3. Instead, they merely assert that "BBPOs granted [under the Agreement] to ROAM an **exclusive product license** ultimately for a single MasterCard magnetic stripe reader." *Id.* at 18.

Plaintiffs' reference to the testimony of Will Graylin (*see id.*) cannot justify a wholesale revision of the license grant. Graylin's testimony as to the "intent" underlying the license to ROAM is parol evidence, but moreover, to the extent his testimony can be understood to mean that "the license grant was not intended … to confer upon ROAM any exclusionary rights in BBPOS's trade secrets or intellectual property" (*id.*), that testimony is flatly incorrect. Section 1.1 of the Agreement specifically granted to ROAM "any … ***trade secrets***, knowledge, data and information owned or controlled by [BBPOS] relating to the Products." Agreement, Doc. No. 188-3 §1.1 (emphasis added.) This license was rendered exclusive by Section 1.3.

The fact that this grant is tethered to the broad definition of Products does not alter the equation.  Any and all trade secrets (and other information) that concerned "Products" were licensed to ROAM exclusively.  Because the intellectual property is exclusive to ROAM under the Agreement, BBPOS was not free to utilize that IP except as provided under the Agreement (*e.g.*, in connection with procuring products for ROAM).  Any use of that IP by BBPOS for its own purposes is prohibited by the exclusive license *regardless of whether BBPOS is using the IP in a product or device that falls within the scope of "Products" as defined in the Agreement.*

Applying the plain language of the Agreement, BBPOS would violate its exclusivity covenant (1) by selling a defined "Product" *or* any product that was similar to or based upon any defined "Product," irrespective of whether the product that was "similar to" or "based upon" a "Product" had been developed specifically for ROAM, or (2) by utilizing the intellectual property licensed exclusively to Ingenico for purposes outside the Agreement.  Whether other BBPOS products are "similar to" or "based upon" Products is a question of fact for the jury as is the question of whether other BBPOS products utilized the exclusively-licensed intellectual property.

Because the plain language of the Agreement is significantly broader than just the "Circle Swipe" product, and because the resolution of whether products sold by BBPPOS outside of its permitted geographic region fell within the scope of that license, summary judgment on this issue would not be appropriate.

## C.     The Exclusive Rights Afforded to Ingenico Under the Agreement Constitute Neither An Illegal Nor An Unenforceable Restraint on Trade.

Plaintiffs contend that the Agreement is an unenforceable restraint of trade, but that contention is predicated on an unstated assumption that the Agreement should be understood, as a matter of law, to be the same as an employment agreement.  *IKON Office Solutions, Inc. v. Belanger*, 59 F. Supp.2d 125, 126–27 (D. Mass 1999) (examining the validity of a non-competition agreement between employer and former employee); *Analogic Corp. v. Data Translation*, *Inc.*, 358 N.E.2d 804 (Mass.

1976) (analyzing the proper form of injunctive relief to provide to an employer whose employees violated their nondisclosure agreements); *All Stainless, Inc. v. Colby*, 308 N.E.2d 481, 485 (Mass. 1974) (examining the validity of a non-competition agreement between employer and former employee); *Club Aluminum Co. v. Young*, 160 N.E. 804, 806–07 (Mass. 1928) (same); *Dynamics Research Corp. v. Analytic Scis. Corp.*, 400 N.E.2d 1274, 1289–90 (Mass. App. Ct. 1980) (addressing the enforceability of a former employee's nondisclosure agreement).

The Agreement is not between an employer and its employee, and Plaintiffs have advanced no legal theory why such cases govern its enforceability.

In fact, the Agreement is a legitimate trade agreement reached by sophisticated parties, at arms' length and without coercion, and therefore does not constitute an illegal restraint on trade.  Contrary to Plaintiffs' suggestions, it is commonplace that businesses enter licensing agreements for the exclusive use of intellectual property.  *See, e.g.,* 35 USCA § 261 (West 2013) ("Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing . . . [t]he applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States."); *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp.2d 1069, 1081 (D. Colo. 2013) ("[A]ntitrust laws do not negate the intellectual property holder's right to exclude others from intellectual property.") (citing *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999)); *Hill v. Whitcomb*, 12 F. Cas. 182 (C.C.D. Mass. 1874) (complainants owned the exclusive right to use, rent, and vend presses containing patented improvements).  Intellectual property rights are inherently exclusive.  Unsurprisingly, Plaintiffs fail to reference a single case that invalidated a commercial license between corporate parties on a restraint-of-trade theory, relying instead – and exclusively – on a litany of inapposite cases that examine the validity of non-compete covenants between employers and former employees.

