**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ANYWHERECOMMERCE, INC.** | |
| **and BBPOS LIMITED,** | |
| **Plaintiffs,** | **CIVIL ACTION NO.** |
| | **1:19-cv-11457-IT** |
| **v.** | |
| **INGENICO INC., INGENICO CORP.** | |
| **and INGENICO GROUP, SA,** | |
| **Defendants.** | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ........................................................................................ 1

II.    PRELIMINARY ISSUES ........................................................................... 1

III.   ARGUMENT .............................................................................................. 3

   A.   BBPOS's Provision of "Trade Secrets" to Ingenico Without Any Contractual Protection Is Fatal to Its Claims ................................................................................................ 3

   B.   The Ben Lo Affidavit Is Insufficient to Dispute the Fact that BBPOS Failed to Take Reasonable Steps to Protect Its "Trade Secrets" ................................................................ 4

   C.   There is No Factual Dispute that would Preclude Entry of Summary Judgment Based upon the Applicable Statutes of Limitations ................................................................ 5

      1.   BBPOS Has Judicially Admitted that Its Claims Accrued in 2012 ................................ 5

      2.   BBPOS Bears the Burden of Demonstrating When It Knew or Should Have Known of the Alleged Misappropriation ................................................................ 6

      3.   BBPOS Discovered or Should Have Discovered All of the Information Giving Rise to Its Claims No Later Than 2013 ................................................................ 7

   D.   No Disputed Facts Preclude Entry of Summary Judgment on AC's Claims ..................... 13

      1.   AC Cannot Establish a Protected Business Relationship ................................ 13

      2.   AC Lacks Standing to Assert Claims Premised on the Misuse of BBPOS Trade Secrets 15

      3.   AC's Damages Theory Is Legally Insufficient ................................ 19

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abreu-Guzman v. Ford*, 241 F.3d 69 (1st Cir. 2001) ...................................................................... 4

*Ahmed v. Hosting.com*, 28 F. Supp. 3d 82 (D. Mass. 2014) ....................................................... 19

*Beekman v. Marsters*, 195 Mass. 205, 80 N.E. 817 (1907) ....................................................... 16

*Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1 (1st Cir. 1994) ........................................ 4

*Colón-Cabrera v. Esso Standard Oil Co. (P.R.)*, 723 F.3d 82 (1st Cir. 2013) .............................. 2

*Doe v. Urohealth Sys., Inc.*, 216 F.3d 157 (1st Cir. 2000) ........................................................... 2

*Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 946 F. Supp. 2d 1321 (S.D. Fla.
    2013) ............................................................................................................................... 15

Fed. R. Civ. Pro. 56 ......................................................................................................................... 18

*Glue–Fold, Inc. v. Slautterback Corp.*, 82 Cal.App.4th 1018, 98 Cal.Rptr.2d 661 (2000) ............ 8

*H. D. Watts Co. v. American Bond & Mortgage Co.*, 260 Mass. 599, 157 N.E. 634 (1927) ....... 17

*Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49 (1st Cir. 2000) ............................ 4

*HSBC Bank USA, N.A. v. Matt*, 464 Mass. 193 (2013) ................................................................ 19

*In re FEMA Trailer Formaldahyde Prods. Liab. Litig.*, 628 F.3d 157 (5th Cir. 2010) .................. 2

*King v. Driscoll*, 418 Mass. 576, 638 N.E.2d 488 (1994) ........................................................... 16

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .......................................................................... 18

*Mass Cash Reg., Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404 (D. Mass. 1995) ....................... 17

Mass. Gen. Laws Ann. ch. 260, § 2a (West) ................................................................................. 12

*Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215 (1st Cir. 2005)
    ..................................................................................................................................... 6, 7

*Mazzu v. Mazzu*, No. 15-P-1601, 2017 WL 1049641 (Mass. App. Ct. Mar. 20, 2017) ............... 19

*McGrath v. City of Somerville*, No. CV 17-10979-FDS, 2019 WL 4764928, (D. Mass. Sept. 30,
    2019) ............................................................................................................................... 4, 5

*Mobile Shelter Systems USA, Inc. v. Grate Pallet Solutions, LLC,* 845 F.Supp.2d 1241 (M.D.Fla.
    2012) ............................................................................................................................... 15

*Nat'l Merch. Corp. v. Leyden*, 370 Mass. 425, 348 N.E.2d 771 (1976) ................................. 17, 19

*P.R. Mar. Shipping Auth. v. Leith*, 668 F.2d 46 (1st Cir. 1981) ................................................... 2

*Pace v. Southern Express Co.,* 409 F.2d 331 (7th Cir. 1969) ....................................................... 2

*Porex Corp. v. Haldopoulos*, 284 Ga. App. 510, 511, 644 S.E.2d 349 (2007) .............................. 8

*Prescott v. Morton Int'l, Inc.*, 769 F. Supp. 404 (D. Mass. 1990) ................................................ 7

*Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co.*, 976 F.2d 58 (1st Cir. 1992) ................ 5

*Sentinel Prod. Corp. v. Mobile Chem. Co.*, No. CIV. A. 98-11782-PBS, 2001 WL 92272, (D.
    Mass. Jan. 17, 2001) ...................................................................................................... 7

*Sgromo v. Polygroup Ltd. (MACAO) Com. Offshore*, No. 2184CV0913, 2021 WL 6297938
    (Mass. Super. Nov. 22, 2021) .................................................................................. 18, 19

*Stark v. Advanced Magnetics, Inc.*, 50 Mass. App. Ct. 226, 736 N.E.2d 434 (2000) ........... 8, 9, 10

*T.H. Glennon Co., Inc. v. Monday,* No. CV 18-30120-WGY, 2020 WL 1270970, (D. Mass. Mar.
    17, 2020) ......................................................................................................................... 6

