UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANYWHERECOMMERCE, INC., and BBPOS LIMITED, | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:19-cv-11457-IT |
| | * | |
| INGENICO INC., INGENICO CORP., and INGENICO GROUP SA, | * | |
| | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

March 29, 2023

TALWANI, D.J.

In 2010, BBPOS Limited ("BBPOS") and ROAM Data, Inc. ("ROAM") entered into an Engineering Development and Licensing Agreement (the "Agreement"). At the time, Ingenico Group SA, Ingenico Inc., and Ingenico Corp. (collectively, "Ingenico") had an ownership interest in ROAM. By the end of 2017, Ingenico and ROAM had merged, and in 2018, Ingenico sought indemnification from BBPOS pursuant to the Agreement.

In AnywhereCommerce, Inc. ("AnywhereCommerce") and BBPOS's First Amended Complaint [Doc. No. 67], BBPOS alleges that Ingenico improperly acquired BBPOS's trade secrets and used those trade secrets to unfairly compete in the market, and AnywhereCommerce alleges that Ingenico used BBPOS's trade secrets to interfere in AnywhereCommerce's business relationship with a third party. In the Second Amended Counterclaims [Doc. No.78], Ingenico Inc. asserts that BBPOS has failed to indemnify Ingenico Inc. and intentionally interfered with Ingenico Inc.'s business relationship with a different third party, that AnywhereCommerce interfered with Ingenico Inc.'s contractual relationship with BBPOS (and in so doing improperly

acquired BBPOS's trade secrets that BBPOS had exclusively licensed to Ingenico Inc. under the Agreement), and that both AnywhereCommerce and BBPOS worked together to engage in unfair methods of competition and deceptive trade practices. Both sides assert claims for tortious interference, breach of contract, and theft of trade secrets.

Ingenico's Motion for Summary Judgment [Doc. No. 191] seeks summary judgment on all counts of BBPOS and AnywhereCommerce's First Amended Complaint [Doc. No. 67], and BBPOS and AnywhereCommerce's Motion for Summary Judgment [Doc. No. 189] seeks summary judgment on all remaining counts of Ingenico Inc.'s Second Amended Counterclaims [Doc. No. 78].[1] For the following reasons, both motions are granted in part and denied in part.

## I.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-

---

[1] The parties previously stipulated to dismissal of Count VIII of Ingenico Inc.'s Second Amended Counterclaims [Doc. No. 78]. See Stipulation [Doc. No. 178].

moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 322-23.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Anderson, 477 U.S. at 255-56. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Id. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (internal quotations omitted). The non-moving party must demonstrate through "submissions of evidentiary quality, that a trial worthy issue persists." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

The fact that the parties have filed cross motions does not alter these general standards; rather the court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each side, the appropriate ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting

that cross-motions for summary judgment do not "alter the basic Rule 56 standard" but rather require the court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed").

## II.    Background to Both Summary Judgment Motions

### A.  Parties and Other Entities Involved in the Dispute

BBPOS is a foreign corporation founded in 2008 by Ben Lo. First Am. Compl. ¶ 6 [Doc. No. 67]; Lo Dep. Tr. 11:20-12:5 [Doc. No. 188-1]. BBPOS designs and manufactures mobile point of sales ("mPOS") devices that allow mobile phones to be used as sales service terminals for payment. First Am. Compl. ¶ 16 [Doc. No. 67]; Defs' Stmt. of Facts ¶ 10 [Doc. No. 193]; Lo Dep. Tr. 18:3-13 [Doc. No. 188-1]. BBPOS also sells hardware including point of sales ("POS") terminals that do not require smartphones, printers, scanners, or accessories. Lo Dep. Tr. 19:16-20:22 [Doc. No. 188-1].

AnywhereCommerce is a foreign corporation involved in credit card processing. First Am. Compl. ¶ 5, 15; Defs' Stmt. of Facts ¶¶ 1, 9 [Doc. No. 193]. AnywhereCommerce has been a distributor for BBPOS since approximately 2010. Kron Dep. Tr. 18:22-24 [Doc. No. 188-6]; Pls' Ex. CC, Vanderhart Rep. 11 [Doc. No. 188-29]. Prior to its incorporation, AnywhereCommerce's parent company, 4361423 Canada Inc. ("436 Canada"), operated under the trade names AnywhereCommerce and HomeATM. Kron Dep. Tr. 19:2-20:18 [Doc. No. 188-6]. 436 Canada holds certain patents that it has licensed to BBPOS. Id. at 21:1-25; Pls' Resp. to Defs' Stmt. of Facts ¶ 3(b) [Doc. No. 198]; Pls' Ex. S [Doc. No. 188-19].

Ingenico Inc. (a corporation organized and existing under the laws of Georgia) and Ingenico Corp. (a Delaware corporation registered to do business in Georgia) are subsidiaries of a foreign corporation, Ingenico Group SA. Answer ¶¶ 1, 7, 8 [Doc. No. 68]; Sec. Am.

Counterclaims ¶ 3 [Doc. No. 78]. Ingenico is a payment solution company and a manufacturer of electronic POS payment terminals. Defs' Resp. to Pls' Stmt. of Facts ¶¶ 31, 32 [Doc. No. 200]; Lo 30(b)(6) Dep. Tr. 45:25-46:11 [Doc. No. 188-10].

ROAM was founded in Massachusetts in approximately 2007 by William Graylin as a mobile payments company. Defs' Resp. to Pls' Stmt. of Facts ¶¶ 22, 23 [Doc. No. 200]. In May 2010, when BBPOS and ROAM entered into the Agreement, Ingenico had a 40.32% ownership in ROAM. Id. In February 2012, Ingenico increased its ownership stake in ROAM to approximately 74.71%. Id. at ¶ 27.

In March 2012, BBPOS and ROAM signed a term sheet to negotiate ROAM's potential acquisition of BBPOS. Lo 30(b)(6) Dep. Tr. 146:22-147:2 [Doc. No. 198-2]; see Pls' Ex. CC, Vanderhart Rep. 5 [Doc. No. 188-29] (stating that ROAM and BBPOS executed a non-binding term sheet related to the acquisition on March 28, 2012). This period of due diligence lasted until approximately June 11, 2012. Lo 30(b)(6) Dep. Tr. 146:22-147:2 [Doc. No. 198-2]. That acquisition never occurred. Pls' Ex. D, Zatkovich Rep. 17 [Doc. No. 188-4].

In May 2013, AnywhereCommerce rejected ROAM's request for an amendment of BBPOS's licensing agreement with 436 Canada (which was terminable on 90 days notice), but invited discussions about potential acquisition, noting that AnywhereCommerce valued its "relationship with BBPOS and by extension Roam/Ingenico." Pls' Ex. V [Doc. No. 188-22].

On July 1, 2013, 436 Canada and BBPOS entered into a new license agreement that granted to BBPOS "a royalty bearing, personal, non-transferrable and non-exclusive license with a right to sub-license…." without the provision for termination on 90 days notice. Pls' Ex. T, 436 Canada License Agreement ¶ 3.1 [Doc. No. 188-20].

By January 2015, Ingenico had acquired 100% ownership of ROAM, and on December 31, 2017, Ingenico and ROAM merged. Defs' Resp. to Pls' Stmt. of Facts ¶ 30 [Doc. No. 200]; Defs' Stmt. of Facts ¶ 8 (undisputed) [Doc. No. 193]; Graylin Dep. Tr. 6:15-23 [Doc. No. 188-5]; Lo 30(b)(6) Dep. Tr. 58:3-8 [Doc. No. 198-2].

*B. The Licensing Agreement*

On May 4, 2010, ROAM and BBPOS entered into the Agreement [Doc. No. 188-3]. On August 15, 2011, ROAM and BBPOS amended the Agreement. 2011 Amendment [Doc. No. 188-3]. The relevant provisions of the Agreement, as amended, provides as follows:

WHEREAS

> A.    The Company[2] wishes to engage the Partner[3] to provide services (the "Services") identified on Schedule I, including design, manufacturing and production of the devices identified in Schedule I (the "Products"[4] and "Devices"[5]), and including software development, in each case according to the scope of work, processes, specifications, schedule and milestone described in Schedule I (the "Specifications").

---

[2] ROAM is the Company under the Agreement. Agreement, 1 [Doc. No. 188-3].

[3] BBPOS is the Partner under the Agreement. Id.

[4] Products are defined under the Agreement as:

- Encrypted Circle Swipe reader, sometimes referred to as the "Crypto Swipe" or "ROAMPay Swipe" that has ability to generate capacitance for encryption from the audio jack of a mobile device or PC, [that] was developed by [BBPOS], and including any variance of this design.
- EMV capable POS unit with Bluetooth interface, sometimes referred to as the "BBPOS," currently completing certification.

Id. at Schedule I. BBPOS's first mPOS device is known as the "Circle Swipe." Lo Dep. Tr. 26:4-27:12 [Doc. No. 188-1]. The Circle Swipe plugged into an audio jack and only accepted Mastercard. Id. The unit referred to as the BBPOS was never completed. Lo 30(b)(6) Dep. Tr. 60:14-61:10 [Doc. No. 198-2].

[5] "The 'ROAMpay POS' EMV terminal developed by the Contractor based on the foundation of BBPOS, is the 'Device' that will be owned by ROAM." Agreement, Schedule I [Doc. No. 188-3].

. . .

NOW IT IS AGREED as follows:

**1.     LICENSE**

1.1     The Partner hereby grants to the Company a worldwide, perpetual, fully-paid license to freely use the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and distribute the Products, any portion thereof, or any products similar to or based upon any Products. For purposes of this Agreement, "Partner Intellectual Property" shall mean: (a) any and all patents and patent applications relating to the Products, including without limitation US Patent Application Number 12/767,831 for secure audio coupled card swiper filed on April 27, 2010 with the United States Patent and Trademark Office (the "Patent Application") and any patents issuing on the Patent Application, including (i) any reissues, renewals, reexaminations, substitutions or extensions thereof and foreign equivalents of the foregoing; (ii) any claim of a continuation-in-part application or patent that is entitled to the priority date of, and is directed specifically to subject matter specifically described in, the Patent Application; (iii) any foreign counterpart thereof (including PCTs); and (iv) any supplementary protection certificates and any other patent term extensions, restorations and exclusivity periods and the like of the Patent Application; and (b) any copyrights, trademarks, trade names, trade secrets, knowledge, data and information owned or controlled by the Partner relating to the Products.

1.2     The license granted in Section 1.1 is not transferrable or assignable in the event a sale of the Company to a competitor with its own POS products without prior written consent of the Partner, not to be unreasonably withheld.

1.3     The license granted in Section 1.1 is exclusive on a worldwide basis (with the exception of China, Philippines, as set forth below and Section 1.5). Without limiting the generality of the foregoing, the Partner may not, directly or indirectly, anywhere in the world, use or sell any Products, or any portion thereof, or any products similar to or based upon any Products (other than as explicitly provided in this Agreement) or grant any other person the rights to the Partner Intellectual Property to make, have made, develop, have developed, use, sell, offer for sale, import and distribute any Products, any portion thereof, or any products similar to or based upon any Products. Notwithstanding the foregoing provisions of this Section 1.3, the Partner shall retain the non-exclusive, non-transferrable right to sell the Products in China for use in China and sell the Products in Philippines for use in Philippines.

