# EXHIBIT 2

**In the Matter Of:**

ANYWHERE COMMERCE V. INGENICO

1:19-cv-11457-IT

# IVAN ZATKOVICH

*May 11, 2022*



800.211.DEPO (3376)
EsquireSolutions.com

```
              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS


    ANYWHERE COMMERCE,      )   NO.
    INC. and BBPOS          )   1:19-cv-11457-IT
    LIMITED,                )
                            )
           Plaintiffs,      )
                            )
       - vs -               )
                            )
    INGENICO INC.,          )
    INGENICO CORP., and     )
    INGENICO GROUP, SA,     )
                            )
           Defendants.      )
    - - - - - - - - - - -   )
```

          Oral deposition of IVAN ZATKOVICH, taken at the offices of KUTAK ROCK, 1760 Market Street, Suite 1100, Philadelphia, Pennsylvania on Wednesday, May 11, 2022, commencing at 10:01 a.m., before Lucy M. Berardi, Professional Reporter and Notary Public in and of the Commonwealth of Pennsylvania.



```
 1  A P P E A R A N C E S:

 2

 3       ADLER, POLLACK & SHEEHAN, PC
         BY:  JEFFREY K. TECHENTIN, ESQUIRE
 4          One Citizens Plaza
            8th Floor
 5          Providence, RI 02903
               Attorneys for the Plaintiffs
 6

 7       KUTAK ROCK, LLP
         BY:  MELISSA A. BOZEMAN, ESQUIRE
 8          1760 Market Street
            Suite 1100
 9          Philadelphia, PA 19103
               Attorneys for the Defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



```
 1  it performed all of the same functions as a trade
 2  secret performed, but that trade secret actually
 3  provided you the circuit to implement that, then
 4  that would be -- that would be still protected as a
 5  trade secret and wouldn't be disclosed in the
 6  patent.
 7  Q.      One of the major points you make in this
 8  introductory part of your reply is that you disagree
 9  with Dr. Shamos with respect to whether the correct
10  inquiry in a trade secret case is if the technology
11  has been reverse engineered versus if the technology
12  is reverse engineerable, right?
13  A.      Yes.
14  Q.      And the opinion that you set forth in your
15  reply is that the only thing that matters is whether
16  it was, in fact, reverse engineered, right?
17  A.      Well, I -- I provide two different
18  opinions.  I provide that opinion that my
19  understanding is that the standard requires that it
20  was, in fact, reverse.  If the information -- if the
21  information was actually obtained from reverse
22  engineering, then it could be obtained legitimately.
23  I also provide an opinion that none of the prior art
24  or none of the opinions that Dr. Shamos provided
```



1  indicated that the information -- the trade secret
2  information that Ingenico did use was, in fact,
3  reverse engineering.
4                    MR. TECHENTIN:  Can you read that
5           back.
6                    (At this time, the court reporter
7           read back from the record.)
8  BY MR. TECHENTIN:
9  Q.       So your second opinion that you just
10 referenced there is that Ingenico didn't reverse
11 engineer any of this?
12 A.       I saw no evidence of that.
13 Q.       Prior to counsel providing you with the
14 text that was in this initial section of your
15 report, had it been your understanding that it had
16 to be reversed engineered in order for it to be
17 non-trade -- not a trade secret misappropriation as
18 opposed to reverse engineerable?
19 A.       Again, there's many ways that you can
20 legitimately use a trade secret.  One of those
21 methods could be that you legitimately reverse
22 engineer from scratch based on publicly available
23 information.  In other words, if you had the device
24 and you can tear it apart in such a way that you can



1  determine that trade secret yourself, that is a
2  legitimate way of obtaining that trade secret.
3  Q.        But the difference that you're articulating
4  with Dr. Shamos in this section is you're rejecting
5  his framework where he says if it's reverse -- if
6  it's reverse engineerable, that is if the
7  information can be readily obtained through reverse
8  engineering, it's not a trade secret in the first
9  place.  That's Dr. Shamos's opinion, right?
10 A.        I think based only on the fact that it
11 could've been reversed engineered means it's not a
12 trade secret is not a legitimate opinion.
13 Q.        And my question is, did you hold that
14 opinion, the one that you just articulated, before
15 counsel gave you this draft section of this report?
16 A.        I think that was -- again, I've worked on
17 other trade secrets.  That had been my general
18 opinion prior to me doing either report.
19 Q.        Had you ever researched this question
20 yourself to figure out whether or not the
21 characteristics of a product as being readily
22 reversed engineered would stop it from obtaining
23 trade secret status?
24 A.        I don't think I've ever crossed that



1  opinion before, whether somebody thought it would be
2  easy to reverse engineer, therefore it's not a trade
3  secret.  You would actually have to reverse engineer
4  it to show that it was easy enough to reverse
5  engineer to obtain it, otherwise, it's just pure
6  speculation.  I think that's easy enough to reverse
7  engineer, it's not a trade secret.  That's pure
8  speculation.  You actually have to reverse engineer
9  it in order to show that it can be reverse
10 engineered.
11 Q.       Would you agree though that whatever the
12 law is, the law is in this regard and you'll be
13 guided by that law; is that fair?
14 A.       Sure.
15 Q.       Whether it's -- whether it's accurately
16 recited in this portion of your report or not?
17 A.       Yes.
18 Q.       So if I ask you to assume that Dr. Shamos
19 is right, that there's -- there is a legal principle
20 that suggests that if it's readily discerned through
21 a process of reverse engineering then it's not a
22 trade secret.  Have you done anything to determine
23 whether or not that principle applies in this case?
24 A.       Yes.



```
 1  Q.       What have you done?
 2  A.       In each case where Dr. Shamos shows or
 3  asserts an opinion on this particular trade secret
 4  is easily reversed engineered, I rebut that.
 5  Q.       And that's set forth in your rebuttal
 6  report?
 7  A.       It is.
 8  Q.       Okay.  Let me broaden that question I was
 9  asking a moment ago.  Are there other portions
10  either in your initial report or your reply report
11  that were written by anyone other than you?
12  A.       Well, let me just say this first,
13  everything in the report, everything that -- every
14  piece of information in my report reflects my
15  opinion, even the legal understanding.  I have
16  enough information to come to the conclusion that's
17  consistent with my opinion.  Did I write -- aside
18  from the legal opinion, did I write every single
19  word in this report?  No.  I had, for example, my
20  consultant provide cites, provide some introductory
21  paragraphs, and some other information.
22  Q.       So for those portions -- and leaving aside
23  the parts that have discussions legal, which I
24  understand is going to be created in a different
```



CERTIFICATION

- - -

I hereby certify that the testimony and the proceedings in the foregoing matter are contained fully and accurately in the stenographic notes taken by me, and that the copy is a true and correct transcript of the same.


_____

Lucy M. Berardi,

Professional Court Reporter

The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying shorthand reporter.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
*EsquireSolutions.com*