## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

**ANYWHERECOMMERCE, INC.**
**and BBPOS LIMITED,**
                                        **Plaintiffs,**


        **v.**


**INGENICO INC., INGENICO CORP.**
**and INGENICO GROUP, SA,**
                                        **Defendants.**

</td><td>

**CIVIL ACTION NO.**
**1:19-cv-11457-IT**

</td></tr>
</table>

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO PRECLUDE UNRELIABLE AND INADMISSIBLE EXPERT TESTIMONY OF IVAN ZATKOVICH

Pursuant to Rules 401, 402, and 702 of the Federal Rules of Evidence, Defendants/Counterclaim Plaintiffs Ingenico Inc., Ingenico Corp. and Ingenico Group, SA (collectively, "Ingenico") submits this memorandum in support of their motion *in limine* for a Court order limiting the testimony of Plaintiff BBPOS Limited's ("BBPOS") liability expert, Mr. Ivan Zatkovich, to opinions concerning the so-called "Audio Jack Polarity Detection trade secret," and further that such opinions be confined to the RP170c, RP350x, RP457c, and RP750x products. The Court should exclude from trial any testimony from Mr. Zatkovich on (1) conclusions about a "trade secret" that BBPOS has never identified as being among its trade secrets; (2) conclusions reached with respect to products that he has not actually examined, and (3) conclusions that are based not upon the examination of the products but rather on the assumption that the alleged trade secrets are used in the products.

## RELEVANT BACKGROUND

Ingenico is a payment solution company and manufacturer of electronic POS payment terminals. Mem. & Order (Mar. 29, 2023) at 5 [Doc. No. 228]. BBPOS designs and manufactures

mobile points of sales ("mPOS") devices that allow mobile phones to be used as sales service terminals for payment. *Id.* at 4. BBPOS and ROAM Data, Inc. ("ROAM Data") entered a 2010 Engineering Development and License Agreement (the "Agreement"), which was amended in 2011. *Id.* at 33 n.4. By operation of the merger of ROAM Data and Ingenico, Inc., Ingenico, Inc. is now party to the Agreement. BBPOS has alleged that Ingenico breached the Agreement by misappropriating BBPOS's alleged trade secrets.

The alleged trade secrets at issue were the subject of written discovery in this matter, as well as deposition testimony. Ingenico's very first interrogatory to BBPOS, issued on May 14, 2020, directed BBPOS to "[i]dentify and Describe in Detail each and every trade secret that forms the basis of Counts II through IX of Plaintiffs' Amended Complaint." Defs.' 1st Set of Ints. At 5, May 14, 2020, attached hereto as **Exhibit 1**. Likewise, Ingenico's very first document request sought "[a]ll documents concerning any actual or alleged infringement." In response, BBPOS objected, saying that the term "trade secret" was vague and ambiguous, and promised to "supplement its answer at an appropriate time after a substantial amount of discovery has been completed." See 2020-06-15 BBPOS Objs & Ans to 1st Ints. at 4, June 15, 2020, attached hereto as **Exhibit 2**.

Two months later, BBPOS supplemented its response to Interrogatory No. 1, stating:

> Subject to and without waiving the foregoing objections, the trade secrets forming the basis of Counts II through IX of Plaintiffs' Amended Complaint concern design, research and development, technical know-how, manufacture, implementation, marketing, business strategy, technical or nontechnical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, financial data, financial plans, product plans, lists of actual or potential customers or suppliers, and/or other related items as to the software, hardware, components, products, technology, and systems involved with mPOS-related host systems, software protocols, data formatting, and audio circuitry, which includes, but is not limited to communication protocols between the mPOS and

> software development chip; means of transmitting data between the card reader and phone through an audio jack; payment app functionality and compatibility; software development kits; modulation; error correction methods; encryption methods; reliable connections with phones; regulation of signal levels; audio channeling; audio jack polarity protection; end user data conversion; and key management.

BBPOS 1st Am. Objs & Ans to 1st Ints. at 4, August 13, 2020, attached hereto as **Exhibit 3**. Despite this laundry list of potential trade secrets, this response contained no reference to "power management."

