# EXHIBIT

# 6

HIGHLY CONFIDENTIAL

Page 1

1              UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MASSACHUSETTS

3       ------------------------------x

4       ANYWHERECOMMERCE, INC. and     :

5       BBPOS LIMITED                   :

6                Plaintiffs            :

7       vs.                           : Civil Docket No:

8       INGENICO INC., INGENICO        : 1:19-cv-11457-IT

9       CORP., and INGENICO GROUP SA   :

10               Defendants            :

11      ------------------------------x

12           HIGHLY CONFIDENTIAL VIDEO-RECORDED

13              VIDEO CONFERENCE DEPOSITION OF

14               JENNIFER VANDERHART, Ph.D.

15      DATE:        WEDNESDAY, MAY 4, 2022

16      TIME:        10:19 A.M.

17      LOCATION:    JENNIFER VANDERHART'S RESIDENCE

18                   VIENNA, VIRGINIA

19      REPORTED BY:  SUZANNE MARIE ALONA ENDERSON

                     Reporter, Notary

20            Veritext Legal Solutions

              1250 Eye Street, NW, Suite 350

21               Washington, D.C.  20005

Page 2

1                  A P P E A R A N C E S

2    On behalf of the Plaintiffs, via video conference:

3            MELISSA A. BOZEMAN, ESQUIRE

4            Kutak Rock LLP

5            1760 Market Street

6            Suite 1100

7            Philadelphia, Pennsylvania  19103

8            (215) 288-4384

9            Melissa.bozeman@kutakrock.com

10     On behalf of the Defendants, via video conference:

11           JEFFREY K. TECHENTIN, ESQUIRE

12           Adler Pollock & Sheehan P.C.

13           One Citizens Plaza

14           8th Floor

15           Providence, Rhode Island  02903

16           (401) 274-7200

17           jtechentin@apslaw.com

18

19      ALSO PRESENT:

20         SCOTT FORMAN, Videographer, via video conference

21         BILL CRADDOCK, Concierge, via video conference

HIGHLY CONFIDENTIAL

Page 3

1                          INDEX

2              Highly Confidential Video-Recorded

3               Video Conference Deposition of

4                  JENNIFER VANDERHART, Ph.D.

5                         MAY 4, 2022

6

7    Examination By:                              Page

8        MS. BOZEMAN                                5

9

10   Exhibit No.                                  Page

11   Exhibit 1  Notice of Deposition                6

12   Exhibit 2  Vanderhart Damages Expert Report    9

13   Exhibit 3  Scherf Expert Report               15

14   Exhibit 4  Scherf Rebuttal Report             16

15   Exhibit 5  BBPOS-ROAM Licensing Agreement     27

16   Exhibit 6  Summary of Terms                   32

17

         (Exhibits attached to transcript.)

18

19

20

21

Page 194

1      A    Again, this is a legal determination.  So

2    that's not -- it's not my -- my -- I haven't been

3    asked to do that.  I don't have the expertise to

4    do that.

5      Q    Is it fair to say that if a court were to

6    determine that not all sales of BBPOS products

7    that incorporate the trade secrets covered under

8    the license consists a contractual breach, that

9    your analysis of the damages would change?

10      A    So yes.  If I were to include a different

11    set of products that did not include all the

12    products that I currently include, the total

13    amount would change.

14      Q    In accordance with that legal

15    determination; is that right?

16      A    That would be -- yes.  I would not be the

17    one to determine which products did or did not or

18    should or should not be included in that analysis.

19      Q    Okay.  Let's move to your section 6.2.3.,

20    indemnification, which starts on page 39.

21      A    Okay.

HIGHLY CONFIDENTIAL

Page 195

1    Q    In 97, you have an understanding "from

2    counsel that Ingenico has incurred legal fees and

3    expenses for litigation and IPR proceedings

4    related to products licensed by BBPOS to ROAM,

5    including between Ingenico and IOENGINE and four

6    additional matters."

