UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANYWHERECOMMERCE, INC. and BBPOS LIMITED,<br><br>    Plaintiffs,<br><br>       v.<br><br>INGENICO INC., INGENICO CORP., and INGENICO GROUP SA,<br><br>    Defendants. | Civil Docket No: 1:19-cv-11457-IT<br><br>Jury Trial Demanded |

## PLAINTIFF BBPOS LIMITED'S TRIAL BRIEF

Pursuant to Local Rule 16.5(f), Plaintiff BBPOS Limited ("BBPOS") respectfully submits this Trial Brief in accordance with the Court's Second Amended Procedural Order Regarding Pretrial/Trial dated March 29, 2023 (Doc. No. 229).

### I.    INTRODUCTION

This trial is about a willful and malicious misappropriation of BBPOS's trade secrets by Defendants, Ingenico Inc., Ingenico Corp., and Ingenico Group SA (collectively, "Ingenico" or "Defendants") and the parties' related contractual disputes, arising out of a 2010 Engineering Development and License Agreement, as amended (the "BBPOS-ROAM Licensing Agreement"). Under this agreement, BBPOS granted ROAM an exclusive product license for the development and sale of a magnetic stripe card reader that connected to mobile phones / tablets via audio-jack plug. The device enabled merchants to accept electronic payments from their customers "on the go" by simply swiping their credit or debit cards. The parties sometimes referred to this product as the "CircleSwipe" or "Crypto Swipe" and/or ROAM's G4X and G5X product series.

This contract was exclusively negotiated and entered into by and between BBPOS and ROAM Data, Inc. ("ROAM"). At the time, BBPOS was a Hong Kong-based hardware manufacturer of emerging mobile "point-of-sale" (or "mPOS") technology that had been recently founded by tech-innovators, Ben Lo, Jimmy Tang, and Daniel Tsai. ROAM was a U.S. payments solutions software start-up, at the time, founded by serial tech entrepreneur and CEO, Will Graylin. Ingenico is a $3 billion publicly-traded French payments industry behemouth, and worldwide leader in traditional terminal POS solutions, that had been founded in the 1980s. In February of 2012, Ingenico obtained a controlling ownership interest in ROAM, before fully-acquiring the company in 2015, and thereafter merging into Ingenico Inc. as of December 13, 2017.

### A. BBPOS Asserts Claims At Trial Against Defendants For Trade Secret Theft, Breach Of Contract, & Unjust Enrichment

In Count II of the First Amended Complaint ("FAC") (Doc. No. 67), BBPOS asserts a claim against Defendants for trade secret misappropriation under the Georgia Trade Secret Act, O.C.G.A. §§10-1-760, *et seq*. BBPOS contends that five of its trade secrets were stolen by Defendants during the calendar year 2012, and then wrongfully used by Ingenico to launch a competitive EMV-capable, mPOS product line, beginning in February 2014. These trade secrets speak to certain technical challenges that were unique, at the time, to the manufacturing of mPOS vs. traditional terminal POS devices: (1) audio jack polarity detection; (2) power management; (3) signal control settings and automatic gain; (4) communication formats; and (5) data security / encryption methods.[1]

---

[1] The following table sets forth descriptions of the five stolen trade sercets at issue in this case:

| BBPOS TRADE SECRET | DESCRIPTION |
|---|---|
| 1. Audio Jack Polarity Detection | Determines if the base of the mobile phone's audio jack has a positive or negative polarity and to route the microphone/input signal appropriately. This enables a single solution to support multiple mobile phone signal formats. |

In the seven or eight months following Ingenico's acquisition of a controlling interest in ROAM in February 2012, Mr. Graylin is squeezed-out and Ingenico's double agents, like Christopher Rotsaert, are sent in to manage "the race to EMV." Ingenico's R&D teams (via ROAM) specifically requested information on each of BBPOS's five trade secrets and then sought out additional details from BBPOS of how to implement those trade secrets; defined their internal product requirements for the accused products based on the five BBPOS trade secrets; and, thereafter, described and even highlighted the stolen features provided by the trade secrets in their user documentation and product marketing.

