**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

**ANYWHERECOMMERCE, INC.**
**and BBPOS LIMITED,**
                              **Plaintiffs,**


          **v.**                                            **CIVIL ACTION NO.**
                                                            **1:19-cv-11457-IT**

**INGENICO INC., INGENICO CORP.**
**and INGENICO GROUP, SA,**
                              **Defendants.**

---

## DEFENDANTS' TRIAL BRIEF

# **TABLE OF CONTENTS**

I.    THE CLAIMS AT ISSUE ................................................................................ 1

   A.    BBPOS's Claim for Misappropriation of Trade Secrets ................................... 2

     1.    BBPOS's Trade Secrets Claim is Time-Barred............................................ 2

     2.    BBPOS Cannot Establish that It Possessed Trade Secrets. .......................... 4

     3.    BBPOS Cannot Show that It Took Reasonable Steps to Safeguard the Information. 14

     4.    BBPOS Cannot Show Misappropriation. ................................................... 15

     5.    BBPOS Cannot Show that the Accused Products Utilize the Trade Secrets............. 16

     6.    BBPOS Cannot Establish that Defendants' Profits Are the Proper Measure of Damages.................................................................................................. 17

     7.    At Most, BBPOS is Entitled to $2 Per Unit, the Amount that More Than Fully Compensated BBPOS for the Use of the Trade Secrets Under the ROAM-BBPOS Agreement................................................................................................ 19

   B.    BBPOS's Claim for Unjust Enrichment...................................................... 20

   C.    BBPOS's Breach of Contract Claim .......................................................... 23

   D.    Laches as to All BBPOS Claims ............................................................... 24

   E.    Ingenico Inc.'s Breach of Contract Claim.................................................. 25

II.   OBJECTIONS TO BBPOS'S PROPOSED JURY INSTRUCTIONS............................... 27

III.  DEFENDANTS' OBJECTIONS TO BBPOS'S PROPOSED JURY VERDICT FORM 27

IV.   DEFENDANTS' OBJECTIONS TO THE INTRODUCTION OF CERTAIN DOCUMENTS AND/OR TESTIMONY AT TRIAL ................................................... 28

V.    AT THE APPROPRIATE TIME, DEFENDANTS INTEND TO MOVE FOR REIMURSEMENT OF THEIR REASONABLE ATTORNEYS' FEES PURSUANT TO THE GTSA. ..................................................................................................... 30

Pursuant to this Court's Second Amended Procedural Order Re: Pretrial/Trial (Doc. 229), and in accordance with LR 16.5(f), Defendants Ingenico Inc., Ingenico Corp. and Ingenico Group, SA (collectively, "Defendants") submit this trial brief relating to the upcoming trial scheduled to commence on April 24, 2023.

## I.   THE CLAIMS AT ISSUE

Plaintiff BBPOS Limited ("BBPOS") will present three claims at trial:  (1) whether Defendants misappropriated five alleged trade secrets and utilized those alleged trade secrets in certain mobile point-of-sale ("mPOS") products in violation of the Georgia Trade Secrets Act; (2) whether Defendant Ingenico Inc. breached a 2010 contract with BBPOS (the "Agreement"); and (3) whether Defendants were unjustly enriched as a result of having procured "trade secrets and business plans" of BBPOS.

Defendant Ingenico Inc. will present one claim at trial:  whether BBPOS breached the Agreement by failing to indemnify and hold Ingenico Inc. harmless with respect to four claims asserted by third parties against Ingenico Inc. alleging intellectual property infringement in association with BBPOS products re-sold by Ingenico Inc.

 Which of the foregoing claims will be tried to a jury is an open question.  As set forth in Defendants' pending Renewed Motion to Strike Jury Demand (Doc. 280), Defendants' position is that in light of the Court's decision on the cross-motions for summary judgment, none of the BBPOS claims entitles BBPOS to a jury trial.  In the alternative, it is Defendants' position that even if issues of liability are tried to a jury, the jury's only role with respect to damages is determining what, if any, damages were suffered by Ingenico Inc. as a result of BBPOS's breach of the Agreement.  Because the sole remedy sought by BBPOS with respect to each of its remaining claims is premised on unjust enrichment, an equitable remedy, the amount of BBPOS's damages is a matter for the Court, and not a jury.  However, as set forth in greater

detail in the pending Renewed Motion to Strike, because the remedy sought with respect to all of BBPOS's claims is equitable, the appropriate result is to try both liability and damages to the Court and not to a jury.

**A.      BBPOS's Claim for Misappropriation of Trade Secrets**

The Georgia Trade Secrets Act O.C.G.A. § 10-1-76 *et seq.* ("GTSA"), permits the recovery of damages, including unjust enrichment, that are caused by a misappropriation of trade secrets.  To prevail on its claim, BBPOS must establish (1) that it possessed trade secrets, (2) that Defendants misappropriated the trade secrets, and (3) that the misappropriation caused Defendants to be unjustly enriched.  Even if BBPOS could prove that the information at  issue is a trade secret and that Ingenico included these "trade secrets" in its products, because BBPOS specifically transferred the information that it now alleges to be trade secret to Defendants voluntarily and pursuant to the License Agreement, BBPOS's claim fails as to each of these three requirements.

**1.      BBPOS's Trade Secrets Claim is Time-Barred**

BBPOS's trade secrets claim is time-barred.  BBPOS has stipulated that the first time it asserted its trade secret claim was on December 20, 2018.  In light of the GTSA's five-year statute of limitations, the claim is only timely if the statute did not begin to run until on or after December 20, 2013.  Given BBPOS's judicial admission, in Paragraph 53 of its First Amended Complaint, that the misappropriation took place in "summer 2012," BBPOS's claim can only be timely if it is saved by the discovery rule.  That rule is codified in the GTSA as follows:  "[a]n action for misappropriation must be brought within five years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  O.C.G.A. § 10–1–767.  Accordingly, BBPOS must establish that it did not know about the misappropriation,

and that the exercise of reasonable diligence would not have revealed the misappropriation, before December 20, 2013.

