## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ANYWHERECOMMERCE, INC. and BBPOS LIMITED,**<br>    **Plaintiffs,**<br><br>                            **v.**<br><br>**INGENICO INC., INGENICO CORP., and INGENICO GROUP SA,**<br>    **Defendants.** | **Civil Docket No: 1:19-cv-11457-IT** |

## BBPOS LIMITED'S PROPOSED CONCLUSIONS OF LAW

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 1

    I.      BBPOS Established the Existence of Five Trade Secrets .................................... 1

          a.      Trade Secret No. 1 - Polarity Detection and Correction ........................... 1

          b.      Trade Secret No. 2 - Power Management .................................................... 2

          c.      Trade Secret No. 3 - Automatic Gain Control .......................................... 2

          d.      Trade Secret No. 4 - Communication Formats .......................................... 3

          e.      Trade Secret No. 5 - Modified DUKPT Encryption ................................. 3

          f.      BBPOS Used Reasonable Efforts to Maintain Secrecy of its Trade
                Secrets ....................................................................................................... 4

    II.     Defendants Misappropriated the Trade Secrets ................................................. 4

          a.      Defendants' Duties of Confidentiality ....................................................... 4

          b.      Rotsaert is Not Credible and His Testimony Should be Disregarded ........ 7

          c.      Defendants' Misappropriation .................................................................... 8

          d.      The Trade Secrets Are Contained in the Accused Products .................... 10

    III.    An Unjust Enrichment Award of $23,989,964 is Proper ................................... 11

    IV.    The Court Should Award Exemplary Damages.................................................. 13

    V.     Ingenico's Affirmative Defenses Fail ................................................................ 14

    VI.    Ingenico's Counterclaim Fails .......................................................................... 15

CONCLUSION.................................................................................................................... 15

4875-0696-7653.5

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
    331 F. Supp. 3d 977 (N.D. Cal. 2018), *vacated on other grounds*, 20 F.4th
    1231 (9th Cir. 2021)..................................................................................................12
*Burten v. Milton Bradley Co.*,
    763 F.2d 461 (1st Cir. 1985)......................................................................................5
*Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*,
    139 F.3d 1396 (11th Cir. 1998) .................................................................................9
*CardiAQ Valve Techs., Inc. v. Neovasc Inc.*,
    2016 WL 6465411 (D. Mass. Oct. 31, 2016).........................................................12
*CMAX/Cleveland, Inc. v. UCR, Inc.*,
    804 F. Supp. 337 (M.D. Ga. 1992) ........................................................................10
*EarthCam, Inc. v. OxBlue Corp.*,
    49 F. Supp. 3d 1210 (N.D. Ga. 2014) ..............................................................4, 11
*Huawei Techs. Co. v. Yiren Huang*,
    2019 WL 2395276 (E.D. Tex. June 6, 2019)..........................................................12
*Knapp Schenck & Co. Ins. Agency v. Lancer Mgmt. Co.*,
    No. CIV.A. 02-12118-DPW, 2004 WL 57086 (D. Mass. Jan. 13, 2004)..................5
*Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*,
    318 F.3d 1284 (11th Cir. 2003) .................................................................................4
*Priority Pmt. Sys., LLC v. Signapay, LTD*,
    161 F. Supp. 1294 (N.D. Ga. 2016) ..........................................................................4
*SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*,
    580 U.S. 328 (2017).................................................................................................15
*Specialty Chemicals & Servs., Inc. v. Chandler*,
    1988 WL 618583 (N.D. Ga. Sept. 29, 1988) ...........................................................9
*SPS Techs., LLC v. Briles Aerospace, Inc.*,
    2021 WL 4913509 (C.D. Cal. Sept. 8, 2021) .........................................................12
*United States v. Alicea*,
    205 F.3d 480 (1st Cir. 2000) .....................................................................................8
*United States v. Osorio*,
    929 F.2d 753 (1st Cir. 1991) .....................................................................................8
*Univ. Computing Co. v. Lykes-Youngstown Corp.*,
    504 F.2d 518 (5th Cir. 1974) ...................................................................................13

### STATE CASES

*Bos. Bicycle Couriers, Inc. v. Deputy Dir. of Div. of Emp. & Training*,
    56 Mass. App. Ct. 473 (2002)...................................................................................9
*Brandenburg v. All-Fleet Refinishing, Inc.*,
    252 Ga. App. 40 .......................................................................................................14
*Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc.*,
    675 N.E.2d 761 (1997).............................................................................................16

