# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ANYWHERECOMMERCE, INC.** and **BBPOS LIMITED,** <br> Plaintiffs, <br><br> v. <br><br> **INGENICO INC., INGENICO CORP.** and **INGENICO GROUP, SA,** <br> Defendants. | **CIVIL ACTION NO.** <br> **1:19-cv-11457-IT** |

## DEFENDANTS' PROPOSED FINDINGS OF FACT

/s/ *Jeffrey K. Techentin*
JOHN A. TARANTINO (BBO #492230)
PATRICIA K. ROCHA (BBO #542348)
NICOLE J. BENJAMIN (BBO #666959)
R. BART TOTTEN (BBO #631605)
JEFFREY K. TECHENTIN (*pro hac vice*)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
btotten@apslaw.com
jtechentin@apslaw.com
Dated:  May 26, 2023

# Contents

I.      The Alleged Trade Secrets .................................................................................. 3

   A.  Audio Jack Polarity Detection ..................................................................... 3

   B.  Power Management ....................................................................................... 4

   C.  Automatic Gain Control................................................................................ 4

   D.  Communication Formats............................................................................... 5

   E.  DUKPT Key Management Process ............................................................... 5

II.     The Accused Products ........................................................................................ 5

III.    Landi Independently Developed And Manufactured The Accused Products ................ 5

   A.  Landi's Development of the RP350x............................................................. 5

   B.  The RP350x Development Agreement .......................................................... 7

IV.     The Accused Products Do Not Incorporate Any Of The Alleged Trade Secrets............ 8

   A.  Audio Jack Polarity Detection ..................................................................... 8

      i.   The Accused Products Do Not Use the Alleged Trade Secret Software ........................ 8

      ii.  The Accused Products Do Not Use the Hardware Component of the Alleged Trade Secret 8

      iii. BBPOS's Failure of Proof ...................................................................... 9

   B.  Power Management ....................................................................................... 10

      i.   The Accused Products Do Not Use the Software Component of the Alleged Trade Secret.......................................................................................................... 10

      ii.  The Accused Products Do Not Use the Hardware Component of the Alleged Trade Secret 11

      iii. BBPOS's Failures of Proof...................................................................... 12

   C.  Automatic Gain Control............................................................................... 14

      i.   There is No Hardware Component of the Alleged Trade Secret ................... 14

      ii.  The Accused Products Do Not Use the Software Component of the Alleged Trade Secret 14

      iii. BBPOS's Failures of Proof...................................................................... 15

   D.  Communication Formats............................................................................... 18

      i.   The Accused Products Do Not Use the Alleged Trade Secret ...................... 18

      ii.  BBPOS's Failures of Proof...................................................................... 19

   E.  DUKPT Key Management Process ............................................................... 21

      i.   The Accused Products Do Not Use the Alleged Trade Secret...................... 21

ii.   2. BBPOS's Failures of Proof ......................................................................... 21

V.    None Of BBPOS's Information Qualifies As A "Trade Secret" ................................ 25

  A.  BBPOS's Alleged Trade Secrets Were Generally Known in the Field ........................... 25

    i.   The Trial Record Contains No Evidence that Any of BBPOS's Alleged Trade Secrets Were Not Generally Known in the Field at the Time of Alleged Misappropriation ........... 25

    ii.   BBPOS's Alleged Trade Secrets Were Generally Known in the Field in 2012 ......... 26

  B.  BBPOS Has Failed to Establish that Its Alleged Trade Secrets Are Not Readily Ascertainable .................................................................................................................... 30

    i.   Audio Jack Polarity Detection .................................................................... 30

    ii.   Power Management ..................................................................................... 30

    iii.  Automatic Gain Control ............................................................................. 31

    iv.  Communication Formats ............................................................................ 31

  C.  BBPOS Has Failed to Prove that Its Alleged Trade Secrets Have Independent Economic Value ............................................................................................................................... 32

    i.   Audio Jack Polarity Detection .................................................................... 32

    ii.   Power Management ..................................................................................... 33

    iii.  Automatic Gain Control ............................................................................. 34

    iv.  Communication Formats ............................................................................ 34

    v.   DUKPT Key Management Process ............................................................. 36

VI.   The Engineering And License Agreement Expressly Authorized ROAM To Use BBPOS's Intellectual Property .............................................................................................. 37

  A.  The License Agreement ............................................................................................. 37

  B.  ROAM's Efforts To Develop An EMV-Capable mPOS Device ................................. 39

VII.   BBPOS Voluntarily Disclosed All Five Of Its Alleged Trade Secrets Without Any Oral Or Written Non-Disclosure Agreement, Confidentiality Agreement, Or Restriction On Use ..... 42

  A.  BBPOS's Voluntary Disclosures at the February 2012 Workshop ................................. 43

  B.  BBPOS's Other Voluntary Disclosures in February 2012 ............................................ 45

  C.  BBPOS's Voluntary Disclosures at the April 2012 Workshop ...................................... 47

  D.  BBPOS's Additional Voluntary Disclosures ............................................................. 48

  E.  BBPOS's Voluntary Disclosures Were Without Any Non-Disclosure or Confidentiality Agreement ........................................................................................................................ 48

VIII.   BBPOS Did Not Exercise Reasonable Diligence With Respect To Discovering The Alleged Misappropriation ...................................................................................................... 50

  A.  BBPOS Did Not Exercise Reasonable Diligence in Fall 2012 ....................................... 50

  B.  BBPOS Did Not Exercise Reasonable Diligence In January 2013 ................................. 52

  C.  BBPOS Did Not Exercise Reasonable Diligence In May 2013 ...................................... 55

IX.    BBPOS Unreasonably Delayed Before Bringing This Lawsuit, Which Unfairly Prejudiced Defendants ............................................................................................ 57

X.    BBPOS Has Failed To Introduce Any Evidence That Any Defendant Committed Trade Secret Misappropriation ........................................................................................ 59

XI.    BBPOS's Evidence Of The Failed Acquisition Of BBPOS Is A Red Herring ............. 60

XII.    No BBPOS Alleged Trade Secrets Were Disclosed to Landi in Connection with the Development of a Prototype for the 2012 Cartes Show .................................................. 62

XIII.    BBPOS's Witnesses Testified Inconsistently On Matters Important to Their Credibility 64

A.    BBPOS's Denial that Ingenico Was a Competitor Is Not Credible .................................. 64

B.    Mr. Lo's Testimony Concerning BBPOS's "Reasonable Efforts" to Maintain  Secrecy Was Not Credible ........................................................................................... 65

C.    Mr. Graylin's Testimony Was Inconsistent and Not Credible .......................................... 66

D.    Mr. Zatkovich's Testimony Was Unreliable ................................................................. 68

XIV.    BBPOS Failed to Identify the "Power Management" Solution as a Trade Secret ......... 70

XV.    BBPOS Asserted Its Misappropriation Claim in Bad Faith ........................................... 70

XVI.    Damages From The Alleged Misappropriation ............................................................... 72

A.    Valuing the Five Alleged Trade Secrets ..................................................................... 72

B.    Mr. Scherf's Reliance on a Technical Expert to Determine the "Basis for the Sale" of the Accused Products and his Application of the "Smallest Saleable Unit" Concept to Determine Unjust Enrichment Damages ................................................................. 75

C.    The "Double Count" .................................................................................................. 77

D.    Accused Units Not Using Audiojack (RP457cBT) ........................................................ 78

XVII.    BBPOS Failed To Indemnify Ingenico Inc. .................................................................. 79

Defendants Ingenico Inc., Ingenico Corp. and Ingenico Group, SA (each individually a "Defendant," and collectively, "Defendants") respectfully submit these Proposed Findings of Fact.  Based on the evidence submitted at trial, as summarized herein, and for the reasons set forth in Defendants' Post-Trial Memorandum (filed contemporaneously herewith), Defendants are entitled to judgment on (1) Plaintiff BBPOS Limited's ("BBPOS") claim for alleged misappropriation under the Georgia Trade Secrets Act, O.G.C.A. §§ 10-1-761, *et seq.*) (Count II of the First Amended Complaint), BBPOS's only remaining claim; and (2) Ingenico Inc.'s claim for breach of contractual indemnification obligations (Count I of the Second Amended Counterclaims).

## INTRODUCTION

Defendants are entitled to judgment on all remaining claims because they did not misappropriate any BBPOS information (*see infra* Sections III, IV, VI, VII, and X) and because BBPOS failed to indemnify Ingenico Inc. for intellectual property claims brought against BBPOS products. *See infra* Section XVII.

The evidence at trial established that Landi developed the Accused Products for ROAM, using Landi's technology and not any of BBPOS's information.  *See infra* Section III.  None of BBPOS's alleged "trade secrets" were disclosed to Landi.  *See infra* Section III, XII.  None of the alleged "trade secrets" are in any Accused Product.  *See infra* Section IV.  Thus, Defendants did not misappropriate anything.

Furthermore, BBPOS voluntarily shared its alleged "trade secrets" with Ingenico, without any confidentiality agreement, in hopes of striking a commercial deal with Ingenico and ROAM. *See infra* Section VII.  BBPOS voluntarily agreed to work collaboratively with Ingenico on a new product, and deliberately shared information without identifying it as confidential or seeking

1

any restrictions on use or transfer.  *See infra* Section VII.  For this additional and independent

reason, Defendants did not misappropriate anything.  Indeed, the record is devoid of

contemporary evidence that any of the alleged trade secrets were considered as such by BBPOS

at the time.  *E.g.*, *infra* Section XIV, XV.

BBPOS waited to filed suit because it was continuing to make money from sales to

Ingenico.  *See infra* Section IX.  It filed suit without even analyzing the Ingenico products to see

if they contained anything that looked like what BBPOS had disclosed years earlier.  *See infra*

Section XV.  Only after hiring a professional expert witness for this lawsuit did BBPOS discover

its "trade secrets" in Accused Products.  *See id.*

The record confirms that BBPOS gave information to Ingenico over a period of months

in 2012.  *See infra* Section VIII, IX.  That information was intended to be used, and was used, to

explore a potential collaborative development of an mPOS device and for no other purpose.  *See*

*infra* Section VI, VII.  This use is consistent with the express terms of the agreement under

which all of BBPOS's swiper-related know-how, including trade secrets, was licensed to

ROAM.  *See infra* Section VI.

BBPOS was aware of ROAM's work with Landi on a "next gen" device within a month

of beginning to collaborate with Ingenico on the same potential product.  *See infra* Section VI.B.

BBPOS was told that Ingenico was using its information to work with Landi by ROAM's

terminated CEO in the Fall of 2012, knew Ingenico was selling a reader from Landi in 2013, and

actually possessed Accused Product by 2014 or 2015.  *See infra* Section VII.  Yet BBPOS took

no enforcement measures until filing a complaint on December 20, 2018 because, according to

Mr. Lo, it was still selling product to Ingenico.  When it filed suit, it did not seek injunctive

relief, only money.  *See infra* Section XV.

The allegedly misappropriated information does not meet the statutory requirements for protection as trade secrets because (1) they were generally known in the field at the time of the alleged misappropriation (*see infra* Section V.A.); (2) they were readily ascertainable, including by mere observation of BBPOS commercially-marketed products (*see infra* Section V.B.); (3) BBPOS did not make reasonable efforts to maintain the information as confidential (*see infra* Section VIII); and (4) they lack independent economic value (*see infra* Section V.C.).

BBPOS failed to present expert opinion evidence of a legally cognizable theory of damages. Its expert's opinion that 100% of the profits from the sale of Accused Products constitute unjust enrichment fails to account for the limited contribution of the "trade secrets" to the Accused Products, is premised on inapposite royalty principles that do not apply to unjust enrichment calculations and relies inappropriately on a technical expert's off-the-record assertion that the "trade secrets" drove demand for the Accused Products. *See infra* Section XVI.

Finally, the evidence concerning Ingenico Inc.'s counterclaim established that it incurred $438,238.51 in fees, expenses, and a settlement payment from BBPOS's breach of its contractual obligation to indemnify and hold Ingenico Inc. harmless for third-party assertion of intellectual property infringement, all of which was unrebutted. *See infra* Section XVII.

## PROPOSED FINDINGS OF FACT

### I.    The Alleged Trade Secrets

1.    BBPOS asserts that it has five alleged trade secrets that were allegedly misappropriated:  (1) audio jack polarity detection and correction; (2) power management; (3) automatic gain control; (4) communication formats; and (5) DUKPT (derived unique key per transaction) encryption key management.  Day 1 Trial Tr., Doc. No. 346 at 101:1-23 (Zatkovich); Day 4 Trial Tr., Doc. No. 349 at 68:5-19 (Tang).

### A.    Audio Jack Polarity Detection

3

2.      When a device is plugged into the audio jack of a cell phone and emits electrical signals, the device needs to have the correct polarity to work with the cell phone.  Two different standards are used for the purpose of connecting devices to the audio jack of a cell phone, and one of the differences between the two standards is the polarity.  Therefore, the device being plugged into the cell phone's audio jack needs a method of determining which standard the audio jack is using so the polarity can be switched if necessary.  Day 8 Trial Tr., Doc. No. 353 at 39:5-40:5 (Shamos); Day 2 Trial Tr., Doc. No. 347 at 6:6-11 (Zatkovich).

3.      BBPOS asserts that its solution for detecting and correcting an audio jack's polarity constitutes a trade secret.

**B.      Power Management**

4.      The issue of power management pertains to managing power consumption by having the device automatically turn on if the data signals pertain to an mPOS transaction and having the device automatically turn off if the signals do not pertain to an mPOS transaction. Day 8 Trial Tr., Doc. No. 353 at 64:7-66:1 (Shamos); Day 2 Trial Tr., Doc. No. 347 at 21:11-17 (Zatkovich).

5.      BBPOS asserts that its solution for managing power consumption constitutes a trade secret.

**C.      Automatic Gain Control**

6.      The data signals of the cell phone and the mPOS device often have different frequencies and/or amplitude.  Day 8 Trial Tr., Doc. No. 353 at 77:13-17 (Shamos).  The role of automatic gain control is to detect the signals and reconfigure them as necessary so the cell phone and the mPOS device can effectively exchange data.  *Id.*, Doc. No. 353 at 77:18-22, 81:9-12, 81:25-82:1.

7.      BBPOS asserts that its solution for automatic gain control constitutes a trade secret.

**D.      Communication Formats**

8.      When digital data is being transmitted, the receiver needs to know how the data is formatted, *i.e.*, where within the data each piece of information is located.  Day 8 Trial Tr., Doc. No. 353 at 89:12-90:8 (Shamos).  The sender's communication format must be shared with the receiver to enable the receiver to understand the data.  *Id.*

9.      BBPOS asserts that its communication formats constitute trade secrets.

**E.      DUKPT Key Management Process**

10.     The standard for encryption key management is DUKPT (derived unique key per transaction), which generates a unique key for each transaction.  Day 8 Trial Tr., Doc. No. 353 at 94:14-23 (Shamos).  The unique key that DUKPT generates for each transaction can be found and used by both the sender and the receiver.  *Id.*, Doc. No. 353 at 94:24-95:5.

11.     DUKPT is a tool for managing keys; it is not an encryption algorithm.  Day 8 Trial Tr., Doc. No. 353 at 95:6-7 (Shamos).

12.     BBPOS asserts that its DUKPT solution constitutes a trade secret.

**II.      The Accused Products**

13.     BBPOS contends that the following products incorporate its asserted trade secrets (the "Accused Products"):  the RP350x, the RP750x, the RP 100 series (those that have audio jacks), and the RP450 series (those that have audio jacks).  Day 1 Trial Tr., Doc. No. 346 at 102:3-15 (Zatkovich).

**III.      Landi Independently Developed And Manufactured The Accused Products**

**A.      Landi's Development of the RP350x**

14.     Landi successfully designed, manufactured, and delivered a functioning EMV-capable mPOS device, the RP350x, which was sold by ROAM beginning in 2013.  Exhibit 214; Exhibit 360 at 4 (showing sales of RP350x units in 2013).

15.     Landi was the original design manufacturer ("ODM"), which means that Landi designed and manufactured the products requested by ROAM using Landi's internal technology based on an existing Landi product.  Day 9 Trial Tr., Doc. No. 354 at 29:25-30:8 (Rotsaert). Landi designed and manufactured the RP350x to specifications set by ROAM and based on an existing Landi product, without any information from BBPOS.  Exhibit 214.

16.     Neither the RP350x nor any other Accused Product was designed or manufactured with the benefit of, or incorporated, any of BBPOS's alleged trade secrets.

17.     Other than the information that was sent to Landi in connection with developing the prototype for the 2012 show in Paris, which did not include any alleged trade secrets (*see infra* at Section XII), no BBPOS information was provided to Landi.  Day 9 Trial Tr., Doc. No. 354 at 21:22-22:10, 31:16-32:23, 41:8-10 (Rotsaert).

18.     Landi did not use any of that information when designing or developing the RP350x.  Exhibits 63, 214; Day 9 Trial Tr., Doc. No. 354 at 29:2530 (Rotsaert).

19.     The trial record evidence of communications with Landi is consistent with independent development of the RP350x by Landi and does not support any inference that the product was developed using BBPOS information.  Exhibit 195.

20.     The first communication with Landi relating to the development of the RP350x is an email from Christopher Rotsaert dated September 20, 2012, in which Mr. Rotsaert asks for confirmation that Landi has "what is necessary for Landi to create usual materials to prepare for first TR milestones.  If not, please tell me what is missing."  Exhibit 195 at 8.  The ensuing

6

exchange between Landi and Mr. Rotsaert does not include any request for information from

BBPOS, or the communication of any information from BBPOS.  *See id.* at 1-7.

### B.   The RP350x Development Agreement

21.     The RP350x Development Agreement establishes that Landi was responsible for

all aspects of the design of the RP350x that might touch upon the subject matter of the alleged

BBPOS trade secrets, except for card data formats, which used the ROAM standard format.

Exhibit 214; Exhibit 1233 at slide 8.

22.     The RP350x Development Agreement called for Landi to develop a new

product – the RP350x – on the basis of an existing Landi product.  Exhibit 214 at 1.  The "Landi

Product" on which the RP350x was to be based was a defined term in the Development

Agreement, the definition for which is in Annex 1 of the Agreement (Exhibit 214 at 13), and

which reads "the LANDI Products are the s055p family considered as reference products for the

Bundled Products & implementing the Unimars Technology for mobile payment solution."

23.     The "Unimars Technology" is a component of the defined "Landi Product" term

of the RP350x Development Agreement and includes, *inter alia*, the Landi Encryption Solution.

Exhibit 214 at 13.

24.     Under the RP350x Development Agreement, Landi (and not ROAM or Ingenico)

was responsible for managing the overall product schedule, all electronical design activities, all

mechanical design activities, mechanical design, electrical design, reference schematics, layout,

initial software/hardware interface document, key components specification and selection, the

printed circuit board design and development, as well as architecture, concept, and mechanical

design.  Exhibit 214 at 62.

25.     Landi was responsible for and managed the process of ensuring that the RP devices worked with different phone models utilizing a lab located in Fuzhou, China.  Day 9 Trial Tr., Doc. No. 354 at 13:8-14:22 (Rotsaert); Exhibit 1056.

## IV.     The Accused Products Do Not Incorporate Any Of The Alleged Trade Secrets

### A.     Audio Jack Polarity Detection

26.     BBPOS's alleged trade secret for "audio jack polarity detection and correction" consists of (1) software and (2) circuitry (hardware).  Day 4 Trial Tr., Doc. No. 349 at 69:112-19 ("the software detects the polarity") (Tang); Exhibit 145.

