UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANYWHERECOMMERCE, INC. and BBPOS LIMITED,<br>            Plaintiffs,<br><br>v.<br><br>INGENICO INC., INGENICO CORP. and INGENICO GROUP, SA,<br>            Defendants. | CIVIL ACTION NO.<br>1:19-cv-11457-IT |

## DEFENDANTS' POST-TRIAL MEMORANDUM

/s/ *Jeffrey K. Techentin*
JOHN A. TARANTINO (BBO #492230)
PATRICIA K. ROCHA (BBO #542348)
NICOLE J. BENJAMIN (BBO #666959)
R. BART TOTTEN (BBO #631605)
JEFFREY K. TECHENTIN (*pro hac vice*)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
btotten@apslaw.com
jtechentin@apslaw.com
Dated:  May 26, 2023

## TABLE OF CONTENTS

ARGUMENT ..................................................................................................................... 2

    I.    Defendants Did Not Misapropriate Any Trade Secrets ...................................... 2

        A.  None Of The Alleged Trade Secrets Are In Any Accused Product ............................. 2

        B.  None of the BBPOS Information Is a Trade Secret ....................................................... 4

        C.  Defendants Acted Properly and Have Not Been Unjustly Enriched .............................. 7

        D.  BBPOS Has Not Proven the Conduct of Any Specific Defendant ............................... 11

    II.   Defendants Are Entitled To Judgment Because BBPOS's Claim Is Not Timely ............ 12

    III.  BBPOS Breached its Contractual Indemnification Obligations ................................... 14

Defendants Ingenico Inc., Ingenico Corp. and Ingenico Group, SA (each individually a "Defendant," and collectively, "Defendants") respectfully submit this Post-Trial Memorandum. Defendants are entitled to judgment on all remaining claims because they did not misappropriate anything and because BBPOS, far from being the wronged party, breached its contractual obligations.

The unrebutted trial evidence is clear and unequivocal: Landi developed the Accused Products for Ingenico, using Landi's technology and not any of BBPOS's information. Indeed, none of BBPOS's alleged "trade secrets" were disclosed to Landi.

BBPOS's pre-litigation conduct confirms that there is no trade secret misappropriation. There is no dispute that BBPOS voluntarily shared the information at issue with Ingenico, without any confidentiality agreement, in hopes of striking a commercial deal with Ingenico and ROAM. BBPOS voluntarily shared this information without restrictions because BBPOS was more interested in future business and it did not consider these items trade secrets. Further proving this point, BBPOS learned of the competing products in 2013 and yet did nothing. BBPOS did not send Ingenico a cease and desist letter. It did not seek a TRO or preliminary injunction. It did nothing for more than five years because BBPOS simply did not consider these items trade secrets. Rather, BBPOS file suit in late 2018, not because it thought Defendants misappropriated trade secrets, but because it was no longer making significant sales to Ingenico. It filed suit without even analyzing the Ingenico products to see if they contained anything that looked like what BBPOS had disclosed years earlier, confident that it could find an expert who would claim to find something in the Ingenico devices that could be claimed as a trade secret. Its principal, Mr. Lo, was remarkably candid about the contrived nature of BBPOS's "trade secrets," admitting that if he had hired a different expert, perhaps he would have found even more of

them – why just five? why not six, or ten? – in the products.

Further, neither Landi or Ingenico used the alleged trade secrets. The Accused Products were developed using an entirely independent process: ROAM hired and paid Landi to do all of the technical development based upon existing Landi technology. In fact, the alleged trade secrets were not even communicated to Landi so they could not have wound up in the Accused Products. And finally, there was no reason to use the BBPOs information – which related only to a few basic functions in a simple reader, and which had nothing to do with the advanced features found in Accused Products, including EMV, PCI, chip card reading, contactless payments, Bluetooth connectivity and tamper resistance – because it had no economic value

BBPOS's strategy of lying in wait for years, profiting from its relationship with Ingenico and watching as Ingenico accumulated profits on its own products, only to bring suit years later on a newfound and meritless trade secrets claim seeking 100% of those profits, is unjust and should not be rewarded. Judgment should enter against BBPOS and the Court should find that its claim was asserted in bad faith.

