## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ANYWHERECOMMERCE, INC. and BBPOS LIMITED,** | |
| **Plaintiffs,** | **Civil Docket No: 1:19-cv-11457-IT** |
| **v.** | |
| **INGENICO INC., INGENICO CORP., and INGENICO GROUP SA,** | |
| **Defendants.** | |

## BBPOS LIMITED'S OPPOSITION TO DEFENDANTS' POST-TRIAL MEMORANDUM

i

## TABLE OF CONTENTS

Introduction ........................................................................................................... 1

ARGUMENT .......................................................................................................... 1

    I.     Defendants Misappropriated BBPOS' Trade Secrets ........................................... 1

         a.      All Five Trade Secrets are in the Accused Products ................................. 1

         b.      The BBPOS Key Designs are Trade Secrets ........................................... 4

         c.      Defendants Were Unjustly Enriched ....................................................... 8

         d.      All Defendants Are Liable ..................................................................... 10

    II.     BBPOS' Claim is Timely ................................................................................. 11

    III.   Defendants' Counterclaim Fails ...................................................................... 12

4865-1150-2183.10

## INTRODUCTION

Defendants' recitation of the facts and offer of lawyer argument as evidence must be reviewed with heavy scrutiny. Many facts are presented with incomplete or misleading record citations,[1] and much of the arguments are without evidentiary support. Defendants have failed to counter what the preponderance of the evidence shows: Defendants misappropriated BBPOS' trade secrets and unjustly benefitted from doing so.

## ARGUMENT

### I.   Defendants Misappropriated BBPOS' Trade Secrets

### a.   All Five Trade Secrets are in the Accused Products

As for the ***polarity detection/correction key design***, software is not claimed as part of this trade secret; it consists solely of the hardware circuitry. Doc. No. 347 at 106–107. The undisputed findings and methodology employed by BBPOS' Zatkovich shows that the Accused Products use the "exact same design with the exact same type of N channel MOSFET transistors and exact same configuration of that circuit connected to the audio jack." Doc. No. 360 at 42–43. Shamos disagreed only over the semantics of calling the two circuits the same, despite "performing the same function," citing a few different passive components that added nothing to the functionality of polarity detection. *Id.* at 44. Rotsaert conceded that *he did not know* whether the Accused Products used this BBPOS key design or claimed trade secret 2. Doc. No. 354 at 11–12.

---

[1] There are multiple misstatements, including at least that: (1) there were no trade secret disclosures to Landi; (2) that BBPOS did not analyze a competing product before filing suit; (3) the polarity detection trade secret includes a software component; (4) Lo conducted "no investigation whatsoever" in 2013; (5); there were sales of the RP350X in 2013; (6) there was no evidence of "any action taken" by a particular Defendant; (7) Lo admitted to delaying filing suit because BBPOS was receiving profits from sales to ROAM; and (8) there was no reason for Landi or Ingenico to use the trade secrets. BBPOS will be prepared to discuss these misrepresentations—and others it is able to locate—at the post-trial hearing.

As for the ***power management key design***, the Landi RP350x circuitry diagram was not the only evidence adduced that the Accused Products used this particular trade secret; Ingenico ignores the two other unrebutted aspects of the evidence including Ingenico's own internal product requirements documents (RP150x at Ex. 193-0020; RP750x at Ex. 209-0025), identifying BBPOS' temp sleep and wake-up feature as a "Must-Have," and the conclusive, unrebutted results of Zatkovich's software functionality testing of the BBPOS and Ingenico Accused Products, which found that the software in both devices behaved in the same manner in detecting valid mPOS transaction signals to "stay-awake."[2] Doc. No. 360 at 40, 46–47.

