UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANYWHERECOMMERCE, INC. and BBPOS LIMITED,<br>        Plaintiffs,<br><br>v.<br><br>INGENICO INC., INGENICO CORP. and INGENICO GROUP, SA,<br>        Defendants. | CIVIL ACTION NO.<br>1:19-cv-11457-IT |

# DEFENDANTS' POST-TRIAL REPLY MEMORANDUM

/s/ *Jeffrey K. Techentin*
JOHN A. TARANTINO (BBO #492230)
PATRICIA K. ROCHA (BBO #542348)
NICOLE J. BENJAMIN (BBO #666959)
R. BART TOTTEN (BBO #631605)
JEFFREY K. TECHENTIN (*pro hac vice*)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
btotten@apslaw.com
jtechentin@apslaw.com
Dated: June 12, 2023

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

    I.    BBPOS's Record Citations Border on Frivolous............................................................ 3

    II.   BBPOS's Disclosure to Ingenico Lacked Any Confidentiality Protections ........................ 6

        A.    There Is No Common Law Duty of Confidentiality Under the GTSA ........................ 6
        B.    Mr. Rotsaert Was Not a ROAM Employee in February 2012 ..................................... 6

    III.  BBPOS's Assertions Regarding Mr. Rotsaert are Unfounded ............................................ 7

    IV.  BBPOS Has Failed to Offer Evidentiary Support for Its Damage Claim............................ 8

    V.   BBPOS's Request For Exemplary Damages Is Meritless .................................................. 10

    VI.  All Alleged Conduct was Permissible Under the ROAM-BBPOS License Agreement ... 11

    VII. BBPOS Breached Its Contractual Indemnification Obligations ........................................ 12

CONCLUSION ................................................................................................................... 12

**INTRODUCTION**

In its proposed findings of fact (Doc. 360) and conclusions of law (Doc. 361), Plaintiff BBPOS Limited ("BBPOS") spins a tale that is untethered to evidence and, more importantly, truth. Defendants did nothing wrong. The truth is that what BBPOS shared with Ingenico was not trade secret because it was both unprotected and readily ascertainable. The truth is that the alleged trade secrets are not in the Accused Products. The truth is that if BBPOS actually believed ROAM or Ingenico had done something wrong, it sandbagged Defendants, wresting every dollar that it could from the relationship before asserting its claim seeking tens of millions of dollars that it could never have earned legitimately.

The parties agree on certain basic facts. In 2012, ROAM wanted to sell an EMV-capable mPOS device. It had contracted with BBPOS in 2010 to produce and sell one, but BBPOS had not been able to develop the device. So, at ROAM's suggestion, BBPOS worked with Ingenico to develop a new mPOS reader for ROAM. In the course of that work, BBPOS intentionally and knowingly gave certain information to Ingenico and ROAM. BBPOS gave Ingenico this information without confidentiality markings and without agreement with Ingenico as to confidentiality or limitations on use. BBPOS gave this information to Ingenico because it hoped to reap a commercial benefit by selling a next generation reader to ROAM. By 2014, ROAM was selling an EMV-capable mPOS device, the RP350x, that Landi had manufactured. By 2014, BBPOS knew about the RP350x. By 2015, BBPOS had a Landi-produced product in hand. BBPOS took no action against the products until December 2018, when it sued three defendants seeking all of the profits from several different models of mPOS devices as well as tens of millions of dollars in exemplary damages.

Beyond those facts, the parties' characterization of events differs significantly, but the version advanced by BBPOS is based on hearsay, innuendo, and deliberate disregard for even its

1

own evidence.

The evidence shows that, back in 2012, ROAM hoped to develop a next-generation reader in one of three ways: (1) with BBPOS, (2) with BBPOS and Ingenico in collaboration, or (3) with Landi.  The evidence also shows that BBPOS knew about ROAM's relationship with Landi and even spoke with Landi about the process.  ROAM pursued these three different options because, while it had a supplier that it liked (BBPOS), it needed a new product (EMV) that BBPOS had yet to deliver.  So it sought a collaboration between BBPOS and Ingenico as one option.  Ingenico stepped up, as did BBPOS.  Ingenico sent engineers to work with BBPOS, and BBPOS hosted them.  BBPOS sent engineers to work with Ingenico, and Ingenico hosted them.  The teams worked together, in good faith and with the mutual desire to develop a commercial product, for months.  BBPOS willingly shared technical information with Ingenico without any effort to protect its disclosures because it did not consider the information to be trade secret and because it hoped to be part of a new, next-generation product that it was unable to develop itself.  After that collaborative effort failed, ROAM continued to work with BBPOS in the hope that BBPOS could develop its own EMV product.  It could not, and therefore ROAM had Landi develop one independently.

