UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANYWHERECOMMERCE, INC., and BBPOS LIMITED, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:19-cv-11457-IT |
| | * | |
| INGENICO INC., INGENICO CORP., and INGENICO GROUP SA, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| INGENICO INC., | * | |
| | * | |
| Counterclaim Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| ANYWHERECOMMERCE, INC., and BBPOS LIMITED, | * | |
| | * | |
| Counterclaim Defendants. | * | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

July 14, 2023

TALWANI, D.J.

Following a ten-day bench trial and post-trial briefings and argument, the court makes the following findings of fact and conclusions of law on BBPOS Limited's ("BBPOS") claim that Ingenico Group SA, Ingenico Inc., and Ingenico Corp. (collectively, "Ingenico") misappropriated BBPOS's trade secrets in violation of the Georgia Trade Secrets Act of 1990 ("GTSA"), O.C.G.A. § 10-1-760 *et seq*., and on the counterclaim by Ingenico Inc., as the successor to ROAM Data ("ROAM"), that BBPOS breached its obligations to indemnify Ingenico Inc. under an agreement between BBPOS and ROAM.

## I.     Findings of Fact

### A.  The Parties

BBPOS is a foreign corporation founded in 2008 by Ben Lo, Timmy Tang, and Daniel Tsai. BBPOS designs and manufactures mobile point of sales ("mPOS") devices that allow mobile phones to be used as sales service terminals for payment.

ROAM was founded in Massachusetts in approximately 2007 by William Graylin as a mobile payments company that developed software to use with smartphones.

Ingenico Inc. (a corporation organized and existing under the laws of Georgia) and Ingenico Corp. (a Delaware corporation registered to do business in Georgia) are subsidiaries of Ingenico Group SA, a foreign corporation located in France. Collectively, Ingenico is a payment solution company and a manufacturer of electronic point of sales ("POS") payment terminals. At the time BBPOS commenced a relationship with ROAM, Ingenico was a minority shareholder of ROAM. By 2012, Ingenico was a majority shareholder of ROAM. In January 2015, Ingenico acquired 100% of ROAM. On December 13, 2017, ROAM and Ingenico Inc. merged.[1]

### B.  2008-2010 - BBPOS's Key Designs

From 2008 to 2010, BBPOS developed an mPOS device, including the schematics, electronics, software, and hardware, called the CircleSwipe, that plugged into a mobile phone audio jack and allowed a user to swipe a credit card to process a payment.

---

[1] The court refers to the pre-merger entity as "ROAM" and the post-merger entity as "Ingenico Inc."

By 2012, BBPOS developed five "key designs" it claims as trade secrets.[2] The five key designs all relate to technology that allows an mPOS device to communicate with a mobile phone through the audio jack and are broadly described as follows.

The "audio jack polarity detection and correction" key design is a circuit design that automatically detects and, if necessary, reverses the polarity of the audio jack. Without audio jack polarity detection and correction, an "active" device like an mPOS would be damaged and unable to implement all of its features.

The "power management" key design involves the mPOS's ability to detect a signal, power on, and go back to sleep if the relevant signal for a valid mPOS transaction is not detected. The power management key design prolongs the life of the mPOS device.

The "automatic gain control" key design is a compilation of optimal data transmission settings and corresponding software for individual phones. To develop this key design, BBPOS tested 442 individual phones on a model-by-model basis to determine optimum settings. The automatic gain control key design's optimal settings minimized both the time to process a transaction and the likelihood of errors.

The "communication format" key design corresponds to the layout of the signal that allows the phone and the mPOS device to communicate. The signal layout is interpreted by a software development kit ("SDK"), which sends the information to the application on the phone. The communication format key design allowed for specific data transfer between the devices based on customer preferences.

---

[2] The parties referred to BBPOS's claimed trade secrets as the "key designs" during trial, and the court uses the same term here.

The "BBPOS encryption/DUKPT" key design is a modification of the standard encryption format, known as Triple DES DUKPT, which helps to protect data transmission from unwanted interception. The BBPOS encryption/DUKPT key design provided unique encryption, although it was not more secure than the traditional DUKPT.

Two of the key designs, namely the communication format and the BBPOS encryption/DUKPT key designs, aided BBPOS with customer retention through what BBPOS called "customer stickiness." By making it difficult for customers to switch to new software or hardware required for other products, BBPOS ensured that customers would continue to use BBPOS products.

### C. 2010-2011 - The Agreement Between ROAM and BBPOS for Licensing and Sale of the Circle Swipe Reader

In 2010 and 2011, BBPOS and ROAM entered into and then amended an Engineering Development and License Agreement (the "Agreement"). Tr. Ex. 1. The Agreement was primarily directed to the design, manufacturing and production of the Circle Swipe reader. The specific provisions are discussed below as relevant in the Conclusions of Law.

The Circle Swipe contained all five key designs.

### D. 2012 - ROAM's Contemplated Acquisition of BBPOS and the Acquisition Term Sheet

In early 2012, Graylin suggested that ROAM should acquire BBPOS.[3] On March 28, 2012, Lo, on behalf of BBPOS, and Graylin, on behalf of ROAM, signed a document entitled "Summary of Terms of Acquisition of BBPOS" ("Acquisition Term Sheet"). Tr. Ex. 75.

---

[3] At the time, ROAM was BBPOS's only customer.

The Acquisition Term Sheet stated that "[ROAM] and BBPOS agree[] that [BBPOS and ROAM] shall make no written or other private or public disclosures regarding this transaction or regarding the parties hereto without the prior written consent of the other party[.]" Id. The Acquisition Term Sheet also stated that the parties intended to close within thirty days of signing, and that BBPOS agreed to negotiate exclusively with ROAM regarding the acquisition until June 1, 2012.