Plaintiffs' reliance upon non-compete cases is misguided and uninstructive.  For instance,

Plaintiffs cite to the Massachusetts Supreme Judicial Court's decision in *Club Aluminum Co.* for the

principle that "an employer cannot by contract prevent his employee from using the skill and

intelligence acquired and improved through experience or through instruction received in the course of

employment."[2]  160 N.E. at 806).  However, unlike non-compete agreements, the Agreement had the

opposite of a constraining effect, facilitating sales of BBPOS-manufactured goods that it would not

otherwise be able to make while permitting BBPOS to continue sell its products directly in a region of

its choosing, specifically in China and the Philippines.  In other words, the Agreement had the

legitimate business purpose of benefiting both BBPOS and ROAM by facilitating a framework in

which they could act in a coordinated and complementary fashion, presumably to each party's business

advantage.  *See, e.g., Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 16 (1st Cir. 2004) (vertical

restraints[3] "often have both pro-competitive and anti-competitive effects" and "[f]or this reason, such

restraints generally are not deemed per se illegal, but, rather, are tested under a rule of reason

analysis.") (quoting *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.1978) (en banc)

(citing *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808

(1988)); *Elecs. Communications Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d

Cir. 1997) ("[E]xclusive distributorship arrangements are presumptively legal."); *see also In re*

*Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503-DJC, 2015 WL

---

[2]     Plaintiffs conspicuously omit the Court's references to employees or employers from their
brief, describing the case as follows:  "[A] plaintiff cannot by contract prevent a party 'from using the
skill and intelligence acquired or increased and improved through experience or through instruction
received in the [term of contract and/or relationship].'"  Pls.' Mem. at 23-24.  What *Club Aluminum*
actually said was:  "But *an employer* cannot by contract prevent *his employee* from using the skill and
intelligence acquired or increased and improved through experience or through instruction received *in
the course of the employment*.").  160 N.E. 804, 806 (1928) (emphasis added).

[3]     "'A vertical restraint is a restraint of trade involving a combination of persons at different
levels of the market structure.'" *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 16 (1st Cir. 2004)
(citing *M & H Tire Co. v. Hoosier Racing Tire Corp.*, 733 F.2d 973, 978 (1st Cir.1984)).

5458570, at *6 (D. Mass. Sept. 16, 2015) (citing *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343 (1982)); *Addamax Corp. v. Open Software Found., Inc.*, 888 F.Supp. 274, 279 (D. Mass. 1995) ("a plaintiff bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market.") (emphasis in original); *cf. Club Aluminum Co.*, 160 N.E. at 806 (stating that courts strike down non-compete agreements when they hinder the public's interest in promoting former employees' "right to use and expand [their] powers").

The Agreement does not implicate the policy interests of noncompete agreements between employers and employees. Because employment covenants raise substantial concerns related to bargaining power, Massachusetts courts closely scrutinize such agreements to ensure that the parties "enter[] into the agreement with the assistance of counsel and without compulsion." *Wells v. Wells*, 400 N.E.2d 1317, 1320 (Mass. App. Ct. 1980). Here, these policy interests are not present because the Agreement involved a transaction between two equally situated, sophisticated parties. Indeed, even if this were a noncompete agreement – which it is not – Plaintiffs' employment cases are inapplicable because the Supreme Judicial Court has consistently observed that "courts look 'less critically' at covenants to compete (outside the employment context) because they do not implicate an individual's right to employment." *Boulanger v. Dunkin' Donuts Inc.*, 815 N.E.2d 572, 576 (Mass. 2004).

Because the Agreement does not implicate the policy concerns of non-compete agreements, Plaintiffs' arguments related to the Agreement's duration are misplaced. Specifically, Plaintiffs note that, in evaluating the duration of a trade restriction, courts consider "the nature of plaintiff's business, situation of parties, necessity of restriction for protection of plaintiff's business and right of defendant to earn a livelihood." Pls.' Mem., Doc. No. 190 at 25. However, this standard is inapplicable because it merely addresses an employer's ability to forestall a former employee's right to earn a living. Even when one attempts to apply that standard, the Agreement aligns with those principles because it

involved two sophisticated parties entering an agreement to receive perpetual benefits.[4]  The Agreement in no way hindered Plaintiffs' ability to earn a living, rather it provided Plaintiffs with the benefit of 1) selling a significant quantity of products to ROAM and 2) retaining rights to sell products in China and the Philippines. In fact, during his deposition, Ben Lo acknowledged this mutual, perpetual benefit, stating:  "[w]e [BBPOS] need ROAM. Yes. We need ROAM for the revenue, but ROAM need[s] us. So ROAM make[s] money and we make money . . . without ROAM we can still sell some product in China." BBPOS 30(b)(6) Dep. (Dec. 10, 2021) Tr. (Pls.' Statement of Material Facts in Support of their Mot. For Summ. J., Ex. J), Doc. No. 188-10, at 119:22-120:11.

Plaintiffs misapply the Supreme Judicial Court's holding in *Analogic Corp. v.*, which does not support their request for summary judgment. 358 N.E.2d 804.  There, the defendants, plaintiff's former employees, had agreed not to take documents belonging to their employer at the conclusion of their tenure; however, they nonetheless retained crucial documents and used them to create a product at a fraction of the cost that the employer invested to invent the product.  *Id.*  The Court held that a permanent injunction was inappropriate and must instead be based on the amount of time "that others in the trade are likely, through legitimate business procedures, to have become aware of these secrets." *Id.* at 808.  The Court's holding is inapposite because *Analogic* involved a total prohibition on the employees' ability to create the product, rather than an agreement between parties to buy and sell products to one another.