*Taygeta Corp. v. Varian Assocs., Inc.*, 763 N.E.2d 1053 (Mass. 2002) ........................................ 7

*Torrech-Hernandez v. GE*, 519 F.3d 41(1st Cir. 2008) ................................................................ 4

**STATUTES**

18 U.S.C. § 1836 ................................................................................................ 7
Ga. Code Ann. § 10-1-766 (West) ...................................................................... 7
Mass. Gen. L. c 260 § 2 ..................................................................................... 6
Mass. Gen. Laws Ann. ch. 260, § 2A, § 12 (West) .......................................... 8

**RULES**

Fed. R. Civ. P. 41 .............................................................................................. 1
Fed. R. Civ. P. 56 ............................................................................................ 14

**TREATISES**

Restatement (Third) of Torts: Liab. for Econ. Harm § 17 (2020) ................... 17

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendants Ingenico Inc., Ingenico Corp., and Ingenico Group S.A. (collectively "Defendants" or "Ingenico"), by and through their attorneys, respectfully submit this reply memorandum of law in further support of their motion for summary judgment ("Motion for Summary Judgment") as to all claims and counts in the First Amended Complaint, Doc. No. 67, (the "Complaint") of Plaintiffs AnywhereCommerce, Inc. ("AC") and BBPOS Limited ("BBPOS") (collectively, "Plaintiffs").

## I.    <u>INTRODUCTION</u>

Plaintiffs have failed to establish any material issues of fact that would justify permitting their untimely and unsupported causes of action to go to trial. AC's claims fail because it has failed to identify any evidence that might support required elements of those claims. BBPOS's claims fail because they are time barred and the "discovery rule" analysis advanced by BBPOS is based upon a timeline that is false, and which BBPOS knows to be false. Because there exist no disputed material facts that might support a verdict in Plaintiffs' favor, the Motion for Summary Judgment should be granted.

## II.    <u>PRELIMINARY ISSUES</u>

Defendants note that Plaintiffs have agreed to dismissal of Counts VI (Lanham Act by BBPOS) and IX (Georgia Fair Business Practices Act by both Plaintiffs. *See* Plaintiffs AC, Inc.'s and BBPOS Limited's Opposition to Defendants Ingenico Inc.'s, Ingenico Corp.'s, and Ingenico Group SA's Motion for Summary Judgment ("Pls.' Opp. to Defs.' Mot. For Summ. J.", Doc. No. 202 at 1). Defendants disagree, however, that Plaintiffs may unilaterally insist that such dismissal be without prejudice. *Compare id. with* Fed. R. Civ. P. 41(a)(1), (2) (after a complaint has been answered or a motion for summary judgment filed, ""an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."). "[D]ismissal without prejudice is the norm, 'unless the court finds that the defendant will suffer legal prejudice.'" *Colón-*

*Cabrera v. Esso Standard Oil Co. (P.R.)*, 723 F.3d 82, 87 (1st Cir. 2013) (quoting *P.R. Mar. Shipping Auth. v. Leith*, 668 F.2d 46, 50 (1st Cir. 1981)).

Because Rule 41(a)(1) is inapplicable, and further because Plaintiffs neither sought nor obtained Defendants' agreement to a dismissal at this stage, their "consent to the entry of a voluntary dismissal without prejudice" (Pls.' Opp. to Defs.' Mot. For Summ. J., Doc. No. 202 at 1) is properly understood as a request for relief under Rule 42(a)(2).  That motion should be evaluated with an eye to "'the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant.'"  *Doe v. Urohealth Sys., Inc.,* 216 F.3d 157, 160 (1st Cir. 2000) (quoting *Pace v. Southern Express Co.,* 409 F.2d 331, 334 (7th Cir.1969).  Plaintiffs offer no explanation for their requested dismissal, nor do they afford any analysis of the other applicable Rule 41(a)(2) factors.  It is appropriate to consider whether "a party proposes to dismiss the case at a late stage of pretrial proceedings, or seeks to avoid an imminent adverse ruling." *Colon-Cabrera*, 723 F.3d at 88 (quoting *In re FEMA Trailer Formaldahyde Prods. Liab. Litig.,* 628 F.3d 157, 162 (5th Cir. 2010)).  Given the advanced stages of this proceeding, the fact that the dismissal is transparently sought to avoid an adverse ruling, and the prejudice to Defendants that would result from a future re-litigation of the to-be-dismissed claims, a dismissal with prejudice is appropriate.

Relatedly, Defendants dispute the allegation that their counsel "did not discuss the merits of" the Motion for Summary Judgment prior to filing in violation of Local Rule 7.1 for the reasons set forth in the accompanying Declaration of Jeffrey K. Techentin.

2

III.    **ARGUMENT**

A.      **BBPOS's Provision of "Trade Secrets" to Ingenico Without Any Contractual Protection Is Fatal to Its Claims**

BBPOS admits that it communicated its secret information to Ingenico, as opposed to ROAM Data, without a nondisclosure or other agreement in place that might protect the information. *E.g.*, Pls.' Opp. at 25 ("BBPOS made certain disclosures of its Confidential Information […] to affiliated Ingenico parties […]").  It did so, it said, because, it believed, "such disclosures would be subject to the confidentiality obligations" of the ROAM-BBPOS license.  *Id.*  This belief, BBPOS says, was justified because "Plaintiffs did not understand them to be disclosure to a third party, but rather an extension of ROAM."  *Id.*