. . . .

**3.     PARTNER REPRESENTATIONS, WARRANTIES AND COVENANTS**

. . . .

7

3.8     The Partner agrees that, during or after the term of this Agreement, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Devices, or products substantially similar to the Devices, for any third party. The Partner also agrees that, during or after the term of this Agreement, it will not, directly or indirectly, design or produce, or assist in the design or production of, the Products, or products substantially similar to the Products, for any third party (other than in China to the extent permitted in Section 1.3 above).

. . . .

3.10    The Partner represents and warrants that . . .  none of the Products, Devices, Deliverables or Services does or will infringe, misappropriate or violate any intellectual property right of any person. The Partner represents and warrants that . . . none of the Products, Devices, or Deliverables does or will contain any third-party software or products, other than any third-party software or product that is included therein with the Company's written consent and that in no manner interferes with or limits the Company's right to use or sell such Product, Device or Deliverable. The Partner represents and warrants that it has used, and will use for the Company's benefit, its best efforts to perfect and protect all intellectual rights in the Products, Devices, Deliverables and Services. The Partner shall sign all documents, make all filings and take all actions reasonably requested by the Company in order to perfect and protect the Company's intellectual property rights in the Products, Devices, Deliverables or Services. The Partner shall promptly notify the Company if it becomes aware of any actual or alleged infringement with respect to any Products, Devices, Deliverables or Services.

. . . .

3.12    The Partner agrees that the Company is and shall be the sole and exclusive owner of all right, title and interest, including all intellectual property rights, in and to all Deliverables (other than Products), that all Deliverables (other than Products) are deemed "works for hire" for the Company, and that all rights in all Deliverables (other than Products) that are not otherwise vested in the Company are hereby irrevocably assigned and transferred to the Company….

. . . .

3.18    The Partner agrees to indemnify and hold the Company harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Partner or arising out of or resulting from any claim brought by a third party against the Company as a result of or relating to any actual or alleged breach hereof.

. . . .

**4.      COMPANY REPRESENTATIONS, WARRANTIES AND COVENANTS**

. . . .

4.3     The Company agrees to indemnify and hold the Partner harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by the Company or arising out of or resulting from any claim brought by a third party against the Partner as a result of or relating to any actual or alleged breath hereof by the Company. In the event of any such claim, the Partner agrees to notify the Company promptly of the claim and to permit the Company at the Company's expense, to assume control of the defence thereof with counsel of the Company's choosing, and cooperate with the Company in such defence at the Company's expense.

4.4     In the event that any person is infringing on or misappropriating the Partner Intellectual Property within the Company's exclusive geographic field, the Company shall have the first right, but not the obligation, to institute, prosecute and control legal proceedings and/or administrative proceedings to prevent or restrain such infringement or misappropriation, at its own expense. In the event that the Company elects to initiate legal proceedings and/or administrative proceedings in accordance with the preceding sentence, the Company shall be required to deliver notice of such election to the Partner. The Partner shall assist in the prosecution of such proceedings as reasonably requested by the Company at the Company's expense, and the Partner may participate in such proceedings with its own counsel, at its sole cost and expense. Any recoveries from such proceedings shall first be used to reimburse the Company for the costs and expenses associated with the proceedings (including amounts used to reimburse the Partner for expenses incurred by the Partner for assistance requested by the Company). If any recoveries still remain, the balance shall be paid to the Company.

. . . .

## 6.     CONFIDENTIALITY

6.1     Both parties agree to treat the other party's Confidential Information (as defined below) as confidential, to take all reasonable measures to protect and prevent the disclosure of and/or unauthorized use by third parties of the other parties' Confidential Information, to exercise at least the same degree of care exercised for the protection of its own Confidential Information, and to not use Confidential Information other than for its intended purpose under this Agreement.

6.2     "Confidential Information" shall mean information (whether written or oral) of a confidential or proprietary nature concerning this Agreement or the assets, products or business of any party hereto that either party shall have obtained as a result of discussions or communications related to this Agreement or the transactions contemplated undertaken by this Agreement, including (but not

limited to) in the case of the Company, the technical and other information concerning the Products and Devices and related documentation….

6.3    Notwithstanding any provision herein to the contrary, a party may disclose Confidential Information on a need-to-know basis to its contractors, lawyers, accountants and agents, provided that any such person is bound by a duty of confidentiality, and such party shall be responsible for any disclosure or use by any such third party in contravention thereof….

. . . .

**16.    APPLICABLE LAW**

16.1    This Agreement shall be governed by and construed in all respects in accordance with the laws of Massachusetts, USA…

Id. The Agreement also provided that it would continue in effect until it was terminated either by written consent of the parties or pursuant to notice by one party in the event of insolvency or an unremedied breach. Id. at §§ 5.1, 5.3.

**III.    Ingenico's Motion for Summary Judgment of AnywhereCommerce and BBPOS's First Amended Complaint**

In the First Amended Complaint [Doc. No. 67], AnywhereCommerce alleges tortious interference with existing and prospective contracts and business relations against Ingenico (Count I). BBPOS alleges a violation of the Georgia Trade Secrets Act, O.C.G.A. §§ 10-1-760, et seq. (Count II), the Massachusetts Trade Secrets Act, Mass. G. L. c. 93, §§ 42, et seq. (Count III), and the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, et seq. (Count IV) against Ingenico, and a breach of contract claim against Ingenico Inc. (Count V). BBPOS and AnywhereCommerce both allege unjust enrichment (Count VII) and violation of the Georgia Deceptive Trade Practices Act, O.C.G.A. § 10-1-372(a) (Count VIII) against Ingenico. Ingenico moves for summary judgment on all claims, arguing that (1) BBPOS has failed to produce any evidence that any information Ingenico acquired was a protected trade secret or that it was acquired through improper means, (2) BBPOS's claims are time barred, and (3)

AnywhereCommerce cannot sustain claims based on misappropriation of BBPOS's trade secrets.[6]

### A. *Additional Facts Relevant to Ingenico's Motion*[7]

#### 1. Ingenico Acquires BBPOS Schematics

Beginning in approximately February 2012, BBPOS and ROAM were working on projects to develop an EMV reader and an mPOS system for PayPal Holdings, Inc. ("PayPal Holdings"). Lo 30(b)(6) Dep. Tr. 147:15-148:21 [Doc. No. 198-2]; Pls. Ex. D, Zatkovich Rep. 15 [Doc. No. 188-4]. During this period, BBPOS sent the various communications at issue here which BBPOS and AnywhereCommerce assert are BBPOS's trade secrets.

On or around February 28, 2012, Jimmy Tang of BBPOS emailed a document entitled "swiper API android guy.doc" to Christopher Rotsaert, with a copy to at least one Ingenico employee. Lo 30(b)(6) Dep. Tr. 155:9-156:7 [Doc. No. 198-2]; Pls' Resp. to Defs' Stmt. of Facts ¶ 39 [Doc. No. 198] (not disputing the date). Rotsaert, who had been working for Ingenico since 2010, had moved into a new role at ROAM in May 2012. Rotsaert Dep. Tr. 27:20-22, 29:7-9 [Doc. No. 188-2]. Though Rotsaert was spending time at ROAM's Boston office, he remained an employee of Ingenico. Graylin Dep. Tr. 14:12-15:7 [Doc. No. 188-5]. Lo asserts that while

---

[6] BBPOS also asserted a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count VI) and BBPOS and AnywhereCommerce both alleged a violation of the Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, et seq. (Count IX). First Am. Compl. [Doc. No. 67]. After Ingenico moved for summary judgment, BBPOS and AnywhereCommerce sought to dismiss these two counts without prejudice. See Pls. Opp. 1 [Doc. No. 202]. Ingenico contended that the dismissal should be with prejudice, see Defs' Reply 1 [Doc. No. 204], and at the summary judgment hearing, BBPOS and AnywhereCommerce agreed to dismissal with prejudice. See Clerk's Notes [Doc. No. 217]. Accordingly, Counts VI and IX of the First Amended Complaint [Doc. No. 67] are DISMISSED with prejudice.

[7] The additional facts are based on the evidence viewed in the light most favorable to BBPOS and AnywhereCommerce and drawing all reasonable inferences in their favor.

BBPOS did not know why Tang was sending the document, Lo understood Rotsaert to be a corporate representative for ROAM. Lo Aff. ¶ 17 [Doc. No. 198-1]; Lo 30(b)(6) Dep Tr. 153:9-15 [Doc. No. 198-2] ("Christopher is a ROAM people."). Lo explained that "when ROAM asked me to send some data to them, they must…have some reason." Lo 30(b)(6) Dep. Tr. 155:25-156:1 [Doc. No. 198-2].

On or about July 17, 2012, Daniel Tsai of BBPOS sent an email to Rotsaert with the schematics for the PayPayl G4X, a product ROAM bought from BBPOS to sell to Paypal Holdings. Defs' Stmt. of Facts ¶ 40 [Doc. No. 193]; Lo 30(b)(6) Dep. Tr. 153:19-154:12 [Doc. No. 198-2].[8] The schematics were not marked confidential. Lo 30(b)(6) Dep. Tr. 145:14-15 [Doc. No. 198-2].

BBPOS took some measures to protect its trade secrets, intellectual property ("IP") and other confidential information but did not take other measures. BBPOS did not burn off the fuses of the microprocessor chips, as was one convention in the industry. Lo Dep. Tr. 109:1-10 [Doc. No. 198-4]. BBPOS used password protection on some of the claimed trade secrets, but not all. Id. at 109:11-14; Lo 30(b)(6) Dep. Tr. 140:13-14 [Doc. No. 198-2]. Schematics were stored on the BBPOS computer, which could only be accessed by certain engineers. Lo 30(b)(6) Dep. Tr. 139:13-25 [Doc. No. 198-2]. BBPOS also had employment agreements with its employees that governed the restrictions on distribution of confidential information. Id. at 140:15-24. To send confidential information, which Lo categorized as "basically all engineering file[s]," an

---

[8] BBPOS and AnywhereCommerce's expert Stephen Scherf stated that he did not know if the information was sent to Ingenico; he only knew it was sent to ROAM. Scherf Dep. Tr. 112:15-22 [Doc. No. 193-7]. However, Ivan Zatkovich, BBPOS's expert, acknowledged that BBPOS sent the information at issue directly to Ingenico employees. Zatkovich Dep. Tr. 76:2-12 [Doc. No. 193-6].

employee would have to get permission from either Lo or "some very early senior staff." Id. at 141:2-142:4, 145:25-146:10 (stating that Lo gave permission to Jimmy Tang to send information to Rotsaert).[9]

On August 29, 2012, Graylin sent Rotsaert an email stating that Graylin had learned that Rotsaert had asked Lo to send Rotsaert and his "Ingenico colleague" "various design files of the G3X and G4X reader and various source code" in July 2012. Pls' Ex. I, 3-4 [Doc. No. 188-9]. Graylin wrote that this "is ROAM's IP and we need to have access to this data." Id. Graylin understood that Rotsaert transferred that data to Ingenico in France "for them to build the iTMP audio jack EMV reader." Id. Graylin asserted that there was no commercial agreement between ROAM and Ingenico, and asked Rotsaert to not transfer any more data or intellectual property. Id.[10]

Rotsaert replied that same day, stating that he received documents from BBPOS related to the schematic of the G4X and protocol documents. Id. at 3. He said the transferred files did not contain source code and that Lo did not agree to provide source code. Id.