BBPOS again amended this interrogatory answer three months later to specify the means by which it alleged the trade secrets had been misappropriated, but did not alter its description of the asserted trade secrets. BBPOS 2nd Am. Objs. & Ans. to 1st Ints. at 4, November 6, 2020, attached hereto as **Exhibit 4**.

Nearly a year later, on July 2, 2021, BBPOS amended its response to Interrogatory No. 1 yet again, this time – for the first time – identifying specific documents in connection with the trade secrets. BBPOS 3rd Am. Objs. & Ans. to 1st Ints. at 5, July 2, 2021, attached hereto as **Exhibit 5**. In this fourth and final version of its interrogatory response (which was not verified by BBPOS), BBPOS "identifie[d] the following as trade secrets":

- The software development kit (SDK) developed by BBPOS for application developers to interact with the device using the APIs and device configuration setting described therein. Aspects of this trade secret include documentation and software for the APIs that interact with the device. Such as: configure the device via device settings; update the device software; interact with servers to process data received from the device; establish communications channels between the device and the cell phone.

- POS Device Specifications, Components and Interfaces

  o Documentation for Hardware design and specifications for BBPOS devices, components and specifications of the POS device. This includes EMV Swiper design using chips from: STM32F405xxSTM32F407xx; Teridian - 73S1215F80515 System-on-Chip with USB, ISO 7816 / EMV, PINpad; NuMicro™ NUC120; (SeeBBPOS_0005601-BBPOS_0005606);

- o Documentation of Battery Life Estimates for multi-track devices (SeeBBPOS_0005647-BBPOS_0005648);

- o Documentation of BBPOS Data Output Format for POS Device (BBPOS_0005649-BBPOS_0005663, BBPOS_0005123-BBPOS_0005137, BBPOS_0005633-BBPOS_0005645);

- o Documentation of process flow diagrams for end to end transactions (BBPOS_0005113-BBPOS_0005114);

- o Documentation and schematics created for custom POS devices for clients (BBPOS_0005665-BBPOS_0005667);

- o Documentation and schematics created for the Audio Interface of the POS device (BBPOS_0005632);

- o Documentation of Two Way Communication between the POS device and the cell phone (BBPOS_0005115-BBPOS_0005116);

- o Documentation of the Swiper API Programming Guide (BBPOS_0004628-BBPOS_0004648, BBPOS_0004622-BBPOS_0004627)

- The program source code, header files, solution files, libraries, and executables associated with Integration of iWL (wireless terminal) with ROAM Data Solution (BBPOS_0004382, BBPOS_0004383-BBPOS_0004384, BBPOS_0004385-BBPOS_0004387, BBPOS_0004388, BBPOS_0004389, BBPOS_0004390, BBPOS_0004391-BBPOS_0004397, BBPOS_0004398, BBPOS_0004399-BBPOS_0004406, BBPOS_0004407-BBPOS_0004410, BBPOS_0004411, BBPOS_0004413-BBPOS_0004417, BBPOS_0004418, BBPOS_0004419)

*Id.* None of these assertions included any reference to "power management" or any circuit designs that related to power management.

Ingenico deposed BBPOS on this same issue, asking it to identify each of the trade secrets that BBPOS contends had been misappropriated. Its corporate designee, Mr. Ben Lo, testified that there were four trade secrets that had been misappropriated:

> **Question**:   What were the trade secrets that were stolen by the defendants?
>
> **Answer**:   They consist of a few things, including hardware part and software part.· In the hardware part of, you know, it's the audio positive and a negative.  In different from we have different polarity.· So in order -- if a product -- if a part of the audio jack (inaudible) with different polarity, it will destroy the wisest [*sic*].

4

Just like electric front.  If you cross positive to the negative, it will burn.· It will burn the (inaudible) or burn the electric comprises.  So we come up with a method to overcome that.  ***So we devise circuit which can allow the wisest to (inaudible) mobile phone, no matter what polarity it is.  This is one of the trade secrets***.

***Another one is the automatic gain control or AGC***.  So the automatic gain control is like a different phone.  It is not your standard.  So the automatic gain control is the mixture that the wisest can communicate with the phone at optimum speed.· So the control, the communication speed, the communication wall page of the product with the smartphone.· So this is another trade secret.

And ***the third thing is about communication format*** or communication protocol.  It's like a language that the two of the wisest communicate.  So this format is another secret that we share with ROAM Data.