7          Can you tell me what the basis of -- of

8    your understanding is?

9    A    Just as I say there, I understand from

10   counsel.

11   Q    Did you do anything to make an

12   independent analysis of whether or not the -- this

13   understanding is correct?

14   A    So I got information on the amounts of

15   legal fees and expenses.  I got a spreadsheet that

16   specified how much those were.  So in terms of

17   whether or not they incurred legal fees, I

18   understand that these are ongoing cases.  I

19   didn't -- myself, in an ongoing case, I'm -- I'm

20   familiar with the legal system.  And certainly

21   legal fees are typically incurred when a legal

Page 196

1    matter is ongoing.

2            So I -- I'm not sure what -- what I would

3    have verified other than the fact of there being

4    legal fees incurred.  I -- I feel like I'm

5    rambling now.  I don't know that I'm answering

6    your question.

7        Q    Well, this understanding, it's based on

8    information that was supplied to you by counsel;

9    is that right?

10       A    The fact that legal fees were incurred is

11   what understanding, I guess, is my question?

12       Q    Well, the understand -- what is the --

13   what is the -- did you do any independent analysis

14   of these actual legal proceedings that form the

15   basis of the indemnification claims here?

16       A    So I did look at the IOENGINE litigation

17   in order to see the type of litigation that it was

18   and the specific part that was being played by the

19   products that would be indemnified.  And -- but

20   other than that, the amount of legal fees was --

21   was given to me by counsel.

HIGHLY CONFIDENTIAL

Page 197

1          For the other -- other litigations, my

2     understanding is that they were to be fully

3     indemnified.  But I did not do any additional

4     analysis to determine whether or not they would be

5     fully indemnified.  That is a -- a legal

6     determination.  I was asked to just make that

7     assumption.

8          Q    Okay.  Is there anything else that you

9     would have -- that you would have done to satisfy

10     yourself that legal fees are appropriately part of

11     the damages that are claimed in connection with

12     the indemnification breach of contract claim?

13          A    No.  I wouldn't interpret the

14     indemnification clauses in the contract myself.

15     So whether or not these litigations are or are not

16     covered under those indemnification clauses is a

17     legal determination.  I've been asked to assume

18     here that they were.  And -- and I've moved

19     forward under that assumption.

20          Q    So you did say you did look at the

21     IOENGINE litigation in some sort of fashion.

Page 198

1    What -- what, in particular, did you review?

2         A    So as I note here in the -- in the

3    footnote, I looked at the complaint itself.  And I

4    state here, Since the IOENGINE litigation had

5    other products than those covered under the

6    ROAM-BBPOS license, I allocate the total legal

7    fees associated with the litigation by considering

8    an equal weight share of the litigation expenses

9    and fees by product category since the BBPOS

10   products all fall into one of the categories.

11        Q    Did you undertake any analysis of the

12   actual amount of accused products involved in that

13   litigation?

14        A    So if we look at -- let's see.  Where do

15   I cite to?  I cite to Exhibit D -- for the accused

16   products and category, see Exhibit D-10.

17        Q    And Exhibit D-10, it outlines the

18   products that were accused in that -- in the

19   IOENGINE litigation; is that right?

20        A    That's correct.

21        Q    Okay.  But do you have an understanding

HIGHLY CONFIDENTIAL

Page 199

1        of, in total, what the accused products -- what

2        the accused products would be in that litigation?

3        Like the number.

4            A    So this is based -- if you look at the

5        footnote in this -- in this Exhibit D-10, I refer

6        to the -- the answer affirmative defenses and

7        counterclaims in that product.  And these are the

8        products that are cited to there.  So that's --

9        that's what I used in order to determine the

10       specific products that were alleged.

11           Q    So they're divided into three categories;

12       is that right?

13           A    That's my understanding, yes.

14           Q    Okay.  And for category 1 which is

15       identified as the mPOS card readers, there are --

16       1, 2, 3, 4, 5, 6, 7, 8, 9, 10 -- 11 different

17       products; is that right?