The five mPOS trade secrets at issue in this case were shared by BBPOS with Defendants under the context of their "alleged" joint development project for an EMV-enabled mPOS device, and further disclosed subject to the confidentiality protections and other terms and conditions contained in the BBPOS-ROAM Licensing Agreement, as amended, at Section 6.3, and elsewhere. Unbeknownst to BBPOS, meanwhile, Ingenico was working on their own competitive product line of mPOS devices, rather than truly engaging in any honest, transparent, or equitable joint undertaking with BBPOS. In violation of Georgia law and in breach of the contract, Defendants improperly disclosed, disseminated, implemented, and used BBPOS's trade secrets to manufacture

| 2. Power Management | Refers to methods for efficient power use for battery powered mPOS devices as well as performing sleep and auto wakeup (Power on) functions in order to conserve power. |
|---|---|
| 3. Signal Control Settings and Auto Gain Control | Determines the appropriate gain (e.g. signal thresholds) to use in decoding data, and at what speed to reliably transmit and receive the information based parameters defined for the specific mobile phone being used. |
| 4. Communication Formats | Refers to over 25 different formats for sending credit card and transaction related information between the mPOS device and the mobile phone to ensure compatibility with different mobile payment vendor applications. |
| 5. Data Security / Encryption Methods | Refers to methods for encrypting credit card data based on variations of data encryption methods. |

and launch competing mPOS products for their own commercial use. Thus, in addition to its claim for misappropriation of trade secrets, BBPOS also has claims against Defendants for breach of their confidentiality, and other contractual obligations, and for unjust enrichment.

### B. Defendants Admit Zero Wrongdoing &, In Fact, Assert Their Own Claim Against BBPOS At Trial For Alleged Breaches Of Contract

Defendants maintain they did nothing wrong here – but even if they did, they say that the stolen trade secrets identified by BBPOS in this lawsuit were worthless. They take the position that the information BBPOS shared with ROAM and Ingenico was lawfully transferred and does not, in any event, constitute protectible trade secrets; and further suggest (*but, without expert analysis or proffered testimony*) they aren't practiced in the accused products[2] (according, presumably, to Mr. Rotsaert). Ingenico also argues that BBPOS's claims are time-barred because it filed this lawsuit too late.

In addition to their defenses, Ingenico also brings a counterclaim against BBPOS arising under the BBPOS-ROAM Licensing Agreement, as amended. In its counterclaim, Ingenico alleges that BBPOS has breached Sections 3.18 and 3.10 of the agreement in failing to indemnify Ingenico for certain losses it incurred in defending certain third-party infringement claims brought in 2017 and after involving the CircleSwipe device BBPOS white-labled under the contract for ROAM's exclusive sale and use everywhere in the world except China and the Philippines. BBPOS claims that Defendants' preceding material breach of the BBPOS-ROAM Licensing Agreement, and confidentiality obligations, relieves it of any subsequent performance of its indemnification and other contractual obligations under the contract. BBPOS also claims that it was not provided timely notice and information regarding the disputes, as was promised in Ingenico's written indemnity

---

[2] The accused products are Defendants' RP350x, RP750x, RP100 series, and RP450 series.

requests, and challenges the reasonableness of the amounts paid and attorneys' fees incurred to resolve the matters.

## II.   PROPOSED CONCLUSIONS OF LAW

BBPOS offers the following proposed conclusions of law applicable to the parties' remaining claims and defenses in this case for the Court's consideration and / or for the purposes of charging the jury.

   A.   *BBPOS's Count II – BBPOS Timely Asserted Their Claim That Defendants Violated the Georgia Trade Secrets Act ("GTSA") (O.C.G.A. §§ 10-1-760, et seq.)*

   1.   The GTSA allows for relief where a plaintiff proves "that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret." *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1290-91 (11th Cir. 2003) (internal quotations omitted).

   2.   "To prove the existence of a trade secret, the plaintiff must show that it possessed information—which may include technical or nontechnical data, financial plans, customer lists, a product design, or product plans—that derives economic value from not being generally known or readily ascertainable to others, and that 'is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *Diamond Power Intl, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1332 (N.D. Ga. 2007) (quoting O.C.G.A. § 10-1-761(4)); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others.").