BBPOS cannot meet this burden.  BBPOS was placed on notice of what it now contends to be misappropriation at least as early as October 11, 2012, when Will Graylin, the recently-terminated CEO of ROAM Data, told BBPOS's founder, Ben Lo, that Ingenico had been passing BBPOS information to its subsidiary, Fujian Landi Commercial Equipment Co., Ltd. ("Landi"). That supposed transfer of information is, of course, precisely the alleged misappropriation asserted here.  Within two months, in December of 2012, Lo saw a prototype of a competing card reader shown by Ingenico at the Cartes trade show in Paris.  In early January of 2013, Graylin gave Lo a copy of the shareholder derivative complaint he had filed against Ingenico, which spelled out in detail the alleged transfer of intellectual property to Ingenico that forms the basis for this case (BBPOS even quotes the Graylin complaint at length in its complaint in this case).  Within days, Lo received a product announcement for Ingenico's new card reader, the RP350x, which BBPOS now says contains the asserted trade secrets.  In April of 2013, the RP350x officially launched.  All of this information was known or by the exercise of reasonable diligence should have been discovered many months before December 20, 2013.

Moreover, according to BBPOS, despite the fact that ROAM Data was its biggest customer and had just entered the market as a product manufacturer in direct competition with BBPOS, it simply did nothing to investigate the matter until shortly before filing this lawsuit. Critically, there was absolutely no new or additional information available to BBPOS in 2014, 2015, 2016, 2017, or 2018 that enabled it to ascertain that it did or did not have a claim for trade secret misappropriation.  At any point, it could have hired an outside consultant like Ivan Zatkovich (or used its own internal engineers) to investigate the Ingenico products and "see" its

trade secret technology in them, but it chose not to.  That is not "reasonable diligence," it is willful ignorance.  Because BBPOS had all of the information available to it prior to December 20, 2013, that it had when it filed suit, BBPOS cannot establish that there were any matters that could not have been found through the exercise of reasonable diligence.

So why did BBPOS wait to bring suit at the end of 2018 when it had chosen not to do so in the previous six years?  Only one critical thing had changed:  BBPOS's audio jack technology was virtually obsolete and Ingenico's purchases had shrunk to a fraction of what they had been in 2012.[1]  BBPOS continued for years to enjoy profits from its relationship with Ingenico while allowing Ingenico to work to sell products, the profits for which BBPOS now contends are rightly BBPOS's.

### 2.    BBPOS Cannot Establish that It Possessed Trade Secrets.

The GTSA defines a "trade secret" as:

> information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
>
> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper

---

[1]    In addition, in the intervening years ROAM Data, and Ingenico after the companies merged, enjoyed significant commercial success with the RP350x device, and other devices in the RP line of products.  BBPOS's delay in bringing suit induced ROAM Data and Ingenico to diversify and promote its products because they had no idea that BBPOS would later contend that the products were the product of trade secret misappropriation.  In effect, BBPOS sat on its rights while Ingenico earned business profits that BBPOS would later claim to be unjust enrichment.  BBPOS's unreasonable delay prejudiced Ingenico significantly and is the basis for a finding by the Court that BBPOS's claims are barred by laches as discussed *infra*.  Similarly, its claims are barred by unclean hands as a result of its contractual breaches and tortious and otherwise unfair competitive conduct, including attempts to poach customers from ROAM Data and Ingenico.

means by, other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

O.C.G.A. § 10–1–761(4).  The "trade secrets" asserted here fail to meet this standard in multiple respects.

BBPOS asserts five trade secrets.  As defined by BBPOS's retained technical expert, Ivan Zatkovich, those are (1) Audio Jack Polarity Detection; (2) Power Management; (3) Pre-Analyzed Communication Settings; (4) Proprietary mPOS Communication Formats; and (5) Data Security/Encryption Methodology.  BBPOS can present no objective evidence that it had considered any of these matters to be trade secrets at any time before filing suit.  Indeed, BBPOS did not even claim the "power management" to be a trade secret in discovery.  While Mr. Zatkovich has cloaked these "secrets" in technical jargon and asserts that they are critical to the function of the accused products, none of them qualifies as trade secret under the GTSA.

To qualify as a trade secret, each of these matters must (1) not be commonly known or available to the public, (2) derive economic value from being generally not known to others, and (3) be the subject of reasonable efforts to maintain their secrecy.  *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1224-25 (N.D. Ga. 2014), aff'd, 703 F. App'x 803 (11th Cir. 2017).  The evidence at trial will show, by overwhelming evidence, that each of the asserted trade secrets fail to meet at least one, and in some cases all three, of these requirements.

Matters that are generally known in the field or readily ascertainable by proper means by those skilled in the art cannot meet this standard.  *Id.*  Each of the alleged trade secrets here were either well known prior to the alleged misappropriation or readily ascertainable.

a.    "Polarity Detection"

The "**polarity detection**" technology claimed by BBPOS is a straightforward and well-known solution to a well-known problem. Audio jacks, like those on headphones before Bluetooth became ubiquitous, have a number of rings that correspond to "left" and "right" audio channels, the microphone, and a "ground." The problem in the early days of cell phones was that different cell phone models used two different standards for audio ports, and the rings that had been designed for one configuration would not work properly in a phone with the other configuration. Zatkovich illustrates the problem as follows:



*Mobile Phone Audio Jack*

This problem was commonly known, even among consumers: the Apple headphones that came with an iPhone might not work in a Sony Walkman or a Nokia phone, and vice versa, and so for years headphones would advertise their compatibility (*e.g.*, "works with Samsung Galaxy A7" or "iPhone compatible").

This problem impacted virtually any technology that utilized an audio jack to interface with a cell phone audio port, and as a result there were numerous solutions to the problem that were well known in the industry. The evidence at trial will establish that detecting and

6

correcting for this problem had been solved by others in various ways (including the way the BBPOS asserts to be its trade secret) long before the alleged misappropriation.

Moreover, the "polarity detection" solution implemented by BBPOS was not a secret because it was embodied in the products that it sold on the open market, and the "polarity detection and correction" circuitry is available to anyone who cares to examine the products. The evidence will show that the "secret" was, in fact, readily ascertainable through a process that is so simple it can hardly be described as reverse engineering.

b.      "Power Management"

The "**power management**"technology claimed by BBPOS is likewise a well-known solution to a well-known problem.  Because the early mPOS devices, like other small electronics, ran on a battery, the need to manage the power consumption of the device is obvious – when the power runs out, the device is useless, either until it is recharged (if the battery is rechargeable) or forever (if it uses a coin-type battery).  Essentially, BBPOS's "power management" "trade secret" consists in automatically powering on and off the device.  The BBPOS device does this through a combination of hardware and software; however, there is no allegation that BBPOS ever shared the software with Defendants, and therefore the only "trade secret" that could have been misappropriated is the hardware circuit design.

The evidence will establish that the "power management" circuit design for the BBPOS device and the accused devices are entirely different[2]:

---

[2]      Despite the fact that the circuit designs contain clear differences, Zatkovich insists that they are "the same design."