*Kuehn v. Selton & Assocs., Inc.*,
　242 Ga. App. 662, 530 S.E.2d 787 (2000)...........................................................................10

*Porex Corp. v. Haldopoulos*,
　284 Ga. App. 510 (2007) ....................................................................................................14

*Shea v. Shea*,
　4 N.E.2d 1015 (1936)..........................................................................................................15

*White v. Arthur Enterprises, Inc.*,
　219 Ga. App. 124 (1995) .....................................................................................................11

## STATE STATUTES

Ga. Code § 10-1-761(2), subsection (A)....................................................................................10

Ga. Code § 10-1-761(2), subsection (B)(i) ...............................................................................10

Ga. Code § 10-1-761(2), subsection (B)(ii)(I)..........................................................................10

Ga. Code § 10-1-761(2), subsection (B)(ii)(II).........................................................................10

Ga. Code § 10-1-763(a) .............................................................................................................11

Ga. Code § 10-1-763(b) .............................................................................................................13

Georgia Trade Secrets Act ................................................................................................ 1, 10-11

iv

**INTRODUCTION**

      This case involves the misappropriation of trade secrets under the Georgia Trade Secrets Act ("GTSA") stemming from Defendants' Ingenico Inc., Ingenico Corp., and Ingenico Group, SA (collectively, "Ingenico") improper use and disclosure of five trade secrets developed by BBPOS Limited ("BBPOS") relating to mobile point-of-sale ("mPOS") devices. The trade secrets were shared with Defendants under the auspices of confidentiality agreements and various common law duties, and then misappropriated by Defendants to develop their own competing mPOS devices and to shift BBPOS' customers to Defendants' products. The five trade secrets work in tandem to attract customers with novel technology and then to retain them by making it more difficult for customers to switch to another mPOS developer. This "customer stickiness" allows BBPOS to keep its customers over the course of generations of products. At trial, BBPOS proved by the preponderance of the evidence the existence of the five trade secrets, that Defendants misappropriated and improperly used those trade secrets in each of the accused mPOS devices in violation of the agreements and applicable duties, that BBPOS did not know and could not have reasonably known about Defendants' misappropriation until 2014, and that Defendants' misappropriation resulted in their unjust enrichment of nearly $24 million. The evidence adduced at trial also demonstrates that Defendants' actions regarding the misappropriation was egregious and justifies enhanced damages, including exemplary damages and attorneys' fees.

**ARGUMENT**

**I.    BBPOS Established the Existence of Five Trade Secrets**

  **a.    Trade Secret No. 1 - Polarity Detection and Correction**

      By 2012, BBPOS had developed a low-cost solution to the issue of polarity detection in mPOS devices that used a very small number of components. The trade secret is a specific circuit design that automatically detects the polarity of a phone when connect via audio jack and reverses

1

the polarity if necessary.  Doc. No. 360 at 11.  While the concept of polarity detection was known

before 2012, BBPOS' unique solution was not known.  At the time the design was disclosed to

ROAM and Ingenico in 2012, there were no other mPOS devices that had a solution to the polarity

detection issue.  *Id*.  The BBPOS design had additional value because the method is low cost and

uses a small number of components.  *Id*.  The design is not readily ascertainable because the

circuitry components related to polarity detection are not apparent from looking at the device.

Doc. No. 360 at 12.

### b.  Trade Secret No. 2 - Power Management/Temp Sleep and Wake-Up

BBPOS also developed a unique solution to manage the power consumption of an mPOS

device by 2012.  Doc. No. 360 at 14.  The trade secret is a combination of hardware and software

algorithm that monitors and detects wake-up signals from the mobile device and consumes

virtually no power when no signal is detected.  *Id*.  There were no other "active" mPOS devices

available in 2012, and thus the BBPOS solution was unique.  *Id*.  This power management solution

is not ascertainable by others because it is a combination of hardware and software.  Doc. No. 360

at 15.  While the hardware may theoretically be reverse engineered at great time and expense, the

software component is impossible to reverse engineer.  *Id*.

### c.  Trade Secret No. 3 - Automatic Gain Control

By 2012, BBPOS had invented a novel solution to transmit data necessary for mPOS

transactions through this audio channel.  The trade secret also optimizes the data rate and speed of

incoming and outgoing signals through an audio jack.  BBPOS tested between 400 and 500 mobile

phones before arriving at its solution.  Doc. No. 360 at 15–16.  In 2012, no other solution existed

in the mPOS market.  Doc. No. 360 at 17.  The solution is not ascertainable by others because the

parameters for implementing the automatic gain control are contained in BBPOS proprietary

software and are not accessible from the device itself.  *Id*.