### i.     The Accused Products Do Not Use the Alleged Trade Secret Software

27.     Mr. Tang testified that BBPOS's solution for audio jack polarity includes software that "detects the polarity."  Day 4 Trial Tr., Doc. No. 349 at 69:9-16 (Tang); Exhibit 145 at 2 ("The preamble and the sync pattern should allow the polarity to be determined.").

28.     BBPOS did not share any software source code with any Defendant.  Exhibit 166 at 1 ("Ben did not accept [agree] to provide any source code file"); Day 9 Trial Tr., Doc. No. 354 at 12:21-25 (Rotsaert).

29.     The trial record contains no evidence that any Defendant used any software, including BBPOS software, that detects and/or corrects the polarity.  Mr. Zatkovich offered no opinion with respect to the nature of the BBPOS software that detects polarity, or of any corresponding feature in any Accused Product.

### ii.     The Accused Products Do Not Use the Hardware Component of the Alleged Trade Secret

30.     None of the BBPOS hardware circuitry used to detect and correct audio jack polarity is the same as the corresponding circuitry in the Accused Products.  Day 8 Trial Tr., Doc. No. 353 at 59:19-61:23, 60:16-17 (Shamos) ("they're obviously not" the same); *Id.*, Doc.

8

No. 353 at 63:8-64:6; Exhibit 817 at 3.  Although the two circuits perform the same function, they are different circuits.  *Id.*, Doc. No. 353 at 64:3-6; Exhibit 817 at 3.

31.     In addition to differences in components such as resistors and capacitors, the circuit diagram for the RP350x includes direct connections between terminals of the transistors and the "Sleeve" and "Ring2" positions that are absent from the asserted BBPOS design, as shown and highlighted below:



Exhibit 817 at 1 (highlighting added); Day 8 Trial Tr., Doc. No. 353 at 61:16-64:6 (Shamos).

### iii.     BBPOS's Failure of Proof

32.     BBPOS utilizes at least three different hardware circuits in connection with the polarity detection and correction function.  Exhibit 817 at 1 (citing Exhibits 372 at 5, 138, and 143); Day 7 Trial Tr., Doc. 352 at 89:22-90:20 (Lo).

33.     BBPOS did not present any evidence concerning the use of the circuitry disclosed in Exhibits 138 and 143 in any Accused Product; Mr. Zatkovich's only opinion regarding the Accused Products' polarity detection and correction functionality was based upon page 3 of Exhibit 372 and its "efficient" two-transistor solution.  *E.g.*, Day 2 Trial Tr., Doc. No. 347 at 15:11-16:6 (Zatkovich).

34.     BBPOS did not introduce circuit diagrams for any Accused Product other than the RP350x.  Consequently, BBPOS presented no evidence as to the circuitry in those devices, if any, associated with polarity detection and correction beyond an unsupported assertion by Mr. Zatkovich that circuits in other Accused Products are the same as those in the RP350x.  The only graphical references to other Accused Products appeared in Exhibit 817, which was only admitted as a chalk.  Exhibit 817 contains imagery from an exhibit 607, which was not admitted into evidence.  Day 4 Trial Tr., Doc. No. 349 at 7:16-21 (Court "not relying on material in there that isn't explicated during examination or cross-examination."); *see also* Day 2 Trial Tr., Doc. No. 347 at 17:20-18:2 (Zatkovich).

### B.    <u>Power Management</u>

35.     BBPOS's power management solution uses both software and hardware (circuitry).  Day 8 Trial Tr., Doc. No. 353 at 73:16-20 (Shamos); Day 2 Trial Tr., Doc. No. 347 at 19:24-20:1 (Zatkovich); Day 4 Trial Tr., Doc. No. 349 at 75:21-76:8 (Tang).

### i.    The Accused Products Do Not Use the Software Component of the Alleged Trade Secret

36.     BBPOS's solution for "power management" includes "microprocessor software" that detects the presence of a valid mPOS signal and determines whether to power on or off the device.  Day 2 Trial Tr., Doc. No. 347 at 21:11-23 (Zatkovich); Day 8 Trial Tr., Doc. No. 353 at 66:2-5 (Shamos); Day 4 Trial Tr., Doc. No. 349 at 75:21-76:8 (Tang).

37.     The software component of the power management design is critical to powering down the device and thereby saving battery charge:  "if you didn't have any software running on it, this wouldn't work."  Day 2 Trial Tr., Doc. No. 347 at 125:9-16 (Zatkovich).

38.     BBPOS's technical expert, Mr. Zatkovich, opined that the software within the Accused Product "behaved essentially identical" to BBPOS's software without ever having

analyzed the actual software and therefore without any basis for suggesting that the result was the consequence of any similarities in the software or its design.  Day 2 Trial Tr., Doc. No. 347 at 30:2-4 (Zatkovich).  However, the trial record contains no evidence that BBPOS's software for its power management solution was ever shared with, or disclosed to, any Defendant.  The Court will not infer that BBPOS's information has been shared based on an assertion that the software in an Accused Product "behaved essentially identical" to BBPOS's software, especially in light of the fact that the trial record contains no evidence that BBPOS's software is the only software that can "behave[]" in the referenced manner.

39.     BBPOS did not share any software source code with any Defendant.  Exhibit 166 at 1 ("Ben did not accept [agree] to provide any source code file"); Day 9 Trial Tr., Doc. No. 354 at 12:21-25 (Rotsaert).

### ii.     The Accused Products Do Not Use the Hardware Component of the Alleged Trade Secret

40.     None of the BBPOS hardware circuitry used to detect and correct audio jack polarity is the same as the corresponding circuitry in the Accused Products.  Day 8 Trial Tr., Doc. No. 353 at 59:19-61:23 (Shamos), 60:16-17 ("they're obviously not" the same), 63:8-64:6; Exhibit 817 at 3.  Although the two circuits perform the same function, they are different circuits.  Day 8 Trial Tr., Doc. No. 353 at 64:3-6 (Shamos); Exhibit 817 at 3.

41.     The RP350x does not use the circuitry disclosed by BBPOS for power management because, *inter alia*, the "circuits are plainly different" and even the active components are different in light of the fact that "[t]here's no Zener diode in the Ingenico solution," as seen below (Zener diode is highlighted):



BBPOS Circuit (Exhibit 118-0005)



RP350x Circuit (Exhibit 208-0004)

Day 8 Trial Tr., Doc. No. 353 at 74:15-76:12 (Shamos); Exhibit 817 at 8; Exhibit 118; Exhibit 208.

### iii.    BBPOS's Failures of Proof

42.    BBPOS utilizes at least three different hardware circuits in connection with the power management function.  Exhibit 817 at 6 (citing Exhibits 118, 143, and 372); Day 2 Trial Tr., Doc. No. 347 at 24:12-25:8 (Zatkovich).

43.    BBPOS did not present any evidence concerning the use of the circuitry disclosed in Exhibits 143 or 372 in any Accused Product; Mr. Zatkovich's only opinion regarding the Accused Products' power management functionality was based upon page 5 of Exhibit 118.  Day 2 Trial Tr., Doc. No. 347 at 20:2-6 (Zatkovich).

12

44.     There was no evidence at trial that any Accused Product other than the RP350x utilized any form of power management, including the BBPOS solution.  BBPOS did not introduce circuit diagrams for any Accused Product other than the RP350x.  Consequently, BBPOS presented no evidence as to the circuitry in other devices, if any, associated with power management.  Mr. Zatkovich offered no opinion about non-RP350x Accused Products utilizing the asserted power management trade secret.  The only reference to other Accused Products in the trial record as it relates to power management is at page 7 of Exhibit 817, which was only admitted as a chalk.  That page, 817-0007, contains screenshots taken from unidentified documents not entered into evidence.  Day 4 Trial Tr., Doc. No. 349 at 7:16-21 (Court "not relying on material in there that isn't explicated during examination or cross-examination."); *see also generally* Day 2 Trial Tr., Doc. No. 347 at 26:2-30:14 (Zatkovich)  (identifying basis for opinion that Ingenico used BBPOS power management solution).

45.     According to BBPOS's technical expert, Mr. Zatkovich, the "trade secret" in BBPOS's power management solution is the "function performed by the active components."  Day 2 Trial Tr., Doc. No. 347 at 127:12-15 (Zatkovich).  However, "[t]here's no Zener diode in the Ingenico solution," and the Zener diode is an "active component."  Day 8 Trial Tr., Doc. No. 353 at 75:9-14 (Shamos); Day 9 Trial Tr., Doc. No. 354 at 50:8-14, 65:24-66:6 (Zatkovich) (conceding that Zener diode is an active component of the "temp wake-up circuit").

46.     Mr. Zatkovich testified that power management "software [for the Accused Products] was not provided for my inspection."  Day 2 Trial Tr., Doc. No. 347 at 29:18-20 (Zatkovich).  However, the trial record contains no evidence that BBPOS ever requested any Defendant to produce the power management software for any Accused Product or that the

software on the device(s) was inaccessible to Mr. Zatkovich, and the Court's docket reflects that

BBPOS never filed a motion to compel production of any such software.

###### C.   **Automatic Gain Control**

47.    Dr. Shamos and Mr. Zatkovich agree that "Ingenico" uses "auto gain control

software functionality.  Everybody does."  Day 8 Trial Tr., Doc. No. 353 at 87:22-88:10

(Shamos).

###### i.    **There is No Hardware Component of the Alleged Trade Secret**

48.    BBPOS asserts that it has a trade secret for what it calls "automatic gain control"

that consists of algorithms for the optimization of communication settings including the

modulation method, the data rate, volume, and size of the preamble to characterize an audio

channel; BBPOS contends that this solution is unique because it utilizes different parameters,

including its own "particular modulation, frequency, data rate, and preamble formats."  Day 4

Trial Tr., Doc. No. 349 at 79:4-13, 81:23-82:3 (Tang).

49.    According to Mr. Zatkovich, the automatic gain control functionality is contained

in software.  There was no evidence presented at trial of any hardware components to the

automatic gain control function.  Day 2 Trial Tr., Doc. No. 347 at 32:13-33:13 (Zatkovich).

Thus, there is no hardware circuit associated with this solution.

###### ii.    **The Accused Products Do Not Use the Software Component of the Alleged Trade Secret**

50.    Automatic Gain Control refers to a method by which communications between an

mPOS device and the phone to which it is attached can be optimized to ensure interoperability.

For the Accused Products, this function was performed by Landi, in its lab in Fuzhou, China, not

by the Accused Products.  Day 9 Trial Tr., Doc. No. 354 at 13:8-14:22 (Rotsaert); Exhibit 1056.

51. The trial record contains no evidence that BBPOS ever shared the device settings for any particular mPOS device or cell phone associated with the automatic gain control function with ROAM or any Defendant.

52. BBPOS presented no evidence that the device settings for any Accused Product are the same as the device settings for any BBPOS device. In fact, Mr. Zatkovich did not examine that subject. Day 4 Trial Tr., Doc. No. 349 at 31:8-13 (Zatkovich).

53. BBPOS did not share any software source code with any Defendant. Exhibit 166 at 1 ("Ben did not accept [agree] to provide any source code file"); Day 9 Trial Tr., Doc. No. 354 at 12:21-25 (Rotsaert).

### iii. BBPOS's Failures of Proof

54. The trial record contains no evidence that BBPOS ever disclosed either the software or the parameters used by BBPOS to perform automatic gain control to ROAM or any Defendant. Day 8 Trial Tr., Doc. No. 353 at 88:11-13 (Shamos).

55. Mr. Zatkovich testified that the parameters used by BBPOS to perform automatic gain control were data rate, volume, data size, and audio source, and that Ingenico used the same parameters; however, he did not identify any basis to conclude that the Accused Products utilized the same modulation method as BBPOS. *Compare* Day 2 Trial Tr., Doc. No. 347 at 40:10-41-22, 43:7-17 (Zatkovich) *with* Day 4 Trial Tr., Doc. No. 349 at 79:4-13, 81:23-82:3 (Tang).

56. With respect to the use of a preamble as part of the automatic gain control function, there was no evidence presented at trial as to the length or format of any preamble used in the Accused Products. Mr. Zatkovich offered the inference that "if Ingenico is using the same formats, then you're also using the preamble." Day 9 Trial Tr., Doc. No. 354 at 64:20-22 (Zatkovich).

57.     Mr. Zatkovich's opinion that the Accused Products use a BBPOS preamble is based on two other inferences:  first, that "in order for optimum settings to be utilized, you had to have some form of auto gain control," and second, that the BBPOS data formats, which "require the use of the preamble" are employed in the Accused Products.  Day 2 Trial Tr., Doc. No. 347 at 43:9-17 (Zatkovich).  BBPOS presented evidence of at three different formats for preambles. The data formats referenced by Mr. Zatkovich contain the following preamble formats, one if the output is Manchester code, and another if the output is FSK:

**3.2.1.  Manchester Code**
If the output is Manchester code, data format is as follows:

| Preamble | Sync | Data Packet |
| --- | --- | --- |
| 16 bytes "0" | 1 bit "1" | Defined in the Packet Format Section |

**3.2.2.  FSK**
If the output is FSK, data format is as follows:

| Preamble | Sync | Data Packet |
| --- | --- | --- |
| 16 bytes "0" | 0XCA | Defined in the Packet Format Section |

Exhibit 371 at 6.  Additionally, Mr. Zatkovich described Exhibit 784 as containing "the most detailed spec that BBPOS gave to Ingenico regarding how the preamble would be used to synchronize the auto gain control," which specified the following format:

Basic Communication structure:

| Preamble | Sync Pattern | Data | Checksum | Dummy |
| --- | --- | --- | --- | --- |
| At least 128 bit 0 (to swiper) | 1 bit 1 | N bytes | 1 byte | 1 byte |
| At least 64 bit 0 (from swiper) | | | | (0x00) |

Checksum – CRC8-CCITT of Data

Exhibit 784 at 2.  There is no evidence in the trial record that the Accused Products used any of these three formats.

58.     The parameters for automatic gain control that Mr. Zatkovich attributed to Ingenico were contained in what he described as a public version of a software developer kit

(SDK) that he had found on the internet and decompiled.  Day 2 Trial Tr., Doc. No. 347 at 45:13-20 (Zatkovich).  The SDK is software that runs on a phone.  Day 4 Trial Tr., Doc. No. 349 at 35:6-10 (Zatkovich).

59.     There was no evidence presented at trial that either automatic gain control software or the parameters associated with automatic gain control is present on or contained in any Accused Product.

60.     Mr. Zatkovich's inference that the existence of automatic gain control functionality associated with the Accused Products establishes that BBPOS's specific parameters or software were used is unwarranted and speculative.  Day 8 Trial Tr., Doc. No. 353 at 88:5-13 (Shamos).

61.     Mr. Zatkovich testified that he "did not have access to Ingenico's software" for automatic gain control.  Day 2 Trial Tr., Doc. No. 347 at 42:9-10 (Zatkovich).  However, the trial record contains no evidence that BBPOS ever requested any Defendant to produce the automatic gain control software for any Accused Product, and the Court's docket reflects that BBPOS never filed a motion to compel production of any such software.

62.     BBPOS offered inconsistent evidence with respect to the definition of its asserted trade secret for automatic gain control.

63.     Mr. Zatkovich testified that a "flowchart" sets forth the step-by-step process for BBPOS's automatic gain control system, which an engineer could use to "convert it into software."  Day 2 Trial Tr., Doc. No. 347 at 34:8-21 (Zatkovich); Exhibit 817 at 10 (displaying image taken from Exhibit 375).  However, the trial record contains no evidence that any Defendant used this flowchart and no evidence that any Defendant employed any portion of the methodology disclosed in the flowchart, which includes filtered signals, "spark filters,"

17

calculated preamble period distributions, changing the state of the Manchester decoder, and symbol detection, among other steps.

64.     Mr. Tang testified that Exhibit 145, rather than Exhibit 375, sets forth BBPOS's "automatic gain control algorithm."  Day 4 Trial Tr., Doc. No. 349 at 112:2-4 (Tang). The trial record contains no evidence that any Defendant

- Used "Manchester coding";

- Sent commands from phones to Accused Products with a carrier frequency of 4kHz and a bit rate of 4kHz;

- Sent commands from Accused Products to phones with a carrier frequency of 2kHz and a bit rate of 2kHz;

- Sent data from phones to an Accused Product using the L-channel of the phone;

- sent data from an Accused Product to phones through the MIC channel of the phone; or

- Sent commands within 1.5 seconds with a timeout set at two seconds after the first bit of data is received.

*See* Exhibit 145 at 2.

### D.     Communication Formats

#### i.     The Accused Products Do Not Use the Alleged Trade Secret

65.     BBPOS's data communication formats are not used in any of the Accused Products.  Day 9 Trial Tr., Doc. No. 354 at 15:4-9 (Rotsaert).

66.     BBPOS's data communication formats are not compatible with the Accused Products.  Day 9 Trial Tr., Doc. No. 354 at 15:10-13 (Rotsaert).

67.     Exhibit 1233 sets forth the manner in which all Accused Products format card data.  Exhibit 1233 at slide 8; Day 9 Trial Tr., Doc. No. 354 at 18:6-8 (Rotsaert).

68.     The ROAM Standard data formatting method identified in Exhibit 1233 differs from all the BBPOS data formats introduced at trial.  *Compare* Exhibit 1233 at slide 8 *with* Exhibit 371 at 7-24.  The differences include, *inter alia*, that the ROAM Standard specifies the format for country codes and Service restriction codes, "start sentinels," "field separators," and "end sentinels," none of which appear in any of the BBPOS formats.  *Id.*

### ii.     BBPOS's Failures of Proof

69.     BBPOS asserts that client-specific data formats are trade secrets.  Day 2 Trial Tr., Doc. No. 347 at 46:16-21 (Zatkovich); Day 4 Trial Tr., Doc. No. 349 at 86:2-4 (Tang).  The allegedly proprietary data formats are set forth in Exhibit 371.  Day 4 Trial Tr., Doc. No. 349 at 115:13-116:9 (Tang).

70.     BBPOS contends that a document entitled "ROAM Data Key Management System Product Requirements Document" establishes that the Accused Products utilize the BBPOS data formats.  Day 4 Trial Tr., Doc. No. 349 at 117:14-118:17 (Tang); Day 2 Trial Tr., Doc. No. 347 at 56:24-57:10 (Zatkovich).

71.     Although Mr. Zatkovich testified that he had relied upon a requirements document for the RP350x to determine that the Accused Products use BBPOS data formats, this testimony is mistaken because the RP350x product requirements document (PRD) contains no reference to BBPOS formats and does not specify the manner in which card data is to be formatted.  Day 4 Trial Tr., Doc. No. 349 at 36:24-37:9 (Zatkovich); Exhibit 192 (version 5.0 of RP350x PRD); Exhibit 214 at 19-44 (version 7.0 of RP350xPRD).

72.     Exhibit 207, identified by Mr. Zatkovich and Mr. Tang as the basis for asserting that that Accused Products used BBPOS data formats, is a requirements document applicable to all ROAM Data products, including BBPOS-manufactured products, which references BBPOS

formats 11 and 29.  Day 4 Trial Tr., Doc. No. 349 at 3:10-18 (Zatkovich); Day 4 Trial Tr., Doc.

No. 349 at 117:14-118:17 (Tang); Exhibit 207.