## ARGUMENT

I. **Defendants Did Not Misapropriate Any Trade Secrets**

    A. **None Of The Alleged Trade Secrets Are In Any Accused Product**

BBPOS's first alleged trade secret, the "BBPOS Polarity Solution," consists of software and hardware circuits. *See* Defendants' Proposed Findings of Fact ("DPFF") ¶ 26. Neither Ingenico nor Landi used this solution. DPFF ¶¶ 27-31. BBPOS presented no evidence that any Accused Product uses software to correct for audio jack polarity, let alone BBPOS software. DPFF ¶¶ 28, 32-34. As to hardware, BBPOS introduced only the circuit diagram of the RP350x not for any other Accused Products, and the RP350x design is "obviously different" from the BBPOS circuit because the circuits have different components and connections. DPFF ¶¶ 31, 34.

2

BBPOS's second alleged trade secret, the "BBPOS Power Management Solution," also consists of software and hardware circuits, neither of which can be found in any Accused Product.[1] BBPOS presented no evidence as to the software component, and for hardware, BBPOS again only introduced the circuitry of the RP350x, which is plainly different from the BBPOS circuits. DPFF ¶¶ 35-41. The differences are important: not only are there many different components, the circuits follow different pathways and have different "active components," which, according to Mr. Zatkovich, are the critical components. DPFF ¶¶ 42-46.

BBPOS's third alleged trade secret, the "BBPOS AGC Solution," consists of some combination of laboratory testing (to evaluate various phone models) and software that is in a software development kit, or "SDK," that runs on a phone, not on an mPOS device. DPFF ¶¶ 48-53, 58. BBPOS claims this function was expressed in flow charts and algorithms but did not present any evidence that any Accused Product (or anything associated with the Defendants) actually performs any step of the algorithms that comprise the BBPOS AGC Solution. Its proof consists only of its technical expert having found some parameter names in a Landi SDK that, he says, correspond to some of the parameters names he found in the BBPOS SDK. Neither Ingenico nor Landi uses the AGC Solution. DPFF ¶¶ 50-64. There is no evidence as to how those parameters were used, or that they are used to perform the BBPOS AGC Solution or anything like it.

BBPOS's fourth alleged trade secret, formats for credit card data (the "BBPOS Data Formats"), consists of a number of specific arrangements of information that is extracted from

---

[1] The Court should disregard the BBPOS Power Management Solution because it was not properly disclosed. *See* DPFF ¶¶ 317-19; *see also* Doc. 294 at 3-6, 12-13. BBPOS's failure to identify the trade secret justifies prohibiting its consideration at trial. Fed. R. Civ. P. 37 ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless.").

3

the magnetic stripe of a credit card. BBPOS contends that the Accused Products use two of those formats (Formats 11 and 29) based solely on a reference to those formats in a single ROAM document that describes encryption key management for all of ROAM's products, including both BBPOS products. DPFF ¶¶ 72-75. The Accused Products do not use these formats, and instead use ROAM's own standard methodology, which is different from any of the BBPOS Data Formats. DPFF ¶¶ 65-68. There was no evidence that these formats are used in the software or hardware of the Accused Product. To the contrary, the evidence shows that the BBPOS Data Formats are not compatible with the Accused Products. DPFF ¶¶ 65-68, 76. Ingenico would have no use for the formats because they are customer specific (DPFF ¶¶ 69) and there is no evidence any Accused Product were ever sold to customers associated with either Format 11 or 29.

BBPOS's final alleged trade secret is a method of derivating encryption keys that consists of a BBPOS customization of the industry standard DUKPT key generation method (the "BBPOS DUKPT Variant"). The Accused Products do not use this method. DPFF ¶¶ 77-79. The Accused Products use an industry standard DUKPT as implemented by the device developer, Landi. DPFF ¶¶ 78. BBPOS's sole evidence that the Accused Products use the BBPOS DUKPT Variant is an inference premised on the Accused Products' alleged use of Formats 11 and 29, which is simply wrong. DPFF ¶¶ 86-94.