As for the ***automatic gain control key design***, it was again uncontroverted at trial that the Accused Products use this particular BBPOS trade secret.[3] Doc. No. 360 at 48–49. Rotsaert was aware that Landi had some process for evaluating cell phones, but did not understand it, and had no appreciation how this observation related, if at all, to BBPOS' claims for trade secret theft. Doc. No. 354 at 13–14. Ingenico hinges its entire post-trial "rebuttal" arguments[4]—*as none was presented at trial*—on two things: (1) Rotsaert's unreliable testimony (he did not know how automatic gain control works) and a Landi document (Ex. 1056) that *was not admitted* into evidence (*cf.* Doc. No. 362 at 18 (DPFF ¶50) and Doc. No. 354 at 13–16); and (2) a mischaracterization of Shamos' testimony, actually agreeing that "Ingenico uses auto gain control

---

[2] Although requested, no Ingenico software or source code was produced in discovery. Doc. No. 346 at 105; Doc. No. 347 at 29, 42, 45, 104–105; Doc. No. 349 at 24–25.

[3] Using the source code for BBPOS' SDK to reveal its obfuscated optimal parameters, Doc. No. 349 at 22, 81, Zatkovich identified those same parameters in Ingenico's devices by decompiling Landi SDK, Doc. No. 360 at 48, and deduced therefrom Ingenico's use of BBPOS' algorithm as necessary to use these optimum settings and the specified preamble format needed to synchronize the software as required under BBPOS' communication formats, Doc. No. 347 at 43.

[4] *See* Doc. No. 363 at 5 (citing Doc. No. 362 at 18–22 (DPFF ¶¶50-64)).

2

software functionality," but not indicating that Zatkovich's conclusions were either "unwarranted" or "speculative" as stated in Ingenico's proposed finding of fact #60 (*cf.* Doc. No. 362 at 21 (DPFF ¶60) and Doc. No. 353 at 88).

 As for the ***communication format key design***, Ingenico claims the only adduced evidence of its use of this trade secret in the Accused Products is "a single ROAM document." Doc. No. 363 at 6.  This, too, is false.  Ingenico's internal key management system, product requirements documents, and other business records demonstrate that Ingenico used BBPOS' key designs for both its communication formats and modified data DUKPT encryption in the Accused Products. Doc. No. 360 at 50–51. Tang testified that Ingenico's product requirements document for the RP100x[5] (at Ex. 451A-0028) depicts a table that is a "blatant copy" of BBPOS' data output format for its communication formats (Ex. 371) and evidence Ingenico's use of BBPOS' Formats 29 and 12 in column "FID" in its RP100x. Doc. No. 349 at 114–117; *cf.* Exs. 451A-0027–28 and 371-0010–12, 17–18; Doc. No. 360 at 50.

 As for the ***modified Data DUKPT key design***, Defendants deny the use of this particular trade secret in any accused product.  But Defendants' product requirements document states that this trade secret is "applicable to all ROAM Data products" and mandated that "BBPOS Encryption should be supported in both Test & Production as a Service."  Doc. 362 at 22; Ex. 207 at 19.  Defendants' brief ignores this evidence, even though Zatkovich cited Ingenico's key management system document (Ex. 207) as evidence of Ingenico's use of BBPOS Formats 11 and 29, necessitating Ingenico's use of this particular trade secret. Doc. No. 360 at 50.  Tang also confirmed that this shows use of BBPOS encryption in Ingenico's devices, in order to maintain

---

[5] The document indicates this product was intended to supplant its existing G5X sales to PayPal on a "compatible API as the one supporting RP350x & RP750x." Ex. 451A-0009.

compatibility and more easily gain customers.  Doc. No. 349 at 118.  Ingenico's counsel complained in his opening remarks about how unwieldy using BBPOS' modified DUKPT has been in servicing "PayPal, its largest customer."  Doc. No. 346 at 76.  Ingenico used these two key designs in the Accused Products to take advantage of the "customer stickiness" aspect of these two BBPOS key designs.[6]  Only Rotsaert's suspect testimony—that Ingenico purportedly created its own "ROAM Data format"—was offered to rebut BBPOS' evidence, but, even if true, this failed to establish *when* this allegedly was implemented nor any basis for the Court to infer that the use of its own communication formats vs. BBPOS' formats would be mutually exclusive (about which no evidence was offered).  Doc. No. 354 at 15–19.