What's more, critical components of what BBPOS contends to be trade secret were never shared with Ingenico or ROAM.  Auto gain control was never disclosed at all and, if used, would not even be contained in an mPOS device.  BBPOS's data formats were not compatible with the Accused Products.  The software that enabled polarity detection and power management was never shared.  And there is no evidence of the DUKPT variant ever being used in any Accused Product.

Landi could not have used any BBPOS "secrets" to develop Accused Products because it did not even have them.  There is no evidence that any supposed trade secrets were used in the

2

development of the Accused Products.  BBPOS did not present a single document or the testimony of a single witness that either ROAM or Ingenico had relayed BBPOS circuit diagrams, software, or any other of its claimed trade secrets to Landi.  BBPOS did not present a single document or the testimony of a single witness that Landi even knew about the BBPOS circuit diagrams, software, or any other of its claimed trade secrets.  So it is not surprising that the Landi-developed products do not use any of the alleged "secrets" or, for that matter, bear any resemblance to BBPOS's products beyond general features necessary to battery-powered mPOS devices.

BBPOS has offered some after-the-fact rationalizations for not seeking relief sooner, from lacking "energy" to avoiding the optics of suing a customer, but in truth, BBPOS did not bring suit because it was making money off of its ongoing business relationship with Ingenico and because it knew that Ingenico had done nothing wrong.  And, of course, these excuses would only pertain to actually filing suit; BBPOS did not lack the resources to send an email to its customer putting it on notice of its concerns.

Defendants' actions were appropriate and entirely lawful.  There was no misappropriation.  Judgment should enter accordingly.

## ARGUMENT

### I. BBPOS's Record Citations Border on Frivolous

BBPOS has asked this Court to make findings of fact that are contrary to the record.  For example, the main "fact" that BBPOS relies on to support a finding of willful and malicious conduct – and therefore nearly $50 million in extra money to BBPOS – is a collection of statements from an email that the Court found to be hearsay and that was not admitted for the truth of any of its contents.  *Compare* Doc. No. 360 at ¶190.a. *with* Day 6 Trial Tr., Doc. No. 351 at 59:13-63:16.

Other proposed findings of fact have no nexus to the evidence that BBPOS cites in support.  For example, BBPOS asks the Court to conclude that Exhibit 828 "highlighted" the use of two

3

alleged trade secrets (data formats and DUKPT), but the exhibit does not mention data formats or key generation at all. BBPOS suggests that Mr. Zatkovich "undertook a software comparison of the BBPOS and Ingenico [power management] designs" when he did not have access to the software from either device. Doc. No. 360 at 44. BBPOS suggests that Mr. Rotsaert had been acting "on behalf of ROAM before first meeting with BBPOS in February 2012" when there was no testimony at all as to Mr. Rotsaert's activities before February 2012 other than that he worked for Ingenico in China. Doc. No. 361 at 9, citing Doc. No. 360 at 23-24.

BBPOS seeks findings that the record does not support and attempts to paper over that fact with lengthy string citations that, when checked, do not support the proposed findings. For example, BBPOS has proposed multiple findings that Mr. Rotsaert "specifically requested" "trade secret" information, but the many, many cited documents do not support that statement. For example, there is no evidence that Mr. Rotsaert "specifically requested" the BBPOS polarity detection solution (No. 126):

- Doc. No. 347 at 10, 12-13: consists of the technical expert characterizing the information exchange, which the Court noted it would not accept because "[i]t's only hearsay through [Zatkovich]" (Day 1 Trial Tr., Doc. 346 at 126:18-24).
- Exhibits 817, 372, 138, and 143 are all schematics.
- Doc. No. 349 at 73–74, 88, 90–93, 96-98, 102–103: testimony that does not reference requests for information.
- Exhibit 791 only requests schedules and budgets.
- Exhibits 406 and 588 do not mention any alleged trade secrets.
- Doc. No. 351 at 89–102: testimony that contains no reference to any requests for information.

The same problem attends the lengthy cites for proposed facts 124, 125, and 127-132.