On June 8, 2012, Lo wrote to Graylin that BBPOS had just received a large order for the Circle Swipe in China, and that he didn't want to continue with ROAM's acquisition of BBPOS, but that he wanted to remain "as is." Tr. Ex. 122 at 2. Graylin wrote to Ingenico Executive Vice President Christopher Coonen and Ingenico CEO Lazare (who together with Graylin constituted ROAM's board of directors), to express his frustrations that Ingenico had stymied ROAM's ability to close the deal with BBPOS. Shortly thereafter, Lazare threatened "to kill" BBPOS if Lo didn't agree to the purchase as offered. Day 6, 135:20-136:12.

BBPOS still did not agree to the offer and ROAM's acquisition of BBPOS did not occur.

E.   2012 – The "Pre-study" and BBPOS's Sharing of its Claimed Trade Secrets with Ingenico and ROAM Employees

In February 2012, before the Acquisition Term Sheet was signed, Graylin introduced Christopher Rotsaert to Lo to work together with BBPOS to develop a next generation EMV chip-card capable mPOS product. Rotsaert was a former Ingenico Operation Director and Graylin introduced Rotsaert to Lo as an Ingenico employee. Rotsaert referred to the project with BBPOS as a "pre-study" to explore the potential development of a next generation mPOS EMV product for ROAM as quickly as possible. Day 6, 51:9-19. As part of Ingenico's larger goal of developing an EMV reader, Ingenico was also considering "scenarios" involving development

by BBPOS and Ingenico together, BBPOS alone, and Ingenico and Fujian Landi Commercial Equipment Co Ltd ("Landi"), a Chinese manufacturer acquired by Ingenico.[4] Day 6, 50:4-13.

The Agreement between BBPOS and ROAM did not include development of the next generation product, and ROAM also had no agreement with Ingenico to develop the next generation product. Nonetheless, Graylin told Lo to share information with Ingenico and ROAM to come up with the new product, and as discussed below, BBPOS sent ROAM and Ingenico information directly via email, phone calls, and workshops.

On February 9, 2012, BBPOS, Ingenico, and ROAM held a workshop in Hong Kong to exchange information about BBPOS's designs. Jimmy Tang and Daniel Tsai from BBPOS attended, along with Rotsaert and Ingenico engineer Patrice Fivel. The workshop occurred over two days, and all five key designs were discussed. BBPOS communicated the information using drawings on a whiteboard (which Rotsaert and Fivel took pictures of), verbal description, draft papers, and exchange of copies of certain documents. Rotsaert was not asked to sign a non-disclosure agreement prior to the workshop. Nonetheless, Rotsaert did not believe that the information being shared at this or subsequent workshops was for unlimited use, but for the purpose of the joint product.

On February 13, 2012, Jerome Grandemange, an Ingenico Mobility Business Line Software Architect manager and lead engineer for Ingenico on the pre-study project, wrote to Lo and Tang asking for more information on the encryption algorithm. Tang responded with information on BBPOS's encryption, with a copy to Lo and Rotsaert, and after Grandemange

---

[4] As an Ingenico Operation Director from September 2010 to sometime in 2011, Rotsaert had worked with engineers and management at Landi.

asked a follow up question regarding a data format, Rotsaert requested a conference call for February 16, 2012, to discuss the encryption. Tang, at Lo's request, continued to participate in several calls per month throughout 2012 with Rotsaert and other engineers regarding the development project.

Also on February 16, 2012, Tang sent information regarding the communication format and BBPOS encryption/DUKPT to Rotsaert, with a copy to Grandemange, BBPOS firmware engineer Derek Chan, and Lo. Grandemange replied with a follow-up question, and Tang responded with more information on the communication format and BBPOS encryption/DUKPT key designs. Tang and Grandemange continued to exchange emails, with a copy to Rotsaert, Chan, and Lo, through February 21, 2023, and Rotsaert proposed a conference call for February 23, 2012. On February 28, 2012, Tang sent Rotsaert, with a copy to Grandemange, Chan, Lo, and another BBPOS email address, a copy of the "Swiper API Programming Guide for Android" Tr. Exs. 72, 73, which related to the communication format and BBPOS encryption/DUKPT key designs and contained proprietary information to BBPOS. The Guide had "RESTRICTED DOCUMENT" and "CONFIDENTIAL" markings on each page. Tr. Ex. 73.

On March 26, 2012, Rotsaert emailed Lo, copying Graylin, that "we may consider using one Landi platform" for the EMV reader, but that the Landi platform was new and not fully developed insofar as the "swipe, audio jack interface & power management are not ready." Tr. Ex. 791. Rotsaert suggested that he and Lo should discuss "how we could manage to move fast leveraging both teams" at the upcoming Cartes Asia trade show, and asked to set up a discussion between BBPOS, Rotsaert, and Landi. Id.

On April 26, 2012, Tang emailed Grandemange, with a copy to Lo (and an unidentified person named Christopher Miller), asking to set up a call. On at least one occasion, Tang had telephone conversations directly with Grandemange.

In April 2012, BBPOS and Ingenico held a second workshop in Hong Kong at BBPOS's office. Tang and Tsai from BBPOS, and Grandemange from Ingenico attended. Again, all five key designs were discussed, though this time with more focus on the communication formats and the BBPOS encryption/DUKPT.

On May 18, 2012, Rotsaert asked Lo, with a copy to Tsai, Chan, and Graylin, to send "all materials you have about swipe + EMV Chip product," including schematics and specifications, which related to the next generation product. Tr. Ex. 115; Day 3, 32:8-22:13. Rotsaert also wrote that he would confirm if he was going to set up a call or workshop with BBPOS and the Ingenico research and development team in Valence after to speaking with the Ingenico team.

As of July 1, 2012, Rotsaert was formally assigned to work part-time for ROAM as a project manager on the next generation product.[5]

In July 2012, BBPOS, ROAM, and Ingenico held a third workshop in France. Tsai and Chan attended on behalf of BBPOS, and Tang helped them prepare for the workshop.