---

[4]      Plaintiffs make much of what they describe as "the indefinite duration of the non-compete period."  Pls.' Mem., Doc. No. 190 at 25; *see generally id.* at 23-25.  Plaintiffs overstate the scope of the provision.  As it relates to "Products," the post-termination restrictions on BBPOS extend only to the "product[tion], or assist[ance] in the design or production of, the Products, or products substantially similar to the Products for any third party […]."  *Id.* at 23 (quoting Agreement).  This BBPOS covenant is part and parcel of the grant of rights that lies at the heart of the Agreement:  an "exclusive," "worldwide" (other than China and the Philippines) license that is "perpetual" and "fully-paid."  Agreement, Doc. No. 188-3 §§1.1, 1.3.  BBPOS's argument would have the law permit BBPOS to grant a perpetual, fully-paid license and then terminate the agreement and thereby claw back the rights that it had granted without recourse by Ingenico.  BBPOS offers no law to support such an inequitable result.

In short, the Agreement is not a non-compete agreement between an employer and employee and the standards applicable to this discrete type of contract should not be applied here.  Accordingly, this Court should deny summary judgment on this basis.

### D.    Ingenico Has Established Actionable Harm Because the Unjust Enrichment that BBPOS Derived from the Sales of Ingenico's Products is the Proper Measure of Damages for Ingenico's Breach of Contract Claim.

Ingenico has established actionable harm because, as a matter of law, the unjust enrichment that BBPOS derived from the sales of Ingenico's products serves as the proper measure of damages for Ingenico's breach of contract claim.  In their memorandum, Plaintiffs rely on a single trial court opinion to support the sweeping proposition that unjust enrichment "is not a proper measure of damages on a breach of contract claim."  Pls.' Mem., Doc. No. 190 at 21-22 (citing *People's Choice Mortg., v. Premium Cap. Funding, LLC*, No. 06-3958-BLS2, 2010 WL 1267373, at *11 n.6 (Mass. Super. Mar. 31, 2010)).

Plaintiffs' reliance on *People's Choice Mortg.* is misplaced.  Contrary to the suggestion inherent in Plaintiffs' direct citation to the case without introductory signal, the Superior Court of Massachusetts did not hold that a disgorgement theory of damages is inapplicable to a breach of contract action.[5]  However, earlier this year, the same court held that disgorgement is a valid remedy for breach of contract.  *Shedd v. Sturdy Mem'l Hosp., Inc.*, No. 2173CV00498C, 2022 WL 1102524, at *11 (Mass. Super. Apr. 5, 2022) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 39 (2011)).  In *Shedd*, the Superior Court of Massachusetts expressly recognized that "'[i]f a deliberate breach of contract results in a profit to the defaulting promisor and the available damage remedy affords inadequate protection to the promisee's contractual entitlement, ***the promisee has a claim to***

---

[5]    Rather, the court noted that the plaintiff had "offer[ed] no authority" in support of applying a disgorgement theory of damages to a breach of contract action.  *People's Choice Mortg.*, 2010 WL 1267373, at *11 n.6.

***restitution of the profit realized by the promisor as a result of the breach***'"  2022 WL 1102524, at

*11 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 39 (2011) (emphasis

added)).  Damages ordinarily "'afford inadequate protection to the promisee's contractual

entitlement'" when they "will not permit the promisee to acquire a full equivalent to the promised

performance in a substitute transaction.'"  *Id.* at *11 (quoting Restatement (Third) of Restitution and

Unjust Enrichment § 39 (2011)).  A breach of contract is "'profitable when it results in gains to the

defendant (net of potential liability in damages) greater than the defendant would have realized from

performance of the contract.'"  *Id.* (quoting Restatement (Third) of Restitution and Unjust Enrichment

§ 39).  Profits from a breach of contract include "'saved expenditure and consequential gains that . . .

the defendant would not have realized but for the breach, as measured by the rules that apply in other

cases of disgorgement."  *Id.* (quoting Restatement (Third) of Restitution and Unjust Enrichment § 39).

Disgorgement is therefore an available remedy in a breach of contract action when (1) the

breach was deliberate; (2) the breach was profitable; and (3) an award for compensatory damages

cannot adequately protect the non-breaching party's contractual entitlement.  *See* Restatement (Third)

of Restitution and Unjust Enrichment § 39 .  Under these circumstances, the courts have considered the

breach to be "opportunistic," determining that the appropriate remedy is restitution (*i.e.*, disgorgement

of the breaching party's gains) rather than compensation.  *See id.* § 39 & cmt. d.  The disgorgement

remedy does not serve to punish the breaching party, but rather to deprive them of a profit wrongfully

made.  *See id.* (citing *Laurin v. DeCarolis Const. Co.*, N.E.2d 675, 679 (Mass. 1977)).

*Laurin* is instructive.  There, the plaintiff real property purchasers prevailed on their breach of

contract claim against the defendant vendor when the defendant removed gravel and other material

from the property during the construction of the house, despite the plaintiffs having expressly

conveyed to the defendant their disapproval of any such removal, and the plaintiffs' purchase price did

not reflect a diminution in value resulting from such extraction.  *Id.* at 677. *Id.*

The Supreme Judicial Court held that the fair market value of the gravel was an appropriate award of damages for the plaintiff's "claim for a deliberate and willful breach of contract." *Id.* at 676, 678. In so holding, the court determined that this assessment of damages was not punitive, as "it merely deprive[d] the defendant of a profit wrongfully made, a profit which the plaintiff was entitled to make." *Id.* at 678-79; *see also Kansas v. Nebraska*, 574 U.S. 445, 461-465 (2015) (applying Restatement (Third) of Restitution and Unjust Enrichment § 39 in holding that disgorgement of the defendant's profits was an appropriate remedy for the defendant's breach of a settlement agreement with the plaintiff because the defendant "knowingly exposed [the plaintiff] to a substantial risk of breach, and ultimately proceeded."); *Cernelle v. Graminex, L.L.C.*, 437 F. Supp. 3d 574, 594 (E.D. Mich. 2020), *amended on reconsideration in part*, 539 F. Supp. 3d 728 (E.D. Mich. 2021) (recognizing that plaintiff's request for disgorgement was a remedy available under the Restatement (Third) of Restitution and Unjust Enrichment § 39 based on the defendant's purported unjust enrichment from the breach of a settlement agreement).