This statement is not credible and need not be credited in the context of summary judgment.  Plaintiffs' motion for summary judgment (Doc. No. 189) was premised on an asserted "undisputed fact" that "the final executed version [of the ROAM-BBPOS license] includes the bargained-for anti-assignment language" that made the agreement "not transferable or assignable in the event of a sale of [ROAM] to a competitor," and that the purpose of the anti-assignment provision was included specifically with Ingenico in mind.  *See* Doc. No. 188 at ¶¶ 47-48 ("There was, at least, one major distinction between ROAM and Ingenico, at this time, that bore on the rationale for inclusion of anti-assignment language.").  To support this assertion, Plaintiffs cited to and quoted the depositions of both Will Graylin of ROAM Data ("Graylin" and Ben Lo of BBPOS ("Lo"), as well as the April 23, 2010 draft of the agreement and the final agreement, which had been signed in 2010.  *Id.*

BBPOS cannot have it both ways.  In 2010 they saw "major" distinctions between ROAM and Ingenico, to the point that they would consider a sale of ROAM to Ingenico such a significant event that it might cause the termination of the relationship.  This is the precise

3

opposite of Ingenico being "an extension of ROAM." BBPOS fully appreciated the distinction between the two companies, as evidenced by its actions at the time. Its after-the-fact, self-serving assertions to the contrary to avoid summary judgment should be disregarded.

### B.    The Ben Lo Affidavit Is Insufficient to Dispute the Fact that BBPOS Failed to Take Reasonable Steps to Protect Its "Trade Secrets"

When "a party has given clear answers to unambiguous questions in discovery, that party cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory." *McGrath v. City of Somerville*, No. CV 17-10979-FDS, 2019 WL 4764928, at *4 (D. Mass. Sept. 30, 2019) (quoting *Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 54 (1st Cir. 2000) (quoting *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)) (internal quotation marks omitted)); *see also Torrech-Hernandez v. GE*, 519 F.3d 41, 47 (1st Cir. 2008) (internal citations omitted) (affirming the district court's decision to not consider statements and assertions presented in the plaintiff's affidavit submitted in opposition to summary judgment because the affidavit "seemingly contradict[ed]" the plaintiff's "own deposition testimony and asser[ted] what amount[ed] to nothing more than self-serving, factually-devoid allegations); *Abreu-Guzman v. Ford*, 241 F.3d 69, 74 (1st Cir. 2001) ("a party opposing summary judgment may not manufacture a dispute of fact by contradicting [their] earlier sworn testimony."). Such an affidavit "may be accepted if the party provides a 'satisfactory explanation of why the testimony [has] changed.'" *McGrath*, 2019 WL 4764928, at *4 (alteration in original).

Here, BBPOS improperly attempts to avoid summary judgment on its trade secrets claims by using a declaration from Lo executed after Ingenico moved for summary judgment and well after the close of fact discovery. This declaration contains information – for example, that BBPOS files were password-protected and only Lo could give permission to distribute

4

confidential information – that directly contradicts testimony Lo gave during the BBPOS

30(b)(6) deposition taken on December 10, 2021. *See* Lo Decl., Doc. No. 198-1 at ¶¶ 19-22; *cf*

Defs.' Statement of Undisputed Material Facts ("SUMF"), Doc. No. 193 at ¶¶ 45-48; SUMF Ex.

2, Doc. No. 193-2 at 139:13-140:14 (Lo stating he was "unsure" if files were password

protected), 141:4-142:4 (Lo admitting he did not know exactly who had authority to grant

employees permission to disburse confidential information).  Importantly, BBPOS provides no

explanation whatsoever of "why the testimony [has] changed."  *See McGrath*, 2019 WL

4764928, at *4 (alteration in original).  As such, this Court should not allow Plaintiffs to rely

upon Lo's Declaration to avoid summary judgment on its trade secrets claims.

Without evidence that BBPOS took measures to protect its alleged trade secrets,

Plaintiffs cannot prove that the documents and information were in fact trade secrets, as

previously discussed in Defendants' memorandum in support of their motion for summary

judgment. *See* Defs.' Mem. in Support of Mot. for Summ. J., Doc No. 192 at 14-18.

Accordingly, all claims that rely upon proving theft of trade secrets, including the trade secrets

claims, as well as the tortious interference, unjust enrichment, and unlawful trade practices

claims necessarily fail.

C.   **There is No Factual Dispute that would Preclude Entry of Summary Judgment Based upon the Applicable Statutes of Limitations**

1.   **BBPOS Has Judicially Admitted that Its Claims Accrued in 2012**

Plaintiffs' arguments regarding "insufficient showing" (Pls.' Opp. to Defs.' Mot. For

Summ. J., Doc. No. 202 at 4) fail as a matter of law.  They have averred, and therefore are estopped

from denying, that the "breach [of the ROAM-BBPOS License Agreement] began in the summer

of 2012."  First Amended Complaint, Doc. No. 67 at ¶ 53; *see also Schott Motorcycle Supply, Inc.

v. Am. Honda Motor Co.*, 976 F.2d 58, 61 (1st Cir. 1992) (averments in complaint constitute

judicial admissions binding on the party throughout the proceedings).  That "breach" was the allegedly unlawful transference of BBPOS trade secret information to Ingenico.  First Amended Complaint at ¶ 51.

This judicial admission is fatal to Count V (breach of contract) because the applicable statute does not contain a "discovery" rule provision.  *See* Mass. Gen. L. c 260 § 2.  BBPOS failed to bring suit within the six-year limitations period.

The elements for a trade secret action are the same under both the Massachusetts and federal statutes invoked here: "(i) the existence of a trade secret; (ii) that the plaintiff 'took reasonable steps to protect' its confidentiality; and (iii) the defendant 'used improper means, in breach of a confidential relationship, to acquire and use the trade secret.'"  *T.H. Glennon Co., Inc. v. Monday*, No. CV 18-30120-WGY, 2020 WL 1270970, at *13 (D. Mass. Mar. 17, 2020).  The "breach" that Plaintiffs reference in the summer of 2012 would satisfy each of these elements, and thus BBPOS could have asserted its theft of trade secret claims at any point thereafter.  *See id.* at *15 (obtaining trade secrets by breaching contractual obligations constitutes "improper means").