On August 30, 2012, Graylin responded that "transfer[ing] value out of the company for the interest of one group over the other...is unlawful," and asked Rotsaert to stop transferring information without Graylin's "explicit consent." Id. at 2. He then stated that he was dissatisfied

---

[9] As discussed further below, BBPOS contends that any information it provided to ROAM was subject to the Agreement's confidentiality provisions, without any need to separately mark the documents. Lo 30(b)(6) Dep. Tr. 142:17-143:13, 143:24-144:1 [Doc. No. 198-2].

[10] According to Graylin, ROAM gave Ingenico access to its data, including its intellectual property, because they were "partners," but "there was still a wall between ROAM Data and Ingenico as two separate companies," because ROAM was not fully acquired at that point. Graylin Dep. Tr. 14:23-15:7, 15:13-22 [Doc. No. 188-5].

with Rotsaert's work, and even though Rotsaert was meant to be working for both ROAM and Ingenico, he "seem[ed] to be spending much more time on Ingenico than Roam." Id.

On September 16, 2012, Rotsaert replied that he "strongly den[ied] the allegations" by Graylin. Id. at 1. He wrote that he believed there had been previous discussions which were shared with Graylin about using ROAM's G4X technology to "accelerate the development by Ingenico." Id. at 1. He also wrote that "[a]s ROAM has been using BBPOS as a design house for swiper[,] we are leveraging [I]ngenico internal development capacity to develop this EMV product." Id. On September 17, 2012, Graylin replied that Rotsaert "does not…have my agreement and permission to start transferring IP that does not belong to Ingenico." Id. He wrote that Rotsaert was wrong to assume that the reader IP belonged to ROAM,[11] and that the transfer to Ingenico was a "real mistake." Id. He wrote that Rotsaert's actions were "threatening the very fabric of ROAM's relationship with its most important supplier. You are transferring value from one company to another company unilaterally without agreement or consideration. There is an apparent lack of respect for the IP or BBPOS and ROAM[.]" Id.

In his deposition, Graylin explained that "there's a part of that [IP] that belongs to BBPOS" and that he was concerned that Ingenico was going to use the shared information to build competing products. Graylin Dep. Tr. 46:7-18, 54:10-21 [Doc. No. 188-5]. Graylin stated that Rotsaert shouldn't have transferred the IP because ROAM was still separate from Ingenico, and "ROAM has an agreement with BBPOS, but Ingenico does not have an agreement directly with BBPOS." Id. at 50:4-13.

---

[11] In discussing this phrase, Graylin stated that the IP was split into two parts: the form factor, which was owned by ROAM, and the hardware design, which was owned by BBPOS. Id. at 48:16-50:3.

Later in September 2012, Graylin was terminated from his position at ROAM. Id. at 55:11-23. Lo reported that sometime thereafter Graylin had called him to say that "Ingenico [stole] our IP" and that ROAM had transferred the IP to Ingenico, Lo Dep. Tr. 110:20-111:11, 112:12-14 [Doc. No. 198-4], and that Graylin's disagreement about the transfer of information from ROAM to Ingenico was one of the reasons Graylin was fired by ROAM, id. at 112:24-113:9, 113:15-23.[12] Graylin believed that he told Lo that Ingenico was giving information about BBPOS's designs to Fujian Landi Commercial Equipment Co Ltd. ("Landi"),[13] and that he was concerned that Ingenico was giving Landi the POS solutions ROAM was working on with BBPOS. See Graylin Dep. Tr. 100:11-102:1 [Doc. No. 198-5].

Lo "was quite skeptical" and "did nothing" regarding the information from Graylin. Lo Dep. Tr. 112:15-23 [Doc. No. 198-4]. Lo did not believe that Ingenico was stealing BBPOS's IP based on his conversation with Graylin. Id. at 114:21-25. However, on October 11, 2012, Lo wrote to Daniel Tsai and Jimmy Tang of BBPOS that ROAM's new product manager was going to visit BBPOS, instructing "[p]lease don't disclose too much technical information to him" because Graylin had told him that "Ingenico passe[d] some info to Landi for making [a] terminal to compete with us. We should not trust any hardware guy from Ingenico or ROAM anymore." Pls' Resp. to Defs' Stmt. of Facts, Ex. 6 [Doc. No. 198-6].

---

[12] Graylin sued Ingenico and ROAM following his termination, and at the time contended that Rotsaert had told ROAM employees that Ingenico wanted to create its own competing EMV reader. Graylin Dep. Tr. 36:12-24 [Doc. No. 198-5]. This suit ended through a settlement. See Graylin et al v. Lazare et al, No. 1284-cv-04032 (Mass. Super. Nov. 1, 2012).

[13] Landi is a Chinese manufacturing company. Pls' Stmt. of Facts ¶ 37 [Doc. No. 188] (not disputing the characterization of Landi). Ingenico partially acquired and then continued to expand its relationship with Landi in the latter half of 2012. See Rotsaert Dep. Tr. 19:2-20:7, 111:1-20 [Doc. No. 188-2].

In January 2013, Lo received a brochure announcement about the release of ROAM/Ingenico's new product, the RP350X, that would compete with BBPOS's "Chipper" product; however, Lo did not pay much attention to it. Lo 30(b)(6) Dep. Tr. 126:3-127:20 [Doc. No. 198-2]. On January 19, 2013, Ken Paull of ROAM sent Lo an email in response to hearing that Lo was "upset that there is an Ingenico EMV prototype that we are showing," and wrote that "I can assure you that there is no commonality in terms of architecture, firmware or power with the Ingenico device as it is based off an existing Landi product." Pls' Resp. to Defs' Stmt. of Facts, Ex. 8 [Doc. No. 198-8]; Rotsaert Dep. Tr. 36:3-20 [Doc. No. 188-2].

Sometime during the fourth quarter of 2014, Lo saw an Ingenico product at the Cartes trade show in France similar to BBPOS' EMV device known as the Chipper. Lo Dep. Tr. 112:4-11, 176:8-24 [Doc. No. 198-4]. Lo stated that seeing the RP350X product reminded him of the conversation he had with Graylin in 2012, and "at that period of time, I believe that the defendant steal my IP." Id. at 112:4-11, 176:8-178:4; Lo 30(b)(6) Dep. Tr. 125:12-22 [Doc. No. 198-2] (stating that Lo saw the "actual product" of the RP350X at the trade show). Lo then asked Michael Kron from AnywhereCommerce to get more information. Lo Dep. Tr. 181:18-182:13 [Doc. No. 198-4]. Kron told Lo that the prototype at the Ingenico booth was "almost the same" as BBPOS's Chipper. Id. at 182:14-20. Lo stated that he was worried because "Ingenico is not the type of company who deals mobile POS sales…And all of a sudden, they have this Chipper like product. So I start to worry[.]" Id. at 185:4-14. However, Lo did not take further action. Id. at 186:17-25; see also Lo 30(b)(6) Dep. Tr. 106:12-24 [Doc. No. 198-2] (describing when the RP350x came out after the trade show). Lo stated that 2014 was the first time he saw the actual product. Lo 30(b)(6) Dep. Tr. 128:12-25 [Doc. No. 198-2].

2.  Ingenico Secures Business with First Data

First Data Corporation ("First Data") is a company with headquarters in Georgia. See First Am. Compl. ¶ 127 [Doc. No. 67]. Beginning in 2008, AnywhereCommerce "had a healthy and established relationship with First Data of good standing over a period of time," and historically, AnywhereCommerce had submitted bids in response to First Data's requests for proposals where AnywhereCommerce was either the top bidder or was in the number two position. Cobrin 30(b)(6) Dep. Tr. 50:8-52:17 [Doc. No. 193-1]. At a First Data live request for proposals in 2013, AnywhereCommerce was the low bidder. Kron 30(b)(6) Dep. Tr. 69:6-12 [Doc. No. 193-11]. For the 2014 revised request, AnywhereCommerce does not know whether it was the lowest bidder. Id. at 69:6-20.

At some point in 2015, First Data chose to accept a bid from Ingenico rather than AnywhereCommerce. AnywhereCommerce's 30(b)(6) deponent Mitchell Cobrin found it "very bewildering" when AnywhereCommerce did not win the bid. Cobrin 30(b)(6) Dep. Tr. 50:8-52:17 [Doc. No. 193-1]. Cobrin stated that "based on [his] conversations with [First Data employees] Dan Bobier and O.B. Rawls there was pressure placed upon First Data by Ingenico to displace [AnywhereCommerce] and use them exclusively." Cobrin Dep. Tr. 39:11-40:13 [Doc. No. 193-13]. While Cobrin acknowledged that there is nothing wrong with discounting prices to win bids, he contends that Ingenico used the "BBPOS recipe" to improperly acquire First Data's business. Cobrin 30(b)(6) Dep. Tr. 126:4-17 [Doc. No. 193-1]. Cobrin stated that he believed that Ingenico "exerted undue pressure on a mutual client to, for all intents and purposes, try to put [AnywhereCommerce] out of business." Cobrin Dep. Tr. 40:18-41:6 [Doc. No. 193-13]. Kron stated that that "the principal damage [to AnywhereCommerce] is the loss of sales and gross margin associated with…Ingenico's sales of the same product to First Data." Kron 30(b)(6) Dep. Tr. 65:15-25 [Doc. No. 193-11].

17

*B. Discussion*

    1. <u>AnywhereCommerce's Claims</u>

AnywhereCommerce brings claims for tortious interference (Count I), unjust enrichment

(Count VII), and a violation of the Georgia Deceptive Trade Practices Act (Count VIII) related to

Ingenico's purported theft of BBPOS's trade secrets.

    a. Tortious Interference (Count I)

AnywhereCommerce alleges that Ingenico tortiously interfered with its relationship with

First Data.[14] To prevail on a claim for tortious interference with a contractual relationship under

Massachusetts law,[15] a plaintiff must show that "(1) [the plaintiff] had a contract with a third

party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference,

in addition to being intentional, was improper in motive or means; and (4) the plaintiff was

harmed by the defendant's actions." <u>Hamann v. Carpenter</u>, 937 F.3d 86, 90 (1st Cir. 2019). To

demonstrate interference with advantageous business relationships, a plaintiff must show "[(1)] a

known advantageous relationship…; [(2)] deliberate interference; [(3)] improper in motive or

---

[14] AnywhereCommerce alleged additional grounds for its tortious interference claim, including that Ingenico was bundling and discounting its products and services to shut out competition. <u>See</u> First Am. Compl. ¶¶ 125-134 [Doc. No. 67]. However, AnywhereCommerce's <u>Opposition</u> [Doc. No. 202] and its arguments during the motion hearing exclusively focused on First Data and Ingenico's alleged misuse of BBPOS's trade secrets. Accordingly, AnywhereCommerce's additional arguments are waived.