And ***the last one is the key -- is the key generation*** (inaudible).  We call it DUKPT.  So we treat the DUKPT in a way that can be used for generation of the key for card data.  So these are the trade secrets that we identify as and being stolen by Ingenico.

**Question**:      Anything else?

**Answer**:      That's it.

Deposition of Ben Lo at 74:11-76:2, December 8, 2021 (emphasis added), attached hereto as

**Exhibit 6**.[1]

To support its trade secret claim, BBPOS has identified Mr. Ivan Zatkovich as a technical expert witness.  Mr. Zatkovich opines that BBPOS shared not four, but five trade secrets with ROAM Data relating to its mobile point-of-sale (mPOS) products, and that Ingenico utilized those trade secrets in its development of mPOS devices.  Mr. Zatkovich identifies the five identified

---

[1]      To oppose Ingenico's motion for summary judgment, BBPOS wrongly asserted that it had identified "power management" as a trade secret during its Rule 30(b)(6) deposition notwithstanding Mr. Lo's clear statement that the four trade secrets were "it."  *See* Dkt. 202 at 39 (citing Deposition of Ben Lo 89:20-25 – 90:1-92:1-16; 94:1-95:1-7; 134:16-25 – 135:1-8, December 10, 2021).  That testimony is contained in Dkt. 198-2 and contains no hint of the circuit design that Mr. Zatkovich claims is the "power management" trade secret.

trade secret as: (1) Audio Jack Polarity Detection; (2) Power Management; (3) Pre-Analyzed Communication Settings; (4) Proprietary mPOS Communication Formats; and (5) Data Security/Encryption Methodology.  Mr. Zatkovich opined that "Power Management" was a trade secret and disclosed to ROAM Data on the basis of a number of documents, none of which had been listed in BBPOS's third amended interrogatory response.[2]

In connection with his work in this case, Mr. Zatkovich examined the following Ingenico products for the misappropriation of alleged trade secrets: (1) the RP350x (2) the RP750x; (3) the RP457c; and (4) the RP170c (the "Examined Products").  *See* Expert Report of Ivan Zatkovich ¶¶ 151-160, 164-167, relevant excerpts of which are attached as **Exhibit 7**.  Based on this examination, Mr. Zatkovich opined that the following Ingenico products misappropriated BBPOS's trade secrets: (1) the RP350x; (2) the RP750x; (3) the RP100 series; and (4) the RP450 series (collectively, the "Accused Products.").  *Id.* § 7.2.1.  ***Mr. Zatkovich provides no facts or analysis to support his conclusion that each of the products from an entire series of products embody all of the alleged trade secrets based upon his examination of a single product from that series.***

Mr. Zatkovich performed only minimal analysis of the Examined Products.  In order to assess whether the Examined Products embodied the BBPOS "Power Management" function, he tested the "behavior of the [Examined Products] by monitoring the activity on the audio jack interface with an oscilloscope." *Id.* at 72.   This testing, which Mr. Zatkovich described as "quite simple," is the only testing performed by Mr. Zatkovich aside from performing continuity tests on the circuit boards on the Examined Products.  Transcript of Deposition of Ivan Zatkovich, May

---

[2]     Specifically, Mr. Zatkovich cites to:  IngenicoInc_0009883-9891, IngenicoInc_0010195-200, IngenicoInc_0134751-759, IngenicoInc_0135063-068, BBPOS_0005646-67, and IngenicoInc_0010655-56.  Zatkovich Report at 55-56.

11, 2022, at 17:6; 18:3-14, attached hereto as **Exhibit 8**.  These continuity tests are not even mentioned in Mr. Zatkovich's report and therefore, presumably, do not form the basis of any of his opinions.

Mr. Zatkovich's analysis of the other four alleged trade secrets involved no testing of the Examined products whatsoever.  To determine whether the BBPOS "Audio Jack Polarity Detection" solution was present in the Examined Products, Mr. Zatkovich relied exclusively on his observation of the physical circuitry of the devices and a circuit diagram of one of the Examined Products.  Zatkovich Report at 63-70.