18           A    That's correct.

19           Q    And only three of those relate to

20       products that were sold by BBPOS to ROAM or

21       Ingenico -- Ingenico.  Would you agree with that?

Page 200

1        A     So I don't know for certain.  So I know

2    that the G3X, 4X and 5X.  I don't know if maybe in

3    the past the G2 may have also been sold by ROAM to

4    Ingenico.

5        Q     Well, would you agree that BBPOS would

6    not be responsible for each of these products that

7    are identified in this one category?

8        A     So I would agree that it could be not all

9    of these were sold by BBPOS.  But in terms of

10   identifying the costs associated with the

11   litigation, this category of products included the

12   BBPOS products.  So that's how I've done the

13   allocation here because those fall into those

14   categories.

15           So with the basic, you know, underlying

16   assumptions that certain of the litigation costs

17   would have been associated with the categories --

18   the broader categories themselves, I thought that

19   this was a reasonable way to estimate the costs.

20           In addition, this would really

21   understate, you know, what the incremental value

Page 201

1  would be associated just for these products.  For

2  instance, if there was a litigation that included

3  only these products, because some of the work that

4  has to be done from a legal perspective would be

5  done no matter how many products are associated in

6  the litigation.

7      Q    Did you do anything to independently

8  analyze whether or not the cost have been properly

9  allocated or accurate and reasonable?

10     A    That was not my -- I was not asked to do

11 that, no.

12     Q    And the one-third allocation is

13 appropriate with respect to the underlying

14 litigation but not appropriate with respect to the

15 IPR; is that correct?

16     A    So the IPR I understood to affect all of

17 the products.  And so, you know, regardless of

18 whether it was just these products or other

19 products.  So all of the patents associated with

20 the IPR I understood to -- to be associated with

21 the -- the BBPOS products.

Page 202

1          Q    How is that different from the underlying
2     litigation?
3          A    Well, because the IPR -- you're looking
4     at just -- you're not looking at -- it's not
5     product specific.  So you're just looking at the
6     patents that are being asserted.  And the patents
7     were all being asserted against the BBPOS
8     products.
9          Q    Do you have an understanding of how many
10    patent infringement claims are comprised of -- of
11    this category of damages?
12         A    I don't understand the question.
13         Q    Well, you identified the one lawsuit,
14    right.  The I -- IOENGINE litigation.  But are
15    there other litigation matters that you considered
16    and contribute to this damages figure?
17         A    Yes.  And so I -- I list those -- those
18    matters in -- is it D-12?  I'm sorry.  In Exhibit
19    D-13.
20         Q    And did you -- did you review the -- any
21    of the litigation documents in connection with the

Page 203

1   other matters that are listed here in D-13, other

2   than the I -- IOENGINE matter?

3       A    No.  My understanding was that for the

4   other matters there was no allocation needed, that

5   all of the products would be subject to

6   indemnification.

7       Q    All of the accused products in those

8   matters were related to the devices that were sold

9   by BBPOS to ROAM or Ingenico; is that right?

10      A    Just more generally, my understanding was

11  that these matters, at least up until the point

12  where these are smaller amounts, that -- the

13  allegation is that the entirety of the matter

14  would be subject to indemnification.  I don't -- I

15  don't know the specifics of that.

16      Q    And that was based on information from

17  counsel; is that right?

18      A    That's correct.

19      Q    And is that the basis for your assumption

20  that no allocation would be appropriate for the

21  remaining four matters?

HIGHLY CONFIDENTIAL

Page 204

1      A     That's correct.

2      Q     What is the basis of your understanding

3   of a possible indemnification obligation owed by

4   BBPOS with respect to litigation between PayPal

5   and IOENGINE?

6      A     Well, as I state in my report, "There is

7   a litigation between PayPal and IOENGINE involving

8   Ingenico products licensed from BBPOS, where

9   Ingenico may be required to indemnify PayPal for

10   fees and costs resulting from the litigation."