   3.   Under Massachusetts contract law, "an individual who breaches contractual duties to obtain trade secrets has used improper means," and "[a] party who knowingly benefits from the

5

breachr's trade secret bounty is also liable." *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 240 (D. Mass. 2011).

    4.      The statute of limitations on trade secret claims under the Georgia statute is five years and runs from the time the misappropriation is discovered or, by reasonable diligence, should have been discovered. O.C.G.A. § 10-1-766.

    5.      Under the "discovery" rule, the statute of limitations does not begin to run until the plaintiff has sufficient information to make a "meaningfully colorable" claim of trade secret misappropriation. The mere suspicion of possible misappropriation does not amount to objectively reasonable notice sufficient to trigger the running of the statute. *Porex Corp. v. Haldopoulos*, 644 S.E.2d 349, 353 (2007), cert. denied, (June 25, 2007).

    6.      Under Georgia law, if the plaintiff becomes aware of facts that would make a reasonably prudent person suspicious, he has a duty to investigate further and is charged with knowledge of the matters that would have been revealed in such investigation. This rule applies even if the potential plaintiff fails to conduct an investigation. However, if certain key facts are unavailable even to a reasonably diligent plaintiff, the statute is tolled until the facts become available. *Id.*

    7.      Moreover, to prevent multiple claims for a continuing use of a misappropriated trade secret, the statute states that a continuing misappropriation by any person constitutes a single claim against that person. O.C.G.A. § 10-1-766. However, the limitation period is applied separately to claims against different persons who misappropriate the trade secret by receiving it from another misappropriator. *Id.*

    8.      In rejecting a trial court articulation of the triggering date for the 5-year statute of limitations period that "[a]ny fact that excites [a plaintiff's] suspicion is the same as actual

6

knowledge of his entire claim," the Court of Appeals for Georgia in *Porex* explained that "mere suspicion of possible misappropriation does not amount to objectively reasonable notice sufficient to trigger the running of the statute."

9. The *Porex* Court stated:

> In interpreting the language of the uniform statute, courts have concluded that the statute begins to run when the plaintiff has "knowledge of sufficient facts from which a reasonable jury could infer misappropriation." . . . Thus, the statute of limitation does not begin to run until a plaintiff has sufficient information to make a "meaningfully colorable" claim. . . . Accordingly, mere suspicion of possible misappropriation does not amount to objectively reasonable notice sufficient to trigger the running of the statute.

*Id.* at 353 (internal citations omitted).

10. Noting that " '[m]ere knowledge that a company is competing in the marketplace and manufacturing similar parts is not dispositive on the accrual of the statute of limitations in a trade secret misappropriation case[,]' " *Id.* at 355 (quotation omitted), the appellate court found error with the trial court's findings on two grounds.

11. First, it determined that certain suspicions reflected in a letter seeking assurances regarding a question of potential theft created a material issue of fact as to whether they were sufficient to cause a reasonably prudent person to investigate whether its trade secrets had been misappropriated. *Id.*

12. Second, it found that "the trial court erred in finding as a matter of law that reasonable diligence would have revealed information of an arguably colorable claim during the five-month period between April and September 2000", noting that:

> . . . Certainly nothing in the current record indicates that further investigation in 2000 would have revealed the information that Porex discovered on its tour of the MicroPore facility in August 2005, upon which it now bases its claim. There is no evidence in the record that MicroPore or Haldopoulos ever supplied plastic products to Safari; in fact, the only indication in the record is that no business relationship existed between those parties.

*Porex*, 644 S.E.2d at 355. Accordingly, the court reversed the trial court's order granting partial summary judgment.