The BBPOS "power management secret" boils down to the device being automatically turned on or off to conserve power – not the way in which that is implemented, because Ingenico didn't have the software and didn't copy the hardware - but the mere idea of turning it on or off automatically. Thus, BBPOS's expert will not opine that the accused devices implemented the BBPOS solution to power management, but rather that they "exhibit[] the same behavior as the BBPOS" meaning both devices turn on and off automatically. That behavior, however, is not and cannot be a trade secret, even if the particular BBPOS solution could be, because the behavior is publicly displayed when the device is used, and further because, as will be shown at trial, the use of automatically powering on and off devices that lack a dedicated power button has been around publicly since at least the 1990s.

c.      "Pre-Analyzed Communication Settings"

BBPOS's asserted "**Pre-Analyzed Communication Settings**" "trade secret" is completely devoid of substance.  The BBPOS device and the accused devices transmit data over the audio jack of the device, via the audio port interface on a cell phone or tablet.  Because there were (and are) many, many different cell phone models in the world, mPOS manufacturers face the obvious challenge of ensuring that their products are compatible with as many different cell phone models as possible.  However, particularly in phones that have cheaper components, the quality of the data connection using this technique can be poor and without any adjustment, the device might not function properly with a given phone model.  Therefore BBPOS, like others before them who were transmitting data over an audio jack, sought to optimize the signal by changing it (essentially making it louder or softer, for example) in a way that would work well with a particular phone model.  To determine what settings would work with a particular phone, BBPOS would attach the phone to a testing device that would test different settings for different parameters until a satisfactory data signal was established.

For BBPOS, as for others, this was a brute force, trial-and-error process.  The end result was a data table that provided particular settings that should be used when a given phone was connected to a given mPOS device.  This information was encoded into software that would run on the cell phone so that when, for example, a BBPOS G4X was plugged in, the settings would be adjusted appropriately so that the reader could communicate with the phone.

Critically, there is no evidence that BBPOS ever shared with ROAM Data or Ingenico (1) the list of parameters that BBPOS examined; (2) the method of examination; (3) the algorithm or software used to determine optimal settings; or (4) the actual settings for any phone.

Landi, the manufacturer of Ingenico products at issue, like all mPOS manufacturers has a dedicated room full of various cell phones to test its various products and achieve the optimal

settings.  It did not use BBPOS data for the BBPOS device and that information, even if it was ever received by Landi (which it was not), would have been of zero value.  Landi needs to and does test its own products with its own devices to achieve optimal settings.

So what is this trade secret?  According to Zatkovich, Ingenico utilized "similar parameter settings" (*i.e.*, both of them set the frequency of outgoing and incoming communications, etc.) to optimize the data transfer, and this "would have required the use of adaptive threshold methods (i.e. Auto Gain Control) that BBPOS had developed and shared with Ingenico."  Zatkovich Report at 75.  Zatkovich has no evidence of any method actually used by Defendants, let alone one that is similar to this supposed BBPOS method.  But no "adaptive threshold method" was ever shared with Ingenico.  Worse, BBPOS has never even disclosed an "adaptive threshold method" in this case – and Zatkovich does not identify one.  In his rebuttal report, Zatkovich asserted that the "specific algorithm for the adaptive threshold method as I describe in my report, is an internal algorithm used by the processor to determine the signal threshold that identifies when the next 'bit' of data can be detected."  Zatkovich Rebuttal Report at 37.  He clarified that the "operation and results of this method occurs purely within the code."  *Id.*  But the code was never disclosed, and neither BBPOS nor Zatkovich have provided any evidence otherwise.[3]  Zatkovich's bare assertion that there is a method, it was disclosed, and that it must have been utilized, is utterly unfounded.

---

[3]     Zatkovich asserts that "BBPOS shared code from their SDK with Roam that Ingenico could have utilized regarding communication settings," but that assertion is not supported with a citation, nor does he even attempt to tie the disclosed code to the alleged trade secret.  Zatkovich Rebuttal Report at 38.  In his initial report, Zatkovich only cited to two emails for disclosure of this "secret" to Ingenico, one in which Ben Lo of BBPOS states that "every phone behaves differently" and optimizing data transfer over the audio jack is a "research project," and one forwarding the same material nonspecific statements.  Zatkovich Report at 57.  BBPOS did not identify any computer code concerning an adaptive threshold method in its trade secret discovery responses.

> d.    "Proprietary mPOS Communication Formats"

Like the alleged three trade secrets discussed earlier, the "**Proprietary mPOS Communication Formats**" is simply not a trade secret  This "format" is simply the order in which the credit card information is presented.  For example, the first four digits could be an expiration date or a security code.  It's simply a matter of the ordering of numbers.  Such formats are, by their very nature, not confidential because they must be shared with third parties in order to carry out the function for which they are designed.

In order to process a credit card transaction using a point of sale device (mobile or otherwise), certain data needs to be collected.  For magnetic stripe transactions, that information typically includes the credit card number, the cardholder's name, an expiration date, and a "CVV" code (the three digit number on the back of the card).  When the card is swiped through a reader, that information is retrieved from the card.  The card information is then relayed to the credit card processor (PayPal, or a bank, for instance) to process the transaction.  BBPOS's "trade secret" is the order in which the information from the card is arranged (card number first, followed by the name, etc., with some "padded" digits added between the blocks of card data, for example) before relaying the information to a credit card processor.

For the transaction to be secure, the sensitive information can never be transmitted "in the clear," but instead needs to be encrypted.  The information is typically encrypted using an industry standard encryption methodology called "TDES (or Triple DES) DUKPT."  That method is used throughout the payments industry with the notable (for this case's purpose) exception of BBPOS, which implemented a non-standard variant of this encryption.  Using an industry standard encryption methodology is important because the receiving party (again, a bank or PayPal) needs to be able to ***decrypt*** the information to process the transaction, and to do that they need to use the same methodology that had been used to ***encrypt*** it.

11

That same principle (the need for both ends of the transaction to know the method used) explains why it is preposterous to assert a data format as a trade secret.  Not only does the receiving party need to know what method was used to encrypt the data, it needs to know the format the data was in before it was encrypted, so that after decryption, it knows which of the decoded digits are from the card number, which are from the CVV, etc.  If BBPOS were to keep its data format confidential, ***it would defeat the purpose of having a data format at all***.  Data formats, whether developed by BBPOS or Ingenico or any other POS device provider, must be, and are, shared with the credit card processors and are therefore not kept confidential.