2

### d. Trade Secret No. 4 - Communication Formats

BBPOS creates and implements communication formats that an mPOS device uses to communicate with payment software in the mobile phone.  Doc. No. 360 at 18.  Communication formats cannot be ascertained from the devices; they are contained in proprietary software and product requirement documents.  *Id*.  Other mPOS developers create their own communication formats.   However, mPOS devices are not interchangeable because they utilize different communication formats.  Doc. No. 360 at 18–19.  Thus, if an mPOS client, like PayPal, is using a BBPOS mPOS device, and then switches to an Ingenico mPOS device, the new device would not be compatible with the existing payment software.  *Id*.  This effect is referred to by BBPOS as "customer stickiness," meaning that once BBPOS signs up a client to use BBPOS mPOS devices, it is difficult for the client to switch to a competitor.  Doc. No. 360 at 18.  This customer stickiness is what makes the communication format valuable, which increases over time as customer bases expand.  *Id*.; Doc. No. 360 at 51–52.

### e. Trade Secret No. 5 - Modified DUKPT Encryption

BBPOS has always utilized a non-standard encryption method, called modified DUKPT or BBPOS encryption.  Doc. No. 360 at 20.  BBPOS' design applies standard DUKPT in an unconventional manner that is unique to BBPOS.  *Id*.  The BBPOS encryption method adds another layer of "customer stickiness."  The encryption method is unique to BBPOS, and to switch to another mPOS device, a client would have to again modify its payment software to be compatible with a new mPOS device.  *Id*.  The BBPOS encryption method is not ascertainable because the method is contained in an encrypted algorithm and would be impossible to determine without access to the BBPOS proprietary algorithm and source code.  Like communication formats, the value of this trade secret derives from customer retention.  *Id*.; Doc. No. 360 at 51–52.

### f.  BBPOS Used Reasonable Efforts to Maintain Secrecy of its Trade Secrets

The steps undertaken by BBPOS to protect its trade secrets, including password protected storage, security audits and the use of confidentiality agreements/NDAs demonstrate reasonable precautions to maintain the secrecy of trade secrets under Georgia law.  *See, e.g., Priority Pmt. Sys., LLC v. Signapay, LTD*, 161 F. Supp. 1294, 1300 (N.D. Ga. 2016) (confidentiality provisions, mandatory employee security policies, and password protection of critical data were reasonable measures to protect trade secrets).  Doc. No. 360 at 48–49.  BBPOS never disclosed the trade secrets publicly.  *Id*.  In this case, BBPOS reasonably relied on both contractual and common law duties of confidentiality to protect the trade secrets.  This duty is evidenced by how all parties treated the information, including ROAM/Ingenico employee Christopher Rotsaert holding the information in a select control involving just two other Ingenico engineers for several months until the misappropriation took place.

## II.  Defendants Misappropriated the Trade Secrets

### a.  Defendants' Duties of Confidentiality

Section 6.1 of the Licensing Agreement obligated ROAM to protect BBPOS' mPOS trade secrets from unauthorized disclosure or use, which BBPOS was required to provide upon request per Section 3.1.  Doc. No. 360 at 21–22.  Section 6.3 permitted ROAM to share the trade secrets with Ingenico, provided that ROAM ensured that the trade secrets would not be misused.  *Id*.  Breach of such contractual protections constitutes misappropriation.  *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003), *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1225 (N.D. Ga. 2014).  The evidence produced at trial shows that it is more likely than not that ROAM—now Ingenico Inc.—breached Section 6.1 by using the BBPOS trade secrets for its own gain and by disclosing them to Landi.  The evidence at trial also demonstrated that it is more likely than not that ROAM breached Section 6.3 by instructing BBPOS to share the trade

4

secrets with Ingenico and failing to ensure that Ingenico did not use or disclose the trade secrets. In fact, ROAM's former CEO, Graylin, confirmed that ROAM misappropriated the BBPOS trade secrets.  Doc. No. 360 at 28.  In addition to the Licensing Agreement, Summary Terms of Acquisition of BBPOS contained a confidentiality provision.  *Id*.  By the time that agreement was signed in March 2012, sixteen versions memorializing the parties' confidentiality obligations had been exchanged.  *Id*.