73.    The reference to BBPOS data formats is contained in a bullet point on page 10 of

Exhibit 207, highlighted below:

> High level description :
> - 3rd Party partner for BDK (batch of several BDK) generation & strorage
> - No more BDK created by BBPOS for new P/N, replacement of BDK for Roam production standard. New P/N with Data DUKPT format (format 11 & equivalent of 29 for Data DUKPT)
> - Key custodians for transmission to Roam Datacenter & Landi/BBPOS factory
> - Key injection in Flextronics with TR39 compliant Landi solution (key loader, secure room)  with Landi
> - Decryption made in HSM without redundancy
> - Decryption / HSM packaged to be delivered as an appliance for installation into a 3rd party datacenter (with MCM5 license)

Exhibit 207 at 10; *see also* Exhibit 817 at 15.

74.    The ROAM key management document referenced "format 11" and "equivalent

of 29" because, at the time of the document, ROAM was still supporting the BBPOS-

manufactured G4X, so ROAM needed to support the BBPOS format.  Day 5 Trial Tr., Doc. No.

350 at 984:6-10 (Rotsaert).

75.    The applicability of Exhibit 207 to BBPOS products as well as Accused Products

is demonstrated by the bullet point immediately below the reference to "format 11 & equivalent

of 29 for Data DUKPT," which references key custodians for transmission to BBPOS factory

and another bullet point on the same page under the heading "rationale" that references "Move to

industry standard for BBPOS encryption supported by HSM without specific environment."

Exhibit 207 at 10.

76.    BBPOS presented no evidence of the use of BBPOS data formats other than

Exhibit 207.  Mr. Zatkovich did not examine the software that formats card data for the Accused

Products and he saw no documents relating to how the Accused Products format card data.  Day

4 Trial Tr., Doc. No. 349 at 61:12-62:10 (Zatkovich).

### E.     DUKPT Key Management Process

#### i.        The Accused Products Do Not Use the Alleged Trade Secret

77.     BBPOS's DUKPT variation is not used in Accused Products.  Day 9 Trial Tr., Doc. No. 354 at 21:5-14 (Rotsaert).

78.     The Accused Products use Landi's version of DUKPT, not BBPOS's version. Day 9 Trial Tr., Doc. No. 354 at 21:5-14 (Rotsaert); Exhibit 214 at 13 (specifying "Landi Encryption Solution") and 63 (indicating Landi is responsible party for encryption engine).

#### ii.     2.      BBPOS's Failures of Proof

79.     BBPOS asserts that it has a trade secret relating to an encryption key generation method that it describes as a modified form of DUKPT.  Day 2 Trial Tr., Doc. No. 347 at 59:9-12 (Zatkovich); Day 4 Trial Tr., Doc. No. 349 at 87:6-8 (Tang).

80.     Although BBPOS witnesses referred to it as an "encryption method," the alleged DUKPT trade secret is not an encryption methodology, but a method for derivating, or generating, keys that would be used in an industry standard, Triple DES encryption process.  Day 7 Trial Tr., Doc. No. 352 at 40:18-41:7 (Lo); Day 8 Trial Tr., Doc. No. 353 at 95:10-15 (Shamos).

81.     BBPOS presented inconsistent testimony regarding the scope of its asserted encryption-related trade secret.

82.     Mr. Zatkovich contended that another aspect of the BBPOS encryption-related trade secret is that one of their data formats, Format 11, specified that card data should be encrypted using the "CBC" variant of triple DES encryption rather than the industry standard ECB variant, whereas Mr. Tang denied this was component of the trade secret.  *Compare* Day 4 Trial Tr., Doc. No. 349 at 45:15-19 (Zatkovich) *with* Day 4 Trial Tr., Doc. No. 349 at 106:7-15 (Tang) (modified DUKPT is "the entirety of [BBPOS's] key design related to encryption.").

21

83.     BBPOS contends that the "ROAM Data Key Management System Product Requirements Document" establishes that the Accused Products utilize the BBPOS DUKPT variant.  Day 4 Trial Tr., Doc. No. 349 at 117:14-118:17 (Tang); Day 2 Trial Tr., Doc. No. 347 at 61:23-62:9 (Zatkovich).

84.     Exhibit 207, identified by Mr. Zatkovich and Mr. Tang as the basis for asserting that Accused Products used BBPOS data formats, is a requirements document applicable to all ROAM Data products, including BBPOS-manufactured products that references BBPOS formats 11 and 29.  Day 4 Trial Tr., Doc. No. 349 at 61:23-62:9 (Zatkovich); Day 4 Trial Tr., Doc. No. 349 at 117:14-118:17 (Tang); Exhibit 207.

85.     BBPOS did not assert at trial that the Accused Products utilize any BBPOS data format other than Format 11 and Format 29.  Day 4 Trial Tr., Doc. No. 349 at 37:10-18 (Zatkovich).

86.     Mr. Zatkovich opined that the Accused Products utilize the BBPOS DUKPT variant because formats 11 and 29, referenced in Exhibit 207, "required the use of the data DUKPT encryption key."  Day 2 Trial Tr., Doc. No. 347 at 61:23-62:9 (Zatkovich).

87.     Other than Mr. Zatkovich's implicit assertion, BBPOS introduced no evidence that BBPOS Format 11 or BBPOS Format 29 require the use of the BBPOS DUKPT variant.

88.     BBPOS "Format 11" refers to "DUKPT data key" but does not specify the BBPOS variant:

### 4.1.9.  Format 11

| 1 byte | 1 byte | 2 byte | 2 byte | 2 byte | 26 byte | 10 byte | 1 byte | 80 byte | 1 byte |
|---|---|---|---|---|---|---|---|---|---|
| Format ID (0x0B) | Length of PAN | First 4 digits of PAN | Last 4 digits of PAN | Expiry Date (YYMM) | 26 bytes after the 1st ^ | KSN | Track 1 Length | Encrypted Track 1 | Checksum CRC8 of all bytes |
| 0 | 1 | 2 | 4 | 6 | 8 | 34 | 44 | 45 | 125 |

- Track 1 is in ASCII.
- Track 1 is padded with 0x00 to the least multiple of 8 bytes before encryption.
- Encrypted track is padded with 0x00 to 80 bytes.
- DUKPT data key is used for encryption.
- TDES CBC mode is used to encrypt track 1.
- CRC is using CCITT CRC.
- This format is for Vantiv with magnetic head to read track1 only.

Exhibit 371 at 10.

89.    BBPOS "Format 29" contains no reference to DUKPT whatsoever:

### 4.1.23. Format 29

| 1 byte | 1 byte | 2 byte | 2 byte | 2 byte | 26 byte | 10 byte | 40 byte | 24 byte |
|---|---|---|---|---|---|---|---|---|
| Format ID (0x1D) | Length of PAN | First 4 digits of PAN | Last 4 digits of PAN | Expiry Date (YYMM) | 26 bytes after the 1st ^ | KSN | Encrypted Track 1 | Encrypted Track 2 |

| 1 byte | 1 byte | 1 byte |
|---|---|---|
| Track 1 Status | Track 2 Status | Checksum (CRC8 of all bytes) |

- Each character in Track 1 is 6 bits in length. 4 characters are packed into 3 bytes and padded with zero to make it 40 bytes in length before encryption.
- 26 bytes after the 1st ^ are extracted from Track 1 before encryption.
- Each character in Track 2 is 4 bits in length. 2 characters are packed into 1 byte and padded with zero to make it 24 bytes in length before encryption.
- Track 1 and 2 data is encrypted by TDES in ECB mode.
- The track status code has the following meaning:

| Result | Value | Comment |
|---|---|---|
| Success | 0 | |
| Error | 1 | Error reading the track data |
| Parse Error | 2 | Unable to parse track data, likely due to unrecognized track data format.   For Track 1, this happens when the separator ^ cannot be found. For Track 2, this happens when the |

| | | separator = cannot be found. |
|---|---|---|
| | | Corresponding part in encTrack is 0 |
| Data not present | 3 | The specific track is not on the card. |
| | | Corresponding part in encTrack is 0 |
| Not equipped | 4 | The reader is not configured to read this track. |

- CRC is using CCITT CRC.
- This format is for Swiper with magnetic head to read both track 1 and track2.

Exhibit 371 at 17-18.

90.    BBPOS presented no evidence as to why the use of Format 11 or Format 29 would require the use of the BBPOS DUKPT variant to generate an encryption key rather than open source, industry standard DUKPT.

91.    The reference to "Data DUKPT" is contained in a bullet point on page 10 of Exhibit 207, highlighted below:

High level description :
- 3rd Party partner for BDK (batch of several BDK) generation & strorage
- No more BDK created by BBPOS for new P/N, replacement of BDK for Roam production standard. New P/N with Data DUKPT format (format 11 & equivalent of 29 for Data DUKPT)
- Key custodians for transmission to Roam Datacenter & Landi/BBPOS factory
- Key injection in Flextronics with TR39 compliant Landi solution (key loader, secure room)  with Landi
- Decryption made in HSM without redundancy
- Decryption / HSM packaged to be delivered as an appliance for installation into a 3rd party datacenter (with MCM5 license)

Exhibit 207 at 10.

92.    Mr. Zatkovich's inference that the reference to "Data DUKPT" on Exhibit 207 refers to the BBPOS DUKPT variant, rather than industry standard DUKPT, is unwarranted, speculative, and contradicted by other statements in the same exhibit.

93.    Exhibit 207 recites that the "rationale" for the "targeted implementation," which includes "New P/N with Data DUKPT format" is to "[m]ove to industry standard for BBPOS encryption supported by HSM without specific development."  Exhibit 207 at 10.

94.     BBPOS presented no evidence of the use of the BBPOS DUKPT variant other than Exhibit 207.

**V.      None Of BBPOS's Information Qualifies As A "Trade Secret"**

> **A.      BBPOS's Alleged Trade Secrets Were Generally Known in the Field**
>
> > **i.      The Trial Record Contains No Evidence that Any of BBPOS's Alleged Trade Secrets Were Not Generally Known in the Field at the Time of Alleged Misappropriation**

95.     Mr. Zatkovich opined that in 2012, BBPOS's alleged trade secrets were not generally known in the field.  Day 4 Trial Tr., Doc. No. 349 at 10:9-25 (Zatkovich); Day 2 Trial Tr., Doc. No. 347 at 113:24-25 (Zatkovich).  This opinion has no probative value on the question of whether the information was generally known at the relevant time, *i.e.*, when the alleged misappropriation occurred.

96.     Although Mr. Zatkovich testified that he "reviewed prior art that extended into 2013," he did not offer an opinion as to whether any of BBPOS's trade secrets were not generally known in the field in 2013.  Day 4 Trial Tr., Doc. No. 349 at 10:21-25 (Zatkovich).

97.     Neither Mr. Zatkovich nor any other witness testified at trial that any of BBPOS's alleged trade secrets were not generally known in the field for any period of time after 2012.

98.     Therefore, even if the Court rejects Dr. Shamos's testimony regarding general knowledge of the trade secrets in its entirety and concludes that BBPOS's alleged trade secrets were not generally known in the field through 2012, the Court cannot find that BBPOS's alleged trade secrets were not generally known in the field after 2012 because the trial record contains no evidence to support such a finding.

99.     2012 is the incorrect reference point because all the evidence of disclosure and use of BBPOS's alleged trade secrets during 2012 concerned (1) collaboration on a potential new

EMV-capable mPOS device; (2) technical support concerning the BBPOS products then being sold by ROAM; and/or (3) exploring new potential sales opportunities for BBPOS products.

100.    There was no evidence at trial that any Defendants used any information relating to the alleged trade secrets for impermissible purposes, or disclosed such information to anyone, during 2012. Rather, all information concerning 2012 activity consisted of contractually-permitted collaboration on a potential new EMV-capable mPOS device or the exploration of new business in Germany for the sale of BBPOS products.

101.    The earliest event that corresponds to an alleged misappropriation of trade secrets is the sale of Accused Products that are included in the parties' respective experts' analyses of damages, which began in 2014. Day 5 Trial Tr., Doc. No. 350 at 65:2-7, 66:7-12 (Scherf); Day 9 Trial Tr., Doc. No. 354 at 153:19-23, 154:5-7 (Vanderhart).

102.    Because there was no evidence at trial of any Defendant impermissibly using or disclosing any of BBPOS's alleged trade secrets prior to 2014, Mr. Zatkovich's opinion about the state of knowledge in 2012 is irrelevant to the status of the information as protectable trade secrets on the date of the alleged misappropriation.

### ii.    BBPOS's Alleged Trade Secrets Were Generally Known in the Field in 2012

103.    Two of the alleged trade secrets – polarity detection and power management – include hardware components, but as BBPOS's witness, Mr. Graylin, confirmed, "hardware is not hard." Exhibit 168 at page 2; Day 3 Trial Tr., Doc. No. 348 at 102:21-24 (Graylin).

### a)    Audio Jack Polarity Detection

104.    Even prior to 2012, the issue of audio jack polarity "was a very common problem." Day 8 Trial Tr., Doc. No. 353 at 39:5-40:5 (Shamos); *see also* Day 2 Trial Tr., Doc. No. 347 at 6:6-11 (Zatkovich).

105.    In 2012, the problem of audio jack polarity had been solved.  Day 8 Trial Tr., Doc. No. 353 at 40:21-47:8, 55:11-17 (Shamos).

106.    In 2012, it was not unusual to send data over an audio jack to a phone.  Day 8 Trial Tr., Doc. No. 353 at 15:1-18, 17:8-18:15, 19:9-38:24, 101:24-103:10 (Shamos); Exhibit 643; Exhibit 674; Exhibit 676; Exhibit 686; Exhibit 693; Exhibit 678; Exhibit 679; Exhibit 681; Exhibit 683; Exhibit 684; Exhibit 685; Exhibit 696; Exhibit 1124; Exhibit 1143.

107.    The audio jack of the cell phone had been used for transmitting data for decades prior to 2012.  *Id.*, Doc. No. 353 at 15:11-13, 20:6-21:22; Exhibit 676.

108.    A patent published on January 12, 2012 discloses "a reader device that's plugged into the audio jack of a tablet," which reads the magnetic stripe on a credit card, and communicates digital data over the audio interface.  Day 8 Trial Tr., Doc. No. 353 at 31:3-19 (Shamos); Exhibit 684.

109.    A patent issued in 2004 for an integrated circuit that automatically detected polarity "not only detects the polarity, but makes a correction if necessary, changes the polarity." Day 8 Trial Tr., Doc. No. 353 at 41:12-20 (Shamos); Exhibit 692.  This patent, like one of the BBPOS circuits identified by Mr. Zatkovich, uses a two-transistor solution.  Day 8 Trial Tr., Doc. No. 353 at 42:9-43:15 (Shamos); Exhibit 692.

110.    By May 2013, Texas Instruments had published the product specification sheet for a chip that disclosed the use of two MOSFET transistors to solve the audio jack polarity problem.  Day 8 Trial Tr., Doc. No. 353 at 45:19-47:5 (Shamos); Exhibit 633.

111.    Therefore, both (1) the concept of polarity detection and correction and (2) using two transistors to detect and correct polarity were generally known in the field in 2012.

      **b)**      **Power Management**

112.    As of the close of fact discovery in this case (December 10, 2021), "BBPOS didn't believe that it had a trade secret on power management that had been misappropriated," even though BBPOS had been in possession of at least one of the Accused Products for six years. Day 7 Trial Tr., Doc. No. 352 at 55:7-56:14 (Lo).

113.    BBPOS claimed "power management" as one of its trade secrets only upon the analysis of its technical expert, Mr. Zatkovich.  Day 7 Trial Tr., Doc. No. 352 at 6:15-19, 61:19-24 (Lo).

114.    The need to have power management in electronic devices, and hardware solutions to manage power consumption, were known before 2012.  Day 8 Trial Tr., Doc. No. 353 at 24:16-26:13; 66:20-73:7 (Shamos).  Indeed, "[s]leep and wake-up capability was known in many different devices."  Day 1 Trial Tr., Doc. No. 346 at 120:16-17 (Zatkovich); Exhibit 679; Exhibit 680; Exhibit 682; Exhibit 689; Exhibit 690.

### c)    Automatic Gain Control

115.    "[A]utomatic gain control is necessary in order to accommodate different devices into which the mPOS reader might be plugged."  Day 8 Trial Tr., Doc. No. 353 at 76:20-22 (Shamos).

116.    Generally speaking, cell phones are tested to obtain their electrical parameters, which are encoded into software (for the automatic gain control) that is used when the cell phone is connected to the mPOS device.  Day 8 Trial Tr., Doc. No. 353 at 79:13-23 (Shamos); Day 2 Trial Tr., Doc. No. 347 at 32:15-22 (Zatkovich).

117.    Automatic gain control was well known in the field, as demonstrated by, *inter alia*, the Dorsey patent for the Square product.  Day 8 Trial Tr., Doc. No. 353 at 77:23-86:2 (Shamos); Exhibit 696.  Although the specific parameters that BBPOS opted to use for the

28

specific phones it tested were not generally known (*id.*, Doc. No. at 85:23-86:5), the trial record contains no evidence that any of those parameters (or the related software) were ever disclosed to any Defendant or were used in any of the Accused Products.

      **d)**    **Communication Formats**

118.    Communication formats inherently are not secret.  The recipient of the data must know the format to understand the data that is being sent.  Furthermore, one could ascertain what format is being used by examining the data that is being exchanged between the two devices.  Day 8 Trial Tr., Doc. No. 353 at 90:5-10, 90:16-91:18 (Shamos); Exhibit 669.

119.    Communication formats are well known in the field and are commonly published because "you want to make your device as usable by any other manufacturers as possible."  Day 8 Trial Tr., Doc. No. 353 at 90:16-91:18 (Shamos); Exhibit 669.

120.    Unitech published a manual so people could interact with the magnetic stripe card reader Unitech was selling and thereby increase sales.  Day 8 Trial Tr., Doc. No. 353 at 91:19-92:3 (Shamos).

      **e)**    **DUKPT Key Management Process**

121.    The data that is transmitted in connection with digital payments is encrypted.  The same key that is used to encrypt the data is used to decrypt it.  Thus, both the sender and the recipient must have that key.  Day 8 Trial Tr., Doc. No. 353 at 93:18-94:2, 96:1-9 (Shamos).

122.    The encryption method used by BBPOS, triple DES (data encryption standard) encryption, is standard.  Day 8 Trial Tr., Doc. No. 353 at 95:10-11, 95:16-23 (Shamos).

123.    "[K]ey management is essential in applying any kind of encryption."  Day 8 Trial Tr., Doc. No. 353 at 94:3-4 (Shamos).

124.    The tool for managing keys is not kept secret:  "You don't even keep the key-generation method secret."  Day 8 Trial Tr., Doc. No. 353 at 96:10-11 (Shamos).

125.     The standard implementation of DUKPT is in the public domain, and BBPOS could not identify which components, if any, of its DUKPT variant were not in the public domain.  Day 8 Trial Tr., Doc. No. 353 at 95:13-14, 96:16-17 .

**B.     BBPOS Has Failed to Establish that Its Alleged Trade Secrets Are Not Readily Ascertainable**

**i.     Audio Jack Polarity Detection**

126.     With respect to audio jack polarity detection, the two-transistor solution that BBPOS has identified as the hardware component of a trade secret is "easily ascertainable."  Day 8 Trial Tr., Doc. No. 353 at 55:20-57:25 (Shamos).

127.     One can take apart the BBPOS device, examine it, and "if necessary, apply electronic testing equipment" to determine "which devices are connected to which devices and figure out how it works in that manner."  Day 8 Trial Tr., Doc. No. 353 at 56:17-21 (Shamos).

128.     "With this two-transistor solution to polarity, it's particularly easy because the components that are going to do the polarity reversal have to be right next to the headphone jack, because you don't want any signals going into the device before the correct polarity has been determined."  Day 8 Trial Tr., Doc. No. 353 at 56:22-57:1 (Shamos).