    **B.**    <u>**None of the BBPOS Information Is a Trade Secret**</u>

        **1.**    **BBPOS Did Not Protect This Information; BBPOS Voluntarily Disclosed This Information Without Restriction To Develop Business**

The evidence establishes that BBPOS did *not* make reasonable efforts to maintain the secrecy of its alleged trade secrets. *See* Defendants' Proposed Jury Instructions (ECF No. 275) at I(B), II(A)(1)-(2), (6)-(7). Voluntarily sharing information with others is incompatible with

reasonable efforts. *See id.* at II(A)(7).

*BBPOS willingly and voluntarily disclosed all five of its alleged trade secrets to its competitor without a nondisclosure or confidentiality agreement*, at which point the information ceased being eligible for protection as a trade secret. DPFF ¶¶ 184-217. As a result, none of BBPOS's alleged trade secrets qualifies as "trade secret" under the GTSA. A company that shares what it claims to be its trade secrets with another company has failed to make reasonable efforts to maintain the secrecy of its alleged trade secrets even if the information is shared in the hopes of future business collaboration. *See Infrasource, Inc. v. Hahn Yalena Corp.*, 613 S.E.2d 144, 149 (Ga. App. 2005) (information not trade secret under GTSA, although shared in anticipation of a joint venture); *Stargate Software Int'l, Inc. v. Rumph*, 482 S.E.2d 498, 502 (Ga. App. 1997) (company failed to take reasonable steps to maintain secrecy when company shared alleged trade secret without a nondisclosure or confidentiality agreement in connection with a proposed, but ultimately unrealized, acquisition).

Even if BBPOS's disclosures to Mr. Rotsaert are deemed to be somehow protected, BBPOS disclosed all five of its alleged trade secrets to its competitor, whom it knew to be separate from ROAM, by disclosing them (1) in person to Mr. Fivel at the February 2012 Workshop; (2) by emails to Mr. Grandemenge on February 16, 17, and 28, 2012; and (3) in person to Mr. Grandemenge at the April 2012 Workshop. DPFF ¶¶ 184-217.

BBPOS's contention that the disclosures were made under Section 6.3 of the ROAM-BBPOS Agreement is erroneous for the reasons discussed at the argument of Defendants' Rule 52(c) motion. Day 7 Trial Tr., Doc. No. 352 at 129:21-142:8. This provision applies to disclosures by ROAM to ROAM's contractors, etc., not to BBPOS's disclosure to ROAM's

contractors or to Mr. Fivel and Mr. Grandemenge.[2,]

The limited evidence presented by BBPOS is insufficient to support a finding of reasonable efforts even ignoring the naked disclosure of the information to its competitor. The bulk of the materials said to be trade secret bore no confidentiality markings and BBPOS introduced at trial no confidentiality agreements or NDAs with its employees or third parties. DPFF ¶¶ 211-17. Other, unspecified written agreements or efforts to compartmentalize information to prevent unfettered access by employees do not constitute reasonable efforts to maintain secrecy. *HCC Ins. Holdings, Inc. v. Flowers*, 237 F. Supp. 3d 1341, 1351 (N.D. Ga. 2017).[3]

### 2. The Alleged Trade Secrets Were Generally Known or Readily Ascertainable During the Entire Relevant Time Period

For information to be protected as a trade secret, it must "[d]erive[] economic value, actual or potential, from not being generally known to . . . other persons who can obtain economic value from its disclosure or use." O.G.C.A. § 10-1-761(4)(A); *see* Defendants' Proposed Jury Instructions at II(A)(2, II(A)(4); *see also Cap. Asset Rsch. Corp. v. Finnegan*, 160 F.3d 683, 687 (11th Cir. 1998). Because the technical information at issue concerns commonly-known problems inherent to technology that communicates data over an audio jack or that is