### b. The BBPOS Key Designs are Trade Secrets

#### 1.  BBPOS Reasonably Protected Its Trade Secrets

Defendants owed multiple contractual and common law duties of confidentiality to BBPOS, all of which were breached, any of which are sufficient to show improper means under the GTSA.[7]  First, Defendants owed a duty of confidentiality under Massachusetts common law.  *See* Doc. No. 361 at 4.  This duty arose under Massachusetts law because the state has a significant connection to the facts giving rise to the misappropriation, which included interactions between parties located in Boston (ROAM, Graylin, Rotsaert), Hong Kong (BBPOS) and France (Lazare, Coonen).  *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 41 (1st Cir. 2020).[8]  Breach of this duty constitutes "improper means" under the GTSA.  *Camp Creek Hosp. Inns, Inc. v. Sheraton*

---

[6] *See*, *e.g.*, Doc. No. 354 at 22–27; Ex. 828.

[7] It is undisputed that BBPOS took measures to protect its trade secrets generally.  Doc. 360 at 48–49.

[8] Defendants insisted this case be transferred to Massachusetts from Georgia, relying in part on this state's connection to the case.  Doc. No. 23-1 at 14.

4

*Franchise Corp.*, 139 F.3d 1396, 1411 (11th Cir. 1998) (misuse of information provided pursuant to Massachusetts contract sufficient for misappropriation where information was used in violation of the contract).

Second, BBPOS and Defendants had a confidential relationship under Georgia law. Confidential relations arise under Georgia law where one party exercises a "controlling influence over the will, conduct, or interest of another," or in context of principal and agent, among other relationships. O.C.G.A. § 23-2-58. Here, the evidence shows that BBPOS shared its trade secret with ROAM, Rotsaert, and Ingenico at the instruction of ROAM (including both Graylin and Rotsaert). ROAM, as BBPOS' sole customer, exercised tremendous influence over BBPOS.

This case is nothing like *Infrasource, Inc. v. Hahn Yalena Corp.*, where no written confidentiality agreements or joint development relationship existed, the supposed trade secrets were widely available to the public as well as reverse engineerable, and no reasonable efforts to keep them secret were made. 272 Ga. App. 703 (2005). Those controlling facts do not exist in this matter. First, two written confidentiality agreements as well as various common law duties apply here. Doc. No. 360 at 20–28, Doc. No. 361 at 4–6. The evidence further shows that by the time of the misappropriation, the parties were already working to create a next generation product which brought the parties to the early 2012 meetings. Doc. No. 360 at 28–29, 35–38. Further, all involved understood the confidential nature of the meetings and the duties of confidentiality that attached. Doc. No. 360 at 26–28. Graylin made it clear to Rotsaert that the information was to be kept confidential. *Id.*

The fact that the trade secrets were also disclosed to Fivel and Grandmenge—both of whom invoked Rotsaert and/or ROAM to obtain the trade secrets—does not undermine the fact that the meetings were confidential in a controlled environment with very few people involved.

5

Importantly, the participants treated the information as confidential consistent with the agreements that were place, the instructions given by Graylin, and the joint development project that was underway.  Paull's later representation (albeit, untruthfully) to BBPOS that ROAM/Ingenico were not involved in taking any BBPOS intellectual property demonstrates the parties understanding that the information was confidential and that it was improper to take it.  These facts are materially different than those in *Infrasource*, making that case inapplicable.