BBPOS's proposed findings improperly edit out inconvenient portions of the record. In proposed fact 145 concerning polarity detection, for example, BBPOS claims that the only difference between the BBPOS design and the RP350x design that Dr. Shamos identified was the apparent incompleteness of the BBPOS circuit diagram, but this is not true. In fact, Dr. Shamos

4

had illustrated – literally – that there were two connections within the RP350x circuit that are not present in the BBPOS design. Day 8 Trial Tr., Doc. 353 at 60:18-64:6. BBPOS does likewise with proposed fact 157, in which it characterizes Dr. Shamos's testimony as pointing to only "passive components" as differences, when in fact Dr. Shamos had also identified the presence of a "Zener diode," which BBPOS concedes is an active component. Doc. No. 360 at 44-45.

BBPOS even seeks to rewrite the testimony of its expert, Mr. Zatkovich. Dr. Shamos had noted that the "polarity detection" circuit in the BBPOS products was readily ascertainable because the two transistors are visible to the naked eye and "there are only six different ways of connecting two transistors, and so it's very easy to figure out what the circuit is doing." Day 8 Trial Tr., Doc. No. 353 at 57:2-6 (Shamos). Mr. Zatkovich disagreed, claiming that there would be "thousands of different circuits using a combination of two transistors." Day 9 Trial Tr., Doc. No. 354 at 62 (Zatkovich). On cross examination, he conceded that the correct figure was six, not thousands. *Id.* at 63:2-13. Post-trial, BBPOS now seeks to substitute some new, previously undisclosed analysis that that there are 720 possible permutations. Doc. No. 360 at 13 ¶43 and n. 11. This is both improper and wrong because, as Zatkovich conceded, the correct answer is six.[1]

---

[1]   BBPOS arrives at this figure by taking the factorial of the total number of leads on the two transistors, six. This is incorrect. Each of the leads on each transistor must connect to a lead on the other transistor, and therefore the total number of permutations will be the factorial of the number of leads *in each transistor* because you cannot connect two leads on the same transistor. In this case, the total number of permutations is $3! = 3 \times 2 \times 1 = 6$, as shown here:

| A—X  B—Y  C—Z | A—X  B⤫Y  C⤫Z | A  X  B  Y  C—Z | A  X  B⤫Y  C  Z | A  X  B  Y  C  Z | A  X  B⤫Y  C  Z |

## II. **BBPOS's Disclosure to Ingenico Lacked Any Confidentiality Protections**

### A. There Is No Common Law Duty of Confidentiality Under the GTSA

In *In re Dippin' Dots Patent Litigation*, a Georgia federal district court concluded that there are no implied duties of confidentiality under the Uniform Trade Secrets Act, on which the GTSA is based. 249 F. Supp. 2d 1346, 1376 (N.D. Ga. 2003); *HCC Ins. Holdings, Inc. v. Flowers*, No. 1:15-cv-3262-WSD, 2017 WL 5118224, at *1 (N.D. Ga. Nov. 6, 2017). The court observed that "the doctrine of an implied duty to maintain confidences comes out of a line of cases which … did not arise under the Uniform Act" and that "there are no cases holding an implied duty to be sufficient to bring a Uniform Act claim." *Id.* (citing *Rogers v. Desa Int'l, Inc.*, 183 F. Supp. 2d 955, 958 (E.D. Mich. 2002)). Reasoning that the Uniform Act (like the GTSA) focuses on whether a party used reasonable efforts to protect the confidentiality of its putative trade secrets, the court held that the Uniform Act will not imply a duty of confidentiality between parties. *Id.* at 1376-77.

The two cases BBPOS relies on are inapposite; both involve claims for misappropriation of trade secrets under Massachusetts common law, not under the GTSA or the UTSA. *See Knapp Schenck & Co. Ins. Agency, Inc. v. Lancer Mgmt. Co., Inc.*, No. Civ. A. 02-12118-DPW, 2004 WL 57086, at *7 (D. Mass. Jan. 13, 2004); *Burden v. Milton Bradley Co.*, 763 F.2d 461, 462-63 (1st Cir. 1985). BBPOS has not asserted a claim for common law misappropriation, so Ingenico could not, and did not, have an implied duty to maintain the secrecy of information shared by BBPOS.

### B.    Mr. Rotsaert Was Not a ROAM Employee in February 2012

BBPOS willfully misstates evidence to suggest that Mr. Rotsaert was a ROAM employee in February 2012, saying that Mr. Graylin "testified that Rotsaert was assigned to ROAM from Ingenico when he arrived in February 2012." Mr. Graylin did not say that. Rather, Mr. Graylin's testimony was that Mr. Rotsaert was "to come and work for us" and was "stationed here in Boston." The evidence established that Mr. Rotsaert was living in China in February 2012, not

6

Boston. Exhibit 406 at 1. There is no evidence that Mr. Rotsaert had any relationship with ROAM in February 2012, express or implied.