On July 16, 2012, Tsai emailed Rotsaert a copy of a document entitled "Data Output Format for POS device," Tr. Ex. 400F, which contained information on the communication format key design. The document had "Confidential and Proprietary" markings on each page. On July 18, 2012, Tang emailed Rotsaert a document entitled "Two way communication," which

---

[5] Ingenico and ROAM each paid half of Rotsaert salary, beginning sometime in the latter half of 2012.

8

related to the automatic gain control key design. Tr. Exs. 144, 145; Day 4, 111:25-112:4. The document contained "Confidential and Proprietary" markings on each page.

F. *2012 - Rotsaert's Transfer of BBPOS's Intellectual Property to Ingenico and Graylin's Termination from ROAM*

Sometime in late July 2012, Rotsaert sent ROAM's design files and source code from BBPOS to Ingenico research and development in Valence, France, to work on Ingenico's own version of the EMV reader.

From August 29, 2012, to September 17, 2012, Graylin and Rotsaert exchanged a series of emails where Graylin expressed concern about the transfer of ROAM's data and BBPOS intellectual property to Ingenico. Rotsaert acknowledged that BBPOS had not agreed to provide any source code when other material was shared. Rotsaert justified the transfer of data, writing that "[i]n order to proceed to such development exercise [of an EMV reader] we obviously have to feed Ingenico with information" which he contended did not amount to a transfer of technology from ROAM to Ingenico. Tr. Ex. 175 at 1. Graylin admonished Rotsaert, writing that Rotsaert's "assumption that the reader IP belongs to ROAM was already incorrect," and again stated that intellectual property should not have been transferred to Ingenico. Id. Graylin also expressed his concerns about the transfer of intellectual property from ROAM to Ingenico with Coonan and Lazare. Tr. Ex. 172.

In mid-September 2012, ROAM's board terminated Graylin's employment with ROAM. Sometime thereafter, Graylin left Lo voice messages that he (Graylin) had been fired and advising Lo to "watch his back" because Ingenico intended to build a competing product. Day 3, 64:13-66:17. Graylin did not give Lo any specifics about the project or the competing product, and Lo did not take investigatory steps.

9

On November 10, 2012, Lo sent an email to Tsai and Tang telling them not to "disclose too much technical information" to ROAM's new project manager who was set to visit BBPOS. Tr. Ex. 186. Lo explained that Graylin had informed him that Ingenico passed on information to Landi to make a competing terminal, and that "[w]e should not trust any hardware guy from Ingenico or ROAM anymore." Id. Despite these concerns, Lo did not take any investigatory steps at this time.

G. *2012 - ROAM/Ingenico's Initial Development and Marketing of an EMV Reader*

Meanwhile, effective October 29, 2012, ROAM and Landi entered into a Development Agreement for an EMV reader called the RP350X. Tr. Ex. 214.[6]

In November or December 2012, ROAM's RP350X prototype was introduced at the Cartes trade show in Paris. The prototype used a BBPOS data format in a Landi device with a new casing. ROAM began to promote the product but did not ship it until approximately 2014. Lo could not recall if he was at the 2012 trade show, and that he did not see a device in the fall of 2012 that was similar to BBPOS's device.

H. *2013 - Further Warning from Graylin and Assurances from and Further Dealings with ROAM*

On January 1, 2013, Graylin advised Lo by email that Lo should not trust Lazare or ROAM's new CEO Ken Paull, and that Graylin had "heard Ingenico is now actively selling its solution instead of yours, including the EMV audio reader." Tr. Ex. 191 at 5. Graylin attached a copy of his November 29, 2012 complaint filed in Massachusetts Superior Court against Lazare,

---

[6] The Development Agreement states that Ingenico SA is also a party and that Ingenico SA is Landi and ROAM's "ultimate parent company and exercises sole control" of both. Tr. Ex. 214 at 1. However. no one signed the Development Agreement for Ingenico SA. See id. at 12.

which alleged that in the summer of 2012, Graylin learned that Rotsaert had sent designs and

trade secrets from BBPOS to Ingenico's research and development team in France.

Graylin's charge that Ingenico already had an EMV reader alarmed Lo, and Lo called

Bill Bachrach, ROAM's Chief Operating Officer, and asked him if ROAM was stealing

BBPOS's intellectual property. On January 19, 2013, ROAM CEO Paull emailed Lo that he had

heard from Bachrach that Lo was concerned about the Ingenico EMV prototype. Paull assured

Lo that "there is no commonality in terms of architecture, firmware, or power with the Ingenico

device as it is based off an existing Landi product." Tr. Ex. 200.

Although Lo was still skeptical of Paull, he took Paull's "word as a guarantee" because

Paull was the new CEO of ROAM. Day 6, 128:4-16. After the email, Lo did not take any further

investigative steps. Instead, based on Paull's assurance, BBPOS invested more support into

creating the next generation product, and continued working with ROAM and Ingenico on the

pre-study for the EMV reader through 2013 or 2014. In 2013, BBPOS received a small order

from ROAM for the next generation product,[7] and BBPOS hired more engineers.

> I.   *2013-2014 - ROAM/Ingenico's Further Development and Marketing of Products*

By May 7, 2013, BBPOS knew that ROAM wanted to sell a product that was competing

with BBPOS's "Walker" chip-card reader. Tr. Ex. 491 (email from Lo to Mitchell Cobrin and

Michael Kron of AnywhereCommerce that "ROAM wants to sell their EMV audio jack reader

from Landi (a product competing [sic] with Walker."); Day 7, 103:1-104:4 (Lo testified that by

---

[7] In a January 5, 2013 email, Graylin warned Lo that Ingenico may want to purchase BBPOS's
EMV solution temporarily until they could sell Landi's solution, but that Lo should not expect a
"huge volume." Tr. Ex. 191 at 1. Graylin advised Lo to "take their money while you can." Id.

the time of this email, he knew that ROAM wanted to sell a product that was competing with Walker).