Here, the profits that BBPOS attained from its breach of the Agreement are the proper measurement of Ingenico's actual harm, and as a result, disgorgement of those same profits is the proper remedy. By selling licensed devices within the exclusive region (*i.e.*, everywhere outside of China and the Philippines), BBPOS deliberately and willfully breached the Agreement. *See* Pls.' Statement of Material Facts in Support of their Mot. For Summ. J., Ex. CC, Doc. No. 188-29 at 36, Exhibit D-1. That opportunistic breach yielded a profit for BBPOS totaling $56,084,456. *See id.* at 37-38, Exhibits D-2 to D-8, D-13, G-2 to G-3, G-8. The terms of the Agreement entitled Ingenico to the above-mentioned profit, and compensatory damages fail to adequately protect that contractual right.[6] As such, disgorgement of BBPOS's wrongfully obtained profits is the appropriate remedy to cure Ingenico's actionable harm.

---

[6] BBPOS's position on summary judgment is that Ingenico's claims fail because it cannot establish lost sales. *See* Pls.' Mem., Doc. No. 190 at 21. However, had Ingenico advanced a lost

**E.      Defendants' Claims Are Not Barred by the Applicable Statutes of Limitation.**

The applicable statute of limitations does not bar Ingenico's contractual breach claims against

BBPOS (*i.e.*, Counts I and II).  Massachusetts law recognizes a six-year statute of limitations for

breach of contract actions. *See Fisher v. HSBC Bank*, 332 F. Supp. 3d 435, 440 (D. Mass. 2018) (citing

Mass. Gen. Laws ch. 260, § 2).  The statute of limitations "does not begin to run . . . 'until the plaintiff

knows or reasonably should know that [they have] been harmed.'"  *Fisher*, 332 F. Supp. 3d at 440

(quoting *Williams v. Ely*, 668 N.E.2d 799, 804 (Mass. 1996)).  For statute of limitations purposes,

"Massachusetts law . . . considers a counterclaim to have been filed as of the date of the filing of the

complaint."  *Freudenberg Bldg. Sys., Inc. v. Architectural Floor Sys., Inc.*, No. CIV. A. 94-10654-

GAO, 1995 WL 598827, at *7 n.9 (D. Mass. Oct. 3, 1995) (citing Mass. Gen. Laws ch. 260, § 36);

*Moore v. Valle Auto Mall, Inc.*, 92 Mass. App. Ct. 1117, 2017 WL 6002817, at *2 (Mass. App. Dec. 5,

2017) (same).

Here, Plaintiffs initiated this lawsuit in December 2018.[7]  Therefore, to prevail on their theory

that the pertinent statute of limitations bars Ingenico's contractual breach claims against BBPOS,

Plaintiffs must present uncontroverted evidence that—prior to December 2012— Ingenico knew or

should have known that BBPOS was selling Covered Mobile Payment Devices outside of China and

the Philippines.

---

profits theory of damages, BBPOS's position would have been that Ingenico cannot establish lost sales
due to the "estimated 230 providers in the mobile payment space as of 2016," as stated by the BBPOS
damages expert in his rebuttal report.  *See* Defendants' Statement of Additional Undisputed Material
Facts Precluding Summary Judgment (filed concurrently with this Opposition) ¶ 4.  Ingenico is, in
BBPOS's reckoning, unable to obtain relief under any theory.  However, it is a "fundamental principle
of our jurisprudence" that "where there is a right there is a remedy," or, in the Latin, *ubi jus ibi
remedium*. *United States v. Pena-Gonzalez*, 62 F. Supp. 2d 358, 365 (D.P.R. 1999).  Here, the
Agreement grants Ingenico an undoubtable right to exclude BBPOS from selling Products outside of
China and the Philippines.  That right, now violated, must have a remedy.

[7]      On December 20, 2018, Plaintiffs filed their Complaint in the United States District Court for
the Northern District of Georgia.  *See* Compl., Doc. No. 1.  On July 2, 2019, the Honorable Michael L.
Brown entered a Consent Order referring the present action to this Court.  *See* Consent Order, Doc.
No. 36.