### 2. BBPOS Bears the Burden of Demonstrating When It Knew or Should Have Known of the Alleged Misappropriation

The question underlying the application of various statutes of limitations for trade secret misappropriations is slightly different from the question of when the conduct gave rise to a viable cause of action.  As the First Circuit explained in *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215 (1st Cir. 2005), under Massachusetts law, notice of one misappropriated trade secret does not necessarily begin tolling for all misappropriations.  *Id.* at 241.  The court noted that the statute of limitations in trade secret cases commences according to the "discovery rule," in which the statute of limitations does not toll "until a plaintiff knows, or reasonably should have known, that it has been harmed or may have been harmed by the

defendant's conduct." *Id.* at 238 (quoting *Taygeta Corp. v. Varian Assocs., Inc.*, 763 N.E.2d 1053, 1063 (Mass. 2002)).  However, the burden is on the plaintiff to establish a "delayed accrual" for statute of limitations purposes.  *Sentinel Prod. Corp. v. Mobile Chem. Co.*, No. CIV. A. 98-11782-PBS, 2001 WL 92272, at *15 (D. Mass. Jan. 17, 2001) (citing *Prescott v. Morton Int'l, Inc.*, 769 F. Supp. 404, 408 (D. Mass. 1990)).

Accordingly, if BBPOS contends that the date on which the applicable statutes of limitations began to run was anything later than the "summer of 2012," it bears the burden of establishing such a later date.  It has not done so.

### 3.   BBPOS Discovered or Should Have Discovered All of the Information Giving Rise to Its Claims No Later Than 2013.

BBPOS's statute of limitations analysis relies on conclusions woven from half-truths, conclusions that BBPOS knows to be false.  Fundamentally, it contends that the earliest date that a statute of limitations "could be triggered here is February 4, 2014 – i.e., the date of the first accused product sale based on Defendant's sales records."  Pls.' Opp at 15.  This is incorrect as a matter of law and fact.

### a.   The Limitations Period Commenced Prior to Ingenico's Commercial Sale of mPOS Devices

Legally, it is simply not the case that, as BBPOS argues, it could not have known of a misappropriation until it inspected a physical sample of one of the accused products.  The standard is when "the ***misappropriation*** is discovered or, by reasonable diligence, should have been discovered."  Ga. Code Ann. § 10-1-766 (West) (emphasis added).  Similar "reasonable diligence" language is included in the federal Defend Trade Secrets Act.  *See* 18 U.S.C. § 1836(d).  Notably, the Massachusetts statute is starkly different in that it does not contain a "discovered or should have been discovered" clause; the statute mandates that the action "be commenced only within three years next after the cause of action accrues," which may be tolled "[i]f a person liable to a

personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it." Mass. Gen. Laws Ann. ch. 260, § 2A, § 12 (West). Nothing in these statutes suggests that a plaintiff need not act with reasonable diligence with respect to a misappropriation simply because the misappropriator has not released a product that embodies the trade secrets, or that the only way to discover a misappropriation is by examination of a commercial product.

The cases cited by Plaintiffs support this analysis. In *Stark v. Advanced Magnetics, Inc.*, 50 Mass. App. Ct. 226, 736 N.E.2d 434 (2000), for example, there was no suggestion that the defendant had introduced a commercial product that embodied the intellectual property at issue. Rather, plaintiff's complaint was that the defendant "was claiming for itself the plaintiff's alleged inventions and trade secrets" *Id.* at 233. The assertion of ownership over that IP was the harm for which the plaintiff sought redress (*id.*) and the statute of limitations issue was analyzed in terms of when the plaintiff knew or should have known that the IP had been converted. *Id.* at 233-36.

The legal question is therefore: had BBPOS discovered or should it have discovered that its purported trade secrets had been misappropriated prior to December 20, 2013, five years prior to the filing of its complaint (five years being the longest applicable statute)?

The undisputed facts establish that BBPOS knew or, through reasonable diligence, should have known of the alleged misappropriation by November 2012. This is, of course, not a typical trade secret misappropriation case in which information is appropriated and misused without any notice to the rights-holder. *E.g.*, *Porex Corp. v. Haldopoulos*, 284 Ga. App. 510, 511, 644 S.E.2d 349, 350 (2007) (noting that "'trade secret misappropriation is ordinarily covert and hard for the betrayed party to discover'") (quoting *Glue–Fold, Inc. v. Slautterback Corp.*, 82 Cal.App.4th 1018, 1026, 98 Cal.Rptr.2d 661 (2000)). Rather, BBPOS knew about Ingenico having obtained the purported trade secrets at the exact moment that Ingenico obtained them ***because BBPOS was the***

*party that gave the information to Ingenico, directly*.  In light of BBPOS's claim that it disclosed the information in a manner that imposed some burden of confidentiality on Ingenico, the question then becomes:  when did BBPOS know that Ingenico was misusing the information, *i.e.*, that it had misappropriated the trade secrets?

BBPOS answers this question in its Statement of Disputed Facts, more specifically Doc. No. 198-6, an internal BBPOS email dated November 10, 2012.  In that email, Lo tells his colleagues:

> ROAM's new product manager called RAM is going to visit us on Tuesday.  **Please don't disclose too much technical information to him.**
>
> After last visit, Christopher [Roetsart] and the two Ingenico R&D guys must collect some info back to Ingenico.  Will [Graylin] told me that Ingenico passes some info to Landi for making terminal to compete with us.  We should not trust any hardware guy from Ingenico or ROAM anymore.  Actually, Will left ROAM and we have no worry on ROAM anymore.  And ROAM relies on us much more than we relies [*sic*] on them.  ROAM needs us but not the other way around.