[15] Count I specifically noted that (1) First Data rejected AnywhereCommerce's bid in Georgia where First Data has its headquarters, (2) Ingenico Inc. is incorporated and has its headquarters in Georgia, and (3) Ingenico Corp. is registered to do business and has its headquarters in Georgia. <u>See</u> First Am. Compl. ¶ 127, n.23 [Doc. No. 67]. Ingenico's summary judgment briefing on Count I cited both Georgia and Massachusetts law and argued that summary judgment was warranted regardless of the choice of law. Defs' Mem. 7, n.1. [Doc. No. 192]. As BBPOS and AnywhereCommerce's opposition did not directly address the choice of law question, relied on Massachusetts law, and made no claim that Georgia law applies, <u>see</u> Pls' Opp. 6 [Doc. No. 202], the court considers the claim under Massachusetts law only and any claim under Georgia law abandoned.

means; and [[4]] resulting economic harm." Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 43

(1st Cir. 2011) (citing Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 395, 822 N.E.2d 667

(2005)). Ingenico contends that AnywhereCommerce cannot establish any of these elements.

The court need not address the latter elements of either theory of tortious interference

where AnywhereCommerce does not claim that it had an ongoing contract with First Data at the

time the 2015 contract was awarded and has not offered sufficient evidence from which a jury

could find that AnywhereCommerce had a relationship with First Data that was reasonably likely

to develop. A number of companies (including both AnywhereCommerce and Ingenico)

responded to First Data's 2015 requests for proposals. Although AnywhereCommerce had

submitted successful bids in the past, there is only speculation that First Data was reasonably

likely to choose AnywhereCommerce on this bid. While AnywhereCommerce's 30(b)(6)

deponent Mitchell Cobrin found it "very bewildering" when AnywhereCommerce did not win

the bid, Cobrin 30(b)(6) Dep. Tr. 50:8-52:17 [Doc. No. 193-1], and relayed his suspicions that

there was undue pressure placed upon First Data by Ingenico to displace AnywhereCommerce

and use Ingenico exclusively, see Cobrin Dep. Tr. 39:11-41:16  [Doc. No. 193-13],

AnywhereCommerce has not provided evidence from which a jury could determine that this is

what occurred, especially where AnywhereCommerce did not know if it was the lowest bidder,

see Kron 30(b)(6) Dep. Tr. 69:6-20 [Doc. No. 193-11]. Accordingly, Ingenico is entitled to

summary judgment as to this count.

b.   Unjust Enrichment (Count VII)

AnywhereCommerce alleges that Ingenico was unjustly enriched by improperly

procuring AnywhereCommerce and BBPOS's trade secrets. First Am. Compl. ¶¶ 174-79 [Doc.

No. 67]. Under Massachusetts law,[16] to state a claim for unjust enrichment a plaintiff must prove "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances [which] would be inequitable without payment for its value." Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir.), decision clarified on denial of reh'g, 559 F.3d 1 (1st Cir. 2009) (citing Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts, § 68:5 (4th ed. 1993)). Here, there is no evidence to support AnywhereCommerce's claim that it conveyed a benefit on Ingenico where the alleged secrets belonged to BBPOS, not AnywhereCommerce. Further, any benefit conferred on Ingenico from the First Data contract was from First Data. Accordingly, Ingenico is entitled to summary judgment as to AnywhereCommerce's claim in this count.

c.   Georgia Uniform Deceptive Trade Practices Act (Count VIII)

AnywhereCommerce alleges that Ingenico engaged in deceptive business practices in violation of the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10–1–372(a), through theft of BBPOS and AnywhereCommerce's trade secrets and business plans, which AnywhereCommerce asserts that Ingenico used to deceive consumers. But the record contains no evidence that Ingenico stole anything from AnywhereCommerce. See Kron 30(b)(6) Dep. Tr. 117:10-20 [Doc. No. 193-11] (conceding that although the First Amended Complaint referenced

---

[16] Count VII alleged that "Defendants accepted, retained, and enjoyed the benefit of Plaintiffs' trade secrets and business plans in connection with Ingenico's U.S.-based mPOS operations in the State of Georgia," and reiterated that Ingenico Inc. is incorporated and has its headquarters in Georgia, and that Ingenico Corp. is registered to do business and has its headquarters in Georgia. See First Am. Compl. ¶ 177 [Doc. No. 67]. Both Ingenico's summary judgment briefing on Count VII, and BBPOS and AnywhereCommerce's opposition cited only Massachusetts law. Defs' Mem. 9 [Doc. No. 192]; Pls' Opp. 8-9 [Doc. No. 202]. Accordingly, the court considers Count VII as brought under Massachusetts law and any claim under Georgia law abandoned.

"Plaintiffs," there was no allegation that Ingenico improperly procured trade secrets or business plans from AnywhereCommerce). In opposition to Ingenico's summary judgment motion as to this count, AnywhereCommerce asserted only that "to the extent that [AnywhereCommerce's] tortious interference and/or unjust enrichment claims survive," summary judgment must also be denied as to the deceptive practices count. See Pls' Opp. 10 [Doc. No. 202]. But where AnywhereCommerce cannot sustain its tortious interference or unjust enrichment claims, its statutory claim predicated on such cannot be sustained.

Accordingly, Ingenico's Motion for Summary Judgment [Doc. No. 191] is GRANTED as to AnywhereCommerce's claims.

### 2. BBPOS's Claims

BBPOS brings claims against Ingenico for violation of the Georgia Trade Secrets Act, O.C.G.A. §§ 10-1-760, et seq. (Count II), the Massachusetts Trade Secrets Act, Mass. G. L. c. 93, §§ 42, et seq. (Count III), the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, et seq. (Count IV), unjust enrichment (Count VII), and a violation of the Georgia Deceptive Trade Practices Act, O.C.G.A. § 10-1-372(a) (Count VIII),[17] and against Ingenico Inc. only for breach of contract (Count V).

#### a.   Statute of Limitations

##### i.      Trade Secrets and Deceptive Practices Claims

Ingenico argues that BBPOS's statutory claims are time-barred because BBPOS knew about Ingenico's allegedly breaching product by January 2013 when Lo received the brochure announcement about the release of ROAM/Ingenico and Landi's new product but did not initiate

---

[17] As noted above, Counts VII and VIII were brought by both BBPOS and AnywhereCommerce.

this action until December 2018, almost six years later. Defs' Mem. 14 [Doc. No. 192]. BBPOS and AnywhereCommerce argue that the date the statute began running is significantly later, ranging from February 4, 2014 – when Ingenico allegedly sold its first product – to 2016, when BBPOS experienced a large decline in sales. Pls' Opp. 13-22 [Doc. No. 202].

For the trade secret act claims, BBPOS's claims accrued when the misappropriation was discovered or, by the exercise of reasonable diligence, should have been discovered, with relevant statute of limitations of: 5 years for Count II, Georgia Trade Secrets Act, O.C.G.A. § 10-1-766; 3 years for Count III, Massachusetts Trade Secrets Act, Mass. G.L c. 93, § 42E; and 3 years for Count IV, Defend Trade Secrets Act, 18 U.S.C. § 1836(d). For Count VIII, Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372(a), BBPOS's claims accrued when the injury occurred, and may be "tolled until the fraud is discovered or by reasonable diligence should have been discovered," and the statute of limitations is 4 years. Currie v. Cayman Res. Corp., 595 F. Supp. 1364, 1378-79 (N.D. Ga. 1984) (internal quotations omitted); Kason Indus., Inc. v. Component Hardware Grp., Inc., 120 F.3d 1199, 1204-05 (11th Cir. 1997).

Viewing the record in the light most favorable to BBPOS, a jury could reject Ingenico's contention that the claim accrued no later than January 2013. Although Graylin had communicated his suspicions to Lo in approximately November 2012 and Lo saw the brochure in January 2013, Ingenico assured BBPOS on January 19, 2013, that "there is no commonality in terms of architecture, firmware or power with the Ingenico device as it is based off of an existing Landi product." Pls.' Resp. to Defs' Stmt. of Facts, Ex. 8 [Doc. No. 198-8]. Moreover, at this juncture, no product had yet been put on the market such that BBPOS would have discovered it. A jury could find that a terminated employee's warning, combined with assurances from the allegedly breaching party, do not sufficiently create a reasonably colorable claim such that

BBPOS should have known that Ingenico was allegedly using its trade secrets without permission.

By approximately October 2014, however, BBPOS reasonably knew about Ingenico's allegedly breaching product when Lo saw the RP350X at the Cartes trade show in France. See Pls' Opp. 15-16 [Doc. No. 202] (identifying October 2014 as the approximate date of the Cartes trade show); Lo Dep. Tr. 112:4-11, 176:8-184:9 [Doc. No. 198-4] (Lo believed Ingenico stole BBPOS's trade secrets when he saw Ingenico's new product at the Cartes trade show). Although Lo did not physically inspect the product himself, Lo asked AnywhereCommerce to look at the product during the trade show, and AnywhereCommerce reported that the device at the Ingenico booth was "almost the same" as BBPOS's Chipper. Lo Dep. Tr. 181:18-182:20 [Doc. No. 198-4]. Regardless of when Ingenico's product went on the market and when BBPOS experienced a decline in sales, BBPOS reasonably knew in October 2014 that Ingenico had a very similar product such that BBPOS was on notice by then of the potential claim. Where BBPOS knew or should have known of Ingenico's alleged actions by October 2014, BBPOS's claims for violations of the Massachusetts Trade Secrets Act (Count III), the Defend Trade Secrets Act (Count IV), and the Georgia Uniform Deceptive Trade Practices Act (Count VIII) are time-barred under the relevant statute of limitations. BBPOS's claims under the Georgia Trade Secrets Act (Count II) is not time barred where the applicable statute of limitations is five years.

Accordingly, Ingenico's Motion for Summary Judgment [Doc. No. 191] is GRANTED as to Counts III, IV, and VIII.

ii.      Contract and Unjust Enrichment Claims

Although Ingenico contends that each of BBPOS's claims fails based on the pertinent statute of limitations, Ingenico's opening brief includes no statute of limitations argument as to

the breach of contract claim (Count V). After BBPOS and AnywhereCommerce pointed out that this claim is subject to a six-year statute of limitations, Ingenico raised a new argument in its reply, arguing for the first time that the contract claim is barred because the First Amended Complaint ¶ 53 [Doc. No. 67] alleges that Ingenico breached the Agreement beginning in the summer of 2012. Defs' Reply 5 [Doc. No. 204]. Where Ingenico raised an entirely new argument in their reply brief, the court declines to consider the argument now.

Ingenico also argues that the unjust enrichment claim (Count VII) has a 4 year statute of limitations under Georgia law. Defs' Mem. 13 [Doc. No. 192] (citing O.C.G.A. § 9-3-26). As noted above, the court treats BBPOS and AnywhereCommerce's claim of unjust enrichment under Georgia law abandoned and considers only a claim of unjust enrichment under Massachusetts law, which has a 6 year statute of limitations. See Mass. G.L. c. 260, § 2. Where the court has determined for purposes of summary judgment that BBPOS reasonably knew about Ingenico's allegedly breaching product in October 2014, Ingenico has not demonstrated that an unjust enrichment claim under Massachusetts law is barred by the statute of limitations.

b.  Designation of Alleged Trade Secrets

Ingenico moves for summary judgment of BBPOS's remaining claims for violation of the Georgia Trade Secrets Act (Count II), Breach of Contract (Count V), and Unjust Enrichment (Count VII) on the grounds that the schematics were not trade secrets.