For the remaining three "trade secrets," Mr. Zatkovich did not examine anything, at all, specific to the products that he accuses of embodying these technologies.  To assess whether the Examined Products utilized the BBPOS "Pre-Analyzed Communication Settings," Mr. Zatkovich stated that he downloaded and decompiled a PayPal document which, he contends, contains a "Landicorp SDK" (software development kit), which, he further contends, contains "communication settings" that are "similar" to parameters used by BBPOS.  Zatkovich Report at 75.[3]  From this, Mr. Zatkovich opined that the Examined Devices must have been developed using the methods "that BBPOS had developed and shared with Ingenico."  *Id.* at 76.  Mr. Zatkovich provides no analysis to support his unspoken assumption that the "communication settings" that he describes as appearing in an undisclosed PayPal document were present on each of the Accused Products.  Mr. Zatkovich did not support his conclusion regarding the use of "Pre-Analyzed Communication Settings" with any references to the Examined Devices or any technical

---

[3]     This decompiled PayPal document has not been produced in this litigation and is not available from the URL identified in the Zatkovich report.  As a result, Ingenico has no means of assessing the truth of Mr. Zatkovich's assertions about its contents.

documents concerning any Accused Products.  Notably, Mr. Zatkovich provides no foundation for his assumption that BBPOS had even told Ingenico about these communication settings or how they could be used in an mPOS product.[4]

     Mr. Zatkovich's analysis of the Ingenico's alleged use of the remaining alleged trade secrets—"Proprietary mPOS Communication Formats" and "Data Security/Encryption Methodology"—consisted of a reference to a single document, a "product requirements document" (or PRD) for ROAM Data's "Key Management System."  *Id.* at 75-77, which state, in relevant part:

- "No more BDK created by BBPOS for new P/N, replacement of BDK for Roam production standard.  New P/N with Data DUKPT format (format|11 & equivalent of 29 for Data DUKPT)";

- "Same BDK format for Landi Product & BBPOS (after migration to Data DUKPT)";

- "BBPOS Encryption should be supported in both Test & Production as a Service"; and

- "BBPOS Encryption should be available as a License model."

---

[4]    Mr. Zatkovich asserts that this "trade secret determines the appropriate gain (e.g., signal thresholds) to use in decoding data and determining at what speed to reliably transmit and receive the information based on parameters defined for the specific mobile phone being used." Zatkovich Report at 84.

     This "secret" appears to have been created by the expert from whole cloth.  If it exists, it is not contained in any of the materials that Mr. Zatkovich identifies as constituting such a disclosure.  His report refers to a single email from BBPOS to ROAM Data on this subject, which he characterizes as "describ[ing] to the ROAM/Ingenico [Project Manager] the concept of Automatic Gain Control and how it affects data rates."  Zatkovich Report at 57.  In fact, that email provided no explanation of any method, stating only that "[t]he AGC (automatic gain control) of every phone behaves differently and it affects the received signal quality."  See IngenicoInc_009756-57, attached hereto as **Exhibit 9**.  Rather than disclosing any secret know-how, the email actually confessed that achieving a high data rate over an audio jack "is a research topic."  *Id.*

*Id.* The Key Management System PRD document relied upon by Mr. Zatkovich makes no mention of any mPOS products other than the RP350x and the RP750x, but because these words appeared in the PRD document, Mr. Zatkovich concludes that the data formats and BBPOS encryption methodology are present in all Accused Devices. *Id.* at 76-77.

## ARGUMENT

Mr. Zatkovich purports to offer expert opinions to the effect that the alleged trade secrets that are the subject of BBPOS's claims are found in an array of Ingenico products. *However, most of his conclusions are not based upon an examination of the Accused Products themselves but instead on assumptions and inferences drawn by Mr. Zatkovich.* Of the five "trade secrets" identified by Mr. Zatkovich (including one that BBPOS does not assert to be a trade secret), he only claims to have found one of them (the "Audio Jack Polarity Detection") in in each of the Examined Products. For the rest, Mr. Zatkovich has simply asserted that the BBPOS solutions are embodied in the devices without any actual examination of the devices.

This is speculation, not science, and it is not helpful to the jury. Accordingly, Mr. Zatkovich should not be permitted to testify at trial on (1) conclusions about a "trade secret" that  BBPOS has never identified as being among its trade secrets; (2) conclusions reached with respect to Accused Products that he has not actually examined, and (3) conclusions that are based not upon the examination of the Accused Products but rather on the assumption that the alleged trade secrets are used in the Accused Products.