11      Q     And it's -- and in 101 of your report,

12   you say, "A similar allocation of fees and costs

13   as described for the Ingenico-IOENGINE matter

14   would [sic] be appropriate in connection with the

15   PayPal-IOENGINE litigation"?

16      A     I say "could be used," "should amounts

17   associated with that need to be indemnified."  So

18   yes, in terms of identifying various groups of

19   products and allocating them that way.

20      Q     You didn't undertake any analysis of

21   actually counting up the actual accused products

Page 205

1    at issue in either of the IOENGINE litigation

2    matters, did you?

3         A    So I don't understand -- you keep asking

4    me that question about the first one, but I went

5    to G-2, the specific exhibit that I created that

6    has the products that I assume to be the accused

7    products.  And so there's not that many of them.

8    I can certainly count them.

9              As to the PayPal matter, no.  I haven't

10   done any further analysis into the PayPal matter.

11   I simply say that that allocation methodology

12   could be used in that matter, but I haven't

13   actually applied that to the PayPal litigation.

14        Q    I think maybe I'm -- I'm being too

15   general when I'm -- I think my -- my -- I think my

16   questions are -- were being too general.  But what

17   I'm actually trying to ask you is, did you

18   undertake an analysis that would actually count

19   each device that would comprise of the devices

20   identified in all -- in those three different

21   categories, the number -- like the actual number

HIGHLY CONFIDENTIAL

Page 206

1    sold?

2         A    Oh, the actual number sold.  Well, that's

3    different.  So that would be -- you know, in terms

4    of the number sold -- and the litigation costs

5    aren't going to be associated with the number of

6    devices sold.

7              In term of damages, that's -- in terms of

8    indemnifying for damages, that's a completely

9    different thing.  And, presumably, the damage

10   analysis would specify the damages that are

11   associated with the different products.  And then

12   those -- those amounts could be identified with

13   specificity.

14             And so at that point in time that

15   analysis could be done in terms of identifying

16   the -- the specific damages associated with the

17   products themselves.  But in terms of identifying

18   the legal costs, that's not -- that wouldn't be a

19   methodology that I would -- that I would propose

20   using.

21        Q    Why not?

HIGHLY CONFIDENTIAL

Page 207

1        A     Because it simply isn't -- isn't

2     relevant.  And so whether or not there is 1,000

3     units sold or a million units sold isn't going to

4     necessarily impact the litigation costs

5     associated.  It's going to impact damages for

6     sure.  But the litigation costs associated aren't

7     necessarily going to change.

8        Q     With respect to 6.3. of your report which

9     relates to BBPOS tortious interference claim, you

10    calculate damages associated with sales to any

11    NAB, which I believe is North American Bancard.

12    What is the underlying product that informs your

13    damages figure of $753,475?

14       A     And so, again, as I've stated, the

15    information available to me did not break out

16    customer and product level information.  My

17    understanding is that the sales by BBPOS to North

18    American Bancard were the products that --

19    Ingenico was selling them to North American

20    Bancard.

21             And North American Bancard basically

Page 215

1              CERTIFICATE OF NOTARY PUBLIC

2           I, Suzanne Marie Alona Enderson, the

3     officer before whom the foregoing deposition was

4     taken, do hereby certify that the witness whose

5     testimony appears in the foregoing deposition was

6     duly sworn by me; that the testimony of said

7     witness was taken by me in stenotype and

8     thereafter reduced to typewriting under my

9     direction; that said deposition is a true record

10    of the testimony given by said witness; that I am

11    neither counsel for, related to, nor employed by

12    any of the parties to the action in which this

13    deposition was taken; and, further, that I am not

14    a relative or employee of any counsel or attorney

15    employed by the parties hereto, or financially or

16    otherwise interested in the outcome of this

17    action.

                _Suzanne Marie Alona Enderson_

18                 SUZANNE MARIE ALONA ENDERSON

19                 Notary Public in and for

20                 the State of Maryland

21    My ommission Expires:   11/23/2022