13.     Misappropriation arises when one who has legitimate access to trade secret information, such as in the course of his or her employment or by virtue of a license or other type of agreement (*see CMAX/Cleveland, Inc. v. UCR, Inc*., 804 F. Supp. 337, 358-359 (M.D. Ga. 1992) (applying Georgia law)), takes advantage of that knowledge by using it to develop or market his or her own product (*see Specialty Chemicals & Services, Inc. v. Chandler*, 9 U.S.P.Q.2d 1793, 1988 WL 618583 (N.D. Ga. 1988) (applying Georgia law); *Thomas v. Best Mfg. Corp., Division of Tillotson Corp*., 234 Ga. 787, 218 S.E.2d 68 (1975)) or discloses the product to unauthorized persons (*see Georgia-Pacific Corp. v. Lieberam*, 959 F.2d 901 (11th Cir. 1992) (applying Georgia law)).

14.     This is true even if the final product has been modified as long as the product is substantially derived from the original. *EarthCam, Inc. v. OxBlue Corp*., 49 F. Supp. 3d 1210 (N.D. Ga. 2014), aff'd, 703 Fed. Appx. 803 (11th Cir. 2017) (applying Georgia law) (further providing that if the contribution made by the trade secret is so slight that the actor's product or process can be said to derive from other sources of information or from independent creation, the trade secret has not been "used" for purposes of imposing liability); *Specialty Chemicals & Services, Inc. v. Chandler*, 9 U.S.P.Q.2d 1793, 1988 WL 618583 (N.D. Ga. 1988) (applying Georgia law).

15.     However, a licensee may use trade secrets as long as the use is within the scope of the license agreement. *Philip Morris, Inc. v. Brown & Williamson Tobacco Corp*., 641 F. Supp. 1438, 1468 (M.D. Ga. 1986), order clarified, 645 F. Supp. 174 (M.D. Ga. 1986) (applying Georgia law).

16. Section 10-1-763 provides for an entitlement to a recovery of monetary damages for violations of the GTSA. "Damages can include both the actual loss of the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account when computing actual loss. If neither are proved by a preponderance of the evidence the court may award damages caused by the misappropriation measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret for no longer than the period of time for which use could have been prohibited." O.C.G.A. § 10-1-763(a).

17. Willfulness is reckless indifference to an unreasonable risk. Malicious misappropriation involves the subjective intent to cause harm to the owner of the trade secret. *See e.g., Brandenburg v. All-Fleet Refinishing, Inc*., 252 Ga. App. 40, 40 (2001) (finding willful and malicious misappropriation where the evidence showed the defendant hired four of the plaintiff's employees who stole computer software which formed the basis of its operations and, generally, noting the defendant's "actions in hiring [plaintiff's] employees, stealing its software, and actively soliciting its customers, were willful and malicious."); *Molinaro v. Burnbaum,* No. 69-762, 1978 WL 21376 (D. Mass. Nov. 22, 1978) (holding that it was proper to award punitive damages, where there was trade secret misappropriation and establishment of a business competitive with the plaintiff's in violation of certain noncompetition covenants contained in the plaintiff's agreements with its former employees, and where the defendants acted with knowledge of both the noncompetition covenants and the confidentiality of the information appropriated); *AgroFresh Inc. v. MirTech, Inc.,* 257 F. Supp. 3d 643 (D. Del. 2017) (holding that the jury was reasonable in finding that the refusal to review the contract or conduct a "meaningful investigation" into the consultant's contractual obligations to AgroFresh—combined with other dubious acts such as

actively concealing the consultant's burgeoning relationship with Decco from AgroFresh—constituted willful and malicious misappropriation).

18. "If willful or malicious misappropriation exists the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a) of this Code section." O.C.G.A. § 10-1-763(b).

19. If there is a finding of willful and malicious conduct, the court may award reasonable attorneys' fees to the prevailing party. O.C.G.A. § 10-1-764.

B. *BBPOS's Count V – BBPOS Claims That Ingenico Inc. Breached Its Confidentiality Obligations Under the BBPOS-ROAM Licensing Agreement*

20. "To prevail on a claim for breach of contract, a plaintiff must demonstrate that there was [1] an agreement between the parties; [2] the agreement was supported by consideration; [3] the plaintiff was ready, willing, and able to perform his or her part of the contract; [4] the defendant committed a breach of the contract; and [5] the plaintiff suffered harm as a result." *Bulwer v. Mount Auburn Hosp.*, 46 N.E.3d 24, 39 (Mass. 2016) (citing *Singarella v. Boston*, 173 N.E.2d 290, 291 (Mass. 1961)).