Moreover, BBPOS will be unable to establish that there is any economic value in its particular data formats to other industry participants.  Such data formats are a matter of convenience, and there is no advantage to one format over another.  Simply, BBPOS does not enjoy any advantage over other market participants based upon its having specified a variety of data formats.

        e.      "Data Security/Encryption Methodology"

Finally, BBPOS cannot establish that its asserted "**Data Security/Encryption Methodology**" is a trade secret.  The title given by Zatkovich to this "trade secret" creates the false impression that BBPOS created a new, proprietary method of encrypting data.  That is not true.  Rather, what BBPOS did that was different from anyone else in the payments industry was to apply an industry standard encryption method incorrectly.

As mentioned above, the standard encryption method for credit card transactions is Triple DES DUKPT, a highly secure method of encrypting data that applies the Data Encryption Standard (DES) cipher algorithm three times to each data block ("Triple DES") utilizing a key management scheme called DUKPT, which stands for Derived Unique Key Per Transaction

(meaning each transaction is encrypted using a different key).  Ingenico uses Triple DES

DUKPT, as does BBPOS, as do all of their competitors and their customers.

There are two distinct implementations of this encryption method applicable to the

payments industry.  One implementation is "CBC" and is intended to encrypt card data, and the

the other is "ECB," which is intended for encryption of the Personal Identification Number, or

PIN, associated with the card.[4]  Straightforwardly, the PIN method is used to encode/decode

PINs, and the card data method is used to encode/decode card data.   For a time, however,

BBPOS flipped the two around, encoding PINs with the card data method and vice versa.  This

was simply a mistake, and was not beneficial in any respect.  However, because the encryption

method was burned into BBPOS's mPOS devices that it was selling to ROAM Data, ROAM

Data had to support this non-compliant encryption method.

BBPOS's faulty encryption approach caused several problems for ROAM Data (and

likely others).  First, the customers who purchased BBPOS units from ROAM Data were unable

to decrypt the card data because it had not been encrypted with the proper technique.  ROAM

Data had to accommodate PayPal (ROAM Data's largest customer), for example, by having

PayPal re-route the encrypted information to ROAM Data, where it was decrypted using the

incorrect DUKPT technique, re-encrypted with the right one, and then returned to PayPal so it

could complete the transaction.  In another instance, the faulty encryption method was cited as a

security failing that prevented BBPOS-created devices from obtaining a "Visa Ready" security

certification.  The unit could not be certified "Visa Ready" until BBPOS (at ROAM Data's

insistence) utilized standard encryption methods.

---

[4]     More technically, the CBC variant is for encryption of data with a size greater than a
single block as defined in the DUKPT specification, and the ECB variant is for encryption of
data with a size equal to or less than one block.

Ingenico was forced to support the BBPOS nonstandard encryption because it bought BBPOS's products, but it was a burden, not a benefit. BBPOS's encryption "trade secret" has no value whatsoever, at least no positive value. It is simply a mistake that BBPOS later corrected.

### 3. BBPOS Cannot Show that It Took Reasonable Steps to Safeguard the Information.

This is not a case where the Defendants stand accused of having purloined trade secrets surreptitiously. All of the information at issue was given, freely, by BBPOS to ROAM Data and Ingenico. None of it was designated as trade secret. BBPOS did nothing to alert any recipient of any particular concerns regarding keeping the information confidential. None of the schematics or computer code bore any indicia of confidentiality or secrecy. No one from BBPOS raised any concerns about limiting the dissemination of the information. BBPOS claims that it has nondisclosure agreements with its employees to safeguard its trade secrets, but because the information is not marked as confidential, its employees would have no basis to determine what information was confidential and what was not. BBPOS did not even ask for a nondisclosure agreement with Ingenico before it shared the information directly with its competitor. BBPOS welcomed Ingenico's engineers from France at its Hong Kong facility, where it willingly disclosed what it claims to be trade secrets.

BBPOS cannot show that its direct sharing of information with Ingenico was done under the misimpression that Ingenico and ROAM Data were the same, or that Ingenico was subject to the confidentiality restrictions in the ROAM-BBPOS agreement. In its interrogatory responses, BBPOS specifically asserted that "Ingenico had no rights under any license agreements between Plaintiff and ROAM, so the scope of such rights is irrelevant as to Ingenico." Plaintiff BBPOS Limited's Third Amended Objections and Answers to Defendants' First Set of Interrogatories to

Plaintiffs AnywhereCommerce, Inc. and BBPOS Limited at 4. If Ingenico had no rights vis-à-vis BBPOS under the agreement, it had no obligations, either.

### 4.    BBPOS Cannot Show Misappropriation.

ROAM Data and Ingenico, through their affiliate, Landi, independently developed every aspect of the accused devices, even those specific aspects that touch on the subject matter of the alleged trade secrets. There will be no evidence at trial, because there is none, that any of the allegedly trade secret information was shared with Landi. There would be no reason to communicate this information to Landi because Landi is an "original design manufacturer," or ODM. As is customary with ODMs, ROAM Data and Ingenico specified the characteristics of the final product (physical form factor, performance criteria, etc.), and Landi delivered a product that met those specifications. Neither ROAM Data nor Ingenico would, or did, tell Landi how to implement, for example, power management on the device because it was Landi's responsibility to design and build that function in the product. This independent development will be evidenced by testimony and the underlying development agreements. Independent development is definitionally not misappropriation.

BBPOS does not have a credible theory of misappropriation. The evidence at trial will establish that BBPOS gave the information to ROAM Data and Ingenico, directly, and that this was a knowing act done deliberately and pursuant to the License Agreement between BBPOS and ROAM Data. Although neither ROAM Data nor Ingenico actually utilized any of the alleged trade secrets in the development of accused products, doing so would have been completely lawful because the information was conveyed, including by express license, without any restriction against using the information for product development.

To create the misimpression that there was something nefarious about Ingenico's use of the information provided by BBPOS, BBPOS asserted in discovery that it had been tricked into

giving the information "as part of an expressed and purported, but feigned, interest to acquire BBPOS" and that Ingenico somehow unfairly obtained the information when it merged with ROAM Data, years later. Both of these theories will fail at trial.

The evidence at trial will include the testimony from BBPOS's Ben Lo that the "secret" information was sent to ROAM Data and Ingenico both prior to any due diligence on a potential acquisition of BBPOS, and after BBPOS had terminated the negotiations on that deal. In fact, the evidence will show that the information was shared by BBPOS specifically for product development purposes: BBPOS was working with ROAM and Ingenico to develop a new, more sophisticated card reader. It conveyed information to ROAM Data, and directly to Ingenico engineers, in the hope that it would participate in the next generation card reader to be released by ROAM Data.