Independently, common law duties of confidentiality also applied to ROAM, Ingenico, and BBPOS with regard to the information shared during the joint development or "prestudy" period. Specifically, the circumstances under which the trade secrets were disclosed created a confidential relationship between BBPOS, ROAM, and Ingenico.  *Knapp Schenck & Co. Ins. Agency v. Lancer Mgmt. Co.*, No. CIV.A. 02-12118-DPW, 2004 WL 57086, at *7 (D. Mass. Jan. 13, 2004) ("A confidential relationship generally arises by operation of law from the affiliations of the parties and the context in which the disclosures are offered.").  "Where the facts demonstrate that a disclosure was made in order to promote a specific relationship, e.g., disclosure to a prospective purchaser to enable him to appraise the value of the secret, the parties will be bound to receive the information in confidence." *Id*.  (quoting *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 (1st Cir. 1985)).

The evidence presented at trial made clear that a confidential relationship existed between BBPOS, ROAM, and Ingenico at all relevant times, because the parties understood the confidential nature of the relationship under which BBPOS revealed the trade secrets to Rotsaert and Ingenico. First, all the parties understood that Graylin had directed BBPOS and Rotsaert to meet in confidence and in person so the development and due diligence of BBPOS could proceed.  Doc. No. 360 at 22–23.  Graylin introduced Rotsaert to BBPOS as an employee of ROAM and Ingenico

who would act as project manager for the joint development.  Doc. No. 360 at 23.  Rotsaert agreement that he was "leading the cooperation" for the joint development. *Id*. Rotsaert was specifically informed by Graylin about the confidential nature of the information.  Doc. No. 360 at 26–27.  The information was shared with Ingenico only to small control group consisting of Rotsaert and two engineers who Rotsaert had approved as having access to this information.[1] Doc. No. 360 at 25.  Rotsaert made clear his understanding of the confidential nature of the meeting by testifying that the trade secrets were never provided to third parties.  Doc. No. 360 at 26.  Although the confidential nature of those trade secrets was maintained for a time, the evidence presented at trial makes clear that Rotsaert shared those trade secrets with others in violation of those common law duties.  Doc. No. 360 at 30–32, 34–35, 38–48.

Another event demonstrating the confidential nature of the information occurred when Rotsaert was confronted by Graylin about Rotsaert's improper sharing of the trade secrets; Rotsaert did not respond that the information had been freely provided or that it was consistent with the understanding between Ingenico and BBPOS.  Doc. No. 360 at 31.  Rather, Rotsaert encouraged Graylin to go along with the scheme so that ROAM and Ingenico could enjoy the profits of the venture together.  *Id*.  At trial, no credible evidence was put forth contradicting the evidence that Defendants understood confidential nature of the relationship and information shared between BBPOS, ROAM, Rotsaert, and Ingenico.

---

[1]The other two Ingenico individuals with whom BBPOS shared trade secret information directly were either in the presence of Rotsaert or reached out to BBPOS and specifically named Rotsaert. Ingenico engineer Patrice Fivel attended the first workshop in Hong Kong where Rotsaert was also present.  Then, when Ingenico software architect Jerome Grandemenge contacted Lo and Tang in February 2012, he specifically stated that Rotsaert had given him their contact information, citing a need for clarification of the "roam swiper encryption algorithm."  Doc. No. 360 at 25.

4875-0696-7653.5

### b.  Rotsaert is Not Credible and His Testimony Should be Disregarded

The evidence introduced at trial demonstrate that Rotsaert was at the core of Defendants' misappropriation of BBPOS' five trade secrets.  His trial testimony, which is contradicted by both the contemporaneous record and the testimony of other witnesses, cannot be credited.  When Rotsaert entered the scene in February 2012, he was employed both Ingenico and ROAM. Through the multiple workshops, calls, and numerous emails, Rotsaert and his team worked hard to obtain the trade secret information.  Unknown to BBPOS or Graylin, Ingenico executives became concerned in May 2012 about the risk of "being taken hostage by BBPOS if the deal doesn't go through" and had "discussed the matter" with Rotsaert.  Doc. No. 360 at 53.  BBPOS rejected the acquisition in June 2012, and Ingenico CEO, Philippe Lazare, flew to Hong Kong and delivered a clear message to BBPOS founder Ben Lo: take the deal as-is, "or I will kill your company."  Doc. No. 360 at 29.  BBPOS did not take the deal.