129.     Although there was no evidence at trial with respect to whether the software for BBPOS's polarity detection and correction solution would be readily ascertainable, the trial record contains no evidence that the software was ever shared with, or disclosed to, any Defendant.

**ii.     Power Management**

130.     The hardware, including the circuitry, for BBPOS's power management solution can be visually examined and is readily ascertainable.  Day 8 Trial Tr., Doc. No. 353 at 73:9-74:3 (Shamos); *see also* Day 4 Trial Tr., Doc. No. 349 at 75:1-76:4 (Tang) (identifying software

as the reason the power management solution could not be ascertained by looking at the product).

131.    Although the software that is not decodable is not readily ascertainable (*id.*, Doc. No. 353 at 73:9-74:3), BBPOS did not share the associated software with any Defendant.  Day 5 Trial Tr., Doc. No. 350 at 28:1-13 (Tang).

### iii.    Automatic Gain Control

132.    Any circuitry for BBPOS's automatic gain control solution would be readily ascertainable.  Day 8 Trial Tr., Doc. No. 353 at 87:10-17 (Shamos).

133.    The "preamble" of an automatic gain control solution is the exchange of signals between the cell phone and mPOS device before any data is exchanged.  Day 8 Trial Tr., Doc. No. 353 at 88:21-89:7 (Shamos).  The preamble is readily ascertainable because "[a]ll you have to do is look at the signals that are being exchanged between the devices.  You can't keep that secret."  *Id.*, Doc. No. 353 at 89:8-89-11; Day 9 Trial Tr., Doc. No. 354 at 52:7-8 (Zatkovich) ("So naturally, the preamble would be easily detectible, because that's the intent.").

134.    Ascertaining the specific parameters that BBPOS developed might take considerable time.  Day 8 Trial Tr., Doc. No. 353 at 87:17-21 (Shamos).  However, the trial record contains no evidence that any of those parameters (or the related software) were ever disclosed to any Defendant or were used in any Accused Product.

### iv.    Communication Formats

135.    The BBPOS communication formats are readily ascertainable:  "You can certainly ascertain the format.  You might not be able to decrypt a decrypted [sic] field, but you can tell that it's encrypted because you can't read it."  Day 8 Trial Tr., Doc. No. 353 at 91:19-22, 92:19-93:12 (Shamos).  "[E]ven an eavesdropper is able to tell what the format is by looking at the data that's exchanged between the two devices."  *Id.*, Doc. No. 353 at 90:5-10.

136.    BBPOS's technical expert, Mr. Zatkovich, agrees as to the "detectability of the

format."  He testified as follows:

> The detectability of the formats would be being able to eavesdrop
> on the communication between the mPOS device and the phone.
> And from that perspective, I agree that that can be done and that
> you can, in some cases, detect some of those fields, specifically the
> ones that are not encrypted, especially if they come from the credit
> card data.

Day 9 Trial Tr., Doc. No. 354 at 54:6-11 (Zatkovich).

137.    BBPOS's communication formats are readily ascertainable:  "Everything about it

is readily ascertainable except the contents of this field labeled 45 . . . [because] [t]hat's

encrypted."  Day 8 Trial Tr., Doc. No. 353 at 92:12-13, 92:21-93:12 (Shamos); Exhibit 817 at

13.  The fact that a field is encrypted is readily ascertainable, but without knowledge of the

encryption method and key, the contents of that field would not be readily ascertainable.

### C.    BBPOS Has Failed to Prove that Its Alleged Trade Secrets Have Independent Economic Value

#### i.    Audio Jack Polarity Detection

138.    Although audio jack polarity detection is important, "[t]here's many ways of

implementing polarity detection" including solutions "other than the one [BBPOS claims to be a]

trade secret."  Day 1 Trial Tr., Doc. No. 346 at 127:24-25 (Zatkovich); Day 4 Trial Tr., Doc. No.

349 at 17:10-13 (Zatkovich).

139.    As noted above in connection with audio jack polarity detection being generally

known in the field, there have been multiple solutions for the polarity problem beyond the three

different circuit designs used by BBPOS.

140.    BBPOS presented no evidence of value of the alleged polarity detection trade

secret other than the testimony of Mr. Zatkovich, who opined that the function of polarity

detection and correction was necessary to enable the function of the mPOS device and to avoid potential damage to the device.  Day 2 Trial Tr., Doc. No. 347 at 6:12-25 (Zatkovich).

141.    Because the evidence of value is based upon the function of the alleged trade secret (correcting for polarity) rather than the specific implementation developed by BBPOS, the trial record contains no evidence that BBPOS's solution for detecting and correcting audio jack polarity would be of any economic value to third parties in light of other methods available at the time.  Mr. Zatkovich testified that he has not provided any opinion that BBPOS's polarity detection solution was better or more advantageous than available alternatives.  Day 9 Trial Tr., Doc. No. 354 at 61:6-12 (Zatkovich).

### ii.    Power Management

142.    As noted above in connection with power management being generally known in the field, there have been multiple solutions to manage power consumption beyond the three or more different circuit designs used by BBPOS.

143.    BBPOS presented no evidence of value of the alleged power management trade secret other than the testimony of Mr. Zatkovich, who opined that the function of power management was necessary because "an mPOS device [] has limited power."  Day 2 Trial Tr., Doc. No. 347 at 23:1-11 (Zatkovich).

144.    Because the evidence of value is based upon the function of the alleged trade secret (managing power) rather than the specific implementation developed by BBPOS, the trial record contains no evidence that BBPOS's solution for power management would be of any economic value to third parties in light of other methods available at the time.  Mr. Zatkovich testified that he has not provided any opinion that BBPOS's power management solution was better or more advantageous than available alternatives.  Day 9 Trial Tr., Doc. No. 354 at 61:6-12 (Zatkovich).

### iii.      Automatic Gain Control

145.      As noted above in connection with automatic gain control being generally known in the field, there have been multiple solutions for automatic gain control, including (but not limited to) the Dorsey patent for the Square product.  Day 8 Trial Tr., Doc. No. 353 at 82:14-85:22 (Shamos); Exhibit 696.

146.      BBPOS presented no evidence of value of the alleged automatic gain control trade secret other than the testimony of Mr. Zatkovich, who opined that the function of automatic gain control is important "to minimize the amount of transmission time it takes and then the auto gain control allows you to make sure that that signal is sent in the highest quality possible."  Day 2 Trial Tr., Doc. No. 347 at 35:2-5 (Zatkovich).

147.      Because the evidence of value is based upon the function of the alleged trade secret (correcting a signal) rather than the specific implementation developed by BBPOS, the trial record contains no evidence that BBPOS's solution for automatic gain control would be of any economic value to third parties in light of other methods available at the time. Mr. Zatkovich testified that he has not provided any opinion that BBPOS's auto gain control solution was better or more advantageous than available alternatives.  Day 9 Trial Tr., Doc. No. 354 at 61:6-12 (Zatkovich).

148.      Mr. Zatkovich testified that this function (correcting a signal) is performed by software:  the "auto gain software . . . does the automatic adjustment."  Day 2 Trial Tr., Doc. No. 347 at 39:3-4 (Zatkovich).   However, the trial record contains no evidence that BBPOS's automatic gain control software (or any of the parameters BBPOS developed) were ever disclosed to any Defendant or that there is any even analogous function present in any Accused Device.

### iv.      Communication Formats

149.     The trial record contains no credible evidence that BBPOS's communication formats would be of any economic value to third parties, as opposed to any other formats, including the formats published by Unitech in 2011 for its compact credit card reader and the data format methodology actually used in the Accused Products.  Exhibit 669 at 22-49; Exhibit 1233 at slide 8.

150.     Mr. Zatkovich testified that he has not provided any opinion that BBPOS's data formats are better or more advantageous than available alternatives.  Day 9 Trial Tr., Doc. No. 354 at 61:6-12 (Zatkovich).

151.     BBPOS's theory of value for its data formats is that they create "some kind of customer stickiness" in the sense that once a customer uses a BBPOS format, the customer would need to undertake certain changes to its system to accommodate a different hardware supplier.  Day 2 Trial Tr., Doc. No. 347 at 58:23-59:6 (Zatkovich); Day 4 Trial Tr., Doc. No. 349 at 84:9-19 (Tang); Day 7 Trial Tr., Doc. No. 352 at 5:9-13 (Lo).

152.     BBPOS's "stickiness" value theory for its data formats is incorrect – BBPOS's customers would not need to change the data formats because the customers do not use the data formats and do not even know what the data formats are.  Day 7 Trial Tr., Doc. No. 352 at 57:19-58:14; 59:16-21 (Lo).

153.     BBPOS's "stickiness" value theory for its data formats, if true, provides a basis for value of the formats to BBPOS (retaining customers) but not to third parties.

154.     Although Mr. Zatkovich expressed an opinion that BBPOS competitors could utilize BBPOS's data formats to win a customer such as Google (*see* Day 2 Trial Tr., Doc. No. 347 at 51:16-53:3), this testimony was conclusory, without foundation, and contradicted by the testimony of BBPOS's own witness.

35

155. Mr. Lo explained why Mr. Zatkovich was incorrect to suggest that having access to BBPOS's Format 11, for example, would enable a competitor to "be compatible with those clients' payment software." The client would need to make sure that the whole solution worked using the new devices, and there would need to be substantial changes that would need to happen throughout the payment-processing structure, involving testing and substantial work by software engineers. Changing a data format would only be a single component of that process. *Compare* Day 2 Trial Tr., Doc. No. 347 at 58:19-59:6 (Zatkovich) *with* Day 7 Trial Tr., Doc. No. 352 at 71:7-73:1 (Lo).

### v.     DUKPT Key Management Process

156. BBPOS introduced no evidence as to the value of its DUKPT key generation variant.

157. The sole evidence at trial that purported to address the value of the BBPOS DUKPT variant was from Mr. Zatkovich, who stated that "[i]t makes the formats, 11 and 29, unique in terms of the type of encryption that it performs." Day 2 Trial Tr., Doc. No. 347 at 60:18-20 (Zatkovich). However, there is no predicate for this assertion because, as explained above, Format 11 does not reference the BBPOS DUKPT variant, and Format 29 makes no reference to DUKPT whatsoever. *See supra* at ¶¶ 88-89; *see also* Exhibit 371 at 10, 17-18.

158. The industry has not accepted BBPOS's DUKPT variation. Day 8 Trial Tr., Doc. No. 353 at 96:18-19 (Shamos). Neither BBPOS nor any of its competitors needs to use the BBPOS DUKPT variant – they "could have used standard DUKPT it they wanted to." *Id.*, Doc. No. 353 at 97:2-7.

159. The trial record contains no evidence that BBPOS's DUKPT variation would be of any economic value to third parties in light of the existence of standard DUKPT. BBPOS's technical expert, Mr. Zatkovich, testified that he has not provided any opinion that BBPOS's

solution was better or more advantageous than available alternatives.  Day 9 Trial Tr., Doc. No.

354 at 61:6-12 (Zatkovich).

## VI. The Engineering And License Agreement Expressly Authorized ROAM To Use BBPOS's Intellectual Property

### A. The License Agreement

160.    On May 4, 2010, ROAM Data, Inc. ("ROAM") and Plaintiff BBPOS Limited

("BBPOS") entered into the Engineering Development and License Agreement.  Exhibit 1 at 1-

11.  Prior to the events at issue in this case, on August 5, 2011, ROAM and BBPOS entered into

the Amendment to Engineering Development and License Agreement.  *Id.* at 12-16.  The

Engineering Development and License Agreement, as amended, is referred to herein as the

"Agreement" or the "License Agreement."

161.    The Agreement expressly provided ROAM Data the license to use a wide range

of intellectual property concerning credit card reading technology:

> [BBPOS] hereby grants to [ROAM] a worldwide, perpetual, fully-
> paid license to freely use the Partner Intellectual Property to make,
> have made, develop, have developed, use, sell, offer for sale,
> import and distribute the Products, any portion thereof, or any
> products similar to or based upon any Products.

Exhibit 1 at 12, §1.1.

162.    The Agreement expressly defines "Products" as including two different devices:

the "Encrypted Circle Swipe reader" and an "EMV capable POS unit with Bluetooth interface."

Exhibit 1 at 10 (Schedule I).

163.    The Agreement expansively defines "Partner Intellectual Property" to include:

> (a) any and all patents and patent applications relating to the
> Products, including without limitation US Patent Application
> Number 12/767,831 for secure audio coupled card swiper filed on
> April 27, 2010 with the United State Patent and Trademark Office
> (the "Patent Application") and any patents issuing on the Patent

37

Application, including (i) any reissues, renewals, reexaminations, substitutions or extension s thereof and foreign equivalents of the foregoing; (ii) any claim of a continuation-in-part application or patent that is entitled to the priority date of, and is directed specifically to subject matter specifically described in, the Patent Application; (iii) any foreign counterpart thereof (including PCTs); and (iv) any supplementary protection certificates and any other patent term extensions, restorations and exclusivity periods and the like of the Patent Application; and (b) any copyrights, trademarks, trade names, trade secrets, knowledge, data and information owned or controlled by [BBPOS] relating to the Products.

Exhibit 1 at 12-13, § 1.3.

164.     The express purpose of the Agreement was to permit ROAM to freely use BBPOS's intellectual property to develop and make products, and/or have products developed and made by a third party.  Day 3 Trial Tr., Doc. No. 348 at 79:24-80:8 (Graylin).

165.     The Agreement granted ROAM a license to use BBPOS's intellectual property to, *inter alia*, make, develop, sell, and/or distribute, and/or to have third parties make, develop, sell, and/or distribute, (1) the Circle Swipe (also known as CryptoSwipe) device, (2) an EMV (Europay, MasterCard, and VISA) capable point-of-sale ("POS") device with Bluetooth interface, and/or (3) devices related to either of those two devices.  Day 3 Trial Tr., Doc. No. 348 at 79:19-80:8, 80:14-17, 83:15-19, 84:11-13, 85:11-86:16 (Graylin).

166.     The CircleSwipe device was a simple mobile POS ("mPOS") card reader that could read the magnetic stripe on a credit card.  The CircleSwipe device did not have features found in other POS or later mPOS devices such as EMV capability, secure card reading (chip functionality), contactless (tap) payments, rechargeable batteries, tamper resistance, PCI certification, Bluetooth, or USB connectivity.  Day 4 Trial Tr., Doc. No. 349 at 9:4-10:5 (Zatkovich); Day 4 Trial Tr., Doc. No. 349 at 66:24-4 (Tang); Day 5 Trial Tr., Doc. No. 350 at 32:23-36:7 (Tang).

167.     As of the time the License Agreement was executed, BBPOS had not yet completed development of the EMV-compliant and Bluetooth-capable mPOS identified in the Agreement.  Exhibit 1 at 10 (Schedule I).

168.     Under the Agreement, BBPOS sold the CircleSwipe mPOS device to ROAM for BBPOS's cost plus a profit margin of $3.00 for the first 150,000 units and $2.00 for all subsequent units.  Exhibit 1 at 15 (Schedule II).  This profit margin included the royalty payment to BBPOS for its intellectual property that is contained in the CircleSwipe reader.  Exhibit 1; *see also* Exhibit 168 at page 2; Day 3 Trial Tr., Doc. No. 348 at 102:21-24 (Graylin) ("They feel that this margin we pay them includes the royalties we pay for their IP, which was the intention discussed with them early on but not specified clearly in the contract.").

169.     The asserted trade secrets relate to the CircleSwipe reader because that device contains all five trade secrets that BBPOS alleges to have been misappropriated by one or more Defendants:  (1) audio jack polarity detection and correction; (2) power management; (3) automatic gain control; (4) communication formats; and (5) DUKPT (derived unique key per transaction) encryption key management.  Day 4 Trial Tr., Doc. No. 349 at 10:6-8 (Zatkovich); Day 1 Trial Tr., Doc. No. 346 at 101:6-23 (Zatkovich).

170.     ROAM would resell the CircleSwipe reader rebranded as G3, G4x, and G5x.  Day 2 Trial Tr., Doc. No. 347 at 55:13-21 (Zatkovich); Day 4 Trial Tr., Doc. No. 349 at 9:10-14 (Zatkovich).

171.     ROAM merged with and into Ingenico Inc. on December 13, 2017.  Joint Pretrial Mem., Doc. No. 316 at 6 (stipulated fact).

## B.     ROAM's Efforts To Develop An EMV-Capable mPOS Device

172.     The development of an EMV-capable mPOS device was a priority for ROAM in 2012.  Exhibit 163 at 1; Day 3 Trial Tr., Doc. No. 348 at 113:21-114:4 (Graylin); Exhibit 147 at

page 5.  As a result, beginning in February 2012, ROAM explored multiple scenarios for the

delivery of a next generation, EMV-capable mPOS reader.  Day 6 Trial Tr., Doc. No. 351 at

13:5-12 (Rotsaert).

173.    Because BBPOS had not yet finished developing the EMV-compliant and

Bluetooth-capable mPOS designated a "Product" in the Agreement, ROAM sought to leverage

its relationship with Ingenico, an established company in the hardware POS space.  Exhibit 1;

Day 3 Trial Tr., Doc. No. 348 at 22:2-20 (Graylin); Day 5 Trial Tr., Doc. No. 350 at 143:3-23

(Rotsaert).

174.    In order to develop an EMV-capable mPOS device, ROAM simultaneously

pursued multiple potential sources for the new card reader, including (1) having BBPOS

independently develop the device; (2) having Ingenico develop a product utilizing BBPOS

swiper-related know-how as permitted by Section 1.3 of the Agreement; and (3) having

Ingenico's subsidiary, Landi, independently develop the device. Day 6 Trial Tr., Doc. No. 351 at

50:4-13 (Rotsaert).

175.    Christopher Rotsaert disclosed the fact that he was having discussions with Landi

about Landi being a potential source for an EMV-capable mPOS reader no later than March 23,

2012.  Exhibit 791 at 4-5 ("Hi Ben…Regarding EMV, my idea is that we may consider using

one Landi platform…").  Mr. Rotsaert invited Ben Lo to have technical discussions about

Landi's involvement to explore the possibility of moving quickly by leveraging both teams, *i.e.*,

Landi and BBPOS.  *Id.*

176.    ROAM's first option, having the EMV-capable reader independently developed

by BBPOS, had been contemplated since at least the date of the Agreement, evidenced by the

explicit reference to an EMV- and Bluetooth-capable unit in the Agreement.  Exhibit 1 at 10 (Schedule I).

177.    Because BBPOS did not have a Level 2 EMV kernel, independent development by BBPOS required the acquisition of a license for the kernel at a cost of $100,000.  ROAM's board of directors rejected Will Graylin's suggestion that ROAM pay for the license, determining that if BBPOS was to be the supplier of ROAM's EMV-capable reader, BBPOS would have to pay for the license.  Day 3 Trial Tr., Doc. No. 348 at 92:9-94:23 (Graylin).

178.    ROAM continued to pursue the possibility of an EMV-capable reader independently developed by BBPOS into 2013, but the process was not ultimately successful. Day 6 Trial Tr., Doc. No. 351 at 52:20-53:1 (Rotsaert).

179.    In early 2012, ROAM's CEO, Will Graylin, arranged for BBPOS to meet with two senior staff from Ingenico to explore a joint effort to develop a new, EMV-capable mPOS reader for ROAM, similar to or the same as the EMV-capable reader referenced in the Agreement.  Exhibit 406 at 1; Day 3 Trial Tr., Doc. No. 348 at 89:5-9 (Graylin); Day 4 Trial Tr., Doc. No. 349 at 90:11-91:20 (Tang).