---

[2] BBPOS's other theories are similarly flawed. The contention that BBPOS made disclosures at the instruction of ROAM under Section 3.1 of the Agreement is incorrect because Section 3.1 concerns disclosures to ROAM, not to third parties. BBPOS's contention that "[i]t was ROAM's responsibility" to designate material as confidential disregards the fact that the GTSA imposes the duty to make reasonable efforts to protect information on the owner of the information, BBPOS. Furthermore, Mr. Graylin's rebuttal testimony was too vague to support a finding that there was any confidentiality obligation on any receiving party, and generally not credible. DPFF ¶¶ 302-08. Moreover, a finding of agency on the part of Mr. Rotsaert would not negate the naked disclosure *directly to Mr. Fivel and Mr. Grandemenge*. DPFF ¶¶ 186-217.

[3] BBPOS's unprotected disclosure to the engineers from France justifies granting Defendants' pending Rule 52(c) motion regardless of whether the disclosure to Mr. Rotsaert might be considered to have been protected.

6

powered by a non-rechargeable battery, the BBPOS solutions for polarity detection and power management, were generally known prior to any alleged misappropriation. DPFF ¶¶ 103-25.

Further, BBPOS provided evidence only to show these alleged trade secrets were not generally known in 2012, and no evidence for any period thereafter. DPFF ¶¶ 95-102. As a result, Ingenico's evidence that these alleged trade secrets were generally known after 2012 is unrebutted, and BBPOS has not met its burden to show they were not generally known after 2012. Thus, BBPOS is not entitled to an award of profits for sales of Accused Products, which did not begin until 2014. DPFF ¶ 102; *see Sunjoy Indus. Group, Ltd. v. Permasteel, Inc.*, No. 2:22-cv-1896, 2023 WL 406211, at *10 (S.D. Ohio Jan. 25, 2023); *see also Nite Glow Indus. Inc. v. Cent. Garden & Pet Co.*, No. 2020-1897, 2021 WL 2945556, at *7 (Fed. Cir. July 14, 2021).

### 3. The Alleged Trade Secrets Do Not Have Independent Economic Value

BBPOS willingly disclosed its information without an NDA because the information lacks any independent economic value. DPFF ¶¶ 138-59; Defendants' Proposed Jury Instructions (Doc. No. 275) at II(A)(1), II(A)(9). BBPOS's litigation theories of value were limited to the value of the information to BBPOS. DPFF ¶¶ 141, 144, 147, 151-55, 159. The sole exception was a speculative assertion that competitors could use BBPOS Data Formats to obtain business from BBPOS customers, which is contradicted by evidence in the record. *Id.* The value to BBPOS of using the information is irrelevant; to be a trade secret, the information must be valuable to others. Because each of BBPOS's "secrets" were was just one of many well known solutions, they held no inherent value to others.

## C. Defendants Acted Properly and Have Not Been Unjustly Enriched

### 1. There Is No Evidence that Any Defendant Obtained Information by

7

**Improper Means or Misused Any Information**

Acquisition of an alleged trade secret by voluntary disclosure by its owner constitutes a lawful means of acquisition. *See Onbrand Media v. Codex Consulting, Inc.*, 687 S.E.2d 168, 175 (Ga. App. 2009) (no misappropriation where information voluntarily shared).[4]

The trial record establishes that the acquisition of BBPOS information was done by the lawful means of BBPOS's voluntary disclosure.[5] Because the voluntary disclosure did not impose any restrictions on the use of the information, there could be no "misappropriation by misuse," both because there were no restrictions that could be violated and because such a naked disclosure vitiates any trade secret protection. *See Smith v. Mid-State Nurses, Inc.*, 403 S.E.2d 789, 790 (Ga. 1991) (because plaintiff did not make reasonable efforts to maintain secrecy, the information was not a "trade secret"); *In re Dippin' Dots Patent Litig.*, 249 F. Supp. 2d 1346, 1375-76 (N.D. Ga. 2003) ("At no time did Plaintiffs indicate to Defendants that the information disclosed was a trade secret. Having made these unprotected disclosures, Plaintiffs cannot now complain that Defendants violated their rights under the Uniform Act."); *TLS Mgmt. & Marketing Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 56 (1st Cir. 2020); *JTH Tex LLC v. D'Souza*, No. CV 20-00087 JAO-KJM, 2021 WL 4353099, at *19 (D. Haw. Sept. 24, 2021; *Flotec, Inc. v. Southern Research, Inc.*, 16 F. Supp. 2d 992, 1004-05, 1007 (S.D. Ind. 1998).