Further, the contractual protections under the Licensing Agreement and Summary Acquisition terms (each) imposed a duty of confidentiality upon ROAM (Ingenico Inc.). Disclosures to Ingenico do not remove the protections of Section 6.3.  BBPOS *and* ROAM understood that if Rotsaert or those working at his direction requested the trade secrets, BBPOS had to provide them.  Doc. No. 348 at 26.  The idea that the trade secrets were required to flow first to ROAM and then to Fivel and Grandmenge elevates form over substance.  Rotsaert (ROAM), was in each meeting, and Fivel and Grandmenege upheld their confidentiality obligations just as the parties intended.  The weight of the evidence shows that later on, Rotsaert did not.  Any of these above breaches of confidentiality, including under Massachusetts or Georgia common law, the Licensing Agreement, or the Summary Acquisition terms, is an independent basis to find Defendants acted with improper means.

Finally, nothing in Defendants' brief addresses other theories of misappropriation, including (1) that ROAM/Ingenico Inc. violated Section 6.1 by misusing and disclosing the trade secrets; (2) ROAM breached the confidentiality provision in the acquisition terms; (3) ROAM, Rotsaert, and Ingenico improperly disclosed the trade secrets acquired under improper means to Landi in violation of O.C.G.A. § 10-1-761(B)(i), (B)(ii)(I), (B)(ii)(II); and (4) ROAM, Rotsaert, and Ingenico misappropriated BBPOS' trade secrets by disclosure to Landi because each recipient

6

knew that trade secrets derived from ROAM and Rotsaert in violation of part (B)(ii)(III) (no requirement of "improper means").

   **2.**   The Trade Secrets Were Not–and Are Not—Generally Known or Readily
          Ascertainable and Were Not Independently Created

Ingenico suggests that its "evidence that the alleged trade secrets were generally known after 2012 is unrebutted[.]" Doc. No. 363 at 7.  This is not true.  BBPOS provided ample evidence that its trade secrets have been valuable and kept secret from competitors since 2012.  Tang testified that the only other mPOS products available today with solutions to polarity detection are Ingenico products—which use the BBPOS solution.  Doc. No. 349 at 71.  He further testified that the BBPOS trade secret on auto gain control is superior to competitors (to this day) because it results in fewer error rates.  *Id*. at 80.  The evidence further demonstrates that BBPOS deliberately omits its key designs from patents to avoid their public disclosure.  Doc. No. 349 at 119; Doc. No. 360 at 51–52.  None of this was disputed at trial.  While certain general concepts related to the trade secrets may have existed in 2012, Shamos admitted that none of the prior art references discussed at trial revealed the entirety of any one of BBPOS' five claimed trade secrets.  *Id.* at 9–10.  Moreover, the trade secrets related to customer stickiness are not technology that could be discovered or rendered obsolete. The weight of the evidence also shows that none of the trade secrets are reverse engineerable or could be arrived at through independent development.  Doc. No. 360 at 4–20.

Defendants' assertion that Landi independently developed all of its accused products is not persuasive.  Despite Landi (and ROAM) being in Defendants' control, Defendants produced only Rotsaert, who suggested (without corroboration) that "Landi did it."  This testimony cannot be credited.  The failure to offer anyone else from Landi or from ROAM (despite moving this case to

Massachusetts) to corroborate Rotsaert is tantamount to offering no evidence regarding independent development at all.

**3.** The Trade Secrets Are Valuable to mPOS Developers

BBPOS provided significant testimony as to the value of each trade secret.[9]  The record shows Ingenico's repeated requests for information about BBPOS' key designs because neither Ingenico nor Landi could figure it out on their own.  Doc. No. 360 at 10–12, 39–40; Ex. 791.  The record is clear that Defendants understood that their misappropriation of the trade secrets would allow them to take BBPOS' customers and market share away—something that would have been substantially more difficult, if not impossible, to do if Defendants had tried to use their own technology to lure those customers away.  *See, e.g.*, Doc. No. 360 at ¶¶ 100, 64, 170, 185; Ex. 828.

**c.  Defendants Were Unjustly Enriched**

**1.** Defendants Misappropriated the Trade Secrets Through Improper Means, Misused the Trade Secrets, and Improperly Disclosed the Trade Secrets

BBPOS refers to Section II of BBPOS' Proposed Conclusions of Law, Doc. No. 361 at 4–10; BBPOS' Proposed Findings of Fact, Doc. No. 360 at 22–28, and above at Section I(b)(1).