BBPOS's attempt to suggest that Mr. Rotsaert had started at ROAM "months and months" before his July 1, 2012 contract date deliberately misreads Mr. Graylin's testimony. In connection with a September 2012 email discussing his refusal to pay half of Mr. Rotsaert's salary, Mr. Graylin stated that he "thought he was under agreement for months and months well ahead of time." Day 3 Trial Tr., Doc. 348 at 104:8-21. That is, months before September, not July, as was made clear moments later when Mr. Graylin confirmed that Mr. Rotsaert had started with ROAM on July 1, 2012. *Id.* at 105:18-25.

BBPOS's citation to *Bos. Bicycle Couriers, Inc. v. Deputy Dir. Of Div. of Emp. & Training*, 45 Mass. App. Ct. 473, 475 (2002), falls wide of the mark. Mr. Rotsaert was an employee of Ingenico and, in serving as a liaison between ROAM, BBPOS, and Ingenico, he was doing Ingenico business just as much as ROAM business. BBPOS offers no law for the proposition that an employee of one company becomes an employee of another merely by coordinating work that is happening between the two companies—there is none. By BBPOS's reckoning, he would also have been an employee of BBPOS at the time, an absurd result.

### III.     BBPOS's Assertions Regarding Mr. Rotsaert are Unfounded

BBPOS overstates its case when it asserts that Mr. Rotsaert's testimony "is contradicted by both the contemporaneous record and the testimony of other witnesses." Doc. No. 361 at 7. Mr. Rotsaert's testimony differed from Mr. Zatkovich's assertions regarding the use of automatic gain control, BBPOS data formats, and BBPOS's DUKPT variant in the Accused Products. But his testimony was based upon direct knowledge and was consistent with the documentary evidence, whereas Mr. Zatkovich's was made without any inquiry into how the Accused Products handled gain control, data formatting, and key generation. Meanwhile, Mr. Graylin's rebuttal

7

testimony regarding unspecified discussions about confidentiality does not undercut Mr. Rotsaert at all—Mr. Graylin testified after coordinating with BBPOS's counsel and with the benefit of written trial testimony in violation of the sequestration order, undermining his credibility.

BBPOS disputes Mr. Rotsaert's testimony that the alleged trade secrets were never disclosed to Landi based on a "direct" email exchange between Rotsaert and Landi "discussing one of the BPOS trade secrets." Doc. No. 361 at 8 (citing Exhibit 182). However, this "direct email exchange" did not include any of the alleged trade secrets. Exhibit 182 concerned the prototype to be shown at the 2012 Cartes expo. Post-trial, BBPOS claims that Exhibit 182 refers to the "Android Swiper API and implementation guide" (Exhibit 73), but that is inconsistent with the terms of Exhibit 182 itself, which attached "a SwiperController.java file *that ROAM has created* to aid in the creation of a new demo library." Exhibit 182 at 4 (emphasis added). This "java" file is the only attachment in the email chain going from ROAM to Landi, and there is no indication that BBPOS created it even though the email also states that the "java" file "lives in the com.bbpos.swiper package." Nothing indicates that Landi ever received the package itself, nor was there any testimony to explain what any of this means and how it might relate to any BBPOS intellectual property. Most importantly, none of this information has anything to do with the five trade secrets asserted here and therefore there is no inconsistency between Exhibit 182 and Mr. Rotsaert's testimony.

## IV. BBPOS Has Failed to Offer Evidentiary Support for Its Damage Claim

BBPOS misstates both the law and the facts when it argues that it should be entitled to 100% of the profits from the Accused Products because the trade secrets (1) were "integral to the functionality of the products" and (2) permitted Defendants to "poach customers." Federal courts have consistently declined to disgorge profits where a plaintiff fails to present evidence that the trade secrets at issue drove demand for the product. For example, in *In re Avaya Inc.*, the court

observed:

> The entire-market-value rule may allow for a damages award of up to all of the profits derived by a trade-secret misappropriator from any infringing products making use of the misappropriated content. It is the appropriate measure of calculating damages only in those circumstances where the basis of customer demand for the infringing product is traceable to the infringing features of the product. *See, e.g., Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) ("For the entire market value rule to apply, the patentee must prove that the patent-related feature is the basis for customer demand." (quotation marks omitted)). By contrast, "the entire market value rule [is] impermissible" where a plaintiff "fail[s] to present evidence showing that the patented [features] drove demand for the" product. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012). Thus, to obtain entire-market-value damages, SAE had to convince the Bankruptcy Court that "the presence of [its trade secrets] ... motivate[d] consumers to buy a [G650] in the first place."