In February 2014, BBPOS's distributor AnywhereCommerce, Inc., asked Lo for his opinion on ROAM/Ingenico's production, and whether they were using manufacturers other than BBPOS. Lo responded that "[y]ou should send them email telling that they are potential infringer…" Tr. Ex. 495. Lo testified that he thought there may be potential infringement because the ROAM/Ingenico product was an audio jack card reader.

In late 2014, Lo saw the RP350X at a trade show in Paris. Although Lo contends that he knew at that point that ROAM and Ingenico had stolen BBPOS's key designs, he didn't "have any energy to do anything." Day 6, 128:17-129:8. Sometime thereafter, BBPOS lost its business with Paypal to Ingenico, and Lo testified that this increased his suspicion that the RP350X device used BBPOS's key designs. In 2015, BBPOS hardware engineer Tsai finally bought the RP350X product and opened it up to examine the circuitry, confirming to BBPOS software engineer Tang that ROAM and Ingenico had used BBPOS's key designs. However, BBPOS continued to do business with ROAM under the Agreement, and said nothing to ROAM or Ingenico.

*J.   2014-2018 BBPOS's Financial Circumstances*

In 2014, BBPOS lost its largest Chinese customer to Landi.

Lo testified that BBPOS suffered financial hardship through 2018 and that to keep BBPOS afloat, he began fundraising and mortgaged his property. However, during that time frame, BBPOS had approximately $70 million in revenue, and was selling tens of millions of dollars of products to ROAM and Ingenico.

*K.   2017-2018 - ROAM and Ingenico Inc.'s Requests for Indemnification*

On January 19, 2017, Ingenico notified BBPOS that ROAM had received notice that its customer Comerica Inc. ("Comerica") had received a letter from REM Holdings 3, LLC ("REM Holdings 3"), alleging "that it is highly likely" that a product sold by Comerica "that employs the headphone jack on a cell phone to process credit card payments" infringes on one or both of two patents assigned to REM Holdings 3, LLC. Tr. Ex. 1146 at 2. Ingenico advised BBPOS that the card reader device at issue was provided to ROAM by BBPOS under the Agreement and asserted that BBPOS had a "duty to indemnify and hold harmless ROAM pursuant to Section 3.18 of the Agreement, and pursuant to the representations and warranties made in Sections 3.9 and 3.10." Id. at 1. The letter asked BBPOS to contact Ingenico's outside counsel, Attorney Kerry Timbers at Sunstein Kann Murphy & Timbers LLP ("Sunstein"), to confirm BBPOS's acknowledgement of its indemnification duties, and to discuss the matter further. On February 28, 2017, Ingenico sent a second letter, asserting that despite communications with BBPOS's president and CEO Alex Choi and BBPOS's attorney, BBPOS had not acknowledged its indemnification duties. Ingenico stated that ROAM "will submit [Sunstein's] invoices for legal services relating to this matter to BBPOS for payment" and that "ROAM Data's counsel will keep BBPOS reasonably informed of the progress of the Comerica matter and inform BBPOS prior to the completion of any settlement." Tr. Ex. 1147. The record includes no further communications regarding this matter for over a year and a half.

On October 4, 2018, Ingenico sent BBPOS a letter notifying BBPOS of a lawsuit filed by MobilePay LLC against PayPal, Inc., a week earlier in the Western District of Texas alleging patent infringement by the PayPal Mobile Card Reader. Ingenico's letter to BBPOS stated that the referenced device was sold to Ingenico by BBPOS under the Agreement, and again sought

acknowledgment of BBPOS's indemnification duties. In 2019, Ingenico Inc. and MobilePay entered into a settlement agreement under which Ingenico Inc. paid $100,000 to resolve the dispute.

On October 22, 2018, Ingenico notified BBPOS that Ingenico had received notice that two of its customers—Blackbaud, Inc., ("Blackbaud") and Total Merchant Services, Inc., ("TMS") (together with its parent North American Bancard, LLC, ("NAB"))—had received letters from Blackbird Technologies ("Blackbird") alleging potential infringement. Blackbird's letter to Blackbaud alleged patent infringement by Blackbaud's "MobilePay" device. Tr. Ex. 351 at 4. Blackbaud's letter to Ingenico Inc. claimed that ROAM supplied the mobile card reader hardware and the ROAMswipe API under a 2012 Agreement between ROAM and Blackbaud, and that Ingenico, as a successor to ROAM, had an obligation to indemnify Blackbaud. Id. at 3.[8] According to a letter from TMS/NAB to Ingenico, Blackbird's letter to TMS and NAB alleged patent infringement by TMS and NAB's "Payment Jack audio jack-based card reader products and associated services," which TMB and NAB claimed were supplied by Ingenico pursuant to two 2010 reseller agreements between TMS and NAB and ROAM. Id. at 7. Similarly, TMS and NAB also notified Ingenico of its indemnification duties and responsibilities.[9] Ingenico's letter to BBPOS regarding these two matters again claimed that the devices cited in the letters from Blackbird were provided to Ingenico by BBPOS under the Agreement and sought acknowledgment from BBPOS of its indemnification duties. However, Timbers conceded at trial that the matters involved both BBPOS and non-BBPOS products.

---

[8] Blackbaud's letter to Ingenico is dated August 6, 2018.

[9] TMS/NAB's letter to Ingenico is dated August 22, 2018.

On October 26, 2018, Ingenico notified BBPOS that REM Holdings 3 had also sent letters to ROAM's clients Capital One, N.A., Elavon, Inc., Total System Services, Inc., PayPal, Inc. and TMS/NAB[10] alleging patent infringement on products Ingenico claims were sold to Ingenico by BBPOS under the Agreement.

For all of the REM Holdings 3 matters, including the indemnification claim from Comerica and the matter involving the six additional companies, the products at issue involved both BBPOS and non-BBPOS products.

On November 2, 2018, BBPOS's counsel sent Timbers a letter requesting more information on the indemnification demands.[11] Timbers did not respond to BBPOS's letter.

Sunstein submitted its invoices to Ingenico for the work performed for the four matters. BBPOS did not reimburse Ingenico for any costs associated with the four matters.