Plaintiffs fall short of meeting their burden.  In their attempt to convince this Court otherwise, Plaintiffs rely on three documents.  The first is an April 2010 email chain that predates the Agreement. *See* Pls.' Mem., Doc. No. 190 at 28-29, Ex. Q (Doc. No. 188-17).  At no point in the correspondence does anyone state, suggest, or imply that BBPOS breached the Agreement, naturally enough because BBPOS had yet to agree to abstain from sales outside of China and the Philippines.  *See id.* at Ex. Q (Doc. No. 188-17).  In fact, the email correspondence concerns ROAM's contemplation of the terms of its eventual exclusive licensing agreement with BBPOS and discusses the significance to BBPOS of granting exclusivity to a third party for products that it had developed.  *See id.*  Significantly, these communications include Will Graylin's representation to the then-CFO of ROAM, John Frontz, that Mr. Graylin was "convincing [BBPOS] to take [the Crypto Swipe device] off the market and give [ROAM] exclusivity."  *See id.* at 29 (quoting Ex. Q, Doc. No. 188-17 at 2).  Far from demonstrating that anyone knew of an "immediate and unabating breach" that accrued immediately upon signing the Agreement (Pls.' Mem., Doc. No. 190 at 29), these emails demonstrate that the parties knew and expected that once the Agreement was signed, BBPOS would cease selling its products except in the limited geographic region carved out in the Agreement.

Second, Plaintiffs point to a September 2011 email that included photographs of "the Anywhere Commerce Rambler."  *See id.* at 29 (citing (Ex. Y) Doc. No. 188-25).  This email does not concern BBPOS's sales of any products, let alone sales of Covered Mobile Payment Devices.  *See id.* at (Ex. Y), Doc. No. 188-25.  The attached photographs likewise fail to shed any light on BBPOS's breach of the Agreement.  *See id.*  The mere existence of an AnywhereCommerce-branded product, even if the product was a "Product" under the Agreement, does not demonstrate that Ingenico (or ROAM) was aware that BBPOS had sold such devices at any time after the Agreement was reached. In fact, its existence is fully consistent with the fact, critical to the April 2010 email chain discussed immediately above, that BBPOS had been selling products to other third parties prior to entering into the Agreement.

15

Finally, Plaintiffs rely on a PowerPoint presentation by Ingenico entitled "Business Review December 2015." *See id.* at 29 (citing Ex. Z, Doc. No. 188-26).  Because the statute of limitations is six years, a 2015 document does not demonstrate Ingenico's awareness of a breach within the relevant period, *i.e.*, prior to December 2012.  Separately, the document simply is not probative of Ingenico's awareness of a breach.  As Plaintiffs themselves note, in December 2015, Ingenico was under the impression that "'BBPOS *continue[d] to honor and abide by the contract signed in July 2013*.'" *See id.* at 29 (quoting Ex. Z, (Doc. No. 188-26 at 17)) (emphasis added).  Although Plaintiffs' fail to clarify in their memorandum, Ingenico acts under the reasonable impression and belief that the above-mentioned signed contract refers to the License Agreement and Non-Competition Agreement between AnywhereCommerce's parent company, 4361423 Canada Inc. ("4361423 Canada"), and BBPOS dated July 1, 2013 (the "July 2013 Contract").  *See* Pls.' Statement of Material Facts in Support of their Mot. For Summ. J., Ex. T, Doc. No. 188-20.

Significantly, the July 2013 Contract expressly recognizes and consents to the terms of the Agreement.[8]  For this reason, the cited portion of the December 2015 PowerPoint reflects—if anything—Ingenico's then-*unawareness* of BBPOS's breach of the Agreement.  Accordingly, Plaintiffs have failed to present *any* evidence—much less undisputed evidence—of Ingenico's knowledge of BBOS's breach of the licensing agreement prior to December 2012.

---

[8]  The July 2013 Contract provides, in relevant part, as follows:

> [4361423 Canada] hereby expressly acknowledges that [BBPOS] previously entered into an Engineering and Development and Licensing Agreement with ROAM Data, Inc., a subsidiary of Ingenico S.A., dated May 4, 2010, and [4361423 Canada] hereby consents to such agreement, and [4361423 Canada] acknowledges and agrees that [4361423 Canada] shall not enter into any licensing agreement with ROAM Data, Inc., Ingenico S.A. or any of their respective Affiliates in relation to the use of the Licensed Patent Rights in the Region during the terms of this Agreement.

*See* Pls.' Statement of Material Facts in Support of their Mot. For Summ. J., Ex. T, Doc. No. 188-20 § 9.2.

**F.      Sections 3.10 and  3.18 of the Agreement are Unambiguous and Ingenico Is Entitled to Relief Thereunder.**

Ingenico is entitled to relief under Sections 3.10 and 3.18 of the Agreement not only in the form of indemnification, but also costs and expenses of pending litigation, including but not limited to "reasonable fees of attorneys."  Section 3.18 of the Agreement provides:

> The Partner [BBPOS] agrees to indemnify and hold the Company harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Partner or arising out of or resulting from any claim brought by a third party against the Company as a result of or relating to any actual or alleged breach thereof.

Agreement, Doc. No. 188-3 § 3.18.  Section 3.10 states that:

> The Partner [BBPOS] represents and warrants that none of the Products, Devices, Deliverables or Services does or will infringe, misappropriate, or violate any intellectual property right of any person.  The Partner represents and warrants that . . . none of the Products, Devices, or Deliverables does or will contain any third-party software or products, other than any third-party software or product that is included therein with the Company's written consent and that in no manner interferes with or limits the Company's right to use or sell such Product, Device or Deliverable.  The Partner represents and warrants that it has used and will use for the Company's benefit, its best efforts to perfect and protect all intellectual rights in the Products, Devices, Deliverables and Services. The Partner shall sign all documents, make all filings and take all actions reasonably requested by the Company in order to perfect and protect the Company's intellectual property rights in the Products, Devices, Deliverables and Services. The Partner shall promptly notify the Company if it becomes aware of any actual or alleged infringement with respect to any Products, Devices, Deliverables or Services.