(Emphasis in original.)   BBPOS had been told no later than November 10, 2012, that Ingenico was using the information it had obtained from BBPOS to make a competing mPOS terminal, which is precisely the nature of its claims asserted over six years later.  In this email, Lo told his colleagues, to use the phrasing employed by the *Stark* court, that Ingenico was "claiming for itself [BBPOS's] alleged inventions and trade secrets."  And the source for that information, Graylin, less than three weeks later filed the so-called "Derivative Complaint" quoted extensively by Plaintiffs in their pleadings in this case, including for the fact that Ingenico had converted "exclusive" BBPOS information to its own benefit.  *See*, *e.g.*, Original Complaint, Doc. No. 1 at ¶ 48; First Amended Complaint, Doc. No. 67 at ¶ 49.  BBPOS therefore had available to it, either itself or through Graylin, with whom Lo had been communicating after Graylin ceased working

for ROAM Data, all of the information needed to assert its claims here. Lo denies having spoken to Graylin about the allegations of his lawsuit, but even if that were true, BBPOS's refusal to further investigate the situation constitutes willful blindness, not "reasonable diligence." Accordingly, BBPOS has failed to adduce evidence sufficient to establish that that limitations periods for its trade secret claims commenced any later than November 2012, over six years before suit was filed.

The case on which Plaintiffs primarily rely, *Stark*, is distinguishable on the facts.[1] In *Stark*, the court found that it could not resolve the statute of limitations issue where there had been disputed facts regarding "whether the parties' relationship was a fiduciary one or amounted to no more than an arm's length business relationship" and whether, as the plaintiff had contended, there had been nothing about the information available to it "which is inconsistent with the parties' collaborative efforts." *Id.* at 235. Here, BBPOS has not suggested that there was any fiduciary relationship involved, and Lo's email, which explicitly stated that Ingenico was passing information to Landi to create a competing product, belies any suggestion that, as of November 2012, there was nothing "inconsistent with the parties' collaborative efforts."[2]

---

[1]   Plaintiffs' brief copies an extended passage from the *Stark* decision, including its internal citations, without attribution or any indication that the material is a quotation. *Compare* Pls.' Opp. at 17-18 *with Stark*, 50 Mass. App. Ct. at 233-34. On page 19 of the Opposition, Plaintiffs likewise appear to have used, verbatim, language from *Salois v. Dime Sav. Bank of New York, FSB*, 128 F.3d 20, 26 (1st Cir. 1997), without attribution.

[2]   The fact that BBPOS had actual knowledge of the misappropriation, and/or had the means to discover it, precludes any contention that the cause of action had been fraudulently concealed from it. *See Stark*, 50 Mass. App. Ct. at 234 (statute of limitations is not tolled "if the plaintiff has actual knowledge of the facts giving rise to his cause of action" and in a case of actual fraud, "the statute will not be tolled if the plaintiff also had the means to acquire the facts on which his cause of action is based."). Given BBPOS's actual knowledge and its ability to discover additional information from Will Graylin, BBPOS's citation to Ingenico's general assurance that "there is no commonality in terms of architecture, firmware or power with the Ingenico device as it is based off of an existing Landi product" is insufficient to toll the statute,

b. BBPOS Misstates the Date of First Sale of Accused
Devices.

Even if the Court were to agree that the limitations period for trade secret claims would not commence until Ingenico had introduced commercial products embodying the purported trade secrets, the BBPOS claims are time-barred. It is simply incorrect for BBPOS to argue that "the date of the first accused product sale based on Defendant's sales records was February 4, 2014 as a matter of law and fact. *See* Pls.' Opp. to Defs.' Mot. For Summ. J., Doc. No. 202 at 15.

"Defendant's sales records" – including records that BBPOS used at its Rule 30(b)(6) deposition of Ingenico – confirm that accused products were sold in 2013. *See* Ingenico Sales Records (2013 – 2018.10 YTD), attached as **Exhibit 1**. As can be seen on that spreadsheet, the RP350x model was the first to be sold, with sales from 2013 forward. *See id.* The second accused product to market was the RP 750x, for which no sales are shown until 2014. *See id.*

The fact that the RP350x was available and offered for sale in 2013 is not subject to reasonable dispute. Not only is that fact consistent with the fact that Ingenico had announced the product launch in early 2013 (*see* Defs.' SUMF,Doc. 193 at ¶ 49), the product could be seen on the archived ROAM Data webpage from November 5, 2013 and even earlier. *E.g.*, https://web.archive.org/web/20131105182941/http://www.roamdata.com:80/products/hardware/rp350x-chip-sign-mobile-card-reader (last accessed July 7, 2022). Moreover, the fact that the RP350x was introduced in 2013 was a fact known to BBPOS prior to its submission of its Opposition, as confirmed by its own expert's recitation of the relevant history. *See* Expert Report of Ivan Zatkovich (Doc. No. 188-4) at 12. In his report, BBPOS liability expert, Ivan Zatkovich, included the following table:

---

even if Ingenico's statement could somehow be construed as fraudulent. *See* Pls.' Opp. to Defs.' Mot. For Summ. J., Doc. No. 202 at 16.