The Georgia Trade Secret Act allows for relief where a plaintiff proves "that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret." Penalty Kick Mgmt. Ltd. v. Coca Cola Co., 318 F.3d 1284, 1290–91 (11th Cir. 2003) (internal quotations omitted). "To prove the existence of a trade secret, the plaintiff must show that it possessed information— which may include technical or nontechnical data, financial plans, customer lists, a product

design, or product plans—that derives economic value from not being generally known or readily ascertainable to others, and that 'is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" Diamond Power Int'l, Inc. v. Davidson, 540 F. Supp. 2d 1322, 1332 (N.D. Ga. 2007) (quoting O.C.G.A. § 10–1–761(4)); Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984) ("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others."). Under Massachusetts contract law, "an individual who breaches contractual duties to obtain trade secrets has used improper means," and "[a] party who knowingly benefits from the breacher's trade secret bounty is also liable." Optos, Inc. v. Topcon Med. Sys., Inc., 777 F. Supp. 2d 217, 240 (D. Mass. 2011).

Although Ingenico does not dispute that the schematics of BBPOS's products were not commonly known by or available to the public, or that BBPOS derived economic value from keeping those schematics secret, Ingenico argues that BBPOS did not take adequate steps to protect its alleged trade secrets or indicate to Ingenico that the schematics BBPOS sent should be kept confidential. Defs' Mem. 17-18 [Doc. No. 192]. BBPOS argues that information sent to ROAM was covered by the confidentiality provisions of the Agreement, and alternatively, that whether BBPOS took reasonable steps to protect its trade secrets is a question of fact for a jury. Pls' Opp. 27-28 [Doc. No. 202].

Ingenico's argument that it was under no obligation of confidentiality with BBPOS as a matter of law is unavailing. A jury could find that prior to the Ingenico-ROAM merger in 2017, both BBPOS and Ingenico treated Ingenico as a party to the Agreement (despite ROAM's soon to be terminated CEO's protestations). At the time of the alleged theft, BBPOS was regularly dealing with joint employees of ROAM and Ingenico and continued its obligations under the

Agreement as Ingenico acquired more, and then eventually the entirety, of ROAM. Similarly, although Ingenico asserts that there was never a transfer of the Agreement from ROAM to Ingenico, it held itself out to be a successor to the contract through the acquisition, and both parties seemed to agree that BBPOS was dealing with Ingenico. Further, at least some of the trade secrets in question were sent to Rotsaert, who Ingenico submits worked for both ROAM and Ingenico. Accordingly, a jury could find that Ingenico was subject to the Agreement's confidentiality provisions.

Further, a reasonable jury could find that BBPOS took reasonable measures to protect its trade secrets. Where parties in a business relationship expressly or implicitly agree to maintain secrecy, trade secret protection is not usually destroyed when information is shared, although "the plaintiff must demonstrate that it has taken reasonable efforts to maintain [the information's] secrecy by not widely distributing the information to its employees without proper controls." Diamond Power Int'l, Inc., 540 F. Supp. 2d. at 1333. Here, because a jury could find that BBPOS and Ingenico were operating as parties to the Agreement, it could also find that Ingenico was under a duty of confidentiality pursuant to the Agreement such that the disclosure of documents by BBPOS to Ingenico did not undermine the documents' status as trade secrets. See Protegrity Corp. v. Elavon Inc., 2018 WL 8949789, at *3 (N.D. Ga. Aug. 22, 2018) ("[A] licensing agreement may constitute reasonable steps if the agreement contains confidentiality provisions or other measures to ensure a product's secrecy.").

Further, BBPOS took other measures to protect its trade secrets, including using password protection on some of its trade secrets and storing schematics on a limited-access computer, see Lo Dep. Tr. 109:11-14 [Doc. No. 198-4]; Lo 30(b)(6) Dep. Tr. 139:13-140:1, 140:13-24 [Doc. No. 198-2], and requiring BBPOS employees to obtain permission from either

Lo or "very early senior staff" to share confidential information, Lo 30(b)(6) Dep. Tr. 141:2-142:4 [Doc. No. 198-2]; see, e.g., Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc., 793 F. Supp. 2d 1302, 1311 (N.D. Ga. 2011) (finding that a party took reasonable efforts to maintain confidentiality where the trade secrets were only transmitted through a protected computer network and email system, and were only made available to certain executives). Lo also testified that he approved sending trade secret information to Rotsaert. Lo 30(b)(6) Dep. Tr. 145:25-146:14 [Doc. No. 198-2]. Additionally, BBPOS also had employment agreements governing confidentiality and distribution of information. Id. at 140:15-24; c.f., Diamond Power Int'l, 540 F. Supp. 2d at 1334 (finding a party did not take reasonable efforts to protect its information where files were accessible to any employee with computer access and where a general employee confidentiality did not contain a specific policy to restrict or track file usage or distribution). Although BBPOS could have arguably taken more efforts to protect its trade secrets, by, for example, marking them as confidential, a jury could find the steps it took, combined with a written confidentiality agreement, sufficient where a claim under the Georgia Trade Secrets Act only requires "reasonable" efforts.

In sum, a jury could find that BBPOS's schematics were trade secrets and Ingenico therefore is not entitled to summary judgment on this ground.

Accordingly, Ingenico's Motion for Summary Judgment [Doc. No. 191] is DENIED as to BBPOS's claims in Counts II, V, and VII.

### IV.   AnywhereCommerce and BBPOS's Motion for Summary Judgment of Ingenico Inc.'s Second Amended Counterclaims

Ingenico Inc. brings claims against BBPOS for breach of contract (Count I) and breach of the duty of good faith and fair dealing (Count II) related to BBPOS's unauthorized sale of products allegedly covered under the Agreement and its failure to indemnify Ingenico Inc.

Ingenico Inc. also alleges that BBPOS intentionally interfered with Ingenico Inc.'s business relationship with third-party North American Bancard ("NAB") (Count III). Additionally, Ingenico Inc. alleges that AnywhereCommerce tortiously interfered with Ingenico Inc.'s business relationship with BBPOS (Count IV) by inducing BBPOS to breach the Agreement, and in so doing improperly acquired BBPOS's trade secrets that were exclusively licensed to Ingenico Inc. under the Agreement in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, et seq. (Count V) and the Massachusetts Trade Secrets Act, Mass. G.L. c. 93 §§ 42 et seq (Count VI). Finally, Ingenico Inc. alleges that BBPOS and AnywhereCommerce worked together to engage in unfair methods of competition and deceptive trade practices in violation of Mass. G.L. c. 93A § 11 (Count VII). BBPOS and AnywhereCommerce move for summary judgment on all claims against them.

### A. Additional Facts Relevant to BBPOS and AnywhereCommerce's Motion [18]

#### 1. BBPOS Accepts a Purchase Order from North American Bancard, LLC

On December 8, 2015, Chris Dismukes of Ingenico sent an internal email stating that "we have come to understand that BBPOS has taken the NAB business direct resulting in a cancelled PO and likelihood of $1M+ in lost revenues in 2016." Pls' Ex. EE [Doc. No. 188-31]. According to the email, Robert (Bob) Cook of BBPOS left Dismukes a voicemail that day "stating that we have both accepted duplicate PO's for same Swipers from NAB and that we could cancel the PO without penalty" and that Cook "wants to talk to me about competing moving forward." Id.

Two days later, David Szczepanski of Ingenico emailed Cook, with a copy to BBPOS and Ingenico/ROAM employees, confirming the conversation between Cook and Dismukes

---

[18] The additional facts are based on the evidence viewed in the light most favorable to Ingenico Inc. and drawing all reasonable inferences in its favor.

regarding an order from NAB to BBPOS for "ROAM-type MSR devices." Pls' Ex. R, 3 [Doc. No. 188-18]. Szczepanski wrote that "ROAM Data has an exclusive license from BBPOS to sell MSR devices manufactured by BBPOS," and directed BBPOS to "cease and desist from interfering with ROAM Data's contractual relationship with NAB or any other ROAM Data customers." Id. Szczepanski asserted that in the event that BBPOS did sell the devices to NAB, BBPOS would be in breach of the Agreement, and ROAM would consider action. Id. That same day, Alex Choi, BBPOS's CEO at the time, responded that he believed that the situation was a misunderstanding. Id. at 2.

On December 11, 2015, Szczepanski responded that "ROAM Data appreciates that this may be a misunderstanding at the BBPOS headquarters level." Id. at 1. However, he also asked Choi to (1) "confirm that BBPOS will instruct its US sales force to cease and desist from interfering with ROAM Data's contractual relationship with [NAB] or any other ROAM Data customers," (2) "confirm that BBPOS will fulfill ROAM Data's order for the MSRs destined for NAB," and (3) "confirm that BBPOS will respect the exclusivity provisions of [the Agreement] between ROAM Data and BBPOS and will not sell any MSR devices directly to ROAM customers, including NAB." Id.

In an internal BBPOS email regarding the three requests, Cook wrote that he was "not aware of any NAB agreement we would be interfering with, we did not solicit NAB they came to us." Id. He agreed that BBPOS would fulfill ROAM's order but instructed BBPOS to inform Szczepanski that BBPOS was "not approving assignment of the agreement to [Ingenico] and consider this notification of cancellation." Id. He noted that Ingenico was a "competitor," and that although BBPOS may continue to sell to Ingenico, it would not do so under the Agreement, particularly the exclusivity provision, in order to "protect [BBPOS's] interests." Id.

On December 17, 2015, BBPOS Finance Director Matthew Ng responded to Ingenico to confirm that BBPOS would cease to interfere with ROAM's contractual relationship with NAB and that it would fulfil ROAM's order. Defs' Stmt. of Addt'l. Facts, Ex. 2 [Doc. No. 201-2]. However, he wrote that "the acquisition of [ROAM] by Ingenico has triggered the event of transfer of [ROAM] to a competitor under Section 1.2 and the Agreement was deemed to be terminated as a result." Id. He wrote that BBPOS would be interested in discussing a "continued collaboration with [ROAM] on terms mutually beneficial and acceptable to us both…" Id.

Despite this email, Lo testified as a 30(b)(6) deponent for BBPOS that the Agreement remained in effect at the time of the instant case, see Lo 30(b)(6) Dep. Tr. 50:14-15, 180:12-13 [Doc. No. 198-2], and neither party disputes that the Agreement was still in effect at the time of summary judgment briefing, see Defs' Stmt. of Facts ¶ 24 (undisputed) [Doc. No. 193].