### 1.   Applicable Legal Standards For Admissibility Of Expert Testimony

Expert testimony that is properly disclosed under Rule 26 must still meet the requirements of Rule 702 of the Federal Rules of Evidence in order to be admissible. Rule 702 states as follows:

> If scientific, technical or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,

> a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

To be admissible, the subject of expert testimony must be "scientific, technical or other specialized knowledge" and it must "assist the trier of fact" such that it is reliable, relevant and helpful to the case at hand. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993); *Bogosian v. Mercedez-Benz of North America, Inc.*, 104 F. 3d 472, 476 (1st Cir. 1997)). Whether expert testimony "assist[s] the trier of fact" is based on "the reliability and helpfulness of the proposed expert testimony, the importance and the quality of the eyewitness evidence it addresses, and any threat of confusion, misleading the jury, or unnecessary delay." *United States v. Rodriguez-Berrios*, 573 F.3d 55, 71 (1st Cir. 2009) (quoting *United States v. Brien*, 59 F. 3d 274, 277 (1st Cir. 1995)).

"The party seeking to introduce the evidence has the burden of establishing both its reliability and its relevance." *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 473 (1st Cir. 2016), (citing *Daubert*, 509 U.S. at 593 n.10).

Expert testimony also "assist[s] the trier of fact" when it relates to obscure matters beyond the knowledge of most people, when it deals with complex matters that challenge the comprehension of lay people, or when the subject matter is simply confusing. *See* 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Federal Rules of Evidence Rules 614 to 706*, § 6264, at 212-13 (1997); *see also United States v. Winkle*, 477 F.3d 407, 415 (6th Cir. 2007) (allowing expert to testify because case was complex); *United States v. Tapia-Ortiz*, 23 F.3d 738, 740 (2d Cir. 1994) (holding expert testimony "should normally be used only for subjects that have esoteric aspects reasonably perceived as beyond the ken of the jury"); *United States v.*

*Theodoropoulos*, 866 F.2d 587, 592 (3d Cir. 1989) (allowing expert to testify because issues in question were complex and there was confusion created by such issues); *Board of Educ., Yonkers City School Dist. v. CAN Ins. Co.*, 113 F.R.D. 654, 655 (S.D.N.Y. 1987) ("[I]t is the very purpose of expert testimony to assist the trier of the facts to understand, evaluate and decide the complex evidential materials in a case.").  Expert testimony might also be appropriate if there is no other evidence concerning the issue in question. *See Wright & Gold*, *supra*, at 214.

In contrast, expert testimony does not "assist the trier of fact" when it is speculative or ambiguous. *See United States v. Frazier*, 387 F.3d 1244, 1266 (11th Cir. 2004) (excluding expert whose imprecise and unspecific expert opinion "easily could serve to confuse the jury and might well" mislead it).  Moreover, the "helpfulness" standard under Rule 702 "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92.

In addition, the proposed expert's methodology must be valid and capable of being reliably applied to the facts. *See Daubert*, 509 U.S. at 594-95.  Factors that courts consider when qualifying an expert include the following:  (1) whether the proposed expert's methodology can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) general acceptance within the scientific community. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert*, 509 U.S. at 594-95.

For a proposed expert to have sufficient and reliable specialized knowledge that would assist the trier of fact, that purported expert must possess and be able to present "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.  Indeed, "'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence

11

which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Martinez v. United States*, 33 F.4th 20, 24 (1st Cir. 2022), quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Therefore, a proposed expert's opinion lacks a reliable foundation if it is based solely on his own experience and thus such testimony should be excluded.  *Grdinich v. Bradlees*, 187 F.R.D. 77, 82 (S.D.N.Y. 1999) (excluding witness as expert on industry standards because his own subjective experience did not constitute sufficient knowledge that would assist trier of fact) (citing *Daubert*, 509 U.S. 590).  *Cf. Frazier*, 387 F.3d at 1266 (when purported expert relies "solely or primarily on experience, then the witness must explain **how** that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. . . .  An expert's qualification and experience alone are not sufficient to render his opinions reliable" (emphasis in original)).

Finally, in addition to the requirements set forth in *Daubert* and *Joiner*, expert testimony must "fit" the actual litigation scenario at issue.  *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).