21. A breach of contract is a failure to comply with the terms of an agreement without legal excuse. *See Guckenberger v. Bos. Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997); *Realty Developing Co. v. Wakefield Ready-Mixed Concrete Co.*, 327 Mass. 535, 537 (1951) ("A breach of contract is a failure to perform for which legal excuse is lacking").

22. The interpretation of the parties' rights and obligations under a contract is a question of law for the Court. *See Fairfield 274-278 Clarendon Trust v. Dwekm*, 907 F.2d 990, 993 (1st Cir. 1992); *Freelander v. G. & K. Realty Corp.*, 357 Mass. 512, 516 (1970).

23. "The interpretation of an [agreement] is directed to the meaning of the terms of the writing or writings in the light of the circumstances of the transaction." *Davis v. Dawson*, 15 F.

10

Supp. 2d 64, 107 (D. Mass. 1998) (quoting *Boston Edison Company v. Federal Energy Regulatory Commission*, 856 F.2d 361, 365 (1st Cir. 1988)).

24. An agreement is examined and construed "with reference to all of its language and to its general structure and purpose and in light of the circumstances under which it was executed." *Cofman v. Acton Corporation*, 958 F.2d 494, 498 (1st Cir. 1992); *see Baybank Middlesex v. 1200 Beacon Props., Inc.*, 760 F. Supp. 957, 963 (D. Mass. 1991).

25. Where "the contract language is unambiguous, [the Court] interpret[s] it according to its plain terms." *Den norske Bank AS v. First Nat'l Bank*, 75 F.3d 49, 53 (1st Cir. 1996).

26. When a contract term is ambiguous, Massachusetts law provides that the Court should consider (1) the parties' negotiations, (2) their course of performance, (3) their prior course of dealing, and (4) trade usage in the industry. *See Den norske Bank AS v. First Nat'l Bank*, 75 F.3d 49, 52-53 (1st Cir. 1996).

27. Where a party successfully demonstrates a claim for breach of contract, that party is entitled to be placed in the same position as it would have been if the contract had been fully performed, i.e., expectation or benefit-of-the-bargain damages. *See Fecteau Benefits Grp., Inc. v. Knox*, 72 Mass. App. Ct. 204, 208-09 (2008) ("The long-settled rule for breach of contract recovery is that a wronged party is entitled to receive the benefit of the bargain, that is, be placed in the same position as if the contract had been fully performed.") (quotation omitted); *VMark Software v. EMC Corp.*, 37 Mass. App. Ct. 611 n.2 (1994).

C. ***BBPOS's Affirmative Defense Of A Preceding Material Breach* – Regarding Ingenico Inc.'s Remaining Indemnity Claims Under Count I Of The Second Amended Counterclaims**

28. A material breach of contract by one party excuses the other from performance as a matter of law. *Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc.*, 675 N.E.2d 761, 766 (1997).

11

*See Lease–It, Inc. v. Mass. Port Auth.*, 33 Mass.App.Ct. 391, 600 N.E.2d 599, 602 (1992) ("When a party to an agreement commits an immaterial breach of that agreement, the injured party ... may not stop performing its obligations under the agreement.").

29. "A material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract[ ].' " *Id.* (alteration in original) (quotation omitted).

D. *BBPOS's Count VII – BBPOS Claims Defendants Were Unjustly Enriched*

30. Under Massachusetts law, unjust enrichment has three elements: (1) A benefit conferred upon the defendant by the plaintiff; (2) An appreciation or knowledge of the benefit by the defendant; and (3) The acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable. *Sweeney v. DeLuca*, No. 042338, 2006 WL 936688 (Mass. Super. Mar. 16, 2006) (distinguished on unrelated grounds).

31. "Unjust enrichment is defined as 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.' " *Santagate v. Tower*, 833 N.E.2d 171, 176 (2005).

32. "The fact that a person has benefited from another is not of itself sufficient to require the other to make restitution therefor." *Keller v. O'Brien*, 683 N.E.2d 1026, 1030 (1997).