The truth of this arrangement (that BBPOS was sharing the information in real time with Ingenico) is also fatal to its second theory: the novel assertion that Ingenico's merger with ROAM Data constituted a misappropriation of trade secrets. Ingenico already had the information – from BBPOS and ROAM Data as part of the product development discussions in 2012, five years before the ROAM Data/Ingenico merger.

### 5. BBPOS Cannot Show that the Accused Products Utilize the Trade Secrets.

The evidence at trial will establish that none of the accused products utilize any of the asserted trade secrets. The accused devices implement power management differently, resolved the "polarity" issue with the audio jacks using a well-known solution, did not employ the undisclosed "automatic gain" method that BBPOS says it has, did not use any of the supposedly proprietary data formats except in connection with BBPOS-manufactured devices, and did not

use the BBPOS nonstandard encryption method except to the extent necessary to support BBPOS-manufactured devices.

BBPOS's assertion that the accused devices utilize the alleged trade secrets is founded entirely upon the testimony of Iven Zatkovich, whose non-scientific conclusions are the subject of a pending *Daubert* challenge.  *See* Doc. 293.

### 6.    BBPOS Cannot Establish that Defendants' Profits Are the Proper Measure of Damages.

BBPOS contends that it is entitled to all of Defendants' profits from all of the accused devices, effectively arguing for complete disgorgement of profits.  This is not the appropriate measure of damages under the GTSA.

BBPOS bears the burden of proving that the entire profits are a reasonable expression of the value of the trade secrets, *i.e.*, the amount by which one or more defendants were unjustly enriched.  *Cochran v. Ogletree*, 244 Ga. App. 537, 540, 536 S.E.2d 194, 197 (2000) ("Where an award of money damages is made for unjust enrichment [or quantum meruit], it must be supported by evidence from which it can be determined to a reasonable certainty that the [plaintiff] in fact realized such [gains].") (quoting *White v. Arthur Enterprises*, 464 S.E.2d 255 (1995)); *see also In re White*, 559 B.R. 787, 807 (Bankr. N.D. Ga. 2016) (burden on plaintiff to establish value of property transferred to defendant to calculate the amount of enrichment that was "unjust").  In the context of a trade secret claim, this requires the presentation of "evidence by which the jury can value the rights the defendant has obtained."  *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 853 (11th Cir. 2017) (applying Florida Uniform Trade Secrets Act) (citation and quotation omitted).

If BBPOS seeks to obtain the entire profit from the accused devices, BBPOS bears the burden of presenting evidence that the alleged trade secrets form the basis of customer demand.

*In re Avaya Inc.*, 602 B.R. 445, 459 (S.D.N.Y. 2019) (*citing  Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009)); *see also MSC Software Corp. v. Altair Eng'g, Inc.*, No. CV 07-12807, 2015 WL 13273227, at *3 (E.D. Mich. Nov. 9, 2015), supplemented, No. CV 07-12807, 2015 WL 13359781 (E.D. Mich. Nov. 22, 2015) (trade secret damages determined by reference to analogous provisions of patent damages) (quoting *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535 (5th Cir. 1974)).

Georgia law specifically distinguishes between the remedy of unjust enrichment, which is the remedy specified by the Georgia Trade Secrets Act, and the disgorgement of profits, which might be available under a different cause of action, for example trademark infringement. *Compare* Ga. Code Ann., § 10-1-451 (for trademark violations, permitting award of "all profits derived from" unlawful conduct) *with* Ga. Code Ann., § 10-1-763 (Trade Secrets Act providing for damages in the form of unjust enrichment).  Unlike disgorgement, which would divest a defendant of all profits associated with the wrongful activity, "'[e]quity requires only that a defendant give up its unjust enrichment.'"  *Est. of Pidcock By & Through Pidcock v. Sunnyland Am., Inc.*, 726 F. Supp. 1322, 1336 n. 12 (S.D. Ga. 1989) (quoting *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1241 (7th Cir.1988)).  In the *Estate of Pidcock* case, the court analyzed whether unjust enrichment would entitle a plaintiff to the profits, not only on the half of the property at issue, but on the half owned by the defendant.  The court found that while "disgorgement of any profit associated with the fraud might be appropriate under certain circumstances[,] that is not the prevailing view[…]."  *Id.* (citation omitted).

Here, BBPOS seeks profits not only from the alleged trade secrets, but from the sale of products that perform functions well beyond the scope of those trade secrets.  Defendants will present evidence that (1) the accused devices are complex electronic products that, even if they

contain the trade secrets, include other features and components such that any alleged trade secret features would be of *de minimis* value; and (2) the profit margin associated with the accused products reflects the efforts (in terms of research, design, manufacture, marketing, and sale) of Defendants, and not the alleged trade secrets.  The portion of the profits that are attributable to Defendants' efforts, as opposed to the alleged trade secrets themselves, is not an amount by which Defendants have been unjustly enriched.  *Pidcock v. Sunnyland Am., Inc.*, 854 F.2d 443, 447 (11th Cir. 1988) ("A significant limitation on the disgorgement doctrine is that ***a plaintiff may not recover any portion of the profits attributable to the defendant's 'special or unique efforts*** ... other than those for which he is duly compensated.") (cleaned up) (emphasis added).

> ### 7.   At Most, BBPOS is Entitled to $2 Per Unit, the Amount that More Than Fully Compensated BBPOS for the Use of the Trade Secrets Under the ROAM-BBPOS Agreement.

BBPOS presents no alternative to its all-the-profits approach to damages.  However, assuming liability in this case, in determining an "unjust enrichment" remedy, the actual value of the trade secrets to the misappropriator should be taken into account.  BBPOS entered into the License Agreement with ROAM Data, which remains in effect to this day, under which BBPOS was entitled to a $2 margin on each product that BBPOS sold to ROAM Data (and later Ingenico) for further resale[5].  Because all of the trade secrets were utilized in the products that BBPOS was selling under the Agreement, BBPOS was paid $2 for the use of all of the trade secrets, and its manufacturing, and its product design, and its support efforts, and whatever else BBPOS was providing in connection with those sales.  $2 per unit therefore overstates the value of the trade secrets themselves to an mPOS device and should serve as a ceiling for any

---

[5] BBPOS received $3 for each of the first 150,000 units and $2 thereafter.

assessment of unjust enrichment.  In fact, because of the trivial nature of the alleged trade

secrets, the real value of their contribution to the accused devices, even if they were used, is zero.