By August 2012, Graylin had discovered that Rotsaert was misappropriating the trade secrets by siphoning (without BBPOS' knowledge) BBPOS intellectual property to the Ingenico engineering team for the purpose of building the next generation EMV reader without any agreement in place.  Doc. No. 360 at 30–31.  Graylin informed Rotsaert that his actions were unlawful and demanded he stop.  *Id.*  Far from trying to explain the propriety of his actions, Rotsaert encouraged Graylin to participate in the scheme because it would "be profitable to ROAM."  Doc. No. 360 at 31.  Graylin declined, and he was summarily fired.  Doc. No. 360 at 32. With Graylin gone, Rotsaert immediately (again, with BBPOS' knowledge) began connecting others at ROAM with Landi to assist in disclosing and implementing the BBPOS trade secrets. Doc. No. 360 at 54–55.  Rotsaert even informed Landi that he had been unable to involve other ROAM personnel until September 24, 2012—just days after Graylin's termination.  *Id.*

7

Rotsaert's trial testimony was inconsistent with other testimony and documents presented at trial.  He testified that he did not "get a specific message from Will Graylin saying that this prestudy should have very strong confidentiality management." Doc. No. 360 at 26.  Graylin directly contradicted Rotsaert's testimony, stating that had conversations with Rotsaert about the confidential nature of the BBPOS technology.  Doc. No. 360 at 26–27.  Rotsaert also testified that he never disclosed the BBPOS trade secrets to Landi.  Doc. No. 360 at 26.  This is contradicted by the great weight of the evidence, including direct email exchanges between Rotsaert and Landi discussing one of the BBPOS trade secrets and Rotsaert's email to Landi instructing it not to send him emails on intellectual property issues, because he knew that emails may someday have to be produced in court.  Doc. No. 360 at 55–56.  Rotsaert's testimony was even inconsistent with itself, at one time stating that the RP350x contained no BBPOS IP, and at another time stating that it contained some BBPOS IP, but that the BBPOS IP never made it into the final product.  Doc. No. 360 at 32–33.  As the finder of fact, the Court has discretion to disregard contradictory portions of Rotsaert's testimony, or to disregard the entirety of his testimony. *United States v. Alicea*, 205 F.3d 480, 483 (1st Cir. 2000); *United States v. Osorio*, 929 F.2d 753, 757 (1st Cir. 1991) (once a witness's credibility had been impeached on any matter, the finder of fact may choose to distrust or disregard all of that witness's testimony).

### c.  Defendants' Misappropriation

ROAM (now "Ingenico Inc.") and the other Ingenico entities misappropriated all five of BBPOS' trade secrets through breaches of confidentiality, arising both from breach of contract and common law breaches of confidentiality.  BBPOS shared the trade secrets with ROAM and, at ROAM's direction, with Ingenico between February 2012 and July 2012.  Doc. No. 360 at 22–24.  BBPOS shared the trade secrets because it understood that (1) BBPOS, ROAM, and Ingenico

8

were jointly developing the next generation of mPOS technology and (2) Ingenico was conducting due diligence related to the BBPOS technology pursuant to a potential acquisition of BBPOS.  *Id.*

Rotsaert oversaw the facilitation of information from BBPOS to ROAM and Ingenico, as an employee of ROAM and Ingenico.  Doc. No. 360 at 23.  While his employment contract with ROAM contained a start date of July 1, 2012, Rotsaert was an employee because he was performing activities on behalf of ROAM before first meeting with BBPOS in February 2012.  Doc. No. 360 at 23–24.  *Bos. Bicycle Couriers, Inc. v. Deputy Dir. of Div. of Emp. & Training*, 56 Mass. App. Ct. 473, 475, (2002).  Rotsaert was also held out to BBPOS as an employee of ROAM at the time of his first meeting with BBPOS.  Doc. No. 360 at 23.  When trade secrets are disclosed to another in confidence for a specific intended use, misappropriation occurs when the recipient begins utilizing the trade secrets for his own use, thereby breaching that confidence.  *Specialty Chemicals & Servs., Inc. v. Chandler*, 1988 WL 618583, at *5 (N.D. Ga. Sept. 29, 1988) ("[O]ne who, by reason of confidential business relations with the discoverer [of a trade secret], has gained possession of his trade secret, will be restrained by a court of equity from betraying the trust reposed in him by using the knowledge thus acquired for his own gain."); *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1411 (11th Cir. 1998) (even where relationship among parties did not rise to the level of a "confidential relationship" misappropriation of trade secrets nevertheless may occur under GTSA where the evidence shows that plaintiff provided the information to defendant "with the understanding that its use would be limited and that it would be kept confidential").  The GTSA "not only prohibits wrongful acquisition of trade secrets, it prohibits disclosure of trade secrets acquired under circumstances in which one has a duty to limit use of the information." *Kuehn v. Selton & Assocs., Inc.*, 242 Ga. App. 662, 666, 530 S.E.2d 787, 791 (2000).