180.    In February 2012, the two senior staff from Ingenico, Christopher Rotsaert and Patrice Fivel, met with BBPOS engineers for the purpose of a potential collaboration between BBPOS and Ingenico on a new product (the "February 2012 Workshop").  *E.g.*, Day 4 Trial Tr., Doc. No. 349 at 91:1-23 (Tang).

181.    ROAM's use of a third party, Ingenico, to develop a new EMV-capable card reader was expressly permitted under the License Agreement and ROAM was free to utilize any of BBPOS's technical information, including any trade secrets, in that development.  Exhibit 1 at 12-13, § 1.3.  Under the Agreement, the information exchange between and among BBPOS,

41

"Ingenico," and ROAM was an intended use for the licensed BBPOS intellectual property.  *Id.*;
Day 3 Trial Tr., Doc. No. 348 at 79:24-80:8 (Graylin).

182.    BBPOS had direct knowledge of the communication of BBPOS technical
information to Ingenico, and understood Ingenico's use of the information, specifically the
development of an EMV-capable mPOS reader.  BBPOS also had direct knowledge of the fact
that Ingenico's subsidiary, Landi, was another potential source for developing an EMV-capable,
audio jack-based mPOS device for ROAM.  Exhibit 791 at 1; Day 7 Trial Tr., Doc. No. 352 at
45:14-46:5 (Lo).  BBPOS not only did not object to the process, BBPOS was an active
participant.  Day 7 Trial Tr., Doc. No. 352 at 47:20-48:5 (Lo).

183.    The BBPOS-ROAM-Ingenico collaboration did not yield a viable product and the
collaboration was terminated in late summer 2012.  Day 6 Trial Tr., Doc. No. 351 at 52:20-53:1
(Rotsaert).

## VII.    **BBPOS Voluntarily Disclosed All Five Of Its Alleged Trade Secrets Without Any Oral Or Written Non-Disclosure Agreement, Confidentiality Agreement, Or Restriction On Use**

184.    BBPOS asserts that it has five alleged trade secrets that were allegedly
misappropriated.  Day 1 Trial Tr., Doc. No. 346 at 100:24-101:23 (Zatkovich); Day 4 Trial Tr.,
Doc. No. 349 at 68:5-19 (Tang).

185.    BBPOS voluntarily disclosed to one or more Defendants all five of BBPOS's
alleged trade secrets without an oral or written nondisclosure agreement, confidentiality
agreement, or restriction on use.  Exhibits 68, 72, 73, 407; Day 2 Trial Tr., Doc. No. 347 at
108:15-109:10, 24:21-25, 35:19-22 (Zatkovich); Day 4 Trial Tr., Doc. No. 349 at 92:11-96:9,
97:15-99:11, 99:16-18, 126:1-25, 127:19-23, 129:10-130:12, 130:15-23 (Tang); Day 4 Trial Tr.,
Doc. No. 349 at 104:1-23, 105:19-106:15-108:2, 108:12-110:25 (Tang); Day 6 Trial Tr., Doc.

No. 351 at 75:21-76:2 (Rotsaert); Day 7 Trial Tr., Doc. No. 352 at 39:17-40:14, 41:14-42:1, 42:18-21, 124:10-21 (Lo); Day 9 Trial Tr., Doc. No. 354 at 38:22-25 (Rotsaert).

A.   **BBPOS's Voluntary Disclosures at the February 2012 Workshop**

186.   In February 2012, representatives of BBPOS (Daniel Tsai and Jimmy Tang) met with representatives "from Ingenico" (Christopher Rotsaert and Patrice Fivel) in Hong Kong to discuss their joint work on potential development of a new mPOS device (the "February 2012 Workshop").  Exhibit 406; Day 4 Trial Tr., Doc. No. 349 at 91:11-23, 124:21-125:15, 135:5-17 (Tang); Exhibit 144; Exhibit 145; Exhibit 146.

187.   The February 2012 Workshop occurred over two days, for approximately six hours per day.  Day 4 Trial Tr., Doc. No. 349 at 92:7-10, 125:22-25 (Tang).

188.   Mr. Fivel was never an employee of ROAM.  The trial record contains no evidence that Mr. Fivel ever was an employee of ROAM.

189.   At the time of the February Workshop, Mr. Rotsaert was not an employee of ROAM.  See Day 3 Trial Tr., Doc. No. 348 at 105:10-25 (Graylin); Day 5 Trial Tr., Doc. No. 350 at 115:2 (Rotsaert); Day 6 Trial Tr., Doc. No. 351 at 85:24-86:1 (Rotsaert).

190.   Mr. Rotsaert did not become an employee of ROAM until July 1, 2012.  Day 3 Trial Tr., Doc. No. 348 at 105:10-25 (Graylin); Day 5 Trial Tr., Doc. No. 350 at 115:2 (Rotsaert); Day 6 Trial Tr., Doc. No. 351 at 85:24-86:1 (Rotsaert).

191.   Mr. Lo understood that ROAM and "Ingenico" were separate companies.  Day 7 Trial Tr., Doc. No. 352 at 73:20-74:1 (Lo).

192.   At the time of the February 2012 Workshop, BBPOS did not have any written or oral nondisclosure agreement, confidentiality agreement, or restriction on use with any Defendant, with Mr. Rotsaert, or with Mr. Fivel.  The trial record contains no evidence that at the time of the February 2012 Workshop, BBPOS had any nondisclosure agreement, confidentiality

agreement, or restriction on use with any Defendant, with Mr. Rotsaert, or with Mr. Fivel. The

evidence admitted at trial establishes that there were no such agreements or restriction on use.

Day 6 Trial Tr., Doc. No. 351 at 75:2-11, 75:21-76:2, 77:3-8 (Rotsaert); Day 7 Trial Tr., Doc.

No. 352 at 110:20-111:1 (Lo), 124:10-21; Day 9 Trial Tr., Doc. No. 354 at 38:22-25 (Rotsaert).

193.    During the February 2012 Workshop, Mr. Tsai and Mr. Tang, as representatives

of BBPOS, voluntarily disclosed to Mr. Rotsaert and Mr. Fivel all five of BBPOS's alleged trade

secrets.  Jimmy Tang testified as follows:

> Q:    And during that workshop, you, BBPOS, disclosed all five
>        of these key designs, correct?
> A:    Yes.
> Q:    And you did that through a combination of showing
>        schematics, correct?
> A:    Yes.
> Q:    And when we talk about schematics, we're talking about
>        circuit designs; is that fair?
> A:    Yes.
> Q:    And you shared – did someone draw on a whiteboard?
> A:    Yes.
> Q:    And what sorts of things were drawn on the whiteboard?
> A:    The diagrams, the system logic, information, flow direction
>        to illustrate ideas.
> Q:    And was this a – was this workshop a back-and-forth of
>        discussion?
> A:    Yes.
> Q:    So as you explained things to Christopher and – well,
>        Mr. Rotsaert and Mr. Fivel, they might have questions,
>        right?
> A:    Yes.
> Q:    And you answered them?
> A:    Yes.
> Q:    Did they seem to understand what it was that you were
>        communicating?
> A:    Yes.
>                          . . .
>
> Q:    Okay.  And I think on the audio jack polarity issue, I
>        think – did I understand you correctly to testify that you
>        disclosed not only the problem that you were trying to
>        solve, but also the solution for it?

A:      Yes.

Day 4 Trial Tr., Doc. No. 349 at 126:1-25, 127:19-23 (Tang); *see also id.*, Doc. No. 349 at

92:11-96:9, 99:16-18.

194.    BBPOS's technical expert, Ivan Zatkovich, also testified at trial about BBPOS's

voluntary disclosures of its alleged trade secrets at the February 2012 Workshop.  Day 2 Trial

Tr., Doc. No. 347 at 108:15-109:10, 24:21-25, 35:19-22 (Zatkovich).

**B.      BBPOS's Other Voluntary Disclosures in February 2012**

195.    In February 2012, BBPOS provided one or more Defendants numerous

documents containing BBPOS's alleged trade secrets without any confidentiality designations or

markings.

196.    On February 16, 2012, Mr. Tang sent an email to Mr. Rotsaert and Jerome

Grandemenge (as a "cc").  Exhibit 407.  Mr. Tang understood Mr. Grandemenge to be the lead

engineer for "on the Ingenico side."  Day 4 Trial Tr., Doc. No. 349 at 129:10-14 (Tang).

197.    Mr. Grandemenge was never an employee of ROAM.  The trial record contains

no evidence that Mr. Grandemenge was ever an employee of ROAM.

198.    In February 2012, BBPOS did not have any written or oral nondisclosure

agreement, confidentiality agreement, or restriction on use with any Defendant, with

Mr. Rotsaert, or with Mr. Grandemenge.  The trial record contains no evidence that in

February 2012, BBPOS had any written or oral nondisclosure agreement, confidentiality

agreement, or restriction on use with any Defendant, with Mr. Rotsaert, or with

Mr. Grandemenge.  The evidence admitted at trial establishes that there were no such agreements

or restriction on use.  Day 6 Trial Tr., Doc. No. 351 at 75:2-11, 75:21-76:2, 77:3-8 (Rotsaert);

Day 7 Trial Tr., Doc. No. 352 at 110:20-111:1, 124:10-21 (Lo); Day 9 Trial Tr., Doc. No. 354 at

38:22-25 (Rotsaert).

199.    Mr. Lo admitted that as of February 16, 2012, BBPOS did not have a nondisclosure agreement with Mr. Rotsaert or Mr. Grandemenge.  Day 7 Trial Tr., Doc. No. 352 at 42:22-43:3 (Lo).

200.    In Mr. Tang's February 16, 2012 email to Mr. Rotsaert and Mr. Grandemenge, BBPOS provided one or more Defendants information concerning BBPOS's "key designs" for "the communication format and the BBPOS encryption."  Exhibit 407; Day 4 Trial Tr., Doc. No. 349 at 104:1-23 (Lo); Day 7 Trial Tr., Doc. No. 352 at 39:17-40:14, 41:14-42:1 (Lo).  This information included (1) BBPOS's "proprietary format . . . [that] describe[s] how we [BBPOS] do the transformation from the Track 1 to the encryption format data that we use to communicate from our reader to the mobile phone" and (2) "the entirety of your [BBPOS's] key design related to encryption."   Day 4 Trial Tr., Doc. No. 349 at 105:19-106:15 (Lo).  "[N]one of the source code for this BBPOS implementation of DUKPT was marked as confidential."  Day 7 Trial Tr., Doc. No. 352 at 42:18-21 (Lo).

201.    In a February 17, 2012 email from Mr. Tang to Mr. Grandemenge, BBPOS disclosed to one or more Defendants "how to use the swiper controller API," which describes how to "retrieve useful information [including "encrypted data"] from the data formats" and pertains to the "key designs" of the communication format and encryption.  Exhibit 68; Day 4 Trial Tr., Doc. No. 349 at 106:16-108:2 (Lo).

202.    In a February 28, 2012 email from Mr. Tang to Mr. Rotsaert and Mr. Grandemenge (as a "cc"), BBPOS provided one or more Defendants the "swiper API programming guide for Android," which "describes what data you can see on the mobile phone, on the receiving end," and pertains to the key designs" of the communication format and encryption.  Exhibit 72 at 1; Exhibit 73; Day 4 Trial Tr., Doc. No. 349 at 108:12-110:25 (Lo).

203.    BBPOS's disclosures of all five of its alleged trade secrets at the February 2012 Workshop and in the additional documentary disclosures in February 2012 predated the "Summary of Terms of Acquisition of BBPOS," which was signed on March 28, 2012. Exhibit 75; Day 7 Trial Tr., Doc. No. 352 at 111:2, 111:20-112:8 (Lo).

C.    **BBPOS's Voluntary Disclosures at the April 2012 Workshop**

204.    A second workshop occurred in Hong Kong in April 2012 (the "April 2012 Workshop"), attended by Mr. Tsai and Mr. Tang on behalf of BBPOS and Mr. Grandemenge, whom Mr. Tang understood to be the lead engineer for "on the Ingenico side." Day 4 Trial Tr., Doc. No. 349 at 97:15-98:11, 129:10-130:10 (Tang). Mr. Rotsaert did not attend the April 2012 Workshop. *Id.*, Doc. No. 349 at 130:9-12.

205.    At the time of the April 2012 Workshop, BBPOS did not have any written or oral nondisclosure agreement, confidentiality agreement, or restriction on use with any Defendant or with Mr. Grandemenge. The trial record contains no evidence that at the time of the April 2012 Workshop, BBPOS had any nondisclosure agreement, confidentiality agreement, or restriction on use with any Defendant or with Mr. Grandemenge. The evidence admitted at trial establishes that there were no such agreements or restriction on use. Day 6 Trial Tr., Doc. No. 351 at 75:2-11, 77:3-8 (Rotsaert); Day 7 Trial Tr., Doc. No. 352 at 110:20-111:1 (Lo); Day 9 Trial Tr., Doc. No. 354 at 38:22-25 (Rotsaert).

206.    During the April 2012 Workshop, all five of BBPOS's alleged trade secrets were discussed, including "disclosing [BBPOS's solutions] for these five . . . key designs." Day 4 Trial Tr., Doc. No. 349 at 130:15-23 (Tang); *see also id.*, Doc. No. 349 at 98:12-99:11.

207.    The evidence admitted at trial, discussed above, establishes that at the February 2012 Workshop, in the February 2012 emails, and at the April 2012 Workshop,

BBPOS voluntarily disclosed to one or more Defendants all five of BBPOS's alleged trade secrets, without any nondisclosure agreement, confidentiality agreement, or restriction on use.

### D.   BBPOS's Additional Voluntary Disclosures

208.   BBPOS made other voluntary disclosures of its alleged trade secrets to one or more Defendants.  In a May 1, 2012 email from Mr. Lo to Mr. Rotsaert, "all answers I [Mr. Lo] provided to Christopher [Rotsaert] is proprietary."  Exhibit 98 at 1-4; Day 6 Trial Tr., Doc. No. 351 at 115:5-116:8 (Lo); Day 7 Trial Tr., Doc. No. 352 at 28:17-19 (Lo).

209.   In a May 17, 2012 email from Mr. Lo to Mr. Rotsaert, BBPOS provided information "concerning one or more of these key designs."  Exhibit 587 at 1; Day 7 Trial Tr., Doc. No. 352 at 28:20-29:25, 30:18-31:5 (Lo).

210.   In addition, BBPOS provided to one or more Defendants a number of documents (Exhibits 118, 138, 143, 372, 375), all of which contain "key designs" of BBPOS's alleged trade secrets and none of which are marked "confidential."  Exhibits 118, 138, 143, 372, 375; Day 7 Trial Tr., Doc. No. 352 at 16:10-19, 17:20-24, 23:5-21, 24:14-16, 24:23-25:17, 32:7-23, 33:21-34:2 (Lo).

### E.   BBPOS's Voluntary Disclosures Were Without Any Non-Disclosure or Confidentiality Agreement

211.   As set forth above, the evidence admitted at trial establishes that BBPOS did not have any written or oral nondisclosure agreement, confidentiality agreement, or restriction on use with any Defendant, with Mr. Rotsaert, with Mr. Fivel, or with Mr. Grandemenge.

212.   The trial record contains no evidence that BBPOS ever communicated to any Defendant, to Mr. Rotsaert, to Mr. Fivel, or to Mr. Grandemenge that BBPOS's information should be treated as confidential.

213.    Other than Mr. Graylin's rebuttal testimony (which the Court rejects as unclear and lacking credibility), the trial record contains no evidence that Mr. Graylin ever communicated to any Defendant, to Mr. Rotsaert, to Mr. Fivel, or to Mr. Grandemenge that BBPOS's information should be treated as confidential.

214.    On rebuttal, Mr. Graylin testified that he allegedly had conversations with Mr. Rotsaert about the alleged confidentiality of BBPOS's information.  Day 10 Trial Tr., Doc. No. 355 at 44:11-14, 45:15-46:4 (Graylin).  However, BBPOS did not submit any such evidence (including through Mr. Graylin's testimony) during its case-in-chief.  None of the emails that Mr. Graylin sent to Mr. Rotsaert and/or others about sharing BBPOS's alleged trade secrets with "Ingenico" reference any non-disclosure or confidentiality agreement.  Exhibits 163, 168, 175. Thus, Mr. Graylin's rebuttal testimony lacks credibility.  Mr. Graylin also violated the Court's sequestration order  by reviewing prior testimony before offering his rebuttal testimony.  Day 10 Trial Tr., Doc. No. 355 at 48:15-21).

215.    Even if Mr. Graylin had communicated to Mr. Rotsaert that BBPOS's information should be treated as confidential, the trial record contains no evidence that Mr. Rotsaert or any Defendant acknowledged that or agreed to maintain BBPOS's information as confidential.

216.    Even if Mr. Graylin had communicated to Mr. Rotsaert that BBPOS's information should be treated as confidential, the trial record contains no evidence that BBPOS was informed that Mr. Rotsaert or any Defendant had acknowledged that or had agreed to maintain BBPOS's information as confidential.  Therefore, when BBPOS provided all five of its alleged trade secrets to one or more Defendants without any non-disclosure or confidentiality agreement, BBPOS did so without any agreement or assurance that Defendants would maintain BBPOS's information as confidential.

217.     The trial record contains no evidence that any Defendant obtained any of BBPOS's alleged trade secrets by theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

## VIII.   BBPOS Did Not Exercise Reasonable Diligence With Respect To Discovering The Alleged Misappropriation

218.     BBPOS has stipulated that the first time it asserted its misappropriation claim was on December 20, 2018.  Joint Pretrial Mem. (Doc. No. 316) at 6.

### A.      BBPOS Did Not Exercise Reasonable Diligence in Fall 2012

219.     In a March 26, 2012 email, Mr. Rotsaert informed Mr. Lo that his "idea is that we may consider using one Landi platform which is very low end but with embedded EMV L2," *i.e.*, use Landi hardware instead of BBPOS hardware for the EMV-capable mPOS device to be sold by ROAM.  Exhibit 791 at 1; Day 7 Trial Tr., Doc. No. 352 at 45:14-46:5 (Lo).

220.     In Fall 2012, Mr. Lo received a message from Mr. Graylin that "Ingenico steal our IP."  Exhibit 565; Day 6 Trial Tr., Doc. No. 351 at 122:12-20 (Lo).

221.     After receiving Mr. Graylin's message that Ingenico had stolen BBPOS's intellectual property, BBPOS took no steps to investigate.  Day 6 Trial Tr., Doc. No. 351 at 122:24-123:1 (Lo).

222.     Although BBPOS conducted no investigation, Mr. Lo was concerned.  On November 10, 2012, after recently receiving Mr. Graylin's message, Mr. Lo emailed Mr. Tsai and Mr. Tang to warn them not to "disclose too much technical information" to ROAM's new product manager because Mr. Graylin told him that "Ingenico passes some info to Landi for making terminal[s] to compete with [BBPOS]."  Exhibit 186; Day 6 Trial Tr., Doc. No. 351 at

123:5-15 (Lo).  Mr. Lo further advised that BBPOS "should not trust any hardware guy from Ingenico or ROAM anymore."  Exhibit 186.

223.    Despite Mr. Lo's warnings and his continuing suspicions, BBPOS took no action to investigate "Ingenico's" alleged conduct.  Day 6 Trial Tr., Doc. No. 351 at 123:19-24 (Lo).