  **2.**  **Defendants Have Not Been "Unjustly Enriched" by the Profits from**

---

[4] Employment decisions also recognize that a trade secret that is voluntarily shared without a confidentiality agreement has not been misappropriated. *See, e.g.*, *Release Marine, Inc. v. Freeman*, No. CV421-203, 2022 WL 696796, at *4 (S.D. Ga. Mar. 8, 2022); *Putters v. Rmax Operating, LLC*, No. 1:13-CV-3382-TWT, 2014 WL 1466902, at *3 (N.D. Ga. Apr. 15, 2014).

[5] In addition to being lawful, the acquisition of BBPOS's alleged trade secrets was not by "improper means" because the trial record contains no evidence of "theft, bribery, misrepresentation, breach or inducement of a breach of confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." *See* O.G.C.A. § 10-1-761(1); DPFF ¶ 217.

8

**Sales of the Accused Devices**

The Court should reject BBPOS's claim for damages for several independent reasons. First, Defendants did not misappropriate BBPOS trade secrets and did not incorporate BBPOS technology into the Accused Products.

Second, Dr. Vanderhart provided a well-reasoned opinion based on sound economic principles as to the amount of BBPOS's damages, if any. She, unlike Mr. Scherf, measured the value that the five trade secrets contribute to the profitability of the Accused Products and opined that, assuming liability is established, BBPOS' damages would be in the range $0-$2,704,484.[6] To determine her upper bound of damages, Dr. Vanderhart used the Agreement, which provided a $2 margin for the sale of an early mPos product (the CryptoSwipe a/ka CircleSwipe) that contained all of the five trade secrets at issue (but not the additional features and functionalities noted above). She testified that the $2 margin in the License Agreement was a "reliable market-based" benchmark to value the five trade secrets. [7] DPFF ¶¶ 334-37.

Third, Mr. Scherf failed to measure the value that the trade secrets contribute to the profitability of the Accused Products. *See* Defendants' Trial Brief at 17-19; Defendants' Proposed Jury Instructions at 51-58. Instead, Mr. Scherf opined that BBPOS should recover 100% of the profits from the Accused Products, even though they include valuable features and

---

[6] Dr. Vanderhart also compared the negotiated purchase price of $1.65 million in Ex. 75 for the entirety of BBPOS company (including the five trade secrets) as a "reasonableness check" of her damages range. DPFF ¶¶ 343-45.

[7] Dr. Vanderhart's damages range likely overstates BBPOS's damages. She used Mr. Scherf's definition of accused products which, as set forth above, was overstated since many did not contain all five alleged trade secrets. She also attributed the full $2 margin to the five alleged trade secrets, even though the CryptoSwipe likely contained more than just these trade secrets. She also calculated damaged for sales occurring as late as 2023 (following Mr. Scherf's calculations), even though BBPOS presented no evidence that the alleged trade secrets were not generally known at any point after 2012. DPFF ¶¶ 328-45.

functionalities that contribute significantly to their profitability and are not based, in any way, on the five alleged trade secrets.[8]

Fourth, Mr. Scherf's methodology was fatally flawed and his testimony was not credible. Mr. Scherf based his opinion that he did not need to apportion the value that the five alleged trade secrets contributed to the Accused Products on the purported opinion of Mr. Zatkovich – a technical expert – that the five trade secrets were the "basis for demand" for sale of the Accused Products.  DPFF ¶¶ 346-59.  The reliance on a technical expert for an economic principle (drivers of demand for a product) that the technical expert did not even offer at trial was wholly improper and the Court should reject Mr. Scherf's damages opinion in its entirety.  *Carrozza v. CVS Pharmacy, Inc.*, 391 F. Supp. 3d 136 (D. Mass. 2019).