**2.** Defendants Have Been Unjustly Enriched by the Profits of the Accused Products

Defendants' assertion that Plaintiff is not entitled to unjust enrichment damages because, citing to DPFF ¶166, the Accused Products purportedly "include valuable features and functionalities that contribute significantly to their profitability and are not based, in any way, on the five alleged trade secrets," was never established at trial.  Doc. No. 363 at 12.  Ingenico's cite to proposed fact finding ¶ 166 to support this assertion is misleading, as it merely contends that

---

[9] Tang and Zatkovich detailed the value of each of these key designs, Doc. No. 360 at 9, 14, 17, 19, 21, 23, as echoed in Graylin's and Rotsaert's contemporaneous written communications and trial testimony, *id.* at 5, 10–12, 33, 34, 54, Ex. 175, Ex. 828, and corroborated by Ingenico / Landi's engineering roadblocks and demonstrated need for the design solutions, *id.* at 10–12; Ex. 791.

BBPOS' CircleSwipe did not have features sometimes found in later mPOS devices "such as EMV capability, secure card reading (chip functionality), contactless (tap) payments, rechargeable batteries, tamper resistance, PCI certification, Bluetooth, or USB connectivity." Doc. No. 363 at 42.   But the cited testimony includes no evidence that these features appear in the Accused Products, were valuable in the Accused Products, or had any contribution (significant or otherwise) to the Accused Products' profitability.[10]   Ingenico ignores Tang's observations that, *depending on the market*, some of these features, like chip functionality, EMV capability, and PCI certification, would not be essential or highly desirable. Doc. No. 350 at 33, 35–36.

Ingenico also mischaracterizes Scherf's testimony.  Scherf did not rely on Zatkovich in determining (like Vanderhart)[11] that apportionment of the value BBPOS' key designs contributed to the Accused Products was not necessary in this case; rather, he relied on Zatkovich for his own underlying assumption that the five trade secrets "were necessary for the sale because, without those five trade secrets, the product wouldn't work."  Doc. No. 350 at 61, 95–96.  Vanderhart admitted that the "smallest salable unit" patent concept is "sometimes applied to other areas of intellectual property."[12]  Doc. No. 355 at 14.  *LaserDynamics, Inc. v. Quanta Computer, Inc.* is

---

[10] DPFF ¶166 (citing "Day 4 Trial Tr., Doc. No. 349 at 9:4-10:5 (Zatkovich); Day 4 Trial Tr., Doc. No. 349 at 66:24-4 (Tang); Day 5 Trial Tr., Doc. No. 350 at 32:23-36:7 (Tang)").

[11] Vanderhart claimed that there was "no need" for her to measure the value because they were "worthless." *See* Doc. No. 355 at 24–25 ("[T]here's no need to allocate a percentage [of value to the five alleged trade secrets]. The percentage is that there's no value because they would [be] readily available through reverse engineering, or there were alternatives that were readily available."). Her underlying assumptions were proven to be *incorrect* or *unreliable* at trial. Doc. No. 360 at 15, 55–56; Doc. No. 347 at 120; Doc. No. 353 at 101, 104; Doc. No. 354 at 62.

[12] *See* David S. Almeling et al., Disputed Issues in Awarding Unjust Enrichment Damages in Trade Secret Cases, 19 Sedona Conf. J. 667, 673–74 (2018) (citing *Bianco v. Globus Medical, Inc.,* No. 2:12-cv-00147, 2014 WL 5462388, *18–19 (E.D. Tex. Oct. 27, 2014), *aff'd,* 618 F. App'x 1032 (Fed. Cir. 2015) (damages of entire market value of a product is appropriate where the accused products are the smallest saleable unit reflecting the use of the trade secrets)).