602 B.R. 445, 459 (S.D.N.Y. 2019) (alterations in original).

Even the cases BBPOS cites recognize that apportionment of the profits attributable to the trade secrets is required unless the "trade secrets themselves are the driver of demand for the product." *SPS Technologies, LLC. v. Briles Aerospace, Inc.*, 2021 WL 4912509, at *3 (C.D. Cal. Sept. 8, 2021). As previously explained, BBPOS offered no evidence that the trade secrets (as opposed to Bluetooth, "tap" and chip payment features, security certifications, etc.) drove demand for the Accused Products other than Mr. Scherf's testimony that Mr. Zatkovich, a technical expert unqualified to opine on economic principles, had told him so.

Nor was there any evidence that Defendants "poached" any BBPOS customers, and the single exhibit (828) upon which BBPOS relies says nothing of the sort. The exhibit states that "PayPal will also benefit from ROAM unified mobile SDK . . . a single SDK to integrate with RP170c/RP350x/RP450c/RP750x and G5x". Exhibit 828 at 3/30. The ROAM SDK has nothing to do with the alleged trade secrets, and the fact that it allows for seamless integration between all ROAM products is wholly unsurprising since it is a unified software kit that supports all products

9

ROAM sold, including those BBPOS manufactured for ROAM.  In any event, BBPOS cites no authority supporting its contention that "poaching customers" justifies disgorgement.

Accordingly, BBPOS offered no competent evidence in support of its damage claim.

### V.     **BBPOS's Request For Exemplary Damages Is Meritless**

The Court should reject as meritless BBPOS's request for exemplary damages.  *First*, this case presents none of the conduct that has justified such relief in the past.  In the one case BBPOS cites, the court awarded exemplary damages because the defendant hired the competitor's employees, stole its software, and actively solicited customers.  *See Brandenburg v. All-Fleet Refinishing, Inc.*, 252 Ga. App. 40, 43 (2001).  BBPOS has not alleged that Defendants have done any such things.

*Second*, the trial record does not reflect the "conduct" that BBPOS alleges supports its claim.  The alleged trade secrets were not disclosed to Landi and were not incorporated into any Accused Product.  As to BBPOS's claim that Mr. Lazare threatened to "kill" BBPOS, that supposed threat is belied by the facts that (1) the parties continued to negotiate a potential sale of BBPOS to ROAM *after* Mr. Lo rejected the previously-agreed terms, and (2) not only did Ingenico not seek to kill BBPOS, it continued to do business with it and enrich it with millions of dollars in profits over several more years.  Doc. No. 362 at ¶¶ 258-61, 282-83.  ROAM's termination of Mr. Graylin, which came long after BBPOS gave its information to Ingenico and long before any supposed misuse, had no effect on BBPOS whatsoever and cannot be the basis for finding willful or malicious conduct.

### V.     **BBPOS's Laches Argument Misstates the Law**

BBPOS asserts that a claim that is brought within the statute of limitations cannot be barred by laches based upon an inapposite case applying federal patent law, *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328 (2017).  In *SCA*, the Supreme Court

10

addressed a claim that was brought within a *federal* statute of limitations and a defense of laches under *state* common law. *Id.* at 332-33. The Supreme Court held that laches could not bar the claim because that would improperly enable federal courts to override federal legislation. *See id.* at 334-35. Those principles of separation of powers and federalism do not apply in this case because both the statute of limitations (under the GTSA) and laches are governed by *state* law. Georgia does not impose this restriction. *See Cooper v. Aycock*, 34 S.E.2d 895, 900 (Ga. 1945) (barring state law claim under state common law laches without determining whether the claim was within the state statute of limitations).

BBPOS also argues that Defendants' alleged misconduct constitutes unclean hands that precludes the assertion of the equitable doctrine of laches. Doc. No. 361 at 15. BBPOS's position that the defense applies only if a defendant is not liable is irrational and contrary to law. *See Rotor Blade, LLC v. Signature Util. Servs., LLC*, 545 F.Supp.3d 1202, 1212, 1220-21 (N.D. Ala. 2021) (recognizing laches as defense to statutory claim of alleged theft of trade secrets and concealment). Furthermore, BBPOS misstates the Massachusetts case on which it bases its argument. The *Shea* case BBPOS cites stands for the unremarkable proposition that a laches defense is not available to a party that inequitably procured the underlying delay. *Shea v. Shea,* 4 N.E.2d 1015, 1018 (1936). No such facts are present here. Defendants did nothing to contribute to the delay; in fact, at least since 2015, BBPOS had all of the information that it possessed when it filed suit.