## II.  Conclusions of Law

### A.  BBPOS's Claim - Violation of the Georgia Trade Secrets Act, O.C.G.A. § 10–1–760, et seq.

BBPOS claims that ROAM, now Ingenico Inc., and the other Ingenico entities misappropriated BBPOS's key designs in the development and sale of their products. Ingenico responds that BBPOS's suit was not filed within the statute of limitations and is also barred by

---

[10] TMS/NAB sent Ingenico its notification letter and request for indemnification on the REM Holdings 3 claim on August 22, 2018, the same day it sent the letter regarding the Blackbird matter. The evidence presented at trial does not indicate when Capital One, N.A., Elavon, Inc., Total System Services, Inc., and PayPal, Inc., notified Ingenico. However, the underlying letter from REM Holdings 3 to Elavon, Inc., is dated July 5, 2017, and the letters from REM Holdings 3 to Capital One, N.A., and PayPal Inc. are dated October 5, 2017.

[11] The letter claimed that BBPOS's counsel had attempted to reach Timbers several times, including on October 19, 2018, by voicemail and follow up email.

15

the doctrine of laches, that none of the key designs are protected trade secrets, and that Ingenico and ROAM did not misappropriate any of the key designs. In response to the affirmative defenses, BBPOS argues that it did not discover the misappropriation until 2014, bringing its claim within the five-year statute of limitations, see O.C.G.A. § 10-1-766, and that a laches defense is inapplicable under the GTSA. The court starts (and ends) with Ingenico's defenses.

    1.   Statute of Limitations

Claims under the GTSA are subject to a five-year statute of limitations which begins to run when "the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." O.C.G.A. § 10-1-766. Under Georgia law, "the statute of limitations does not begin to run until the plaintiff knows (or reasonably should know) the cause of her injury." M.H.D. v. Westminster Schs., 172 F.3d 797, 804 (11th Cir. 1999). "On the other hand, if certain facts necessary to the claim are unavailable even to a reasonably diligent plaintiff, the limitations period is tolled until the facts do become available." Porex Corp. v. Haldopoulos, 284 Ga. App. 510, 516–17, 644 S.E.2d 349 (Ga. Ct. App. 2007) (internal citations and quotations omitted).

BBPOS initiated proceedings in this case on December 20, 2018. The court considers whether BBPOS reasonably should have known about of ROAM and Ingenico's alleged misappropriation by December 2013.

By March 26, 2012, Lo was on notice that ROAM and Ingenico were considering using the Landi platform for an EMV reader. Tr. Ex 791 at 1 (Rotsaert email asking Lo to discuss "how we could manage to move fast leveraging both teams."). Although Lo knew that Landi was potentially involved in developing an EMV reader, and that Rotsaert may have even wanted BBPOS and Landi to work together, Lo did not yet have reason to know that ROAM or Ingenico were potentially using BBPOS's key designs.

ROAM and Ingenico introduced the RP350X prototype at the Cartes trade show in November or December 2012, but the device was non-functional, and would not reasonably put BBPOS on notice that the new prototype potentially contained BBPOS's key designs.

When Lo received warnings from Graylin, who had just been terminated by ROAM, about ROAM and Ingenico potentially misappropriating BBPOS's trade secrets in November 2012, Lo told his staff to not share technical information with ROAM's new project manager but took no steps to investigate. However, after he received Graylin's email on January 1, 2013, which contained more specific allegations of misappropriation and attached Graylin's complaint against Ingenico, Lo called ROAM'S COO Bachrach to ask if ROAM was using BBPOS's key designs. Shortly thereafter, on January 19, 2013, Paull, ROAM's new CEO, assured Lo that the new Landi product did not use BBPOS's key designs. Given this assurance, BBPOS had no further obligation to investigate at this time.

By May 7, 2013, however, Lo knew that ROAM and Ingenico wanted to sell a competing audio-jack product made by Landi. With this knowledge that ROAM and Ingenico were potentially using audio-jack technology, BBPOS should have investigated further but failed to do so.

BBPOS argues that it was not on notice of the alleged misappropriation until Lo saw the RP350X at a trade show in Paris in approximately November 2014. The statute of limitations, however, runs when "by the exercise of reasonable diligence" the alleged misappropriation should have been discovered. O.C.G.A. § 10-1-766. By May 2013, BBPOS knew that Ingenico/ROAM was trying to sell a competing product on the market, and Lo told AnywhereCommerce his concerns about the competing product. Accordingly, where BBPOS should reasonably have discovered the alleged misappropriation by May 2013, and where

BBPOS did not initiate proceedings in this case until December 2018, BBPOS's claims do not fall within the five-year statute of limitations under the GTSA.

2. Laches

Ingenico alternatively argues that even if BBPOS brought its claim within the statute of limitations, the claim is barred where BBPOS waited approximately four years to take action after learning of the alleged misappropriation. BBPOS argues that laches is inapplicable as a defense to a statutory claim, and even if it did apply, BBPOS did not unreasonably delay in bringing its claims.

As an initial matter, a laches defense to a claim for unjust enrichment under the GTSA is not barred as a matter of law. BBPOS primarily relies on SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC, 580 U.S. 328 (2017). In SCA, the Supreme Court concluded that a claim for damages brought within the statute of limitations under the Patent Act, 35 U.S.C. § 286, could not be precluded under the doctrine of laches, just as laches could not preclude a claim for damages brought within the Copyright Act's 3-year statute of limitations. Id. at 346 (citing Petrella v. Metro–Goldwyn–Mayer, Inc., 572 U.S. 663, 675-77 (2014)). The Court explained that "[t]his case turns on the application of the defense to a claim for damages, a quintessential legal remedy." SCA, 580 U.S. at 334 (emphasis added). Here, although the cause of action is statutory and does allow for damages as a remedy, BBPOS only seeks unjust enrichment, an equitable remedy. See Commodity Futures Trading Comm'n v. Wilshire Inv. Mgmt. Corp., 531 F.3d 1339, 1345 (11th Cir. 2008) ("The equitable remedy of restitution does not take into consideration the plaintiff's losses, but only focuses on the defendant's unjust enrichment."). Notably, BBPOS has not identified, and the court has not found, any case applying SCA to a claim under the Uniform Trade Secrets Act, or Georgia's adopted version.