*Id.* § 3.10.

Plaintiffs argue that the counterclaim Ingenico brought under this section should be dismissed for five reasons:

    1)    "failure to establish the existence of a duty to defend (vs. duty to indemnify)";

    2)    "failure to establish the existence of a duty to prosecute";

    3)    "failure to keep informed";

4) "lack of advance notice and/or evidence of reasonableness of settlements; and/or

5) "lack of evidence of reasonableness of attorneys' fees and costs allegedly incurred.

*See* Pls.' Mem., Doc. No. 190 at 30.  Each of these arguments fails.

### 1. Sections 3.10 and 3.18 are Unambiguous.

The question of whether a contract or its terms are ambiguous is one of law for the court. *Nicolaci v. Anapol*, 387 F.3d 21, 26 (1st Cir. 2004).  A contract is ambiguous if "'an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.'" *Ivers v. Lincoln Nat'l Life Ins. Co.*, No. 20CV10507-LTS, 2020 WL 4673569, at *3 (D. Mass. Aug. 12, 2020), *aff'd*, No. 20-1880, 2021 WL 4239642 (1st Cir. June 2, 2021) (citing *Nicolaci*, 387 F.3d at 26 (quoting *Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49, 53 (1st Cir. 2001)).  An unambiguous contract "leaves no question of fact to be resolved, and the contract must be enforced according to its terms." *Id.* (citations omitted).  "Ambiguity is not created merely because the litigants disagree about the meaning of a contract." *Id.* (citations omitted).

Under Massachusetts law, courts are required to interpret a contract to "'give effect to its plain language and give terms their usual and ordinary meaning.'" *City of New Bedford v. AVX Corp.*, No. CV 15-10242-WGY, 2015 WL 13697608, at *4 (D. Mass. Aug. 27, 2015) (*quoting Southern Union Co. v. Dep't of Pub. Utils.*, 458 Mass. 812, 820 (2011) (internal quotation marks omitted)).

The plain language of Section 3.18 of the Agreement provides greater protection than a mere duty to indemnify, encompassing what one might call duties to defend and prosecute.  The provision states that BBPOS would not only indemnify, but also "hold the Company harmless" from "*any and all* losses, costs, liabilities, or expenses"  1) "arising out of or resulting from the breach [of] any warranty, representation or other provision of this Agreement by the Partner *or*" 2) "arising out of or resulting from any claim brought by a third party."  Agreement, Doc. No. 188-3 § 3.18 (emphasis

added).  To "hold harmless is to "absolve (another party) from ***any responsibility*** for damage or other liability arising from the transaction."  HOLD HARMLESS, Black's Law Dictionary (11th ed. 2019) (emphasis added).  Considered in conjunction with Section 3.10 of the Agreement, as discussed in section 2, *infra*, it is clear that the contract imposes on BBPOS an unquestionable obligation to absolve Ingenico from any responsibility arising from any breach of the Agreement by BBPOS. *See AVX Corp.*, 2015 WL 13697608, at *4.  There is no other reasonable interpretation of the language in Sections 3.10 and 3.18, and Plaintiffs' bald assertion to the contrary does not render these terms ambiguous.  *See Ivers*, 2020 WL 4673569, at *3.

> ### 2. Plaintiffs Simultaneously Ignore Contractual Language and Add Contractual Terms to Abdicate BBPOS's Responsibilities to Ingenico.

Plaintiffs improperly ask this Court to ignore longstanding principles of contract interpretation.  A contract "must be interpreted holistically, with each clause and provision examined and construed in light of all other clauses and provisions." *Ivers*, 2020 WL 4673569, at *3 (citing *Fin. Res. Network, Inc. v. Brown & Brown, Inc.*, 867 F. Supp. 2d 153, 177 (D. Mass. 2012) (citing *Cofman v. Acton Corp.*, 958 F.2d 494, 498 (1st Cir. 1992) and *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1357 (1st Cir. 1992))).  A contract's meaning "'cannot be delineated by isolating words and interpreting them as though they stood alone.'" *Nicolaci*, 387 F.3d at 26 (quoting *Starr v. Fordham,* 420 Mass. 178, 648 N.E.2d 1261, 1269 (1995)); *see also Zhao v. CIEE Inc.*, 3 F.4th 1, 7 (1st Cir. 2021) ("contractual interpretation does not start and end on reading one phrase in isolation.").  Plaintiffs' reading of provision 3.18 elides critical components and should be rejected.