30.     As part of the iTMP portfolio, Ingenico and Landi produced the following models of mPOS devices.

| Model | Function | Timing | Development Notes |
|-------|----------|--------|-------------------|
| RP100x | Swipe Only/PayPal | 2013 | Roam Data/Ingenico with Landi<br>- based on the R350x platform |
| RP150x | Swipe Only | 2013 | Roam Data/Ingenico with Landi<br>- based on the R350x platform |
| RP350x | Chip & Swipe | 2013 | Roam Data/Ingenico with Landi |
| RP750x | Chip & PIN, Contactless | 2013 | Roam Data/Ingenico with Landi<br>- based on the R350x platform |
| RP170c | Magstripe & Contactless Reader | 2014-2016 | Roam Data/Ingenico with Landi<br>- based on the RP750x platform<br>- no chip reader<br>- came just before the RP457c |

The fact that Ingenico introduced the RP350x in 2013 is beyond reasoned debate.  This fact is fatal to the entire statute of limitations analysis set forth by BBPOS.  BBPOS's contentions rest on an unspoken assumption, that the spreadsheet that it has utilized to build its chart of supposed product introduction dates is not only reflects actual sales but that it contains ***all sales*** of the products at issue.  This has never been asserted to be the case, and in fact is not true, as explained above.  Most importantly, BBPOS has adduced no evidence that it is true.  BBPOS bears the burden of proof if it wishes to establish that the statutes of limitation did not start running until 2014 or after, and it has failed to do so.

       c.    BBPOS's Contention that Each of its Claims Are Subject to Several Different Limitations Periods is Unfounded

Without any legal support, BBPOS asks the Court to assume that limitations periods would be different for different accused products.  Leaving aside the factual issue that the "first sale" dates recited by Plaintiffs are wrong, this suggestion would be inconsistent with the basic nature of statutes of limitations.  Statutes of limitations apply to causes of action, not particular damages that might be recoverable in a given action.  *See*, *e.g.*, Mass. Gen. Laws Ann. ch. 260, § 2a (West)

(claim must be brought within three years of when "the cause of action accrues").  It would be manifestly unfair to permit a plaintiff such as BBPOS to sit on its rights for years (decades?), secure in the knowledge that they can bring suit any time their competitor comes out with a new product that the plaintiff claims incorporates stolen IP.

The same problems attend BBPOS's speculation as to whether its claims might not be time barred based on some unidentified "transfer" of the "license."  Without any legal citation, BBPOS asserts that "[o]ne could further argue each act of transferring the license post-2015 gives rise to a new cause of action."  Pls. Opp. to Defs.' Mot. For Summ. J., Doc. No. 202 at 20.  But BBPOS has not identified any "transfer" of the license, or how that might give rise to a new cause of action for misappropriation of trade secrets.[3]  Such speculative and undeveloped arguments should not be lent credence.

### D.   No Disputed Facts Preclude Entry of Summary Judgment on AC's Claims

AC contends that Defendants tortiously interfered with its business relationship with a third party, First Data, by inducing First Data to choose ROAM Data as its mPOS hardware supplier following a request for proposals, or RFP.  This claim lacks any legitimate foundation.

#### 1. AC Cannot Establish a Protected Business Relationship

First, AC cannot establish a protected business relationship with First Data that might give rise to liability for tortious interference with an existing or prospective contract.

To substantiate its tortious interference claim, AC mentions a "Purchase and Sale Agreement for the supply of mPOS hardware within the United States" between it and First

---

[3]      Plaintiffs make several undeveloped arguments concerning the so-called "anti-assignment provisions of the exclusive product license" (*e.g.*, Pls.' Opp. to Defs.' Mot. For Summ. J., Doc. No. 202 at 16), including that an assignment of the ROAM-BBPOS license might be a breach of contract or re-start the statute of limitations clock.  However, Plaintiffs have not provided any basis upon which the Court might find that there had been an assignment of the license or a sale of ROAM, because there has been none.

13

Data; however, AC does not cite to, or attach, the actual agreement.  Pls.' Opp. to Defs.' Mot.

For Summ. J., Doc. No. 202 at 6.  AC cites to its Concise Statement of Genuine Disputed

Material Facts, but the cited paragraph refers only to the Plaintiffs' First Amended Complaint,

which does not attach the purported agreement.  *See* Pls.' Opp. to Defs.' Mot. For Summ. J.,

Doc. No. 202 at 6; Pls.' Concise Statement of Genuine Disputed Material Facts, Doc. No. 198 at

40, ¶ 66(b); Pls.' First Amended Compl. Doc. No. 67 at ¶¶ 88-90, 93, 95.  AC also refers to a

"Statement of Work" in its Opposition, but likewise fails to cite to any document other than

Plaintiff's First Amended Complaint. *See* Pls.' Opp. to Defs.' Mot. For Summ. J., Doc. No. 202

at 6; Pls.' Concise Statement of Genuine Disputed Material Facts, Doc. No. 198 at 40, ¶ 66(a);

Pls.' First Amended Compl. Doc. No. 67 at ¶¶ 81, 84-87.  Moreover, AC does not even cite

specific language from these documents, so all of the terms are unknown.  Accordingly, this

Court should not consider these documents and unsubstantiated statements regarding a contract

or agreement between AC and First Data.  *See* Fed. R. Civ. P. 56(c)(1), (3).

AC also fails to establish that it had a business relationship for economic benefit with First

Data outside of a contract.  AC states that First Data had "consistently invited" AC to *bid* on

requests for proposals issued by First Data and *was* awarded projects"; however, there are no facts

that support an agreement that Frist Data would accept AC's bid, prioritize their bids, or otherwise

ensure that AC's bids would be accepted.  *See* Pls.' Opp. to Defs.' Mot. For Summ. J., Doc. No.

202 at 6 (emphasis added).

Because First Data had actually put the business at issue out to bid using an RFP process,

AC's past dealings are insufficient to establish that it could expect that relationship to continue.

"[A] a bidder generally cannot establish a protected business relationship with an entity soliciting

bids through a competitive bidding process."  *Duty Free Americas, Inc. v. Estee Lauder*

*Companies, Inc.*, 946 F. Supp. 2d 1321, 1338 (S.D. Fla. 2013) (quoting *Mobile Shelter Systems*

*USA, Inc. v. Grate Pallet Solutions, LLC,* 845 F.Supp.2d 1241, 1258–59 (M.D.Fla. 2012).[4]  This

is the case for two reasons:

> A solicitation for bids, such as an RFP, is not a contract, but merely
> a request for offers from interested parties. And since a solicitation
> for bids encourages parties besides a plaintiff bidder to submit offers
> in response, the bidding process itself cannot serve as evidence that
> the solicitor probably would have entered into a contract with the
> plaintiff but for the defendant's interference.