2.   The Indemnification Requests and Responses

Between 2017 and 2018, Ingenico Inc. requested indemnification from BBPOS pursuant to the Agreement for five matters involving patent infringement claims by third parties against Ingenico customers based on products BBPOS had produced for Ingenico.

a.   The Third-Party Patent Infringement Claims

On March 23, 2018, IOEngine LLC ("IOEngine") initiated a patent infringement litigation against PayPal Holdings in the District of Delaware. IOENGINE LLC v. PayPal Holdings, Inc., No. 1:18-cv-00452-WCB (D. Del. 2018). PayPal Holdings was an Ingenico customer and some of the products at issue were produced by BBPOS for Ingenico. See Pls' Ex. AA, 23 [Doc. No. 188-27]. On June 1, 2018, Ingenico Inc. filed a related case against IOEngine seeking a declaratory judgment of non-infringement regarding the BBPOS product. See Pls' Ex. DD, Docket for Ingenico Inc. v. IOENGINE LLC, No. 1:18-cv-00826-WCB (D. Del. 2018)

[Doc. No. 188-30]. While the litigation was pending, Ingenico also filed related Inter Partes Review ("IPR") proceedings before the United States Patent and Trademark Office. Id. At the time of BBPOS and AnywhereCommerce's Motion [Doc. No. 189], the litigation and IPR proceedings were pending. See Pls' Stmt. of Facts ¶ 87 [Doc. No. 188].

Between some time in 2017 and September 28, 2018, Ingenico received four requests for indemnification from Ingenico customers related to devices produced by BBPOS under the Agreement where REM Holdings 3, Blackbird Technologies, and MobilePay LLC were claiming infringement. See Pls' Ex. AA [Doc. No. 188-27].

> b. Communications Concerning Indemnification Between BBPOS and Ingenico

As reported in a later letter from Ingenico, Ingenico first sent notice to BBPOS on May 7, 2018, regarding the IOEngine suit against PayPal Holdings and BBPOS's duties to "indemnify and hold harmless Ingenico pursuant to Section 3.18 of the Agreement, and pursuant to the representations and warranties BBPOS made in Sections 3.9 and 3.10 of the Agreement," but received no response. Id. at 23.

On October 4, 2018, Ingenico informed BBPOS that Ingenico customer PayPal, Inc., sought indemnification from Ingenico in connection with MobilePay LLC's patent infringement lawsuit in the Western District of Texas against PayPal, Inc. involving a card-reader produced by BBPOS under the Agreement. Id. at 1-14. In the letter, Ingenico asserted that BBPOS had a "duty to indemnify and hold harmless Ingenico" under § 3.18, pursuant to the representations and warranties in §§ 3.9 and 3.10, of the Agreement. Id. at 1.

According to a later letter from BBPOS, BBPOS's counsel attempted to get in touch with Ingenico's counsel by voice message and email on October 19, 2018, but was not successful. Pls' Ex. BB, Bozeman Decl. ¶ 2; Ex. A [Doc. No. 188-28].

On October 22, 2018, Ingenico notified BBPOS that three additional Ingenico customers—Blackbaud, Inc., Total Merchant Services, Inc., and its parent company NAB—sought indemnification from Ingenico in connection with an action by Blackbird Technologies against them for patent infringement for a mobile card reader produced by BBPOS under the Agreement. Pls' Ex. AA, 15-22 [Doc. No. 188-27]. Ingenico again asserted that BBPOS had a "duty to indemnify and hold harmless Ingenico" under the same provisions of the Agreement. Id. at 15.

On October 23, 2018, Ingenico sent BBPOS a follow up letter regarding the IOEngine action against PayPal Holdings, stating that BBPOS had "ignored [Ingenico's] request…that BBPOS acknowledge its duties and responsibilities under the Agreement, specifically its obligation to indemnify and hold harmless Ingenico." Id. at 23. The letter states that Ingenico interpreted the silence as "acceptance of Ingenico's position that BBPOS owes Ingenico a duty to indemnify and hold harmless Ingenico in connection with the IOEngine matter" and as BBPOS's assent to Ingenico proceeding with a defense and settlement at BBPOS's expense. Id.

On October 26, 2018, Ingenico sent BBPOS a letter updating BBPOS on an earlier claim for indemnification from Ingenico customer Comerica Inc., where REM Holdings 3, LLC, was alleging patent infringement against Comerica on a card reader device provided to Ingenico by BBPOS. Id. at 24-25. The letter also asserted that BBPOS had a "duty to indemnify and hold harmless Ingenico" under the same provisions of the Agreement. Id. In the same letter, Ingenico advised BBPOS that REM Holdings 3 had sent similar letters to six additional companies for which Ingenico was now seeking indemnification under the Agreement. Id.

On November 2, 2018, BBPOS's counsel sent a letter to Ingenico's counsel regarding Ingenico's indemnification requests. Pls' Ex. BB, Bozeman Decl. ¶ 2; Ex. A [Doc. 188-28]. The

letter stated that BBPOS disagreed with Ingenico's analysis in the October 23, 2018 letter, and requested more information on the indemnity claims. Id. at Ex. A.

On November 9, 2018, Ingenico's counsel acknowledged receipt of BBPOS's letter, proposed a common interest agreement, and attached a sample. Id. at ¶ 3; Ex. B. Counsel for BBPOS responded via email on December 3, 2018, stating that subject to final approval, BBPOS would be interested in a common interest and requesting a draft. Id. at ¶ 4. Ingenico counsel did not respond, did not send a draft agreement, and did not communicate further regarding indemnification. Id. at ¶ 5; Lo 30(b)(6) Dep. Tr. 56:14-16 [Doc. No. 198-2]. BBPOS did not agree to indemnify Ingenico Inc., see Lo 30(b)(6) Dep. Tr. 56:17-19 [Doc. No. 198-2], and BBPOS and AnywhereCommerce initiated the instant case a few weeks later on December 20, 2018.

B. *Discussion*

1. <u>Breach of Contract and Breach of Duty of Good Faith and Fair Dealing Claims against BBPOS (Counts I, II)</u>[19]

Ingenico Inc. alleges that BBPOS breached the Agreement and the duty of good faith and fair dealing by (1) selling products exclusively licensed to Ingenico Inc. and (2) refusing to indemnify and hold Ingenico Inc. harmless. BBPOS moves for summary judgment on both categories of alleged breach.

---

[19] Although BBPOS asserts that ROAM's assignment of the Agreement to Ingenico was a material breach supporting summary judgment in BBPOS's favor, see Pls. Mem. 15 [Doc. No. 190], BBPOS does not substantively address the argument in its brief, nor does either party dispute that both BBPOS and Ingenico are parties to the Agreement. Accordingly, the court finds for purposes of summary judgment that Ingenico has standing to enforce any breach of the Agreement.

a.   Breach of Exclusivity Provisions

Ingenico Inc. alleges that BBPOS breached the exclusivity provisions under §§ 1.1 and 1.3 of the Agreement by selling devices exclusively licensed to Ingenico Inc. under the Agreement to NAB, AnywhereCommerce, and other non-parties. Sec. Am. Counterclaims ¶¶ 16-21 [Doc. No. 78]; Defs' Opp. 4-6 [Doc. No. 199]. BBPOS argues that Ingenico Inc.'s claims fail for a number of reasons, including that Ingenico Inc. has failed to establish actionable harm.

To state a claim for breach of a written contract, a plaintiff must prove that "a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach." Brooks v. AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007). Under Massachusetts law, "[t]he covenant of good faith and fair dealing is implied in every contract," Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385, 805 N.E.2d 957 (2004), and provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract," Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 471-72, 583 N.E.2d 806 (1991) (quoting Uproar Co. v. Nat'l Broad. Co., 81 F.2d 373, 377 (1st Cir. 1936)). "The covenant is preserved so long as neither party injures the rights of another to reap the benefits prescribed by the terms of the contract." Uno Rests, Inc., 441 Mass. at 385. Central to both breach of contract and breach of the duty of good faith and fair dealing claims is a showing of harm caused by defendant's breach.[20] See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 232

---

[20] Under Massachusetts law, "a person who is injured by a breach of contract has a right to judgment even if the breach caused no harm." Flynn v. AK Peters, Ltd., 377 F.3d 13, 23 (1st Cir. 2004). The First Circuit has held that when a plaintiff has expressed that it seeks, even alternatively, nominal damages, it need not prove causation damages as an element for breach of contract. See Neponset Landing Corp. v. Nw. Mut. Life Ins. Co., 902 F. Supp. 2d 149, 165–66 (D. Mass. 2012) (denying summary judgment on a contract claim where plaintiff "has expressed

(1st Cir. 2013) (requiring that plaintiff "sustained damages as a result of the breach"); Thermal

Eng'g Int'l (USA) Inc. v. Lanaville, 2022 WL 17541938, at *5 (D. Mass. Dec. 8, 2022) ("A

plaintiff may not bring a claim for breach of contract if it has not suffered a harm caused by that

breach."); Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 187 F. Supp. 3d 217, 223

(D. Mass. 2016) (listing damages as an element of a claim under the implied covenant of good

faith and fair dealing).

Using a theory of unjust enrichment, Ingenico Inc. points to the profits BBPOS gained by

selling allegedly covered products to third parties in breach of the Agreement as the measure of

damages.[21] BBPOS argues that unjust enrichment is not a proper measure of damages, and that

Ingenico Inc. cannot establish actionable harm to sustain its breach of contract claim without

---

a desire to pursue its contract claims…even if it may recover no more than nominal damages").
However, "if damages are sought causation and the amount of damages must also be proved."
Amicas, Inc. v. GMG Health Sys., Ltd., 676 F.3d 227, 231 (1st Cir. 2012).

Here, Ingenico Inc. has not made a claim for nominal damages, seeking instead judgment,
monetary damages, disgorgement of profits, "an account for past, present, and future sales,
revenues, and profit for all devices or products made, sold, used, or licensed in violation of
Ingenico Inc.'s exclusive licenses thereto," a permanent injunction prohibiting further
infringement, attorneys' fees, a declaration for the award of treble damages and attorneys' fees,
interest, costs, exemplary and/or punitive damages, and other relief the court deems proper. Sec.
Am. Counterclaims [Doc. No. 78]. Further, Ingenico Inc. did not raise the issue of nominal
damages in its Opposition, and states that damages are an element for an action for breach of
contract. See Defs' Opp. 22 [Doc. No. 199]; see also Flynn, 377 F.3d at 23 (holding that
although a plaintiff could have raised the issue of nominal damages in jury instructions, she
waived her right to do so when she "did not make the nominal damages argument," "argued that
she had, in fact, proved damages," and "herself asserted that proof of damages was an essential
element of a breach of contract action."). Where Ingenico has not made a claim for nominal
damages, Ingenico must demonstrate that it sustained harm as a result of BBPOS's alleged
breach.

[21] Ingenico's expert estimated that BBPOS made approximately $56,084,456 in profits from the
breach. Pls' Ex. CC, Vanderhart Rep. 6, 36-38 [Doc. No. 188-29].

evidence that it lost out on any sales or profits as a result of the alleged breach. Pls' Mem. 21
[Doc. No. 190].

"The usual rule for damages in a breach of contract case is that the injured party should
be put in the position they would have been in had the contact been performed." Situation Mgmt.
Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 880, 724 N.E.2d 699, 704 (2000); see Ruggers, Inc. v.
U.S. Rugby Football Union, Ltd., 843 F. Supp. 2d 139, 145 (D. Mass. 2012) ("Generally, in a
breach of contract action, damages are based on the injured party's 'expectation interest' and are
intended to place him in the same position he would have been in had the contract been
performed."). Although the court may consider other measures of damages, including reliance or
consequential damages, a plaintiff in a breach of contract action may not be awarded damages
that place them in a better position than if the defendant had not breached. See Perroncello v.
Donahue, 448 Mass. 199, 206, 859 N.E.2d 827, 832 (2007) ("The law of contracts is intended to
give an injured party the benefit of the bargain, not the benefit of the bargain and a windfall.").