### 2. Mr. Zatkovich is not Qualified to Testify that "Power Management" is a BBPOS Trade Secret in Light of BBPOS's Failure to Identify It as Such.

Mr. Zatkovich is a retained expert witness with no direct knowledge of the underlying facts of this case.  Mr. Zatkovich only knows about BBPOS's trade secrets through a review of documents and discussions with BBPOS personnel.  *See* Zatkovich Report at Exhibit B; *see also*, *e.g.*, Zatkovich Dep. at 54:16-18.  Mr. Zatkovich is not competent to testify as to what information, if any, BBPOS holds as trade secret.  Moreover, he is not competent to testify in contradiction to BBPOS as to the scope of BBPOS's trade secrets.  Admitting into evidence Mr. Zatkovich's opinion that "power management" is one of the misappropriated BBPOS trade secrets regardless

of BBPOS having said otherwise in its interrogatory response and sworn deposition testimony would impermissibly convert him from an expert witness into a fact witness.

Even if Mr. Zatkovich were competent to identify a BBPOS trade secret where BBPOS does not claim it to be one, BBPOS's late-identification of a supposedly-misappropriated trade secret, in an expert report issued after the close of discovery, is improper. *Vesta Corp. v. Amdocs Mgmt. Ltd.*, No. 3:14-CV-1142-HZ, 2018 WL 830141 (D. Or. Feb. 12, 2018) is directly on point. There, just as here, the plaintiff's expert identified a new trade secret in his expert report that had never been identified as a trade secret by plaintiff; the court struck the new trade secret from the report because it had not previously been disclosed with reasonable particularity. *Id.* at *7. *See also, e.g., Lynchval Sys., Inc. v. Chicago Consulting Actuaries, Inc.*, No. CIV. A. 95 C 1490, 1996 WL 780492, at *2 (N.D. Ill. Dec. 11, 1996) (upholding magistrate judge's striking of trade secrets identified in expert report that had not been claimed as trade secrets prior to close of discovery). The case for precluding testimony on this late-identified "trade secret" is even more compelling here than in *Lynchval Sys.*, because in that case, the subject matter of the newly disclosed secrets had previously been identified, although there had not been an allegation of misappropriation. *Id.* Here, "power management" was almost literally ***the only thing BBPOS did not*** claim to be a trade secret during discovery.  And if Mr. Zatkovich's identification of the "power management" trade secret is viewed as essentially a supplementation of BBPOS's earlier interrogatory answers, it is likewise improper even leaving aside the fact that it was issued after the close of discovery. *E.g., Seshadri Raju, M.D., P.A. v. Medtronic, Inc*., No. 3:17-CV-357-CWR-LGI, 2021 WL 1232102, at *4 (S.D. Miss. Mar. 31, 2021), appeal dismissed, No. 21-60387, 2021 WL 5238195 (5th Cir. July 20, 2021) (even new discovery materials cannot justify adding a new trade secret based on information previously known).

### 3.   Mr. Zatkovich Should Be Precluded from Offering Conclusions About "Trade Secrets" That He Has Not Identified in Any Accused Product.

Mr. Zatkovich has not offered any support for his opinion that any Accused Products embody the Pre-Analyzed Communication Settings, Proprietary mPOS Communication Formats, or the Data Security/Encryption Methodology.  *See* Zatkovich Report at 74-77.  Mr. Zatkovich performed no testing, analysis, or examination of any Accused Device to determine whether any of these "trade secrets" were actually found in or on the devices.  Indeed, Sections 6.3.3, 6.3.4, and 6.3.5 of Mr. Zatkovich's report, which purport to show Ingenico's use of these alleged trade secrets, are devoid of any reference to any Accused Product.

In one instance (the so-called "Auto Gain Control"), Mr. Zatkovich relies exclusively on a PayPal document, which has never been shared with Ingenico, which he supposedly decompiled, which, he says, showed "communication settings" that are, in his unexplained opinion, "similar" to the parameters used by BBPOS.  *Id.* at 75.  Mr. Zatkovich does not even claim that the BBPOS parameters had been shared with ROAM Data; rather, he says that the information that BBPOS shared was the fact that optimizing data transfer over the audio jack was "a research project." There is no logical nexus between that disclosure and Mr. Zatkovich's conclusion that the parameters shown in the PayPal document "required" that Ingenico "utilize[] BBPOS' Auto Gain Control trade secret information in their product designs."  *Id.*  His opinion is purely the result of assertion and consists of nothing more than the *ipse dixit* of an expert.  Because this opinion is utterly speculative, it lacks sufficient reliability to be presented to the jury.