33. Standard for unjust enrichment is based on reasonable expectations of party. *Santagate v. Tower*, 833 N.E.2d 171, 176 (2005).

E. *Defendants Cannot Meet Their Burden Of Proof To Rebut BBPOS's Expert's Opinions Calculating Nearly $24 Million In Unjust Enrichment / Disgorgment Damages – Regarding BBPOS's Count II For Trade Secret Theft*

34. On April 14, 2023, BBPOS's damages expert issued a supplemental expert report to include damages based on Defendants' internal sales data, which was just recently produced to Plaintiffs in response to an updated request for sales figures from 2021 through the present. Based

on the entirety of relevant sales data presented, Mr. Scherf determined that BBPOS suffered unjust enrichment damages on Defendants' sale of 1,294,808 units of Accused Products during the Damages Period equal $57,315,682 in revenues representing $23,989,824 in gross profits.

35. A plaintiff alleging misappropriation of trade secrets must prove proximate causation to receive damages for its lost sales, its lost profits, or disgorgement of a defendant's profits. The plaintiff also bears the burden to prove causation of its own losses (whether sales or profits). The Sedona Conference, Commentary on Monetary Remedies in Trade Secret Litigation, at sec. II(E)(2), THE SEDONA CONFERENCE (2022, Public Comment Version), https://thesedonaconference.org/publication/Commentary_on_Monetary_Remedies_in_Trade_Secret_Litigation.

36. Regarding disgorgement, a plaintiff generally must show that the defendant's misappropriation proximately caused the defendant's unjust enrichment. *Id.*

37. After that showing, the burden then shifts to the defendant to apportion the value of the defendant's profits or other benefit attributable to its wrongdoing. *Id.* (citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 45 cmt. f (AM. LAW INST. 1995) ("The plaintiff is entitled to the defendant's net profits from sales of goods incorporating the trade secret… [and only] bears the burden of establishing sales; the defendant has the burden of establishing deductible expenses and any sales not attributable to the use of the trade secret."); *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974) ("if the defendant enjoyed actual profits, a type of restitutionary remedy can be afforded the plaintiff—either recovering the full total of defendant's profits or some apportioned amount designed to correspond to the actual contribution the plaintiff's trade secret made to the defendant's commercial success.")).

38. Notwithstanding any burden shifting, then, the ultimate proof of proximate causation regarding disgorgement of a defendant's profits or unjust benefits will likely remain the responsibility of the plaintiff. *Id.*

39. There is no Georgia precedent (that Plaintiffs' research has been able to uncover), requiring an apportionment of value to alleged multiple trade secrets.

40. However, BBPOS's technical liability expert will opine, consistent with his Initial and Rebuttal Reports, that (1) each asserted trade secret is so integral to the product that it is truly impossible to apportion value between them; and (2) the five alleged trade secrets encompass the designs and methods used to create parts of a unified structure, such that the misappropriation of any of the asserted trade secrets would have caused all of the damages it sought.

41. The issue of apportionment may arise when a trade secret plaintiff asserts larger numbers of trade secrets or the accused product/service at issue is a composite of accused and nonaccused components. In such situations, as here, it may be the case that each asserted trade secret is so integral to the product that it is truly impossible to apportion value between them. *See, e.g., Huawei Techs. Co. v. Yiren Huang*, No. 4:17-CV-00893, 2019 WL 2395276, at *3 (E.D. Tex. June 6, 2019) ("[Plaintiff] is a small start-up company . . . the asserted trade secrets are an integral part of the all research and development and it is not possible to identify and apportion research and development expenses that are tied solely to the ten trade secrets."); *BladeRoom Group v. Emerson Electric,* 331 F. Supp. 3d 977, 979 (N.D. Cal. 2018) (rejecting a challenge to the sufficiency of the evidence to support the damages award, in part because "the jury was not asked to apportion damages among the trade secrets[,]" reasoning that, in the absence of a rule requiring apportionment, the plaintiff "could argue that since its trade secrets encompass the designs and methods used to create parts of a unified structure, the misappropriation of any of the asserted

trade secrets would have caused all of the damages it sought."); *Sabre GLBL, Inc. v. Shan*, 779 Fed. App'x 843, 852 (3d Cir. 2019); *CardiAQ Valve Techs., Inc. v. Neovasc Inc*., No. 14-CV-12405-ADB, 2016 WL 6465411, at *11-12 (D. Mass. Oct. 31, 2016) (denying motion for new trial on damages where jury found three of six asserted trade secrets misappropriated and expert did not testify as to reasonable royalty for each trade secret because court found jury had reasonable basis to conclude that the individual trade secrets misappropriated solved the same challenges and gave defendant the same head start).