In contrast to the $2 per unit that BBPOS was receiving from ROAM for units that

contained the exact "trade secrets" that BBPOS now claims were misappropriated, BBPOS'

damage expert has valued these trade secrets at approximately $20 per unit, nearly 10 times what

BBPOS was receiving under the Agreement.[6]

BBPOS is not entitled to any damages beyond the amount of unjust enrichment for

misappropriation of trade secrets. As set forth in Defendants' pending motion *in limine* to

exclude non-disgorgement damages (Doc. 283), BBPOS has not presented any documents or

calculation of any damages that are not based upon Defendants' profits.  Having failed to

disclose any other damages in discovery, BBPOS is precluded from advancing a new damages

theory at trial.  *See* Doc. 284 at 7-8 (citing cases).  Because all of BBPOS's damages are

premised on the same pool of Defendants' profits, awarding separate damages for BBPOS's

unjust enrichment claim or its contract claim would be duplicative of damages awarded for

misappropriation of trade secrets.

### B.    BBPOS's Claim for Unjust Enrichment

BBPOS has asserted a claim for unjust enrichment against all three Defendants.  *See* First

Amended Complaint (Doc. 67) at 38.  The First Amended Complaint alleges that Defendants

were unjustly enriched as a result of obtaining the asserted trade secrets by operation of the

merger of Ingenico Inc. with ROAM Data, Inc.  *Id.* at 39.  Because liability under this claim is

predicated on the misappropriation of trade secrets, both liability and damages for this claim

---

[6] BBPOS has valued the 5 trade secrets at approximately $24M despite the fact that BBPOS and Ingenico had entered into a non-binding term sheet where BBPOS would sell its entire business (including the 5 trade secrets) for $1.6 M.

would be entirely duplicative of BBPOS's recovery under its GTSA claim.  The unjust enrichment claim should therefore not be presented to the jury as a separate cause of action, with separate damages.  *See generally* Motion in Limine to Exclude Any and All Testimony of, and/or Reference to, BBPOS Limited's Duplicative Claim for Unjust Enrichment (Doc. 291).

 Separately, the BBPOS unjust enrichment claim is time-barred to the extent it is premised on wrongdoing prior to the merger of ROAM Data and Ingenico Inc. in 2017.  Under the Massachusetts choice of law rules, this Court should apply the four-year Georgia statute of limitations to BBPOS's claim.[7]  *See* Ga. Code Ann. § 9-3-26.  "Massachusetts has rejected the "automatic application of the forum State's statute of limitations" and instead applies a 'functional approach' to choice of law questions concerning statutes of limitation as stated in the Restatement (Second) of Conflict of Laws § 142."  *In re Fresenius Granuflo/NaturaLyte Dialysate Prod. Liab. Litig.*, 76 F. Supp. 3d 294, 305 (D. Mass. 2015), quoting *Nierman v. Hyatt Corp.*, 441 Mass. 693, 808 N.E.2d 290, 292 & n. 7 (2004).  "Under this functional approach, a Massachusetts court 'generally will apply its own statute of limitations to permit a claim unless: (a) maintenance of the claim would serve no substantial interest of the forum; and (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.'"  *Id.*, quoting *Nierman*, 808 N.E.2d at 292 (quoting Restatement (Second) of Conflict of Laws § 142).[8]

---

[7] This Court previously stated it considers the unjust enrichment claim to have been brought under Massachusetts law because the parties cited Massachusetts law in their summary-judgment papers, but has not conducted a choice of law analysis.  Memorandum and Order at 20 n.16 (ECF No. 228).

[8] The same result should obtain if the Court finds that the unjust enrichment claim is brought under Massachusetts law.  Although the Court's March 29, 2023 Decision applied the 6 year contract statute of limitations to this claim (Doc. 228 at 24), that appears to have been in error.  Massachusetts unjust enrichment claims are subject either to the 6-year contract statute or

Georgia clearly has a more significant relationship to the parties and the occurrence. Ingenico Inc. is a Georgia corporation and headquartered in Georgia, Ingenico Corp. is a Delaware corporation but with a principal place of business in Georgia, and Ingenico Group SA is organized and headquartered in France.  First Am. Compl. ¶¶ 7-9.  BBPOS is a Hong Kong entity.  *Id.* at ¶ 6.  BBPOS initially brought this lawsuit in the United States District Court for the Northern District of Georgia.  After the case was transferred to this Court, BBPOS amended its Complaint to add the allegation that Defendants accepted, retained, and enjoyed the benefit of the alleged trade secrets in connection with Defendants' operations in Georgia.  *Id.* at ¶ 177. This allegation made clear that BBPOS is asserting its unjust enrichment claim under Georgia law.  Because this claim has nothing to do with Massachusetts, maintaining it would serve no substantial Massachusetts interest.

Further, if the unjust enrichment claim is governed by Georgia law, the claim is preempted by the Georgia Trade Secrets Act.  *See* Ga. Code Ann. § 10-1-767(a) (the Georgia Trade Secrets Act "supersedes all conflicting laws providing restitution or civil remedies for the misappropriation of trade secrets"); *Diamond Power International, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1346 (N.D. Ga. 2007) (granting summary judgment on an unjust-enrichment claim because the claimant "ma[de] no attempt to distinguish the factual basis for its unjust enrichment claim from the factual basis for its trade secrets claims"); *Robbins v. Supermarket*

---

the 3-year tort statute depending upon the nature of the claim.  *Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.*, 448 F. Supp. 2d 244, 262 (D. Mass. 2006), aff'd, 510 F.3d 77 (1st Cir. 2007).  Just as in that case, BBPOS's unjust enrichment claim is "not based on a contractual relationship between the parties, such as a failure to pay royalties under an agreement, but instead seek a division of profits from" Defendants' alleged exploitation of BBPOS intellectual property.  *Id.* (applying 3-year statute of limitations for unjust enrichment based upon use of copyrighted work).  Accordingly, the claim is subject to a three year limitations period.

*Equip. Sales, LLC*, 722 S.E.2d 55, 58 (Ga. 2012) (holding that a claim for equitable relief was preempted by the GTSA).

### C.      BBPOS's Breach of Contract Claim

BBPOS claims that Ingenico Inc. breached the ROAM-BBPOS agreement by failing to abide by its confidentiality provisions.  The evidence at trial will establish that neither ROAM Data, the party to the contract prior to its merger with and into Ingenico Inc., nor Ingenico Inc. violated the contract.  Any information shared by either of those parties was consistent with and/or in furtherance of the contractual arrangement with BBPOS.

In defense, Ingenico Inc. will establish that the BBPOS Contract claim is barred by the Massachusetts six-year statute of limitations because BBPOS knew or should have known of the purported transfer of information in violation of the contract prior to December 20, 2012.