Ingenico first misappropriated the trade secrets by using them independently in development of a competing product, which likely began in late summer 2012. Doc. No. 360 at 30. ROAM followed suit shortly after firing Graylin, improperly using BBPOS trade secrets without compensation (or even notification) to BBPOS. Doc. No. 360 at 54–55. ROAM's new CEO lied to Lo in January 2013 by falsely stating that the new product, which would become the RP350x, had "no commonality in terms of architecture, firmware, or power" with the BBPOS device. Doc. No. 360 at 33. Ingenico and ROAM also both misappropriated of BBPOS' trade secrets when they improperly transferred them to Landi without the consent of BBPOS. *See id.*; *CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F. Supp. 337, 358 (M.D. Ga. 1992). Doc. No. 360 at 30–32, 34–35, 38–48. Landi used the trade secrets when it developed the RP350x and other accused products. *Id.*

For these reasons, the evidence introduced at trial shows that it is more likely than not that Defendants misappropriated BBPOS' five trade secrets under the GTSA, including Ga. Code § 10-1-761(2), subsections (A), (B)(i), (B)(ii)(I), and (B)(ii)(II), and that Defendants' misappropriation applies to all of the accused products because any changes related to the trade secrets were immaterial and the trade secrets were shown to be embedded in Defendants' subsequent products that were substantially derived from the products that originally contained the misappropriated trade secrets. *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210 (N.D. Ga. 2014), aff'd, 703 Fed. Appx. 803 (11th Cir. 2017).

### d. The Trade Secrets Are Contained in the Accused Products

There is no dispute that Defendants requested, and received, all five of the trade secrets. Doc. No. 360 at 35–38. Further, the trade secrets are contained in all accused products. Doc. No. 360 at 38–48. Defendants presented no evidence that ROAM, Ingenico, or Landi actually developed the trade secrets independently, or developed solutions to the problems the trade secrets

addressed, other than from a naked assertion from Rotsaert that Landi did the independent development.  Rotsaert's testimony on this issue was inconsistent and not credible.  Defendants also conceded that the trade secrets were not reverse engineered.

## III.   An Unjust Enrichment Award of $23,989,964 is Proper

Under the GTSA, unjust enrichment damages must be proved by a preponderance of the evidence.  Ga. Code § 10-1-763(a).  The gross profit of the accused products is $23,989,964.[2] This is the correct measure of damages because the evidence introduced at trial show that it is more likely than not that it represents the amount that Defendants realized from use of the trade secrets. *White v. Arthur Enterprises, Inc.*, 219 Ga. App. 124, 124, (1995) ("The unjustly enriched party should pay for its gain.").  The full amount of Defendants' profits is the proper measure because the trade secrets were integral to the functionality of the products and use of BBPOS communication formats and modified encryption gave Defendants a key to access customers who had previously used BBPOS products, unfairly permitting Defendants to poach customers. *Huawei Techs. Co. v. Yiren Huang*, 2019 WL 2395276, at *3 (E.D. Tex. June 6, 2019) (recognizing that apportionment may not be possible where plaintiff argued that each trade secret was integral to an overall process); *SPS Techs., LLC v. Briles Aerospace, Inc.*, 2021 WL 4913509, at *3 (C.D. Cal. Sept. 8, 2021) (apportionment of value of each trade secret not required); *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 989 (N.D. Cal. 2018) (noting that trade secret damages need not be apportioned if the trade secret encompasses "designs and methods used to create parts of a unified structure" because the misappropriation of any of the asserted trade secrets

---

[2] This amount was not disputed, except that Defendants asserted that certain products were "double counted," resulting in an overstatement of gross profits of about $300,000.  And Rotsaert testified that the RP755x did not contain an audio jack.  Ingenico failed to produce the RP755x in discovery despite being required to do so.  The RP755x generated gross profits of $404,623.47.  If this amount and the double count are subtracted, the unjust enrichment amount is $23,285,340.53.

would have caused all of the damages it sought), *vacated on other grounds*, 20 F.4th 1231 (9th Cir. 2021); *CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, 2016 WL 6465411, at *11-12 (D. Mass. Oct. 31, 2016) (upholding jury award where jury found three of six asserted trade secrets misappropriated because the jury had reasonable basis to conclude that the individual trade secrets misappropriated solved the same challenges).