224.    Given Mr. Rotsaert's email of March 26, 2012 to Mr. Lo advising him that his "idea is that we may consider using one Landi platform which is very low end but with embedded EMV L2" (*i.e.*, use Landi hardware instead of BBPOS hardware), Mr. Graylin's message to Mr. Lo in Fall 2012 provided BBPOS reason to investigate whether there had, in fact, been a theft of BBPOS's intellectual property.  Mr. Lo's directives to Mr. Tsai and Mr. Tang not to "disclose too much technical information" to ROAM's new product manager and that BBPOS "should not trust any hardware guy from Ingenico or ROAM anymore" demonstrate that BBPOS was suspicious and should have investigated.  Exhibit 791 at 1; Exhibit 186

225.    A reasonable investigation of whether there had been a theft or other misuse of BBPOS's intellectual property should have included a request to its contract partner and largest customer, ROAM, to obtain more information about the situation and to examine a sample of the subject product.

226.    Because ROAM was actively selling the RP350x to potential customers in 2013, and therefore the product had been publicly disclosed, there is no basis to infer that ROAM would have refused to provide a sample to its contract partner, BBPOS.  *E.g.*, Exhibit 360 at 4 (showing sales of RP350x units in 2013); *see also* Day 5 Trial Tr., Doc. No. 350 at 129:9-23 (Rotsaert) (ROAM promoting the RP350x beginning in December 2012).

227.     If BBPOS had obtained a sample product it could have opened it up, studied its elements (including the circuitry), and determined whether it incorporated any of BBPOS's alleged trade secrets.  Day 4 Trial Tr., Doc. No. 349 at 122:6-12 (Tang).

228.     BBPOS could even have just requested a picture of the products because, according to Mr. Lo, "when I see the product, I know that they stole my IP."  Day 6 Trial Tr., Doc. No. 351 at 129:3-8 (Lo).  Mr. Lo's conclusion that he "[knew] that they stole my IP" did not require a physical sample of the product, because it was only after he reached this conclusion that he kept "reminding my engineer to keep an eye on eBay to look for their product to do an analysis."  *Id.*

229.     Rather than requesting a picture or sample of the product, BBPOS chose to do no investigation whatsoever.

230.     Because BBPOS did not conduct any investigation after having been placed on notice of potential theft of its intellectual property, BBPOS failed to exercise reasonable diligence.

231.     If BBPOS had conducted a reasonable investigation in Fall 2012, BBPOS would have discovered the alleged misappropriation before December 20, 2013 because all that was needed was for Mr. Lo to see the product.  Day 6 Trial Tr., Doc. No. 351 at 129:3-8 (Lo).

   **B.     BBPOS Did Not Exercise Reasonable Diligence In January 2013**

232.     By January 2013, Mr. Graylin and Mr. Lo were in a relationship of trust and friendship.  Exhibit 191 at 2, 4, 6, 7.

233.     In an email dated January 1, 2013, Mr. Graylin informed Mr. Lo that "I [Mr. Graylin] also heard Ingenico is now actively selling its solution instead of yours, including the EMV audio reader."  Exhibit 191 at 5.

52

234.     In his email of January 1, 2013, Mr. Graylin stated to Mr. Lo that PayPal had informed him (Mr. Graylin) that Landi was developing an audio reader but that it was not yet ready.  Exhibit 191 at 5; *see also* Day 3 Trial Tr., Doc. No. 348 at 127:23-128:4 (Graylin).

235.     Mr. Graylin's email to Mr. Lo of January 1, 2013 provided BBPOS notice that Ingenico was "actively selling its solution instead of BBPOS' [product]," including the EMV audio reader.  Day 3 Trial Tr., Doc. No. 348 at 125:20-126:14 (Graylin); Exhibit 191 at 5.

236.     As Mr. Lo admitted, as of January 1, 2013, BBPOS was aware that "Will Graylin said that Ingenico was actively selling its EMV reader."  Day 7 Trial Tr., Doc. No. 352 at 94:25-95:3 (Lo).

237.     In his January 1, 2013 email, Mr. Graylin also notified Mr. Lo of the lawsuit that the minority shareholders of ROAM (including Mr. Graylin) had brought against Philippe Lazare as, inter alia, a member of ROAM's board of directors.  Exhibit 191 at 5; Exhibit 1008 at 1; Day 3 Trial Tr., Doc. No. 348 at 28:20-22, 29:19-21, 122:1-123:3 (Graylin).

238.     Mr. Graylin's email of January 1, 2013 attached a copy of the Complaint (Exhibit 1008) that ROAM's minority shareholders filed against Mr. Lazare, which provided Mr. Lo notice that "[i]n the summer of 2012, Graylin learned that Rotsaert transferred key technology, knowhow and design information of ROAM products to Ingenico's research and development team in France, including designs and trade secrets from ROAM's exclusive vendor BBPOS Ltd, without any commercial agreement in place between ROAM and Ingenico." Exhibit 1008 ¶ 48; Day 3 Trial Tr., Doc. No. 348 at 123:4-6 (Graylin).  That Complaint also provided Mr. Lo notice that "Ingenico planned on building a competing EMV reader and they would study ROAM's industrial design and make their own."  Exhibit 1008 ¶ 49.

239.    The factual allegations in the Complaint that ROAM's minority shareholders filed against Mr. Lazare are the same as the factual allegations that form the crux of this case, and the referenced intellectual property is the same information that is at issue in this case. Exhibit 1008; Day 3 Trial Tr., Doc. No. 348 at 123:25-124:14 (Graylin) ("this is the same transfer of information that we've been talking about all day"); Day 3 Trial Tr., Doc. No. 348 at 124:15-22 (Graylin) ("this is part of the same batch of information").  As Mr. Lo admitted, BBPOS's Complaint in this case "quoted extensively from the complaint that Mr. Graylin had sent to [Mr. Lo] with [the January 1, 2013] email."  Day 7 Trial Tr., Doc. No. 352 at 94:3-20 (Lo).

240.    Both the January 1, 2013 email itself and the attached Complaint provided BBPOS reason to investigate whether there had been a theft of BBPOS's intellectual property. However, BBPOS did not, even when Mr. Lo received confirmation that ROAM was showing "an Ingenico EMV prototype."  Day 7 Trial Tr., Doc. No. 352 at 85:5-18, 88:17-18, 89:3-15 (Lo); Exhibit 200 at 1.

241.    BBPOS did not contact Ingenico, or request a picture or sample of the product or any technical information regarding its design.

242.    Instead of requesting a sample of the subject product from Ingenico, BBPOS asked the new ROAM CEO whether Ingenico was stealing BBPOS's intellectual property.  Day 6 Trial Tr., Doc. No. 351 at 127:2-11 (Lo); Day 7 Trial Tr., Doc. No. 352 at 84:25-85:18 (Lo). Mr. Paull, the CEO of ROAM, advised Mr. Lo that "there[] [was] no commonality between [BBPOS's] product and Ingenico['s] product."  Exhibit 200 at 1; Day 6 Trial Tr., Doc. No. 351 at 127:12-128:14 (Lo).  However, ROAM was a separate company from "Ingenico," which Mr. Lo understood.  Day 7 Trial Tr., Doc. No. 352 at 73:20-74:1 (Lo).

243. Moreover, Mr. Lo understood that Mr. Paull was new at ROAM and not an engineer, and therefore he remained skeptical, but took no further action. Day 7 Trial Tr., Doc. No. 352 at 86:8-18 (Lo).

244. Rather than requesting a picture or sample of the product, BBPOS chose to do no investigation whatsoever.

245. Because BBPOS did not conduct any investigation after having been placed on notice of potential theft of its intellectual property, BBPOS failed to exercise reasonable diligence.

246. If BBPOS had conducted a reasonable investigation beginning in January 2013, BBPOS would have discovered the alleged misappropriation before December 20, 2013 because all that was needed was for Mr. Lo to see the product. Day 6 Trial Tr., Doc. No. 351 at 129:3-8 (Lo).

### C.     BBPOS Did Not Exercise Reasonable Diligence In May 2013

247. On May 7, 2013, Mr. Lo sent an email to Mitchell Cobrin of AnywhereCommerce, stating that "ROAM wants to sell their EMV audio jack card reader from Landi (a product completing [*sic*] with Walker)." Exhibit 491 at 1; Day 7 Trial Tr., Doc. No. 352 at 103:1-17 (Lo).[1] "Walker" is the AnywhereCommerce brand name for Chipper, which is a product that connects to the audio jack of a cell phone and reads the card's magnetic stripe. Day 7 Trial Tr., Doc. No. 352 at 50:6-12, 104:2-4 (Lo).

248. As Mr. Lo admitted, as of May 7, 2013, BBPOS "knew that ROAM wanted to sell their EMV audio jack card reader from Landi." Day 7 Trial Tr., Doc. No. 352 at 103:21-23 (Lo).

---

[1] In that email, Mr. Lo meant to say "competing" with Walker. *See* Day 7 Trial Tr., Doc. No. 352 at 103:13-17 (Lo).

249.     Given that, as of May 7, 2013, BBPOS "knew that ROAM wanted to sell their EMV audio jack card reader from Landi," BBPOS had reason to investigate whether "Ingenico" had stolen BBPOS's intellectual property.  However, the trial record contains no evidence that BBPOS conducted any investigation.

250.     At the very least, a reasonable investigation of whether there had been a theft of BBPOS intellectual property should have included a request for a sample of the product that ROAM wanted to sell to compete with the BBPOS "Walker" device.

251.     Rather than requesting a picture or sample of the product, BBPOS chose to do no investigation whatsoever.

252.     Because BBPOS did not conduct any investigation after having been placed on notice of potential theft of its intellectual property, BBPOS failed to exercise reasonable diligence.

253.     If BBPOS had conducted a reasonable investigation beginning in January 2013, BBPOS would have discovered the alleged misappropriation before December 20, 2013 because all that was needed was for Mr. Lo to see the product.  Day 6 Trial Tr., Doc. No. 351 at 129:3-8 (Lo).

254.     At any point prior to December 2013, BBPOS could, and should, have hired an outside consultant like Ivan Zatkovich (or used its own internal engineers) to investigate the subject products and assess whether any of BBPOS's alleged trade secrets were incorporated in them.  BBPOS did not, so it failed to exercise reasonable diligence.  Mr. Zatkovich, who did not work for BBPOS prior to his engagement as an expert, was able to perform his analysis with respect to many of the allegedly misappropriated technologies in a matter of days with standard laboratory equipment.  Day 2 Trial Tr., Doc. No. 348 at 102:13-103:24, 105:10-17 (Zatkovich).

255.    If BBPOS had conducted a reasonable investigation beginning in May 2013 and had requested pictures or samples of, or the technical information about, the subject products, BBPOS would have discovered the alleged misappropriation before December 20, 2013.

## IX.    BBPOS Unreasonably Delayed Before Bringing This Lawsuit, Which Unfairly Prejudiced Defendants

256.    BBPOS asserts that it, through Mr. Tsai and Mr. Tang, "first became aware" that BBPOS's alleged trade secrets were being used in devices of "Ingenico" in 2014 or 2015, when Mr. Tsai opened up such a device "to study the circuitry."  Day 4 Trial Tr., Doc. No. 349 at 122:6-12 (Tang).

257.    This discovery made Mr. Tang "upset" and generated an "internal discussion" at BBPOS, but BBPOS nonetheless waited years, until December 20, 2018, to file this lawsuit. Day 4 Trial Tr., Doc. No. 349 at 122:13-20 (Tang).

258.    The reason that BBPOS delayed in bringing this lawsuit was because it was receiving business from ROAM.  Day 7 Trial Tr., Doc. No. 352 at 107:25-108:2 (Lo).

259.    In 2014, ROAM was BBPOS's biggest customer, and BBPOS was profiting from that business.  Day 4 Trial Tr., Doc. No. 349 at 124:4-18 (Tang).

260.    As Mr. Lo admitted, from 2014 until 2018, BBPOS had revenues of over $70 million (over and above any revenues from sales to ROAM and "Ingenico," which were in the tens of millions of dollars).  Day 7 Trial Tr., Doc. No. 352 at 12:20-13:11 (Lo).

261.    The unrebutted testimony of Dr. Vanderhart was that during the period after BBPOS studied the circuitry of an RP350x device until the filing of the lawsuit (*i.e.*, from 2015 through 2018), BBPOS's revenues from sales of products to ROAM and Ingenico were $16,831,478, and BBPOS's profits from those sales was $5,306,847.  Day 10 Trial Tr., Doc. No. 355 at 18:2-12 (Vanderhart); Exhibit 1236.

262.    The unrebutted testimony of Dr. Vanderhart was that during the period after BBPOS studied the circuitry of an RP350x device until the filing of the lawsuit (*i.e.*, from 2015 through 2018), sales of Accused Products accounted for more than $14 million of the $24 million in profits that BBPOS seeks to recover in this case.  Day 10 Trial Tr., Doc. No. 355 at 16:22-17:9 (Vanderhart); Exhibit 1236.

263.    The trial record contains no evidence that in 2014, 2015, 2016, and/or 2017, BBPOS took any action either to assert its intellectual property rights or even to place its then-largest customer, ROAM, on notice that it believed the products that ROAM was selling unlawfully incorporated BBPOS's alleged trade secrets, or to demand that ROAM or Ingenico cease and desist any such development or sales.

264.    Mr. Lo testified that when he saw the Landi device at the trade show in Paris in 2014, he was "very angry" but he did not take any action because he did not have "any energy to do anything" and that he "really [had] low energy to deal with this case."  Day 6 Trial Tr., Doc. No. 351 at 128:17-129:2 (Lo); Day 7 Trial Tr., Doc. No. 352 at 7:22-25 (Lo).  Mr. Lo said that when he saw the device at the trade show in 2014, "I know they stole my IP" and put the issue on his "to-do list."  Day 6 Trial Tr., Doc. No. 351 at 129:3-5.  BBPOS then waited over four more years to bring suit.

265.    Defendants were prejudiced by BBPOS's inaction.  Because there was no expressed concern about the propriety of the Landi-produced mPOS devices, ROAM continued to develop and market new products, including other Accused Products, such as the RP100x, the RP750x, and the RP457c.  These new products generated tens of millions of dollars of revenues and profits that, now, BBPOS contends belong to BBPOS.

266.     Given that (1) BBPOS has known since early 2012 that ROAM was working with Landi to develop an EMV-capable mPOS device, (2) BBPOS was placed on notice of potential theft of its intellectual property repeatedly throughout late 2012 and early 2013, (3) BBPOS admits that it was aware of the facts giving rise to this litigation in 2014 or 2015, (4) BBPOS did not file this lawsuit until December 20, 2018, (5) BBPOS was obtaining profits from its sales of products to ROAM and "Ingenico" from 2014 through 2017, and (6) from 2014 through 2017, BBPOS was incurring alleged damages from the alleged misappropriation, BBPOS unreasonably delayed in filing this lawsuit, which unfairly prejudiced Defendants.

## X.     BBPOS Has Failed To Introduce Any Evidence That Any Defendant Committed Trade Secret Misappropriation

267.     The trial record contains no evidence that any specific Defendant took any action that constituted or contributed to misappropriation of any of BBPOS's alleged trade secrets.

268.     There are three defendants in this case, each of whom is a distinct corporate entity but whose name includes "Ingenico":  Ingenico Inc., Ingenico Corp., and Ingenico Group SA. *See generally* First Amended Complaint (Doc. No. 67) at 3.

269.     Plaintiff's original Complaint (Doc. No. 1) identified a fourth "Ingenico" entity as a defendant:  Ingenico Ventures SAS.

270.     Of the evidence presented with respect to BBPOS's misappropriation claim, there was no reference to Ingenico Inc. except as the entity into which ROAM was merged on December 13, 2017 and which, thereafter, employed Christopher Rotsaert and sold Accused Products after the merger.

271.     There was no evidence at trial of any action taken by Ingenico Corp.

272.     There was no evidence at trial of any action taken by Ingenico Group SA.

273.    There was no evidence at trial of any action taken by Ingenico Inc. prior to December 13, 2017.

274.    All the testimony that BBPOS submitted at trial referenced "Ingenico," without specifying whether Defendant Ingenico Inc., Defendant Ingenico Corp., Defendant Ingenico Group, SA, or former Defendant Ingenico Ventures SAS was the entity that allegedly committed any particular act.  Day 1 Trial Tr., Doc. No. 346 at 108:12-14, 110:16-20 (Zatkovich); Day 3 Trial Tr., Doc. No. 348 at 14:23-24, 19:10-13 (Graylin); Day 4 Trial Tr., Doc. No. 349 at 91:3-4 (Tang); Day 5 Trial Tr., Doc. No. 350 at 51:10-13 (Scherf); Day 6 Trial Tr., Doc. No. 351 at 109:19-20, 134:17-20 (Lo).

275.    Not even BBPOS's counsel distinguished among Defendants:  "So I didn't want to get into all these names in the first ten minutes, but there's only four names, BBPOS, ROAM, Ingenico, and Landi.  And 2012 is the year that all the interactions between the companies occur."  Day 1 Trial Tr., Doc. No. 346 at 29:12-15 (BBPOS's opening statement by Oliver D. Griffin, Esq.).

276.    BBPOS submitted no evidence that Patrice Fivel or Jerome Grandemenge was the employee of any specific Defendant (or former Defendant).

277.    BBPOS submitted no evidence at trial that any Defendant acted as the principal or agent of, or in partnership with, any other Defendant.

278.    BBPOS submitted no evidence at trial of Defendants' corporate structure.

XI.    **BBPOS's Evidence Of The Failed Acquisition Of BBPOS Is A Red Herring**

279.    BBPOS has suggested that the unsuccessful attempt of ROAM to acquire BBPOS is at the heart of this dispute, but it is nothing more than a distraction.  *See e.g.*, Day 1 Trial Tr., Doc. No. 346 at 17-51 (opening statement).  According to BBPOS's counsel, the information sharing that occurred in 2012 was predicated on the expected sale of BBPOS to ROAM, and that

when the deal did not materialize, Mr. Graylin said "stop transferring the IP without a new

agreement in place" because he was "very concerned that ROAM's IP, BBPOS's IP, is going

places that we can't track."  Day 1 Trial Tr., Doc. No. 346 at 39:9-18 (Opening Statement).

280.    In addition to the statements of counsel, BBPOS elicited extensive testimony from

Mr. Graylin concerning the ups and downs of the negotiations of a potential acquisition of

BBPOS and his communications with the ROAM board about that subject.  *See generally* Day 3

Trial Tr., Doc. No. 348 at 28-66.

281.    This construct is not supported by the evidence admitted at trial.  The trial record,

including Mr. Graylin's testimony, establishes that the information sharing began in February

2012, when Mr. Graylin introduced two senior staff from Ingenico to BBPOS with the intent that

they would collaborate on the development of a new, EMV-capable mPOS reader for ROAM to

sell.  Exhibit 406 at 1; Day 3 Trial Tr., Doc. No. 348 at 89:5-9 (Graylin); Day 4 Trial Tr., Doc.

No. 349 at 90:11-91:20 (Tang).  The nonbinding term sheet for the sale of BBPOS would not be

signed for over a month, so the information could not have been shared based upon an

expectation that ROAM would acquire BBPOS.  Exhibit 75.

282.    The evidence at trial also confirmed that the information exchange continued well

past the time that Mr. Lo rejected the term sheet because the deal no longer made sense to him

economically, in early June 2012.  *E.g.*, Exhibit 135; Exhibit 144; Exhibit 155.

283.    The trial record establishes that the potential acquisition was simply irrelevant to

the collaborative efforts that were happening in 2012 and into 2013, long past the time when

Mr. Graylin had been terminated.  After Mr. Lo rejected the previously-agreed terms, both

parties continued to attempt to negotiate a sale of BBPOS to ROAM, although they were

ultimately unable to reach agreement.  *E.g.*, Exhibit 149; Exhibit 163f.  There was no evidence

presented at trial that the decision to terminate the BBPOS-Valence discussions had anything to

do with the fact that BBPOS would not be acquired.  In fact, the evidence was that the BBPOS-

Valence collaboration was terminated because it would not produce a satisfactory mPOS device,

and yet ROAM continued to work with BBPOS, and not Valence, until 2013 in an effort to have

BBPOS independently develop an EMV-capable reader.  Day 6 Trial Tr., Doc. No. 351 at 52:20-

53:1 (Rotsaert).