Fourth, Mr. Scherf used Mr. Zatkovich's opinion as to the "basis for the sale" of the accused products and applied a "smallest salable unit" concept to reach his opinion on unjust enrichment damages.  DPFF ¶¶ 347-59.  This was improper and contrary to Mr. Scherf's own experience as a damages expert.  Mr. Scherf acknowledged that the "smallest salable unit" concept applies to a reasonable royalty analysis and that he did not perform a reasonable royalty analysis in this case.  DPFF ¶¶ 352-54; *see LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed Cir. 2012) (damages for royalties may be based on the smallest salable unit).  Mr. Scherf admitted that he (a) did not use the term "smallest salable unit" in any of his expert reports in this case; (b) had never in his career applied the smallest salable unit concept to determine unjust enrichment damages; and (c) had never reviewed any literature applying the smallest salable unit concept to an unjust enrichment calculation of damages.  *See* DPFF ¶¶ 352-

---

[8] These include EMV capability, secure card reading (chip functionality), contactless (tap) payments, rechargeable batteries, tamper resistance, PCI certification, Bluetooth, and USB connectivity, among others.  *See* DPFF ¶ 166.

56. As such, the Court should reject Mr. Scherf's inflated damage opinion in its entirety.[9]

Finally, Mr. Scherf used 100% of the profits from the Accused Products for his damages calculation, even though the evidence at trial established that many of them contained none, or less than all, of the five alleged trade secrets, including:

- The automatic gain control solution has a software component that is not in the mPOS devices but instead runs on the phone itself.
- The RP 457cBT devices (representing nearly $3.5 million of Mr. Scherf's damages opinion) do not have audio jacks and therefore would not contain the audio jack polarity detection trade secret.
- There was no evidence that Accused Devices even performed the software components of the polarity and power management solutions.
- Mr. Scherf had no basis to assume that the information was trade secret at any point during his asserted damages period because BBPOS only offered an opinion regarding the technology not being generally known as of 2012.

*See* DPFF ¶¶ 29, 38-39, 58-59, 95-125, 367-70.

### D. BBPOS Has Not Proven the Conduct of Any Specific Defendant

BBPOS sued three Defendants. To establish liability against any one Defendant, BBPOS must, *inter alia*, identify the specific alleged conduct that is allegedly attributable to that Defendant. *See Marcilis v. Township of Redford*, 693 F.3d 589, 596 (6th Cir. 2012) (upholding dismissal of complaint that referred to all defendants "generally and categorically" because the plaintiff had failed to "'allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right'") (quoting *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008)); *Atuahene v. City of Hartford*, No. 00-7711, 2001 WL 604902, at *1 (2d Cir. May 31, 2001) (granting motion to dismiss in part because "[t]he complaint failed to differentiate among the defendants, alleging instead violations by 'the defendants.'"). At trial, BBPOS submitted no evidence that any specific Defendant took any action that allegedly misappropriated any of

---

[9] Mr. Scherf also did not adjust for double counted sales of the accused products. DPFF ¶¶ 360-66.

BBPOS's alleged trade secrets. DPFF ¶¶ 267-78. For example, BBPOS has not provided any evidence that Ingencio Group S.A. or Ingenico Corp. had any role in developing the Accused Product or ever sold the Accused Product. As a result, BBPOS cannot possibly show that either entity misappropriated any of the alleged trade secrets.

Furthermore, BBPOS submitted no evidence at trial that any Defendant was the principal or agent of, or acted in partnership with, any other Defendant, so liability cannot be imposed on the basis of vicarious liability such as respondeat superior. *See Griffiths v. Town of Hanover*, No. 1:11-CV-12115-JLT, 2012 WL 3637791, at *3 n.33 (D. Mass. Aug. 21, 2012) ("In tort, the liability of the principal for the acts of his agent rests upon the ancient doctrine of respondeat superior, and the burden is upon the party seeking to prove the agency to establish the relationship of principal and agent . . . .") (citations omitted); *Commonwealth Aluminum Corp. v. Baldwin Corp.*, 980 F. Supp. 598, 611 (D. Mass. 1997) ("To prove that a corporation can be bound by an alleged misrepresentation by an agent, a plaintiff must first demonstrate that a principal-agent relationship existed."); *see also* DPFF ¶¶ 277-78.