distinguishable.  It is a patent royalty case, and the Court cannot apply a reasonable royalty unless BBPOS fails to prove unjust enrichment by a preponderance of the evidence.  Further, BBPOS provided evidence that the trade secrets "drove demand" for the Accused Products, which included testimony that trade secrets one, two, and three were unique and efficient solutions to technical problems, and trade secrets four and five gave Ingenico unfair access to BBPOS' customer base. The evidence more than establishes how "customer stickiness" drove demand.  Ingenico's lawyer argument that the RP 457cBT devices represented nearly $3.5 million of damages is not accurate (BBPOS could not replicate this figure).[13]  Regardless, the customer stickiness trade secrets are not reliant on the existence of an audio jack.

### d.  All Defendants Are Liable

Defendants now suggest that they can escape liability because their respective liability in the scheme was not proven.  This is untrue, and highlights Defendants' longstanding use of its corporate structure to try and avoid liability.  BBPOS is not required to "eliminate all possibility that the defendant's conduct was not a cause," but is merely required to "introduce evidence from which [a fact finder] may conclude that it is more probable that the event was caused by the defendant than that it was not."  *Spencer v. Baxter Int'l, Inc.*, 163 F. Supp. 2d 74, 78 (D. Mass. 2001).  Having proven that it is more likely than not that the scheme took place among all Defendants, it is their burden to show how any one particular Defendant is free of liability.  *Damon v. Sun Co.*, 87 F.3d 1467, 1476 (1st Cir. 1996).  Defendants have failed to do this.

Defendants' citations to cases involving alleged constitutional violations are not helpful. Far from what Defendants suggest from these cases, ROAM became Ingenico Inc., and it is

---

[13] Although neither expert addressed this issue, pre-trial, BBPOS will be prepared to discuss its damages calculations, as may be useful to the Court, at the post-trial hearing.

undisputed that Rotsaert was an employee of ROAM and Ingenico in 2012 and beyond.  Ingenico Inc.'s parent corporation is Ingenico Corp., and Ingenico Corp.'s parent corporation is Ingenico Group S.A.  Doc. No. 19.  Ingenico SA entered the RP350X agreement with Landi.  Ex. 214.  The documents—which were *produced by these Defendants*—make clear that Defendants refer to themselves as Ingenico and use generic @ingenico.com email domains.  *See e.g.*, Ex. 192, 193, 214, 351, 820, 821.  The evidence showed that Rotsaert, while an employee of ROAM and Ingenico, misappropriated trade secrets by sending them to Ingenico engineers (outside of the prestudy control group) to build a competing mPOS device.  Ex. 175.  There is evidence of Rotsaert and ROAM sending BBPOS trade secrets to Landi in October 2012.  Ex. 182.  Landi incorporated those trade secrets in Ingenico products (Ex. 208).  Doc. No. 360 at 38–48; Ex. 207.  BBPOS was harmed by both ROAM and Ingenico, and thus all are jointly and severally liable.  *Chelsea Hous. Auth. v. McLaughlin*, 482 Mass. 579, 586 (2019).

## II.    BBPOS' Claim is Timely

Defendants also now assert that reasonable diligence required BBPOS to "observe" the accused product when Lo first had suspicions of misappropriation in late 2012/early 2013. Defendants cite no case law for this proposition or evidence that such observation was possible. The unrebutted evidence shows that it was impossible for Lo to have received an RP350X or other Accused Product in 2013 because they did not *exist* and were *still being developed*.  Exs. 472, 219. Here, Lo did conduct a reasonable investigation by seeking assurances from ROAM that the upcoming Ingenico product did not utilize any BBPOS trade secrets.  Ex. 200.  He cannot be charged with knowledge of facts that were not available to him.  *Porex Corp. v. Haldopoulos*, 284 Ga. App. 510, 517 (2007).  The argument that ROAM or Ingenico (or Landi) would have simply

11

shipped Lo a prototype product that was still under development (and would be for nearly two years) is not credible, nor does it address the fact that the RP350X was not yet finalized.