**VI.     All Alleged Conduct was Permissible Under the ROAM-BBPOS License Agreement**

In the 2010 License Agreement (Exhibit 1), BBPOS licensed all of the asserted technology to ROAM. That license was fully paid and permitted ROAM to "freely use" the information to have third parties develop new products that are "similar to or based upon" the defined "Products" in the Agreement. Exhibit 1; Day 3 Trial Tr., Doc. No. 348 at 82-86 (Graylin). The "Products" include an EMV-capable mPOS reader, like the Accused Products; Mr. Graylin even confirmed

11

that the product being developed collaboratively with Ingenico was "the same" as the EMV product under development by BBPOS. *Id.* at 101. The Agreement places no restrictions whatever on ROAM's right to use the information that it licensed, and paid for, from BBPOS.

In any event, Ingenico did not share the alleged BBPOS trade secrets with Landi, nor did it use them in connection with Accused Products. And, even crediting BBPOS's theory that it shared the information under the Agreement's confidentiality protections, the contract permitted any use ROAM or Ingenico made of the information to develop products similar to the BBPOS EMV, so there could have been no misappropriation. Exhibit 1 at 12-13.

### VII. BBPOS Breached Its Contractual Indemnification Obligations

Because BBPOS continued to perform under the Agreement after ROAM's alleged breach (selling millions of dollars of product to ROAM and Ingenico), it waived its argument that it had no duty to perform its indemnification obligations under the Agreement. *See Soo v. Bone Biologics Corp.*, No. 1:19-CV-11520-ADB, 2020 WL 4673521, at *5 n.2 (D. Mass. Aug. 12, 2020); *see also Lahren v. Univ. & Community College Sys. of Nev.*, No. 3:03-CV-0631-ECR-VPC, 2005 WL 8161787, at *9 (D. Nev. Dec. 27, 2005). Also, (1) the trial record established that all the matters involved BBPOS products, so the work would have been the same even if other products also were involved; (2) the MobilePay matter related solely to BBPOS products; (3) in the REM matter, 80% of the subject products were BBPOS products; (4) for the Blackbird matter, one of the two products was a BBPOS product; and (5) the total amount attributable to BBPOS's products is at least $372,235.24. DPFF ¶¶ 260, 382, 386, 388, 390, 398; Day 9 Trial Tr., Doc. No. 354 at 123:6-17, 124:5-7, 128:13-22 (Timbers).

### CONCLUSION

The Court should find for Ingenico on BBPOS's claims and on Ingenico's counterclaims.

Respectfully submitted,
INGENICO INC., INGENICO CORP. AND
INGENICO GROUP, SA,

By their attorneys,

/s/ *Jeffrey K. Techentin*
JOHN A. TARANTINO (BBO #492230)
PATRICIA K. ROCHA (BBO #542348)
NICOLE J. BENJAMIN (BBO #666959)
R. BART TOTTEN (BBO #631605)
JEFFREY K. TECHENTIN (*pro hac vice*)
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 351-4607
jtarantino@apslaw.com
procha@apslaw.com
nbenjamin@apslaw.com
btotten@apslaw.com
jtechentin@apslaw.com
Dated:  June 12, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2023, I caused to be served via electronic mail a true copy of the within document on the following counsel of record:

Jonathon D. Friedmann, Esq.
Robert P. Rudolph, Esq.
Rudolph Friedmann LLP
92 State Street
Boston, MA 02109
JFriedmann@rflawyers.com
RRudolph@rflawyers.com

Oliver D. Griffin, Esq.
Peter N. Kessler, Esq.
Melissa A. Bozeman, Esq.
Kutak Rock LLP
303 Peach Street, N.E., Suite 2750
Atlanta, GA 30308
Oliver.griffin@kutakrock.com
Peter.kessler@kutakrock.com
Melissa.bozeman@kutakrock.com

Ricardo G. Cedillo, Esq.
755 E. Mulberry Ave., Ste 500
San Antonio, Texas 78212
rcedillo@lawdcm.com

/s/ *Jeffrey K. Techentin*
Jeffrey K. Techentin

*4859-0846-8841, v. 2*