18

Instead, at least one other court has found that laches could apply to a trade secret claim. See e.g., Danaher Corp. v. Lean Focus, LLC, 2021 WL 3190389, at *10 (W.D. Wis. July 28, 2021) (analyzing a laches defense to a trade secret claim, noting that "the Seventh Circuit did *not* hold that there is no role for laches in the context of a trade secret misappropriation claim.") (emphasis in original).

"To prove the affirmative defense of laches under Georgia law, a defendant must show it would be inequitable to allow the plaintiff to enforce his legal rights." Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1207 (11th Cir. 2008). "Whether laches should apply depends on a consideration of the particular circumstances, including the length of the delay in the claimant's assertion of rights, the sufficiency of the excuse for the delay, the loss of evidence on disputed matters, [and] the opportunity for the claimant to have acted sooner ...." Id. (quoting Whiten v. Murray, 267 Ga. App. 417, 422, 599 S.E.2d 346 (Ga. Ct. App. 2004)); see City of Dalton v. Carroll, 271 Ga. 1, 1, 515 S.E.2d 144 (1999) (listing similar factors). Although a determination of laches is a fact specific inquiry, "[l]aches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Costello v. United States, 365 U.S. 265, 282 (1961).

Based on the evidence presented at trial, the court finds that BBPOS unreasonably delayed in bringing its claims for misappropriation against ROAM and Ingenico. Lo understood by November 2014 that ROAM and Ingenico had misappropriated BBPOS's key designs. Nonetheless, BBPOS did not take any action for more than four years. Further, BBPOS's excuse for the delay, namely that BBPOS was not in a financial position to initiate a lawsuit, is insufficient. Even if BBPOS's financial situation was precarious in 2014, BBPOS took no action

between the discovery of the alleged misappropriation and initiating the case, failing to avail itself of even low-cost actions such as sending a cease-and-desist letter to ROAM or Ingenico.

Although BBPOS argues that ROAM and Ingenico should be barred from asserting a laches defense by nature of ROAM and Ingeinco's own unclean hands, unclean hands that did not contribute to the delay have no bearing on the availability of the defense. See Coffey v. Braddy, 834 F.3d 1184, 1190 ("It is true that a defendant may not be able to base a defense on laches if the defendant contributed substantially to the delay in the filing of the suit or if the delay results from the defendant's concealing or misrepresenting facts."). Here, even if ROAM and Ingenico did misappropriate BBPOS's key designs, those bad acts do not relate to BBPOS's delay in bringing suit, and thus do not preclude a laches defense. And the one time-related bad act—ROAM's allegedly false assertion in January 2013 that the new Landi product did not use BBPOS's key designs—was not the cause of delay after November 2014.

Further, where BBPOS is seeking as a remedy unjust enrichment in the amount of Ingenico Inc.'s gross profits, BBPOS's delay in bringing its claim is prejudicial to Ingenico. Had BBPOS alerted ROAM or Ingenico of BBPOS's contention that ROAM and Ingenico had misappropriated BBPOS's key designs, ROAM and Ingenico could have taken the opportunity to cure any misappropriation, particularly where at least some of the key designs (such as those related to stickiness) were not necessarily complicated or highly technical solutions. Instead, BBPOS sat on its rights for more than four years after it knew of the alleged misappropriation while ROAM and Ingenico had produced and sold large amounts of the products. Allowing BBPOS's unjust enrichment claim to go forward would be unduly prejudicial. See Black v. Barnes, 215 Ga. 827, 829, 114 S.E.2d 38 (1960) ("Where, as in this case, the parties delayed bringing their action until such time as the defendant had expended large sums for materials and

20

labor, and the building had progressed substantially according to the plan thereof, the plaintiffs are estopped by their acquiescence, or failure to proceed promptly.").

For example, the court in <u>Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC</u>, 7 F.4th 989, 1011 (11th Cir. 2021), affirmed the district court's finding of undue prejudice under a laches defense to a trademark infringement case because "if [defendant] had known of [plaintiff's] infringement and unfair competition claims sooner, it could have redirected its resources into promoting its business and brand under a different name during the four years it continued to promote the [claimed mark] after [plaintiff] should have known of its infringement and unfair competition claims." Here, allowing BBPOS to recover profits from products it believed infringed on its rights, but did nothing about, is the type of inequitable recovery laches seeks to prevent. <u>See</u> <u>Danaher Corp</u>. 2021 WL 3190389, at *11 ("[W]hether plaintiff's delay was reasonable turns on the reasonableness of its sitting on a claim to see if [defendant] would again attempt to use the trade secrets in a way that will make the lawsuit worthwhile to pursue….[C]ourts are reluctant to find reasonable delay where a plaintiff apparently waits to file until a defendant's business is a success."); <u>see also</u> 6 McCarthy on Trademarks and Unfair Competition § 31:14 (5th ed.) ("A trademark owner cannot simply wait without explanation to see how successful the defendant's business will be and then ask for an injunction to take away good will developed by defendant in the interim.").

Accordingly, BBPOS's claim is prohibited by laches where BBPOS unreasonably waited to take any action after it concluded in 2014 that ROAM and Ingenico had misappropriated its trade secrets, and where such delay unduly prejudiced Ingenico.

### 3. Motion for Judgment on Partial Filings

Ingenico made an oral motion for a judgment on partial filings pursuant to Federal Rule of Civil Procedure 52(c) at the close of BBPOS's case. The court reserved judgment on that motion until trial was complete and post-trial motions briefed. In light of the court's findings on Ingenico's defenses to BBPOS's claim, this motion is now denied as moot.