Plaintiffs attempt to limit BBPOS's obligations by ignoring the "hold harmless" language, which creates an immediate and ongoing duty once Ingenico is presented with a claim. This obligation to hold harmless is similar to a duty to defend, which this Court recognized is "antecedent to, and independent of, the duty to indemnify."  *Arvest Bank v. RSA Sec. Inc.*, 1:15-

CV-11798-IT, 2017 WL 4287358, at *3 (D. Mass. Sept. 27, 2017). Moreover, the duty to take affirmative steps, such as prosecuting an *inter partes* review of asserted patents, is within the scope of BBPOS's obligations if, in Ingenico's reasonable opinion, such actions are necessary to defend the case brought against it. This is confirmed by Section 3.10 of the Agreement, which states that "[t]he Partner shall sign all documents, *make all filings* and *take all actions reasonably requested by the Company* in order to perfect and protect the Company's intellectual property rights in the Products, Devices, Deliverables and Services." Agreement, Doc. No. 188-3 § 3.10 (emphasis added); *see Ivers*, 2020 WL 4673569, at *3.

Plaintiffs' myopic focus on the language stating that BBPOS must indemnify and hold Ingenico harmless from "losses, costs, liabilities, or expenses" arising out of third-party actions, ignores the immediately preceding language. Each of the claims for which Ingenico seeks indemnification included, in the first instance, a claim by a third party that BBPOS products sold by Ingenico violated the third party's intellectual property rights. That a patent claim would engender a review of the asserted patent is entirely foreseeable, and under Section 3.10 of the Agreement, BBPOS would be required to "make [such] filings" at Ingenico's reasonable instruction that it do so. Of course, BBPOS has shirked its obligations thus far and therefore the requisite steps have been taken by Ingenico directly; however, that does not in any way lessen BBPOS's obligation to absolve Ingenico from the harm stemming from the asserted IP claims.

Plaintiff also attempts to create a duty for Ingenico, which is not in the language of the Agreement, to notify BBPOS and keep it informed. Neither Sections 3.10 nor 3.18 include specific notice requirements, beyond informing BBPOS of the "losses, costs, liabilities, or expenses" such that BBPOS can fulfill its obligations under these sections. Ingenico did notify BBPOS of the pending

litigation; however, BBPOS repeatedly tried to impose additional requirements on Ingenico that were not bargained for and thus not included in the contract. *See* Pls.' Mem., Doc. No. 190 at Ex. BB.[9]

> **3.      Even if the Court Credits Plaintiffs' Argument that the IOEngine Indemnification Claim is Premature, the Claim Should Not be Dismissed With Prejudice.**

Plaintiffs argue that Ingenico's claims under the indemnification clause of the Agreement are premature insofar as they relate to the IOEngine matters because there has not yet been a "settlement and/or entry of judgment." Pls.' Mem., Doc. No. 190 at 34. Notwithstanding that position, Plaintiffs urge that this claim be dismissed with prejudice. *Id.* at 30; *see also* Mot. at 4. A dismissal with prejudice would be inappropriate where the decision is predicated on a finding that the claim is not yet ripe. *See*, *e.g.*, *In re Clemens,* No. CV 18-MC-91252-IT, 2020 WL 5946621, at *2 (D. Mass. Oct. 7, 2020) (recounting First Circuit's amendment of a dismissal with prejudice to a dismissal without prejudice "because the claim was not yet ripe.").

> **4.      Plaintiffs' Selective Focus on "the Bulk" of Ingenico's Indemnification Damages Ignores the Remainder of the Damages, Precluding Summary Judgment on that Claim.**

Plaintiffs' request for summary judgment on Ingenico's indemnity claim fails, because Plaintiffs address only part of Ingenico's damages and make evidentiary arguments that do not warrant summary judgment. Specifically, Plaintiffs focus their accrual analysis on the IOEngine proceedings that were initiated by Ingenico; however, Ingenico seeks indemnification for four other matters: REM Holdings 3, REM Holdings 3 (Vantiv/Comerica), Blackbird Tech, LLC and MobilePay LLC. *See* Vanderhart Report at 39 & n.175 (the "Non-IOEngine Proceedings,"

---

[9]      Plaintiffs' memorandum references an email dated December 3, 2018, citing to Exhibit BB, the Declaration of Melissa Bozeman, and even faults Ingenico for not having responded to the email. However, the Declaration does not include a copy of the email as an exhibit. Pls.' Mem., Doc. No. 190 at Ex. BB. BBPOS also fails to note that the parties' discussions likely came to a halt because, shortly after the undisclosed December 3, 2018 email was supposedly sent to someone at Ingenico regarding a potential common interest agreement, Plaintiffs filed this lawsuit, undermining any notion of common interest.

collectively). The Non-IOEngine Proceedings are all resolved.  Additionally, Plaintiffs argue that *some* of the claims for indemnity involve affirmative claims that "fall outside the scope of any indemnity obligations." Pls.' Mem., Doc. No. 190 at 34.  Even if the Agreement limited BBPOS's indemnity obligations to third-party actions – which it does not – the Non-IOEngine Proceedings involve matters that third-parties brought against Ingenico.  *See* Section 2, *supra*. Despite Plaintiffs' patchwork arguments, the indemnity claim survives summary judgment, as there are claims that do not fit any of Plaintiffs' arguments.  Even if Plaintiffs could establish that Ingenico is not entitled to any compensation in connection with the IOEngine-related claims, the fact that Ingenico has identified other damages is fatal to an attempt to dispose of the claim by way of summary judgment.