*Duty Free Americas*, 946 F. Supp. 2d at 1338-39 (internal citations omitted).  The court in *Duty*

*Free Americas* explained that to establish a claim for tortious interference in an RFP context, a

plaintiff must show that "the relationship went beyond the bidding process and into negotiations

which in all probability would have been completed."  *Id.* at 1339 (internal citations omitted).[5]

### 2.  AC Lacks Standing to Assert Claims Premised on the Misuse of BBPOS Trade Secrets

The only wrongful conduct that it alleges to constitute tortious interference with its

relationship with First Data is "a head-start to the market with the help of BBPOS's stolen trade

secrets."  Pls.' Opp. to Defs.' Mot. For Summ. J., Doc. No. 202 at 7.[6]  Long gone are the allegations

---

[4]      The elements of a claim of tortious interference are the same under Florida law as under
the law of Massachusetts.   *See Mobile Shelter Sys. USA, Inc. v. Grate Pallet Sols., LLC*, 845 F.
Supp. 2d 1241, 1258 (M.D. Fla. 2012), *aff'd in part*, 505 F. App'x 928 (11th Cir. 2013).

[5]      Critically, AC has not alleged that the First Data RFP was simply a "low price"
solicitation (or that it was the low bidder aside from ROAM Data); its burden is therefore to
show that it would have been selected as a provider under First Data's actual criteria.  *See*, *e.g.*,
*Cedroni Assocs. v. Tomblinson, Harburn Assocs., Architects & Planners, Inc.*, 492 Mich. 40, 46-
47, 821 N.W.2d 1 (2012) (no contractual expectancy where soliciting school district retained
authority to reject any or all bids and contract would not necessarily go to the low bidder); *see
also  Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 592 F. Supp. 2d 86, 98 (D.D.C.
2009) (expectancy shown where Amtrak "met the stringent bid requirements, had highly
qualified employees, had an opportunity to acquire the [soliciting authority] as a new customer,
and Amtrak and [Defendant] were the only bidders").

[6]      AC presents no evidence of the length of this "head-start."  Given that the allegedly
infringing products were introduced in 2013 (*see infra* at 11), and the First Data RFP was
conducted in 2015, this theory cannot stand unless Plaintiffs demonstrate that the supposed

15

in its First Amended Complaint that Defendants had misused "confidential and sensitive business information of AC," that had been "maliciously elicited" with "fake acquisition promises and other false claims," or that Defendants had "appropriated AC's business plans and strategies for its own use" "in contravention of confidentiality agreements with AC." Pls.' First Amended Compl. Doc. No. 67 at ¶ 118. Gone are the allegations that First Data insiders like OB Rawls and Dan Bobier could attest to some insidious coercion by Ingenico that cost AC its relationship with First Data. *Compare id.* at ¶¶ 111-12 *with* Pls.' Opp. to Defs.' Mot. For Summ. J., Doc. No. 202 at 7-8. Critically, AC can point to no evidence, whatsoever, that First Data would have awarded the business to AC even if ROAM Data had not participated in the First Data RFPs.

In short, AC has presented no evidence that Defendants did anything ***with respect to AC*** other than engage in ordinary business competition, which is not actionable. *Beekman v. Marsters*, 195 Mass. 205, 212, 80 N.E. 817 (1907); *see also King v. Driscoll*, 418 Mass. 576, 587, 638 N.E.2d 488 (1994) ("motivation of personal gain, including financial gain, however, generally is not enough to satisfy the improper interference requirement").

The evidence that AC elicited from First Data in this case eviscerates any claim that it would have retained the First Data business but for Defendants' actions. The "Executive Summary" of the First Data Mobile Pay/POGO business, produced by First Data in response to Plaintiffs' subpoena, is fatal to AC's tortious interference claim. A copy of the First Data business summary (the "Executive Summary") is attached as **Exhibit 2**. In the Executive Summary, First Data recounts its "[c]oncerns over vendor viability," including the "risk" presented by the dongle provider, AC. These concerns caused First Data to "accelerate evaluation of immediate

---

misappropriation afforded the Defendants a two-year "head start." Plaintiffs bear the burden on this issue, which stands as an independent basis to enter summary judgment in Defendants' favor on the tortious interference claim.

alternatives." *Id.*  The Executive Summary lists four alternative paths that First Data might pursue for its Mobile Pay/POGO business ("insourcing/internal build," a buy-out of their current supplier (Apriva), investment in another third party, or migrating to another vendor (ROAM)); ***none of which would include doing business with AC***.  *Id.*

AC cannot meet its burden of proof without showing that Defendants' actions were the proximate cause of its loss of business.  *Nat'l Merch. Corp. v. Leyden*, 370 Mass. 425, 430, 348 N.E.2d 771, 774 (1976) (plaintiff is entitled to recover the "loss of advantages" that it would have attained "but for such interference.") (quoting *H. D. Watts Co. v. American Bond & Mortgage Co.*, 260 Mass. 599, 613, 157 N.E. 634, 639 (1927) (internal quotation marks omitted); Restatement (Third) of Torts: Liab. for Econ. Harm § 17 (2020) (requiring that tortious conduct be the proximate cause of claimant's harm).  To survive a summary judgment challenge, therefore, AC must show, not merely that there is a legitimate factual question as to whether Defendants engaged in wrongful conduct, but also that "but for" Defendant's conduct, it would have prevailed in the First Data RFP and won the business.