Relying on Shedd v. Sturdy Mem'l Hosp., Inc., 2022 WL 1102524 (Mass. Super. Apr. 5,
2022), and the Restatement (Third) of Restitution and Unjust Enrichment § 39, Ingenico Inc.
argues that disgorgement is a proper remedy for a breach of contract action where BBPOS
engaged in a deliberate breach and where typical contract damages "afford inadequate
protection." See Defs' Opp. 12 [Doc. No. 199]. The First Circuit has not determined whether
disgorgement or unjust enrichment is an alternative measure of damages in a contract action.
However, even assuming that disgorgement of profits is a proper measure of damages, such a
remedy is inapplicable here.

The First Circuit's ruling in Gemini Invs. Inc. v. AmeriPark, Inc., 643 F.3d 43 (1st Cir.
2011) is instructive. In that case, the parties entered into binding exclusivity and confidentiality

provisions to facilitate the potential financing of an acquisition in which defendant agreed to not discuss the potential financing with any third-party for a set period of time. Gemini Invs. Inc., 643 F.3d at 45. After defendant approached other firms about financing, plaintiff sued for breach and sought expectation damages, and alternatively, damages under a "lost opportunity theory." Id. at 46-47. Relying on Air Technology Corp. v. General Electric Co., 347 Mass. 613, 199 N.E.2d 538 (1964), plaintiff argued that the district court erred in not instructing the jury on the "lost opportunity" approach to damages, insofar as plaintiff could prove harm by showing that defendant's breach deprived plaintiff of an opportunity to negotiate a contract, and presumably gain the profits from a contract. However, the court in Gemini rejected plaintiff's argument, and found that the "lost opportunity" theory did not apply because the contract did not contemplate an affirmative contractual duty, but rather defendant's "obligation was merely to refrain from discussing, negotiating for, or obtaining financing from third parties." Id. at 51. The court held that "there is a meaningful difference between a duty to award a subcontract, albeit subject to certain conditions, and a duty to refrain from dealing with third parties." Id.

Here, the alleged breach similarly concerns a duty to refrain from dealing with third parties. The Agreement granted Ingenico Inc. an exclusive license to use BBPOS's intellectual property as it related to the Products, and to be the exclusive distributor of the Products and Devices, except as to China and the Philippines. Agreement §§ 1.1, 1.3 (as amended) [Doc. No. 188-3]. Ingenico Inc. has not claimed that BBPOS failed to provide the intellectual property or to produce any and all Products sought by Ingenico Inc. Instead, the breach concerns the prohibition on BBPOS from selling the covered products to companies other than Ingenico Inc. outside of China and Philippines.

BBPOS's profits from such sales, even if those sales were in breach of the Agreement, are not a proper measure of Ingenico Inc's damages here. Although Ingenico Inc.'s "loss of prospective profits as an element of damages for breach of contract … may be recovered when it appears to have been within the contemplation of the parties as a probable result of breach of the contract, to be its natural, primary and probable consequence, and to be susceptible of proof by evidence reasonably certain," Randall v. Peerless Motor Car Co., 212 Mass. 352, 380, 99 N.E. 221 (1912), Ingenico Inc. can make no such showing here where nothing in the record suggests that Ingenico Inc. would have sold those devices in the absence of BBPOS's purported breach.

If BBPOS had been required under the Agreement to produce one thousand units for Ingenico Inc., and then diverted some of those units to a third-party, Ingenico Inc. may be able to recover the profits from those third-party sales. Here, however, where Ingenico Inc. was under no obligation to purchase units from BBPOS, and BBPOS was under no obligation to produce any units for Ingenico Inc. other than those requested by Ingenico Inc., Ingenico Inc.'s claim to BBPOS's profits would put Ingenico Inc. in a better position than if BBPOS had not allegedly breached the contract. See G4S Tech. LLC v. Massachusetts Tech. Park Corp., 479 Mass. 721, 735, 99 N.E.3d 728, 741 (2018) ("The nonbreaching party is entitled to be made whole and no more.") (internal quotations omitted). Further, Ingenico Inc. has not alleged that BBPOS's alleged breach resulted in any reduction of Ingenico Inc.'s sales, or that BBPOS did not provide units to Ingenico Inc. as requested under the Agreement. In sum, Ingenico Inc. has failed to show that it incurred any damages as a result of the alleged breach of contract. Ingenico Inc. has made no claim that it lost profits, and recovery based on unjust enrichment is inapplicable where Ingenico Inc. was never entitled to BBPOS's profits for units not contemplated under the Agreement.

Accordingly, BBPOS and AnywhereCommerce's <u>Motion for Summary Judgment</u> [Doc. No. 189] is GRANTED as to Counts I and II insofar as they relate to a breach of the exclusivity provisions.[22]

  b. Breach of Indemnification Provisions (Count I)[23]

Ingenico Inc. alleges that BBPOS breached the Agreement by failing to indemnify and hold Ingenico Inc. harmless for third-party patent infringement claims relating to products sold by Ingenico Inc. and produced by BBPOS. BBPOS argues that its duty only relates to "losses incurred or arising out of a covered claim" under § 3.18 of the Agreement, which does not require the defense of any claim against a third party nor a duty to prosecute in the IOEngine matter. Pls' Mem. 33-34 [Doc. No. 190]. Ingenico Inc. counters that BBPOS's duties go beyond indemnification and encompasses duties to defend and prosecute, and include affirmative acts "if, in Ingenico's reasonable opinion, such actions were necessary to defend the case against it" under §§ 3.10 and 3.18 of the Agreement. Defs' Opp. 20 [Doc. No. 199].

A duty to indemnify corresponds to the insurer's responsibility to pay for the insured's final judgment, settlement, or other resolution. <u>See</u> <u>House of Clean, Inc. v. St. Paul Fire &</u>

---

[22] Because the court grants summary judgment on Counts I and II as to the exclusivity provisions in favor of BBPOS on failure to establish harm grounds, it does not reach BBPOS's alternate arguments that: the Agreement only contemplated exclusivity for the Circle Swipe and not a larger breadth of mPOS products; there is a lack of consideration for the exclusivity provision that Ingenico Inc. advocates for; the assignment of the Agreement to Ingenico was a material breach; the exclusivity provisions as contemplated by Ingenico Inc. are an unenforceable restraint on trade; the exclusivity provisions are insufficiently definite to be enforceable; and Ingenico Inc.'s claim is time barred under the six year statute of limitations for contract claims. Pls' Mem. 15 [Doc. No. 190].

[23] BBPOS's ties the indemnification claims to Ingenico Inc.'s breach of contract claim (Count I), and not Ingenico Inc.'s breach of duty of good faith and fair dealing claim (Count II). <u>See</u> Pls' Mem. 30 [Doc. No. 190] ("Regarding the second type of alleged contractual breaches for indemnification, dismissal of the remainder of Count I with prejudice is warranted…"). Ingenico does not dispute this characterization. <u>See</u> Defs' Opp. 22 [Doc. No. 199].

Marine Ins. Co., 775 F. Supp. 2d 302, 310 (D. Mass. 2011). The First Circuit generally treats the duty to "indemnify" and "hold harmless" as synonymous. See Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 786–87 (1st Cir. 2011) ("In other words, under [the hold harmless agreement], Ripple agreed to indemnify RNK…"); HOLD-HARMLESS AGREEMENT, Black's Law Dictionary (11th ed. 2019) ("A contract in which one party agrees to indemnify the other."). Unlike the duty to indemnify, which "arises only after the insured's liability has been established," "[t]he duty to defend arises in situations involving threatened or actual litigation by a third party…." Wilkinson v. Citation Ins. Co., 447 Mass. 663, 671, 856 N.E.2d 829, 836 (2006).

Under the Agreement, BBPOS has a duty to Ingenico Inc. in two distinct circumstances under § 3.18. First, BBPOS must indemnify and hold Ingenico Inc. harmless for losses and costs "arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by [BBPOS]." Under the plain language of the contract, such indemnification is triggered upon the fact of a breach of the Agreement by BBPOS. Second, BBPOS must indemnify and hold Ingenico Inc. harmless for losses and costs "arising out of or resulting from any claim brought by a third party against [Ingenico Inc.] as result of or relating to any actual or alleged breach thereof." Unlike the first clause, which contemplates only an actual breach by BBPOS, the second clause includes alleged breaches for claims brought by third parties against Ingenico Inc. Relying on this provision, Ingenico Inc. seeks indemnification of approximately $3,561,084 for the IOEngine matter and $398,260 for the REM Holdings 3, REM Holdings 3 (Vantiv/Comerica), Blackbird Technologies, and MobilePay LLC matters. Pls' Mem. 31 [Doc. No. 190]; Defs' Opp. 21 [Doc. No. 199]; Pls.' Ex. CC, Vanderhart Rep., Ex. D-13 [Doc. No. 188-29].

At this stage, the IOEngine matter falls outside of the circumstances requiring indemnity by BBPOS under the Agreement. First, where the affirmative litigation has not yet been resolved at the time of BBPOS and AnywhereCommerce's <u>Motion</u> [Doc. No. 189], there is no proven breach of BBPOS's assurances to provide Ingenico Inc. a non-infringing product. Second, the indemnification Ingenico Inc. seeks does not involve a third-party claim against Ingenico Inc., but rather an affirmative litigation by Ingenico Inc. Accordingly, Ingenico Inc.'s request for indemnification is premature where there is no proven breach of the Agreement by BBPOS.[24]

Ingenico Inc. also posits an obligation based on § 3.10 of the Agreement, which provides that the "[BBPOS] shall sign all documents, make all filings and take all actions reasonably requested by the Company in order to perfect and protect the Company's intellectual property rights in the Products, Devices, Deliverables or Services." Defs' Opp. 17-21 [Doc. No. 199] (quoting Agreement § 3.10 [Doc. No. 188-3]). However, Ingenico Inc.'s reliance on § 3.10 is unavailing where the record reflects that Ingenico only requested indemnification from BBPOS for the IOEngine matter and did not ask BBPOS to take any steps to perfect or protect Ingenico's license under the Agreement. <u>See</u> Pls' Ex. AA, 23 [Doc. No. 188-27]. Section 3.10 reflects BBPOS's representation and warranty that the Products, Devices, Deliverables, and Services

---

[24] BBPOS argues that Ingenico Inc. should also be estopped from renewing any requests for indemnity where Ingenico promised to keep BBPOS informed and then allegedly failed to do so. <u>See</u> Pls' Mem. 35 [Doc. No. 190]; <u>see</u> <u>Guerra-Delgado v. Popular, Inc.</u>, 774 F.3d 776, 782 (1st Cir. 2014) ("An equitable estoppel claim consists of two elements: (1) the first party must make a definite misrepresentation of fact with reason to believe the second party will rely on it, and (2) the second party must reasonably rely on that representation to its detriment.") (internal citations and quotations omitted). Where BBPOS has demonstrated no detrimental reliance on Ingenico Inc.'s promise to keep it informed and initiated the instant case shortly after making additional requests for information, the record and argument before the court provide no basis for barring Ingenico Inc.'s renewed claims for indemnity for the IOEngine proceeding should BBPOS be found to have been in breach.

exclusively licensed to ROAM/Ingenico under the Agreement did not or would not infringe on another's intellectual property rights and contemplates that BBPOS may be required to take affirmative steps to protect and perfect that representation. However, such a duty was contingent on Ingenico's request to BBPOS. Here, Ingenico only notified BBPOS of its "duty to indemnify and hold harmless Ingenico pursuant to Section 3.18 of the Agreement, and pursuant to the representations and warranties BBPOS made in Sections 3.9 and 3.10 of the Agreement." Id. Although Ingenico Inc. asserts in its Opposition that BBPOS "shirked its obligations," under § 3.10, see Defs' Opp. 20 [Doc. No. 199], the record does not reflect that Ingenico Inc. made any such requests to BBPOS beyond indemnification for the IOEngine matter to trigger any duties under § 3.10.