Mr. Zatkovich fares no better on the "communication formats" and "encryption methodology" topics.  Mr. Zatkovich's opinion is that the Accused Devices utilize each of these technologies, either by rendering certain data in formats that are proprietary to BBPOS or by encrypting data in a manner that is a BBPOS trade secret.  But Mr. Zatkovich has not performed

any analysis on the Accused Devices themselves, or their software, to determine if that is, in fact, the case.  Instead, Mr. Zatkovich relied on a "requirements" document to assert that ROAM Data "utilized this information in their product design."  Zatkovich Report at 75.  If Ingenico had implemented these technologies in any of the Accused Products, Mr. Zatkovich could, presumably, have found them and determined their function and functionality, but Mr. Zatkovich did not even attempt to determine if these solutions were included in the actual products.  In these instances, too, Mr. Zatkovich has substituted his own say-so as an expert for a legitimate scientific analysis, and the resulting opinions are speculative and inadmissible.

### 4.  Mr. Zatkovich Should Be Precluded from Offering Opinions That Are Not Based Upon an Evaluation of Accused Products

Finally, Mr. Zatkovich offers opinions about several models of Accused Products that he has simply not examined.  These include any products from the "RP100 series" other than the RP170c and any products from the "RP450 series" other than the RP457c.  Mr. Zatkovich has not tested or examined these products or performed any analysis of the products, their components, or their function.  Mr. Zatkovich's opinions are based on rank speculation that other products in the same series would have the same characteristics, not on any scientific considerations.  These opinions lack any foundation and should be excluded.

## CONCLUSION

In *McGovern ex rel. McGovern v. Brigham & Women's Hospital*, 584 F. Supp. 2d 418 (D. Mass. 2008), the Court held that a district judge performing her *Daubert* gatekeeper duties must ask three questions: (1) Is this junk science?; (2) Is this a junk scientist?; and (3) Is this a junk opinion?  584 F. Supp. 2d at 424.  This case does not even present a close call.  Mr. Zatkovich's unsound methodology, disregard of the actual products as to which he opines, and assertions of fact that even BBPOS has not made demonstrate that, whether or not Mr. Zatkovich might, in other

circumstances, be a qualified expert, his opinions in this case are junk science used to come up with junk opinions.

For the foregoing reasons, Ingenico respectfully requests that this Court limit Mr. Zatkovich's opinions to the disclosed "Audio Jack Polarity Detection" technology and further that such opinions be confined to the RP170c, RP350x, RP457c, and RP750x products.

## REQUEST FOR ORAL ARGUMENT

Ingenico requests oral argument on its Motion in Limine To Preclude Unreliable And Inadmissible Expert Testimony Of Ivan Zatkovich.

Dated:  April 10, 2023

Respectfully submitted,
INGENICO INC., INGENICO CORP. AND
INGENICO GROUP, SA,

By their attorneys,

/s/ *Jeffrey K. Techentin*
JOHN A. TARANTINO (BBO #492230)
PATRICIA K. ROCHA (BBO #542348)
NICOLE J. BENJAMIN (BBO #666959)
R. BART TOTTEN (BBO #631605)
JEFFREY K. TECHENTIN (*pro hac vice*)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
btotten@apslaw.com
jtechentin@apslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2023, I caused to be served via electronic mail a true copy

of the within document on the following counsel of record:

Jonathon D. Friedmann, Esq.
Robert P. Rudolph, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

Oliver D. Griffin, Esq.
Peter N. Kessler, Esq.
Melissa A. Bozeman, Esq.
Kutak Rock LLP
303 Peach Street, N.E., Suite 2750
Atlanta, GA 30308
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com
Melissa.bozeman@kutakrock.com

Ricardo G. Cedillo, Esq.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
rcedillo@lawdcm.com

/s/ *Jeffrey K. Techentin*
Jeffrey K. Techentin

4880-9630-2172, v. 2

17