### III. REQUESTS FOR RULINGS

BBPOS respectfully requests that the Court make the following rulings (and / or findings, as applicable) with respect to the parties' remaining claims and defenses in this case:

1. That BBPOS had protectctible trade secrets under the GTSA;

2. That Defendants misappropriated one or more of BBPOS's trade secrets;

3. That Defendants put one or more of BBPOS's trade secrets to commercial use;

4. That Defendants materially breached their contractual duties owed to BBPOS under the BBPOS-ROAM Licensing Agreement in 2012;

5. That, in additional to injunctive relief, BBPOS is entitled to a recovery of monetary damages for Defendants' violations of the GTSA that includes both the actual loss of the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account when computing actual loss in an amount not less than $23,989,824;

6. That Defendants willfully and maliciously misappropriated one or more of BBPOS's trade secrets;

7.      That BBPOS is entitled to an award of exemplary damages in an amount not exceeding twice any award made under O.C.G.A. § 10-1-763(a) (i.e., $23,989,824 times 2, or an additional $47,979,648);

8.      That BBPOS is entitled to an award of its reasonable attorneys' fees and costs, still accruing;

9.      That Defendants materially breached their confidentiality and other contractual obligations arising under the BBPOS-ROAM Licensing Agreement during the calendar year 2012; and

10.     That Defendants' material breach of the BBPOS-ROAM Licensing Agreement in 2012 excuses BBPOS from performance of any indemnity or other contractual obligations arising thereunder as a matter of law.

## IV.   CONCLUSION

**WHEREFORE**, based upon the foregoing and the evidence at trial, Plaintiff BBPOS Limited seeks judgement in its favor and the requested relief, and such other relief as may be just and appropriate under the circumstances.

Dated: April 18, 2023.

Respectfully submitted by:

KUTAK ROCK LLP

*/s/ Melissa A. Bozeman*
By: Melissa A. Bozeman (Pro Hac Vice)
    Pennsylvania Bar No. 201116
    Oliver D. Griffin (Pro Hac Vice)
    Pennsylvania Bar No. (80126)
    Peter N. Kessler (Pro Hac Vice)

Pennsylvania Bar No. 209033
Two Logan Square
100 N. 18th Street, Suite 1920
Philadelphia, PA  19103-4104
(215) 299-4384 (Telephone)
(215) 981-0719 (Facsimile)
Melissa.bozeman@kutakrock.com
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com

and

Leland P. Abide (Pro Hac Vice)
MN Bar No. 039269
KUTAK ROCK LLP
60 South Sixth Street, Suite 3400
Minneapolis, MN 55402-4018
Telephone: (612) 334-5000
Facsimile: (612) 334-5050
leland.abide@kutakrock.com

and

Jonathon D. Friedmann, Esq. (BBO # 180130)
Robert P. Rudolph, Esq. (BBO # 684583)
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA 02109
Tel.: (617) 723-7700
Fax: (617) 227-0313
JFriedmann@rflawyers.com
RRudolph@rflawyers.com


Ricardo G. Cedillo
DAVIS, CEDILLO & MENDOZA, INC.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
Tel: (210) 822-6666
Fax: (210) 822-1151
rcedillo@lawdcm.com

*Attorneys for Plaintiffs / Counterclaim-Defendants*

**CERTIFICATE OF SERVICE**

    I, Melissa A. Bozeman, do hereby certify that on April 18, 2023, I served a true and correct copy of the foregoing Trial Brief on all parties via the Court's CM/ECF Electronic Filing System.

>  _/s/Melissa A. Bozeman_
>  Melissa A. Bozeman