Further, as set forth in Defendants' Motion *in Limine* to Exclude Any and All Evidence of BBPOS Limited's Alleged Damages and/or Remedies Other than Disgorgement (Doc. 283), BBPOS may not recover any damages other than damages that would be entirely duplicative of its trade secret damages.  As explained in that motion, its remedy for a breach of contract cannot include both legal damages and equitable remedies; *i.e.*, BBPOS must choose one or the other, and because it has failed to articulate or provide any calculation of its supposed legal damages, the only remedy that it can present at trial is the equitable relief of unjust enrichment.  Based on this Court's ruling on summary judgment, such relief is not available to BBPOS for a breach of contract claim.  Because there will be a complete failure of proof on damages at trial, the Court should enter judgment in Ingenico Inc.'s favor on that claim.

Finally, BBPOS's material breach of the License Agreement, by (1) selling products in violation of the exclusivity provisions of the agreement, and (2) failing to indemnify and hold Ingenico Inc. harmless for matters covered by its covenant to do so, operated to excuse further

performance by Ingenico under the contract.  Therefore to the extent BBPOS's breach of

contract claims are predicated on breaches by Ingenico that post-dated BBPOS's breaches, they

are not cognizable at law.

### D.    Laches as to All BBPOS Claims

BBPOS's claims all seek equitable relief that is barred by laches.  Courts in

Massachusetts will not extend equitable relief to one who, like BBPOS here, sits on its rights

over an unreasonable period of time.  Laches is "delay that works disadvantage to another."

*Norton v. Chioda*, 317 Mass. 446, 452, 58 N.E.2d 828, 831 (1945).

> There is no hard and fast rule as to what constitutes laches.  If there
> has been unreasonable delay in asserting claims or if, knowing his
> rights, a party does not seasonably avail himself of means at hand
> for their enforcement, but suffers his adversary to incur expense or
> enter into obligations or otherwise change his position, or in any
> way by inaction lulls suspicion of his demands to the harm of the
> other, or if there has been actual or passive acquiescence in the
> performance of the act complained of, then equity will ordinarily
> refuse her aid for the establishment of an admitted right, especially
> if an injunction is asked.

*Stewart v. Finkelstone*, 206 Mass. 28, 36 (1910).  Even a delay of five months after a cause of

action accrued has been sufficient to bar a claim due to laches.  *Amtech Sys. Corp. v.

Massachusetts Tpk. Auth.*, No. CIV. A. 98-0386, 1998 WL 92471, at *3 (Mass. Super. Feb. 6,

1998) (finding "that both elements of laches have been shown, unreasonable delay and

prejudice" where party failed to act promptly despite knowing that a contract was to be

awarded).

Here, BBPOS waited for literally years, without taking action, to the grave prejudice of

Defendants.  While BBPOS refuses to concede that it knew about Defendants' supposed

misappropriation in 2012 and its competing products in 2013, even BBPOS concedes that by

2015, it had concluded that Defendants were selling competing products that it thought utilized

the alleged trade secrets.  Yet BBPOS did not bring a claim in 2015, or 2016, or 2017, or even in the first 97% of 2018.  Instead, it sat on its rights because it was still selling product to Defendants, and BBPOS wanted to make money off those sales.  BBPOS waited until its technology was so obsolescent that the only way to make any money off of it was by bringing a lawsuit, and then it did so.  During that time ROAM Data and Ingenico continued to develop and sell products that BBPOS now claims to be tainted by the misappropriation.  BBPOS kept its claim in its hip pocket, watching as Ingenico worked diligently to bring products to market, only to claim that now, all of the benefits from that hard work should go to BBPOS.

Because this delay was both unreasonable and highly prejudicial, all of BBPOS's claims that are predicated on the alleged theft of trade secrets, that is, all of them, should be barred by laches.

### E.     Ingenico Inc.'s Breach of Contract Claim

 Ingenico Inc. claims that BBPOS breached the License Agreement by failing to indemnify Ingenico Inc. with respect to four lawsuits brought by third parties against Ingenico, Inc. alleging that products manufactured by BBPOS and re-sold by Ingenico infringe on certain intellectual property rights of the third-party plaintiffs.  Section 3.10 of the License Agreement provides, in part, a representation and warranty by BBPOS that none of the products at issue "will infringe, misappropriate or violate any intellectual property right of any person."  Similarly, Section 3.09 of the License Agreement provides, in part, a representation and warranty by BBPOS that "it has obtained all corporate, third party, and governmental approvals and intellectual property rights necessary to enter into this Agreement and carry out the transactions contemplated hereby."  Finally, Section 3.18 of the License Agreement provides, in part, an agreement by BBPOS to "indemnify and hold harmless [Ingenico Inc] from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other

professionals) . . . arising out of or resulting from any claim by a third party against [Ingenico Inc.] a result of or relating to any actual or alleged breach hereof."

The four third-party lawsuits brought against Ingenico Inc. alleging that the BBPOS product(s) at issue violate the third-party plaintiff's intellectual property rights are known as (1) REM Holdings 3; (2) REM Holdings 3 (Vantiv/Comerica); (3) Blackbird Tech, LLC and (4) MobilePay LLC.  For each of the four lawsuits at issue, Ingenico Inc. made written demand to BBPOS to indemnify Ingenico, Inc. under the ROAM-BBPOS agreement, and, for each of the four lawsuits at issue, BBPOS refused to provide such indemnification.  As a result, Ingenico Inc. hired Kerry Timbers, Esquire and his firm Sunstein LLP to defend Ingenico in each of the matters.  Mr. Timbers and his firm were ultimately successful in defending each of the claims. Ingenico Inc. paid Sunstein LLP fees and expenses of $182,973.25 (REM Holdings 3), $110,086.67 (REM Holdings 3 Vantiv/Comerica), $37,481.89 (Blackbird Tech LLC) and $67,717.57 (MobilePay LLC) for a total of $398,469.36 for the four matters at issue.

Ingenico Inc. will offer in evidence the demand letters for each of the four matters at issue and the invoices for each of the matters detailing the work that was performed and the amount of attorneys' fees and expenses for each matter.  Kerry Timbers is expected to testify as to the defense of each matter.  He is also expected to testify as to his ability and reputation in the defense of similar lawsuits, the demand for his services by others, the amount and importance of each matter, the prices he and his firm charge for similar matters, the amount of money at issue for matter and the results secured.

Ingenico Inc. seeks damages in the amount of $398,469.36 together with prejudgment interest thereon.  In the event that it is successful on its claim, Ingenico Inc. will also seek its attorneys' fees and costs under Rule 54 of the Federal Rules of Civil Procedure.