In this case, the trade secrets worked together, creating, among other things, customer stickiness to BBPOS' offerings, that grew in importance over time.  The unrebutted evidence at trial showed that BBPOS was the first inventor to bring solutions for polarity detection, power management, and automatic gain control to the mPOS market.  The unrebutted testimony also established that the BBPOS solutions to these problems were the best-known solutions due to their low cost and high rates of success.

BBPOS communication formats and modified encryption gained tremendous value over time because they kept customers embedded with BBPOS, allowing customers to seamlessly migrate from one BBPOS device to the next, but not migrate to a competitor's mPOS device.  As Rotsaert agreed at trial, a customer who owns an iPhone8 usually started with an iPhone 1.  Doc. No. 360 at 51.  By taking these trade secrets, Ingenico able to market a "seamless integration" the from BBPOS G5X product into the RP series to PayPal—a major mPOS customer—in 2014.  Doc. No. 360 at 51–52.  This would not have been possible without the trade secrets, because customers are very reluctant to go undertake the costs and risks of redevelopment needed to switch and would likely stayed with BBPOS.  Doc. No. 360 at 19.  Thus, the value to BBPOS of these trade secrets in keeping BBPOS customers as BBPOS customers cannot be overstated.

For these reasons, BBPOS has met its burden to show that the unjust enrichment amount is $23,989,964.  Even in where damage amount may be uncertain, a plaintiff should not be

precluded from recovery, rather, "the plaintiff should be afforded every opportunity to prove damages once the misappropriation is shown." *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir.  1974). Conversely, a reasonable royalty measurement is only appropriate where a plaintiff has not proved unjust enrichment by a preponderance of the evidence. Ga. Code § 10-1-763.  Nevertheless, the "adjusted royalty figure" of about $18 (which Defendants contend BBPOS is seeking) is not unreasonable due to: (i) Defendants' unlawful use of the trade secrets; (ii) the holding and use of the $24,000,000 by Defendants for 10+ years; and (iii) *access to the BBPOS customer network*, which was only possible due to the misappropriation.

## IV.    The Court Should Award Exemplary Damages

BBPOS is entitled to exemplary damages because Defendants' misappropriation was willful and malicious. Ga. Code § 10-1-763(b).  The conduct giving rise to this finding includes: (1) Rotsaert purposefully misappropriating the trade secrets and disclosing them to Landi for the purpose of utilizing it to build a competing mPOS device; Doc. No. 360 at 30–32, 34–35, 38–48, 54; (2) Ingenico's use of the trade secrets to develop a competing mPOS device rather than engage in the joint venture with BBPOS; *Id*.; (3) Lazare's threats to Lo to either accept the acquisition terms "as is" or that he would "kill his company," which came shortly after Ingenico executives worried about being "taken hostage by BBPOS if the deal doesn't go through"; Doc. No. 360 at 54; (4) Rotsaert suggesting to Graylin to embrace the scheme to take BBPOS trade secrets because it would result in more money for his company; Doc. No. 360 at 54; (5) ROAM terminating Graylin for raising the alarm about Rotsaert and Ingenico's misuse of BBPOS trade secrets; Doc. No. 360 at 54; (6) Ken Paull lying to Lo about the use of BBPOS IP in the new Landi product; Doc. No. 360 at 33; (7) Rotsaert instructing Landi not to send him questions about IP issues because he wanted to avoid producing those emails in court someday; Doc. No. 360 at 55–56; and

(8) Defendants competing directly with BBPOS using its own trade secrets and gaining an additional unfair competitive advantage by stealing BBPOS customers by marketing a "seamless integration" from BBPOS products into the RP series products.  Doc. No. 360 at 51–52.

For these reasons, the Court should award exemplary of twice the unjust enrichment damages and reasonable attorneys' fees.  *Brandenburg v. All-Fleet Refinishing, Inc.*, 252 Ga. App. 40, 43(2001) (willful and malicious conduct existed where defendant hired a competitor's employees, stole software, and actively solicited customers).