## XII.   No BBPOS Alleged Trade Secrets Were Disclosed to Landi in Connection with the Development of a Prototype for the 2012 Cartes Show

284.    The information given to Landi in September 2012 in connection with the

construction of a prototype to be demonstrated at the 2012 Cartes show did not include any

alleged trade secrets.

285.    The unrebutted testimony was that the prototype consisted of an existing Landi

product with a display and key pad removed, and housed in a new case to suggest the form factor

for Ingenico's anticipated mPOS product.  There is no evidence that the existing Landi product

had any commonality at all with the circuit designs or other functionality of any BBPOS mPOS

devices.  Day 6 Trial Tr., Doc. No. 351 at 78:7-17 (Rotsaert).

286.     In order to permit the prototype to perform dummy transactions, it was

configured to interact with the existing ROAM processing system in Boston, which supported

BBPOS technology because ROAM was a reseller of BBPOS hardware.  Day 6 Trial Tr., Doc.

351 at 79:3-81:4 (Rotsaert).

287.    In an email to Landi regarding the prototype, Mr. Rotsaert gave instructions

regarding the data format that should be implemented to enable the dummy transactions at

Cartes.  Exhibit 182.

288.     Although Exhibit 182 references format IDs of "07" and "22," it did not provide Landi with the actual data formats.  Rather, the email explicitly instructed that "[t]he format of the encrypted data between the device and he swiper API does not matter.  We have a specific format with format codes, but that does not matter for this exercise."  Exhibit 182 at 5.  The reference to "07" and "22" was merely an instruction to Landi that it list either "07" or "22" as the format ID depending upon the data extracted from a credit card.

289.     A comparison of the information in Exhibit 182 and BBPOS's asserted trade secret data formats confirms that the email did not disclose either Format 7 or Format 22:

| Exhibit 182 |
| --- |
| * enc_track:      The encrypted track data, base64 encoded. <br><br> * ksn:           The full ksn for the current swipe <br><br> * fmt_id:       The format id. "07" for a swipe with track 1 data only, "22" for a swipe with track 1 and track 2 data. <br><br> * masked_pan:    The redacted credit card number, e.g. 4518XXXXXXXX7894 <br><br> * cardholder_name: The cardholder name extracted from track 1 and formatted as GIVEN SURNAME. <br><br> * exp_date:      The expiration date as specified by ISO7813 (i.e. YYMM) <br><br> * partial_track:  The cardholder name from track 1, as specified by ISO7813 (i.e. SURNAME/GIVEN followed by spaces for a total length of 26 characters). |

**Format 7 from Exhibit 371**

### 4.1.6.  Format 7

| 1 byte | 1 byte | 2 byte | 2 byte | 2 byte | 26 byte | 10 byte | 40 byte | 1 byte |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Format ID | Length of PAN | First 4 digits of PAN | Last 4 digits of PAN | Expiry Date | 26 bytes after the 1st ^ | KSN | Encrypted Track 1 | Checksum |
| (0x07) | | | | (YYMM) | | | | CRC8 of all bytes |

- Each character in Track 1 is 6 bits in length. 4 characters are packed into 3 bytes and padded with zero to make it 40 bytes in length before encryption.
- 26 bytes after the 1st ^ are extracted from Track 1 before encryption.
- CRC is using CCITT CRC.
- This format is for Swiper with magnetic head to read track1 only.

**Format 22 from Exhibit 371**

### 4.1.16. Format 22

| 1 byte | 1 byte | 2 byte | 2 byte | 2 byte | 26 byte | 10 byte | 40 byte | 24 byte |
|---|---|---|---|---|---|---|---|---|
| Format ID | Length of PAN | First 4 digits of PAN | Last 4 digits of PAN | Expiry Date | 26 bytes after the 1st ^ | KSN | Encrypted Track 1 | Encrypted Track 2 |
| (0x16) | | | | (YYMM) | | | | |

| 1 byte |
|---|
| Checksum |

(CRC8 of all bytes)

- Each character in Track 1 is 6 bits in length. 4 characters are packed into 3 bytes and padded with zero to make it 40 bytes in length before encryption.
- 26 bytes after the 1st ^ are extracted from Track 1 before encryption.
- Each character in Track 2 is 4 bits in length. 2 characters are packed into 1 byte and padded with zero to make it 24 bytes in length before encryption.
- Track 1 and 2 data is encrypted by TDES in ECB mode.
- CRC is using CCITT CRC.
- This format is for Swiper with magnetic head to read both track 1 and track2.

290.    Neither Format 7 nor Format 22 is alleged to be utilized by any Accused Device and there was no evidence at trial that either was actually used even in the Cartes prototype.

## XIII.    BBPOS's Witnesses Testified Inconsistently On Matters Important to Their Credibility

### A.    BBPOS's Denial that Ingenico Was a Competitor Is Not Credible

291.    BBPOS witnesses repeatedly contradicted themselves and each other with respect to whether Ingenico was a competitor of BBPOS.  Mr. Tang testified that it was not (Day 5 Trial Tr., Doc. No. 350 at 36:24-37:3) and, moments later, that yes, in fact BBPOS viewed Ingenico as a competitor (*id.*, Doc. No. 350 at 37:11-12).  Mr. Lo testified at trial that he was not concerned about sharing information with Ingenico because he "never treat Ingenico as our competitor" in 2012 (Day 7 Trial Tr., Doc. No. 352 at 75:18-76:5), but had testified at deposition, "why do I need to work with a competitor on a product, and that competitor is Ingenico" (*id.*, Doc. No. 352 at 91:24-25).  Minutes later, Mr. Lo again claimed that "we never treat Ingenico as our competitor."  *Id.*, Doc. No. 352 at 101:8-9.

**B.     Mr. Lo's Testimony Concerning BBPOS's "Reasonable Efforts" to Maintain Secrecy Was Not Credible**

292.    Mr. Lo testified that BBPOS protected its information as confidential by signing NDAs with customers and contract manufacturers, having employees sign employment agreements with confidentiality clauses, password protecting some documents, and compartmentalizing its information so that only one engineer could access all hardware or software or firmware information.  Day 6 Trial Tr., Doc. No. 351 at 139:21-141:12 (Lo).  This testimony is not credible.

293.    With respect to NDAs with customers, Mr. Lo confirmed that in 2012, BBPOS only had one customer, ROAM.  While Mr. Lo claims that he had an NDA with ROAM, in fact the Agreement was a license agreement containing only a non-specific confidentiality provision.  Exhibit 1.  And of course ROAM is not BBPOS's only customer now, and yet BBPOS did not introduce any NDAs that it has with any other customers.

294.    With respect to NDAs with contract manufacturers, BBPOS did not introduce any such documents at trial.

295.    With respect to employment contracts, BBPOS did not introduce any such documents at trial.

296.    BBPOS introduced no evidence at trial to corroborate Mr. Lo's assertions regarding password protection and compartmentalization of information.

297.    Mr. Lo's assertion that Daniel Tsai, the chief hardware architect for BBPOS, is the only person at BBPOS who can access all hardware-related information for the BBPOS product, is contradicted by the fact that Exhibit 143, which is the circuit diagram for BBPOS's swiper, was actually sent to Daniel Tsai by Kenny Chan, who used a Systems Art email address to send the document.  Day 7 Trial Tr., Doc. No. 352 at 120:11-121:7 (Lo).  Whether or not Mr.

Chan is with BBPOS or the separate Systems Art Limited business that Mr. Lo had started prior to BBPOS, the fact that he was able to forward the schematic to Mr. Tsai undermines the credibility of Mr. Lo's categorical descriptions regarding access to information among BBPOS personnel.  Day 7 Trial Tr., Doc. No. 352 at 120:11-121:7 (Lo).

298.   Mr. Lo failed to identify any method by which trade secret information is identified and segregated.

299.   Mr. Lo failed to identify any method by which trade secret information is identified as such, including by confidentiality markings.

300.   BBPOS presented no evidence that its employment agreements provide any specificity with respect to the information protected as confidential.

301.   Mr. Lo's description of the extensive, careful steps allegedly taken by BBPOS to protect its confidential information from its own employees, including by segregating the information among its small team of engineers, is inconsistent with its complete failure to seek any assurances concerning confidentiality as to the broad array of technology disclosures at issue in this case.

### C.   Mr. Graylin's Testimony Was Inconsistent and Not Credible

302.   Mr. Graylin testified that in 2012, he was concerned about the sharing of information with Ingenico in the absence of a "commercial agreement" with BBPOS.  *E.g.*, Day 3 Trial Tr., Doc. No. 348 at 20:5-21:5 (Graylin).  Mr. Graylin suggested that "without a commercial license agreement . . . that would be, to me, intellectual property inappropriation [*sic*]."  Day 3 Trial Tr., Doc. No. 348 at 53:9-13 (Graylin).

303.   In fact, Mr. Graylin expressed no concerns whatsoever about the lack of a "commercial agreement" with BBPOS, but rather made serial references to the lack of a commercial agreement between ROAM and Ingenico because if Ingenico were successful in

coming out with a new mPOS reader and there were no agreement with ROAM, "ROAM might not have place at the table on that deal."  Day 3 Trial Tr., Doc. No. 348 at 97:20-23.

304.    In 2012, Mr. Graylin repeatedly expressed his concerns about the lack of a commercial agreement between ROAM and Ingenico in writing, but never once raised any concerns about the lack of an agreement with BBPOS.  *E.g.*, Exhibit 166 at 2 ("As you know we do not have any commercial agreement between ROAM an Ingenico on this matter"); Day 3 Trial Tr., Doc. No. 348 at 55:7-11 (Graylin) (discussing Exhibit 175); 95:24-96:3; *see also* Exhibit 168 (accusing Rotsaert of transferring information about "ROAM's reader to Ingenico R&D team in France without any commercial agreement in place"); Exhibit 175 at 1 (complaining of transfer of information to Ingenico "without commercial agreement in place").

305.    Mr. Graylin's testimony about the need for a "commercial agreement" with BBPOS is not credible not only because his contemporaneous writings confirm that it was the absence of an agreement with Ingenico that was the issue for him, but also because at the time, Mr. Graylin was actively attempting to have ROAM acquire BBPOS, which would render any agreement superfluous.  Day 3 Trial Tr., Doc. No. 348 at 16:6-12, 18:24-19:9, 20:14-20 (Graylin).

306.    Mr. Graylin's testimony that he had been concerned about not having a commercial agreement with BBPOS is also belied by his deposition testimony, in which he confirmed that he did not have any concerns about information sharing as of May 18, 2012.  Day 10 Trial Tr., Doc. No. 355 at 55:16-58:4 (Graylin).

307.    Mr. Graylin's testimony about needing a commercial agreement with BBPOS to allow for the type of information sharing that was done in 2012 is also not credible because Mr. Graylin knew, and confirmed at trial, that this information was rightfully ROAM's

intellectual property.  Day 3 Trial Tr., Doc. No. 348 at 89:24-90:1 (Graylin) (design files and source code belonged to ROAM); Exhibit 175 at 3 ("This is ROAM's IP and we need to have access to this data.").  Mr. Graylin even brought suit alleging that the transfer of the information at issue in this case constituted misappropriation of ROAM trade secrets, and sought damages for that misappropriation.  Exhibit 1008.

308.    Mr. Graylin's testimony is unreliable.  For example, Mr. Graylin claimed expertise by describing himself as being "very product oriented," when he thought that the G4x product, which was in fact a version of the CircleSwipe that ROAM was purchasing from BBPOS, was a code name for the next generation, EMV-capable product that was the subject of the product development efforts in 2012.  Day 3 Trial Tr., Doc. No. 348 at 15:21-22, 119:20-25 (Graylin).  Separately, his testimony on rebuttal was given with the benefit of having reviewed a trial transcript with BBPOS's counsel in violation of the Court's sequestration order, undermining his credibility.

### D.    Mr. Zatkovich's Testimony Was Unreliable

309.    Mr. Zatkovich offered opinions that exceeded the work he performed.

310.    Mr. Zatkovich testified that the Accused Products performed in a manner similar to BBPOS devices, but did so after having loaded BBPOS software onto the products, rather than the ROAM software that would operate the devices as they are sold, without having taken any measures to determine if the commonality in performance was the result of BBPOS's software or design features that would exist in the Accused Products as those are sold.  Day 2 Trial Tr., Doc. No. 347 at 94:16-20, 104:3-8 (Zatkovich).

311.    Mr. Zatkovich opined that the Accused Products use the alleged BBPOS polarity detection and correction trade secret, but he did not even acknowledge that the BBPOS function includes a software component to correct the polarity.

312.    Mr. Zatkovich opined that the "power management" trade secret was present in all Accused Products but did not even analyze the circuitry of any devices other than the RP350x (in addition to not analyzing either the BBPOS software or the software in the Accused Products associated with this technology).  Day 2 Trial Tr., Doc. No. 347 at 24:12-25:20 (Zatkovich).

313.    Mr. Zatkovich opined that the parameters used in BBPOS's automatic gain control software were the same as those he found in a Landi software development kit, but failed to account for the fact that BBPOS identified other parameters as a component of the BBPOS solution.  *Compare* Day 2 Trial Tr., Doc. No. 347 at 40:13-41:19 (Zatkovich) *with* Day 4 Trial Tr., Doc. No. 349 at 79:2-13 (Tang).

314.    Mr. Zatkovich opined that the Accused Products used the BBPOS data formats and DUKPT key generation method, but failed to examine the Accused Products to determine if, in fact, those functions are present in the devices.  Day 2 Trial Tr., Doc. No. 347 at 56:24-57:10 (Zatkovich)

315.    Although he claimed that his expert reports had identified all the information that he considered other than information that he personally knew (Day 2 Trial Tr., Doc. No. 347 at 66:13-18 (Zatkovich), Mr. Zatkovich repeatedly testified based upon materials that were not disclosed as having been considered in the formulation of his opinions, in contravention of the obligations arising under Rule 26(b)(4)(C).  These included the database/internet searches performed in order to support his conclusion that the alleged trade secrets were not generally known as of 2012, his opinions about the relative cost of the BBPOS polarity detection system and the Texas Instruments chip that disclosed the same two-transistor solution, as well as the documents that he reviewed from discovery materials that he reviewed but chose not to include in his expert disclosure.  Day 2 Trial Tr., Doc. No. 347 at 75:19-76:9; 120:1-121:18 (Zatkovich)

These were not subjects as to which he claimed a preexisting knowledge independent of this case, and his having revealed them at trial rather than disclosing them in accordance with the rules undermines his credibility.

316. Mr. Zatkovich's rebuttal testimony is not credible because it consisted of, or at least included, reading from prepared notes. Day 9 Trial Tr., Doc. No. 354 at 58:23-60:9 (Zatkovich).

## XIV. BBPOS Failed to Identify the "Power Management" Solution as a Trade Secret

317. BBPOS's third amended interrogatory answers concerning its trade secret contentions, signed by counsel on July 2, 2021, over two and one-half years after this case was filed, did not disclose power management at all. Exhibit 1000; Day 7 Trial Tr., Doc. No. 352 at 23:1-5 (Lo).

318. BBPOS did not disclose power management as a trade secret at deposition, despite having been asked what trade secrets it contended to have been misappropriated. Day 7 Trial Tr., Doc. No. 352, at 55:17-14 (Lo).

319. BBPOS failed to disclose power management as a trade secret prior to the close of fact discovery despite having had at least one Accused Product for at least six years. Day 7 Trial Tr., Doc. No. 352, at 55:17-14 (Lo).

## XV. BBPOS Asserted Its Misappropriation Claim in Bad Faith

320. BBPOS had no subjective or objective basis to believe that any Defendant had misappropriated its trade secrets because it knew atall relevant tis that its asserted trade secrets were not protectible as such, were not misappropriated by any Defendant, and knew or should have known that none of them was contained in any Accused Product.

321. BBPOS voluntarily disclosed all of the information at issue in this case without designating it as confidential, without an NDA, and without any assurances of confidentiality,

and yet filed suit six years later alleging that the information was trade secret and that using the information would be misappropriation.

322.   BBPOS exhibited a studied refusal to investigate what it now claims to be a serious theft of its valuable intellectual property, either in 2012 when Will Graylin told them that Ingenico was passing its information to Landi, or in 2013 when it was confirmed for them that Ingenico was selling a competing mPOS device, or in 2014 when the products were widely sold, or in 2014 or 2015 when it obtained actual products that it could have examined.

323.   In 2014 and 2015, the BBPOS technology retained some value, as evidenced by its tens of millions of dollars of sales during that period; BBPOS could have, but did not, bring suit and seek injunctive relief.  This is consistent with BBPOS subjectively understanding that there had been no misappropriation and that the Accused Products do not contain any BBPOS technology.

324.   BBPOS took literally no action to enforce its rights until it filed suit, seeking damages, on December 20, 2018, because, as Mr. Lo admitted, Ingenico was still buying product from BBPOS.

325.   When BBPOS did file suit, it did not seek an injunction and when the matter came up for trial, sought no confidentiality protections, such as closing the courtroom to the public, to protect its allegedly valuable intellectual property.  This is consistent with a subjective awareness that the information was not, genuinely, a secret or of any value whatsoever.

326.   Despite having a sophisticated team of engineers and years of experience in the mPOS space, BBPOS failed to examine any Accused Products until it hired its outside expert literally years into the litigation.  BBPOS had no good faith basis upon which to assert trade secret misappropriation.

327.     Even at trial, BBPOS exhibited a flippant and unserious approach to its assertion

of trade secret theft.  To minimize the fact that Mr. Zatkovich, and not BBPOS, was the one who

identified "power management" as a trade secret, Mr. Lo testified "if I engage another IP expert

they may be able to find a sixth trade secret being used. Who knows?"  Day 7 Trial Tr., Doc. No.

352 at 6:7-21.  BBPOS has no actual trade secrets, but is willing to assert anything that its hired

expert is willing to testify to.

## XVI.   Damages From The Alleged Misappropriation

### A.     Valuing the Five Alleged Trade Secrets

328.     The three options that a damage expert has (from an economic perspective) in a

trade secrets matter are to measure damages by (1) actual loss; (2) unjust enrichment or (3) a

reasonable royalty.  Day 5 Trial Tr., Doc. No. 350 at 60:2-10 (Scherf).

329.     In this case, the damages expert for each party measured damages under an unjust

enrichment theory.  Day 5 Trial Tr., Doc. No. 350 at 60:11-14 (Scherf); Day 9 Trial Tr., Doc.

No. 354 at 139:18-140:5 (Vanderhart).

330.     From an economic perspective, unjust enrichment should measure the value that

the trade secrets at issue contribute to the profitability of the overall product.  Day 9 Trial Tr.,

Doc. No. 354 at 139:18-140:5 (Vanderhart).  Dr. Vanderhart testified as follows:

> Q.     And what – from an economic perspective, what is your
> understanding of what unjust enrichment damages should
> measure?
>
> A.     So in a trade secret case, you're going to want to look at the
> value that the trade secrets contribute to the profitability of the
> overall product.  And so you're going to want to break that out
> from any other features or factors or commercial factors that are
> part of the product that are not associated with the trade secrets and
> where the trade secrets don't come into play.

> And so that's what you're looking at when you're trying to figure out the unjust enrichment that's associated with the trade secrets specifically.