## II.     Defendants Are Entitled To Judgment Because BBPOS's Claim Is Not Timely

The first time BBPOS asserted its misappropriation claim was on December 20, 2018. Joint Pretrial Mem. (ECF. No. 316) at 6. Accordingly, BBPOS's claim is timely only if the statute of limitations did not begin to run before December 20, 2013. O.G.C.A. § 10-1-766; *see also* Defendants' Proposed Jury Instructions at II(A)(18).

When "there is reason to suspect that a trade secret has been misappropriated and a reasonable investigation would produce facts sufficient to confirm this suspicion (and justly bring suit), the limitation period begins, even though the plaintiff has not conducted such an investigation." *Porex Corp. v. Haldopoulos*, 644 S.E.2d 349, 353 (Ga. App. 2007). Indeed, if the plaintiff becomes aware of facts "that would make a reasonably prudent person suspicious,"

it has "a duty to investigate further" and is "charged with knowledge of matters which would have been revealed by such an investigation." *Id.* at 353-54.

The trial record establishes that BBPOS did not exercise reasonable diligence because, long before December 2013, BBPOS had knowledge that "would make a reasonably prudent person suspicious," so BBPOS had "a duty to investigate further," yet did not do so. If BBPOS legitimately was concerned that its trade secrets might have been misappropriated by its competitor – who was its only customer! – and used to make a competing product, reasonable diligence would include taking at least *some* action to observe the potentially infringing product. BBPOS did nothing of the sort. If BBPOS had followed up on its admitted suspicions and sought samples of the subject products, BBPOS would have discovered the alleged misappropriation before December 20, 2013. DPFF ¶¶ 218-55. Accordingly, BBPOS's claim under the GTSA is barred by the statute of limitations.

In addition, laches bars BBPOS's attempt to obtain years of profits from sales that accumulated while BBPOS took no action to vindicate its alleged rights. BPOS waited *literally years* before bringing suit because it was profiting from its sales of products to ROAM and Ingenico. Given that (1) BBPOS "first became aware" that its alleged trade secrets allegedly were being used in devices of "Ingenico" in 2014 or 2015, (2) BBPOS did not file this lawsuit until December 20, 2018, (3) BBPOS was obtaining profits from its sales of products to ROAM and "Ingenico" from 2014 through 2017, and (4) from 2014 through 2017, BBPOS was incurring alleged damages from the alleged misappropriation, BBPOS unreasonably delayed in filing this lawsuit, which unfairly prejudiced Defendants. DPFF 256-66. BBPOS's *ex post facto* excuses that it lacked the "energy" to enforce its rights, or was in dire straits financially, are not credible. DPFF ¶¶ 257-64. Equity prohibits rewarding BBPOS for its calculated, multi-year delay, which

13

caused substantial and unfair prejudice to Defendants. *See* Defendants' Trial Brief (ECF No. 321) at 24-25. Accordingly, BBPOS's misappropriation claim is barred by laches and all Defendants are entitled to judgment on Count II.

### III.  **BBPOS Breached its Contractual Indemnification Obligations**

Ingenico Inc. proved by a preponderance of the evidence that BBPOS breached the Agreement by failing to indemnify Ingenico Inc. with respect to the defense of claims made by third parties alleging that products sold by BBPOS to Ingenico Inc. infringed on the intellectual property rights of the third-party claimants. DPFF ¶¶ 371-98; Defendants' Proposed Jury Instructions (ECF No. 275) at I(B), II(D)(1)-(4), III(H). The Agreement required BBPOS to indemnify and hold Ingenico Inc. harmless for the third-party claims. *See* Ex. 1 at §§ 3.9, 3.10, 3.18; DPFF ¶¶ 371-73. Ingenico Inc. sent demand letters to BBPOS for indemnification and to hold Ingenico Inc. harmless for each of the third-party claims. Ex. 1146, 1147, 351, 352, 354; DPFF ¶¶ 374-75. BBPOS ignored the demands, so Ingenico Inc. was left to defend the claims without support from BBPOS. DPFF ¶ 392.[10]