Defendants' suggestion that the claims are barred by laches is also misplaced. Defendants state "the reason that BBPOS delayed in bringing this lawsuit was because it was receiving business from ROAM" citing Lo's testimony, Doc. No. 352 at 107:25-108:2.[14] The testimony cited says nothing about this case.[15] Defendants' claim that Lo's testimony of financial instability is "not credible" because BBPOS made a profit on some specific devices that it had sold is wrong. Turning a profit on sales of specific products to ROAM (according to Vanderhart, about $1.4M/year) does not mean that BBPOS, as a whole, was not struggling. Lo's testimony and BBPOS' financial statements establish that it was experiencing significant financial difficulty through 2017.

## III.    Defendants' Counterclaim Fails

The Licensing Agreement does *not* require BBPOS to defend and indemnify Ingenico for claims related to non-BBPOS products. At trial, Timbers conceded that on at least three of the four matters where indemnification was sought, non-BBPOS products were at issue. No evidence was presented to distinguish what legal fees, if any, were incurred on the time spent on BBPOS products involved in those matters versus the other products at issue. There is, therefore, no evidence establishing what amounts, if any, are within the scope of the Licensing Agreement. Defendants have therefore failed to prove their claim, and it must fail.

---

[14] The cited trial testimony says nothing about delaying the case, but rather terminating the agreement with ROAM: "Q: And you didn't terminate the [ROAM] contract because you still got some business from ROAM Data, right? **A: Yes.**"

[15] BBPOS suffered a $5.6M loss in 2015 (Ex. 1074) and $3.5M loss 2016 (Ex. 1075) before turning a profit of about less than $1M in 2017 (Ex. 1076).

Dated: June 12, 2023.            Respectfully submitted:

                            */s/ Oliver D. Griffin*

By:  Melissa A. Bozeman (Pro Hac Vice)
      Pennsylvania Bar No. 201116
      Oliver D. Griffin (Pro Hac Vice)
      Pennsylvania Bar No. (80126)
      Peter N. Kessler (Pro Hac Vice)
      Pennsylvania Bar No. 209033
      KUTAK ROCK LLP
      Two Logan Square
      100 N. 18th Street, Suite 1920
      Philadelphia, PA  19103-4104
      (215) 299-4384 (Telephone)
      (215) 981-0719 (Facsimile)
      Melissa.bozeman@kutakrock.com
      Oliver.griffin@kutakrock.com
      Peter.kessler@kutakrock.com

        and

      Leland P. Abide (Pro Hac Vice)
      MN Bar No. 039269
      KUTAK ROCK LLP
      60 South Sixth Street, Suite 3400
      Minneapolis, MN 55402-4018
      Telephone: (612) 334-5000
      Facsimile: (612) 334-5050
      leland.abide@kutakrock.com

        and

      Jonathon D. Friedmann, Esq. (BBO # 180130)
      Robert P. Rudolph, Esq. (BBO # 684583)
      RUDOLPH FRIEDMANN LLP
      92 State Street
      Boston, MA 02109
      Tel.: (617) 723-7700
      Fax: (617) 227-0313
      JFriedmann@rflawyers.com
      RRudolph@rflawyers.com

        and

      Ricardo G. Cedillo
      DAVIS, CEDILLO & MENDOZA, INC.
      755 E. Mulberry Ave., Ste 500

13

San Antonio, Texas 78212
Tel: (210) 822-6666
Fax: (210) 822-1151
rcedillo@lawdcm.com

*Attorneys for Plaintiffs/Counterclaim-
Defendants*

## CERTIFICATE OF SERVICE

I, Melissa A. Bozeman, do hereby certify that on June 12, 2023, I served a true and correct

copy of the foregoing Opposition to Defendants' Post-Trial Memorandum on all parties via the

Court's CM/ECF Electronic Filing System.


*/s/ Melissa A. Bozeman*
Melissa A. Bozeman

14

4865-1150-2183.10