### B. Ingenico Inc.'s Counterclaim – Breach of Contract

Ingenico Inc. counterclaims that BBPOS breached the Agreement by failing to indemnify and hold Ingenico Inc. harmless for four matters involving third-party patent infringement claims relating to products sold by Ingenico Inc. and produced by BBPOS under the Agreement. Those matters were: (1) the REM Holdings 3 matter against Comerica (the "REM Holdings 3/Comerica matter"); (2) the REM Holdings 3 matter against Capital One, N.A., Elavon, Inc., Total System Services, Inc., PayPal, Inc., and TMS/NAB (the "REM Holdings 3 matter"); (3) the Blackbird matter against Blackbaud and TMS/NAB (the "Blackbird matter"); and (4) the MobilePay matter against PayPal (the "MobilePay matter"). Ingenico Inc. seeks damages for its legal fees incurred in defending the four matters, along with a settlement payment it made in the MobilePay matter. BBPOS argues that any claim for breach of contract is barred by Ingenico Inc.'s prior material breach, and that Ingenico Inc. has not proved its damages with reasonable certainty. Again, the court starts with the affirmative defense.

### 1. Material Breach Defense

"It is well established that a material breach by one party excuses the other party from further performance under the contract." Ward v. Am. Mut. Liab. Ins. Co., 15 Mass. App. Ct. 98, 100, 443 N.E.2d 1342 (Mass. App. Ct. 1983). A breach is material if it is a breach of "an essential and inducing feature of the contracts." Buchholz v. Green Bros. Co., 272 Mass. 49, 52,

172 N.E. 101 (1930). Conversely, "[w]hen a party to an agreement commits an immaterial breach of that agreement, the injured party. . .may not stop performing its obligations under the agreement." Lease–It, Inc. v. Mass. Port Auth., 33 Mass. App. Ct. 391, 396, 600 N.E.2d 599 (Mass. App. Ct. 1992).

BBPOS alleges that ROAM, and Ingenico Inc. as a successor to ROAM, disclosed or used the key designs in breach of duties of confidentiality under the Agreement. BBPOS contends that ROAM breached two confidentiality provisions under the Agreement – namely Sections 6.1[12] and 6.3[13] – by disclosing key designs to Ingenico and Landi for purposes not contemplated by the Agreement, and by instructing BBPOS to share its key designs with

---

[12] Section 6.1 of the Agreement between BBPOS and ROAM states "Both parties agree to treat the other party's Confidential Information…as confidential, to take all reasonable measures to protect and prevent the disclosure of and/or unauthorized use by third parties of the other parties' Confidential Information, to exercise at least the same degree of care exercised for the protection of its own Confidential Information, and to not use Confidential Information other than for its intended purpose under this Agreement." Confidential Information is defined in Section 6.2 of the Agreement as "information (whether written or oral) of a confidential or proprietary nature concerning this Agreement or the assets, products or business of any party hereto that either party shall have obtained as a result of discussions or communications related to this Agreement or the transactions contemplated undertaken by this Agreement, including (but not limited to) in the case of [ROAM], the technical and other information concerning the Products and Devices and related documentation….Also without limiting the generality of the foregoing, if either party hereto receives from the other party written information that is marked "Confidential" and/or "Proprietary," such information shall be deemed "Confidential Information…."

[13] Section 6.3 states "Notwithstanding any provision herein to the contrary, a party may disclose Confidential Information on a need-to-know basis to its contractors, lawyers, accountants and agents, provided that any such person is bound by a duty of confidentiality, and such party shall be responsible for any disclosure or use by any such third party in contravention thereof…."

Ingenico pursuant to Section 3.1[14] without ensuring Ingenico's confidential treatment of the key designs.

Under the Agreement, ROAM was permitted to use the key designs, which were incorporated in the CircleSwipe sold under the Agreement, "to make, have made, develop, have developed, use, sell, offer for sale, import and distribute the Products,[15] any portion thereof, or any products similar to or based upon any Products." Tr. Ex. 1 at 12. A second portion of the confidentiality terms governed the disclosure of other information marked confidential and/or proprietary, whether they involved the Products or Devices or not. Id. at 6. Thus, ROAM was permitted to use the key designs for purposes of the CircleSwipe, including "any variance of the design," and in that event, ROAM was required to pay BBPOS the royalty included under Schedule II of the Agreement. Id. at 10-11. But ROAM was not permitted to "use Confidential Information other than for its intended purpose under this Agreement," and was not permitted to share Confidential Information with third parties, such as Ingenico. Id. at 6. Where Rotsaert sent ROAM's design files and source code in 2012 to Ingenico research and development in Valence, France, to work on Ingenico's own version of the EMV reader, ROAM was in breach of the Agreement.

But BBPOS has failed to demonstrate that this breach was material, or in the alternative, that BBPOS did not waive this defense. Despite learning from Graylin in late 2012 and early

---

[14] Section 3.1 states "[BBPOS] shall promptly provide and deliver to [ROAM] the Products, Devices, Services or other work product ordered or requested by [ROAM] as specified herein or in any SOW (collectively, the 'Deliverables')." Tr. Ex. 1 at 2.

[15] The "Products" also included an "EMV capable POS unit," referred to as the "BBPOS." This product refers to a POS terminal, versus the mPOS products at issue here, and is not relevant to the dispute. Id. at 10.

2013 that Rotsaert had disclosed BBPOS's confidential information, having reason to believe

that ROAM and Ingenico were using that confidential information by May 2013, and concluding

further in 2014 that ROAM and Ingenico were using BBPOS's key designs, BBPOS continued

to do business with ROAM and did not terminate the Agreement.