Plaintiffs seek summary judgment on Count I, not as to a particular subset of the damages to which Defendants are entiled if they prevail on Count I.  *See* Motion at 4 ("Regarding the second type of Alleged Indemnification Breaches, dismissal of the remainder of Count I with prejudice is warranted, in whole or in part, for five distinct reasons: (i) failure to establish the existence of a duty to defend (vs. duty to indemnify); (ii) failure to establish the existence of a duty to prosecute; (iii) failure to keep informed; (iv) lack of advance notice and/or evidence of reasonableness of settlements; and/or (v) lack of evidence of reasonableness of attorneys' fees and costs allegedly incurred.").  Granting the Motion as to Count I would be error unless Plaintiffs can demonstrate a complete absence of damages.  *See*, *e.g.*, *Taylor v. Sawyer*, No. CV 20-11080-GAO, 2022 WL 975961, at *2 (D. Mass. Mar. 31, 2022) (Under Massachusetts law, damages is an element of an action for breach of contract).  Plaintiffs have not moved in that regard and therefore the Motion should not be granted on that basis.  *See* Fed. R. Civ. P. 56(a) (requiring a party to identify "the part of each claim or defense" on which summary judgment is sought).

**G.     If This Court Finds That the Agreement's Terms Are Ambiguous, a Question of Fact Then Arises That May Not Be Resolved By Summary Judgment.**

Plaintiffs argue that certain provisions of the Agreement are ambiguous, yet still improperly request this Court to enter summary judgment. *See* Pls.' Mem., Doc. No. 190 at 15, 19-20, 25-26.  A contract is ambiguous where its terms "are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Bank v. Int'l Bus. Machines Corp.*, 145 F.3d 420, 424 (1st Cir. 1998). A dispute regarding the meaning of an ambiguous contractual term "is typically an argument about a material fact,  and summary judgment is normally unwarranted" absent extrinsic evidence reflecting a one-sided understanding of the parties intended meaning. *Den Norske Bank AS v. First Nat. Bank of Bos.*, 75 F.3d 49, 53 (1st Cir. 1996). "However, if the extrinsic evidence is 'contested or contradictory,' there is a material dispute of fact and 'summary judgment will not lie.'" *Children's Med. Ctr. Corp. v. Celgene Corp.*, No. CV 13-11573-MLW, 2016 WL 5746358, at *2 (D. Mass. Sept. 30, 2016) (quoting *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 8 (1st Cir. 1985)); *see also D.A. Sullivan & Sons, Inc. v. City of Springfield*, 91 Mass. App. Ct. 1117, 83 N.E.3d 199 (2017).

Accordingly, uncertainty about the meaning of a contractual term creates an issue of fact for a jury to resolve. *Winlake II, Inc. v. Mercier*, No. MICV200500043C, 2006 WL 1360855, at *4 (Mass. Super. May 3, 2006) (citing *Jefferson Ins. Co. v. Holyoke,* 503 N.E.2d 474 (1987); *see Pitcherville Sand & Gravel, Inc. v. Holden Sand & Gravel Co.*, No. 200700531D, 2008 WL 2745262, at *3 (Mass. Super. June 20, 2008) ("[I]f a contract is ambiguous, the interpretation of the contract's language creates an issue of fact for a jury to resolve"); *see also Feinstein v. Brown*, 432 F. Supp. 2d 258, 269 (D.R.I. 2006) ("An ambiguity that creates a genuine issue of material fact, therefore, precludes summary judgment.").

Here, Plaintiffs seek summary judgment pertaining to a contractual provision that Plaintiffs explicitly state is ambiguous. *See* Pls.' Mem., Doc. No. 190 at 15, 19-20, 25-26.  Specifically,

Plaintiffs assert that the exclusivity provision is ambiguous and should be stricken. *See* Pls.' Mem., Doc. No. 190 at 27. Assuming, *arguendo*, that this provision is ambiguous, this would create an issue of fact to be determined by a jury, and this court is precluded from entering summary judgment. *See Winlake II, Inc.*, 2006 WL 1360855, at *4. Likewise, if this Court finds another portion of the contract to be ambiguous – for example Section 3.18 of the Agreement – it should not grant summary judgment on claims involving those parts of the contract.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, Ingenico respectfully requests that this Court deny the Plaintiffs' Motion for Summary Judgment in its entirety.

<u>**REQUEST FOR ORAL ARGUMENT**</u>

Pursuant to Local Rule 7.1(d), Ingenico hereby requests oral argument.

INGENICO INC., INGENICO CORP. AND INGENICO GROUP, SA,

By their attorneys,

/s/ *Jeffrey K. Techentin*
JOHN A. TARANTINO (BBO #492230)
PATRICIA K. ROCHA (BBO #542348)
NICOLE J. BENJAMIN (BBO #666959)
JEFFREY K. TECHENTIN (*pro hac vice*)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
jtechentin@apslaw.com
Dated: July 13, 2022

Dated:  July 13, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 13, 2022, I caused to be served via electronic mail a true copy of the

within document on the following counsel of record:

Jonathon D. Friedmann, Esq.
Robert P. Rudolph, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

Oliver D. Griffin, Esq.
Peter N. Kessler, Esq.
Melissa A. Bozeman, Esq.
Kutak Rock LLP
303 Peach Street, N.E., Suite 2750
Atlanta, GA 30308
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com
Melissa.bozeman@kutakrock.com

Ricardo G. Cedillo, Esq.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
rcedillo@lawdcm.com

/s/ *Jeffrey K. Techentin*
Jeffrey K. Techentin