In this context, "but for" causation requires that AC adduce evidence that First Data would have selected AC as its vendor rather than (1) going with "insourcing/internal build," (2) buying out Apriva, or (3) investing in another third party, all of which appear to have been at least considered alternatives for First Data to avoid the "risk" of doing business with AC.  *See* Exhibit 2.  This Court's decision in *Mass Cash Reg., Inc. v. Comtrex Sys. Corp.*, 901 F. Supp. 404 (D. Mass. 1995) is instructive.  There, the plaintiff's claim for tortious interference failed because it could not show damages that were "suffered as a result of" the alleged interference, particularly in light of the fact that the plaintiff could not "could not meet Dunkin' Donuts' needs, which was the very reason Mass Cash turned to Comtrex."  *Id.* at 422.  Here, First Data was actively looking for

17

alternatives to working with AC; because Plaintiffs' opposition makes no reference to causation whatsoever, its claims survive only if the Court assumes, without evidence, that AC would have retained the business.

Causation is one of three "irreducible constitutional minimums of standing," and is "an indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). To satisfy this element, AC must show "a causal connection between the injury and the conduct complained of…." *Id.* at 560. In other words, Ingenico's alleged wrongful conduct must be "fairly … traceable" to AC's alleged damages resulting from First Data awarding a contract to ROAM Data. *Id.* In response to a motion for summary judgment, AC cannot rely on "'mere allegations' but must 'set forth' by affidavit or other evidence 'specific facts'" that Ingenico's alleged conduct caused AC financial injury. *See id.* at 561 (quoting Fed. R. Civ. Pro. 56(e)).

AC also lacks standing to pursue its tortious interference claim because, as it is currently constituted, it merely seeks relief for torts arising out of the misuse of another party's intellectual property, namely BBPOS's trade secrets. *See Sgromo v. Polygroup Ltd. (MACAO) Com. Offshore*, No. 2184CV0913, 2021 WL 6297938, at *2 (Mass. Super. Nov. 22, 2021) (individual plaintiff lacked standing to seek unjust enrichment damages for using "his trade secrets and patents" where corporate entity that owned the intellectual property at issue). Permitting a party like AC to sue a competitor based upon the mere fact that the competitor used a product that allegedly infringed some other, third party's intellectual property rights would be unprecedented, and for good reason: the concept of standing and even the application of statutes of limitation would be completely unworkable.

"To have standing in any capacity, a party must show they have an 'interest affecting their liberty, rights or property.'" *Mazzu v. Mazzu*, No. 15-P-1601, 2017 WL 1049641, at *1 (Mass.

18

App. Ct. Mar. 20, 2017) (quoting *HSBC Bank USA, N.A. v. Matt*, 464 Mass. 193, 199 (2013)). Ordinarily, only owners or exclusive licensees of intellectual property rights have a sufficient interest in those rights to sue for their infringement.   Thus in *Mazzu*, a former spouse lacked standing to sue with respect to patent rights where she had no claim to the property.   *Id.*   Likewise, the Lanham Act requires a plaintiff to have ownership interest in registered mark to have standing to sue.   *See*, *e.g.*, *Ahmed v. Hosting.com*, 28 F. Supp. 3d 82, 87 (D. Mass. 2014).   The same holds true of state law claims.   *Sgromo*, 2021 WL 6297938, at *2; *see also Mazzu*, 2017 WL 1049641, at *1 (no standing to seek constructive trust).

Because AC lacks a protectible interest in the intellectual property that was, allegedly, the source of the "head-start" advantage that is the foundation of AC's tortious interference claim, AC lacks standing to assert the claim as constituted and summary judgment is warranted.

### 3.   AC's Damages Theory Is Legally Insufficient

Having failed to identify an expert to quantify its damages, AC now asserts that it is entitled to "unjust enrichment" damages and that the calculation of such amounts is simply a function of applying a filter to a spreadsheet.   Pls.' Opp. to Defs.' Mot. For Summ. J., Doc. No. 202 at 8. Massachusetts courts have allowed the award of unjust enrichment damages for tortious interference claims "in proper cases," but never in circumstances analogous to the present case. *See Nat'l Merch. Corp. v. Leyden*, 370 Mass. 425, 433, 348 N.E.2d 771, 776 (1976).   Here, for the same reasons AC lacks standing to assert claims for misappropriation of BBPOS's trade secrets, it lacks standing to collect "unjust enrichment" damages from Defendants.   AC simply was not the injured party, even assuming that Defendants' committed some wrong with respect to BBPOS's intellectual property.   Awarding unjust enrichment damages for business torts is designed to avoid a defendant obtaining a windfall where its profits exceeded the actual harm to the plaintiff, not to allow an opportunistic plaintiff the chance to obtain a windfall of its own.   *Id.*

19

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants are entitled to summary judgment on all counts of Plaintiffs' Amended Complaint.

INGENICO INC., INGENICO CORP. AND
INGENICO GROUP, SA,

By their attorneys,

/s/ *Jeffrey K. Techentin*
JOHN A. TARANTINO (BBO #492230)
PATRICIA K. ROCHA (BBO #542348)
NICOLE J. BENJAMIN (BBO #666959)
JEFFREY K. TECHENTIN (*pro hac vice*)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
jtechentin@apslaw.com
Dated: July 27, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 27, 2022, I caused to be served via electronic mail a true copy

of the within document on the following counsel of record:

Jonathon D. Friedmann, Esq.
Robert P. Rudolph, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

Oliver D. Griffin, Esq.
Peter N. Kessler, Esq.
Melissa A. Bozeman, Esq.
Kutak Rock LLP
303 Peach Street, N.E., Suite 2750
Atlanta, GA 30308
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com
Melissa.bozeman@kutakrock.com

Ricardo G. Cedillo, Esq.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
rcedillo@lawdcm.com

/s/ *Jeffrey K. Techentin*
Jeffrey K. Techentin

21

1126696.v3