The four remaining matters involve now-resolved indemnification requests from third-parties to Ingenico Inc. relating to products created by BBPOS. Although BBPOS moves for summary judgment on all indemnity claims, BBPOS does not discuss these matters beyond disputing the reasonableness of the claimed fees. See Pls' Mem. 35 [Doc. No. 190]. To the extent that BBPOS does challenge Ingenico Inc.'s requests for indemnification for the four remaining matters, a jury could find that BBPOS breached its duty by not indemnifying Ingenico Inc. for the REM Holdings 3, REM Holdings 3 (Vantiv/Comerica), Blackbird Technologies, and MobilePay LLC matters. On its face, the language of § 3.18 does not require litigation, but rather only requires there be a "claim brought by a third party" against Ingenico Inc. Where BBPOS has not indemnified Ingenico Inc. for claims by third-parties against Ingenico Inc. for products allegedly supplied by BBPOS under the Agreement, see Lo 30(b)(6) Dep. Tr. 56:17-19 [Doc. No. 198-2] (stating that BBPOS did not indemnify Ingenico), BBPOS is not entitled to summary judgment.

Accordingly, BBPOS and AnywhereCommerce's <u>Motion for Summary Judgment</u> [Doc. No. 189] as to Count I is GRANTED IN PART as to claims related to indemnification for the IOEngine matter and DENIED IN PART as to the claims related to indemnification for the REM Holdings 3, REM Holdings 3 (Vantiv/Comerica), Blackbird Technologies, and MobilePay LLC matters.

2. <u>Tortious Interference Claims against BBPOS and AnywhereCommerce (Counts III, IV)</u>

Ingenico Inc. brings claims for tortious interference with advantageous business relations against BBPOS as to its relationship with NAB (Count III) and tortious interference with contractual relations against AnywhereCommerce as to its relationship with BBPOS (Count IV). BBPOS argues that insofar as it did not breach the exclusivity provisions, the tortious interference claim must similarly fail, or are alternatively time-barred where Ingenico Inc. knew BBPOS accepted the NAB order no later than December 8, 2015. Pls' Mem. 36-37 [Doc. No. 190]. Further, BBPOS and AnywhereCommerce argue that Ingenico Inc. has failed to establish actionable harm by their alleged conduct. <u>Id.</u>

The elements of tortious interference with advantageous business relations and tortious interference with contractual relations are set forth above. <u>See</u> Sec. III.B.1.a. Actions for tortious interference with contractual or advantageous business relations must be brought within three years after the cause of action accrues. Mass. G.L. c. 260, § 2A.

Ingenico Inc. does not discuss the tortious interference claims in its <u>Opposition</u> [Doc. No. 199]. On the record before the court, Ingenico Inc. has not sufficiently demonstrated it was harmed where BBPOS never fulfilled the NAB order. <u>See</u> Defs' Resp. to Pls' Stmt. of Facts ¶ 93 [Doc. No. 200] (stating that BBPOS "agree[d] to cease interfering with the contractual relationship"); Defs' Stmt. of Addt'l. Facts, Ex. 2 [Doc. No. 201-2] (confirming that BBPOS

would cease interfering and fulfill ROAM's order). Further, even if Ingenico Inc. could show

harm, its tortious interference claim against BBPOS is time-barred where Ingenico Inc. knew

that BBPOS accepted the NAB purchase order by December 8, 2015, see Pls' Ex. EE [Doc. No.

188-31], but the instant case was not initiated until December 20, 2018, see M.G.L. c. 260, § 36

(providing that the statutory limitations period for counterclaims is determined from when a

plaintiff commences an action). Summary judgment is also warranted where Ingenico Inc. has

not provided any evidence demonstrating that AnywhereCommerce's relationship with BBPOS

was improper in motive or means, or that it suffered harm as a result of AnywhereCommerce's

relationship with BBPOS.

Accordingly, BBPOS and AnywhereCommerce's Motion for Summary Judgment [Doc.

No. 189] is GRANTED as to Count III and Count IV.

### 3. Trade Secrets Claims against AnywhereCommerce (Counts V, VI) and Deceptive Trade Practice Claim against AnywhereCommerce and BBPOS (Count VII)

Ingenico Inc. alleges that AnywhereCommerce obtained trade secrets, exclusively

licensed to Ingenico Inc. under the Agreement, by improper means in violation of federal and

Massachusetts law (Counts V and VI). Ingenico Inc. also brings a claim against BBPOS and

AnywhereCommerce for unfair competition and unfair or deceptive acts under Mass. G.L. c.

93A § 11 (Count VII). AnywhereCommerce argues that Ingenico Inc. has no standing to bring

the trade secret claims because it does not have a valid claim to ownership over the trade secrets

and does not identify any stolen trade secrets or how AnywhereCommerce misused them. Pls'

Mem. 39 [Doc. No. 190]. Further, it argues that the claims are time barred where Ingenico Inc.

knew Ingenico Inc. did not have the sublicensing rights for the 436 Canada intellectual property

as of January 18, 2012. Id. Finally, BBPOS and AnywhereCommerce argue that Ingenico Inc.

has not shown any deceptive acts or harms by either party and that the 93A claim is similarly time-barred. Id.

"Massachusetts trade secret law is nearly equivalent to the [Defend Trade Secrets Act]." Allscripts Healthcare, LLC v. DR/Decision Res., LLC, 386 F. Supp. 3d 89, 94 (D. Mass. 2019). "To prevail on a claim of misappropriation of trade secrets, a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." Incase, Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir. 2007). A federal trade secret claim also requires that the trade secret be used in or intended for use in interstate or foreign commerce. 18 U.S.C. § 1836(b)(1). "'A plaintiff has no cognizable trade secret claim until it has adequately identified the specific trade secrets that are at issue.'" Sutra, Inc. v. Iceland Exp., ehf, 2008 WL 2705580, at *4 (D. Mass. July 10, 2008) (quoting Cambridge Internet Sols. v. Avicon Grp., 1999 WL 959673, at *2 (Mass. Super. Sept. 21, 1999)).

"To state a claim under the consumer protection statute, G. L. c. 93A, § 9, a plaintiff must allege facts sufficient to establish four elements: first, that the defendant has committed an unfair or deceptive act or practice; second, that the unfair or deceptive act or practice occurred in the conduct of any trade or commerce; third, that the plaintiff suffered an injury; and fourth, that the defendant's unfair or deceptive conduct was a cause of the injury." Rafferty v. Merck & Co., 479 Mass. 141, 161, 92 N.E.3d 1205, 1222 (2018) (internal quotations omitted). For a business plaintiff to state a claim under chapter 93A, § 11, it generally must plead the additional fifth element that there was a "commercial transaction" between the parties. Id. at 162 n.7.

Here, Ingenico Inc. cannot sustain its trade secret claims against AnywhereCommerce where it has presented no evidence that AnywhereCommerce used improper means to acquire

the trade secrets. Under Massachusetts law, acquisition of trade secrets by improper means "includes, without limitation, theft, bribery, misrepresentation, unreasonable intrusion into private physical or electronic space, or breach or inducement of a breach of a confidential relationship or other duty to limit acquisition, disclosure or use of information[.]" Mass. G.L c. 93, § 42(1); see 18 U.S.C. §1839(6) (including a nearly identical definition under the Defend Trade Secrets Act).

Ingenico Inc. does not substantively address its trade secrets or deceptive trade practices claims in its Opposition, only stating that "any and all trade secrets (and other information) that concerned 'Products' were licensed to ROAM exclusively." Defs' Opp. 6 [Doc. No. 199]. As an initial matter, Ingenico's expert identified eight "AnywhereCommerce Accused Products," see Pls' Ex. CC, Vanderhart Rep., Ex. E-1 [Doc. No. 188-29], but does not state any basis for inferring that those products incorporated trade secrets related to Ingenico Inc.'s exclusive license, and only lists "discussions with Christopher Rotsaert and counsel" as its source, id. Further, there are no facts that demonstrate that AnywhereCommerce used Ingenico's Inc.'s claimed trade secrets or acquired them through improper means. See Sec. IV.B.2 (granting summary judgment on Ingenico Inc.'s tortious interference claim against AnywhereCommerce for lack of evidence demonstrating improper motive or means). Where Ingenico Inc. has not offered sufficient evidence from which a jury could find that AnywhereCommerce acquired trade secrets by improper means, or tortiously interfered with Ingenico Inc.'s contractual relations, see id., AnywhereCommerce is entitled to summary judgment on the trade secret and unfair practices claims against it. Similarly, BBPOS is entitled to summary judgment on the 93A claim against it where the record does not sufficiently support a claim that BBPOS engaged in tortious

interference, see id., or that Ingenico Inc. suffered harm as a consequence of BBPOS's actions, see Sec. IV.B.1.a.

Accordingly, BBPOS and AnywhereCommerce's Motion for Summary Judgment [Doc. No. 189] is GRANTED as to Counts V, VI, and VII.

## V.    Conclusion

For the foregoing reasons, Ingenico's Motion for Summary Judgment [Doc. No. 191] is GRANTED as to Counts I, III, IV, and VIII and GRANTED in part as to AnywhereCommerce's claims in Count VII; DENIED as to Count II and Count V, and DENIED in part as to BBPOS's claims in Count VII of the First Amended Complaint [Doc. No. 67]. Counts VI and IX of BBPOS and AnywhereCommerce's First Amended Complaint [Doc. No. 67] are DISMISSED with prejudice.

BBPOS and AnywhereCommerce's Motion for Summary Judgment [Doc. No. 189] is GRANTED as to Counts II, III, IV, V, VI, and VII of Ingenico Inc.'s Second Amended Counterclaims [Doc. No.78]. As to Count I, BBPOS and AnywhereCommerce's motion is GRANTED as to Ingenico Inc.'s claims against BBPOS for breach of the exclusivity provisions, GRANTED as to Ingenico Inc.'s claims against BBPOS for indemnification of the IOEngine matter, and DENIED as to Ingenico Inc.'s claims against BBPOS for indemnification of the remaining matters.

IT IS SO ORDERED

March 29, 2023                                    /s/ Indira Talwani
                                                 United States District Judge