26

## II.       OBJECTIONS TO BBPOS'S PROPOSED JURY INSTRUCTIONS

Defendants have previously submitted their objections to BBPOS's proposed jury

instructions.  *See* Doc. 302.

## III.      DEFENDANTS' OBJECTIONS TO BBPOS'S PROPOSED JURY VERDICT FORM

Defendants object to the Proposed Verdict Sheet submitted by BBPOS (Doc. 296).[9]

*First*, the verdict form conflates the Defendants as a single entity.  For example, Question 4 asks

whether "Defendants acquire[d] Plaintiff's Trade Secrets through improper means…."  If

BBPOS is entitled to a remedy against any particular Defendant, it must prove such liability and

the jury must find it.  Defendants' proffered form addresses this issue.

*Second*, BBPOS's form conflates all of the trade secrets.  Because BBPOS's unjust

enrichment theory presupposes that all five asserted trade secrets were infringed with respect to

all accused devices, the jury must be able to express a judgment that BBPOS prevailed with

respect to fewer than all of its trade secret assertions.  Defendants' proffered form addresses this

issue.

*Third*, BBPOS's form conflates all accused products.  The evidence at trial will be

different with respect to different accused products, and the jury should not award damages on an

unjust enrichment basis for products that do not benefit from misappropriated trade secrets.

Defendants' proffered form addresses this issue.

*Fourth*, BBPOS's form materially misstates the law on the statute of limitations.

Question 1 asks whether BBPOS's claim was asserted within five years of Defendants'

misappropriation "and/or theft bein discovered by the exercise of due diligence."  The test is not

---

[9] The proposed verdict sheet was submitted on behalf of "Plaintiffs," but in light of the Court's
April 16, 2023 Text Order (Doc. 307), Defendants consider the submission to be on behalf of
BBPOS only.

keyed to BBPOS's actual discovery, but whether it should have discovered the misappropriation through the exercise of reasonable diligence. Defendants' proffered form addresses this issue.

*Fifth*, BBPOS's form does not properly guide the jury to express unjust enrichment damages for a trade secret misappropriation, instead seeking an open-ended "amount of money damages" to be awarded.

*Sixth*, BBPOS's form improperly asks the jury to determine whether an injunction should issue.

*Seventh*, BBPOS's form improperly suggests a double recovery for both misappropriation of trade secrets and the duplicative claim of unjust enrichment. Defendants' proffered form addresses this issue.

*Eighth*, BBPOS's form fails to instruct the jury that its award of breach of contract and unjust enrichment damages should not be duplicative. Defendants' proffered form addresses this issue

*Ninth*, BBPOS's form improperly characterizes the indemnification claims against BBPOS as concerning "unrelated lawsuits." This instruction is factually inaccurate and prejudicial.

*Tenth*, BBPOS's form improperly recites a cap for Ingenico Inc.'s contract damages without a corresponding cap articulated for BBPOS's claims.

## IV. DEFENDANTS' OBJECTIONS TO THE INTRODUCTION OF CERTAIN DOCUMENTS AND/OR TESTIMONY AT TRIAL

The significant evidentiary issues that are anticipated at trial are the subject of pending motions *in limine*. These include:

- The admissibility of parol evidence regarding the License Agreement (*see* Doc. 286);

- The admissibility of undisclosed damages and damage calculations (*see* Doc. 283);

- The admissibility of opinions of BBPOS's disclosed liability expert, Ivan Zatkovich, including any testimony regarding the significance of reverse engineerability of a purported trade secret that is contrary to law (*see* Docs. 288 and 293); and

- The admissibility of evidence of duplicative damages for BBPOS's various claims (*see* Doc. 291).

In addition, BBPOS has identified certain materials as trial exhibits that are not appropriate material for admission as exhibits at trial, such as transcripts of depositions and unspecified video clips from depositions. Deposition transcripts should not be provided to the jury as a general matter because of the risk of prejudice that would arise from the submission of recorded testimony to the jury during its deliberations. *See, e.g.*, *Holdings, Inc. v. Select Energy Servs.*, LLC, No. 21CV1579, 2023 WL 1472484, at *1 (W.D. Pa. Feb. 2, 2023). Also, submitting such materials would be in violation of this Court's trial management order, which required the specification of page and line designations of any proffered deposition testimony rather than the submission of entire transcripts. Doc. 229; *see also Hackbart v. City of Pittsburgh*, No. 2:07CV157, 2009 WL 10728585, at *2 (W.D. Pa. Sept. 1, 2009). Here, BBPOS elected not to make any page and line designations from any depositions. It should not be allowed to circumvent the Court's trial management requirements by attempting to offer in evidence the deposition transcripts and videos.

**V.    AT THE APPROPRIATE TIME, DEFENDANTS INTEND TO MOVE FOR REIMURSEMENT OF THEIR REASONABLE ATTORNEYS' FEES PURSUANT TO THE GTSA.**

Because BBPOS knew at all relevant time that its asserted trade secrets were not protectable as such, were not misappropriated by any Defendant, and knew or should have known that none of them was contained in any accused product, it lacked a good faith basis for its assertion of a claim under the GTSA.  Accordingly, Defendants intend to seek reasonable attorneys' fees pursuant to GA Code § 10-1-764 ("If a claim of misappropriation is made in bad faith […], the court may award reasonable attorneys' fees to the prevailing party.").  *See* Fed. R. Civ. P. 54; *Northstar Healthcare Consulting, LLC v. Magellan Health, Inc.*, No. 1:17-CV-1071-ODE, 2020 WL 10486256, at *29 (N.D. Ga. Feb. 20, 2020) (applying Rule 54 to attorneys' fee claims under GTSA).

Dated:  April 18, 2023

Respectfully submitted,
INGENICO INC., INGENICO CORP. AND
INGENICO GROUP, SA,

By their attorneys,

/s/ *Jeffrey K. Techentin*
JOHN A. TARANTINO (BBO #492230)
PATRICIA K. ROCHA (BBO #542348)
NICOLE J. BENJAMIN (BBO #666959)
R. BART TOTTEN (BBO #631605)
JEFFREY K. TECHENTIN (*pro hac vice*)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
btotten@apslaw.com
jtechentin@apslaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 18, 2023, a true copy of the within was filed electronically via the Court's CM/ECF System.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and the filing is available for viewing and downloading from the Court's CM/ECF System.

/s/ *Jeffrey K. Techentin*
Jeffrey K. Techentin

4892-6490-5309, v. 1