**V.     Ingenico's Affirmative Defenses Fail**

First, the statute of limitations does not begin to run until the plaintiff has reason to suspect misappropriation, and it is possible to uncover colorable facts of the claim from a reasonable investigation.  *Porex Corp. v. Haldopoulos*, 284 Ga. App. 510, 516 (2007).  Here, the statute of limitations began to run in November 2014, when Lo had reason to suspect that the trade secrets had been misappropriated *and* a reasonable investigation could confirm that the new ROAM/Ingenico devices contained the trade secrets.[3]  Before any accused products were commercially available, there was no *reasonable* way for BBPOS to confirm the misappropriation.  Lo's earlier suspicions of misappropriation in late 2012/early 2013, he investigated the situation by contacting ROAM.  Doc. No. 360 at 33.  Ken Paull assured Lo that the new product shared "no commonality in terms of architecture, firmware, or power" with the BBPOS device.  *Id*.  Lo's reliance on this assurance was reasonable at least until he saw the RP350x at a tradeshow in November 2014.  Doc. No. 360 at 34.

Second, laches is an equitable defense whose principal application "was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation" and

---

[3] No accused product was commercially available until February 2014.  Doc. No. 360 at 34.

has refused to apply laches to intellectual property claims that were brought within the statute of limitations. *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 333 (2017). ("Applying laches within the limitations period would also clash with the purpose for which the defense developed in the equity courts."). "The defense of laches is founded on principles of equity and inequitable conduct of a defendant may be such as to make it unjust that he should have the advantage of such a defense." *Shea v. Shea*, 4 N.E.2d 1015, 1018 (1936). Stealing trade secrets and then lying about their use precludes the defense. Regardless, BBPOS did not unreasonably delay bringing suit. BBPOS is a small company that was struggling financially after losing its largest customer (ROAM) and then was forced to compete with Defendants who were using BBPOS' own stolen technology. Doc. No. 360 at 34–35. BBPOS finally had the resources to investigate a claim in 2018. *Id.*

**VI.    Ingenico's Counterclaim Fails**

Ingenico's indemnification claims all stem from a provision in the Licensing Agreement. ROAM had materially breached that agreement no later than 2014, when the infringing products were first sold. All indemnification demands related to disputes arose thereafter. A material breach of contract by one party excuses the other from performance as a matter of law. *Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc.*, 675 N.E.2d 761, 766 (1997). Additionally, the amounts Defendants ask BBPOS to pay are not reasonable because it includes work performed on behalf of other entities. Doc. No. 360 at 56.

<u>**CONCLUSION**</u>

For the above reasons, BBPOS asks that the Court enter judgment in its favor in the amount of $23,989,964, plus exemplary damages in the amount of $47,979,928, plus attorneys' fees.

15

Respectfully submitted:

/s/ Oliver D. Griffin
By: Melissa A. Bozeman (Pro Hac Vice)
Pennsylvania Bar No. 201116
Oliver D. Griffin (Pro Hac Vice)
Pennsylvania Bar No. (80126)
Peter N. Kessler (Pro Hac Vice)
Pennsylvania Bar No. 209033
KUTAK ROCK LLP
Two Logan Square
100 N. 18th Street, Suite 1920
Philadelphia, PA  19103-4104
(215) 299-4384 (Telephone)
(215) 981-0719 (Facsimile)
Melissa.bozeman@kutakrock.com
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com

   and

Leland P. Abide (Pro Hac Vice)
MN Bar No. 039269
KUTAK ROCK LLP
60 South Sixth Street, Suite 3400
Minneapolis, MN 55402-4018
Telephone: (612) 334-5000
Facsimile: (612) 334-5050
leland.abide@kutakrock.com

   and

Jonathon D. Friedmann, Esq. (BBO # 180130)
Robert P. Rudolph, Esq. (BBO # 684583)
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA 02109
Tel.: (617) 723-7700
Fax: (617) 227-0313
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

   and

Ricardo G. Cedillo
DAVIS, CEDILLO & MENDOZA, INC.
755 E. Mulberry Ave., Ste 500

16

4875-0696-7653.5

San Antonio, Texas 78212
Tel: (210) 822-6666
Fax: (210) 822-1151
rcedillo@lawdcm.com

Dated:  May 26, 2023                    *Attorneys for Plaintiffs/Counterclaim-*
                                        *Defendants*


## CERTIFICATE OF SERVICE

I, Melissa A. Bozeman, do hereby certify that on May 26, 2023, I served a true and correct

copy of the foregoing Proposed Conclusions of Law on all parties via the Court's CM/ECF

Electronic Filing System.

                              */s/Melissa A. Bozeman*
                              Melissa A. Bozeman

17

4875-0696-7653.5