*Id.*

331.    Dr. Vanderhart measured the value that the five trade secrets contributed to the Accused Products.  Day 9 Trial Tr., Doc. No. 354 at 144:8-16 (Vanderhart).

332.    Dr. Vanderhart opined that there was a range of potential damages as a result of the alleged misappropriation of the five trade secrets.  That range was $0 - $2,704,484.00.  Day 9 Trial Tr., Doc. No. 354 at 135:24-137:2 (Vanderhart); Exhibit 1236.

333.    Dr. Vanderhart's lower bound of her damage opinion was based on assumption that the trade secrets at issue were readily ascertainable through reverse engineering or that there were alternatives available that could be implemented.  Day 9 Trial Tr., Doc. No. 354 at 144:20-145:13 (Vanderhart).

334.    To determine her upper bound of damages, Dr. Vanderhart used the Agreement (Exhibit 1).  Day 9 Trial Tr., Doc. No. 354 at 146:19-147:6 (Vanderhart).

335.    Specifically, Dr. Vanderhart relied upon the margin to be paid to ROAM for the Crypto Swipe product at follows:

> ROAM will be exclusive distributor of the Products and Devices, Crypto Swipe "branded ROAMpay Swipe" and ROAM will [be] provide[d] [a] margin of $3 per Crypto Swipe unit (which shall be reduced to a margin of $2 per unit per sales above 150,000 cumulative units).

Exhibit 1 at 15 (Schedule II).

336.    Dr. Vanderhart testified that the margin paid on the Crypto Swipe was a "reliable market-based benchmark" to put an upper bound value on the trade secrets."  Day 9 Trial Tr., Doc. No. 354 at 146:19-147:6 (Vanderhart).

337.    In order to determine that the Agreement provided a "reliable market-based agreement by which I could value the trade secrets and their contribution to the profitability of the Accused Devices," Dr. Vanderhart first assumed that, based on witness testimony, all five trade secrets were embodied in the Crypto Swipe.  Day 9 Trial Tr., Doc. No. 354 at 149:13-25 (Vanderhart).

338.    Dr. Vanderhart also referenced Mr. Graylin's testimony that all of the intellectual property of ROAM (including the five trade secrets at issue) was being compensated by the $2 to $3 margin for the Crypto Swipe.  Day 9 Trial Tr., Doc. No. 354 at 150:1-7 (Vanderhart).

339.    Dr. Vanderhart also noted that the Agreement was between ROAM and BBPOS and that ROAM later merged into Ingenico.  Day 9 Trial Tr., Doc. No. 354 at 150:18-24 (Vanderhart).

340.    Dr. Vanderhart concluded that "so this was an agreement for the exact trade secrets at issue between the exact parties at issue in this case." Day 9 Trial Tr., Doc. No. 354 at 150:24-151:1 (Vanderhart).

341.    In addition, Dr. Vanderhart provided expert opinion testimony as to the amount of her upper bound damages through the date that Ingenico acquired 100% of ROAM in January 2015.  This amount was $39,657.00.  Exhibit 1236; Day 10 Trial Tr., Doc. No. 355 at 8:22-9:9 (Vanderhart).

342.    In addition, Dr. Vanderhart provided expert opinion testimony as to the amount of her upper bound damages through the date of the Ingenico-ROAM merger in December 2017.  This amount was $1,430,730.00.  Exhibit 1236; Day 10 Trial Tr., Doc. No. 355 at 9:10-16 (Vanderhart).

343.    Dr. Vanderhart conducted a "reasonableness check" on her upper bound damage range by considering the Summary of Terms of Acquisition of BBPOS set forth in Exhibit 75. Day 10 Trial Tr., Doc. No. 355 at 33:18-22, 9:25-11:8 (Vanderhart).

344.    Dr. Vanderhart considered Exhibit 75, which included a $1.65 million payment for the purchase of the entire BBPOS company.  This would include the five trade secrets at issue "as well as anything else the company owned, any other intellectual property, any other assets."  Day 10 Trial Tr., Doc. No. 355 at 10:23-11:8 (Vanderhart).

345.    With respect to Exhibit 75, Dr. Vanderhart testified as follows:

> That's right.  And so this was 1.65 million.  My damages range from zero to 2.7 million.  And so this was just another data point that said, okay, this is the range of what the value of the trade secrets would be, because this was for the purchase of the entire company, which would include the trade secrets, as well as anything else that the company owned, any other intellectual property, and other assets.

*Id.*

### B.    Mr. Scherf's Reliance on a Technical Expert to Determine the "Basis for the Sale" of the Accused Products and his Application of the "Smallest Saleable Unit" Concept to Determine Unjust Enrichment Damages

346.    Unlike Dr. Vanderhart, BBPOS's damage expert, Mr. Scherf, calculated damages using 100% of the profits from the sales of the accused units. Day 5 Trial Tr., Doc. No. 350 at 88:3-6 (Scherf).

347.    Mr. Scherf testified that he decided not to apportion the value of the five trade secrets at issue (but instead to take 100% of the profits of the accused units) based on his conversation with BBPOS's technical expert, Mr. Zatkovich, who informed Mr. Scherf that the trade secrets were "the basis for the sale" of the Accused Products.  Day 5 Trial Tr., Doc. No. 350 at 60:18-61:18 (Scherf).

348.     Based on the information Mr. Scherf received from Mr. Zatkovich regarding the trade secrets being the "basis for the sale" of the Accused Products, Mr. Scherf determined that "it was also not appropriate to apportion the unjust enrichment because it was the underlying foundation of the sale."  Day 5 Trial Tr., Doc. No. 350 at 61:14-16 (Scherf).

349.     Using the information Mr. Scherf received from Mr. Zatkovich, Mr. Scherf then concluded that 100% of the profits from the Accused Products was the appropriate measure since the products at issue constituted the "smallest saleable unit."  Day 5 Trial Tr., Doc. No. 350 at 61:16-18 (Scherf).

350.     Mr. Scherf testified that it was important to his opinion to determine whether the Accused Products constituted the smallest saleable unit.  Day 5 Trial Tr., Doc. No. 350 at 81:18-22 (Scherf).

351.     Mr. Scherf testified that after determining that it was not necessary to apportion based on Mr. Zatkovich's opinion that the trade secrets at issue were the "basis for the sale of the Accused Devices," he used the smallest saleable unit concept to formulate his damages opinion. Day 5 Trial Tr., Doc. No. 350 at 82:6-10 (Scherf).

352.     Mr. Scherf acknowledged that none of his expert reports referenced the smallest saleable unit concept as a basis for his damages opinion.  Day 5 Trial Tr., Doc. No. 350 at 82:15-17 (Scherf).

353.     Mr. Scherf acknowledged that the smallest saleable unit concept is a concept used in a reasonable royalty analysis.  Day 5 Trial Tr., Doc. No. 350 at 83:11-15 (Scherf).

354.     Mr. Scherf acknowledged that he did not conduct a reasonable royalty analysis in this case.  Day 5 Trial Tr., Doc. No. 350 at 83:19-21 (Scherf).

355.    Mr. Scherf acknowledged that he has never throughout his career used the concept of smallest saleable unit in the calculation of unjust enrichment damages.  Day 5 Trial Tr., Doc. No. 350 at 84:22-85:11 (Scherf).

356.    Mr. Scherf confirmed that none of the damage literature he has reviewed in his career applies the reasonable royalty smallest saleable unit concept to an unjust enrichment calculation of damages.  Day 5 Trial Tr., Doc. No. 350 at 85:17-86:4 (Scherf).

357.    Dr. Vanderhart questioned Mr. Scherf's reliance on Mr. Zatkovich for the proposition that the trade secrets drove demand for the product.  Dr. Vanderhart testified that "Mr. Zatkovich is a technical expert, he is not an economist, he did not testify on demand drivers, I would not even think he would have the expertise to do so."  Day 10 Trial Tr., Doc. No. 355 at 14:5-8 (Vanderhart).

358.    Dr. Vanderhart also testified that in her experience as an economic and damages expert, the use of smallest saleable unit is not applicable to an unjust enrichment calculation of damages.  Instead, "smallest saleable unit is a reasonable royalty topic . . . having to do with the royalty base."  Day 10 Trial Tr., Doc. No. 355 at 14:12-24 (Vanderhart).

359.    Dr. Vanderhart, like Mr. Scherf, testified that she has never used and is not aware of any other economist ever using the smallest saleable unit concept in an unjust enrichment damages analysis.  Day 10 Trial Tr., Doc. No. 355 at 15:7-9 (Vanderhart).

**C.    The "Double Count"**

360.    The sales data for the Accused Products that both experts used to determine damage figures came from Exhibits 472, 473 and 727.  Exhibit 472 contains sales data through March 31, 2018.  Exhibit 473, which was updated to current sales in Exhibit 727, contains sales data that begins on January 1, 2018.  Exhibits 472, 473, 727.

77

361.    There was an overlapping period in the data sets for the months January, February, and March of 2018.  Day 9 Trial Tr., Doc. No. 354 at 154:1-19 (Vanderhart).

362.    Dr. Vanderhart analyzed the three-month overlapping period in the data, looked at each individual customer, and removed orders during the three-month period that were exact in the two data sets.  Dr. Vanderhart concluded that these were overlapping sales and were double counted.  Day 9 Trial Tr., Doc. No. 354 at 154:23-155:21 (Vanderhart).

363.    Dr. Vanderhart determined that there were 21,466 overlapping units.  Day 9 Trial Tr., Doc. No. 354 at 156:4-13 (Vanderhart).

364.    Dr. Vanderhart removed the double-counted units from the total units in determining her damage range.  Day 9 Trial Tr., Doc. No. 354 at 156:4-13 (Vanderhart).

365.    Mr. Scherf acknowledged that the two data sets should not be double counted but did not remove the double-counted units identified by Dr. Vanderhart from his damages calculation.  Day 5 Trial Tr., Doc. No. 350 at 67:4-23 (Scherf).

366.    Mr. Scherf acknowledged that if the double-counted units were taken into account, his damages number would be reduced by approximately $300,000.  Day 5 Trial Tr., Doc. No. 350 at 67:4-23 (Scherf).

### D.    Accused Units Not Using Audiojack (RP457cBT)

367.    Mr. Scherf included in his calculation the RP457c product with a "BT" model number.  Day 5 Trial Tr., Doc. No. 350 at 107:25-108:3 (Scherf).

368.    The RP457cBT products were "bluetooth only" devices and did not contain an audiojack.  Day 8 Trial Tr., Doc. No. 353 at 137:8-15 (Rotsaert).

369.    The RP457c BT products comprised $8,270,007 in revenue and $3,465,814 in profit.  Exhibits 472, 473, 727.

370.    Removing the revenue and profit derived from the RP457cBT products from Mr. Scherf's damages calculation results in $49,045,675 in revenues and $20,524,020 in profits. Exhibits 472, 473, 727.

## XVII.  BBPOS Failed To Indemnify Ingenico Inc.

371.    BBPOS represented and warranted in the Agreement that it had obtained all "intellectual property rights necessary to enter into this Agreement."  Exhibit 1 § 3.9.

372.    BBPOS represented and warranted in the Agreement that "none of the Products, Devices, Deliverables, or Services does or will infringe, misappropriate or violate any intellectual property right of any person."  Exhibit 1 § 3.10.

373.    BBPOS agreed in the Agreement to "indemnify and hold [Ingenico Inc.] harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) . . . arising out of or resulting from any claim brought by a third-party against [Ingenico Inc.] as a result of or relating to any actual or alleged breach hereof."  Exhibit 1 § 3.18.

374.    Ingenico Inc. made demand upon BBPOS to indemnify and hold Ingenico Inc. harmless with respect to claims brought by third parties against Ingenico Inc.'s customers who were alleging that BBPOS products sold to Ingenico Inc. infringed on the intellectual property rights of the third parties (the "Indemnity Demands").  Exhibits 1146, 1147, 352, 351, 354.

375.    Each of the Indemnity Demands directed BBPOS to contact Kerry Timbers, Esq. at Sunstein Kann Murphy & Timbers, LLP.  Mr. Timbers was the attorney primarily responsible for representing Ingenico Inc. with respect to the matters underlying the Indemnity Demands. Exhibits 1146, 1147, 352, 351, 354.

376.     Mr. Timbers has been an attorney for more than 30 years.  Day 9 Trial Tr., Doc. No. 354 at 70:21-22 (Timbers).  Mr. Timbers specializes in intellectual property litigation.  *Id.*, Doc. No. 354 at 70:24-25.

377.     The matters underlying the Indemnity Demands were brought by non-practicing entities ("NPEs") against Ingenico Inc.'s customers.  Mr. Timbers has handled approximately two dozen matters involving NPEs throughout his career.  Day 9 Trial Tr., Doc. No. 354 at 71:15-24, 72:5-10 (Timbers).

378.     During the time period at issue (2017 to 2020), Mr. Timbers's standard billing rate ranged from $750 per hour to $850/$900 per hour.  Day 9 Trial Tr., Doc. No. 354 at 73:6-15 (Timbers).

379.     With respect to the matters underlying the Indemnity Demands, Mr. Timbers charged Ingenico Inc. between $450 and $475 per hour for his work defending the matters.  Day 9 Trial Tr., Doc. No. 354 at 108:10-20 (Timbers).

380.     Mr. Timbers and his law firm defended each of the matters underlying the Indemnity Demands.  The work performed on the matters was consistent with the manner that Mr. Timbers had handled claims brought by other NPEs.  Day 9 Trial Tr., Doc. No. 354 at 108:21-25, 109:1 (Timbers).

381.     For each of the matters underlying the Indemnity Demands, Mr. Timbers prepared invoices to Ingenico Inc. describing in detail the work that had been performed with respect to each matter and the amount of legal time devoted to each task.  Exhibits 1231.1, 1231.2, 1231.3, 1231.4.

382.     Exhibits 1231.1 and 1231.2 are invoices for the REM Holdings matter. Exhibits 1231.1, 1231.2.

383.     The REM Holdings matter was significant because REM Holdings had been in a large fight with Square, which is also a maker of credit card payment devices.  Day 9 Trial Tr., Doc. No. 354 at 80:19-81:1 (Timbers).

384.     As a result of the REM Holdings/Square dispute, Mr. Timbers did not believe the REM Holdings matter could be resolved for a low settlement.  Day 9 Trial Tr., Doc. No. 354 at 80:19-81:5 (Timbers).

385.     As a result, Mr. Timbers's firm did substantial analyses of the patents, infringement, and validity.  Day 9 Trial Tr., Doc. No. 354 at 80:19-81:12 (Timbers).

386.     Exhibit 1231.3 contains invoices for the Blackbird Tech matter.  Exhibit 1231.3.

387.     The Blackbird Tech dispute was on a smaller scale than the REM Holdings matter but still required analysis of the patent at issue and the potential defenses.  Day 9 Trial Tr., Doc. No. 354 at 96:13-21 (Timbers).

388.     Exhibit 1231.4 contains invoices for the MobilePay matter.  Exhibit 1231.4.

389.     In the MobilePay matter, a complaint was filed, which required an answer and substantial work related to scheduling.  Day 9 Trial Tr., Doc. No. 354 at 98:2-6 (Timbers).

390.     Mr. Timbers's firm ultimately negotiated a settlement in the MobilePay matter and participated in the drafting of the settlement agreement.  Day 9 Trial Tr., Doc. No. 354 at 98:14-22 (Timbers).

391.     Mr. Timbers's firm billed Ingenico Inc. for work performed in defense of each of the matters underlying the Indemnity Demands, as follows:

   a.     Exhibit 1231.1 (Matter 5003):  $146,087.55

   b.     Exhibit 1231.2 (Matter 5004):  $ 90,224.10

   c.     Exhibit 1231.3 (Matter 5005):  $ 37,481.89

    d.  Exhibit 1231.4 (Matter 5013): $ 64,444.97.

392. Despite Ingenico Inc.'s demand to BBPOS for indemnification, BBPOS did not indemnify or hold Ingenico Inc. harmless with respect to any of the matters underlying the Indemnity Demands.  Day 9 Trial Tr., Doc. No. 354 at 79:2-7, 96:10-12, 98:9-13 (Timbers).

393. Ingenico Inc. paid Mr. Timbers's law firm for the full amount set forth in the invoices for each of the matters underlying the Indemnity Demands.  Day 9 Trial Tr., Doc. No. 354 at 106:8-19, 107:9-11 (Timbers).

394. The results obtained by Mr. Timbers's law firm on behalf of Ingenico Inc. with respect to the matters underlying the Indemnity Demands issue were as follows:

    a.  For the matter set forth in Exhibits 1231.1 and 1231.2, the third-party claimant ultimately did not file a lawsuit.  Day 9 Trial Tr., Doc. No. 354 at 81:16-21 (Timbers).

    b.  For the matter set forth in Exhibit 1231.3, the third-party claimant filed a lawsuit but ultimately withdrew its claim.  Day 9 Trial Tr., Doc. No. 354 at 96:13-21 (Timbers).

    c.  For the matter set forth in Exhibit 1231.4, the third-party claimant filed a lawsuit and, ultimately, Ingenico Inc., through Mr. Timbers's law firm, negotiated a settlement of the dispute whereby Ingenico Inc. paid the third-party claimant $100,000 to resolve the dispute.  Day 9 Trial Tr., Doc. No. 354 at 98:2-8, 98:14-18 (Timbers); Exhibit 1230.

395. In November 2018, nearly 22 months after receipt of the first Indemnity Demand, counsel for BBPOS requested certain information with respect to the Indemnity Demands. Exhibit 353; Day 9 Trial Tr., Doc. No. 354 at 127:8-128:1 (Timbers).

396. Prior to the request in November 2018, Mr. Timbers had not received any requests from BBPOS or its counsel similar to those set forth in Exhibit 353.  Day 9 Trial Tr., Doc. No. 354 at 127:21-128:1 (Timbers).

397.    On December 20, 2018, one month following the request by BBPOS's counsel for information set forth in Exhibit 353, BBPOS filed its lawsuit.  Doc. No. 1.

398.    The total amount for which Ingenico Inc. seeks indemnity from BBPOS under the Indemnity Demands is $438,238.51 which is comprised of the following:

    a.    Invoices in Exhibit 1231.1:    $146,087.55

    b.    Invoices in Exhibit 1231.2:    $ 90,224.10

    c.    Invoices in Exhibit 1231.3:    $ 37,481.89

    d.    Invoices in Exhibit 1231.4:    $  64,444.97

    e.    Settlement Payment in Exhibit 1230:    $100,000.00

Respectfully submitted,
INGENICO INC., INGENICO CORP. AND
INGENICO GROUP, SA,

By their attorneys,

/s/ *Jeffrey K. Techentin*
JOHN A. TARANTINO (BBO #492230)
PATRICIA K. ROCHA (BBO #542348)
NICOLE J. BENJAMIN (BBO #666959)
R. BART TOTTEN (BBO #631605)
JEFFREY K. TECHENTIN (*pro hac vice*)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
btotten@apslaw.com
jtechentin@apslaw.com
Dated:  May 26, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2023, I caused to be served via electronic mail a true copy of the within document on the following counsel of record:

Jonathon D. Friedmann, Esq.
Robert P. Rudolph, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

Oliver D. Griffin, Esq.
Peter N. Kessler, Esq.
Melissa A. Bozeman, Esq.
Kutak Rock LLP
303 Peach Street, N.E., Suite 2750
Atlanta, GA 30308
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com
Melissa.bozeman@kutakrock.com

Ricardo G. Cedillo, Esq.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
rcedillo@lawdcm.com

/s/ *Jeffrey K. Techentin*
Jeffrey K. Techentin

*4858-6257-5459, v. 4*