Ingenico Inc. incurred $338,238.51 in legal fees and expenses in defending the third-party claims and settled one of the claims for $100,000. DPFF ¶¶ 382, 386, 388, 394, 398. Ingenico Inc. established at trial, through uncontradicted evidence, that, *inter alia*, the fees and expenses were fair and reasonable under Massachusetts law, that each matter was important to defend in the manner defended by Mr. Timbers and his firm, and that a successful result was

---

[10] BBPOS's letter from its litigation counsel sent nearly 22 months after the initial indemnity demand was received weeks before BBPOS filed suit in this matter and was merely a litigation tactic that cannot obviate the conclusion that BBPOS breached its indemnification obligations. Ex. 353; DPFF ¶¶ 395-97. In the 22 months during which BBPOS ignored its indemnity obligations, the vast majority of the defense work was completed, and after BBPOS filed its lawsuit following the letter from its litigation counsel, it became clear that BBPOS had no intention to honor its promise to indemnify Ingenico Inc. *Id.*

obtained in each matter. The invoices in evidence provide a detailed description of each task performed for each matter together with the amount of time devoted to each task. DPFF ¶ 381.

The Massachusetts Supreme Court has set the standard for review of a claim for attorneys' fees:

> In determining what is a fair and reasonable charge to be made by an attorney for his services many considerations are pertinent, including the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the property affected by controversy, and the results secured. Neither the time spent nor any other single factor is necessarily decisive of what is to be considered as a fair and reasonable charge for such services.

*In re Estate of King*, 920 N.E.2d 820, 829 (Mass. 2010) (citing *Cummings v. Nat'l Shawmut Bank*, 188 N.E. 489 (Mass. 1933)). The factfinder must "evaluate the pertinent factors in the context of examining the attorney's description of the services actually provided, the hours spent, and the hourly rate charged." *Id.* (citing *Robbins v. Robbins*, 476 N.E.2d 230 (Mass. 1985)).

The evidence at trial established that the amounts incurred by Ingenico Inc. were fair and reasonable to defend each matter, so judgment should enter in favor of Ingenico Inc. for $438,238.51.

>Respectfully submitted,
>INGENICO INC., INGENICO CORP. AND
>INGENICO GROUP, SA,
>
>By their attorneys,
>
>/s/ *Jeffrey K. Techentin*
>JOHN A. TARANTINO (BBO #492230)
>PATRICIA K. ROCHA (BBO #542348)
>NICOLE J. BENJAMIN (BBO #666959)
>R. BART TOTTEN (BBO #631605)
>JEFFREY K. TECHENTIN (*pro hac vice*)
>Adler Pollock & Sheehan P.C.
>One Citizens Plaza, 8th Floor
>Providence, RI 02903
>Tel: (401) 274-7200
>Fax: (401) 351-4607
>jtarantino@apslaw.com
>procha@apslaw.com
>nbenjamin@apslaw.com
>btotten@apslaw.com
>jtechentin@apslaw.com
>Dated:  May 26, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2023, I caused to be served via electronic mail a true copy of the within document on the following counsel of record:

Jonathon D. Friedmann, Esq.
Robert P. Rudolph, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

Oliver D. Griffin, Esq.
Peter N. Kessler, Esq.
Melissa A. Bozeman, Esq.
Kutak Rock LLP
303 Peach Street, N.E., Suite 2750
Atlanta, GA 30308
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com
Melissa.bozeman@kutakrock.com

Ricardo G. Cedillo, Esq.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
rcedillo@lawdcm.com

/s/ *Jeffrey K. Techentin*
Jeffrey K. Techentin

4878-4636-1958, v. 3