Where BBPOS continued to perform under the Agreement despite the breach, without

any action or notice to Ingenico Inc., a prior breach by Ingenico Inc. cannot excuse BBPOS from

nonperformance. See 14 Williston on Contracts § 43:15 (4th ed.) ("When there has been a

material failure of performance by one party to a contract, so that a condition precedent to the

duty of the other party's performance has not occurred, the latter party has the choice to continue

to perform under the contract or to cease to perform and conduct indicating an intention to

continue the contract in effect will constitute a conclusive election, in effect waiving the right to

assert that the breach discharged any obligation to perform."); see also DeMarie v. Neff, 2005

WL 89403, at *5 (Del. Ch. Jan. 12, 2005) ("[T]he nonbreaching party may not, on the one hand,

preserve or accept the benefits of a contract, while on the other hand, assert that contract is void

and unenforceable."). Accordingly, BBPOS's indemnity obligations under the Agreement are not

excused by Rotsaert's earlier disclosure of BBPOS's confidential information.

### 2. Claim for Indemnification

To state a claim for breach of a written contract under Massachusetts law,[16] a plaintiff

must prove that "a valid, binding contract existed, the defendant breached the terms of the

contract, and the plaintiff[] sustained damages as a result of the breach." Brooks v. AIG

SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007). Neither party disputes here

---

[16] The Agreement contains a Massachusetts choice of law provision. Tr. Ex. 1 at 8.

that the Agreement is a binding contract between BBPOS and Ingenico Inc. as the successor to ROAM. Under sections 3.9 and 3.10 of the Agreement, BBPOS warranted that it had intellectual property rights to sell its products and that none of its products infringe the intellectual property rights of any other products. Under section 3.18, BBPOS backed up those promises with the following indemnification provision:

> [BBPOS] agrees to indemnify and hold [ROAM] harmless from any and all losses, costs, liabilities, or expenses (including court costs and reasonable fees of attorneys and other professionals) arising out of or resulting from the breach any warranty, representation or other provision of this Agreement by [BBPOS] or arising out of or resulting from any claim brought by a third party against [ROAM] as a result of or relating to any actual or alleged breach hereof.

Tr. Ex. 1 at 5. In other words, BBPOS agreed to indemnify ROAM from any claim brought by a third party "as a result of or relating to any actual or alleged breach" of its representation that the products did not infringe on the rights if a third party. Id.

As to each of the four matters, a third party sent a letter to a client of Ingenico Inc. claiming infringement by that client's product, and the client in turn has made a claim on Ingenico Inc., which in turn has claimed that the claimed infringement relates to a product supplied by BBPOS. BBPOS does not dispute that these letters are claims under the Agreement, and BBPOS has not indemnified Ingenico Inc. for these claims. Accordingly, BBPOS has breached the Agreement. Further, Ingenico demonstrated that it sustained harm, namely legal fees and settlement payments, from defending the matters.[17]

---

[17] Where BBPOS did not brief other potential defenses to Ingenico Inc.'s counterclaim, such as insufficient notice to BBPOS, failure to respond to BBPOS's request for information, the scope of BBPOS's indemnification duties, and/or improper recovery of fees incurred both prior to notice and after BBPOS request for information more information, those arguments are waived.

"A plaintiff in an action for breach of contract is entitled in general to damages sufficient in amount to compensate him for the loss actually sustained by him and to put him in as good a position financially as he would be in had there been no breach." F.A. Bartlett Tree Expert Co. v. Hartney, 308 Mass. 407, 411, 32 N.E.2d 237 (1941). A plaintiff bears the burden establishing damages with reasonable certainty by a preponderance of the evidence. Restatement (Second) of Contracts § 352 (1981); Coady v. Wellfleet Marine Corp., 62 Mass. App. Ct. 237, 245, 816 N.E.2d 124 (Mass. App. Ct. 2004) ("The plaintiff has the burden of proving his damages with reasonable certainty.") (internal quotations omitted). Although damages must not be calculated with mathematical precision, they "may not be determined by mere speculation or guess." Agoos Leather Cos. v. Am. & Foreign Ins. Co., 342 Mass. 603, 608, 174 N.E.2d 652 (1961).

Where Sunstein's counsel testified at trial that the MobilePay matter only involved BBPOS products, and BBPOS presented no conflicting evidence, Ingenico Inc. has established with reasonable certainty that it incurred, and paid, $64,444.97 in legal fees from Sunstein for services related to BBPOS products rendered on the MobilePay matter between September 29, 2018, and July 15, 2019. Ingenico Inc. also proved by a preponderance of the evidence that it incurred a loss of $100,000 payment pursuant to the settlement between Ingenico Inc. and MobilePay. Accordingly, Ingenico Inc. is entitled to contract damages in the amount of $164,444.97, for BBPOS's failure to indemnify Ingenico Inc. for the MobilePay matter.

However, Ingenico Inc. has not proven its damages with specificity for the REM Holdings 3/Comerica, REM Holdings 3, or Blackbird matters. The uncontested evidence at trial demonstrates that the allegedly infringing products in the REM Holdings 3/Comerica, REM Holdings 3, and Blackbird matters included both BBPOS-produced and non-BBPOS produced products. Ingenico Inc.'s invoices for these matters did not apportion the work spent defending

27

claims against BBPOS-produced products versus time spent defending other products. At trial, Ingenico Inc. made no effort to establish its damages under the Agreement with reasonable certainty beyond Sunstein counsel's overall estimate that 80% of the products at issue in the REM Holdings 3 matters involved BBPOS's products. But 80% of the products does not necessarily translate to 80% of the legal work. Where Ingenico Inc. did not produce any apportionment of fees incurred in defending third-party infringement claims based on different products, Ingenico Inc. did not sufficiently meet its burden of proving its damages for the REM Holdings 3/Comerica, REM Holdings 3, and Blackbird matters with reasonable certainty.

### III.   Conclusion

For the foregoing reasons, the court will enter judgment for Ingenico and against BBPOS on BBPOS's claims against Ingenico for misappropriation of trade secrets, and in favor of Ingenico Inc.'s and against BBPOS on Ingenico Inc.'s counterclaim against BBPOS for breach of contract in the amount of $164,444.97.

July 14, 2023                                        /s/ Indira Talwani
                                                    United States District Judge